**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)
Louis Gottlieb (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Jeffrey A. Dubbin (SBN 287199)
Wendy Tsang (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
ivasilchenko@labaton.com
jdubbin@labaton.com
wtsang@labaton.com

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

**BERMAN DEVALERIO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SECURITIES LITIGATION,<br><br>This Document Relates to:<br><br>All Actions. | Master File No. 3:15-cv-04883-BLF<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. Defendants ..... 10

IV. CONTROL PERSON ALLEGATIONS ..... 11

V. SUBSTANTIVE ALLEGATIONS ..... 13

A. Extreme's Business Overview ..... 13

B. Start of Class Period: Extreme Acquires Enterasys, Emphasizing the Integration and the Synergies to Be Obtained ..... 14

C. Throughout the Class Period, Defendants Repeatedly Assured the Market that Extreme's Integration of Enterasys Was "On Track" and Progressing Smoothly ..... 16

1. January 13, 2014 – Company Releases Combined Pro Forma Financials ..... 16

2. February 5, 2014 – Q2 2014 Results ..... 17

3. May 6, 2014 – Q3 2014 Results ..... 18

4. July 21, 2014 – Q4 2014 Revised Guidance ..... 19

5. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results ..... 19

6. October 15, 2014 – Prerelease of Q1 2015 Results ..... 20

7. October 28, 2014 – Q1 2015 Results ..... 20

8. December 17, 2014 – Bernstein Technology Innovation Summit ..... 21

9. January 28, 2015 – Q2 2015 Results ..... 21

D. Defendants Repeatedly Touted Extreme's Partnership with Lenovo ..... 22

1. Inception of the Lenovo Partnership ..... 22

2. February 5, 2014 – Q2 2014 Results ..... 23

3. May 6, 2014 – Q3 2014 Results ..... 24

4. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results ..... 24

5. October 15, 2014 – Prerelease of Q1 2015 Results ... 25

6. October 28, 2014 – Q1 2015 Results ... 25

7. January 28, 2015 – Q2 2015 Results ... 26

E. Defendants Promoted the Company's Integration of Enterasys and Its Lenovo Relationship as Key Aspects of a "Commitment" Announced to Investors: to Achieve Double-Digit Revenue Growth and 10% Profit Margin By June 2015. ... 27

1. Extreme Announces Its "Goal" of 10% Profit Margin By June 2015. ... 27

2. Extreme's "Goal" Becomes a "Commitment" to Achieve *Both* Double-Digit Revenue Growth *and* 10% Profit Margin by June 2015. ... 27

3. Extreme Began to Distance Itself From Its "Commitment" ... 29

F. End of Class Period: Extreme Announces Missed Guidance and Termination of Jeff White ... 31

G. Post Class-Period Revelations ... 33

H. The Company Experienced Substantial Integration Problems and Adverse Impact on Sales ... 36

1. Defendants' Representations About the Acquisition Were Never Fulfilled and Lacked Reasonable Basis When Made. ... 36

2. Defendants Experienced But Did Not Disclose Substantial Integration Problems During the Class Period. ... 39

3. The Company Experienced Significant Executive Turnover During the Class Period Related to Its Substantial Integration Problems ... 43

I. Defendants Lacked Any Reasonable Basis to Believe That the Lenovo Partnership Would Positively Impact Extreme's Revenue ... 46

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ... 47

A. Misstatements and Omissions Regarding the Enterasys Integration ... 47

1. September 12, 2013 – Business Update Conference Call ... 47

2. November 4, 2013 – Q1 2014 Press Release and Earnings Call ... 49

3. February 5, 2014 – Q2 2014 Press Release and Earnings Call – The Truth Partially Emerges but Defendants Continue to Mislead the Market ... 52

4. May 6, 2014 – Q3 2014 Press Release and Earnings Call – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market ........ 58

5. June 2, 2014 – Press Release ........ 61

6. July 21, 2014 – Press Release ........ 63

7. August 14, 2014 – Q4 2014 Press Release and Earnings Call ........ 65

8. October 15, 2014 – Press Release – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market ........ 70

9. October 28, 2014 – Press Release and Earnings Call ........ 73

10. December 17, 2014 – Bernstein Technology Innovation Summit ........ 77

11. January 14, 2015 – Needham Growth Conference – the Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market ........ 79

12. January 28, 2015 – Q2 2015 Earnings Call ........ 81

13. April 9, 2015 – The Truth Is Revealed ........ 84

B. Misstatements and Omissions Regarding the Lenovo Partnership ........ 85

1. November 4, 2013 – Q1 2014 Earnings Call ........ 85

2. February 5, 2014 – Q2 2014 Earnings Call ........ 87

3. May 6, 2014 – Q3 2014 Earnings Call ........ 88

4. August 14, 2014 – Q4 2014 Earnings Call ........ 89

5. October 15, 2014 – Press Release ........ 90

6. October 28, 2014 – Q1 2015 Earnings Call ........ 91

7. January 14, 2015 – Needham Growth Conference – The Truth Partially Emerges but Defendants Continue to Mislead the Market ........ 94

8. January 28, 2015 – Q2 2015 Earnings Call ........ 95

9. April 9, 2015 – The Truth Is Revealed ........ 97

VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ........ 98

A. Defendant Berger's Unique Compensation Scheme ........ 98

B. Confidential Witnesses ........ 99

C. The Integration of Enterasys Was Followed Closely by Senior Management ........ 100

D. Extreme Utilized Sophisticated Programs to Closely Monitor and Analyze Its Revenues and Predict Future Earnings During the Class Period .................. 102

VIII. CLASS ACTION ALLEGATIONS .................................................................................. 103

IX. LOSS CAUSATION ........................................................................................................ 105

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........................................................................................ 108

XI. NO SAFE HARBOR ........................................................................................................ 109

A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking ........................................................................................ 110

B. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........................................................................................ 110

C. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ........................................................................................ 111

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................................................ 112

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Berger, Arola and Kurtzweil ........................................................................................ 113

XII. PRAYER FOR RELIEF ........................................................................................................ 115

XIII. JURY DEMAND ........................................................................................................ 115

Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Extreme Networks, Inc. ("Extreme" or the "Company") and Charles W. Berger, Kenneth B. Arola, and John T. Kurtzweil (collectively, the "Individual Defendants," described more fully below) (together with Extreme, the "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Extreme and the Individual Defendants; (ii) research reports issued by financial analysts concerning Extreme's business; (iii) reports filed publicly by Extreme with the Securities and Exchange Commission (the "SEC"); (iv) an investigation conducted by and through Lead Plaintiff's attorneys, which included interviews of numerous former employees of Extreme on a confidential basis; (v) news articles, media reports, and other publications concerning the networking technology industry and markets; and (vi) other publicly available information and data concerning Extreme, its securities, and the markets therefor. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from September 12, 2013 through April 9, 2015 inclusive (the "Class Period"), purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Extreme during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Extreme's employee retirement and benefit plan(s); and (vi)

the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

2. Extreme develops and sells network infrastructure equipment. Its main products include wired and wireless devices for accessing the Internet, as well as relevant software. The Company also offers related services contracts for extended warranty and maintenance of its equipment. Together, equipment sales and service contract payments constitute "substantially all" of the Company's revenue. Its domestic and international customers include businesses such as hospitals, hotels, universities, sports venues, and telecommunications companies, as well as government agencies.

3. Enterasys Networks, Inc. ("Enterasys") was a privately held company headquartered in Salem, New Hampshire, that also sold network infrastructure equipment and software, including analytics and security products. Enterasys was a direct competitor of Extreme's.

4. Extreme announced its acquisition of Enterasys on September 12, 2013 and completed it on October 31, 2013 for $180 million, net of cash acquired. The acquisition roughly doubled the size of the Company, and the Company described it as a "merger of equals." On the September 12, 2013 conference call where Extreme announced the acquisition, Defendant CEO Charles Berger ("Berger") represented to investors that the Company conducted "several months of due diligence" as well as a "detailed analysis of the revenue sources for both Companies" leading up to the acquisition. On the same call, he guaranteed investors that: "***There will be no disruption in customers' ability to grow and operate their networks. Period. None***."[1] He further promised that the acquisition "will certainly be transformational for our Companies, the industry, and ***create significant value for the Extreme shareholders***."

[1] All emphasis is added unless otherwise noted. **Bold** emphasis is used for general emphasis; ***bold and italics*** are used specifically to denote statements alleged to be false and misleading, as specified in Section VI, *infra*.

5. Defendant CFO John T. Kurtzweil ("Kurtzweil") similarly stressed that management had a plan to "fully integrate[] the two Teams" and then "reduce product costs and operating expenses between $30 million to $40 million," telling investors they could "expect to realize these synergies over a 12 to 24-month period."

6. During the Class Period, Extreme's business model depended primarily on selling its products and services through other companies called "channel partners." Indeed, because Extreme sold its products primarily through partners in these arrangements, the Company described its business during the Class Period as "partner-driven." One such partnership was with the global technology company Lenovo Group Ltd. ("Lenovo"), which Extreme announced for the first time on July 17, 2013.

7. Throughout the Class Period, Defendants repeatedly highlighted the Lenovo relationship to investors as one of the Company's "key partnerships" as well as a key "growth driver." For example, on a February 5, 2014 conference call, when CEO Berger was asked to describe the Company's partnerships responsible for over 10% of revenue, he responded: "The two large ones are really Ericsson ***and Lenovo going forward***." Lenovo was touted as being particularly important due to its expanding server business—for example, Extreme claimed to be Lenovo's "only networking partner" and publicized the relationship "as tremendously positive."

8. From the moment the Enterasys acquisition was announced, Extreme management created a growth narrative out of the above factors to encourage investment in the Company. Specifically, Defendants assured investors during the Class Period that the Company would achieve 10% revenue growth and 10% operating (profit) margin as a result of integrating Enterasys successfully, the Lenovo relationship, and only a few other factors. In fact, Defendants repeatedly assured investors that these results would be achieved by June 2015 at the latest. CEO Berger, for example, speaking at Extreme's earnings call on May 6, 2014 (FY 3Q14), stated:

> ***I want to again reemphasize our plan and our commitment to attain double digit [10% or higher] revenue growth by the second half of [fiscal year] 2015***[2]

[2] The Company's fiscal year 2015 ended June 30, 2015.

> ***as we complete the integration, realize the benefits of our key partnerships like Lenovo*** and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments. ***Over the same period we are committed to achieve a 10% operating margin*** on a non-GAAP basis.

9. Defendant Berger was uniquely incentivized to promote this growth narrative: if he could get Extreme's stock price to rise to $4, $5, and $6 per share and stay there for only 30 days, pursuant to the terms of his employment agreement, Berger would earn options to purchase 300,000 shares of Extreme Stock at each level, for only $3.17 per share. The chart below indicates Extreme's share price throughout the Class Period. As indicated at the points "A," "B," and "C," Extreme's stock did indeed inflate to $4, then $5, then $6 per share for 30 consecutive days. At each point, Berger became entitled to purchase 300,000 additional shares of Extreme stock, totaling 900,000 shares:




Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **ten times** his starting baseline annual salary of $450,000.

10. In the statement above and as described in further detail below, Defendants repeated throughout the Class Period that the integration of Enterasys was proceeding smoothly

and on schedule. Defendants also repeated that cost savings (or "synergies") from the integration, in combination with benefits from the Lenovo partnership, would drive double-digit revenue growth and a 10% operating margin.

11. Their baseless assurances continued during the Class Period even as the Company lowered its revenue guidance and reported quarterly revenue results below both guidance and analyst expectations. On more than a dozen occasions, Extreme touted that the Company's integration efforts were "on track," "made significant progress," "made dramatic progress," had "few surprises," were "ahead of plan," were "ahead of our expectations," were "going very well," were "moving in the right direction," or "significantly exceeded … expectations," and similar assurances. For example, on October 15, 2014, the Company preannounced that it would be falling below its revenue guidance while CEO Berger stated in a Company press release that "'[t]he combination of strong sales leadership, nearly completed [Enterasys] integration[,] and the finalization of the Lenovo acquisition position us well for the remainder of our fiscal year.'" Extreme also continually flaunted, in at least nine instances, that the Company was "more confident than ever," "ahead of plan," "exactly where [they] planned to be," and "on track," to realize $30 to $40 million in synergies from the integration.

12. Defendants' statements regarding the supposedly successful progress of the Enterasys integration and achievement of cost-saving synergies were false and misleading because the integration was a complete failure. Based on information from Confidential Witnesses ("CWs") who worked at the Company during the Class Period, the integration was a failure because the Company experienced substantial integration problems including: lost clients, client dissatisfaction with a poorly integrated salesforce and lack of a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and management problems that would result in high executive turnover. In reality, Extreme lacked a reasonable basis to expect to achieve the promised synergies, and indeed, never did. From the beginning of the Class Period, Defendants knew or recklessly disregarded these facts.

13. Further, Defendants made false and misleading statements regarding their relationship with Lenovo. Specifically, Defendants touted that the Company's "key partnership" with Lenovo was "tremendously positive," would have "meaningful revenue impact," will "generate significant revenue," "will have double-digit revenue impact," and "has strengthened" on more than a half-dozen occasions, as well as the fact that Lenovo, too, was "strongly committed to the alliance." However, Extreme would later reveal that it had "zero visibility" into Lenovo's operations to understand or forecast Lenovo's ability to contribute to Extreme's overall revenue. Based on information from CWs who worked at the Company during the Class Period, there was no support for the partnership at Lenovo's "field" level, or even a way to benefit from Extreme's products. As a result, the Company had no reasonable basis for believing during the Class Period that its partnership with Lenovo would positively impact Extreme's revenue, and in particular had no basis for making a commitment that it would drive double-digit revenue growth by June of 2015.

14. Nevertheless, Defendants emphasized the Company's "commitment" to achieve 10% revenue growth and 10% operating margin by the end of its fiscal year 2015 (*i.e.*, by June 2015) at least five times during the Class Period, even in the face of revenue shortfalls and other revelations described herein. Defendants also stated during the Class Period that Extreme's commitment "has only strengthened." However, Defendants lacked any reasonable basis to expect to achieve 10% revenue growth and 10% profit margin by June 2015, and in fact failed to fulfil this "commitment" to investors.

15. Accordingly, during the Class Period, Defendants knowingly or recklessly made materially false and misleading statements and omissions regarding the Company's quarterly and year-end revenue and earnings guidance.

16. As a result of these misrepresentations and omissions, Extreme's stock traded at artificially inflated prices during the Class Period, reaching a high of $8.14 per share in intraday trading on January 23, 2014.

17. The inflation caused by the fraud came out of the Company's stock price in a sequence of four partial events before a final event on April 9, 2015, as shown in the chart below.




18. On February 5, 2014, before the market opened, Extreme reported low revenues and disappointing guidance for the next quarter, citing issues relating to the integration. On May 6, 2014, Extreme reported disappointing revenues, admitted that it "experienced some integration issues," and revealed that its CFO and COO would be leaving. On October 15, 2014, Extreme preannounced revenues significantly below its previous guidance. And on January 14, 2015, the Company backed away from its commitment to achieve 10% revenue growth and 10% operating margin by June 2015.

19. Finally, on April 9, 2015, after the markets closed, Extreme Networks preannounced that it would miss guidance for its third fiscal quarter of 2015, reporting non-GAAP revenue of $118-$120 million and earnings per share ("EPS") of ($0.09)-($0.07), significantly below its guidance of $130-$140 million and ($0.03)-$0.02, respectively. The Company also announced more executive turnover – Chief Revenue Officer Jeff White, who had been hired only six months earlier to manage the integration of the Extreme and Enterasys

salesforces, was "no longer with the Company" – and trading in its shares was halted. On these disclosures, the Company's stock price fell nearly 25%, from $3.24 per share to $2.50 per share, on highly unusual trading volume of 10.1 million shares traded (versus 356,300 shares traded the day before).

20. Less than two weeks after the end of the Class Period, on April 21, 2015, the Company announced that Defendant CEO Berger had resigned, effective April 19, and would be replaced by Ed Meyercord, then Chairman of Extreme's Board of Directors ("Meyercord").

21. On May 6, 2015, the Company announced its financial results for the third fiscal quarter of 2015, and Meyercord hosted his first earnings call as CEO. During the call, Meyercord was asked to explain how an acquisition that created a Company with combined annual revenues of $624 million was reporting only $535 million annual revenue less than two years later. Meyercord admitted, among other things, that **the integration of Enterasys and its salesforce had not been successful**, and indeed, **the acquisition "wasn't a very good deal"** to begin with. He further admitted that **Extreme had "zero visibility into Lenovo"** and was "uncomfortable" providing any forecast for when that relationship would contribute to Extreme's revenue. These revelations show that the previous revenue shortfalls, guidance misses, and executive turnovers were materializations of undisclosed risks relating to Enterasys's failed integration and the weakness of the Lenovo partnership.

22. The Company never achieved the promised 10% operating margin or double-digit revenue growth, either by the scheduled second half of fiscal year 2015 or thereafter. Extreme's stock price returned to pre-fraud levels at the end of the Class Period and has not risen to its inflated Class Period levels since.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

24. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

25. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Extreme has operations in this district and division, including its principal place of business at 145 Rio Robles, San Jose, California 95134.

26. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ Stock Market ("NASDAQ"), the world's second-largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

27. On June 28, 2016, this Court appointed Arkansas Teacher to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 75).

28. Arkansas Teacher is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas. Arkansas Teacher was established by Act 266 of 1937, as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system. Arkansas Teacher has more than $15 billion in net assets held in trust for pension benefits. As of June 30, 2015, Arkansas Teacher has 335 participating employers and more than 126,000 individual members. As set forth in its PSLRA certification previously filed with the Court (ECF No. 30-1), Arkansas Teacher purchased Extreme common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

**B. Defendants**

29. Defendant Extreme is a Delaware corporation with principal executive offices at 145 Rio Robles, San Jose, CA 95134. Founded in 1996, Extreme first incorporated in California in May 1996 and shipped its first products in 1997. The Company reincorporated in Delaware in March 1999 and had its initial public offering ("IPO") in April 1999. As of June 30, 2016, Extreme had approximately 1,378 employees worldwide. Throughout the Class Period, Extreme common stock traded actively on the NASDAQ under the ticker symbol "EXTR." During the Class Period, there were approximately 94 million to 100 million shares of Extreme common stock outstanding.

30. Extreme's fiscal year ends on June 30 of each year. Thus, for example, its 2015 Fiscal Year ended on June 30, 2015, and its 2015 fiscal quarters Q1, Q2, Q3, and Q4 ended on September 30, 2014, December 31, 2014, March 31, 2015, and June 30, 2015 respectively.

31. Defendant Charles W. Berger was at all relevant times Extreme's President and Chief Executive Officer ("CEO"). Berger was Extreme's CEO and a member of Extreme's Board of Directors from April 2013 until April 19, 2015, when his employment with Extreme was terminated. Prior to joining Extreme, Berger was the Chairman and CEO of ParAccel, Inc., a software company that provided a database management system designed for advanced analytics for business intelligence. From April 2006 through December 2009, Berger served as CEO of DVDPlay, Inc., a developer and manufacturer of automated and remotely managed DVD rental kiosks, for which he also served as Chairman from December 2001 through December 2009. From March 2003 through September 2005, he served as President, CEO, and as a director of Nuance Communications, Inc., a computer software technology company that provides speech and imaging applications. Berger was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Extreme's press releases, quarterly conference calls, industry events, and events for analysts, investors, and the media.

32. Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and Senior Vice President from June 29, 2012 to June 1, 2014. Kurtzweil then served as "Special

Assistant to the CEO," from June 2, 2014 until September 30, 2014, when his employment with Extreme ended. Prior to Extreme, from 2006 to 2012, Kurtzweil was the Executive Vice President of Finance, CFO, and Treasurer of Cree, Inc., a manufacturer of lighting-class LEDs, lighting products and products for power and radio frequency applications. Kurtzweil was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in press releases, quarterly conference calls, industry events, and events for analysts, investors, and the media.

33. Defendant Kenneth B. Arola ("Arola") was Extreme's CFO and Senior Vice President from June 2, 2014 to May 2016. Prior to joining Extreme, from 2005 to 2013, Arola was the Vice President of Finance and CFO of Align Technology, Inc., a medical device company. From 1990 to 2004, he was the Vice President of Finance and Corporate Controller at Adaptec, Inc., a manufacturer of computer storage products. Arola was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Extreme's press releases, quarterly conference calls, industry events, and events for analysts, investors, and the media.

34. For purposes of this Complaint, "Individual Defendants" refers to Defendants Berger, Kurtzweil, and Arola. The Individual Defendants, together with Extreme, are the "Defendants."

## IV. CONTROL PERSON ALLEGATIONS

35. The Individual Defendants, by virtue of their high-level positions at Extreme, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

36. Berger was very closely involved in all aspects of the Company's operation. For example, he took over direct responsibility for the integration of Enterasys when COO Chris Crowell left the Company on May 6, 2014. Berger continued in that capacity until he was

replaced by Jeff White on October 1, 2014. *See, e.g., infra* ¶¶ 320, 322-23. As further described below, both before and after this period, Berger spoke personally with employees who were upset with the failures of the integration process. *See, e.g., infra* ¶¶ 143, 316-17.

37. The Individual Defendants, as senior executive officers, and Berger as a director, of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Extreme's publicly-traded common stock would be based on accurate information. Berger, Kurtzweil, and Arola each violated these requirements and obligations during the Class Period.

38. The Individual Defendants, because of their positions of control and authority as senior executive officers of Extreme, and Berger as an Extreme director, were able to and did control the content of the SEC filings, press releases, and other public statements issued by Extreme during the Class Period. Each was provided with copies of the statements made in statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Berger, Kurtzweil, and Arola are responsible for the accuracy of the public statements detailed herein.

39. The Individual Defendants, because of their positions of control and authority as senior executive officers of Extreme, and Berger as an Extreme director, had access to the adverse undisclosed information about Extreme's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Extreme management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Extreme materially false and misleading.

40. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Extreme common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Extreme's products, business, operations, and management, and the intrinsic value of Extreme's common stock and options; and (ii) caused Lead Plaintiff and members of the Class to purchase Extreme common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Extreme's Business Overview[3]

41. Extreme is a network infrastructure company. It develops and sells equipment for accessing the Internet, as well as software for running the equipment, monitoring its usage, and analyzing the data that passes through. The Company also offers related services contracts for extended warranty and maintenance of its equipment. Together, equipment sales and service contract payments constitute, in the Company's words, "substantially all" of the Company's revenue.

42. Extreme occupies part of the modern information technology ecosystem known as "switching" and/or "routing," *i.e.*, the part of network infrastructure that is upstream of the Internet user's device but downstream of the data carrier (such as Ethernet, 3G, and 4G services). The Company's products consist of wired and wireless means of accessing the Internet such as wired switching, wireless switching, and access point devices. The Company also offers software services, including programs that monitor and address Internet performance, as well as programs that capture and analyze or "mine" Internet usage data. In addition, the Company sells what it refers to as "renewable support arrangements," which include extended warranty contracts that generally range from one to five years.

43. These products and services together accounted for over $500 million in global revenues per fiscal year during the Class Period. The Company broke out its 2014 and 2015

[3] This discussion of Extreme's business, products, and customers is limited to the Class Period, unless otherwise noted.

revenues geographically to show approximately 40% from the United States and 50% from North America as a whole, 40% from the European or "EMEA" region, and the remaining 10% from its "Asia-Pacific" region. Extreme's main competitors during the Class Period included Cisco Systems, Inc., Brocade Communications Systems, Inc., Juniper Networks Inc., and Hewlett-Packard.

44. Extreme's domestic and international customers include businesses such as hospitals, hotels, universities, sports venues, and telecommunications companies, as well as government agencies. For example, its customers during the class period included Ericsson AB, U.S. school districts, the University of Southern California, and the National Football League.

45. Throughout the Class Period, Extreme's primary business model was to sell its products and services through other companies called "channel partners." A channel partner is another company in the same technology ecosystem that supplements its own goods and services with Extreme products. Typically, companies partnered with Extreme so they could offer their own customers more complete information technology solutions. Because Extreme sold its products primarily through partners in these arrangements, Extreme described its business during the Class Period as "partner-driven."

46. The Company also generated revenue through the efforts of its internal salesforce, also referred to as its "field sales organization." This salesforce both provided support to channel partners and made direct sales to Extreme's own customers. According to the Company, "about 65% to 70%" of its revenue during the Class Period was earned through its partners, and "about 25% to 30%" of its revenue was from direct sales by the Company itself.

### B. Start of Class Period: Extreme Acquires Enterasys, Emphasizing the Integration and the Synergies to Be Obtained

47. On September 12, 2013, Extreme issued a press release, before the market opened, announcing that it had acquired rival network infrastructure technology company Enterasys. The release disclosed that Extreme would acquire all Enterasys outstanding stock in an all cash transaction valued at $180 million.

48. The acquisition roughly doubled the size of the Company. At the time the acquisition was announced on September 12, 2013, Extreme had approximately 750 employees and reported "just shy of $300 million in annual revenues." Enterasys had approximately 900 employees and announced it would "achieve between $325 million and $330 million" in annual revenues for its fiscal year about to end on September 30. As such, Extreme stated it "will have trailing 12-months revenues in excess of $600 million." Further, Extreme had more than 6,000 customers before the acquisition, and management announced at the September 12, 2013 conference call that "[t]he combined Company will have over 12,000 customers." Accordingly, the Company described the acquisition as a "merger of equals."

49. On the September 12, 2013 conference call, where Extreme announced the acquisition, Defendant Berger represented to investors that the Company conducted "several months of due diligence" as well as a "detailed analysis of the revenue sources for both Companies" leading up to the acquisition. In response to a question from an investment analyst asking for additional details, Berger represented that:

> ***[O]ne thing you can imagine we did was a pretty detailed analysis of the revenue sources for both Companies, and we were very pleased to find virtually no overlap***. In fact, we looked at the top 200 customers of both Companies which were the predominance of our revenues and found literally, like $28,000 of revenue between one of our customers and one of their customers. So we are encouraged that there is the opportunity for significant accretive revenue growth here as opposed to duplicative revenue. . . . They have a substantial federal business; we have virtually no federal business. Geographically, we're pretty equally matched, except for APAC [Asia-Pacific], where we have a pretty strong presence that is relatively small on the Enterasys part. So good customer fit, good market fit, and geographically, we think it is pretty additive.

50. On the same call, Defendant Kurtzweil outlined management's "plan to reduce product costs and operating expenses between $30 million to $40 million." Kurtzweil specified that the cost savings would occur "when we have fully integrated the two Teams," further specifying that "[w]e expect to realize these synergies over a 12 to 24-month period." Kurtzweil also assured investors that "in the first full quarter of operations we expect the transaction to be accretive immediately by approximately $0.03 to $0.06 per share." Later on the same call, Defendant Berger guaranteed investors that: "***There will be no disruption in customers' ability***

***to grow and operate their networks. Period. None***." He further promised that the acquisition "will certainly be transformational for our Companies, the industry, and ***create significant value for the Extreme shareholders***."

51. The following day, Craig-Hallum issued an analyst report repeating Defendant Kurtzweil's announcement that Extreme's acquisition of Enterasys would be "**immediately accretive,**" *i.e.* that it would immediately increase the Company's earnings per share, and "has the potential to be significantly more accretive following expected cost reductions of $30-40 million in the 12-24 months following the acquisition." The report also repeated Defendant Berger's guarantee that the integration would have "**no disruption to customers' businesses**," highlighted it as a "key takeaway," and included a "Buy" rating and an increased price target.

52. On September 17, 2013, Wedbush Securities upgraded its rating on Extreme from "neutral" to "outperform" "based on [its] view that the acquisition of Enterasys is **immediately accretive and offers potential upside from synergies**, leading to valuation which suggests upside from current levels." The report made special note that "Extreme management indicated that the acquisition is expected [to] be accretive to non-GAAP 2014 earnings, **with EPS accretion in the range of $0.03-.06 in its first full quarter**, which we think reflects the initial removal of duplicate cost structures." This analyst report further explained that its rating "upgrade is predicated on [its] belief that . . . **we think the company will benefit from deal synergies**, including optimization of the supply chain and **the removal of duplicate cost structures**."

53. The Company completed the acquisition on October 31, 2013 and announced that it made "Extreme the fifth largest Ethernet switching company in the market."

## C. Throughout the Class Period, Defendants Repeatedly Assured the Market that Extreme's Integration of Enterasys Was "On Track" and Progressing Smoothly

### 1. January 13, 2014 – Company Releases Combined Pro Forma Financials

54. On January 13, 2014, after the acquisition was completed and the Company had spent over two months on integration, it released a set of consolidated financial statements.

These statements showed, among other metrics, a look at the combined Company's pro forma financial statements as if it were operating as one company for the entirety of fiscal year 2013. The pro forma GAAP revenue for the combined year would have been $632 million.

55. In a January 14, 2014 conference call to discuss these financial statements, CFO Kurtzweil assured investors that after over two months of integration efforts, "[w]e remain focused on the integration activities to provide the synergies previously mentioned of $30 million to $40 million."

56. The market reacted positively to these assurances. An analyst report released the same day from Wedbush Securities maintained its "Outperform" rating and increased its price target, stating "the company is looking to extract $30-40mn in synergies from the combined company over the next 24 months. We expect early returns to be generated . . . . The **key takeaway** is that there are **no major changes to original assumptions**."

**2. February 5, 2014 – Q2 2014 Results**

57. Less than a month later, on February 5, 2014, the Company reported its financial results for its second fiscal quarter of 2014, as well as guidance for the next fiscal quarter (Q3 2014). On the earnings conference call that day, the Company acknowledged it was "at the low end of the revenue guidance" for the quarter, and that its Q3 2014 guidance was also "at the low end," albeit "similar" to its Q3 2013. The Company further acknowledged that it had as yet "not seen significant evidence of revenue to synergies" and that it experienced some "self imposed" integration issues "most pronounced in our North American organization." On the same call, the Company assured investors that it was "ahead of the curve" in integrating the sales teams, and repeated its assurance that "a reduction in operating expenses . . . will begin to show up in sales in the third fiscal quarter." The Company reported in a press release that "***[o]ur integration plans are on track***" and "we continue to make ***steady progress towards a complete integration***."

58. An analyst report released the next day from Wedbush Securities confirmed its understanding that "lower-than-expected revenue guidance reflects ongoing integration activities including training the sales force on both product lines" and "ongoing realignment of the legacy Extreme sales force," and accordingly lowered its share price target for Extreme. The same

analyst also maintained its positive “outperform” rating, echoing Defendants’ reassurance: “**Bottom line, there is no change to the story and the company remains on track to deliver on its stated goals.**”

**3. May 6, 2014 – Q3 2014 Results**

59. On a May 6, 2014, the Company reported financial results for its next quarter: the third fiscal quarter of 2014. This was the first full quarter after the acquisition, and the quarter in which management had told investors to expect to see the first positive impact of the integration on the Company’s financials. *See* ¶¶ 50, 52, & 57, *supra*. However, the Company reported results at the low end of its previous guidance, and management revealed that they “have experienced some integration issues” “particularly in North America.” Despite these integration issues and the disappointing financial news, management assured investors that the integration was “ahead of plan,” “ahead of schedule,” and “going very well”; that “our target for synergy savings as a result of the acquisition of Enterasys continues” unchanged; and that overall the Company would deliver the positive revenue impacts that Defendants had been promising. Specifically, in the press release Berger stated, ***“[t]he integration efforts following the acquisition of Enterasys continue ahead of plan***.” Similarly, during the earnings call on the same date, Berger repeated that the integration plan was still “***going well***” and “***on track***,” and in fact “***ahead of our expectations***.”

60. The market believed Extreme’s reassurances. The following day, Wunderlich Securities released an analyst report maintaining its “Buy” rating and price target, stating “We believe the company is ahead of plan or on plan with regard to integration of everything but Americas sales.”

61. Likewise, Craig-Hallum released an analyst report maintaining its “Buy” rating because “[a]lthough Extreme Networks has experienced some hiccups integrating two equal sized companies, management remains confident in its ability to find $30-$40 million in synergies.”

### 4. July 21, 2014 – Q4 2014 Revised Guidance

62. On July 21, 2014, Extreme issued a press release and announced higher guidance for Q4 2014. In the press release, Berger reiterated that "***[o]ur integration remains ahead of plan*** as we continue to execute against key Company operational and financial milestones, including successfully completing our ERP integration in early July, two months ahead of schedule."

63. Analysts were reassured by Berger's statement that the integration was "ahead of plan." For example, on July 22, 2014, Craig-Hallum published an analyst report maintaining its positive "Buy" rating and raising its price target. The report echoed Berger's reassuring statements: "We are also encouraged that the company's integration efforts are **ahead of plan**. . . ."

### 5. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results

64. On August 14, 2014, the Company reported financial results for its fourth fiscal quarter and fiscal year 2014, as well as guidance for the next fiscal quarter (Q1 2015). In a press release, Berger was quoted as saying: "Our sales force integration is complete, with all territories rationalized, and the team is aligned and executing, which is evident in this quarter's results." In the subsequent earnings call, Arola reiterated that "***the two companies are now fully integrated***." Berger discussed "signs that the integration issues are behind us" and told investors "we are exactly where we planned to be in [the] integration process." This reassurance was echoed the next day in an analyst report from Wunderlich Securities, observing that "[m]anagement appears on track to achieve targets." Similarly, Martin Vlcek, an analyst writing at the investment analysis website *SeekingAlpha.com*, raised his price target in an August 15, 2014 report analyzing the Company's fourth quarter 2014 financial results, writing:

> The North American integration issues seem to be over now. . . . **The Enterasys integration has "significantly exceeded expectations"**. It is ahead of track in some areas, such as the ERP IT systems integration. The **integration challenges** experienced earlier in the North American sales and partner organization **seem to be successfully resolved now thanks to special attention and focus of the company's CEO on this area**. . . . Overall, EXTR had a very strong quarter and finished a fiscal year of transformation. **Synergies from Enterasys acquisition should start flowing in**.

As a result of Defendants' reassurances, analysts and investors believed that Extreme had put the problems with the acquisition and integration of Enterasys behind it.

**6. October 15, 2014 – Prerelease of Q1 2015 Results**

65. Two months later, on October 15, 2014, the Company preannounced in a press release that its earnings for the first quarter of fiscal year 2015 would fall short of previous guidance. Nevertheless, Berger reassured investors that the Company "made dramatic progress towards finalizing the integration of the acquisition of Enterasys" and remained "on track to realize the full $30-$40 million in cost synergies expected from the acquisition."

66. A Craig-Hallum analyst report maintained its "Buy" rating, despite being "disappointed in the negative pre-release," because "management believes the company remains on track to realize $30-$40 million of synergies from the Enterasys acquisition."

67. Similarly, a Wunderlich Securities analyst report the next day said that the "degree" of the announced shortfall was "surprising," but maintained its "Buy" rating due to management's reassurances that "the integration sales channel and management issues that handicapped the quarter are mostly behind the company and we expect to see better execution almost immediately."

**7. October 28, 2014 – Q1 2015 Results**

68. Two weeks later, on October 28, 2014, the Company released full financial results for the same fiscal quarter, as well as guidance for the next fiscal quarter (Q2 2015). On a conference call, Defendants attributed the Company's below-expected results to "significant" "disruptions" caused by the acquisition and integration of Enterasys, which Defendants previously assured investors would not happen. In a press release, Berger specified that some integration efforts "had an impact on our revenues during the quarter as our partners and sales people had to learn a new way to do business with us" – in direct contradiction with Berger's statement on August 14, 2014 that "integration issues are behind us" and Arola's assurance that the companies were "***fully integrated***." However, Berger reassured investors in the press release that the Company "made significant progress towards finalizing the integration" and once more reiterated that "[w]e are on track to realize the full $30 to $40 million in cost synergies expected

from the acquisition." Berger further reassured investors on the conference call by promising: "***We stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better.***" Arola added: "We continue to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition."

69. On the same call, Defendants attempted to explain part of the Company's financial shortfall as deal slippage. Per Berger, "we saw a significant number of deals slip beyond Q1." However, this explanation came with repeated assurance that these deals only slipped into the next quarter, and were not lost. Arola assured investors that: "Although many deals were pushed out of the quarter, they remain in the Pipeline," and "we are confident in our ability to compete for these deals that were delayed from Q1."

70. Analysts repeated Extreme's slippage explanation. For example, a Craig-Hallum analyst report the following day maintained its "Buy" rating and price target in part because it was "encouraged that management is seeing some of the deals that were pushed out last quarter begin to close and that gives us increased conviction in a recovery." Likewise, a Wunderlich Securities analyst report the same day described the shortfall in part "due to deal slippage and/or not having enough opportunities to offset it," which in turn was "due to the process of integrating the Enterasys acquisition."

**8. December 17, 2014 – Bernstein Technology Innovation Summit**

71. On December 17, 2014 at the Bernstein Technology Innovation Summit, Arola continued describing the Company's achievement of cost-saving synergies as "on track," further assuring investors that "we pretty much completed the integration of the two companies" and "integration of sales is completed." Regarding deal slippage leading to a revenue shortfall, he commented that "[w]e haven't lost the deals."

**9. January 28, 2015 – Q2 2015 Results**

72. On January 28, 2015, the Company reported financial results for its second fiscal quarter of 2015 and announced guidance for the next fiscal quarter (Q3 2015). In an earnings call, Berger disclosed that "while we are making daily substantial progress on the complete integration and upgrading of our salesforce, it is clear that we still have considerable work to do

going forward." But he continued to reassure investors: "I absolutely do not believe the acquisition and subsequent integration of Enterasys has, to use your words, failed miserably. . . ***we're right on track with where we expected to be from a synergy basis***."

73. Thus, throughout the Class Period, Defendants repeatedly assured the market that Extreme's integration of Enterasys and promised cost-saving "synergies" were on track and progressing smoothly, thereby continually misleading investors. As explained below, these representations were part of a "commitment" from the Company to investors to achieve cost-saving synergies, leading to double-digit revenue growth and 10% profit margin by a specific time. *See* Section V.E., *infra*.

**D. Defendants Repeatedly Touted Extreme's Partnership with Lenovo**

**1. Inception of the Lenovo Partnership**

74. As noted above, Extreme earned the majority of its revenue through products and services through "channel partners," *i.e.*, other companies in the same technology ecosystem that supplement their own goods and services with Extreme offerings. One such partnership was with the global technology company Lenovo, which Extreme announced on July 17, 2013. Defendants repeatedly highlighted the Lenovo relationship to investors as one of the Company's "key partnerships" as well as an important "growth driver."

75. On a November 4, 2013 earnings call to discuss financial results for Q1 2014 and guidance for Q2 2014, Berger informed the market that "Lenovo plans a fairly significant launch of their service [server] business in North America coming into the middle of this month, November, with a major launch in the Asia Pacific region coming in the first calendar quarter. So I suspect we won't see a lot of business from them in the December quarter, but we should see a pick up coming into the March quarter." A Wedbush Securities analyst report the following day echoed the financial impact of Berger's announcement: "Lenovo is expected to formally launch its server products in November in the US and late March in APAC. While it will take time to build, expect initial revenues in 1H14." The report maintained its positive "outperform" rating in part based on the "newly announced partnerships [including Lenovo] which should drive revenue upside late in FY14."

76. On January 23, 2014, Lenovo announced that it would be greatly expanding its server business by acquiring IBM's "x86" server business for approximately $2.3 billion. Within weeks of the announcement, Extreme began to publicize its relationship with Lenovo as being even more important for Extreme's growth strategy.

**2. February 5, 2014 – Q2 2014 Results**

77. On a February 5, 2014 earnings call to discuss financial results for Q2 2014 and guidance for Q3 2014, Berger described Lenovo's IBM deal as "tak[ing] them [Lenovo] from a 2% global market share player to a 14% global market share player." On the same call, Berger claimed that Extreme was Lenovo's "only networking partner" and publicized the relationship "as tremendously positive." Berger touted that Extreme "will be now included in a price list shared by 1200 more sales people they are getting as part of the acquisition." Finally, he told investors that they could expect the news to affect Extreme's financial results "at a fairly steep ramp once we left the fiscal year." When an analyst asked Berger to describe the Company's partnerships responsible for over 10% of its **total revenue**, he responded: "The two large ones are really Ericsson ***and Lenovo going forward***."

78. Analysts incorporated the Company's view of the Lenovo partnership into their investment theses. For example, Craig-Hallum rated Extreme a "Buy" in a report dated February 6, 2014, stating: "Management remains optimistic about its partnership potential with Lenovo and noted that Lenovo trying to buy IBM's X86 server business should result in Lenovo's global market share growing from 2% to 14%." The same report repeated Berger's revelation that "Extreme is the only networking partner Lenovo has currently," and concluded by stating "management expects this relationship to eventually have a positive impact on the company."

79. In addition, Wedbush Securities maintained its positive "outperform" rating in a report the same day, based on its observation that "[m]anagement remains positive on partner opportunity, with . . . Lenovo." The analyst report identified the relationship as one of the Company's "key drivers" due to the Company's indication that "Lenovo's recent purchase[4] of

[4] Lenovo announced its intent to purchase IBM's x86 server business on January 23, 2014, but the deal did not close until October 15, 2014.

IBM's server assets increases their global market share to ~14% from ~2%, and significantly increases the addressable market, particularly with regards to enterprise."

80. When Wunderlich Securities initiated its coverage of Extreme on April 1, 2014 with a "Buy" rating, it noted "Extreme also has OEM channels that offer **potential for upside** in data center networks, **especially Lenovo**, which could become a much more significant data center player after acquiring the IBM server line."

**3. May 6, 2014 – Q3 2014 Results**

81. On the Company's May 6, 2014 earnings call to discuss financial results for Q3 2014 and guidance for Q4 2014, Berger reiterated the importance of the Lenovo partnership to Extreme's revenues. He stated, "we expect the relationship with Lenovo in particular as I have said for the last several calls, to have meaningful revenue impact in the second half of fiscal 2015."

82. Analysts continued to incorporate this information into their investment theses. For example, Craig-Hallum published an analyst report on May 7, 2014 that maintained its positive "Buy" rating, "expect[ing] growth to be driven by key partnerships with Lenovo."

**4. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results**

83. On the Company's August 14, 2014 earnings call to discuss financial results for its fourth fiscal quarter and fiscal year 2014, and to announce guidance for Q1 2015, Berger again touted the "key partnership" with Lenovo, the Company's "progress in expanding" the relationship, and the expectation that it would "generate significant revenues" for the company "starting in our fourth quarter of 2015 and beyond." Berger represented that he "met with the Lenovo executive team in China and ***it is clear they are strongly committed to the alliance***." In closing, Berger reiterated that Extreme "expect[s] to attain year-over-year double-digit revenue growth in the fourth fiscal quarter, driven by our expected ramp of the Lenovo business."

84. Analysts continued to incorporate this information into their investment theses. For example, Craig-Hallum reiterated its positive "Buy" rating on August 15, 2014 in part because "Management believes that given the . . . positive impact of its partnership with Lenovo,

the company can achieve double digit year/year revenue growth and 10% operating margins in the June 2015 quarter."

85. On the same day, Buckingham Research Group released an analyst report increasing its price target for Extreme, stating "we continue to think Lenovo remains the biggest potential catalyst for the top line" in part because "[m]anagement indicated that . . . Lenovo remains committed to the partnership."

86. Similarly, on August 18, 2014, Wunderlich Securities issued an analyst report stating, "[w]e believe Extreme management is working closely with Lenovo in order to provide products that will complement what Lenovo is acquiring from IBM. . . . Implications could be transformational."

**5. October 15, 2014 – Prerelease of Q1 2015 Results**

87. On October 15, 2014, Extreme issued a press release preannouncing results for its first fiscal quarter of 2015 below its previous guidance. On the call, Berger reported that Lenovo "closed the acquisition of the IBM X86 server business" during the quarter, which would "position us well for the remainder of our fiscal year."

88. Notwithstanding the disappointing quarterly financial results, analysts were encouraged by Defendants' statements regarding the Lenovo relationship. For instance, Craig-Hallum published an analyst report on October 16, 2014 maintaining its positive "Buy" rating and stating, "we believe over the next few quarters the company will be positively impacted by its partnership with Lenovo."

**6. October 28, 2014 – Q1 2015 Results**

89. On the October 28, 2014 earnings call to discuss the Company's disappointing financial results for its first fiscal quarter of 2015, as well as guidance for Q2 2015, Berger touted that there were "extensive" communications between Extreme and Lenovo, listed "a number of things that we've done," and promised that the two companies "continue to make progress each day towards realizing the potential of this agreement," including "significant results by the fourth quarter." He guaranteed investors "***there is no longer any doubt*** that this will happen." When an analyst asked Berger about his previous commitments to achieve double-

digit revenue growth by the end of June 2015, detailed below in Section V.E. *infra*, Berger responded that "Lenovo [] ***certainly by then*** we believe will have double-digit revenue impact."

90. Analysts continued to react positively to Defendants' representations about the Lenovo partnership. For example, an October 29, 2014 analyst report from Craig-Hallum maintained its positive "Buy" rating on the news that "management is confident the company can see return to strong year/year growth beginning in the June quarter as Lenovo could drive double digit millions of quarterly revenue."

91. In another analyst report that day, Buckingham Research Group maintained its rating and increased its price target, similarly stating, "Lenovo remains the biggest potential catalyst for the top line," noting that "management has taken a decidedly optimistic tone regarding the partnership" and "expects a material revenue impact from Lenovo contribution in F2H15."

**7. January 28, 2015 – Q2 2015 Results**

92. On the Company's January 28, 2015 earnings call to discuss financial results for its second fiscal quarter of 2015, and to announce guidance for Q3 2015, Berger disclosed that the Company would not be able to keep its promise regarding the Lenovo relationship. Specifically, he revealed that the promised positive revenue impact would not be achieved by the promised time of June 2015, and perhaps not for another year, even while continuing to tout the strength of Extreme's partnership with Lenovo. He stated: "we're still expecting the kind of results that we have talked about before; we just think they are another 2 to 4 quarters [6-12 months] out." Berger reassured investors that the "partnership with Lenovo ***strengthened*** during the quarter ***on many fronts***," with "continued productive discussions ***at all levels*** with Lenovo." He further assured investors that "we continue to make progress almost on a daily basis with Lenovo, ***across the board***." Berger confirmed, "***on the positive side, we are exactly where we thought we would be*** on things like being on the price list, being in their literature, having airtime with the legacy Lenovo salesforce."

93. Analysts were again encouraged by Extreme's reassurance regarding the Lenovo partnership. For example, Wunderlich Securities published an analyst report on January 29,

2015 that maintained its positive "Buy" rating and "view[ed] the formal revision of timeframe to achieve profit goals to be cathartic."

94. In addition, Buckingham Research Group published a report the same day that stated, in spite of the longer time horizon on management's commitment to achieve increased revenue through the Lenovo relationship, "[w]e continue to believe that revenue catalysts [including Lenovo] have the potential to eventually contribute materially to the top line."

95. Thus, throughout the Class Period, Defendants repeatedly assured the market that Extreme's partnership with Lenovo would result in increased revenues and profits. As explained below, these representations were part of a "commitment" from the Company to investors to achieve double-digit revenue growth and 10% profit margin by June 2015. *See* Section V.E., *infra*.

### E. Defendants Promoted the Company's Integration of Enterasys and Its Lenovo Relationship as Key Aspects of a "Commitment" Announced to Investors: to Achieve Double-Digit Revenue Growth and 10% Profit Margin By June 2015.

#### 1. Extreme Announces Its "Goal" of 10% Profit Margin By June 2015

96. On November 4, 2013, Extreme issued a press release outlining its first fiscal quarter 2014 financial results. In this release, the Company unveiled the target of and strategy behind its financial plan: "The company is targeting a quarterly financial model of operating at a non-GAAP operating income of 10% +/-, by the end of fiscal [year] 2015. To achieve this goal, the company intends to focus on completing the integration of the two companies and growing its revenue with high performing and lower cost products and services."

97. On February 5, 2014, Extreme issued a press release outlining its second fiscal quarter 2014 financial results. Using identical language, the Company reiterated the same strategy, "completing the integration of the two companies and growing its revenue," for achieving the same target, "operating income of 10% +/-, by the end of fiscal [year] 2015."

#### 2. Extreme's "Goal" Becomes a "Commitment" to Achieve *Both* Double-Digit Revenue Growth *and* 10% Profit Margin by June 2015

98. On May 6, 2014, Extreme hosted a conference call with investors to discuss the Company's third fiscal quarter 2014 financial results. Defendant Berger referenced and repeated

the same plan – this time, as a ***commitment*** to investors, including additional detail about where the "key" Lenovo relationship factored in:

> I want to again reemphasize ***our plan and our commitment to attain double digit revenue growth by the second half of 2015 as we complete the integration***, realize the benefits of our ***key partnerships like Lenovo*** and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments. ***Over the same period we are committed to achieve a 10% operating margin on a non-GAAP basis.*** My belief in our ability to achieve these goals ***has only strengthened*** since our last earnings call.

99. Analysts took this commitment seriously. On May 7, 2014, Craig-Hallum issued an analyst report maintaining its positive "Buy" rating despite negative news from the Company the previous day, including high-level executive turnover and reported earnings at the low end of prior guidance. The report justified its rating because "management believes it can achieve 10% operating margins exiting the year, up from 2.3% in the current quarter," noting "[w]e expect growth to be driven by key partnerships with Lenovo." The report further noted that "[a]lthough Extreme Networks has experienced some hiccups integrating two equal sized companies, management remains confident in its ability to find $30-$40 million in synergies" on schedule, and therefore "we expect synergies to begin . . . during the September quarter."

100. On August 14, 2014, Extreme hosted a conference call with investors to discuss the Company's fourth fiscal quarter and fiscal year 2014 financial results. During the earnings call, Berger stated that "com[pleting] the integration . . . is largely behind us." Not only did he highlight the successful integration progress to date, but he also repeated the Company's commitment to achieving the same revenue and profit targets by the same deadlines though the success of both the integration and Lenovo relationship:

> We completed major elements of the integration of Enterasys and are on track to realize the synergies ***we have committed to***. I would like to reiterate our prior guidance, that ***we expect to attain year-over-year double-digit revenue growth in the fourth fiscal quarter, driven by our expected ramp of the Lenovo business***…. In addition, through focused cost management, ***we expect to achieve a 10% non-GAAP operating margin in Q4*** and beyond.

101. As management repeated its commitment, more analysts began to incorporate it into their investment analyses. For instance, a Wunderlich Securities analyst report from August

15, 2014 maintained its positive "Buy" rating and updated its model because "[m]anagement re-iterated the goal of 10%+ revenue growth and 10% + operating margins exiting F2015," further noting that "[m]anagement appears on track to achieve targets."

102. Similarly, Craig-Hallum continued to maintain its positive "Buy" rating in part because "[m]anagement believes that given the . . . positive impact of its partnership with Lenovo, the company can achieve double digit year/year revenue growth and 10% operating margins in the June 2015 quarter."

103. On the October 28, 2014 conference call to discuss the Company's first fiscal quarter 2015 financial results, Arola reiterated Extreme's unchanged commitment: "I want to remind you that I remain ***committed*** to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015." Later on the same call, an analyst asked Berger, "As it relates to your 10%, keeping the 10% operating margin target for June of next year, which would require some additional growth . . . when we get to that range, in June, your conviction in the June quarter number, is that more driven by E-Rate and success there, or Lenovo?" Berger responded that whereas the Company's E-Rate business "by itself isn't the full 10% we need," in contrast, "Lenovo [] ***certainly*** by then we believe will have ***double-digit revenue impact***."

104. After the Company's reiteration of its commitment, an analyst report from the Buckingham Research Group increased its price target "based on better than expected guidance." The report emphasized that management "reiterated its goal of double digit revenue growth by F4Q15 with a 10% OM," and "indicated to us that achievement of 10% targets will be driven by double-digit Lenovo contribution" and other factors.

### 3. Extreme Began to Distance Itself From Its "Commitment"

105. Shortly thereafter, management began to distance itself from its commitment to achieve double digit growth or a 10% operating margin by its fourth fiscal quarter of 2015, *i.e.*, the end of June 2015.

106. On January 14, 2015, Extreme made a presentation at the Needham Growth Conference, touting the success of the integration, its customers, and the quality of its products

and services. In response to a question from an audience member about when to expect meaningful revenue from Lenovo, Arola stated:

> I'll start by saying because we are in a quiet period I don't want to comment on a future forecast. But with that said, we are currently looking at what our second half looks at right now, **evaluating where we are with things like our Lenovo relationship**. . . . But we are currently evaluating that top line and operating expenses in bottom line. We are looking at alternatives. If something didn't materialize and we stayed at levels we are, that we would go out and look at how we are going to restructure the business in essence to make sure we can drive bottom line. And we'll provide updates when we come to earnings. **But, again, I don't want to today make a comment about the 10% and the 10%**, but our long-term view of the business, if you ask me we should be running this business at a 10% operating margin pretty consistently over time. The question is as **we are evaluating it now,** we will make some comments on our earnings call more specifically about timing of that.

107. Securities analysts negatively reacted to Arola's statement. A Craig-Hallum analyst report dated January 22, 2015 attributed the share price's subsequent decline to Arola's lack of enthusiasm and evasiveness regarding management's commitment. He observed that "shares have fallen over 10% since presenting" because, the analyst believed, "**management sounded less enthusiastic** about its previous outlook for 10% y/y [year-over-year] growth and 10% operating margins for the upcoming June quarter." The analyst further noted that "[w]hen asked about meaningful revenue from Lenovo kicking in, **management side stepped the question** and said it was still evaluating and mentioned if something did not materialize, the company would address operating expenses."

108. The following day, an analyst report from the Buckingham Research Group similarly interpreted management's non-disclosures as signifying bad news regarding the timing of any benefits: "We think material revenue from the Lenovo partnership will likely **not occur before 2H15**, ramping in 2016." The analyst further noted that "we think the targeted 10% revenue growth and 10% OM may be somewhat challenging."

109. Two weeks after the Needham presentation, on January 28, 2015, the Company released its financial results for the second fiscal quarter of 2015. As anticipated by the analysts, Berger retreated from his commitment:

> In the past, we committed to 10% year-over-year revenue growth, and 10% operating margin in the fourth fiscal quarter of this year. Our commitment was

> based on the expected lift from improved sales execution [from the integration], the return of E-Rate, and improved sales and channel execution, and from our relationship with Lenovo. . . . ***However, it is now clear that it will take longer for them to have enough impact to deliver 10% year-over-year growth***.

110. A Wunderlich Securities analyst report on January 29, 2015 summarized the market's reaction to this news:

> "The biggest change in outlook commentary was not so much a qualitative surprise **but a quantitative reset to more reasonable levels**. With progress taking longer than previously anticipated, **the market had lost confidence in F2015 goals and the target of achieving 10% revenue growth and 10% operating margin in F4Q15 had begun to look unnaturally off-trend**. Management is pushing the timing of the 10% revenue growth and 10% operating margin target out 2+ quarters from the old F4Q15 goal."

111. Defendants failed to fulfil their commitment to investors to achieve double-digit revenue growth and 10% profit margin by June of 2015 (or ever).

### F. End of Class Period: Extreme Announces Missed Guidance and Termination of Jeff White

112. On April 9, 2015, Extreme issued a press release preannouncing results for its third fiscal quarter of 2015 below its previous guidance. The Company did not hold a conference call that day to discuss the negative preannouncement.

113. In the same press release, the Company disclosed that: "Effective April 6, 2015, Jeff White, who served as our Chief Revenue Officer, is no longer with the Company. We are currently in the process of identifying a successor." Jeff White did not leave to immediately join another company.

114. Analysts drew a direct connection between the missed earnings guidance, the unexplained departure of the Company's executive in charge of the integration (White), integration problems, and the Company's overall financial health. On April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to $2.80/share. The report clarified that Extreme's announcements the previous day were the main cause of its downgrade. Regarding the Company's announced failure to achieve its revenue guidance, the report noted that the failure to meet its own guidance "continued the pattern of missing expectations in

alternating quarters with a F3Q15 warning of magnitude comparable to that of F1Q15, except that estimates have come down since then." Regarding the announced departure of Jeff White, the report noted that he only "had a 6-month stint" and "the CEO will run the department again until a replacement executive is found." Together, these disclosures caused the analyst report to dramatically revise its valuation of the company downward, which would last "until there are signs that the company can find the recipe for execution."

115. Similarly, a Buckingham Research Group analyst report on the same day announced that it was lowering its share price target from $3.50 to $3.00 "on [the] negative preannouncement." Specifically, the report noted that "Mr. White had only been on board since October 1, 2014, and **we see the surprise announcement as an indicator of greater challenges at the company**." The report further explained the negative implications of this news:

> [T]he appointment of Mr. White, given his years of experience at companies such as [Cisco] . . . was supposed to be an answer to the challenges. In fact management had even indicated that sales changes would drive some of the potential revenue improvement over the next several quarters. There are few details explaining why there is a vacancy once again in the sales leadership position, but **the bottom line is that a significant sales rebound is unlikely to occur until there is stability in the role**, in our view.

The report analyzed "[r]easons for the miss" and concluded "we believe . . . internal challenges likely had a role" since the Company itself offered "few details explaining why." The analyst lowered its estimates because, per the report's title: "Another Miss and Sales Leadership Departure **Signal Ongoing Challenges**."

116. Analysts also noted that this news would seriously and negatively impact the Company's partnership with Lenovo. In the same analyst report dated April 10, 2015, Wunderlich Securities noted that:

> The company may need to decide whether or not to continue efforts to be a player in the data center... [S]ustaining this activity **in hopes of Lenovo** (992-HKG – NR) **developing as a partner to drive revenue may be questionable**. The risk is that Lenovo, like the IBM (IBM – NR) business it acquired, simply **goes with the path of least customer resistance** when it comes to data center networks and that **prospects for data center networking success degrade to a quixotic fantasy for Extreme**.

117. Similarly, the Buckingham Research Group analyst report from the same day noted that, because of the news, the "timing and magnitude" of any "contribution from Lenovo as [a] primary top-line catalyst[]" became "uncertain," concluding: "We advise investors to stay on the sidelines."

118. This news disclosed to investors that the integration of the two companies was a failure, and also indicated that the Lenovo relationship could not produce the revenue growth that management had committed to investors.

**G. Post Class-Period Revelations**

119. On April 21, 2015, the Company announced the resignation of its CEO, Defendant Berger, as of April 19. This announcement came less than two weeks after the Company's disappointing April 9 preannouncement of a revenue shortfall and the abrupt departure of Jeff White as CRO. The April 21, 2015 press release also disclosed that Berger was replaced by Board of Directors Chairman Ed Meyercord, effective two days previously.

120. On the May 6, 2015 conference call to discuss the Company's third fiscal quarter 2015 financial results, the Company's new CEO Ed Meyercord confirmed that the acquisition of Enterasys and subsequent integration efforts were a failure. When an analyst asked Meyercord how to evaluate the Company's loss of almost $100 million in revenue since Extreme acquired Enterasys, Meyercord disclosed that it could be attributable not only to the fact that the acquisition "wasn't a very good deal," but also to the fact that there were problems with its "execution":

[Analyst]: **[W]hen we put Enterasys and Extreme together in 2014, we had a company doing about $624 million in revenue. And this year, we are going to go down at the midpoint to $535 million in revenue.** What is the ultimate size of this business before we attempt to go at growth? Is this a $500 million business? Is this a $600 million business? What do you think it is?

Meyercord: Well, actually, this is something I'm going to tell you within the next 30 days. **I mean, look, if I go back to the Enterasys acquisition with Extreme, if you look at it on paper, you'd say that wasn't a very good deal. There's no doubt there were some execution issues, and it was harder for the teams to put the companies together than anticipated.**

121. The Company's May 6, 2015 press release and statements during the earnings call no longer promised – or even mentioned – the Company's commitment to raise revenues by 10% or achieve a 10% operating margin by the end of the following fiscal year. Instead, Meyercord revealed at the earnings call that there was no basis for such a specific promise:

> We see a business that can grow, and we see a business that will generate cash flow in the near-term. **I don't want to get to specific guidance. It's really not fair to my team, because people are working very hard, and we have top-down a new vision for this company.** We have a new strategy. We have a bottoms-up operating plan that's being worked on. **And for me to start tossing out numbers here, it's not fair to the team that's doing all the work. And so, I wish I had them for you right now, but I've been here for two and a half weeks, and people are working really hard on this.** And what I am confident in is our ability to grow the business and our ability to generate cash in this business very quickly.

122. The Company's May 6, 2015 press release and prepared statements during the earnings call also no longer touted – or even mentioned – the Lenovo partnership. At the earnings call, an analyst asked: "And how about an update on Lenovo? You didn't mention that. Is that still a few quarters out?" Meyercord's response confirmed the truth, that the Company had no basis for committing to future revenue growth from the Lenovo relationship:

> One of the things that I looked at when I came in was taking a deeper dive into Lenovo. And there's a lot of changes happening in that organization. We've got a very good relationship at the corporate level with the Lenovo folks. But, the deals right now are happening out in the field, and **it's just a question of whether or not we're collaborating in the field to get deals done with them**, which it's hard to step on a throttle when that's the situation. So, I don't have much visibility into that. **At this stage, I have zero visibility into Lenovo.** So, as far as where that is or how you're building that as a model, **I'd be uncomfortable giving you a forecast for Lenovo**.

This statement indicated not only that the Company did not know "whether or not we're collaborating in the field to get deals done with" Lenovo, but also that it had no "visibility" or other basis to forecast revenue growth from the Lenovo partnership.

123. Two weeks later, Extreme announced that it was belatedly reducing its workforce by a substantial amount -- 18% -- effectively confirming that its integration efforts during the Class Period failed to sufficiently eliminate redundancies. Specifically, on May 20, 2015, the Company issued a press release announcing a "new operating plan" to "restructure its global

workforce and implement other operating cost reductions," which was "expected to yield approximately $40 million in reduction to operating costs in fiscal 2016." On May 21, 2015, Extreme hosted a conference call to discuss its "New Go-to Market Strategy and Realignment," which was already being put into effect. During the Call, Meyercord explained that "the actions we took yesterday" included "reduction of 18% of the global workforce." The Company's post-Class Period workforce reduction revealed that Defendants' statements committing to and reassuring investors of $30-$40 million in cost-saving "synergies" were false and misleading because Defendants knew or should have known that Extreme would not be able to accomplish $30-$40 million in cost-saving "synergies" without substantial elimination of workforce redundancies created by the Enterasys acquisition, which did not occur as part of the integration efforts during the Class Period.

124. On the same May 21, 2015 conference call, an analyst asked the Company for an update on "the potential Lenovo opportunity." Meyercord reiterated that "**we don't have a specific target for Lenovo**," and there was "**nothing tangible** for us to guide you towards" regarding any revenue contribution from the Lenovo partnership. Meyercord put the issue to rest by concluding that "until something comes up with Lenovo, my preference is to **just take it off the table**." These statements further confirmed that Defendants had no reasonable basis to commit to revenue growth from its relationship with Lenovo during the Class Period.

125. Subsequent to the May 21, 2015 conference call, Defendants ceased to describe the Lenovo partnership as a revenue driver. In fact, the Company has not mentioned any aspect of the Lenovo partnership or even Lenovo's name in any of Extreme's subsequent earnings calls, press releases, 10Qs or 10Ks.

126. The Company never achieved the promised 10% operating margin or double-digit revenue growth, either by the scheduled second half of fiscal year 2015 or thereafter. Extreme's share price returned to pre-fraud levels at the end of the Class Period and has not risen to its inflated Class Period levels since.

### H. The Company Experienced Substantial Integration Problems and Adverse Impact on Sales

127. Extreme's acquisition and integration of Enterasys was a failure from its inception, throughout its implementation, and through the end of the Class Period. First, Defendants made promises about the acquisition without basis, which were never fulfilled. Second, Defendants experienced but, did not disclose, substantial integration problems during the Class Period. Finally, the Company experienced significant executive turnover related to its substantial integration problems during the Class Period.

#### 1. Defendants' Representations About the Acquisition Were Never Fulfilled and Lacked Reasonable Basis When Made.

##### (a) Defendants' Representations Were Never Fulfilled

128. As noted above, *see* Section V.B., Berger represented that the Company had conducted a "detailed analysis" of Extreme and Enterasys before the integration and found "virtually no overlap" between Extreme's annual revenue "just shy of $300 million" and Enterasys's annual revenue "between $325 million and $330 million." The analysis was described as finding only "literally, like $28,000 of revenue between one of our customers and one of their customers." Kurtzweil then indicated they expected the acquisition would be "accretive immediately" based on a "plan to reduce product costs and operating expenses between $30 million to $40 million." Finally, Berger guaranteed investors: "***There will be no disruption in customers' ability to grow and operate their networks. Period. None.***"

129. None of these plans, commitments, and guarantees were ever achieved. The acquisition was not accretive (immediately or otherwise), the $30-40 million synergies were not achieved, and there was significant disruption to customers. Defendants never achieved the touted combined revenues "in excess of $600 million." In fact, by the end of its first fiscal year as a combined company, Extreme reported reduced net revenues of only $520 million. After the next fiscal year, it was still only $553 million.

130. Defendants' unfulfilled promises lacked any reasonable basis. Extreme's Chairman of the Board of Directors Ed Meyercord disclosed on May 6, 2015 that: "if I go back to ***the Enterasys acquisition*** with Extreme, if you look at it on paper, you'd say that ***wasn't a***

***very good deal***." Meyercord was Chairman of the Extreme Board of Directors when the acquisition was first announced on September 12, 2013. His statement revealed that the acquisition was incapable of benefiting the Company from its inception, and that anyone familiar with the deal was on notice that the acquisition "wasn't a very good deal." In light of these post-Class Period revelations, Berger's and Kurtzweil's statements, referenced *supra*, touting the acquisition could not have had a reasonable basis.

131. In addition, the acquisition and integration failed to such a degree that Defendants could not have had a reasonable basis for their repeated commitments, guarantees, and other positive statements throughout the Class Period.

**(b) Confidential Witnesses Confirm That Defendants Lacked Any Reasonable Basis for Its Representations About the Acquisition.**

132. Confidential Witness 1 ("CW1") was employed by Extreme from March 2004 until April 2014. CW1 last held the position of Senior Systems Engineer, the technical counterpart to a regional sales manager. During CW1's employment at Extreme, s/he reported to John Barger, Extreme's Senior Director of Worldwide Systems Engineering. CW1, who was responsible for Extreme's sales and technical support for one of its North American sales regions, personally observed the Company's integration efforts in North America from the beginning of the Class Period.

133. CW1 stated that there was no centralized plan to integrate Extreme and Enterasys. Initially after the acquisition, each company had its own distinct products, and each had a separate product roadmap for developing features, hardware, and management systems. From the time the acquisition was announced to CW1's departure in April of 2014, CW1 was never told – by Company management or otherwise – whether the combined Company would be able to provide customers going forward with product features, hardware, or management systems from the legacy Extreme or Enterasys sides.

134. Immediately after the acquisition, CW1 personally observed that there was no plan to combine these separate product roadmaps, but rather a "power struggle" to figure it out. According to CW1, the lack of an integration plan and a single product roadmap made the

integration confusing to customers. Further, CW1 personally knew existing customers were not happy because they could not be told which product features, hardware, or management systems would be available after the acquisition. CW1's customers who expressed dissatisfaction due to the lack of a product roadmap and with whom s/he personally interacted during this time period, including the University of Central Florida (the second-largest university in the nation by student enrollment), the University of West Georgia, and Georgia State University.

135. Confidential Witness 2 ("CW2") was a senior executive of Extreme before, during, and after the Class Period.[5] CW2 indicated that s/he sat on conference calls with upper management and the Board of Directors and had personal knowledge of how the acquisition of Enterasys was originally conceived. CW2 stated that s/he first became aware of the acquisition idea being seriously discussed when Oscar Rodriguez was CEO, and that Rodriguez opposed the measure. CW2 specified that, in CW2's opinion, the idea was the "brainchild" of Directors Ed Meyercord and Edward Kennedy, who orchestrated bringing in Chuck Berger as the CEO (replacing Rodriguez) to accomplish the acquisition.

136. CW2's opinion is that the integration was "problematic right from the get-go." CW2's view was that the immediate result of the acquisition was a clash of cultures from the two companies. CW2 believed that there was difficulty retaining clients due to uncertainty with the future of the combined Company's product roadmap as follows: "When we came out to refresh the network, they [legacy clients] didn't go with us because we didn't have a story or a product roadmap." Further details regarding the basis for CW2's opinions are detailed below. *See* ¶ 144, *infra*.

137. Confidential Witness 3 ("CW3") was employed by Extreme from January 2012 until June 2015. CW3 last held the position of Territory Sales Manager for New York. During CW3's employment at Extreme, s/he reported to Peter Katavolos, Extreme's Regional Sales Director. CW3 confirmed that the acquisition was favored by Chairman/Director Ed Meyercord.

---

[5] Lead Plaintiff believes that the details of CW2's identity contained herein are sufficient to satisfy the requirements of the PSLRA. Lead Plaintiff can provide additional specificity, including CW2's exact position title and dates of employment, to the Court through an *in camera* submission.

CW3 recalled attending the first Global Sales meeting after the acquisition, where the highest levels of management were present, and where the schism between Extreme and Enterasys personnel was clear with the two factions sitting on opposite sides of the room, making it obvious that "they did not want to integrate!" CW3 concluded from personal experience at Extreme that there was no plan for integration.

138. CW1, CW2, and CW3 confirmed an understanding that Extreme's integration of Enterasys was a failure from the start because of a lack of integration plan and/or product roadmap from the start.

139. The absence of a product roadmap and integration plan disrupted customers' ability to grow and operate their networks, despite the fact that Berger promised "no disruption in customers' ability to grow and operate their networks. Period. None."

**2. Defendants Experienced But Did Not Disclose Substantial Integration Problems During the Class Period**

140. CW1 stated that s/he personally observed the Company's integration efforts in North America. CW1 stated that s/he and a colleague, John Greiner (Extreme's Sales Director for the Southeast region from July 2001-April 2014), were consistently cited as top performers at the regional level.

141. CW1 recalled that after the acquisition of Enterasys, their (CW1's and Greiner's) territory of almost 10 years was taken from them and "divvied up to 8-10 Enterasys people" who had no experience or understanding of Extreme's legacy products. CW1 described that CW1's client base used Extreme legacy products and because the Enterasys replacements did not understand the Extreme legacy products, clients became dissatisfied. CW1 listed examples of legacy Extreme customers who were dissatisfied due to the lack of understanding from Enterasys sales personnel, including the University of Central Florida, the University of West Georgia, and Georgia State University, with whom s/he personally interacted during this time period. CW1 was certain that at least one large client – DeKalb Schools (then the third-largest school district in Georgia) – was lost as a direct result of the integration failures s/he personally observed, described above. CW1 also stated that the University of Central Florida decided not to expand

its current contract for the same reasons, losing progress sales people had made before the integration. CW1 further recalled that Extreme also lost Abbott Laboratories for the same reasons, which had been its “largest customer” worth several million dollars in the years CW1 was with the Company.

142. CW1 recalled that the replacement of Extreme personnel with Enterasys people who did not understand Extreme legacy products also created hostility and animosity that became an “us and them mentality which internally was called Red (Enterasys) and Purple (Extreme) teams.” These terms were based on the brand colors of the respective companies’ products. CW1 personally observed employees and management using these terms openly, stating “that’s what our leadership called it.” Specifically, CW1 remembers COO Chris Crowell using those terms to describe the post-acquisition schism. CW1 also recalls from a personal interaction with CEO Berger, described in more detail below, that Berger did not use these terms but knew about them and was “miffed” about their usage.

143. CW1 called the results of being replaced with Enterasys people who did not understand Extreme legacy products “**disastrous**,” and indicated that s/he voiced her/his opposition with CW1’s superior, Barger, before CW1’s voluntary departure in April of 2014. CW1 identified these integration problems as the reason for CW1’s resignation. CW1 further stated that after s/he submitted CW1’s resignation on April 1, 2014, s/he was contacted by CEO Berger and asked to reconsider. CW1 recalled this conversation with Berger in detail. CW1 recalled that s/he described the reasons for CW1’s departure to Berger at length, including the manner in which s/he and Greiner were replaced by Enterasys personnel, who were not as familiar with legacy Extreme products, despite CW1’s and Greiner’s superior performance. CW1 also related the ensuing negative impact on customers and revenue in their region to Berger.

144. Likewise, CW2 was of the opinion that the integration was “problematic right from the get-go” based on CW2’s recollection that the acquisition immediately resulted in a clash of cultures from the two companies. S/he believed that the problems stemmed from the unusual situation wherein Enterasys CEO Chris Crowell continued to have a role at the

combined Company, resulting in a "power struggle" that "caused the company not to come together as one." CW2 specified particular problems that s/he personally observed as a result of the acquisition. CW2 believed that "people synergies" or the elimination of employee redundancies did not actually start until Meyercord replaced Berger as CEO (after the class period), as Meyercord brought a new "tough love" approach. CW2 believed there was a difficulty retaining clients due to uncertainty with the future of the combined Company's product roadmap as follows: "When we came out to refresh the network, they [legacy clients] didn't go with us because we didn't have a story or a product roadmap." One "major client" CW2 recalled losing due to such problems was Abbott Laboratories, and CW2 believed there were "probably more" legacy Enterasys customers that were lost this way as well. CW2 attributed an approximately $90 million in lost revenue due to client losses stemming from integration failures.

145. So, too, CW3 described the Company's failure to integrate overlapping sales force personnel after the acquisition of Enterasys. When asked about the integration, CW3 replied "there was none – not for Sales." S/he indicated that Enterasys sales people had absolutely no knowledge of Extreme's products or clients, yet were given sales territories "ripped" from Extreme salespeople that had built relationships in those territories over years. CW3 also described the example of John Greiner, Extreme's Sales Director for the Southeast region from July 2001-April 2014, who CW3 describes as having received an award for bringing in $100 million in revenue during his tenure. CW3 described how, after the acquisition, an Enterasys executive (who stayed on in the combined Company) named Mike Fabiaschi got rid of Greiner to replace him with Enterasys personnel, including Fabiaschi's nephew.

146. CW1, CW2, and CW3 confirmed an understanding that Extreme's integration of Enterasys was consistently a failure through the duration of integration efforts while they were at Extreme.

147. Confidential Witness 4 ("CW4") was employed by Extreme from February 2008 until February 2014. CW4 held the position of Regional Sales Director during the Class Period. CW4 indicated that s/he was re-assigned to be Regional Sales Director of a new region in 2013

to accommodate an Enterasys legacy appointment to CW4's region.[6] CW4 stated that s/he was rated as a sales leader prior to CW4's voluntary departure from Extreme, and was assured that the Company wished to retain CW4.

148. CW4 personally observed one reason why the integration failed, which was a lack of action to manage duplication between the two businesses, as illustrated by CW4's own re-assignment. CW4 stated that Extreme and Enterasys were about equal in size and each came with overlapping product lines and a duplicate sales structure. CW4 observed, "With that acquisition, came political infighting for jobs and mistrust between Extreme legacy staff and conjoined Enterasys legacy people." CW4 observed that COO Chris Crowell, who had been the CEO of Enterasys, looked out for his people and slotted an Enterasys individual to run North American Sales. CW4 provided a specific example in addition to CW4's own situation: a New York sales representative who was executing quite favorably while his Enterasys counterpart was not selling anything, but both continued at overlapping positions for a year. CW4 personally observed that sales people were stepping on each other by calling the same accounts.

149. Confidential Witness 5 ("CW5") was employed by Extreme from August 2014 until February 2015. CW5 last held the position of "Solutions Marketing Manager." CW5 recalled coming to work for Extreme in August of 2014 and being told that, instead of the Company having an integration plan in place, the "dust had not yet settled from the integration," the Company was still going through a "period of adjustment," and people were still trying to figure out the best ways of working together. CW5 also stated that at this time, s/he was informed that the "challenges" related to the integration stemmed from two different companies with two different cultures and two different geographical locations encountering difficulty "blending." While employed at Extreme, CW5 was responsible for conducting case studies of customers that were either legacy Enterasys, legacy Extreme, or combined customers, which included conducting interviews of these customers. CW5 had personal knowledge of duplicative

---

[6] Lead Plaintiff believes that the details of CW4's identity contained herein are sufficient to satisfy the requirements of the PSLRA. Lead Plaintiff can provide additional specificity, including the regions for which CW4 and CW4's replacement were responsible, to the Court through an in camera submission.

case studies being conducted by other personnel in the marketing team, which was inefficient because s/he had no visibility into what the larger marketing group was doing, and others in the group did not have a good understanding of what s/he was doing.

150. Confidential Witness 6 ("CW6") was employed by Extreme from shortly after the beginning of the Class Period until the end of the Class Period. CW6 last held the position of Systems Engineer.[7] During CW6's employment at Extreme, s/he reported to one of Extreme's Regional Directors. CW6 recalled one obstacle during the integration of the sales teams that began in the summer of 2014. According to CW6, directives came down regarding expense cuts that impacted CW6's ability to travel. CW6 reported that the directives escalated, first requiring special permission to travel and eventually becoming "a travel embargo." These restrictions negatively impacted CW6's work, which usually required up to two weeks of travel per month on average. CW6 reported CW6's understanding that the cost-cutting measures were implemented because Extreme was not hitting its forecasted financial metrics, and therefore required significant expense reductions. CW6 confirmed that these cuts negatively impacted CW6's work. CW6 further reported that the cuts accelerated to become "major reductions" by January 2015.

151. Thus, it is clear that Defendants experienced but did not disclose substantial integration problems during the Class Period.

### 3. The Company Experienced Significant Executive Turnover During the Class Period Related to Its Substantial Integration Problems

152. Effective November 1, 2013, Chris Crowell joined Extreme as its Chief Operating Officer. Crowell was the former CEO of Enterasys.

153. On a November 4, 2013 conference call, Berger characterized Crowell's hire as "significant progress" on the integration, specifying that Crowell's role would include "direct

[7] Lead Plaintiff believes that the details of CW6's identity contained herein are sufficient to satisfy the requirements of the PSLRA. Lead Plaintiff can provide additional specificity, including CW6's exact title and dates of employment, to the Court through an in camera submission.

responsibility for sales and marketing" to "maintain the entire revenue streams of both companies." Berger continued, "I have no doubt he will succeed."

154. On May 6, 2014, the Company announced in a press release that Chris Crowell "will be leaving the Company effective immediately." In another press release the same day, the Company announced that Kurtzweil would transition on June 2, 2014 from CFO to "special assistant to the CEO," before his departure at the end of September 2014, and that Arola would become the Company's new CFO. None of the disclosures explained the reasons for these changes.

155. The Company was not immediately prepared with a replacement for Crowell. Instead, Berger disclosed in a conference call later the same day that, notwithstanding prior assurances, there had been problems with the integration and that, as a result, he would be taking a more direct role in the integration efforts:

> As we move on to the next phase of the integration I feel that **it is critical that I stay close to our field organizations** [i.e. the salesforce] particularly in North America **where we have experienced some integration issues**. The field organizations and corporate marketing will **report directly to me effective today**.

156. A May 7, 2014 Wunderlich Securities analyst report observed that "**[c]hallenges of combining** like-size companies **impacted Extreme 3Q14 results and outlook** with the Americas team **lagging behind integration** in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being**." The report further noted that "CEO Chuck Berger has eliminated the COO role **and put himself in charge of sales management** for the time being." The report also noted that "a new CFO has been recruited," interpreting this as partially negative news because "we believe departing CFO John Kurtzweil has been a major factor in driving most of the Enterasys integration." On this news, the analyst report revised its estimates lower.

157. As noted above, CW1 specifically recalled that Crowell used the terms "red" versus "purple" to describe the post-acquisition schism even though Berger disapproved of using those terms. *See* ¶ 142, *supra*. CW2 believed that the integration was "problematic right from

the get-go" in part because Crowell continued to have a role at the combined Company, fueling a "power struggle" that "caused the company not to come together as one" and instead created a division within the combined Company. *See* ¶ 144, *supra*. CW4 observed that COO Chris Crowell, who had been the CEO of Enterasys, looked out for his people. *See* ¶ 147, *supra*.

158. On October 1, 2014, the Company issued a press release announcing that it had hired Jeff White to be its new Chief Revenue Officer. White, as CRO, would be "responsible for overseeing Extreme's global sales and marketing organizations." The role did not exist before White's hire. Ever since the Company lost Crowell as COO, "field organizations and corporate marketing" had been reporting **directly** to CEO Berger. *See* ¶ 155, *supra*.

159. Analysts recognized that the appointment of White in the Chief Revenue Officer role was to remedy problems integrating Extreme and Enterasys, particularly their respective sales forces. For instance, the Buckingham Research Group issued a report on October 1, 2014 and noted that White was to fill a "key void" that was created when Chris Crowell was terminated as COO:

> Given the sales transition issues the company has faced in recent quarters, we think the appointment [of Jeff White as Chief Revenue Officer] is a positive, particularly given Mr. White's international experience [from competitor Cisco]… Bottom line, a key void is filled and given Mr. White's substantial international and leadership experience, we expect near term strategic changes and realignment of the sales organization, leading to top line improvement in 2015.

This executive-level turnover was directly related to the Company's substantial integration problems.

160. Then, on April 9, 2015, Extreme preannounced that it would miss guidance for Q3 2015. The Company also announced that White, who had been hired only six months earlier to manage the integration of the Extreme Networks and Enterasys salesforces, was "no longer with the Company." Trading in Extreme shares was halted. As described more fully above, *see* Section V.G, *supra*, this executive-level turnover was directly related to the Company's substantial integration problems.

161. CW3 further recalled that Jeff White's tenure was another aspect of the failed integration, where White embarked on a six month "listening tour" around the world, culminating in a two-hour global sales call in which White listed "50 things wrong" with the company, which CW3 recalled White also described as his "burning platform." However, shortly thereafter (approximately six months after White joined the Company), White was abruptly no longer with the Company.

162. Finally, in an April 21, 2015 press release, Extreme announced that Berger would be resigning as CEO effective immediately. The same release stated he would be replaced by Board Chairman Ed Meyercord. As described more fully above, *see* Section V.G, *supra*, this turnover at the Company's highest levels was further evidence of the Company's substantial integration problems.

### I. Defendants Lacked Any Reasonable Basis to Believe That the Lenovo Partnership Would Positively Impact Extreme's Revenue

163. CW4 personally observed that the Company's alliance with Lenovo was pushed very hard internally by an Executive Vice President identified as Eileen Brooker, but noted that all activity was at the strategic level and nothing came down to the field level. CW4 stated: "There were no joint meetings, no Go-to-Market sessions, no follow-up – there was no field level activity towards that alliance." CW4 stated that s/he "certainly wanted to get together with Lenovo teams" but was not able to.

164. Confidential Witness 7 ("CW7") was employed by Extreme from May 2013 until January 2015. CW7 last held the position of "Account Executive-Lenovo." CW7 related that s/he had no direct report during CW7's tenure, but would have occasional contact with Executive Vice President Eileen Brooker. CW7 stated that there was "no mechanism in place" for the Lenovo sales people to benefit from Extreme's product line the entire time s/he was with the Company.

165. As described in more detail above, *see* Section V.G, revelations after the Class Period confirmed the CWs' observations. At the Company's May 6, 2015 earnings call, new CEO Meyercord confirmed that the Lenovo partnership had not yet translated into sales at the

field level, and that Extreme had "zero visibility" into when it would. It further confirmed that the Company had no basis to "forecast" any revenue growth from the Lenovo partnership.

166. These facts indicated that Defendants had no reasonable basis for believing during the Class Period that Extreme's partnership with Lenovo would positively impact its revenues, and in particular had no basis for making a commitment that the Lenovo partnership would drive double-digit revenue growth by June of 2015.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO

167. During the Class Period, Defendants made the following false and misleading statements and material omissions.[8]

### A. Misstatements and Omissions Regarding the Enterasys Integration

#### 1. September 12, 2013 – Business Update Conference Call

168. On September 12, 2013, Extreme issued a press release, before the market opened, announcing that it had entered into an agreement to acquire Enterasys Networks ("Enterasys") for $180 million. In the press release, the Company publicized that the acquisition of Enterasys would add immediate value: "The companies' revenue will be approximately double that of either company alone….***The acquisition, excluding transaction, integration and purchase accounting related costs, is expected to be immediately accretive.***"

169. The Company hosted a conference call with analysts to discuss the acquisition later that day. Defendants Berger and Kurtzweil participated in this call. During the call, Kurtzweil explained the terms of the acquisition and stated that the two companies would be fully integrated within 12 to 24 months, resulting in significant cost savings and related "synergies" for shareholders:

> Extreme Networks is purchasing all the outstanding shares of Enterasys Networks for $180 million in cash and is expected to close early in the fourth quarter of 2013. … ***When we have fully integrated the two Teams, we plan to reduce product costs and operating expenses between $30 million to $40 million. We expect to realize these synergies over a 12 to 24-month period.***

---

[8] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

170. During the call, Berger assured investors that as of the announcement, "We are making it clear to the customers of both Companies that ***we will support the full product road map of each Company*** going forward." He further assured investors that the integration between the two companies would be seamless and produce "significant value" for shareholders, and made a guarantee that ***"[t]here will be no disruption in customers' ability to grow and operate their networks. Period. None****….* ***[The acquisition] will certainly*** be transformational for our Companies, the industry, and ***create significant value for the Extreme shareholders***."

171. These statements were false and misleading because (1) Extreme's acquisition of Enterasys "wasn't a very good deal" (*see* Section V.G); and (2) Extreme lacked an appropriate integration plan or product roadmap for the combined Company (*see* Section V.H.1.b). Accordingly, Defendants lacked a reasonable basis for these statements. As CEO and CFO, Berger and Kurtzweil knew, or were reckless in not knowing, that their statements were false and misleading for these reasons (*see* Section VII).

172. Berger stated that "the combined Company will have trailing 12-months revenues in excess of $600 million" based on Extreme's annual revenue "just shy of $300 million" and Enterasys's annual revenue "between $325 million and $330 million." He also touted the purported minimal "overlap" between the two companies based on an internal "detailed analysis" performed before the acquisition:

> Well, one thing you can imagine ***we did was a pretty detailed analysis of the revenue sources for both Companies, and we were very pleased to find virtually no overlap***. In fact, we looked at the top 200 customers of both Companies which were the predominance of our revenues and found literally, like $28,000 of revenue between one of our customers and one of their customers.

173. In reality, by the end of its first fiscal year as a combined company, Extreme reported only $520 million in net revenues. After the next fiscal year, it was still only $552 million. These statements were false and misleading because they incorrectly implied that the combined Company would achieve over $600 million in annual revenues due to its lack of overlap in revenue sources. In addition, these statements were false and misleading because they incorrectly implied that the lack of customer overlap would help the companies achieve annual

revenues in line with their separate trailing revenues. Further, these statements were false and misleading because they omitted to mention substantial overlap between the two companies' salesforce, region, and products/services. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading for these reasons (*see* Section VII).

174. The market reacted favorably to Defendants' statements about the immediate value that the acquisition of Enterasys would add to Extreme. As a result, Extreme's stock price increased 7%, by $0.30 per share on 7.7 million shares traded, from $4.03 per share at the close of trading on September 11, 2013 to $4.33 per share at the close of trading on September 12, 2013.

175. Craig-Hallum issued an analyst report on September 13, 2013 that indicated its understanding that Extreme's acquisition of Enterasys would be "**immediately accretive,**" *i.e.* that it would add value to the Company's earnings per share, and "has the potential to be significantly more accretive following expected cost reductions of $30-40 million in the 12-24 months following the acquisition." The report further stated as a "key takeaway" that the integration would have "**no disruption to customers' businesses**."

176. On September 17, 2013, Wedbush Securities upgraded its rating on Extreme from "neutral" to "outperform" "based on [its] view that the acquisition of Enterasys is **immediately accretive and offers potential upside from synergies**, leading to valuation which suggests upside from current levels." This analyst report further explained that its "upgrade is predicated on [its] belief that . . . (2) **we think the company will benefit from deal synergies**, including optimization of the supply chain and **the removal of duplicate cost structures**."

**2. November 4, 2013 – Q1 2014 Press Release and Earnings Call**

177. On November 4, 2013, Extreme issued a press release announcing its Q1 2014 financial results and its Q2 2014 guidance. Extreme announced that it generated revenues of $75.9 million during Q1 2014, and expected revenue for Q2 2014 to be in the range of $140 to $155 million. The press release further stated that Chris Crowell, the former CEO of Enterasys, had been retained as the COO of Extreme, with direct responsibility for "sales and marketing." In the press release, Berger touted Extreme's "considerable progress" in the integration of

Enterasys, whose acquisition was completed on October 31, 2013: "***We have already made considerable progress towards integrating the two companies including establishing the executive leadership team***."

178. Additionally, later that day, Extreme hosted a conference call with analysts to discuss the Company's financial results for Q1 2014 and Q2 2014 guidance. Berger and Kurtzweil participated in this call, and Berger reiterated that the integration between Extreme and Enterasys was progressing well:

> [T]he acquisition will double the size of the Company, in terms of revenues, and will be immediately accretive from an earnings standpoint….We began to focus on the integration of Extreme and Enterasys right after the announcement. ***We have made significant progress, including finalizing the top levels of executive management….Overall, our integration efforts are on track***.

179. These statements by Berger were false and misleading because he failed to disclose that: (1) Extreme's acquisition of Enterasys "wasn't a very good deal" (*see* Section V.G); (2) Extreme lacked an appropriate integration plan or product roadmap for the combined Company (*see* Section V.H.1.b); and (3) Extreme's revenue depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, and a divisive workplace culture (*see* Sections V.H.2, V.H.3., and V.G). Accordingly, Berger lacked a reasonable basis for his statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading for these reasons (*see* Section VII).

180. During the call, Kurtzweil also discussed the continued expectation of the Enterasys integration synergies coming to fruition over a 12 to 24 month period, resulting in a substantial positive impact on Extreme's revenues: "***When we have fully integrated the two teams, we plan to reduce product costs and operating expenses between $30 million to $40 million. We expect to realize these synergies over a 12- to 24-month period. The timing of the synergies will be seen in the financials in a small way in the third fiscal quarter and will hit full stride in 12 to 15 months from now***."

181. Kurtzweil's statement was false and misleading because: (1) Extreme's ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, and a divisive workplace culture (*see* Sections V.H.2, V.H.3., and V.G); and (2) Kurtzweil lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" within a "12 to 24 month" time frame as a result of the integration (*see* Section V.H.1.b.). Accordingly, Kurtzwel lacked a reasonable basis for these statements. As CFO, Kurtzweil knew, or was reckless in not knowing, that his statements were false and misleading for these reasons (*see* Section VII).

182. The market reacted favorably to Defendants' misstatements regarding the progress of the Enterasys integration and expected synergies with a positive impact on Extreme's revenues. On November 4, 2013, after the release of the Company's financial results and its earnings call, Extreme's stock closed at $6.30 per share on 8.9 million shares traded, rising almost 17% or $0.92 per share from the prior trading day's closing price of $5.38 per share on 1.9 million shares traded.

183. Analysts also reacted positively to Defendants' misstatements. For example, a Craig-Hallum report issued on November 5, 2013 reiterated its "buy" rating on Extreme, stating: "Over the next 24 months management plans to realize synergies of $30-$40 million which we believe will be driven by 200-300bp [basis points] of gross margin improvement from improved purchasing scale and the remainder through headcount reductions as the combined workforce is right-sized."

184. Similarly, a November 5, 2013 Wedbush Securities report maintained its "outperform" rating on Extreme "based on [its] view that the recently closed acquisition of Enterasys is immediately accretive, offers upside from synergies and the potential contribution from partnerships."

185. Further, a follow-up Wedbush Securities report published on November 6, 2013 spoke positively regarding Extreme's ability to improve margins and revenues based on the

Enterasys acquisition: "Initial synergies to begin in December, with potential for better-than-expected [gross margin] long term. . . . [F]urther management due diligence of Enterasys has uncovered additional areas for improvement which have the potential to add another 200-400 [basis points] to initial expectations."

186. Moreover, after Extreme held a conference call to discuss the *pro forma* financials following the acquisition of Enterasys on January 14, 2014, the market became even more encouraged by Defendant's assertions that it will achieve $30 to $40 million in cost-saving synergies from the integration within 12-24 months from the acquisition. In an analyst report published on January 14, 2014, Wedbush Securities maintained its "Outperform" rating "based on [its] view that the acquisition of Enterasys is immediately accretive, potentially more than anticipated and offers **upside from synergies and partnerships**." Wedbush further stated, "**with the acquisition complete, the stock will now trade on integration, capturing synergies** and guide [sic] rather than the first quarterly combined results. . . . Recall the company is looking to extract $30-40 [million] in synergies from the combined company over the next 24 months. . . . **The key takeaway is that there are not major changes to original assumptions**."

187. Similarly, in an analyst report issued on January 23, 2014, Craig-Hallum reported that it was encouraged by the Company's reassuring statements: "[M]anagement recently hosted a call to go over proforma financials following the acquisition of Enterasys and **we came away encouraged by the potential leverage in the model**."

### 3. February 5, 2014 – Q2 2014 Press Release and Earnings Call – The Truth Partially Emerges but Defendants Continue to Mislead the Market

188. On February 5, 2014, before the market opened, Extreme issued a press release that announced its Q2 2014 financial results and its Q3 2014 guidance. Extreme reported revenues of $146.6 million for 2Q 2014, toward the low end of the guidance announced on November 4, 2013, and expected revenues of $140 to $155 million for Q3 2014, below the consensus estimates of $154 million. Later that day, Extreme held a conference call with analysts to discuss its Q2 2014 financial results and guidance. During this call, Berger acknowledged that the Company had as yet "not seen significant evidence of revenue [due] to

synergies." Kurtzweil acknowledged that the Company's guidance was "at the low end of the revenue guidance" compared to its third quarter of 2013. Kurtzweil further attributed the reason why the Company saw "North America as [the] weakest region" to the fact that it "is a tough market right now." When the call was opened to questions, an analyst noted to the contrary that competitors in North America were doing "pretty decent," were "flush," and "one . . . actually had a good quarter," and asked for the Company to explain "what you saw in North America that made it tough." Berger answered: "I think for this, to keep this in perspective is, we have been in the middle of a turnaround of both our sales and marketing efforts at Legacy Extreme, and that was probably most pronounced -- the need for that was probably most pronounced in our North American organization." Berger summarized by disclosing that the Company experienced not only "tough market conditions but also some self imposed issues" relating to integration.

189. These disclosures and softer guidance for Q3 2014 were the first indication that Defendants' statements regarding (a) the Company's successful progress with the integration and (b) realization of cost-saving synergies by the third quarter of 2014, the first full quarter of the combined Company, were false and misleading. Due to this initial partial corrective disclosure and/or materialization of risk, at the close of trading on February 5, 2014, the price of Extreme's stock dropped 16%, from $7.04 per share to $5.92 per share on unusually high trading volume of 8.6 million shares.

190. However, in the midst of the lower guidance, Defendants continued to minimize the emerging problems and falsely reassure investors that the integration was "***on track***" and had "***few surprises***," with any integration issues "***getting dramatically better***." Specifically, in the February 5, 2014 press release, Berger stated, "***[o]ur integration plans are on track.*** The senior management team for the combined Company has been established and announced and ***we continue to make steady progress towards a complete integration***." On the conference call, Berger similarly reassured investors that, with respect to "self imposed" integration issues: "We see that ***getting dramatically better*** with a couple of things, the combination of sales forces under the leadership of our now head of North American sales John Fabiaschi, who came from

Enterasys with strong performance there." Moreover, during the February 5, 2014 earnings call, Berger also stated:

> As significant, we delivered these numbers in the first quarter after closing the acquisition. ***That we were able to forecast our financial performance accurately is one of the many examples of how the integration of the two companies has gone to date. Overall we have found few surprises since closing the acquisition*** reflecting how well Chris Crowell now our Chief Operating Officer and his team managed Enterasys for the past six years.

191. Berger's statements above in ¶ 190 were false and misleading because (1) Extreme's acquisition of Enterasys "wasn't a very good deal" (*see* Section V.G); (2) Extreme's revenue depended on successfully integrating Enterasys, but the integration was a failure (*see* Section V.H); (3) Extreme lacked an appropriate integration plan or product roadmap for the combined Company (*see* Section V.H.1.b); and (4) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, and a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, Berger touted positive aspects of the integration, intentionally or recklessly giving the false impression that the integration was going well, without disclosing the negative aspects outlined above. Berger lacked a reasonable basis for these statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

192. Defendants also discussed the initial integration of the two companies' salesforce in terms of cross selling between the Extreme product lines and Enterasys product lines, similarly reassuring the market that these efforts were progressing well. In particular, Kurtzweil stated:

> This will be the first time we have a full quarter of the Legacy Extreme and Legacy Enterasys combined into one entity. ***As we have already started the integration process and some cross selling*** we will not be providing product line

> splits as we operate in a single segment….Moving on to a bit more detail regarding the acquisition and expected synergies, ***we see cross selling already beginning, scale of the Company that will lead to reduced material costs that will show up in the P&L beginning in the fourth fiscal quarter, a reduction in operating expenses that will being to show up in sales in the third fiscal quarter, marketing in the fourth fiscal quarter, and G&A in FY15***.

Likewise, Berger stated, "***we are just starting to integrate the sales teams and generate cross selling opportunities across the product line, but I would say we are ahead of the curve***, particularly on wireless right now." Additionally, Berger reiterated that the integration was progressing well and would not impact either Company's customers:

> ***We expect to have that integration complete late summer early fall [2014]***…So, we put it in place plans in relatively short order given, that we only closed this transaction three months ago to realize these benefits that as John points out it just takes a little more time. ***On the operating expense side, we are making progress, but we are being very mindful of commitments we've made to our customers not to disturb the product road map of either of the companies until we are ready to combine the product lines under a unified operating system, which as we've said from the beginning would be a 18 to 24 month effort***. And we are also being very mindful not to disturb our ability to create and deliver on our revenue guidance.

193. The statements above in ¶ 192 were false and misleading because (1) Extreme's revenue depended on successfully integrating Enterasys, but the integration was a failure (*see* Section V.H); (2) Extreme lacked an appropriate integration plan or product roadmap for the combined Company (*see* Section V.H.1.b); and (3) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, and a divisive workplace culture (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, Defendants touted positive aspects of the integration such as cross-selling opportunities, intentionally or recklessly giving the false impression that the integration was going well, without disclosing the negative aspects outlined above. Accordingly, Defendants lacked a reasonable basis for these statements. As CEO and CFO, Berger and

Kurtzweil knew, or were reckless in not knowing, that their statements were false and misleading (*see* Section VII).

194. During the earnings call, Kurtzweil further reiterated that the timing of the synergies was still on track with Extreme's initial timeline provided in September 2013:

> When we have fully integrated the two teams, ***we target to reduce combined material costs and operating expenses between $30 million to $40 million. The timing of synergies will begin to be seen in the financials in a small way this coming quarter and will hit full stride in 12 months to 15 months from now.***

Because Kurtzweil made this statement in a February 2014 call regarding Extreme's second fiscal quarter of 2014, his reference to "this coming quarter" meant Extreme's third fiscal quarter of 2014, or January through March of 2014, and the "12 months to 15 months" time period he specified meant February through May of 2015.

195. Further, Berger stated that Extreme was making significant jobs cuts in its sales and marketing department to remove duplicative positions: "***So, we have started to make significant cuts, particularly in removing duplicative and very expensive senior management in the sales organization. We've got a similar move already in the marketing organization. I think you will see more of those synergies in this quarter and certainly next.***"

196. The statements in ¶¶ 194-95 were false and misleading because (1) ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, and a divisive workplace culture (*see* Sections V.H.2, V.H.3., and V.G); (2) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" within the promised time frame (*see* Section V.H.1.b.); and (3) the promised $30-40 million in cost savings did not "begin to be seen" in Extreme's financial results for third fiscal quarter of 2014, nor were they seen even by the planned time period for them to "hit full stride" in January through March of 2014. Furthermore, Berger touted significant cuts of duplicative senior positions, intentionally or recklessly giving the false impression that the integration was going well and duplicative positions were being

eliminated, without disclosing the fact that numerous redundancies remained, as well as the other negative aspects of the integration outlined above. In addition, Berger and Kurtzweil intentionally or recklessly gave investors the false impression that Extreme's cost cutting measures would materialize in increased profit margins in the near future, without disclosing that these cost cuts would not be enough to offset the loss of customers and business due to the poor integration of product lines and salesforce, as outlined above. Defendants lacked a reasonable basis for these statements. As CEO and CFO, Berger and Kurtzweil knew, or were reckless in not knowing, that their statements were false and misleading (*see* Section VII).

197. The market reacted unfavorably to the softer than expected guidance and the initial disclosures revealing that integration was experiencing some initial setbacks. Nevertheless, they were reassured by Defendants' continued false and misleading statements minimizing the extent of the apparent issues and assuring that the integration was still "on track." For example, on February 6, 2014, Wedbush Securities issued a report expressing disappointment, confirming its understanding that that "lower-than-expected revenue guidance reflects ongoing integration activities including training the sales force on both product lines" and "ongoing realignment of the legacy Extreme sales force"; accordingly, the report lowered its share price target for Extreme. However, the same analyst also maintained its positive "outperform" rating, echoing Defendants' reassurances that synergies would be seen on a specific timeline, and that the integration efforts were "on track":

> With the acquisition complete, we believe the focus now turns to delivering on synergies, driving partner revenues and consistent execution. **Bottom line, there is no change to the story and the company remains on track to deliver on its stated goals over the next 12-24 months.**
>
> …
>
> **Company outlines timeline and reiterates targeted synergies of $30-40mn. . . . Management noted that cross selling opportunities have begun**, specifically in WLAN, and reaffirmed its targeted synergies of $30-40mn.

198. A February 6, 2014 Craig-Hallum analyst report similarly stated: "Going forward management continues to expect to generate $30-$40M of synergies which should begin to show up in a small way in the coming quarter and hit full stride 12-15 months from now."

Accordingly, it concluded that "[m]ost importantly, the meaningful potential earnings power of the combined company remains intact even on only modest revenue growth."

**4. May 6, 2014 – Q3 2014 Press Release and Earnings Call – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market**

199. On May 6, 2014, Extreme released two press releases after trading hours. The first announced Company revenues of $143.7 million for Q3 2014, the low end of the guidance given in February 2014, and expected revenues in the range of $143 million to $148 million for Q3 2014. These Q3 2014 announcements reported financial results for the first full quarter since the acquisition was complete, the same quarter in which Defendant Kurtzweil previously specified that investors could expect an increase of earnings per share "by approximately $0.03 to $0.06 per share" attributable to the acquisition. *See supra* ¶ 50. It was also the same quarter in which Defendant Kurtzweil specified that "synergies will begin to be seen in the financials." *See supra* ¶¶ 59, 194-95.

200. The press release also announced the transition of Kurtzweil from CFO to "special assistant to the CEO," before his departure at the end of September 2014; and the hiring of Defendant Arola as CFO. Another press release, later the same day, announced the sudden and unexplained departure of Chris Crowell, Chief Operating Officer of Extreme and former Chief Executive Officer of Enterasys. This significant turnover in the executive leadership was in direct conflict with Extreme's prior statements about the strength of the new executive management team as evidence of its successful integration efforts. *See supra* ¶¶ 153, 177-78.

201. Later that day on May 6, 2014, Extreme hosted an earnings call on which Berger partially disclosed the truth that Extreme had experienced problems with its integration efforts and that, as a result, he would be taking a more direct role in these efforts. Specifically, he stated, "[a]s we move on to the next phase of the integration I feel that it is critical that I stay close to our field organizations particularly in North America **where we have experienced some integration issues.** The field organizations and corporate marketing will report directly to me effectively today."

202. As a result of this partial corrective disclosure that Extreme was experiencing integration issues and its resultant negative impact on the Company's financial results, over the same quarter in which Defendants told investors to expect the benefits of the acquisition, Extreme's stock fell more than 25%, dropping $1.38 per share on unusually heavy trading volume of 9.3 million shares to $3.95 per share by the close of trading the next day, May 7, 2014.

203. However, Defendants continued to mislead the market by representing in the May 6, 2014 press release and earnings call that, despite these integration issues and disappointing financial news, the Enterasys integration was still "ahead of plan," "ahead of schedule," and "going very well" and would soon deliver the positive revenue impacts that Defendants have been promising. Specifically, in the press release Berger stated, ***"[t]he integration efforts following the acquisition of Enterasys continue ahead of plan***."

204. Similarly, during the earnings call, Berger repeated that the integration plan was still "going well," was "on track," and in fact was "ahead of our expectations":

> ***[O]ur target for synergy savings as a result of the acquisition of Enterasys continues to be in the range of $30 million to $40 million per year. We are more confident than ever that we will achieve at least that amount.***
>
> The bulk of the synergies will be realized once we have completed the integration onto one ERP system that will allow us to truly operate as a single Company. ***We are ahead of schedule for this project*** and now believe we will cut over to a single system early in the first fiscal quarter of 2015. ***Overall, the integration of the two companies is going well and is on track or ahead of our expectations.***
> …
> ***I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015 as we complete the integration,*** realize the benefits of our key partnerships like Lenovo[9] and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments.
>
> ***Over the same period we are committed to achieve a 10% operating margin*** on a non-GAAP basis. ***My belief in our ability to achieve these goals has only strengthened since our last earnings call***.
> …

[9] Plaintiff's allegations regarding the false and misleading nature of Defendants' statements and omissions about Extreme's partnership with Lenovo are addressed in Section VI.B, *infra*.

> ***We will be certainly through the integration of the salesforces and the channel by that time [the second half of the fiscal 2015]***.
> …
> Our conviction over our goals for the second half and the impact that some of the growth engines like Lenovo, wireless, datacenter, and completion of the integration will bring to the Company has not weakened at all. ***In fact, if anything, it has strengthened and the fact that we are two months ahead on our ERP integration I take as a very positive sign for that and that even in the midst of this integration we were able to show revenue growth in this quarter so we will keep pushing ahead***….

205. Similarly, Kurtzweil reassured that market regarding the continued progress of the integration thus far:

> ***The integration is going very well***, as Chuck noted earlier. ***Total integration savings in the P&L through synergies during the quarter were approximately $2 million***…. ***Executing our plan for synergies is dependent on the successful integration of our ERP systems. We are on track to finish the merging and testing of the two ERP systems in our first fiscal quarter***. This will allow us to continue our ramp of synergy savings by lowering IT and administration expenses across the Company beginning in our second fiscal quarter.

206. These statements were false and misleading because (1) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the integration was a failure (*see* Section V.H); (2) Extreme lacked an appropriate integration plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); (4) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin by June of 2015, and in fact failed to fulfil their commitment (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G); and (5) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" as a result of the integration (*see* Section V.H.1.b.). Furthermore, when Berger and Kurtzweil chose to tout the few positive aspects of the

integration (*e.g.*, progress integrating the ERP systems), it was materially misleading not to disclose that many other aspects of the integration were not successful; they intentionally or recklessly gave the false impression that the integration as a whole was going well by failing to disclose the negative aspects outlined above.

207. Accordingly, Defendants lacked a reasonable basis for these statements. As CEO and CFO/Special Assistant to the CEO, Berger and Kurtzweil knew, or were reckless in not knowing, that their statements were false and misleading (*see* Section VII).

208. The market recognized and reacted unfavorably to Defendants' partial disclosure of the truth regarding the Enterasys integration efforts. For example, a May 7, 2014 Wunderlich Securities analyst report commented as follows:

> **Challenges of combining like-size companies impacted Extreme (EXTR) F3Q14 results** and outlook with the Americas team lagging behind integration in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being; a new CFO has been recruited to operate from headquarters**….Management was most disappointed in Americas, for which the integration of the Extreme and Enterasys sales forces is taking longer.

However, Wunderlich Securities was reassured by Defendants' continued misstatements regarding the progress of the integration, stating, for example, that "[w]e believe the company is ahead of plan or on plan with regard to integration of everything but Americas sales."

209. Similarly, Craig-Hallum issued a report on May 7, 2014 stating, "[**a]lthough Extreme Networks has experienced some hiccups integrating two equal sized companies, management remains confident in its ability to find $30-$40 million in synergies**. We expect synergies to being to be seen once the company can consolidate its ERP systems which is expected to occur during the September quarter."

**5. June 2, 2014 – Press Release**

210. On June 2, 2014, Extreme issued a press release and announced that Arola would hold the title of CFO effective immediately. In the press release, Berger stated, "We have been intensely focused on integration following the acquisition of Enterasys last September and ***our success is evident in bringing to market new and exciting switching products while expanding***

***globally as a combined company***. . . . Ken will play a pivotal role in ***maintaining this momentum*** as we gear up for our next major integration milestone, combining our ERP onto a single platform."

211. This statement was false and misleading because (1) Extreme's revenue depended on successfully integrating Enterasys, but the integration was a failure (*see* Section V.H); and (2) Extreme's "success" and "momentum" depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, once Berger chose to tout Extreme's so-called global expansion and "momentum," it was materially misleading not to disclose that other aspects of the integration were not successful including declining revenue; he intentionally or recklessly gave the false impression that the integration was going well, failing to disclose the negative aspects outlined above. Accordingly, Berger lacked a reasonable basis for this statement. As CEO, he knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

212. The market continued to be misled by Defendants' false reassurances that early problems with integration had been resolved and the integration was progressing well. For example, on July 2, 2014, Wunderlich Securities issued an analyst report entitled "Extreme Networks, Inc. (EXTR: $4.45): It's Getting Fixed – Buy SDN Strategy Beginning to Emerge with R&D Synergies." Wunderlich reported:

> After 6+ months of discovering integration challenges and disappointment, we believe Extreme (EXTR) is beginning to execute….We believe the sales force disruption that was the primary factor in disappointing results [is] on the mend….
>
> **Discovery phase complete, now things are getting fixed.** We expect improving outlook for sales force productivity. Our understanding is that since the CEO took over sales force management in early May, conflicts that handicapped the Extreme side of the U.S. sales force and distribution network have been

> identified, have progressed toward resolution, and that cross-selling product lines of the constituent operations has begun to occur.
> …
> We understand cost reductions associated with aggregating volumes for Extreme and Enterasys legacies are now coming to fruition.
> …
> **One or two more quarters of tough pro-forma comparisons, but expect improving quality of guidance**. With conflicts being resolved and functional integration underway, we expect stability and improved forecasting ability.
> …
> **Transitioning from discovery to resolution**. The first six months of the November 1 acquisition, Enterasys included a significant amount of discovery, as with any purchase, but when it involves an operation of comparable size to the acquirer, the magnitude of the discoveries can be disruptive, as has been the case for Extreme. **We believe the discovery phase for resolving operational integration and synergies is now largely behind the company with the key milestone of resolving conflict between Enterasys and Extreme sales and channel practices having been solved in recent weeks.** In addition to improved execution, we expect the basis for future guidance to be much firmer.
> …
> Up to now, synergies have been theoretical based on 70%+ functional overlap between product likes of the two constituent companies. **Now we are beginning to see signs of implementation goals. Management continues to assert the goal of achieving $30 million to $40 million in cost reductions from synergies with the November Enterasys acquisition, but these are across the company.**
> …
> We expect tangible signs of execution to yield multiple expansion, especially once the market gains conviction that the likelihood of negative surprises is diminished.

### 6. July 21, 2014 – Press Release

213. On July 21, 2014, Extreme issued a press release and announced higher guidance for 4Q 2014, just two weeks before its official 4Q 2014 financial results would be released. In the press release, Extreme reported that it expected non-GAAP revenues in the range of $154 to $156 million, as compared to its prior guidance of $145 to $150 million. Berger reiterated that "***[o]ur integration remains ahead of plan as we continue to execute against key Company operational and financial milestones***, including successfully completing our ERP integration in early July, two months ahead of schedule."

214. This statement was false and misleading because (1) Extreme's revenue – and whether it "continue[d] to execute against key Company operational and financial milestones" –

depended on successfully integrating Enterasys, but the integration was a failure (*see* Section V.H); and (2) Extreme's "execut[ion] against key Company operational and financial milestones" depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, once Berger chose to tout Extreme's so-called "execut[ion]" and ERP integration, it was materially misleading not to disclose that key aspects of the integration were not successful, including those listed above, which would negatively impact revenue going forward; he intentionally or recklessly gave the false impression that the integration was going well, failing to disclose the negative aspects outlined above. Accordingly, Berger lacked a reasonable basis for this statement. As CEO, Berger knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

215. The market reacted favorably to Defendants' false reassurance that the integrations problems were behind the Company. On July 21, 2014, after the press release was issued, Extreme Networks' stock increased by 15% and closed at $5.06 per share on 9.9 million shares, up from a close of $4.37 per share on over 980,000 shares traded on the previous trading day.

216. This July 21, 2014 press release also reassured analysts that although Extreme hit integration setbacks in Q3 2014, repairing these problems now proceeded "***ahead of plan***." For example, on July 22, 2014, Craig-Hallum issued an analyst report echoing Berger's reassuring statements: "We are also **encouraged that the company's integration efforts are ahead of plan**. . . ." Likewise, Wunderlich Securities published an analyst report the same day stating that the Company's earnings exceeded guidance and its statements concerning Enterasys integration helped to reassure investors. The report also implied that the departures of Crowell and Kurtzweil were involuntary and related to problems with the Enterasys integration efforts:

> The worry about the June quarter was **dysfunction** within the North American sales force, which **cost some management jobs**; **repair is now confirmed to be well underway with better than previously expected volume**. With expectations for the company to field full strength for more than a few weeks in the current quarter, we expect guidance to support our unchanged F1Q15 forecast.

**7. August 14, 2014 – Q4 2014 Press Release and Earnings Call**

217. On August 14, 2014, Extreme issued a press release and announced revenues of $156.87 million for Q4 2014 and expected revenue in the range of $150 to $155 million for Q1 2015. In the press release, Berger again touted the successful progress of the Enterasys integration, noting several accomplishments that Extreme purportedly achieved in Q4 2014:

> ***Our sales force integration is complete, with all territories rationalized, and the team is aligned and executing, which is evident in this quarter's results***. Our new channel program brings together legacy partner programs and provides better resources and incentives for our more than 2,700 worldwide partners.
>
> …
>
> ***On the integration front, Extreme had a number of significant accomplishments. Most notably, we successfully combined ERP systems in early July, two months ahead of schedule.*** With our relationship to our customers, partners, distributors, vendors and employees united on a single interface, ***the combined company is in a better position than ever to seamlessly deliver value to the customer***.

218. On the same day, Extreme hosted an earnings call with analysts to discuss its results for Q4 2014. Berger and Arola participated in this call with the analysts. During the earnings call, Berger again highlighted the successful integration progress to date:

> ***On the whole, the integration has significantly exceeded my expectations. Originally scheduled for September, we completed the ERP integration in July, an unprecedented two months ahead of our original schedule***. Extreme customers, partners, distributors, vendors, and employees now interface with us through a single system.
>
> …
>
> ***Overall, we are exactly where we planned to be in integration process and the realization of the related financial synergies***.
>
> …
>
> ***We completed major elements of the integration of Enterasys and are on track to realize the synergies we have committed to***. I would like to ***reiterate*** our prior guidance, that ***we expect to attain year-over-year double-digit revenue growth in the fourth fiscal quarter***….
>
> In addition, through focused cost management, ***we expect to achieve a 10% non-GAAP operating margin in Q4 and beyond***.

219. These statements were false and misleading because the integration was not where Extreme "planned to be," nor did the integration place Extreme "in a better position than ever to seamlessly deliver value to the customers." Rather, in reality: (1) Extreme's integration continued to be a failure notwithstanding this relatively strong quarter (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) the Company still experienced substantial and not-fully-disclosed integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); (4) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin by June of 2015, and in fact failed to fulfil their commitment (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G); and (5) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" from the integration (*see* Section V.H.1.b.). Furthermore, once Berger chose to tout Extreme's ERP integration, it was materially misleading not to disclose that other aspects of the integration were not successful; he intentionally or recklessly gave the false impression that the integration was going well, failing to disclose the negative aspects outlined above. Accordingly, Berger lacked a reasonable basis for these statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

220. During the earnings call, Arola also made statements regarding Extreme's confidence in being able to deliver synergies of $30 to $40 million. He stated:

> In Q4, we realized our target $5 million to $6 million in savings relating to cost reduction efforts in both cost of goods sold and operating expenses….***While we remain on track to deliver the synergies of $30 million to $40 million annually***, we will not be breaking these out going forward, due principally to ***the fact that the two companies are now fully integrated, and going forward, the efforts to separate normal ongoing cost-cutting activities from execution of synergies will be difficult***.
>
> …

> With the ERP integration completed in early July, we will begin to see IT and administrative costs come down beginning in the fiscal Q2 time frame. ***Also, with integrated product portfolio, consolidated supply chain operations, and fully integrated sales and marketing teams, we expect to being seeing operational efficiencies as we move through the fiscal year***.

221. These statements were false and misleading because: (1) Extreme's integration continued to be a failure notwithstanding this relatively strong quarter (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) the Company still experienced substantial and not-fully-disclosed integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); and (4) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" from the integration (*see* Section V.H.1.b.). Arola's statement about realizing "target $5 million to $6 million in savings relating to cost reduction efforts" was additionally misleading because Extreme was only able to do so in Q4 2015 due to a directive from management to tighten policies for the salesforce – *e.g.*, restrictions on travel – which were **unrelated to integration**, and which were negatively impacting the salesforce's results in bringing in business for Extreme, reduced future revenues. *See* Section V.H.2, ¶ 150. Finally, once Berger and Arola chose to tout positive aspects of the integration (*e.g.*, ERP integration), it was materially misleading not to disclose that other aspects of the integration were not successful; they intentionally or recklessly gave the false impression that the integration was going well, failing to disclose the negative aspects outlined above.

222. Accordingly, Defendants lacked a reasonable basis for these statements. As CEO and CFO, Berger and Arola knew, or were reckless in not knowing, that their statements were false and misleading (*see* Section VII).

223. Additionally, Berger admitted that the integration of the sales forces within North America experienced "challenges," but he assured investors that they were fully resolved:

> ***[W]e are experiencing integration challenges in our North American sales and partner organization. I am confident, having spent a great deal of time with the North America Management team over the quarter, that virtually all of these issues are behind us.*** Additionally, two weeks ago, we held our global sales conference, bringing the entire sales team together for the first time ever. The incredible spirit and unity I saw over the entire event are added signs that the ***integration issues are behind us***.
> …
> ***Of all the things that we had to integrate over the past nine months, integrating the service infrastructure, service programs, and service delivery was probably one of the more, if not most, complex things we did other than the ERP integration….com[pleting] the integration, which is largely behind us***; and then turning those resources and that level of attention towards increasing the attach and renewal rate.

Not only did he selectively limit his statement to the supposedly successful parts of the integration progress to date, but he repeated the Company's commitment to achieving the same targets by the same deadlines though the success of both the integration and the Lenovo relationship:

> We completed major elements of the integration of Enterasys and are on track to realize the synergies ***we have committed to***. I would like to reiterate our prior guidance, that we expect to attain year-over-year double-digit revenue growth in the fourth fiscal quarter driven by our expected ramp of the Lenovo business. . . . In addition, through focused cost management, ***we expect to achieve a 10% non-GAAP operating margin in Q4*** and beyond.

224. These statements were false and misleading because the integration issues were not "behind" the Company, but rather were continuing. In fact: (1) the integration continued to be a failure (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) the Company still experienced substantial and not-fully-disclosed integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); (4)

Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin by June of 2015, and in fact failed to fulfil their commitment (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G); and (5) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" as a result of the integration (*see* Section V.H.1.b.). Furthermore, once Berger chose to tout the entire sales team's attendance at Extreme's global sales conference and that "virtually all" sales integration issues were "behind" the company, it was materially misleading not to disclose the culture clash between Extreme and Enterasys personnel, including a schism acknowledged at all levels of management as "Red" versus "Purple" (*see* ¶142), that was obvious from the way the two factions sat on opposite sides of the room (*see* ¶137); he intentionally or recklessly gave the false impression that the integration was going well, failing to disclose the negative aspects outlined above. Accordingly, Berger lacked any reasonable basis for these statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

225. Analysts reacted positively to Defendants' continued reassuring statements that the concerns with integrating the sales force in North America were over and that the integration was proceeding smoothly to deliver the promised financial benefits. As management repeated its commitment, more analysts began to incorporate this commitment into their investment analyses. For instance, Wunderlich Securities published an analyst report on August 15, 2014 entitled "Extreme Networks, Inc. (EXTR: $5.35): Good Progress in F4Q14 On Track to Make Goals." The report maintained its positive "Buy" rating and updated its model because "[m]anagement re-iterated the goal of 10%+ revenue growth and 10% + operating margins exiting F2015," further noting that "[m]anagement appears on track to achieve targets." Similarly, Craig-Hallum continued to maintain its positive "Buy" rating in part because "[m]anagement believes that given the . . . positive impact of its partnership with Lenovo, the company can achieve double digit year/year revenue growth and 10% operating margins in the June 2015 quarter."

226. Furthermore, on August 15, 2014, in a *SeekingAlpha.com* stock analysis article, the author Martin Vlcek was reassured by Defendants that "[t]he North American integration issues seem to be over now." He wrote:

> The Enterasys integration has "significantly exceeded expectations." It is ahead of track in some areas, such as the ERP IT systems integration. **The integration challenges experienced earlier in the North American sales and partner organization seem to be successfully resolved now thanks to special attention and focus of the company's CEO on this area.**
> …
> Overall, EXTR had a very strong quarter and finished a fiscal year of transformation. **Synergies from Enterasys acquisition should start flowing in.**

### 8. October 15, 2014 – Press Release – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market

227. On October 15, 2014, Extreme issued a press release preannouncing disappointing Q1 2015 financial results. Extreme reported revenues of $135 to $136.5 million for Q1 2015, significantly below the Company's prior guidance of $150 to $155 million. Whereas the Company had previously guided Non-GAAP Net Income per Diluted Share between $0.06 and $0.08, it was now reporting that its quarter would be at best break-even, at ($0.02) to $0.00. In the press release, Berger attributed the results to "***significant delays in closing deals***" in North America, where Extreme was having sales integration problems. Importantly, however, this announcement came over 13 months after the acquisition was announced, making it the first earnings results announced during the original "12 to 24-month period" in which Defendants had specified they would deliver $30-$40 million in cost-saving synergies. *See* ¶¶ 50, 169. This drastic earnings shortfall was a sign that Extreme's integration issues were not firmly behind it as Defendants had previously assured.

228. As a result of these partial corrective disclosures and materialization of concealed risk that integration failures would continue to negatively impact the Company's ability to meet its revenue guidance, by the end of the day on October 16, 2014, following the press release, Extreme's stock fell by approximately 18% on unusually heavy trading volume of 8.5 million shares traded, closing at $3.06 per share from $3.76 per share on the prior day. In the press release, however, Berger minimized these purported issues and again falsely reassured

the market that in this quarter Extreme had "made dramatic progress" with the Enterasys integration. Berger also highlighted the hiring of Jeff White as CRO, responsible for the salesforce integration, as an important positive in resolving any lingering sales integration issues:

> At the same time ***we made dramatic progress towards finalizing the integration of the acquisition of Enterasys*** during the quarter, successfully converging on a single ERP system, closing the Illinois distribution center, converting our direct distribution model in Brazil, and executing a unified partner program and service offering. ***We are on track to realize the full $30-$40 million in cost synergies expected from the acquisition*** and were able to maintain strong gross margins in the first quarter, despite the top line miss. On October 1, we announced that Jeff White joined Extreme as chief revenue officer. Jeff brings with him 20 years of experience in the networking market, most recently at Cisco. . . . ***The combination of strong sales leadership, nearly completed integration*** and the finalization of the Lenovo acquisition ***position us well for the remainder of our fiscal year."***

229. These statements are false and misleading because (1) the integration continued to be a failure (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) the Company still experienced substantial and not-fully-disclosed integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); (4) Extreme's revenue shortfalls could not be fully explained by deal "slippage" or delays, because some deals and, indeed, important customers were completely lost due to integration problems (*see* Section V.H.2); and (5) Defendants lacked any reasonable basis to expect to achieve $30-40 million in cost-savings or "synergies" as a result of the integration, much less be "on track" to do so (*see* Section V.H.1.b.). Furthermore, once Berger chose to explain Extreme's financial shortfalls as mere "delays in closing deals" without disclosing either (a) the role that integration failures played in causing the delays, and/or (b) that the shortfalls had other causes, such as lost

clients, client dissatisfaction, and other factors related to the integration failures outlined above, he intentionally or recklessly gave the false impression that the integration was going well.

230. Accordingly, Berger lacked a reasonable basis for these statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

231. Although analysts recognized the disappointing financial results as a potential sign of some integration issues, they nevertheless continued to be misled by Defendants' false reassurances that these issues were temporary or now resolved. For example, in an October 16, 2014 report, Wunderlich Securities stated, "[**m]anagement commentary** and channel checks during the quarter **mentioned integration issues as having an impact on revenue, including delayed start to the quarter with early July ERP integration**." Nevertheless, Wunderlich was comforted by Defendants' reassurances that any lingering issues were "temporary:"

> Yesterday after regular trading, Extreme Networks (EXTR) warned of F1Q15 shortfall. **With most of the challenges self-imposed for acquisition and distribution integration, we expected them to have been baked in to guidance**. However, it appears a tougher-than-expected economic environment and **perhaps trouble with sales waiting for a new manager to board were more than management anticipated**. **We believe most of these issues are temporary**. . . .

As the report further explained:

> With a more challenging macroeconomic environment combining with integration and management transition, F1Q15 was the worst pro-forma comparison since the Enterasys acquisition. **However, the integration sales channel and management issues that handicapped the quarter are mostly behind the company and we expect to see better execution almost immediately** (assuming no further negative revelations from the earnings call week after next).

232. Likewise, in a report issued on October 16, 2014, Craig-Hallum echoed Defendants' misleading assurances attributing the miss to one-time events such as deal slippage: "[w]e believe roughly half of the company's revenue miss was the result of deal delays in North America and that these deals are not lost but instead pushed out as companies have been digesting macroeconomic uncertainty." This report further maintained its positive "buy" rating on Extreme based on Defendants misstatements regarding the successful progress of the

integration: "**management believes the company remains on track to realize $30-$40 million of synergies from the Enterasys acquisition** which we believe could begin to show up in reduced operating expenses in the next few quarters as the integration of the Enterasys acquisition is nearly finalized."

**9. October 28, 2014 – Press Release and Earnings Call**

233. On October 28, 2014, Extreme issued a press release announcing its financial results of Q1 2015 and Q2 2015 guidance. Extreme reported revenue of $137.1 million for Q1 2015, slightly above the Company's preannounced results, and guided revenue in the range of $140 to $150 million for 2Q 2015. In the press release, Berger reassured investors that Extreme was still on track to meet its $30 to $40 million in cost synergies from the Enterasys integration, and that overall:

> ***During the quarter, we made significant progress towards finalizing the integration of the acquisition of Enterasys:*** successfully converging on a single ERP system, closing the Illinois distribution center, selectively reducing the number of distributors globally, converting our direct distribution model in Brazil to a leveraged two tier model, and executing a unified partner program and service offering. ***Although these changes were well executed, they also had an impact on our revenues during the quarter as our partners and sales people had to learn a new way to do business with us***. ***We are on track to realize the full $30 to $40 million in cost synergies expected from the acquisition*** and were able to maintain strong gross margins in the first quarter, despite the top line miss.

234. Later that day, Extreme hosted an earnings call with analysts to discuss the financial results of 1Q 2015. Berger and Arola participated in the call, and Berger acknowledged that the low revenue and top-line growth were caused by "significant" "disruptions" resulting from the ongoing Enterasys integration efforts – disruptions which Defendants previously assured investors would not happen (*see, e.g.*, ¶ 170). However, Berger reassured investors on the conference call that "***these disruptions are now fully behind us***."

235. During the call, Berger touted the appointment of Jeff White as CRO to lead the ongoing integration:

> I cannot tell you enough how excited I am that Jeff White has joined Extreme Networks. Jeff was at Cisco for 17 years where he was clearly a fast rising star. He is a true sales leader and has already will a strong impact in his first few weeks. Jeff [White] fills a gap that has existed for a very long time here at Extreme, and completes the transition of the exec staff I began over one year ago.

> ***I expect you'll see results from Jeff in this quarter and growing from there. Jeff will not only focus on top line growth, but on reducing our cost of sales by better sales execution***, and gaining far better leverage from our distributors and partners.

Arola likewise promoted White's hire as a factor that would help the realization of promised synergies on scheduled:

> In addition to a strong focus on returning top line growth, Jeff White, our new Chief Revenue Officer, is equally focused on reducing our sales expenses as we go forward. ***We continue to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition.***

Finally, Berger again assured investors that Extreme was on track to realize its goal of 10% year-over-year growth based in part on the successful integration of Enterasys and resultant "synergies":

> Strong sales leadership, new partner and service programs, advancing Lenovo relationships, return of E-Rate, and continued new product introductions, give us confidence in our ability to improve our top line performance going forward. ***Coupled with strong focus on realizing the promised synergies from the acquisition, and ongoing focus on cost reductions across the board, we expect to see substantially improved bottom line performance as well. We stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better***.

236. These statements were false and misleading because (1) far from "finaliz[ed]," the integration was a failure (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); and (4) Defendants lacked reasonable basis to still expect to achieve $30-40 million in cost-savings or "synergies" as a result of the integration (*see* Section V.H.1.b.). In addition, Berger's statement that specific integration efforts "had an impact on our revenues

during the quarter as our partners and sales people had to learn a new way to do business with us" was in direct contradiction with Berger's statement on August 14, 2014 that "integration issues are behind us" and Arola's assurance that the companies were "fully integrated." (Insofar as Defendants' statements pertain to the Lenovo partnership and the Company's commitment to achieve 10% revenue growth and operating margin, they are additionally false and misleading for the reasons discussed in Section VI.B.6., *infra*.)

237. Accordingly, Berger lacked a reasonable basis for these statements. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

238. On the same call, Defendants attempted to explain part of the Company's financial shortfall as "deal slippage." Per Berger, "we saw a significant number of deals slip beyond Q1." Arola and Berger also discussed the delay in closing deals in North America and falsely attributed the "slippage" problem to customer approval structures. For example, Arola reassured investors that these deals only slipped into the next quarter, and were not lost:

> [I]n North America product revenues came in below expectations as a significant number of larger deals were delayed and pushed out of the quarter….***Although many deals were pushed out of the quarter, they remain in the pipeline, and we are confident in our ability to compete for these deals that were delayed from Q1.***

239. Similarly, Berger stated:

> ***We give them incentives to close business in the quarter, and while we're not losing these deals, they are just taking longer to get done. I would add to that every deal needs multiple layers of approval…mostly issues of getting through the layers of management to get approval, in probably at least half of the situations we face in North America***.

Only when pressed by an analyst's question on the subject did Berger come forward with further assurance that "we've seen a number of large deals close this quarter already."

240. These statements were false and misleading because (1) Extreme's revenue shortfalls could not be fully explained by deal "slippage," or delays from "layers of management" approvals, because numerous deals and indeed entire customers were in fact completely lost due to integration problems (*see* Section V.H.2); and (2) Extreme's revenue was

simultaneously being impacted by substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, once Berger chose to explain financial shortfalls as mere "delays in closing deals" without disclosing either (a) the role that integration failures played in causing the delays, and/or (b) that the shortfalls had other causes, such as lost clients, client dissatisfaction, and other factors related to the integration failures outlined above, he intentionally or recklessly gave the false impression that the integration was going well. As CEO and CFO, Berger and Arola knew, or were reckless in not knowing, that their statements were false and misleading (*see* Section VII).

241. Investors reacted positively to this news. After the October 28, 2014 earnings call, Extreme's stock price increased approximately **15%** to an opening price of $3.79 per share on October 29, 2014 from a closing price of $3.30 per share on October 28, 2014 on unusually heavy trading volume of 3.9 million shares.

242. Analysts also reacted favorably to Defendants' misstatements, evidencing that the market continued to be misled, including by adopting Extreme's slippage explanation for its continued failures. For example, in a report issued on October 29, 2014, Wunderlich Securities described the shortfall as being in part "due to deal slippage and/or not having enough opportunities to offset it." The report concluded that "we believe the company is now on much better footing for growth," explaining: "Extreme Networks…integration ambitions were arguably a bit more than could be managed while executing in the current industry environment, **but they appear to have been accomplished and now the company is positioned with channels, executive staff and information systems to grow**."

243. Similarly, a Craig-Hallum analyst report the same day maintained its "Buy" rating and price target in part because it was "encouraged that management is seeing some of the deals

that were pushed out last quarter begin to close and that gives us increased conviction in a recovery."

244. Other analysts also highlighted Defendants' statements regarding the hiring of Jeff White as CRO as an important positive step in rectifying any remaining sales integration issues. For example, an October 29, 2014 Buckingham Research Group report stated: "New sales leadership brings long term positives . . . As we indicated in our note October 1st **when Jeff White was announced, we think the new Chief Revenue Officer (aka head of sales) is likely to bring about positive change to an organization in desperate need of sales leadership**."

**10. December 17, 2014 – Bernstein Technology Innovation Summit**

245. On December 17, 2014, Arola and Eric Broockman, Extreme's Chief Technology Officer, attended the Bernstein Technology Innovation Summit, where Arola discussed the successful completion of the Enterasys integration, particularly with respect to the sales force:

> So we've -- ***in the past year, we pretty much completed the integration of the two companies.*** We converted over our ERP system to one ERP system, Oracle. Enterasys is on a different system.
>
> ***From a sales perspective, more specifically, sales organizations have been integrated***. We've actually brought in new talent also to the organization. We have a new VP of North America. We have a new worldwide VP or CRO who came on board. Both of these individuals, longer-term Cisco employees, very well respected in the industry, and really hit the ground running for us here.
> …
> ***As far as sales organization, again, two teams have been integrated. That was probably more of the difficult things to integrate for us, but it's been done now***. And for the last several months, we are without a leader of sales for about four or five months there. ***But now with, again, Jeff White coming on board at the beginning of October, that's moving ahead nicely. So integration of sales is completed***. We'll see what happens when we get through some of the work we're doing. There's probably some areas to continue to fine-tune in the sales group itself ***but moving in the right direction.***

246. These statements were false and misleading because (1) the integration continued to be a failure (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); and (3) Extreme's revenue and ability to

create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). As CFO, Arola knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

247. Arola also reiterated that the North American deal slippage was due to decision making and that Extreme expected to close those deals in the near future: "***We've had a little bit of struggles last quarter with deals slipping out both in North America and in Latin America, but we expect that will still at some point [in] time close these deals. We haven't lost the deals. We have actually just seen them slip out with decision-making.***"

248. This statement was false and misleading because (1) Extreme's revenue shortfalls could not be properly explained by "deals slipping" because numerous deals and indeed entire customers were in fact completely lost due to integration problems (*see* Section V.H.2); and (2) Extreme's revenue was simultaneously being impacted by substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G). Furthermore, once Arola chose to explain financial shortfalls as mere "deal slippage" without disclosing either (a) the role that integration failures played in causing the delays, and/or (b) that the shortfalls had other causes, such as lost clients, client dissatisfaction, and other factors related to the integration failures outlined above, he intentionally or recklessly gave the false impression that the integration was going well. As CFO, Arola knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

### 11. January 14, 2015 – Needham Growth Conference – the Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market

249. On January 14, 2015, Arola and Norman Rice, Senior Vice President of Corporate Development, made a public presentation on behalf of Extreme at the Needham Growth Conference. At this conference, Arola touted the success of the integration, its customers, and quality of its products and services. However, Arola also partially disclosed the truth about the uncertainty of the synergies the Company said would materialize by the upcoming end of its fiscal year of 2015, when he implied that Extreme would not be able to deliver on its commitment of 10% growth by the end of fiscal year 2015. In response to a question from an audience member about when to expect meaningful revenue from Lenovo, Arola stated:

> I'll start by saying because we are in a quiet period I don't want to comment on a future forecast. But with that said, we are currently looking at what our second half looks at right now, **evaluating where we are with things like our Lenovo relationship**. . . . But we are currently evaluating that top line and operating expenses in bottom line. We are looking at alternatives. If something didn't materialize and we stayed at levels we are, that we would go out and look at how we are going to restructure the business in essence to make sure we can drive bottom line. And we'll provide updates when we come to earnings. **But, again, I don't want to today make a comment about the 10% and the 10%**, but our long-term view of the business, if you ask me we should be running this business at a 10% operating margin pretty consistently over time. The question is as **we are evaluating it now,** we will make some comments on our earnings call more specifically about timing of that.

250. As a result of this partial corrective disclosure that Extreme was reevaluating and would not be delivering on its commitment of 10% growth by the end of fiscal year 2015, Extreme's stock price consistently declined for a two week period. The day after the Needham Growth Conference, on January 15, 2015, Extreme's stock fell 4.8% from $3.36 per share on January 14, 2015 to $3.20 per share. Additionally, on January 16, 2015, Extreme's stock fell another 4.7% to $3.05 per share. This decline in stock price continued until January 28, 2015.

251. Securities analysts also reacted negatively to Arola's statement. A Craig-Hallum analyst report dated January 22, 2015 attributed the share price's subsequent decline to Arola's lack of enthusiasm and evasiveness regarding management's commitment to achieve 10%

revenue growth and 10% operating margin by June 2015. He observed that "shares have fallen over 10% since presenting" at the January 14 conference because, the analyst believed, "**management sounded less enthusiastic** about its previous outlook for 10% y/y [year-over-year] growth and 10% operating margins for the upcoming June quarter." The analyst further noted that "[w]hen asked about meaningful revenue from Lenovo kicking in, **management side stepped the question** and said it was still evaluating and mentioned if something did not materialize, the company would address operating expenses." The following day, an analyst report from the Buckingham Research Group similarly interpreted management's non-disclosures as signifying bad news regarding the timing of any benefits: "We think material revenue from the Lenovo partnership will likely **not occur before 2H15**, ramping in 2016." The analyst further noted that "we think the targeted 10% revenue growth and 10% OM may be somewhat challenging."

252. However, at the January 14, 2015 Needham Growth Conference, Arola continued to mislead the market that although there was North American deals slippage, the Company's business was still "solid:" "Last quarter was an off quarter. ***We had a fair amount of business pushed out of the quarter into quarter two and beyond***. And we'll talk more about that in our earnings call coming up at the end of this month. ***But the business is solid***."

253. This statement was false and misleading because Extreme's business was not "solid," nor was the previous quarter ever shown to be an "off" quarter. In reality: (1) Extreme's integration was a failure (*see* Section V.H); (2) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (3) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); and (4) Extreme's revenue shortfalls could not be explained by deal

"slippage" or being "pushed out," because some deals and, indeed, important customers were in fact completely lost due to integration problems (*see* Section V.H.2). As CFO, Arola knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

**12. January 28, 2015 – Q2 2015 Earnings Call**

254. On January 28, 2015, Extreme hosted an earnings call with analysts to discuss its results for the Q2 2015 and its guidance for Q3 2015. Berger and Arola participated in this call with analysts. Extreme announced that it generated revenue of $147.2 million for Q2 2015, which was in line with original guidance, and expected revenue in the range of $129 to $139 million for Q3 2015, which was slightly lower than analysts' expectations. During the call Berger admitted that the Company would not be able to deliver the 10% year-over-year growth that Defendants had repeatedly projected from the beginning of the Enterasys acquisition, but reassured investors that the strengthening of the sales force, under the leadership of White, among other things, would keep the Company on track to deliver its year-end guidance. For example, Berger stated:

> In the past, we committed to 10% year-over-year revenue growth, and 10% operating margin in the fourth fiscal quarter of this year. Our commitment was based on the expected lift from improved sales execution, the return of E-Rate, and improved sales and channel execution, and from our relationship with Lenovo.
>
> ***We strongly believe these forces will begin to come to have an impact throughout the rest of the year and beyond.*** However, it is now clear that it will take longer for them to have enough impact to deliver 10% year-over-year growth.
>
> ...
>
> ***while we are making daily substantial progress on the complete integration and upgrading of our salesforce,*** it is clear that we still have considerable work to do going forward.
>
> We will give specific guidance for the fourth quarter during our third-quarter earnings announcement; but at this point, we still expect seasonally consecutive revenue growth and improving profitability. ***We expect to reach the metrics previously committed to in 2 to 4 quarters beyond the fourth quarter of 2015***.

255. On the call, Berger made additional statements regarding Extreme's targeted growth in response to an analyst's question:

> [Analyst]: Can you tell me what in either the December 2015 quarter or the June 2016 quarter is going to deliver that growth? What product lines? What am I using as a metric to track this? Is it a function of Ericsson increasing? Is it of function of Lenovo revenues increasing? Is it a function of the data center growth? Is it wireless growth? How do I build up to a 10% growth rate, given all of the variables that are under pressure in your business?
>
> [Berger:] Last comment, correct. That is a market that, as you know, is at best 1% or 2% growth, and more likely not that good. ***I think the metrics you need to watch are really two things -- three things: our overall salesforce effectiveness as Jeff White and his much-strengthened team, after this past quarter, get traction, and putting in place far better sales process and pipeline management and talent capabilities than we've had in the past, and training and things like that.***

256. During the earnings call, Berger further reiterated that the integration synergies were still "on track" and again touted the success of the Enterasys integration in response to an analyst's question:

> [Analyst]: "All right. I think I did the math myself anyway. So this is a little bit tougher question, okay? What is our ultimate OpEx goal? The reason why I say that is, before you bought Enterasys you were doing $299 million, and making $0.18 of your own. And now we've put the two companies together, and revenues have gone down, and we're going to make less than that, this year. So obviously this has not gone well at all.
>
> And so you guys were running at about a $73 million OpEx, give or take. Enterasys was running a little heavier. At one point -- and I know, Chuck, you were put in a position to fail, or a position of extreme difficulty in this acquisition, since you were told shortly after you joined the Company that you had bought it without having your own team together to take a look at what you had, let alone figure out what you had at Extreme. But now that you've been there a while, and we've upgraded the salesforce, at what point in the future should we anticipate OpEx in line with realistic quarterly revenue expectations?
>
> [Berger:] That's a broad question, so let me cover it, and get to the answer regarding OpEx. ***First of all, I absolutely do not believe the acquisition and subsequent integration of Enterasys has, to use your words, failed miserably.*** We've put two very different companies together, although they look a lot alike from the outside. Last year, we managed to finish the year with just over 2% revenue erosion, ***and we're right on track with where we expected to be from a synergy basis.*** We have certainly faced tough market conditions in the first fiscal quarter, as well as the greatest depth of the integration issues that we were facing.
>
> …
>
> We are attacking improved financial results, certainly from two directions: one, we expect to drive revenue up each quarter. You made the comment that now that you've got the salesforce straightened out --Jeff only joined the company in

> October, Stephen in November, and Bob in December. They barely had time here to figure out what's going on.
>
> That said, they are three dynamos that are going at warp speed, and making a lot of progress. But as I said on my prepared comments, ***I think there's another quarter or two of effort before we really see the fruits of their labor***."

257. In response to the analyst's question above, Berger continued to mislead investors. His statements were intentionally or recklessly false and misleading because (1) he failed to admit that the acquisition "wasn't a very good deal" (as his successor Meyercord admitted on the following quarter's earnings call) (*see* Section V.G); (2) the integration was indeed a failure (*see* Section V.H); (3) Extreme still lacked an appropriate plan or product roadmap for the combined Company (*see* Section V.H.1.b); (4) Extreme's revenue and ability to create saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems including lost clients, client dissatisfaction with a salesforce that only understood half of the Company's legacy products and lacked a clear product roadmap, a failure to correct redundancies, a divisive workplace culture, cost-saving measures that were counterproductive to Company performance, and serious integration problems that would result in the early departure of key executives (*see* Sections V.H.2, V.H.3., and V.G); and (5) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin, even within the newly extended timeframe – in fact, they never fulfilled their "commitment" (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G)

258. Accordingly, Berger lacked a reasonable basis for these statements. As CEO, he knew, or was reckless in not knowing, that his statement were false and misleading (*see* Section VII).

259. The market reacted favorably to Defendants' assurances that the co-called "strengthened" sales force and the involvement of White would keep the Company on track to deliver year-end guidance. Accordingly, after the January 28, 2015 earnings call, the Company's stock price increased by 9%, closing at $3.04 per share on January 29, 2015 from a close of $2.78 per share the day before.

260. Analysts were also encouraged by Defendants' reassuring statements. On January 29, 2015, Wunderlich Securities published an analyst report stating,

> It appears the company may have been too hasty to integrate the two sales forces, but there were so many disparate operating policies between the two companies that there was not a lot of choice, especially since integrating ERP systems was a major operating expense initiative. Efforts are underway to achieve long-term customer service, inside sales and territory solutions, among other issues. At a minimum, **we believe that with a quarter of tenure now completed, the new head of sales can at least forecast better**.

### 13. April 9, 2015 – The Truth Is Revealed

261. On April 9, 2015, after the close of trading, the Company preannounced that it would miss its previously issued guidance for the third quarter of fiscal 2015. The press release stated that Extreme expected non-GAAP revenue in the range of $118 to $120 million, compared to the previous guidance of $130 to $140 million, falling far below guidance and investor expectations. It also announced that Jeff White was "no longer with the Company."

262. Extreme's stock collapsed as a result of these disclosures. Shares lost approximately 25% of their value, falling from a close of $3.24 per share on April 9, 2015 to $2.50 per share on April 10, 2015, on 10.1 million shares traded.

263. The market was surprised, as shown by the analyst reports issued on April 10, 2015. Analysts drew a direct connection between the missed earnings guidance, White's departure, integration problems, and the Company's overall financial health. For example, on April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to $2.80/share. The analyst report clarified that Extreme's announcements the previous day were the cause of its downgrade, stating:

> Yesterday after regular trading, Extreme (EXTR) continued the pattern of missing expectations in alternating quarters with a F3Q15 warnings of magnitude comparable to that of F1Q15, except that estimates have come down since then….Chief revenue officer [White] had a 6-month stint. Along with the warning, management announced the departure last Monday of the sales leader who started in early October. Our understanding is that other recent sales department hires will stay on and that the CEO will run the department again until a replacement executive is found.

Together, these disclosures caused the analyst report to dramatically revise its valuation of the company downward, which it stated would last "until there are signs that the company can find the recipe for execution."

264. Similarly, a Buckingham Research Group analyst report on the same day announced that it was lowering its share price target from $3.50 to $3.00 "on [the] negative preannouncement." Specifically, the report noted that "Mr. White had only been on board since October 1, 2014, and **we see the surprise announcement as an indicator of greater challenges at the company**." The report further explained the negative implications of this news:

> [T]he appointment of Mr. White, given his years of experience at companies such as [Cisco] . . . was supposed to be an answer to the challenges. In fact management had even indicated that sales changes would drive some of the potential revenue improvement over the next several quarters. There are few details explaining why there is a vacancy once again in the sales leadership position, but **the bottom line is that a significant sales rebound is unlikely to occur until there is stability in the role**, in our view.

The report analyzed "[r]easons for the miss" and concluded "we believe . . . internal challenges likely had a role." The analyst lowered its estimates because, per the report's title: "Another Miss and Sales Leadership Departure **Signal Ongoing Challenges**."

### B. Misstatements and Omissions Regarding the Lenovo Partnership

#### 1. November 4, 2013 – Q1 2014 Earnings Call

265. On November 4, 2013, Extreme hosted an earnings call to discuss the financial results for Q1 2014 and the Company's guidance for Q2 2014. *See supra* ¶ 177. During the call, Berger discussed the details of the Lenovo agreement that was announced previously, touting its expected positive impact on Extreme's revenue in the near term:

> ***So the Lenovo agreement, which we announced last quarter, will start to go into full swing actually this month***. Lenovo plans a fairly significant launch of their service business in North America coming into the middle of this month, November, with a major launch in the Asia Pacific region coming in the first calendar quarter. So I suspect we won't see a lot of business from them in the December quarter, ***but we should see a pick up coming into the March quarter.***

266. This statement was false and misleading because (1) Extreme did not know the details of Lenovo's plans for North America and did not have an understanding of whether the

Lenovo agreement would positively impact Extreme's revenue (*see* Section V.G.); and (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue (*see* Sections V.G & V.I). As CEO, Berger knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII). Berger intentionally or recklessly gave investors the false impression that the Lenovo agreement would significantly contribute to Extreme's revenues.

267. The market reacted favorably to Defendants' misstatements regarding the Lenovo agreement having a positive impact on Extreme's revenues in the near term. On November 4, 2013, after the release of the Company's financial results, and its earnings call, Extreme's stock closed at $6.30 per share on 8.9 million shares traded, rising almost 17% or $0.92 per share from the prior trading day's closing price of $5.38 per share on 1.9 million shares traded.

268. Analysts also reacted favorably to Defendants' misstatements regarding the Lenovo partnership's expected positive contribution to Extreme's revenues. For example, on November 5, 2013, Wedbush Securities stated in its report: "The company announced two new partnerships, and expects Lenovo to launch in FQ2 with a gradual ramp in CY14. . . . We think the new announcements and the Lenovo opportunity have potential…." Wedbush maintained its positive "outperform" rating on Extreme based in part on the "**newly announced partnerships** [including Lenovo] **which should drive revenue upside late in FY14**."

269. Additionally, in a follow-up November 6, 2013 report, Wedbush Securities also stated, "Lenovo is expected to formally launch its server products in November in the US and late March in APAC. While it will take time to build, expect initial revenues in 1H14."

270. Further, on January 14, 2014, Wedbush Securities issued another analyst report stating, "[w]e think that the **Lenovo partnership has the greatest potential to drive revenue**…."

271. On January 23, 2014, Craig-Hallum also published an analyst report stating, "we believe **Extreme's partnership with Lenovo** for network switching **could be a significant beneficiary and over time boost its market share** and brand awareness."

### 2. February 5, 2014 – Q2 2014 Earnings Call

272. On February 5, 2014, Extreme hosted an earnings call to discuss the financial results of Q2 2014 and the Company's guidance for Q3 2014. *See supra* ¶ 188. During the call, Berger touted Lenovo's acquisition of IBM's server business as a tremendous opportunity for Extreme because Extreme was Lenovo's only networking partner:

> On Lenovo, frankly we are extremely excited about the prospects for Lenovo with their recent announcement of the acquisition of IBM's server business. This takes them from a 2% global market share player to a 14% global market share player, and ***we continue to be their only networking partner, and we will be now included in a price list shared by 1200 more sales people they are getting as part of the acquisition***, assuming it stays on track and closes in 6 to 9 months and ***we just see this as tremendously positive***.

273. This statement was false and misleading because (1) Extreme did not know the details of the acquisition and did not know the timing in which Lenovo would complete its acquisition of IBM's server business (*see* Section V.G.); (2) Extreme also did not know whether Lenovo would continue the partnership with them (*see* Section V.G.); and (3) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue going forward (*see* Section V.G & V.I). However, Berger intentionally or recklessly continued to give analysts and investors the false impression that Lenovo would be a significant contributor to its revenue in the near future. As CEO, Berger knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

274. The market again reacted positively to Defendants' misstatements regarding the Lenovo partnership. For example, on February 6, 2014, Wedbush Securities issued a report that stated:

> **Management remains positive on partner opportunity,** with the NFL, **Lenovo** and Ericsson **key drivers, in our view**.... Management also indicated that Lenovo's recent purchase of IBM's server assets increases their global market share to ~14% from ~2%, and significantly increases the addressable market, particularly with regards to enterprise. We note that the IBM acquisition is expected to close in the next 6-9 months, and the company has seen minimal quoting activity following Lenovo's converged architecture launch in November. **Management did indicate that in approx. two years, they expect Lenovo to become a 10% customer.**

### 3. May 6, 2014 – Q3 2014 Earnings Call

275. On May 6, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q3 2014 and the Company's guidance for Q4 2014. *See supra* ¶ 199. On the call, Berger reiterated that the Lenovo partnership will be a significant factor in the Company's commitment to achieve a 10% operating margin in the second half of 2015:

> ***I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015*** as we complete the integration,[10] ***realize the benefits of our key partnerships like Lenovo*** and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments.
>
> ***Over the same period we are committed to achieve a 10% operating margin*** on a non-GAAP basis. ***My belief in our ability to achieve these goals has only strengthened since our last earnings call.***
>
> …
>
> ***[W]e expect the relationship with Lenovo in particular as I have said for the last several calls, to have meaningful revenue impact in the second half of fiscal 2015***.

276. These statements were false and misleading because (1) Extreme had no visibility into Lenovo, its expansion in North America, and its acquisition of IBM's server business (*see* Section V.G.); (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue (*see* Section V.G & V.I); and Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin, even within the newly extended timeframe – in fact, they never fulfilled their "commitment" (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G). Thus, Extreme had no reasonable basis for assuring investors that Lenovo will have "meaningful revenue impact in the second half of fiscal 2015." As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

[10] Plaintiff's allegations regarding the false and misleading nature of Defendants' statements and omissions relating to Extreme's integration efforts and cost-saving synergies are addressed in Section VI.A, *supra*.

277. The market reacted favorably to Defendant's reassuring statement about the positive impact the Lenovo agreement was expected to have on the Company's revenues in the near future.

278. For example, on May 7, 2014, Craig-Hallum published an analyst report that stated, "management believes it can achieve 10% operating margins exiting the year, up from 2.3% in the current quarter. **We expect growth to be driven by key partnerships with Lenovo** and Ericsson…."

#### 4. August 14, 2014 – Q4 2014 Earnings Call

279. On August 14, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q4 2014 and the Company's guidance for Q1 2015. *See supra* ¶ 217. During the call, Berger again touted the partnership with Lenovo and its substantial contribution to Extreme's revenues:

> ***We continue to make progress in expanding our relationships with key partners, particularly Lenovo. In the last quarter, I met with the Lenovo executive team in China and it is clear they are strongly committed to the alliance.*** We've also trained all Lenovo North American reps on Extreme products. ***We continue to believe that Lenovo will begin to generate significant revenues for us starting in our fourth quarter of 2015 and beyond.***
>
> In closing, Extreme had a solid fourth quarter to finish a transformative year. We completed major elements of the integration of Enterasys and are on track to realize the synergies we have committed to. ***I would like to reiterate our prior guidance, that we expect to attain year-over-year double-digit revenue growth in the fourth fiscal quarter, driven by our expected ramp of the Lenovo business*** and the return of E-Rate funding.

280. This statement was false and misleading because (1) Extreme still did not understand the timing of Lenovo's expansion in North America and did not have visibility into how Lenovo's acquisition of IBM's server business was progressing (*see* Section V.G.); (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue (*see* Section V.G & V.I); and (3) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin, even within the newly extended timeframe – in fact, they never fulfilled their "commitment" (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G). This

statement gave analysts and investors the false impression that Extreme had visibility into Lenovo's North American business and had reason to believe the partnership would positively impact Extreme's revenue. As CEO, Berger knew, or was reckless in not knowing, that his statement was false and misleading (*see* Section VII).

281. The market reacted positively to these assurances regarding the Lenovo partnership as a driver of Extreme's revenues. As management repeated its commitment, more analysts began to incorporate this commitment into their investment analyses. For instance, Craig-Hallum continued to maintain its positive "Buy" rating in part because "[m]anagement believes that **given the . . . positive impact of its partnership with Lenovo, the company can achieve double digit year/year revenue growth and 10% operating margins in the June 2015 quarter**."

282. Similarly, Buckingham Research Group wrote on August 15, 2014 that "**Lenovo remains primary partnership opportunity**."

283. Likewise, on August 15, 2014, in a *SeekingAlpha.com* stock analysis article authored by analyst Martin Vlcek observed: "The company confirmed its previous guidance, with growth expected to be driven by increased Lenovo Business" and "expects a 10% non-GAAP operating margin going forward."

284. Further, on August 18, 2014, Wunderlich Securities issued an analyst report stating, "[w]e believe **Extreme management is working closely with Lenovo** in order to provide products that will complement what Lenovo is acquiring from IBM….**Implications could be transformational**."

**5. October 15, 2014 – Press Release**

285. On October 15, 2014, Extreme issued a press release preannouncing its disappointing Q1 2015 financial results. *See supra* ¶ 227. Berger, however, continued to mislead investors regarding the potential added value of the Lenovo partnership: "Lenovo also closed the acquisition of the IBM X86 server business. ***The combination of*** strong sales leadership, nearly completed integration ***and the finalization of the Lenovo acquisition position us well for the remainder of our fiscal year***."

286. This statement was false and misleading because Extreme did not have visibility into Lenovo's acquisition plan, much less knowledge of how it would position Extreme (*see* Section V.G.) ; and (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue (*see* Section V.G & V.I). As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

287. The market was encouraged by Defendants' statements that Lenovo would have a positive effect on its revenues for the next few quarters. For example, on October 16, 2014, Craig-Hallum published an analyst report stating, "we believe **over the next few quarters the company will be positively impacted by its partnership with Lenovo**."

**6. October 28, 2014 – Q1 2015 Earnings Call**

288. On October 28, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q1 2015 and the Company's guidance for Q2 2015. *See supra* ¶ 233. During the call, Berger expounded on the "extensive" communications Extreme has had with Lenovo regarding their partnership and Lenovo's acquisition of IBM's server business:

> Our current relationship as I have say said in the past with Lenovo is selling into the installed base that they have just bought, which is not a UCS architectural-like installed base. It's an intel, highly fungible server business. That said, ***we've had extensive meetings between the CTO at Lenovo and our CTO, as we've looked forward to finding ways to create differentiation in the market, rather than just preplugged and played converged solutions.*** So nothing specific there, but we certainly are looking in that direction with them.
>
> …
>
> Yes a number of things and we have been working at this for well over a year now, we think that we are well-positioned as this integration evolves, ***you wouldn't think that some of these things would be hard, but Lenovo is a very big company, and getting all of our products, or at least our data center products on their price list, and getting part numbers and getting the ability for Lenovo sales reps to order them through the Lenovo order entry and delivery process has largely been completed globally***. Getting internal sales reps that are Extreme employees sitting side-by-side with people in North America and China has been accomplished. Attendance and training at global sales conferences for Lenovo has happened. ***So there are a number of things that we've done, in addition as I mentioned there's been technology exchange discussions, and we've certainly worked to the extent we're able to a parallel path with some of the IBM assets as well.*** So everything, we didn't wait for the October 1 start gun to go and begin the race. This is really a race that we put a couple laps on the track over the last 14

> or 15 months, but again I think I think there's a lap or two to go before we see meaningful volume.

289. Berger also continued to assure investors that Extreme would see the benefits of the Lenovo partnership in the near future and the substantial revenue obtained from the partnership would set Extreme up to meet the Company's year-over-year revenue growth commitments:

> ***[O]ur partnership with Lenovo took another step forward when they completed the acquisition of the IBM X86 server business on October 1.*** There is no longer any doubt that this will happen. ***We continue to make progress each day towards realizing the potential of this agreement, and reiterate that we expect significant results by the fourth quarter***.

Later on the same call, Berger again assured investors that Extreme was on track to realize its goal of 10% year-over-year growth based in part on the Lenovo partnership:

> Strong sales leadership, new partner and service programs, ***advancing Lenovo relationships***, return of E-Rate, and continued new product introductions, give us confidence in our ability to improve our top line performance going forward. Coupled with strong focus on realizing the promised synergies from the acquisition, and ongoing focus on cost reductions across the board, we expect to see substantially improved bottom line performance as well. ***We stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better***.

Finally, Berger responded to an analyst's question regarding the 10% operating margin commitment, as follows:

> [Analyst]: Okay. As it relates to your 10%, keeping the 10% operating margin target for June of next year, which would require some additional growth from the level that we're guiding for in December, when we get to that range, in June, your conviction in the June quarter number, is that more driven by E-Rate and success there, or Lenovo?
>
> [Berger:] Yes, frankly Christian, I think you can take any one of three or four things and say by themselves they could come close to making that growth happen. ….***And then Lenovo has certainly by then we believe will have double-digit revenue impact***….

Additionally, Arola reiterated Extreme's unchanged commitment: "I want to remind you that ***I remain committed*** to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015."

290. The statements in ¶¶ 288-89 were false and misleading because (1) Extreme had no basis to state to the investors that the Lenovo partnership would come to fruition by the fourth quarter of fiscal year 2015 (*see* Sections V.G., V.I); (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue at all, lacking "visibility" or other basis to forecast growth from the Lenovo partnership (*see* Section V.G & V.I); and (3) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit (10% or more) revenue growth and 10% profit margin by June of 2015, and in fact failed to fulfil their commitment (*see* Section V.E., V.H.1.a., V.H.1.b., & V.G). Furthermore, it was materially misleading to tout communications and discussion with Lenovo executives such as the CTO, but not to disclose that the Company lacked any "visibility" into Lenovo's impact on Extreme's revenue or whether the companies were collaborating at the "field" level to generate that revenue; Defendants intentionally or recklessly gave the false impression that Extreme had visibility into when and how Lenovo would contribute to Extreme's revenue growth (*see* Section V.G.).

291. As CEO, Berger knew, or was reckless in not knowing, that his statements were false and misleading (*see* Section VII).

292. Investors reacted positively to these statements. After the October 28, 2014 earnings call, Extreme's stock price increased approximately **15%** to an opening price of $3.79 per share on October 29, 2014 from a closing price of $3.30 per share on October 28, 2014 on unusually heavy trading volume of 3.9 million shares.

293. Analysts also reacted positively to Defendant's false and misleading statements and omissions. An analyst from Craig-Hallum commented on October 29, 2014 that "management is confident the company can see return to strong year/year growth beginning in the June quarter as **Lenovo could drive double digit millions of quarterly revenue**." Buckingham Research Group also published an analyst report on October 29, 2014, similarly stating: "**We continue to think Lenovo remains the biggest potential catalyst for the top line**, and management has taken a decidedly optimistic tone regarding the partnership with the

closing of the IBM…server business now complete. Against this backdrop, management expects a material revenue impact from Lenovo contribution in F2H15."

**7. January 14, 2015 – Needham Growth Conference – The Truth Partially Emerges but Defendants Continue to Mislead the Market**

294. On January 14, 2015, Arola and Norman Rice, SVP of Corporate Development, made a public presentation on behalf of Extreme at the Needham Growth Conference. Arola touted the success of the integration, its customers, and quality of its products and services. However, toward the end of the day, Arola also partially disclosed the truth about the uncertainty of the synergies and revenue growth the Company said would materialize by the upcoming end of its fiscal year of 2015, when he implied that Extreme would not be able to deliver on its commitment of 10% growth by the end of fiscal year 2015. In response to a question from an audience member about when to expect meaningful revenue from Lenovo, Arola stated:

> I'll start by saying because we are in a quiet period I don't want to comment on a future forecast. But with that said, we are currently looking at what our second half looks at right now, **evaluating where we are with things like our Lenovo relationship, how much business we'll get in our quarter-four timeframe in relation to that business**…. **I don't want to make a comment about the 10% and the 10%**, but our long-term view of the business if you ask me should be running this business at a 10% operating margin pretty consistently over time. **The question is as we are evaluating it now**, we will make some comments on our earnings call more specifically about timing of that.

295. As a result of this partial corrective disclosure that Extreme was reevaluating its commitment to achieving 10% growth and 10% operating margin, and was backing away from its commitment to achieve the same by the end of fiscal year 2015, Extreme's stock price consistently declined for a two week period. The day after the Needham Growth Conference, on January 15, 2015, Extreme's stock fell over 4% from $3.36 per share on January 14, 2015 to $3.20 per share. Additionally, on January 16, 2015, Extreme's stock fell another 4.6% from $3.0 per share to $3.05 per share. This decline in stock price continued until January 28, 2015.

296. Securities analysts also reacted negatively to Arola's partial disclosure. A Craig-Hallum analyst report dated January 22, 2015 attributed the share price's subsequent decline to Arola's lack of enthusiasm and evasiveness regarding management's commitment. He observed

that "shares have fallen over 10% since presenting" because, the analyst believed, "**management sounded less enthusiastic** about its previous outlook for 10% y/y [year-over-year] growth and 10% operating margins for the upcoming June quarter." The analyst further noted that "**[w]hen asked about meaningful revenue from Lenovo kicking in, management side stepped the question** and said it was still evaluating and mentioned if something did not materialize, the company would address operating expenses."

297. The following day, an analyst report from the Buckingham Research Group interpreted management's statements as signifying bad news regarding the timing of any benefits: "We think material **revenue from the Lenovo partnership will likely not occur before 2H15**, ramping in 2016." The analyst further noted that, after the disclosure, "we think the targeted 10% revenue growth and 10% OM may be somewhat challenging."

**8. January 28, 2015 – Q2 2015 Earnings Call**

298. On January 28, 2015, Extreme hosted an earnings call with analysts to discuss the financial results for Q2 2015 and guidance for Q3 2015. *See supra* ¶ 254. During the call, Berger again touted the strength of Extreme's partnership with Lenovo and explained that the delay in the realization of revenues from the Lenovo partnership was due to Lenovo's delay in the acquisition of IBM's server business:

> ***Our partnership with Lenovo strengthened during the quarter on many fronts.*** Most notably, we were selected as their networking partner for their high-performance computing solution that we jointly announced at the Supercomputing Conference in November. ***We have continued productive discussions at all levels with Lenovo, as our partnership with them continues to evolve***.
>
> ...
>
> ***[W]e continue to make progress almost on a daily basis with Lenovo, across the board***. The high-performance computing, we actually -- that was mostly won before even the acquisition closed, competing against the captive networking business inside of -- which is now inside of Lenovo. ***So we're seeing solid progress there.*** Now, all of our products are on their price list, including wireless.
>
> ***We just see things taking much longer to move forward, based on the complexity*** -- first of all, the delay in closure of this deal by nearly 6 months from the original anticipated date. And, secondly, just the magnitude of the effort of a very large Chinese company digesting a $5 billion division of IBM, long-standing division of IBM. I think, as ***I said in my comments, we're still expecting the kind of results that we have talked about before; we just think they are another 2 to 4 quarters out***.

299. Additionally, an analyst questioned management about whether there was any new information causing Extreme to state that the revenue from the Lenovo partnership will be delayed. Berger responded my making additional false and misleading reassurances:

> [Analyst]: going back to this Lenovo issue that I think is the big instrumental here. So, all along, we've known that it's a big, complicated deal and a lot of moving parts and geographic challenges. So **I think what I'm struggling with today is, what's different, or what's changed**?
>
> Part of what I'm wondering is, Extreme is a pretty small company, a small part of this. And is it simply that you're not tight enough in the discussions; it is sort of after the fact? Or did something actually change in terms of the integration? Or are there challenges that weren't anticipated? That's what I'm really trying to focus on, is – what's different from what you knew a few months ago on this integration?
>
> [Berger:] Well, ***on the positive side, we are exactly where we thought we would be on things like*** being on the price list, being in their literature, ***having airtime with the legacy Lenovo salesforce.***

300. These statements were false and misleading because (1) Extreme never had the visibility needed to estimate when the Lenovo partnership would contribute to the Company's overall revenue or information from Lenovo regarding the timeline of Lenovo's expansion into North America (*see* Section V.G.); (2) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact Extreme's revenue at all (*see* Section V.G & V.I); and (3) Berger's statement that "We have continued productive discussions at all levels with Lenovo" was belied by the revelation of his successor, Meyercord, that not only did the Company have no visibility into Lenovo's contribution to Extreme's revenue, but also that the relationship existed only "at the corporate level with the Lenovo folks," and Extreme did not know "whether or not we're collaborating in the field to get deals done with them" (*see* Section V.G. at ¶ 122).

301. The market reacted favorably to Defendants' assurances that although the revenues from the Lenovo agreement would be delayed, Lenovo would still have a big impact on Extreme's revenues when it comes to fruition. Accordingly, after the January 28, 2015 earnings call, the Company's stock price increased by 9%, closing at $3.04 per share on January 29, 2015 from a close of $2.78 per share the day before.

302. Analysts also reacted favorably to Defendants' reassuring statements. For example, Buckingham Research Group published a report on January 29, 2015 that stated:

> Citing the complicated nature of the **Lenovo integration**, later than expected timing on E-rate contribution and the ongoing sales force realignment, management pushed out its target of 10% operating margin and 10% YOY growth exiting FY15 by 2-4 quarters. **We continue to believe that revenue catalysts have the potential to eventually contribute materially to the top line**, and we think street estimates and investors were already pricing in a reset of expectations with regards to timing.

**9. April 9, 2015 – The Truth Is Revealed**

303. On April 9, 2015, after the close of trading, the Company preannounced that it would miss its previously issued guidance. The Company preannounced expected non-GAAP revenue in the range of $118 to $120 million, compared to the previous guidance of $130 to $140 million, falling far below guidance and investor expectations. Extreme also announced that Jeff White was "no longer with the Company."

304. Extreme's stock collapsed as a result of these disclosures. Shares lost approximately 25% of their value, falling from a close of $3.24 per share on April 9, 2015 to $2.50 per share on April 10, 2015, on 10.1 million shares traded before trading was halted.

305. The market was surprised, as evident by the analyst reports issued on April 10, 2015. Analysts drew a direct connection between the missed earnings guidance, White's departure, integration problems, the unlikelihood of a meaningful revenue contribution from the Lenovo partnership, and the Company's overall financial health. For example, on April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to $2.80/share. The analyst report clarified that Extreme's announcements the previous day were the cause of its downgrade, stating:

> Yesterday after regular trading, Extreme (EXTR) continued the pattern of missing expectations in alternating quarters with a F3Q15 warnings of magnitude comparable to that of F1Q15, except that estimates have come down since then….**The risk is that Lenovo**, like the IBM (IBM-NR) business it acquired, **simply goes with the path of lead customer resistance when it comes to data center networks and that prospects for data center networking success degrade to a quixotic fantasy for Extreme**.

306. This revelation was confirmed by the revelations that took place on April 21, May 6, and May 21, 2015, after the end of the class period. *See* Section V.G. at ¶ 122, 124, *supra*.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

307. At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above. Each of the Individual Defendants had actual knowledge that the statements and omissions made by him were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements and omissions. Each of the Individual Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above. The following additional allegations further support a strong inference of scienter.

### A. Defendant Berger's Unique Compensation Scheme

308. Extreme's Board of Directors, and in particular its Chairman Ed Meyercord, brought in Berger as a replacement for the Company's previous CEO, Oscar Rodriguez. Whereas Rodriguez opposed the acquisition of Enterasys, Berger supported it. *See* ¶ 135.

309. Berger was incentivized to increase the value of Extreme stock through a unique contract where he would receive 300,000 Extreme stock options every time Extreme's stock price stayed above a certain price for 30 days. Specifically, he would be given non-qualified stock options for 300,000 shares of Extreme stock, exercisable on **each** of the following events:

a. Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of **$4.00 per share**;

b. Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of $**5.00 per share**; and

c. Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of **$6.00 per share**.

310. In contrast, the previous CEO, Oscar Rodriguez, received a higher annual base salary of $550,000 compared to Berger's base annual salary of $450,000, but Rodriguez had no comparable incentive scheme tied to Extreme's short-term stock price performance.

311. In fact, through Berger's repeated false and misleading statements regarding the Company's anticipated earnings, cost savings, and profits – as well as the false and misleading statements of Berger's direct reports Kurtzweil and Arola – Berger succeeded in meeting all three incentive targets and thereby obtained 900,000 Extreme stock options.

312. Notably, pursuant to the terms of his employment contract, Berger would keep all 900,000 options **even if the stock price subsequently fell below the target stock prices**, as it did.

313. The stock price reached a high of $8.14 per share during the Class Period after Berger succeeded in meeting all three incentive targets. Berger's options to purchase 900,000 shares of Extreme stock had an exercise price of $3.17 per share. Accordingly, his potential profit from his unique incentive scheme was in excess of $4.4 million, or almost **ten times** his annual base salary.

314. With this unique incentive package as motivation, Berger made numerous false and misleading statements and omissions. Specifically, Berger committed to unachievable revenue growth and profit margins, while touting the supposed success of the Company's integration efforts and its partnership with Lenovo. *See* Sections V.G, V.H, and V.I.

315. After the truth emerged, and Extreme's stock price returned to pre-fraud levels, Berger's contract allowed him to keep all 900,000 options. This remained the case even after Berger left the Company. Thus, Berger's unique incentives provided him the opportunity to receive unwarranted compensation while diluting investor holdings.

### B. Confidential Witnesses

316. CW1 stated that after s/he submitted his/her resignation on April 1, 2014, CW1 was contacted by CEO Berger and asked to reconsider. CW1 recalled this conversation with Berger in detail. CW1 recalled that s/he described the reasons for CW1's departure to Berger at length, including the manner in which s/he and her/his colleague Greiner were replaced by

Enterasys personnel who were not as familiar with legacy Extreme products, despite CW1's and Greiner's superior performance. CW1 also related the ensuing negative impact on customers and revenue in their region. CW1's personal interaction with Berger, discussing CW1's personal experience with the integration failures, as well as Berger's response, directly evidences Berger's personal knowledge of the integration failures recited herein.

317. CW3 indicated that upper management knew about the integration problems because s/he personally related them to Berger. CW3 recalled that s/he spoke with Berger twice in October or November of 2014, first over the telephone and later in person while Berger was in New York City to meet with investors and analysts. CW3 related that s/he specifically told Berger of the problems integrating the sales teams, including Fabiaschi's decision to replace Greiner, discussed in Section V.H.2. CW3 stated that Berger indicated that he already knew about what happened with Greiner, was angry about it, and would look into the situation further. This further evidences Berger's personal knowledge of the integration failures recited herein.

**C. The Integration of Enterasys Was Followed Closely by Senior Management**

318. Berger was at all times fully informed about the problems with the acquisition and integration of Enterasys. Extreme acquired Enterasys's outstanding stock in an all cash transaction valued at $180 million, which was nearly **half** of Extreme's market capitalization at the time. When the acquisition was first announced, Berger stated it "**will certainly be transformational** for our Companies."

319. Because Extreme had "just shy of $300 million in annual revenues" at the time the transaction was announced, and Enterasys had "between $325 million and $330 million," the acquisition would be responsible for adding **over half** of the Company's revenue going forward. As such, Extreme's ability to successfully integrate Enterasys was tantamount to its ability to maintain Enterasys's revenue stream. In fact, because of the competition and overlap that resulted from the integration, described *supra*, Extreme's ability to successfully integrate Enterasys also imperiled Extreme's own half of the revenue stream.

320. Further, Berger took on direct responsibility for the integration for a large portion of the Class Period. At the beginning of the Class Period, the "responsibility for sales and

marketing" to "maintain the entire revenue streams of both companies" had been Chris Crowell's, who had been the CEO of Enterasys. When Extreme suddenly announced Crowell's departure as Chief Operations Officer on May 6, 2014, it was not immediately prepared with a replacement. Instead, Berger disclosed in a conference call later the same day that, notwithstanding prior assurances, there had been problems with the integration and that, as a result, he would be taking direct responsibility for the integration efforts:

> As we move on to the next phase of the integration I feel that **it is critical that I stay close to our field organizations** [i.e. the salesforce] particularly in North America **where we have experienced some integration issues**. The field organizations and corporate marketing will **report directly to me effective today**.

Thus, Berger came to be directly in charge of operations.

321. Indeed, a May 7, 2014 Wunderlich Securities analyst report observed that "**[c]hallenges of combining like-size companies impacted Extreme (EXTR) 3Q14 results and outlook** with the Americas team lagging behind integration in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being**." The report further noted that "CEO Chuck Berger has eliminated the COO role **and put himself in charge of sales management** for the time being."

322. Furthermore, on an August 14, 2014 conference call to discuss results for the fourth fiscal quarter of 2014, Berger stated that his knowledge of integration issues in North America came directly from "having spent a great deal of time with the North America Management team over the quarter." On the same call, he disclosed that he attended the Company's "global sales conference" along with "the entire sales team," which he also purported to give him insight into "integration issues" (though he went on to say, falsely, that they were "behind us").

323. Berger continued being directly responsible for the integration until Crowell was replaced by Jeff White on October 1, 2014.

324. Finally, after the departure of Chief Revenue Officer Jeff White after only six months in the position, an April 10, 2015 Wunderlich Securities analyst report stated that Berger

"will run the department **again** until a replacement" for White could be found, referring to the period when Berger previously ran the Company's sales division. This confirmed the market's understanding that Berger was intimately aware of, was closely involved in, and **even managed** the day-to-day operations of the Company's main operations and revenue stream throughout the Class Period.

### D. Extreme Utilized Sophisticated Programs to Closely Monitor and Analyze Its Revenues and Predict Future Earnings During the Class Period

325. Throughout the Class Period, Defendants had access to sophisticated internal programs, analyses, and metrics concerning sales. Specifically, in Berger's capacity as the CEO, in Kurtzweil's capacity as CFO and Special Assistant to the CEO, and in Arola's capacity as the CFO, all Defendants had access to all relevant sales monitoring data during the Class Period. Defendants were therefore able to closely monitor Extreme's revenues and make reasonable estimates of next-period earnings.

326. In fact, in public statements, the Company repeatedly touted its capabilities regarding its sales data during the Class Period.

327. For example, the Company issued a statement on March 5, 2014 to tout one of its "smart technology decisions" as an "early adopter" of the sophisticated sales software tool called "Salesforce." According to the statement by Company's Chief Marketing Officer Vala Afshar: "Using a weighted sum algorithm based on customer contact, type of contract (case, escalation and product returns trending), as well customer satisfaction scores and history, we can proactively predict customer satisfaction and alert the appropriate management team to take proactive measures when necessary." The statement also lauded the Company's "Sales 2.0 program, which is powered by social and cloud solutions, leveraging social networking to greatly improve the sales and marketing processes."

328. CW1 confirmed that Extreme had access to software to monitor sales and projections. CW1 specified that the Company used Salesforce.com, and all sales went on that system. CW1 stated that management engaged in a monthly check to compare what was on the system to the revenue that sales personnel had actually brought in, as well as what the sales

person had previously brought in. CW1 recalls multiple instances in which senior sales management personnel, including senior managers and executives, would use the system to track the progress of individual deals and ask sales personnel, "What can we do to bring it in sooner?" CW1 stated that Company management constantly monitored this system and "were tracking deals all the time," in addition to conducting regular reviews. In addition, CW1 confirmed that such revenue monitoring "rolled up to the CEO and CFO." In CW1's capacity as a Senior Systems Engineer, the technical counterpart to a regional sales manager, CW1 personally interacted with this system and observed its capabilities on a regular basis.

329. As a result, Defendants knew, or were reckless in not knowing, the nature and quality of its revenues throughout the Class Period, including whether the Company would meet its quarterly guidance, whether the Enterasys integration was creating cost-saving synergies or was otherwise proceeding on schedule, the amount and growth of any revenue it was receiving from Lenovo on a worldwide basis, as well as whether the Company could reasonably meet its "commitment" to achieve 10% year-over-year revenue growth and a 10% operating margin by the fourth fiscal quarter of 2015.

## VIII. CLASS ACTION ALLEGATIONS

330. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from September 12, 2013 through April 9, 2015, inclusive (the "Class Period"), purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Extreme during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Extreme's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

331. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Extreme had approximately 94 to 100 million shares of

common stock outstanding and actively trading on the NASDAQ with the ticker symbol "EXTR." While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Extreme or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

332. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

333. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

334. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

a. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c. whether and to what extent the market price of Extreme's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d. whether Defendants acted with the requisite level of scienter;

e. whether the Individual Defendants were controlling persons of Extreme;

f. whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

g. whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

335. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. LOSS CAUSATION

336. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Extreme common stock and operated as a fraud or deceit on Class Period purchasers of Extreme common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Extreme common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

337. As a result of their purchases of Extreme's common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Extreme common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $8.14 per share at the close of the market on January 23, 2014.

338. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Extreme's business and prospects. As the truth about the Company was revealed to the market and concealed risks materialized, the price of Extreme's common stock fell dramatically. These declines removed the artificial inflation from the price

of Extreme's common stock, causing economic loss to investors who had purchased Extreme common stock and exchange-traded options on such common stock during the Class Period.

339. The declines in the price of Extreme common stock after the partial corrective disclosures on February 5, 2014, May 6, 2014, October 15, 2014, and January 14, 2015, and the final corrective disclosure on April 9, 2015 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Extreme's common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

340. During the Class Period, the price of Extreme stock declined as the true state of Extreme's operations was revealed to the investing public.

341. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Extreme common stock and the subsequent material declines in the value of Extreme common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

342. On February 5, 2014, Defendants partially revealed the truth that there were "some self imposed issues" relating to the integration, and reported disappointing revenues and guidance for the next quarter. *See supra* ¶ 188. As a result, on February 5, 2014 Extreme's stock fell almost **16%** on unusually heavy trading with more than 8.6 million shares trading hands (versus 1.4 million shares traded the day before), dropping $1.12 per share to close at $5.92. However, Defendants failed to disclose the full extent of the integration failures or the truth about its partnership with Lenovo up to that point. In fact, Defendants continued to falsely reassure the market that their "integration plans are on track . . . we continue to make steady progress towards a complete integration." *See* ¶¶ 190-96.

343. On May 6, 2014, Defendants further partially revealed that it "experienced some integration issues." The Company also announced the abrupt and unexplained departure of its CFO and COO and reported disappointing revenues. *See supra* ¶¶ 199-201. As a result, on May

7, 2014 Extreme's stock fell almost **26%** on unusually heavy trading with more than 9.3 million shares trading hands (versus 3.7 million shares traded the day before), dropping $1.38 per share to close at $3.95. However, Defendants failed to disclose the full extent of the integration failures, the truth about its partnership with Lenovo, or its lack of a basis for its 10% revenue growth and operating margin "commitment" up to that point. In fact, Defendants continued to falsely reassure the market that "[t]he integration efforts following the acquisition of Enterasys continue ahead of plan." *See* ¶¶ 203-06.

344. On October 15, 2014, Defendants preannounced revenues significantly below its previous guidance. *See supra* ¶ 227. As a result, on October 16, 2014 Extreme's stock fell **more than 18%** on unusually heavy trading with more than 8.4 million shares trading hands, dropping $0.70 per share to close at $3.06. However, Defendants failed to disclose the full extent of the integration failures, the truth about its partnership with Lenovo, or its lack of a basis for its 10% revenue growth and operating margin "commitment" up to that point. In fact, Defendants continued to falsely reassure the market that the Company "made dramatic progress towards finalizing the integration of the acquisition of Enterasys" and remained "on track to realize the full $30-$40 million in cost synergies expected from the acquisition." *See* ¶¶ 228-29.

345. On January 14, 2015, Defendants backed away from its commitment to achieve 10% revenue growth and 10% operating margin by June 2015. *See supra* ¶¶ 249, 294. As a result, by January 16, 2015 Extreme's stock had fallen **more than 9%** on unusually heavy trading with more than 2.2 million shares trading hands that day (versus 351,000 shares traded on January 14, 2015), dropping a total of $0.31 per share to close at $3.05. However, Defendants failed to disclose the full extent of the integration failures, the truth about Extreme's partnership with Lenovo, or their lack of any basis for their 10% revenue growth and operating margin "commitment" up to that point. In fact, Defendants continued to falsely reassure the market that "our long-term view of the business if you ask me should be running this business at a 10% operating margin pretty consistently over time." *See id.*

346. On April 9, 2015, the Company preannounced that it would miss guidance for 3Q15, reporting revenue of $118-$120 million and earnings per share ("EPS") of ($0.09)-

($0.07), significantly below its guidance of $130-$140 million and ($0.03)-$0.02, respectively. The Company also announced more executive turnover – Chief Revenue Officer Jeff White, who had been hired only six months earlier to manage the integration of the Extreme Networks and Enterasys salesforces, was "no longer with the Company" – and trading in its shares was halted. On these disclosures, the Company's stock price fell nearly 25%, from $3.24 per share to $2.50 per share, on highly unusual trading volume of 10.1 million shares traded (versus 356,300 shares traded the day before).

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

347. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

348. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

a. Extreme's common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period.

b. Extreme's common stock traded at high weekly volumes during the Class Period.

c. As a regulated issuer, Extreme filed periodic public reports with the SEC.

d. Extreme regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

e. The market reacted promptly to public information disseminated by Extreme.

f. Extreme's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Extreme during the Class Period included, but are not necessarily limited to, the following: Craig-Hallum Capital, D.A. Davidson & Co., Wedbush Securities, Wunderlich Securities, Inc., Buckingham Research Group, Raymond James, and Needham & Company.

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Extreme's common stock.

h. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Extreme's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI. NO SAFE HARBOR

349. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint. *First*, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. *Second*, any purported forward looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. *Third*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking

350. The majority of the false and misleading statements alleged herein, *e.g.*, ¶¶ 169-70, 172, 177-78, 180, 190, 192, 194-95, 203-05, 210, 213, 217-18, 220, 223, 227-28, 233-35, 238-39, 245, 247, 252, 254, 256, 272, 275, 279, 285, 288-89, 298-99 (1) relate to historical or current facts; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to Extreme's current integration plan (*see, e.g.*, ¶¶ 169-70, 180, & 194); current status of Extreme's integration of Enterasys, (*see, e.g.*, ¶¶ 177-78, 190, 192, 195, 203-05, 210, 213, 217-18, 220, 223, 227-28, 233-35, 238-39, 245, 247, 252, 254, & 256); current reasons for delays in sales, including so-called "slippage," (*see, e.g.*, ¶¶ 227, 238-39, 247, & 252); current status of Extreme's partnership with Lenovo (*see, e.g.*, ¶¶ 272, 275, 279, 285, 288-89, & 298-99); present commitment to achieve 10% revenue growth and 10% operating margin by a specified date (*see, e.g.*, ¶¶204, 218, 223, 235, 254-55, 275, 279, & 289); and historical analysis of Enterasys prior to the acquisition regarding virtually no overlap between revenue sources for the two companies (*see, e.g.*, ¶ 172).

351. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

### B. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language

352. None of Defendants' statements were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

353. Additionally, to the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested. As detailed herein, at the time Defendants were touting the synergies from the integration with Enterasys and the 10% growth, Defendants knew that the integration between Extreme and Enterasys' respective salesforce was unsuccessful and Extreme did not have visibility into how and when the Lenovo partnership would come to fruition. As a result,

Defendants' commitments to deliver synergies, 10% revenue growth, and 10% operating margin had no reasonable basis. For example, from the beginning, Defendants knew that there were extensive issues with the salesforce integration. *See* Section V.H.2. Furthermore, Defendants knew throughout 2014 and 2015 that major clients and around $90 million in revenue were lost due to the failure to successfully integrate the salesforce and thus the synergies promised would not be recognized within the promised 12 to 24 month time frame because Extreme did not start "people synergies" or elimination of employee redundancies in the salesforce until Meyercord replaced Berger as CEO. *See* ¶¶ 144. Defendants also knew they had "zero visibility" into the Lenovo partnership's ability to drive revenue growth. *See* ¶¶ 122-26. Thus, vague warnings regarding, for example, how: (1) failure to integrate successfully and (2) failure to cultivate relationships with channel partners "***may***" adversely affect Extreme's business, were insufficient because they failed to warn that the risks had already occurred when Defendants made their false and misleading statements.

354. To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to the forward-looking statements at issue. The purported cautionary language did not mention important factors that could cause actual results to differ materially from those in the forward-looking statements.

### C. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made

355. Even if the alleged statements were sufficiently identified as "forward-looking" at the time they were made, each speaker knew that the statement was false or misleading, as discussed above. In addition, all such statements were authorized or approved by Extreme executive officers who actually knew that the statements were false or misleading when made. Accordingly, Defendants remain liable even for forward-looking statements.

**COUNT I**

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

356. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

357. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

358. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Extreme common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Extreme common stock and options on such common stock at artificially inflated prices.

359. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

360. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Extreme common stock and options during the Class Period.

361. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Extreme common stock and options, Lead Plaintiff and other members of the Class purchased Extreme common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Extreme common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Extreme common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Extreme common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth was disclosed.

362. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act Against Defendants Berger, Arola and Kurtzweil

363. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

364. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Berger, Arola and Kurtzweil.

365. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Extreme's common stock and options on such common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of their statements and the fraudulent nature of its

scheme during the Class Period. Thus, Extreme is primarily liable under Section 10(b) of the Exchange Act.

366. As set forth above, Defendants Berger, Kurtzweil, and Arola were controlling persons of Extreme during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including Extreme's Enterasys integration efforts, partnership with Lenovo, and sales force.

367. By virtue of the foregoing, Defendants Berger, Arola and Kurtzweil each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Extreme, including the content of its public statements with respect to the Company's integration efforts, the success (or lack thereof) of its partnerships, and financial commitments to investors including growth.

368. Defendants Berger, Arola and Kurtzweil knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Extreme common stock and options during the Class Period.

369. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Extreme common stock and options, Lead Plaintiff and other members of the Class purchased Extreme common stock and options at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Extreme common stock and options at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Extreme common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Extreme common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth began to be disclosed.

370. By reason of the foregoing, Defendants Berger, Arola and Kurtzweil are liable to Lead Plaintiff and the members of the Class as controlling persons of Extreme in violation of Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: September 26, 2016

**LABATON SUCHAROW LLP**

By: *__/s/ Thomas A. Dubbs__*
Thomas A. Dubbs

Louis Gottlieb
Irina Vasilchenko
Jeffrey A. Dubbin (SBN 287199)
Wendy Tsang
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lgottlieb@labaton.com
ivasilchenko@labaton.com
jdubbin@labaton.com
wtsang@labaton.com

***Lead Counsel for the Class***

Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

***Liaison Counsel***

## CERTIFICATE OF SERVICE

I, the undersigned, state that I am employed in the City and County of New York, State of New York, that I am over the age of eighteen (18) years and not a party to the within action, that I am employed at Labaton, Sucharow LLP, 140 Broadway, New York, New York 10005, and that on September 26, 2016, I served a copy of the attached:

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

to the parties listed on the attached Service List by the following means of service:

[X] BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record registered with the Court's electronic filing system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on the 26th day of September, 2016.

*/s/ Thomas A. Dubbs*
THOMAS A. DUBBS