**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JUI-YANG HONG, et al., | Case No. 15-cv-04883-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS'** |
| | **MOTION TO DISMISS WITH LEAVE** |
| EXTREME NETWORKS, INC., et al., | **TO AMEND** |
| Defendants. | [Re: ECF 89] |

This case arises from allegations that certain officers of Extreme Networks, Inc. engaged in securities fraud. Plaintiffs bring this action against Charles W. Berger, Kenneth B. Arola, and John T. Kurtzweil (collectively, "Individual Defendants"), and Extreme Networks, Inc. (collectively with the Individual Defendants, "Defendants") under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs also assert claims against the Individual Defendants as "control persons" pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Before the Court is Defendants' motion to dismiss. Mot., ECF 89. The Court heard oral argument on February 9, 2017. For the reasons set forth herein, the motion to dismiss is GRANTED WITH LEAVE TO AMEND. Defendants have also filed a request for judicial notice, which the Court GRANTS. Mot. 4 n.1.

## I. BACKGROUND

Defendant Extreme Networks, Inc. ("Extreme" or "Company") is a Delaware corporation that develops and sells network infrastructure equipment and related service contracts for warranty and maintenance of its equipment. Consolidated Compl. ("Compl.") ¶¶ 2, 29, ECF 87. Defendant Charles W. Berger was the Company's President and Chief Executive Officer ("CEO") and a

member of Extreme's Board of Directors from April 2013 until April 19, 2015. *Id.* ¶ 31. Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and Senior Vice President from June 29, 2012 through June 1, 2014. *Id.* ¶ 32. From June 2, 2014 until September 30, 2014, Kurtzweil served as "Special Assistant to the CEO." *Id.* Defendant Kenneth B. Arola was the Company's CFO and Senior Vice President from June 2, 2014 through May 2016. *Id.* ¶ 33.

Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiffs") filed a class action complaint on behalf of all investors who purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock between September 12, 2013, and April 9, 2015, (the "class period"). *Id.* ¶ 1. Plaintiffs allege that during the class period, Defendants falsely assured investors regarding the status of Extreme's acquisition of Enterasys Networks, Inc. ("Enterasys"), misrepresented the potential impact of the Company's partnership with Lenovo Group Ltd. ("Lenovo"), and falsely promised that the Company would achieve 10 percent revenue growth and 10 percent operating margin by the end of its fiscal year ("FY") 2015.[1] *Id.* ¶¶ 12–14. Plaintiffs further allege that these misrepresentations and omissions led Extreme's stock to trade at artificially inflated prices during the class period. *Id.* ¶ 16. Plaintiffs offer statements by seven confidential witnesses ("CWs") to suggest that the Individual Defendants knew of or deliberately disregarded the falsity of their statements at the time they were made.

**A.  The Enterasys Integration**

**i.  Overview**

On September 12, 2013, Extreme issued a press release announcing an agreement to acquire Enterasys, a similarly-sized company based in New Hampshire, for $180 million in cash. *Id.* ¶ 4; Ex. 7 to Austin Decl., ECF 89-9 (Sept. 12, 2013 press release). The acquisition roughly doubled the size of the Company, and the Company described it as a "merger of equals." *Id.* The market reacted favorably to statements regarding the immediate value that the acquisition would add to Enterasys. *Id.* ¶ 174. As a result, Extreme's stock price increased seven percent by $0.30

---

[1] The Company's fiscal year 2015 ended June 30, 2015. Compl., at p. 3 n.2.

per share, from $4.03 per share at the close of trading on September 11, 2013, to $4.33 per share at the close of trading on September 12, 2013. The merger closed on October 31, 2013, during Extreme's Second Quarter ("Q2") 2014. *Id.* ¶ 53.

On November 4, 2013, Extreme issued a press release announcing its financial results for Extreme's First Quarter ("Q1") 2014 and its Q2 2014 guidance. *Id.* ¶ 177. Among other things, the press release stated that Chris Crowell, the former CEO of Enterasys, had been retained as the Chief Operating Officer ("COO") of Extreme, with direct responsibility for "sales and marketing." *Id.* In the press release, Berger touted Extreme's "considerable progress" in the integration of Enterasys. *Id.* On a conference call that same day, Berger reiterated that the integration was progressing well. *Id.* ¶ 178. After this announcement, the Company's stock price increased from $5.38 per share to $6.30 per share. *Id.* ¶ 182.

Before the market opened on February 5, 2014, Extreme issued a press release announcing its Q2 2014 financial results and its Q3 2014 guidance. *Id.* ¶ 188. Extreme reported revenues toward the low end of the guidance announced in its November 4, 2013, press release for Q2 2014, and expected reserves for Extreme's Third Quarter ("Q3") 2014 below the consensus estimates of $154 million. *Id.* During a conference call with investors to discuss this announcement, Berger acknowledged that the Company had "not seen significant evidence of revenue [due] to synergies."[2] *Id.* After this disclosure, the Company's stock declined from $7.04 per share to $5.92 per share. *Id.* ¶ 189.

At the close of Q3 2014, Extreme released two press releases after trading hours. *Id.* ¶ 199. These announcements reported financial results for the first full quarter since the acquisition was complete. *Id.* The first announced Company revenues for Q3 2015 that were again on the low end of the guidance given at the end of the prior quarter. *Id.* The press release also announced the transition of Kurtzweil from CFO to "Special Assistant to the CEO" and the hiring of Arola as CFO. *Id.* ¶ 200. The second press release on May 6, 2014, announced the departure of

---

[2] Plaintiffs claim that the disclosures made on this call "were the first indication" that Defendants' statements regarding the integration and realization of cost-saving synergies by Q3 2014 were false and misleading. Compl. ¶ 189.

Chris Crowell, COO of Extreme and former CEO of Enterasys. *Id.* On an earnings call that same day, Berger disclosed that Extreme "ha[d] experienced some integration issues," and announced that the field organizations and corporate marketing would report to him effective immediately. *Id.* ¶ 201. Following these announcements, the Company's stock declined $1.38 per share. *Id.* ¶ 202 (share price was $3.95 per share at the close of trading the next day).

On June 21, 2014, two weeks before Extreme released its official Fourth Quarter ("Q4") 2014 financial results, the Company issued a press release announcing higher guidance for Q4 2014. *Id.* ¶ 213. In the press release, Berger stated that "[o]ur integration remains ahead of plan as we continue to execute against key Company and operational and financial milestones, including successfully completing our ERP integration in early July[.]" *Id.* Berger and Arola continued to tout the successes of the integration through October 2014, when Extreme preannounced disappointing Q1 financial results. *Id.* ¶¶ 217–27.

In October 2014, Extreme issued a press release announcing that Extreme's reported revenues were approximately $15 million below the Company's prior guidance and its Non-GAAP Net Income per Diluted Share would be break-even despite prior announcements that it would be between $0.06 and $0.08. *Id.* ¶ 227. Berger attributed the results to "significant delays in closing deals" in North America, but reassured investors that Extreme had "made dramatic progress" with the Enterasys integration, including hiring Jeff White as Chief Revenue Officer ("CRO"). *Id.* ¶¶ 227–28. The day after these disclosures, Extreme's stock fell by approximately 18 percent, declining from $3.76 per share to $3.06 per share. *Id.* ¶ 228.

Later that same month, Extreme issued a press release announcing its financial results for Q1 2015 and its Q2 2015 guidance. *Id.* ¶ 223. Extreme's reported revenue for Q1 2015 was slightly above the Company's preannounced results. *Id.* In the press release, Berger reassured investors that Extreme was "on track to realize the full $30 to $40 million in cost synergies expected from the acquisition," and that the Company had "made significant progress towards finalizing the integration." *Id.* Later that day, Berger and Arola hosted an earnings call with analysts to discuss the Q1 2015 financial results. *Id.* ¶ 234. During that call, Berger acknowledged that the low revenue and top-line growth were caused by "significant"

4

"disruptions" resulting from the ongoing Enterasys integration efforts. *Id.* Berger, however, assured investors that "these disruptions are now fully behind us." *Id.*

In January 2015, while Arola touted the success of the integration, its customers, and quality of its products and services, he also suggested that Extreme would not be able to deliver on its commitment of 10 percent growth by the end of FY 2015. *Id.* ¶ 249. After making this disclosure, Extreme's stock declined from $3.36 per share to $3.20 per share, and continued to decline for two weeks. *Id.* ¶ 250. Later that month, Extreme announced its Q2 2015 financial results and its guidance for Q3 2015. *Id.* ¶ 254. Extreme's revenue was in line with the original guidance, and its expected revenue was slightly lower than analysts' expectations. *Id.* During a January 28, 2015, earnings call, Berger stated that the Company would not be able to deliver the 10 percent year-over-year growth that he and the other Defendants had projected from the beginning of the Enterasys acquisition. *Id.*

### ii. Alleged False Statements

Plaintiffs allege that Defendants made a number of false and misleading statements related to the acquisition during the class period. Primarily, these statements fall into the following categories: (1) statements touting the success of the integration without disclosing the "failures"; (2) claims that the integration was "on track"; and (3) statements announcing the financial expectations of the acquisition despite having no reasonable basis for such statements.

Plaintiffs identify numerous statements falling into each category. The Court offers the following as examples:

- The acquisition "is expected to be immediately accretive." *Id.* ¶¶ 168 (Sept. 12, 2013), 170 (would produce "significant value" for shareholders) (same date).

- The revenue of the combined companies "will be approximately double that of either company alone." *Id.* ¶¶ 169 (Sept. 12, 2013), 172 (same date).

- "[W]e plan to reduce product costs and operating expenses between $30 million to $40 million . . . over a 12 to 24-month period." *Id.* ¶¶ 169 (Sept. 12, 2013), 180 (Nov. 4, 2013), 194 (Feb. 5, 2014), 220 (Aug. 14, 2014), 228 (Oct. 15, 2014).

- "There will be no disruption in customers' ability to grow and operate their networks." *Id.* ¶¶ 170 (Sept. 12, 2013), 192 (Feb. 5, 2014).

- "We have already made considerable progress towards integrating the two companies including establishing the executive leadership team." *Id.* ¶¶ 177–78 (Nov. 4, 2013).

- "[O]ur integration efforts are on track." *Id.* ¶¶ 178 (Nov. 4, 2013), 190 (Feb. 5, 2014).

- "The senior management team for the combined Company has been established and we continue to make steady progress towards a complete integration." *Id.* ¶ 190 (Feb. 5, 2014).

- "We see [the integration] getting dramatically better with a couple of things, the combination of sales forces under the leadership of our now head of North American sales John Fabiaschi, who came from Enterasys with strong performance there." *Id.* (Feb. 5, 2014).

- "[W]e have started to make significant cuts, particularly in removing duplicative and very expensive senior management in the sales organization. We've got a similar move already in the marketing organization. I think you will see more of those synergies in this quarter and certainly next." *Id.* ¶ 195 (Feb. 5, 2014).

- "We expect to have [the integration of the sales teams] complete late summer early fall [2014]." *Id.* ¶ 192 (Feb. 5, 2014), 220 ("[T]he two companies are now fully integrated . . . .") (Aug. 14, 2014).

- "[O]ur sales force integration is complete." *Id.* ¶ 217 (Aug. 14, 2014).

- "[T]he combined company is in a better position than ever to seamlessly deliver value to the customer." *Id.* (Aug. 14, 2014).

- "On the whole, the integration has significantly exceeded my expectations." *Id.* ¶ 218 (Aug. 14, 2014).

- "Overall, we are exactly where we planned to be in [the] integration process and the realization of the related financial synergies . . . . We completed major elements of the integration of Enterasys and are on track to realize the synergies we have committed to." *Id.* (Aug. 14, 2014).

- "[W]e expect to achieve a 10% non-GAAP operating margin in Q4 and beyond." *Id.* (Aug. 14, 2014)

Plaintiffs claim that these statements were false because: (1) Extreme's acquisition of Enterasys "wasn't a very good deal"; (2) Extreme lacked an appropriate integration plan or product roadmap for the combined Company; (3) they incorrectly implied that the combined Company would achieve over $600 million in annual revenues due to its lack of overlap in revenue sources while failing to mention the substantial overlap between the two companies'

6

salesforce, region, and products/services; (4) they incorrectly implied that the lack of customer overlap would help the joint Company achieve annual revenues in line with their separate trailing revenues; (5) Extreme's revenue and ability to create cost-saving synergies depended on successfully integrating Enterasys, but the Company was experiencing substantial integration problems that were not disclosed; (6) Defendants lacked a reasonable basis to expect to achieve $30 to $40 million in cost savings within the promised time frame; (7) Defendants touted positive aspects of the integration without disclosing the negative aspects, such as significant cuts of duplicative senior positions without disclosing the fact that numerous redundancies remained; and/or (8) gave the false impression that Extreme's cost cutting measures would materialize in increased profit margins in the near future, without disclosing that these cost cuts would not be sufficient to offset the loss of customers and business due to the integration problems. *Id.* ¶¶ 171, 173, 179, 181, 191, 193, 196, 214, 219, 221.

Plaintiffs further allege that even after CEO Berger disclosed that Extreme had "experienced some integration issues," Defendants continued to mislead the market:

- Defendants represented that despite these issues, the integration was "ahead of plan," "ahead of schedule," "going very well," and would soon deliver the positive revenue impacts that had been predicted. *Id.* ¶¶ 203–05 (May 6, 2014), 223 ("I am confident . . . that virtually all of the[ integration challenges in the North American sales and partner organization] are behind us.") (Aug. 14, 2014), 228 (Oct. 15, 2014), 233 ("During the quarter, we made significant progress towards finalizing the integration of the acquisition of Enterasys.") (Oct. 28, 2014), 256 (Jan. 28, 2015).

- Defendants "reemphasize[d their] plan and [ ] commitment to attain double digit revenue growth by the second half of 2015" and a "10% operating margin on a non-GAAP basis." *Id.* ¶¶ 204 (May 6, 2014), 223 ("[W]e expect to achieve a 10% non-GAAP operating margin in Q4 . . . .") (Aug. 14, 2014), 235 (Oct. 28, 2014).

- "[T]he[ ] disruptions [to the integration efforts] are now fully behind us." *Id.* ¶ 234 (Oct. 28, 2014).

- "We continue to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition." *Id.* ¶ 235 (Oct. 28, 2014).

- "Although many deals were pushed out of the quarter, they remain in the pipeline, and we are confident in our ability to compete for these deals that were delayed from Q1." *Id.* ¶¶ 238 (referring to "deal slippage") (Oct. 28, 2014), 247 (Dec. 17,

2014).

Additionally, in December 2014, Defendants first claimed that the integration was complete in some respects. *Id.* ¶ 245 (conversion to one ERP system and integration of sales team completed). Plaintiffs claim that these statements were false and misleading for many of the reasons stated above and because: (1) Defendants lacked any reasonable basis to expect to achieve double-digit revenue growth and 10 percent profit margin by June of 2015, and in fact failed to achieve such results; (2) the integration was a "failure"; (3) Extreme's revenue shortfalls could not be fully explained by "deal slippage" because numerous deals were lost due to undisclosed integration problems *Id.* ¶¶ 206, 219, 224, 236, 240.

### B.    The Partnership with Lenovo

#### i.    Overview

Plaintiffs allege that during the class period, Extreme's business model depended primarily on selling its products and services through other companies it called "channel partners." *Id.* ¶ 6. One such partnership was with Lenovo, a global technology company. *Id.* Extreme first announced this partnership on July 17, 2013. *Id.* Throughout the class period, Defendants claimed that Lenovo was one of the Company's "key partnerships" as well as a key "growth driver" due to its expanding server business. *Id.* ¶¶ 7, 77. Defendants predicted that Extreme would begin to see "a lot of business" from Lenovo beginning in March 2014. *Id.* ¶ 75.

On January 23, 2014, Lenovo announced that it would be expanding its server business by acquiring IBM's "x86" server business. *Id.* ¶ 76. After this announcement, Extreme adjusted its assessment of when it would begin to reap the benefits of the partnership. For example, on May 6, 2014, Berger stated that the Company expected the relationship "to have meaningful revenue impact in the second half of fiscal 2015." *Id.* ¶ 81. Berger continued to tout the "key partnership" with Lenovo throughout 2014. In early Fall 2014, Berger announced that he had "met with the Lenovo executive team in China" and it was clear to him that "they are strongly committed to the alliance." *Id.* ¶ 83. He also stated that Extreme expected "to attain year-over-year double-digit revenue growth in the fourth fiscal quarter, driven by our expected ramp of the Lenovo business." *Id.* On October 28, 2014, Berger stated that the two companies "continue to make progress each

day towards realizing the potential of this agreement," and anticipated "significant results by the fourth quarter." *Id.* ¶ 89. He further stated that "there [was] no longer any doubt that this will happen," and that he expected to achieve double-digit revenue growth as a result of the partnership by the end of 2015. *Id.* After the October 28 announcements, Extreme's stock increased from $3.30 per share to $3.79 overnight. *Id.* ¶ 292.

In mid-January 2015, CFO Arola touted the success of the Enterasys integration and Extreme's customers, products, and services during a public presentation at the Needham Growth Conference. *Id.* ¶ 294. After the presentation, however, Plaintiffs allege that Arola implied that Extreme would not be able to deliver on its commitment of 10 percent growth by the end of FY 2015. *Id.* Arola was also more ambiguous about the potential impact of the Lenovo partnership:

> [We are] evaluating where we are with things like our Lenovo relationship, how much business we'll get in our quarter-four timeframe in relation to that business . . . . I don't want to make a comment about the 10% and the 10%, but our long-term view of the business if you ask me should be running this business at a 10% operating margin pretty consistently over time.

*Id.* After this disclosure, Extreme's stock declined from $3.36 per share to $3.20 per share overnight. *Id.* ¶ 295. Two days after the disclosure, Extreme's stock declined further. *Id.*

During the Company's January 28, 2015, earnings call to discuss financial results for its 2Q 2015, Berger revealed that the revenue impact the Company anticipated as a result of the partnership with Lenovo would not be achieved by June 2015, and perhaps not for another year. *Id.* ¶ 92. Nevertheless, he expressed confidence in the relationship between the two companies, claiming that the "partnership with Lenovo strengthened during the quarter on many fronts," with "continued productive discussions at all levels with Lenovo." *Id.* ¶¶ 92, 298. After these disclosures, the Company's stock price increased from $2.78 per share to $3.04. *Id.* ¶ 301.

### ii. Alleged False Statements

Plaintiffs allege that Defendants made a number of false or misleading statements in connection with Extreme's partnership with Lenovo. The Court offers the following as illustrative of the types of statements Plaintiffs claims were false or misleading:

- "[T]he Lenovo agreement, which we announced [in July 2013], will start to go into full swing this month." *Id.* ¶ 265 (Nov. 4, 2013).

- Given Lenovo's business plans, Extreme "should see a pick up [in business] coming into the March quarter." *Id.* (Nov. 4, 2013).

- "We continue to be [Lenovo's] only networking partner, and we will be now included in a price list shared by 1200 more sales people they are getting as part of the acquisition [of IBM's server business], assuming it stays on track and closes in 6 to 9 months and we just see this as tremendously positive." *Id.* ¶ 272 (Feb. 5, 2014).

- "I want to again reemphasize our plan and commitment to attain double digit revenue growth by the second half of 2015 as we . . . . realize the benefits of our key partnerships like Lenovo and Ericsson . . . ." *Id.* ¶¶ 275 (May 6, 2014), 279 (Aug. 14, 2014), 289 (Oct. 28, 2014).

- "[W]e expect the relationship with Lenovo in particular . . . to have meaningful revenue impact in the second half of fiscal 2015." *Id.* ¶¶ 275 (May 6, 2014), 279 (Aug. 14, 2014).

- "[I]t is clear that [Lenovo's executive team in China is] strongly committed to the alliance." *Id.* ¶ 279 (Aug. 14, 2014).

- "The combination of strong sales leadership, nearly completed integration and the finalization of the Lenovo acquisition position us well for the remainder of our [FY 2015]." *Id.* ¶ 285 (Oct. 15, 2014).

- "We've had extensive meetings between the CTO at Lenovo and our CTO, as we've looked forward to finding ways to create differentiation in the market, rather than just preplugged and played converged solutions." *Id.* ¶ 288 (Oct. 28, 2014).

- "[O]ur partnership with Lenovo took another step forward when they completed the acquisition of the IBM X86 server business . . . . We continue to make progress each day towards realizing the potential of this agreement and reiterate that we expect significant results by the fourth quarter." *Id.* ¶¶ 289 (Oct. 28, 2014), 298 (Jan. 28, 2015).

- "[W]e have continued productive discussions at all levels with Lenovo, as our partnership with them continues to evolve." *Id.* ¶ 298 (Jan. 28, 2015).

- "[W]e're still expecting the kind of results that we have talked about before; we just think they are another 2 to 4 quarters out." *Id.* (Jan. 28, 2015).

- "[W]e are exactly where we thought we would be on things like being on the price list, being in their literature, having airtime with the legacy Lenovo salesforce." *Id.* ¶ 299 (Jan. 28, 2015).

Plaintiffs claim that these statements were false or misleading because: (1) Defendants lacked any reasonable basis to believe that the Lenovo partnership would positively impact

Extreme's revenue; (2) Extreme did not know whether Lenovo would continue the partnership with it after the acquisition of IBM's server business; (3) Extreme had no visibility into Lenovo or its business plans; (4) Defendants lacked any reasonable basis to expect to achieve their "commitment" to investors to achieve double-digit revenue growth and 10 percent profit margin; (5) Defendants touted communications and discussions with Lenovo executives but failed to disclose that the Company lacked any "visibility" into Lenovo's impact on Extreme's revenue or whether the companies were collaborating at the "field" level to generate that revenue. *Id.* ¶¶ 21, 266, 273, 276, 280, 290, 300.

### C.    Final Disclosure on April 9, 2015

After the close of trading on April 9, 2015, the Company announced that it would miss its previously issued guidance for 3Q 2015 by approximately $10 to $20 million. *Id.* ¶¶ 261, 303. The press release also announced that White, the CRO, was no longer with the Company. *Id.* ¶ 261. As a result of these disclosures, Extreme's stock lost 25 percent of its value, declining from $3.24 per share to $2.50 per share. *Id.* ¶¶ 17, 262, 304.

Approximately two weeks later, the Company announced that Berger had resigned, effective April 19, and would be replaced by Ed Meyercord, then Chairman of Extreme's Board of Directors. *Id.* ¶ 20. On May 6, 2015, the Company announced its financial results for 3Q 2015, and Meyercord hosted his first earnings call as CEO. *Id.* ¶ 21. During that call, Meyercord stated that the integration of Enterasys and its salesforce had not been successful, and that the acquisition "wasn't a very good deal" to begin with. *Id.* Meyercord also stated that Extreme had "zero visibility into Lenovo" and was "uncomfortable" providing any forecast for when the relationship would contribute to Extreme's revenue. *Id.* ¶ 21.

### D.    Confidential Witnesses

Plaintiffs offer statements by seven CWs to suggest that the Individual Defendants knew of or deliberately disregarded the falsity of their statements at the time they were made.

Confidential Witness 1 ("CW1") is identified as a former Senior Systems Engineer at Extreme who reported to John Barger, Extreme's Senior Director of Worldwide Systems Engineering. *Id.* ¶ 132. CW1 worked for Extreme from March 2004 to April 2014 and allegedly

observed that there was no centralized plan to integrate Extreme and Enterasys. *Id.* ¶¶ 132–33. CW1 also allegedly observed that there was no plan to combine the separate product roadmaps, but rather a "power struggle" to figure it out. *Id.* ¶ 134. Because of this "power struggle," CW1 claimed that existing customers were dissatisfied with Extreme's service. *Id.* ¶¶ 134, 141. CW1 stated that top sales performers, including him/herself and a colleague John Greiner (Extreme's Sales Director for the Southeast region from July 2001 through April 2014), were replaced with Enterasys personnel who allegedly had no experience or understanding of Extreme's legacy products, which "created hostility and animosity" and was "disastrous." *Id.* ¶¶ 141–43. Specifically, CW1 recalled that after the acquisition of Enterasys, the territory s/he shared with Greiner for nearly ten years was taken from them and "divvied up to 8–10 Enterasys people" who s/he claims had no experience or understanding of Extreme's legacy products. *Id.* ¶ 141. S/he also noted that Crowell used the terms "red" versus "purple" to describe the post-acquisition "schism," even though CEO Berger disapproved of such terms. *Id.* ¶¶ 142, 157. Finally, CW1 confirmed that Extreme had access to software to monitor sales and projections, and that management engaged in a monthly check to compare what was on the system to the revenue that sales personnel had brought in, as well as what the salesperson had previously brought in. *Id.* ¶ 328. After CW1's resignation on April 1, 2014, CW1 spoke to CEO Berger about the manner in which s/he and others were replaced by Enterasys personnel and related the ensuing negative impact on customers and revenue in the North America region. *Id.* ¶¶ 143, 316.

Confidential Witness 2 ("CW2") was a senior executive of Extreme before, during, and after the class period. *Id.* ¶ 135. CW2 stated that s/he sat on conference calls with upper management and the Board of Directors and knew, based on personal knowledge, that the acquisition of Enterasys was the "brainchild" of Directors Ed Meyercord and Edward Kennedy, who "orchestrated" bringing in Berger as the CEO to accomplish the acquisition. *Id.* CW2 opined that the integration was "problematic" from the start, resulted in a "clash of cultures" between the two companies, and caused Extreme to have difficulty retaining clients. *Id.* ¶¶ 136, 144, 157. CW2 also believed that "people synergies" did not begin until Meyercord replaced Berger as the CEO. *Id.* ¶ 144.

Confidential Witness 3 ("CW3") was a former Territory Sales Manager for New York at Extreme from January 2012 through June 2015, who reported to Peter Katavolos, Extreme's Regional Sales Director. *Id.* ¶ 137. CW3 attended the first Global Sales meeting after the acquisition and observed a "schism" between Extreme and Enterasys personnel. *Id.* CW3 also concluded that there was no integration plan, and that Enterasys sales people had no knowledge of Extreme's products or clients but were given sales territories from accomplished Extreme salespeople. *Id.* ¶¶ 137, 145. In particular, CW3 cited the example of John Greiner who was terminated by Mike Fabiaschi, an Enterasys executive, after the acquisition despite having received an award for bringing in $100 million in revenue during his tenure, and was replaced with Enterasys personnel, including Fabiaschi's nephew. *Id.* ¶ 145. CW3 recalled that Jeff White's tenure was another aspect of the "failed" integration. *Id.* ¶ 161 (noting that White listed "50 things wrong" with Extreme during a two-hour global sales call). CW3 spoke with Berger twice in October or November of 2014, first over telephone and later in person. *Id.* ¶ 317. During that conversation, CW3 states that s/he specifically told Berger of the problems integrating the sales teams, including Fabiaschi's decision to replace Greiner, and that Berger indicated that he already knew about what happened with Greiner, "was angry about it," and would look into the situation further. *Id.*

Confidential Witness 4 ("CW4") was employed as a Regional Sales Director during the class period, and worked for Extreme from February 2008 until February 2014. *Id.* ¶ 147. CW4 alleges that there was no effort made to manage duplication between Extreme and Enterasys, and there was "political infighting for jobs and mistrust" between staff of the two companies. *Id.* ¶ 148. CW4 claims to have observed that Crowell, the former CEO of Enterasys "looked out for his people." *Id.* ¶ 157. CW4 also alleges that s/he personally observed that the Company's alliance with Lenovo was pushed very hard by Executive Vice President Eileen Brooker, but noted that "all activity was at the strategic level and nothing came down to the field level." *Id.* ¶ 163.

Confidential Witness 5 ("CW5"), who was employed by Extreme from August 2014 until February 2015, last held the position of Solutions Marketing Manager. *Id.* ¶ 149. CW5 claims that upon commencing employment at Extreme, s/he was "told that, instead of the Company

13

having an integration plan in place, the 'dust had not yet settled from the integration,' the Company was still going through a 'period of adjustment,' and people were still trying to figure out the best ways of working together." *Id.* CW5 was told that the "challenges" stemmed from difficulty "blending." *Id.* While at Extreme, CW5 was responsible for conducting case studies of certain customers, and stated that there were duplicative case studies conducted due to a lack of visibility into what the marketing group was doing. *Id.*

Confidential Witness 6 ("CW6") was employed as a Systems Engineer during the class period. *Id.* ¶ 150. CW6 reported to one of Extreme's Regional Directors. *Id.* According to CW6, directives from upper management cut expenses, which impacted CW6's ability to travel. *Id.* CW6 claims that these restrictions negatively impacted CW6's work, which usually required up to two weeks of travel per month on average. *Id.*

Confidential Witness 7 ("CW7") served as Account Executive-Lenovo, and was employed by Extreme from May 2013 until January 2015. *Id.* ¶ 164. CW7 had no direct report, but occasionally had contact with Executive Vice President Eileen Brooker. *Id.* CW7 stated that there was "no mechanism in place" for the Lenovo sales people to benefit from Extreme's product line the entire time s/he was with the Company. *Id.*

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed

factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## B. Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## C. Confidential Witnesses

To satisfy the PSLRA pleading requirements, "a complaint relying on statements from confidential witnesses must pass two hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005)). First, the confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge [of the events they report]." *Id.* "Second, those statements . . . must themselves be indicative of scienter [or falsity]." *Id.*

### III.   JUDICIAL NOTICE

Before addressing Plaintiffs' claims, the Court considers Defendants' request for judicial notice.  Mot. 4 n.1.  While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute."  Courts have previously taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request judicial notice of the press releases and SEC filings referenced in their Motion, and transcripts of the conference calls, for the purposes of demonstrating what was disclosed to investors.  Mot. 4 n.1; *see* Austin Decl., ECF 89-2; Exs. 1–23 to Austin Decl., ECF 89-3–89-25.  Plaintiffs do not object to the Court taking judicial notice of these documents.  Defendants' requests are accordingly GRANTED.

### IV.   DISCUSSION

#### A.   Claim 1 – Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "To state a securities fraud claim, plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) (internal quotation marks and citation omitted).

### i. Material Misrepresentations or Omissions

To adequately plead a material misrepresentation or omission under § 10(b), the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014).

A material misrepresentation differs significantly from corporate puffery. Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification"). Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Finally, "mildly optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d at 1111.

An omission, by contrast, "refers to the failure to disclose material information about a company." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). "[A]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1061 (citations and internal quotation marks omitted); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011).

In this case, Plaintiffs' allegations concerning misrepresentations involve three areas: (1) the Enterasys integration; (2) the partnership with Lenovo; and (3) statements regarding long-term margins and revenue targets.

### a. Enterasys Integration

Defendants argue that many of the statements regarding the Enterasys integration that Plaintiffs allege were false are immaterial and non-actionable. *See* Mot. 13. Plaintiffs disagree. Opp'n 10, ECF 90.

#### 1. Immaterial and Non-Actionable Statements and Omissions

The importance of the Enterasys integration to Extreme and its investors does not mean that everything Defendants said on the topic was material. In their opening brief, Defendants argue that several paragraphs of the Complaint contain allegations that are not actionable. *See* Mot. 13–14. In their reply brief, Defendants appear to broaden the net for inactionable statements to include "the remaining integration-related statements," *i.e.*, those not disposed of by their prior arguments that Extreme's ongoing disclosures undermine falsity and scienter and that the Complaint does not allege that the statements are false or misleading. Reply ISO Mot. 5, ECF 92. Based on the conclusory manner in which Defendants have lumped all remaining allegations together without identifying specific allegations, the Court is unable to rule on this amorphous category to determine which additional claims might be within the scope of Defendants' motion. Nevertheless, the Court has identified portions of a number of allegations that contain inactionable statements based on Defendants' specific arguments. The Court details those allegations below, and does not consider those statements for the purposes of assessing falsity or scienter.

First, statements that Extreme had substantial success integrating the sales teams of the two companies, *see, e.g.*, Compl. ¶¶ 177–78, 190, 192, 220, have been found to be examples of corporate optimism. *See Grossman*, 120 F.3d at 1121–22 (holding that statements such as a company had substantial success integrating the sales forces of two companies, and that the merger presented a compelling set of opportunities are non-actionable statements of corporate optimism). Similar statements such as "[w]e remain focused on the integration activities to provide the synergies previously mentioned[,]" Compl. ¶ 55, are also inactionable. *See In re Level 3 Comm., Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (2012) (holding that "this year is really focused on integrating and getting synergies from all those acquisitions" is vague and meaningless

18

"management-speak" upon which no reasonable investor would base a trading decision).

Second, statements that describe the merger as "exceed[ing] . . . expectations," Compl. ¶ 218, and "going very well," *id.* ¶¶ 203, 233, "moving in the right direction," *id.* ¶ 245, as well as general statements in anticipation of synergies resulting from the merger, *see, e.g.*, *id.* ¶¶ 169, 172, 195, 218, and statements that the Company had "made dramatic progress towards finalizing the integration," *id.* ¶¶ 65, 228, 344, or was "moving in the right direction," *id.* ¶ 245, are not actionable. *See Fadia v. Fire Eye, Inc.*, No. 14-cv-5204, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016). "CEOs and executives of companies that merge with or acquire companies often describe ongoing mergers as smooth, rapid, and successful—which courts regularly deem corporate puffery." *Id.*; *In re Level 3*, 667 F.3d at 1340 (finding that statements such as ". . . integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions" are non-actionable); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008) (finding that statement that integration of technology was on schedule, continuing smoothly, and already a success was corporate puffery); *cf. Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (finding statement that company "ha[d] already begun to realize synergies from the [ ] acquisition" were actionable because it was based on "representation of historical or current facts") (citation and emphasis omitted).

Third, statements that officers "are confident in [Extreme's] ability to compete" for delayed deals, *see, e.g.*, Compl. ¶¶ 238, 247, are also non-actionable statements of corporate optimism. *See In re Cutera Sec. Litig.*, 610 F.3d at 1110 (concluding that "we believe our employee relations are good" was a non-actionable, "mildly optimistic, subjective assessment"); *In re Level 3*, 667 F.3d at 1340 ("[B]road claims by defendants regarding integration efforts and the customer experience overall are [ ] non-actionable." (citation omitted); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("outstanding retail results," "business will be good this year," and "industry leading growth," are non-actionable statements of corporate optimism); *In re ECOtality, Inc. Sec. Litig.*, No. 13-3791, 2014 WL 4634280, at *8 (N.D. Cal. Sep. 16, 2014) (finding that "we're doing well and I think we have a great future," "everything is

clicking," and "old products are doing well," are non-actionable statements of corporate optimism (citations and internal quotation marks omitted)). "These are all the 'kind of rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity . . . that no reasonably investor could find them important.'" *In re Level 3*, 667 F.3d at 1340 (citations omitted).

Finally, statements that the acquisition "is expected to be immediately accretive," Compl. ¶ 168, and would produce "significant value," *id.* ¶¶ 4, 50, 170, are non-actionable. These statements are inherently subjective "puffing" and would not induce the reliance of a reasonable investor. *See Apollo Grp.*, 774 F.3d at 606 (finding statement that similar statements are "vague and do not set out with specificity the reasons for" the expectation and "provided nothing upon which a plaintiff could reasonably rely"). As the Ninth Circuit explained, "[t]his mildly optimistic, subjective assessment hardly amounts to a securities violation." *In re Cutera*, 610 F.3d at 1111; *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), *aff'd,* 95 F.3d 922 (9th Cir. 1996) (holding as non-actionable puffing the phrases "'we're doing well and I think we have a great future,' 'business will be good this year . . . we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . .,' 'everything is clicking [for the 1990s] . . .,'" among others).

## 2. Material and Actionable Statements

Nonetheless, on occasion, Defendants' comments regarding the integration process did cross the line from corporate optimism and puffery to allegedly objectively verifiable matters of fact. *See* Opp'n 11–13; Mot. 8–13. On several occasions, from February through December 2014, Defendants stated that (1) the integration was "ahead of plan," "ahead of schedule," and "on track"[3]; (2) certain portions of the integration—*i.e.*, the conversion to one ERP system and the

---

[3] The statement that the merger is "on track" has been alternatively interpreted as a non-actionable prediction or a factual statement about a company's present status, which would be actionable. Indeed, "[t]he authority on whether statements that company is 'on track' are forward-looking statements is split[.]" *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198–99 (D. Nev. 2011). Nevertheless, at the hearing on the motion to dismiss, Defendants conceded that the statement "on track" is not protected by the safe harbor rule. Hr'g Tr. 53:16–18, ECF 97; *see also* Opp'n 11–13. Moreover, although Defendants claim that Plaintiffs have used several phrases, including "on track," out of context, Defendants do not direct the Court to any specific place in the

20

integration of the sales team—were "complete"; (3) "[t]here will be no disruptions in customers' ability to grow and operate their networks;" (4) the company had "started to make significant cuts" in personnel; (5) Extreme planned "to reduce product costs and operating expenses between $30 million to $40 million . . . over a 12 to 24-month period"; and (6) "the two companies are now fully integrated."[4]  *See, e.g.* Compl. ¶¶ 169, 170, 178, 180, 190, 192, 194–95, 203–05, 217–18, 220, 228, 223, 235, 238, 245, 247.  "[E]ach of these statements could have, and should have had, some basis in objective and verifiable fact[,]" *Grossman*, 120 F.3d at 1123, and therefore are actionable.  *See In re Level 3*, 667 F.3d at 1340–41; *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (finding to the extent statements that a company was "on track" to meet future goals was actionable because they "rested upon a characterization of the present state of the company); *cf. In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (finding that "vague statements predicting growth," such as "the Company is on target to achieve projected 'synergies' and cost savings" are not actionable).

### b.  Lenovo Partnership

Defendants also challenge Plaintiffs' allegations regarding Extreme's partnership with Lenovo, arguing many of the statements used optimistic words that were too generalized to be actionable.  Mot. 16.  Specifically, Defendants identify eight examples of statements alleged in the Complaint with respect to Extreme's partnership with Lenovo as non-actionable:  (1) "we are extremely excited about the prospects for Lenovo" and see the announced IBM acquisition "as tremendously positive," Compl. ¶ 272; (2) "we continue to invest in these partnerships which we believe will have a significant impact on revenue in the second half of fiscal 2015", *id.* ¶ 275; (3) "[w]e continue to make progress in expanding our relationships with key partners, particularly Lenovo . . . it is clear they are strongly committed to the alliance," *id.* ¶ 279; (4) "we've looked

---

record.  Reply ISO Mot. 6.  The Court is not obligated "to scour the record" for a potential basis to grant or deny Defendants' motion to dismiss.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Arisman v. Woodford*, No. C 00-4049, 2009 WL 814245, at *2 (N.D. Cal. Mar. 25, 2009) (applying *Keenan* in ruling on a motion to dismiss).  For this reason, the Court also declines to address Defendants' argument that many of the alleged statements fall under the PSLRA "Safe Harbor" Provision.  *See* Mot. 23.
[4] This list is not exhaustive, but merely representative of the statements Plaintiffs highlight.  *See generally* Opp'n.

forward to finding ways to create differentiation in the market, rather than just pre-plugged and played converged solutions," *id.* ¶ 288; (5) finalization of Lenovo-IBM acquisition is among factors that "position us well for the remainder of our [2014] fiscal year," *id.* ¶¶ 11, 87, 228, 285; and (6) "[o]ur partnership with Lenovo strengthened during the quarter on many fronts," *id.* ¶¶ 92, 298; (7) "[w]e have continued productive discussions at all levels with Lenovo, as our partnership with them continues to evolve," *id.* ¶¶ 92, 298; and (8) "we continue to make progress almost on a daily basis with Lenovo, across the board." *Id.* ¶¶ 92, 298; *see* Mot. 16.

In their opposition, although Plaintiffs contend that Defendants' statements are actionable, few if any of the statements Plaintiffs rely on overlap with the contested portions of the Complaint. Instead, Plaintiffs point to four categories of statements related to the Lenovo partnership that they contend are actionable because they describe Lenovo as a significant driver of Extreme's revenue: (1) statements describing the Lenovo agreement and Lenovo's expansion plans; (2) statements discussing meetings with Lenovo's executive team in China; (3) statements regarding extensive meetings between Lenovo and Extreme CTOs; and (4) statements that by June 2015, the Lenovo partnership would have "meaningful revenue impact." Opp'n 15 (citing Compl. ¶¶ 265, 272, 275, 279, 285, 288–89, 298). Plaintiffs assert that these statements are specific and contain more "factual content" than other statements that courts deem "more than puffery." Opp'n 14–15 (citing *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1105 & n.3 (N.D. Cal. 2013)). Plaintiffs' also assert that these statement are not puffery when viewed in context of Defendants' repeated touting of that alliance, *i.e.*, when viewed in context. *Id.* at 15. In reply, Defendants argue that the statements regarding the Lenovo partnership did not promise or assure success for the alliance, but rather, used words that are too generalized to be actionable. Reply ISO Mot. 8. Defendants also reject Plaintiffs' contention that the surrounding context of a statement may render it actionable, particularly because Plaintiffs do not contest the statement about their achievements with respect to the alliance. *Id.* at 8–9.

The Court agrees with Defendants that the statements identified by Defendants are not actionable. As explained above, "mildly optimistic, subjective assessment[s]" about particular aspects of a company do not amount to a securities violation. *Apollo Grp.*, 774 F.3d at 606. The

statements Defendants highlight are vague and do not set out with specificity the reasons for the excitement, optimism, or beliefs asserted, nor do they explain what Defendants mean by "progress" or "productive discussions" with respect to the partnership.  *Cf. Apollo Grp.*, 774 F.3d at 606; *Juniper Networks*, 880 F. Supp. 2d at 1064 (finding statement that certain companies were "strong partners" a vague assertion of corporate optimism and therefore non-actionable); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (finding, among others, statement regarding growth that "positions us beautifully," constitute vague, unspecific assertions of corporate optimism).[5]  Accordingly, the Court will not consider the types of statements identified by Defendants for the purposes of assessing falsity or scienter.  As to other statements identified by Plaintiffs not the subject of the present motion, the Court will consider them to be relevant to the asserted claims.

### c. Long Term Margins and Revenue Targets

Defendants argue that their statements regarding their "commitment" to achieving "10% operating margin" and "double-digit" revenue growth by June 2015, driven at least in part by the integration and Lenovo partnership are inactionable puffery.  Mot. 17–18; *see, e.g.*, Compl. ¶¶ 96 (targeting a quarterly financial model of around 10% operating income by the end of FY15), 97 (same), 98 (referencing "our plan and our commitment to attain double digit revenue growth by the second half of 2015," and saying "we are committed to achieve 10% operating margin on a non-GAAP basis") 100 ("I remain committed" to these targets"), 103 ("we expect to achieve" double digit revenue growth in the Fourth Quarter 2015), 204 ("I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015[.]"), 223 ("[W]e expect to achieve a 10% non-GAAP operating margin in Q4 and beyond."), 235 ("We

---

[5] The Court construes statements that the Lenovo partnership would have "meaningful revenue impact" by June 2015—which Plaintiffs identify as actionable—to fall into the category of inactionable statements identified by Defendants.  *See* Opp'n 15; *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41–42 (D. Mass. 2016) (finding statements such as "we believe that [a certain product] will continue to be a major business driver," "we think [it] is a terrific product that is going to perform very well in the market," and "we'd be surprised if we don't see forward momentum from here" immaterial expressions of corporate optimism or puffery, and therefore not actionable). The Court will therefore not consider the statements for the purposes of assessing falsity or scienter.

1    stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter[.]"),

2    279 ("[W]e expect to attain year-over-year double-digit revenue growth in the fourth fiscal

3    quarter[.]"), 289 ("We stand by our commitment for a 10% year-over-year revenue growth by the

4    fourth fiscal quarter[.]").

5         Plaintiffs, however, contend that these statements are "capable of objective verification,"

6    as they set a standard against which a reasonable investor could expect them to be pegged, *i.e.*,

7    Defendants provided a specific number with a specific deadline. Opp'n 13 (citation omitted).

8    Alternatively, Plaintiffs assert that these statements must be viewed in relation to the statements

9    detailing the progress of the integration and Lenovo partnership. *Id.* at 13–14.

10        The Court agrees with Defendants. Defendants' "commitment" is a "vague, generalized

11   assertion of corporate optimism," that courts have found to be inactionable. *See, e.g.*, *Raab v.*

12   *Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (statements in Annual Report that company

13   expected "10% to 30% growth rate over the next several years" and was "poised to carry the

14   growth and success of 1991 well into the future" held to be immaterial "soft 'puffing'"

15   statements). *Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3rd Cir. 1997), on which Plaintiffs rely,

16   supports this conclusion. There, the Third Circuit held that the statement that defendant was

17   "confident of achieving at least 7% real earnings growth" in fiscal year 1995 was actionable. *Id.*

18   at 320. Contrary to what Plaintiffs suggest, however, "confident of" and "committed to" have

19   different meanings. *Compare* Webster's Third New Int'l Dictionary 457 (2002) (defining

20   "commit" as "to pledge to some particular course or use"), *with id.* at 476 (defining "confident" as

21   "undemonstrative firm feeling of certain success"). Saying one is "confident of" invokes surety,

22   whereas saying one is "committed to" indicates they are going to try to achieve a certain result.

23   *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (finding statement

24   touting defendant's "commitment to create earning opportunities" inactionable puffery); *Greater*

25   *Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 684 (S.D. Tex. 2015) (statement

26   that defendants "aim to go above and beyond local requirements to ensure your comfort and

27   security" contains aspirational language, which prevents a reasonable consumer from relying upon

28   it as a statement of fact); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835,

890 (E.D. Mo. 2012) (holding that defendant's statement that it was "'committed to' reaching the predicted goals" was inactionable puffery). The Court construes the statements regarding Defendants' "expectations" in the same light as their "commitment," and therefore those statements are non-actionable, as well. Accordingly, the Court GRANTS Defendants' motion to dismiss as to Defendants statements regarding growth commitments.

### ii. Falsity

Having distilled out the immaterial portions of the statements of which Plaintiffs complain, the Court must now determine whether the Complaint specifies the reason or reasons why the remaining statements are false or misleading. *See* 15 U.S.C. § 78u-4(b)(1). In order to plead falsity, a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"); *In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)"). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH*, 540 F.3d at 1070.

The remaining statements that Plaintiffs allege to be false relate to the Enterasys integration and to the partnership with Lenovo. The Court addresses each in turn below.

### a. Enterasys Integration

Defendants argue that the Complaint does not plead falsity based on their public statements about successes in the effort to integrate Extreme and Enterasys. Mot. 7. Specifically, they focus on four categories of statements, those relating to ERP integration, cost synergies, lack of customer disruption, and management actions. *Id.* at 8–9. A review of the remaining actionable allegations in the Complaint reveals that these statements fall into six broader categories: (1) the integration was "ahead of plan," "ahead of schedule," and "on track"; (2) certain portions of the integration—*i.e.*, the conversion to one ERP system and the integration of the sales team—were

"complete"; (3) "[t]here will be no disruptions in customers' ability to grow and operate their networks;" (4) the company had "started to make significant cuts" in personnel; (5) Extreme planned "to reduce product costs and operating expenses between $30 million to $40 million . . . over a 12 to 24-month period"; and (6) "the two companies are now fully integrated." Compl. ¶¶ 169, 170, 178, 180, 190, 192, 194–95, 203–05, 217–18, 220, 228, 223, 235, 238, 245, 247.

Defendants contend that the Complaint fails to allege the falsity of these statements for three reasons. First, Defendants assert that the Complaint ignores, misquotes, or selectively quotes Defendants' statements about Enterasys so as to mislead as to their actual contents. Mot. 8. Second, Defendants argue that Plaintiffs fail to allege a contradiction between the contents of Defendants' public representations and any undisclosed adverse facts. *Id.* at 7. Third, Defendants contend that their contemporaneous cautionary disclosures undermine any allegation of falsity. *Id.* at 10. In opposition, Plaintiffs argue that the Complaint sufficiently pleads falsity because they allege, based on the accounts of six CWs, that Defendants misrepresented the progress of the Enterasys integration. Opp'n 5–8.

The Court agrees with Defendants and finds that Plaintiffs' allegations of falsity are insufficient. In particular, the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves and the Complaint does not contain any particularized allegations demonstrating that any of the statements was materially false or misleading when made.

### 1. Accounts of Confidential Witnesses

Plaintiffs primarily rely on the accounts of the CWs to support their allegations. Plaintiffs highlight certain integration problems that the CWs claim began immediately after the acquisition and worsened throughout the Class Period: (1) Extreme lacked a centralized integration plan and a product roadmap for the combined Company; (2) without an integration plan, personnel from one company were put in charge of products and customers from the other company that they did not understand; (3) the acquisition created many redundancies, which were not eliminated until after the Class Period; and (4) severe integration problems resulted in high executive turnover. *Id.* at 5–6 (citations omitted). Contrary to Plaintiffs' suggestion, these accounts do not provide sufficient

factual support for Plaintiffs' allegations of falsity and fail to demonstrate that the statements were false when made.

CW1, CW3, and CW5, for instance, reported that there was no centralized plan to integrate Extreme and Enterasys or to combine the separate product roadmaps. Compl. ¶¶ 132–34, 137, 149. Plaintiffs, however, fail to allege facts that explain how or why a "Senior Systems Engineer," "Territory Sales Manager," or "Solutions Marketing Manager" would have been privy to any such plan. Moreover, the observations and experiences of these CWs do not speak directly to the falsity of the alleged statements when made, but rather, reflect generally on difficulties experienced with the overall integration. That the CWs personally observed or experienced the Company's integration efforts," Compl. ¶¶ 132, 137, 149, is insufficient. *See DigiApplestein v. Medivation, Inc.*, 561 Fed. Appx. 598, 600 (9th Cir. 2014) (holding that statements from a CW may be relied on to plead falsity when "the complaint 'provide[s] an adequate basis for determining that the witness in question have personal knowledge of the events they report'" (citing and quoting *Zucco Partners*, 552 F.3d at 995)); *In re Daou Sys.*, 411 F.3d at 1015 (finding that personal sources in a complaint must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" (citation and internal quotation marks omitted)); *see also In re Tibco Software, Inc.*, No. C 05-2146, 2006 WL 1469654, at *24 (N.D. Cal. May 25, 2006) (requiring allegations of personal knowledge specific to the allegations of falsity).

The claims of CW1 and CW3 that top sales performers were replaced with Enterasys personnel who they believed had no experience or understanding of Extreme's legacy projects, Compl. ¶ 141–3, 145, tends to lend credence to Defendants' statements that there was a plan that involved making significant cuts in personnel. Indeed, that CW1 and CW3 believed the replacements were not qualified does not make the statements that the Company was making such cuts false at the time it was made. It also undermines the assertion that the acquisition created many redundancies that were not eliminated until after the Class Period, because these accounts demonstrate that Extreme was eliminating redundancies as the integration progressed. *See, e.g.*, Compl. ¶¶ 143 (CW1 resigned because Extreme personnel were replaced with Enterasys people);

27

145 (CW3 stated that s/he was replaced with Enterasys personnel, as were other Extreme salespeople); 147 (CW4 was reassigned to accommodate an Enterasys legacy appointment and voluntarily departed from the Company because s/he was dissatisfied with the reassignment). This evidence may show that Extreme made poor management decisions when it implemented its plan, but it does not demonstrate absence of a plan.

The CW accounts are similarly deficient with respect to the alleged false statements regarding the completion of portions of the integration, and eventually the statement that the companies "are now fully integrated." Plaintiffs do not allege, and none of the CWs assert, that Extreme had not completed the conversion to one ERP system or the integration of the sales team. *See* Mot. 7–8; Reply ISO Mot. 4–5. Likewise, there is no claim that the two companies were not fully integrated. *Cf. Fadia*, 2016 WL 6679806, at *6–7 (rejecting claims of falsity where alleged problems in integrating newly-acquired company's products with defendants' legacy products did not contradict public statements about integration, among other reasons). Instead, the CWs lament the alleged results of the integration. Anyone who has ever joined two families together knows that the fully blended family is not always perfect. That does not, however, discredit the statement that the families are now one. The same is true here.

There are also no allegations that Extreme failed to make efforts to reduce product costs and operating expenses. Plaintiffs imply otherwise by pointing to the May 2015 announcement that Extreme planned a reduction in force to accompany a new operating plan. Compl. ¶¶ 123–24. However, the CW accounts make Plaintiffs' assertions less plausible. For example, CW6 alleges that controls were instituted for booking air travel. Compl. ¶ 150. This supports the inference that Extreme was looking for ways to cut costs, and thus undermines the allegation that the statement that Extreme was attempting to reduce product costs and operating expenses was false at the time the statement was made. *See also id.* ¶¶ 141–43 (CW1 recounted that Extreme personnel were replaced by Enterasys personnel), ¶ 145 (CW3 cited the example of an Extreme sales person being terminated), ¶ 157 (CW4 claims that there was "political infighting for jobs," suggesting that cuts were being made). CW2's belief that "people synergies" did not being until Meyercord replaced Berger as the CEO is not sufficiently grounded in personal knowledge. *See In re Tibco Software*,

2006 WL 1469654, at *24.

Finally, Plaintiffs unsuccessfully attempt to impugn the statements that "[t]here will be no disruptions in customers' ability to grow and operate their networks," or the integration would have "no disruption to customers' businesses," with observations from CW1 and CW2 that some customers were unhappy with the merger or uncertain about Extreme's product plans going forward and stopped purchasing from Extreme. *See, e.g.*, Compl. ¶¶ 141–42, 175. There are no allegations in the Complaint that the integration did in fact disrupt Extreme's customers' businesses or that the statement that it would not disrupt customers' business was false at the time it was made. *Cf. Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996) ("[A]llegations of specific problems undermining a defendant's optimistic claims suffice to explain *how* the claims are false." (emphasis in original)). CW1 claims that the integration was "confusing" to customers, because there was allegedly no product roadmap, but that is not indicative of disruptions. *See* Compl. ¶ 134. That customers were unhappy with the merger does not plausibly suggest that the statement that there would be no disruptions to customers in a specific area was false at the time it was made. Moreover, the only allegation on this point is not sufficiently particularized and there is no allegation that the observation was made contemporaneously with the statements themselves. *See id.* ¶ 139 ("The absence of a product roadmap and integration plan disrupted customers' ability to grow and operate their networks[.]").

Based on the foregoing, the Court finds that Plaintiffs have not alleged sufficient facts from which the Court can imply that statements regarding an integration plan were false when made or that they misrepresented the progress of the Enterasys integration. *Larkin*, 253 F.3d at 430 (to be actionable, a statement must be false "at [the] time by the people who made them").

### 2.  *Cautionary Statements*

Plaintiffs also make much of the fact that Defendants "concealed the severe problems that plagued the integration from the start and led to its failure." Opp'n 5-8. However, a plaintiff does not state a claim of falsity under the PSLRA by simply alleging that a statement was "incomplete." *Brody*, 280 F.3d at 1006 ("No matter how detailed and accurate disclosure statements are, there

United States District Court
Northern District of California

are likely to be additional details that could have been disclosed but were not. To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

In particular, Plaintiffs allege that Defendants' repeated assurances that the integration was "on track" affirmatively misrepresented the actual situation. Opp'n 7. Defendants contend, however, that they had no duty to disclose the problems alleged by the CWs to render their statements not misleading because they never claimed a perfect integration. Mot. 12–13. The Court agrees that Plaintiffs' omission theory fails to state a claim because, as Plaintiffs admit, Defendants disclosed the challenges faced with respect to the integration. *See* Compl ¶ 17 (demonstrating that Defendants disclosed issues throughout the class period); Mot. 12. Moreover, Plaintiffs have failed to particularly allege how the disclosures regarding problems with the integration "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Thus, the Court cannot conclude that the alleged omissions were misleading. *Id.* (citing *McCormick v. The Fund Am. Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)).

### b. Lenovo Partnership

The remaining allegedly false and misleading statements relating to the Lenovo partnership are those (1) describing the Lenovo agreement and Lenovo's expansion plans; (2) discussing meetings with Lenovo's executive team in China; and (3) regarding extensive meetings between Lenovo and Extreme CTOs. Compl. ¶¶ 265, 272, 275, 279, 285, 288–89, 298. Specifically, Plaintiffs argue that Defendants touted Extreme's partnership with Lenovo, but the accounts of CW4 and CW7 undermine such optimism, and claim that Defendants "improperly concealed adverse facts." Opp'n 8–9. Defendants contend that Plaintiffs do not allege that the statements about positive steps in the alliance were false. Mot. 14.

Plaintiffs rely on statements by CW4, a Regional Sales Director of multiple regions from 2008 through February 2014, and CW7, most recently an Account Executive for Lenovo, as well as statements Meyercord made after taking over from Berger. Opp'n 8–9. CW4 stated that there

was "no field level activity towards that alliance," such as joint meetings or Go-to-Market (marketing planning) sessions. *Id.* ¶¶ 147, 163. Plaintiffs contend that CW4's statements demonstrate that because there was no collaboration at the "field level," the statement that the Lenovo partnership would produce "meaningful revenue impact" was false. Opp'n 8. Similarly, CW7 recounted that there was "no mechanism in place" for Lenovo salespeople to benefit from Extreme's products during his/her tenure, thus rendering the alliance useless for Extreme. Compl. ¶ 164, Opp'n 9. Plaintiffs argue that Defendants concealed this adverse fact. Opp'n 8. Finally, Plaintiffs also rely on Meyercord's statement in May 2015 that the deals with Lenovo "are happening out in the field, and it's just a question of whether or not we're collaborating in the field to get deals done with them," and that Extreme had "zero visibility into Lenovo." Compl. ¶ 122, Opp'n 9.

Plaintiffs do not dispute that Lenovo employees were trained on Extreme products or that Berger met with the Lenovo executive team in China. Moreover, Plaintiffs do not allege that Defendants made any affirmative statements regarding efforts at the field level or any benefit to Lenovo salespeople. They merely contend that Defendants did not disclose the full picture. However, as the Court previously explained, a plaintiff does not state a claim of falsity under the PSLRA by simply alleging that a statement was "incomplete." *Brody*, 280 F.3d at 1006 ("No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not. To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."). Here, Plaintiffs have failed to allege facts showing the reason or reasons why the statements made regarding the Lenovo partnership were misleading or untrue. *Id.* Like *Brody*, Plaintiffs specify what information they contend Extreme omitted, but do not indicate why the statements that were made were misleading, and is it not self-evident that the statements were misleading. *Id.* at 1006–07.

Moreover, contrary to Plaintiffs contentions, Meyercord's statements regarding the partnership do not demonstrate that the prior statements were false or misleading when made. Without the benefit of hindsight, and particularly without Meyercord's knowledge in May 2015

that the partnership did not pan out as expected, the Court cannot reasonably infer that the prior statements were false at the time they were made.  *See Ronconi*, 253 F.3d at 430.   Instead, Meyercord's comments appear to be the statement of a new CEO attempting to distance himself from expectations set by the prior CEO.  They say nothing about the falsity of the statements regarding the partnership's promise at the time Defendants made such comments.

### iii.   Scienter

The Defendants next challenge the sufficiency of the allegations with respect to scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted).  A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter.  *See* 15 U.S.C. § 78u–4(b)(2)(A); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).  A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint.  *See Tellabs*, 551 U.S. at 324.  Plaintiffs must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id.* at 323.  To demonstrate scienter, the defendants must have contemporaneously made "false or misleading statements either intentionally or with deliberate recklessness." *See Zucco Partners*, 552 F.3d at 991 (internal quotation marks omitted).  "[M]ere recklessness or a motive to commit fraud and opportunity to do so" is not enough.  *Reese*, 747 F.3d at 569.  Rather, the defendant must show "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *See Zucco Partners*, 552 F.3d at 991 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990)).  Courts must "assess all the allegations holistically," not "scrutinize each allegation in isolation." Tellabs, 551 U.S. at 326.

Plaintiffs rely on the following to support an inference of scienter:  (1) the CW allegations; (2) Meyercord's "admissions"; (3) the core operations inference; (4) Berger's "unusual" bonus scheme; and (5) the departures of Defendants and other key executives.  Opp'n 19–25.  While this may appear overwhelming, Plaintiffs argue more than their allegations deliver.  Moreover,

Plaintiffs make no allegations or arguments sufficient to suggest that Defendants had knowledge of the alleged issues with the Lenovo partnership at the time they made the alleged statements. As required under *Tellabs*, the Court has reviewed all of the allegations holistically and separately to determine whether Plaintiffs have alleged sufficient facts to support scienter. As discussed below, the Court finds that the Complaint is deficient under both analyses.

### a. Confidential Witnesses

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted). Plaintiffs argue that the allegations of CW1, CW2, and CW3 are strongly indicative of scienter. Opp'n 20. Upon review, however, the CW statements fail to provide information to suggest that Defendants either knew that the allegedly false statements being made were false when made or that they were acting in a deliberately reckless manner. The Court notes that Plaintiffs' arguments in their brief outpace the allegations in the Complaint. It is not clear whether the brief promised too much or the Complaint was more modest than the facts would allow. However, the Court is limited to a review of the allegations in the Complaint.

Plaintiffs first contend that Berger "knew" the integration lacked a plan and was not "on track" due to a conversation with CW1 on April 1, 2014, in which CW1 recounted severe problems integrating the two companies from the start, including the lack of an integration plan or product roadmap. Opp'n 20. Plaintiffs argue that despite this knowledge, Berger continued to make "false assurances" about the integration. *Id.* Plaintiffs' description of this conversation, however, has no basis in the Complaint. In the Complaint Plaintiffs allege more modestly that during his/her conversation with Berger, CW1 described the reasons for his/her departure, including the manner in which s/he and Greiner were replaced by Enterasys personnel who were not as familiar with legacy Extreme products despite CW1's and Greiner's superior performance.

33

Compl. ¶ 143. CW1 also allegedly recounted the negative impact on customers and revenue in their region during this conversation. *Id.* Thus, as pled, all CW1 told Berger was that s//he was dissatisfied with how the integration was proceeding, and particularly that s/he and his/her co-workers were not being treated as CW1 believed they should have been treated.

Moreover, that CW1 purportedly recounted the negative impact on customers is insufficient to establish scienter—it more properly sounds in corporate mismanagement. *Curry v. Yelp Inc.*, No. 14-cv-3547, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) ("every large company can expect to have some customer complaints"); *Fadia*, 2016 WL 6679806, at * 14 (CW allegation "that there were integration issues with the [ ] product, which required the product team to 'babysit' customers while the problem was resolved" was insufficient to satisfy the scienter requirement); *see also Sorkin, LLC v. Fischer Imaging Corp.*, No. 03-cv-631, 2005 WL 1459735, at *10 (D. Col. June 21, 2005) (holding that vague allegations about customer complaints or quality control problems do not establish scienter).

Plaintiffs' reliance on CW3's statements to conclude that Berger knew about various challenges with respect to the integration is equally misplaced. Opp'n 20. Plaintiffs argue that Berger told CW3 that "he already knew about the[ ] issues" integrating the sales team and Fabiaschi's decision to replace Greiner, implying that Berger admitted that he knew about the integration problems writ large. *Id.* Once again, however, Plaintiffs mischaracterize this conversation. *Compare id.*, with Compl. ¶ 317. The Complaint alleges only that Berger admitted that he knew about what had happened with Greiner, *i.e.*, that Greiner was terminated by Fabiaschi, an Enterasys executive, after the acquisition despite having received an award for bringing in $100 million in revenue during his tenure, and was replaced with Enterasys personnel, including Fabiaschi's nephew. Compl. ¶¶ 145, 317. Nevertheless, such information does not give rise to an inference that Defendants knew or believed that the success of the Enterasys integration could not be achieved. *See TIBCO Software*, 2006 WL 1469654, at *19 (CW allegation that CFO knew that his company had handled the [ ] acquisition horribly, and that there were difficulties with the integration, including a major culture clash between the two companies" did not support scienter because plaintiffs did not allege that the "difficulties" caused the poor financial results and

34

whether the CFO knew these "difficulties" were going to affect the company's financial results); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 854–55 (N.D. Cal. 2014) (finding that it would not have been unreasonable for defendants to maintain cautious optimism despite the alleged problems because the facts did not indicate that future prospects were so bleak that defendants "could not have reasonably believed they could turn the ship around," and because the complaint did not plead that management had not already taken the problems into account). Moreover, CW3's allegations suggest, at most, that Extreme's management team exhibited poor judgment and perhaps incompetence. Corporate mismanagement, however, is not actionable fraud under the securities laws.

CW2's account is also deficient. Plaintiffs allege that CW2 was on conference calls with upper management, including Berger and Kurtzweil, and opined that the integration was "problematic right from the get-go" because of the lack of a product roadmap for the combined company, culture clash between the two companies, and delay in eliminating employee redundancies until Meyercord became CEO in April 2015. Opp'n 20–21 (citing Compl. ¶¶ 136, 144). Notably, CW2 does not state that he/she voiced those opinions to Berger or upper management. CW2's opinions, thus, do not give rise to a strong inference of scienter. *In re Intrexon Corp. Sec. Litig.*, No. 16-cv-2398, 2017 WL 732952, at *6 (N.D. Cal. Feb. 24, 2017) (finding CW's opinions fail to suggest scienter); *In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997, 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016) (CW allegation that sales effort "was a complete disaster" did not plead falsity or scienter because "[o]ne person's 'complete disaster' is another's 'setback' or 'problem.'"); *In re American Apparel, Inc. S'holder Litig.*, No. CV 10-6352, 2013 WL 174119, at *20 (C.D. Cal. Jan. 16, 2013) (CW's broad statement of opinion with no supporting facts is insufficient to give rise to a strong inference of scienter); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) ("[I]t is difficult to surmise how the opinions and observations of the CWs could support a reasonable inference about what the[ ] Defendants knew or did not know at the time each of the challenged statements was made.").

The Court is mindful of Plaintiffs' comments at the hearing that extra consideration should

35

be given to CWs who spoke directly to the CEO about the specific matters at issue. The Court agrees that such statements can carry extra weight. However, in this case, the statements attributed to those CWs as alleged in the Complaint are simply not enough.

### b. CEO Ed Meyercord's "Admissions"

May 2015, Ed Meyercord, who had recently stepped in as CEO of Extreme from his position as Chairman of the Board, made various comments related to Extreme's partnership with Lenovo. Specifically, Meyercord said that the integration of Enterasys and its salesforce had not been successful, the acquisition "wasn't a very good deal" to begin with, and Extreme had "zero visibility into Lenovo." Opp'n 21–22; Compl. ¶ 21. Plaintiffs contend that Meyercord's statements demonstrate that Defendants knew the prior statements were false or misleading at the time they were made. *See* Opp'n 21. Defendants, however, argue that Meyercord did not speak to any assessment of the merger at the time it was entered into and did not refer to Defendants' state of mind at the time the statements were made. Mot. 24. The Court agrees with Defendants.

Although a post-class statement "may suggest that a defendant had contemporaneous knowledge of the falsity of his statement . . . [i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir. 1999)). In considering whether a subsequent statement is sufficient to demonstrate the falsity of a prior statement, the Ninth Circuit assesses whether the statement is along the lines of "I knew it all along." *Yourish*, 191 F.3d at 996.

First, Meyercord is not a defendant, and therefore, his statements cannot be deemed an admission of what Defendants knew at any time. *Cf. Read-Rite*, 335 F.3d at 846. Second, even if the Court construed Meyercord's statements as admissions, they are nowhere near the types of statements the Ninth Circuit considers sufficient to demonstrate the falsity of a prior statement. *See Browning v. Amyris, Inc.*, No. 13-cv-2209, 2014 WL 1285175, at *20 (N.D. Cal. Mar. 24, 2014) ("Acknowledging that Amyris had more trouble scaling up its process than anticipated does not show that the defendants always knew that the projections were unattainable or that they acted with scienter[.]"). Third, and finally, CW2 contradicts any allegation that Meyercord or any other

executive knew that the integration was not a good deal and that the partnership with Lenovo was destined to fail from the start. *See* Compl. ¶ 135 (CW2 knew from personal knowledge that the acquisition was the "brainchild" of Meyercord and Kennedy, and that Meyercord brought in Berger as the CEO to accomplish the acquisition).

### c. Core Operations Inference

Certain facts are so critical to a business's "core operations" that "their knowledge may be attributed to the company and its key officers." *In re Read–Rite*, 335 F.3d 843, 848 (9th Cir. 2003). This is called the "core-operations inference." "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry*, 542 F.3d at 784. "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware." *Id.* "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA." *S. Ferry*, 542 F.3d at 785.

"Allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the

37

matter." *Id.* at 785–86.

Plaintiffs assert that the Individual Defendants' positions and close management of Extreme's integration further support a finding of scienter. Opp'n 22. In particular, Plaintiffs allege that Berger took on direct responsibility for sales and marketing, and that Kurtzweil was "a major factor in driving most of the Enterasys integration." Compl. ¶¶ 156, 320, 322. As such, they argue it is clear the Individual Defendants would have been aware of the actual state of the integration, yet continued to make materially false and misleading statements. Opp'n 22. Defendants argue that the core operations doctrine applies only in rare circumstances in which a complaint alleges an undisclosed event of such magnitude that it would be absurd to infer management was unaware of it, and no such event occurred here. Reply ISO Mot. 14.

Considering all three prongs under *South Ferry*, Plaintiffs fail to show that the core-operations inference applies. With regard to the third prong, Plaintiffs have not pleaded that this is the "exceedingly rare" case in which a securities fraud plaintiff may rely solely on the core operations inference without particularized allegations about the Individual Defendants' access to the relevant information. Although Plaintiffs have sufficiently alleged that the Enterasys acquisition cost nearly half of Extreme's market capitalization and doubled the size and revenues of the Company, and was thus an important transaction, Compl. ¶ 318, Plaintiffs have not identified what "relevant *fact* is of such prominence that it would be absurd to suggest" that the Individual Defendants' were unaware of it. *S. Ferry*, 542 F.3d at 786 (emphasis added); *see also Anderson v. Peregrine Pharm. Inc.*, No. CV 12-1647, 2013 WL 4780059, at *12 (C.D. Cal. Aug. 23, 2013) ("The core operations doctrine applies [ ] to transactions worth millions of dollars or that represent a significant portion of the company's revenue and are of the type for which company officials are personally responsible." (citation omitted)). The importance of the integration presents only a "reasonable inference," of scienter, but the allegations are not sufficiently detailed to meet the PSLRA standard. *Read-Rite*, 335 F.3d at 848 (rejecting argument that defendants alleged false statements and high rank within the company, viewed in conjunction with the importance of the products that were the subject of the statements created a strong inference of scienter).

38

With regard to the first and second prongs, Plaintiffs' provide nothing more than a bare contention that they have met the standard. Opp'n 22 ("The Individual Defendants' positions and close management of Extreme's integration further support a finding of scienter."). A review of the Complaint likewise reveals that it lacks "detailed and specific allegations" sufficient to show that the Individual Defendants had actual knowledge that the Enterasys integration was facing the intractable problems alleged. *See S. Ferry*, 542 F.3d at 785. For example, while the Complaint alleges that Berger took on direct responsibility for sales and marketing, Compl. ¶¶ 320, 322, Plaintiffs do not allege that anyone conveyed specific information regarding the challenges of the integration to Berger during the class period. *Cf. Reese*, 747 F.3d 557 (alleging specific documents known to a defendant that contained specific facts contradicting public statements). Moreover, the allegation that Kurtzweil was "a major factor in driving most of the Enterasys integration," is not sufficiently detailed or specific to show that Kurtzweil was aware of the alleged problems. *Id.* ¶ 156. As the Ninth Circuit has held, "[g]eneral allegations of [a] defendant['s] . . . interaction with other officers and employees" are insufficient to create a strong inference of scienter. *In re Daou Sys.*, 411 F.3d at 1022. The Ninth Circuit requires, "additional allegation[s] of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. Here, we have no such additional allegations. *Cf. S. Ferry*, 542 F.3d at 785 ("[S]pecific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA.").

### d.    Berger's Bonus Scheme

Plaintiffs contend that Berger's bonus scheme also supports a strong inference of scienter. Opp'n 23. In particular, the Complaint notes that through his contract, Berger was given 300,000 Extreme stock options every time Extreme's stock price stayed above a certain price for 30 days, and that based on Extreme's stock price during the class period, Berger received 900,000 Extreme shares—*potentially* worth $4.4 million in profit. Compl. ¶¶ 309, 311, 313.

"A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco Partners*, 552 F.3d at 1004. However, for executive compensation to support the inference

of scienter, "the allegations in the complaint must demonstrate a strong correlation—including comparisons to previous years' [compensation]—between the [compensation] and the company's 'bottom line.'" *In re Downey Sec. Litig.* (*Downey II*), No. CV-08-3261, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) (citing *Zucco Partners*, 552 F.3d at 1005).

Here, Plaintiffs have failed to provide the requisite particularity the Ninth Circuit has found persuasive in the past. *See, e.g.*, *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (2003) (noting that because "none of the [defendant's] executive officers received options awards in 1997 . . . [but defendant] awarded [thousands of options to executive officers] in March 1998 [for performance allegedly increased by misrepresentations] . . . a strong inference of scienter can be inferred"). Although Plaintiffs' allege that Berger received stock option grants in part based on Extreme's financial performance, the Complaint fails to provide specifically, with comparisons to prior incentive schemes, the correlation between Berger's compensation and Extreme's bottom line. Plaintiffs allege only that Extreme's previous CEO, Oscar Rodriguez, did not have a comparable incentive scheme without providing sufficient facts for the Court to assess the incentive structures. Compl. ¶ 310. Such generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of the PSLRA. *See Zucco Partners*, 552 F.3d at 991. If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

Moreover, the Complaint does not allege that Berger exercised any options or sold any stock. Reply ISO Mot. 15. Plaintiffs allege only that Berger's stock option were *potentially* worth $4.4 million in profit, Compl. ¶ 313, not that he in fact made such profit. As Defendants correctly argue, "if failure was inevitable as Plaintiff[s] assert[ ], the disclosure of the failure would hurt Extreme's stock price and hence undermine the value of the options." Mot. 25. Without any allegations that Berger sold his stock options before the final disclosure, the Court cannot infer a strong inference of scienter from Berger's incentive structure.

### e. Departures of Defendants and Other Key Executives

Finally, Plaintiffs assert that the departures of Berger, Kurtzweil, and two executives directly responsible for the integration—COO Crowell and CRO White—bolsters the inference of scienter. Opp'n 24. Plaintiffs contend that the timing and circumstances of these departures provide sufficient information to allow the court to infer a suspicious change in personnel. *Id.*

As Defendants correctly argue, Plaintiffs' arguments are unpersuasive. Reply ISO Mot. 15. The determinative inquiry is whether the aforementioned departures, when viewed in conjunction with these failed allegations, support an inference of scienter. The Court finds that it does not. "[A]bsent allegations that the resignation at issue was uncharacteristic . . . or was accompanied by suspicious circumstances," the inference of a suspicious change in personnel will never be as cogent or as compelling as the inference of a benign one. *Zucco*, 552 F.3d at 1002; *see also Downey II*, 2009 WL 2767670, at *13 (holding that Plaintiffs' allegations fail to support an inference of scienter if the facts alleged do not suggest any wrongdoing or fraudulent activity associated with employee terminations). Accordingly, the departure of these executives fails to support a strong inference of scienter. The more plausible inference is that these executives performed poorly, however poor business performance is not securities fraud. *See, e.g.*, *Jasin v. Vivus, Inc.*, No. 14-cv-3263, 2016 WL 1570164, at *22 (N.D. Cal. April 19, 2016).

### f. Holistic Review

After having determined that none of Plaintiffs' allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically. *See In re VeriFone*, 704 F.3d at 702–03; *Zucco*, 552 F.3d at 992. The Court finds that taken together, the facts suggest, at most, corporate mismanagement and negligence, but they do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent. *Tellabs*, 551 U.S. at 323. The allegations in the Complaint do little to diminish the plausibility of this counter-inference. *Cf. id.* at 711 ("Because the alternative hypotheses—either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements—are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent."). Indeed, as the

foregoing demonstrates, Plaintiffs' reliance on the CW allegations, Meyercord's "admissions," the core operations inference, Berger's "unusual" bonus scheme, and the departures of Defendants and other key executives are unpersuasive. Particularly as to the CWs, if the Complaint delivered on what Plaintiffs' opposition promised, this action could possibly progress. However, Plaintiffs' opposition over promises and the Complaint under delivers. Moreover, neither the Complaint nor Plaintiffs' opposition even attempts to support the allegations of scienter with respect to the Lenovo deal.

The Court accordingly GRANTS the motion to dismiss for failure to state a claim under section 10(b) or Rule 10b-5.

## B.    Claim 2 – Section 20(a)

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger*, 914 F.2d at 1572. To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Because Plaintiffs have failed to state a claim for a primary violation of the Exchange Act, they likewise have failed to state a claim for violation of Section 20.

Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claims under section 20(a) WITH LEAVE TO AMEND.

## V.    ORDER

To successfully state a claim, Plaintiffs must plead with particularity what statements were made, when they were made, why they were false at the time they were made, and how the Defendant who made the statement acted with scienter at the time the statements were made. Because Plaintiffs fail to adequately plead that Defendants made any false or misleading statements and that they did so with scienter, the motion to dismiss is GRANTED WITH LEAVE TO AMEND.

Any amended complaint shall be filed **on or before May 29, 2017**. The Court requests that the chambers copy of any amended complaint be a redlined version, in color.

Failure to meet the deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal of Plaintiffs' claims with prejudice.

**IT IS SO ORDERED.**

Dated: April 27, 2017

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California