**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)
Louis Gottlieb (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Jeffrey A. Dubbin (SBN 287199)
Wendy Tsang (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
        lgottlieb@labaton.com
        ivasilchenko@labaton.com
        jdubbin@labaton.com
        wtsang@labaton.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Class*

**BERMAN DEVALERIO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermandevalerio.com
        cpoppler@bermandevalerio.com

*Liaison Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SECURITIES LITIGATION, <br><br> This Document Relates to: <br><br> All Actions. | Master File No. 3:15-cv-04883-BLF <br><br> <u>CLASS ACTION</u> <br><br> **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> Jury Trial Demanded |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION .................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................... 9

III. PARTIES ................................................................................................................ 9

    A. Lead Plaintiff ............................................................................................. 9

    B. Defendants ............................................................................................... 10

IV. CONTROL PERSON ALLEGATIONS ................................................................ 11

V. SUBSTANTIVE ALLEGATIONS ....................................................................... 13

    A. Extreme's Business Overview ................................................................. 13

    B. Start of Class Period: Extreme Acquired Enterasys, Emphasizing the Integration and the Synergies to Be Obtained ....................................... 15

    C. Throughout the Class Period, Defendants Repeatedly Assured the Market that Extreme's Integration of Enterasys Was "On Track" and "Ahead of Plan" .......................................................................................... 16

        1. January 13, 2014 – Company Releases Combined Pro Forma Financials ..................................................................................... 16

        2. February 5, 2014 – Q2 2014 Results ......................................... 16

        3. May 6, 2014 – Q3 2014 Results................................................. 17

        4. July 21, 2014 – Q4 2014 Revised Guidance.............................. 17

        5. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results ...... 17

        6. October 15, 2014 – Prerelease of Q1 2015 Results ................. 18

        7. October 28, 2014 – Q1 2015 Results ......................................... 18

        8. December 17, 2014 – Bernstein Technology Innovation Summit............ 19

        9. January 28, 2015 – Q2 2015 Results ......................................... 19

    D. Defendants Repeatedly Touted Extreme's Partnership with Lenovo .................. 19

        1. Inception of the Lenovo Partnership.......................................... 19

        2. February 5, 2014 – Q2 2014 Results ......................................... 20

        3. August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results ...... 21

        4. October 15, 2014 – Prerelease of Q1 2015 Results ................. 21

5.   October 28, 2014 – Q1 2015 Results ........................................ 21

6.   January 28, 2015 – Q2 2015 Results ........................................ 21

E.   Defendants Promoted the Company's Integration of Enterasys and Lenovo
Relationship as Key Aspects of a "Commitment" Announced to Investors:
to Achieve Double-Digit Revenue Growth and 10% Profit Margin by June
2015 ............................................................................................ 22

1.   Extreme Announced Its "Goal" of 10% Profit Margin by June
2015 .................................................................................... 22

2.   Extreme's "Goal" Changed to a "Commitment" to Achieve *Both*
Double-Digit Revenue Growth *and* 10% Profit Margin by June
2015 .................................................................................... 23

(a)   May 6, 2014 Earnings Call ................................................ 23

(b)   October 28, 2014 Earnings Call ........................................ 23

3.   Extreme Began to Distance Itself From Its "Commitment" ................... 23

F.   End of Class Period: The Truth Was Fully Revealed as Extreme Disclosed
Missed Revenue Estimates and Termination of Jeff White ...................... 25

G.   Confidential Witnesses Demonstrate that the Enterasys Integration Was
Not "On Track" or "Ahead of Plan" Because Extreme Lacked an
Integration Plan, Leading to Substantial Integration Problems and Adverse
Impact on Sales and Revenues ........................................................... 26

1.   Defendants Misled Investors into Believing that the Integration
Was Following a Plan ........................................................... 27

(a)   Confidential Witnesses Reveal That Extreme Lacked an
Integration Plan ............................................................ 28

(i)   Extreme Lacked a Product Roadmap for the Combined
Company ............................................................ 28

(ii)   Extreme Lacked a Plan to Merge the Two Salesforces and
Other Steps to Cut Costs and Obtain Integration Synergies
........................................................................ 33

(iii)   Extreme Lacked a "Go-to-Market" Strategy for the
Combined Company ............................................ 35

2.   Extreme Experienced Substantial Salesforce Integration Problems
During the Class Period, Which Defendants Failed to Disclose ............. 36

3.   The Company Experienced Significant Executive Turnover During
the Class Period Related to Its Substantial Integration Problems............. 41

4.   Summary of CW Allegations Concerning the Enterasys Integration ....... 45

5.  Summary of Berger's Admissions Regarding the Integration ................. 46

H.  Defendants Lacked Any Reasonable Basis to Believe That the Lenovo Partnership Would Positively Impact Extreme's Revenue and Omitted Adverse Facts Undermining Their Statements Regarding Lenovo ..................... 47

I.  Post Class-Period Revelations ............................................................. 48

1.  Meyercord's May 6, 2015 Admissions Regarding the Enterasys Integration and Lenovo Partnership ............................................. 48

2.  Meyercord's May 20-21, 2015 Announcement of a "*New* Operating Plan," Including an 18% Workforce Reduction and a "*New* Go-to-Market Strategy" ................................................. 49

3.  Meyercord's May 21, 2015 Admissions Regarding the Lenovo Partnership .......................................................................... 51

4.  Meyercord's September 14, 2016 Admissions that the Enterasys Acquisition Lacked the Necessary "Integration Planning," Including a "Clean and Clear Product and Technology Roadmap" ......... 51

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ...................................... 53

A.  Misstatements and Omissions Regarding the Enterasys Integration .................. 53

1.  September 12, 2013 – Business Update Conference Call ...................... 53

(a)  Kurtzweil's Misstatement and Omissions ................................. 53

(i)  Falsity ............................................................... 53

(ii)  Scienter ............................................................. 55

(b)  Berger's Misstatement and Omissions .................................... 55

(i)  Falsity ............................................................... 55

(ii)  Scienter ............................................................. 56

(c)  Market Reactions to the Misstatements and Omissions ............... 57

2.  November 4, 2013 – Q1 2014 Earnings Call ................................ 57

(a)  Berger's Misstatement and Omissions .................................... 57

(i)  Falsity ............................................................... 58

(ii)  Scienter ............................................................. 59

(b)  Kurtzweil's Misstatement and Omissions ................................. 59

(i)  Falsity ............................................................... 60

(ii)  Scienter ............................................................. 61

(c)      Market Reactions to the Misstatements and Omissions .............. 61

3.     February 5, 2014 – Q2 2014 Press Release and Earnings Call –
The Truth Partially Emerges but Defendants Continue to Mislead
the Market ..................................................................................... 63

     (a)      Partial Corrective Disclosure and/or Materialization of the Risk 63

     (b)      Berger's Misstatement and Omissions ....................................... 64

          (i)     Falsity.................................................................... 64

          (ii)    Scienter .................................................................. 65

     (c)      Market Reactions to the Misstatements and Omissions .............. 66

4.     May 6, 2014 – Q3 2014 Press Release and Earnings Call – The
Truth Continues to Partially Emerge but Defendants Continue to
Mislead the Market ....................................................................... 67

     (a)      Partial Corrective Disclosure and/or Materialization of the Risk 67

     (b)      Berger's Misstatement and Omissions in the May 6, 2014 Press
Release..................................................................................... 68

          (i)     Falsity.................................................................... 68

          (ii)    Scienter .................................................................. 69

     (c)      Berger's "Integration … Is On Track" Misstatement and
Omissions on the May 6, 2014 Earnings Call ............................ 70

          (i)     Falsity.................................................................... 70

          (ii)    Scienter .................................................................. 71

     (d)      Berger's Integration "Synergies" Misstatement and Omissions on
the May 6, 2014 Earnings Call .................................................. 72

          (i)     Falsity.................................................................... 72

          (ii)    Scienter .................................................................. 73

     (e)      Market Reactions to the Misstatements and Omissions .............. 74

5.     July 21, 2014 – Press Release ....................................................... 76

     (a)      Berger's Misstatement and Omissions ....................................... 76

          (i)     Falsity.................................................................... 76

          (ii)    Scienter .................................................................. 77

     (b)      Market Reactions to the Misstatements and Omissions .............. 78

6.     August 14, 2014 – Q4 2014 Press Release and Earnings Call.................. 79

     (a)      Berger's Salesforce Integration "Complete" Misstatement and
Omissions in the August 14, 2014 Press Release........................ 79

(i)    Falsity ........................................................................ 79

(ii)   Scienter ..................................................................... 80

(b)    Berger's Integration "Plan" Misstatement and Omissions on the
August 14, 2014 Earnings Call ..................................................... 81

(i)    Falsity ........................................................................ 81

(ii)   Scienter ..................................................................... 82

(c)    Berger's Synergies "On Track" Misstatement and Omissions on
the August 14, 2014 Earnings Call ............................................. 83

(i)    Falsity ........................................................................ 83

(ii)   Scienter ..................................................................... 84

(d)    Arola's Synergies "On Track" Misstatement and Omissions on
the August 14, 2014 Earnings Call ............................................. 86

(i)    Falsity ........................................................................ 86

(ii)   Scienter ..................................................................... 87

(e)    Arola's "Fully Integrated" Misstatement and Omissions on the
August 14, 2014 Earnings Call ..................................................... 87

(i)    Falsity ........................................................................ 88

(ii)   Scienter ..................................................................... 89

(f)    Berger's "Behind Us" Misstatement and Omissions on the August
14, 2014 Earnings Call .................................................................. 90

(i)    Falsity ........................................................................ 90

(ii)   Scienter ..................................................................... 91

(g)    Market Reactions to the Misstatements and Omissions ............. 92

7.    October 15, 2014 – Press Release – The Truth Continues to
Partially Emerge but Defendants Continue to Mislead the Market .......... 93

(a)    Partial Corrective Disclosure and/or Materialization of the Risk 93

(b)    Berger's Misstatements and Omissions ..................................... 93

(i)    Falsity ........................................................................ 94

(ii)   Scienter ..................................................................... 95

(c)    Market Reactions to the Misstatements and Omissions ............. 96

8.    October 28, 2014 – Press Release and Earnings Call .............................. 97

(a)    Berger's Misstatement and Omissions in the October 28, 2014
Press Release .................................................................................. 97

(i)    Falsity ........................................................................ 98

(ii)   Scienter ........................................................ 99

(b)   Berger's "Disruptions Now Fully Behind Us" Misstatement on the October 28, 2014 Earnings Call ......................................... 100

(i)   Falsity ............................................................ 100

(ii)   Scienter ........................................................ 101

(c)   Arola's Synergies "On Track" Misstatement and Omissions on the October 28, 2014 Earnings Call ......................................... 103

(i)   Falsity ............................................................ 103

(ii)   Scienter ........................................................ 104

(d)   Market Reactions to the Misstatements and Omissions ............ 104

9.   December 17, 2014 – Bernstein Technology Innovation Summit.......... 105

(a)   Arola's Misstatements and Omissions ..................................... 105

(i)   Falsity ............................................................ 106

(ii)   Scienter ........................................................ 106

10.   January 28, 2015 – Q2 2015 Earnings Call ........................... 107

(a)   Berger's Misstatement and Omissions ..................................... 107

(i)   Falsity ............................................................ 108

(ii)   Scienter ........................................................ 109

(b)   Market Reactions to the Misstatements and Omissions ............ 110

11.   April 9, 2015 – The Truth Was Fully Revealed....................... 110

B.   Misstatements and Omissions Regarding the Lenovo Partnership..................... 112

1.   August 14, 2014 – Q4 2014 Earnings Call ............................. 112

(a)   Berger's Misstatement and Omissions ..................................... 112

(i)   Falsity ............................................................ 112

(ii)   Scienter ........................................................ 113

(b)   Market Reactions to the Misstatement and Omissions ............. 114

2.   October 28, 2014 – Q1 2015 Earnings Call............................ 114

(a)   Berger's Misstatement and Omissions About Field-Level Activity with Lenovo ..................................................... 114

(i)   Falsity ............................................................ 115

(II)   Scienter ........................................................ 116

(b)    Berger's Misstatement and Omissions About Lenovo's "Certain[] . . . Revenue Impact" ................................................................. 117

(i)    Falsity ............................................................................ 117

(ii)   Scienter ......................................................................... 118

(C)    Market Reactions to the Misstatements and Omissions ............ 118

3.    January 28, 2015 – Q2 2015 Earnings Call ............................................. 119

(a)    Berger's Misstatement and Omissions ..................................... 119

(b)    Falsity ........................................................................................ 120

(c)    Scienter ...................................................................................... 121

(d)    Market Reactions to the Misstatements and Omissions ............ 121

4.    April 9, 2015 – The Truth Was Fully Revealed ...................................... 122

C.    Misstatements and Omissions Regarding Defendants' "Commitment" to Achieve 10% Revenue Growth and 10% Operating Margin by June 2015 ....... 123

1.    May 6, 2014  – Q1 2014 Earnings Call ................................................... 123

(a)    Berger's Misstatements and Omissions ................................... 123

(i)    Falsity .......................................................................... 123

(ii)   Scienter ........................................................................ 124

(b)    Market Reactions to the Misstatements and Omissions ............ 125

2.    October 28, 2014 – Q1 2015 Earnings Call ............................................ 126

(a)    Berger's Misstatement and Omissions .................................... 126

(i)    Falsity .......................................................................... 127

(ii)   Scienter ........................................................................ 127

(b)    Arola's Misstatement and Omissions ...................................... 129

(i)    Falsity .......................................................................... 129

(ii)   Scienter ........................................................................ 130

(c)    Market Reactions to the Misstatements and Omissions ............ 131

3.    January 14, 2015 – Needham Growth Conference – The Truth Was Partially Revealed ................................................................................ 132

4.    January 28, 2015 – The Truth Was Confirmed ....................................... 133

VII.   ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ................................................................................. 134

A.    Defendant Berger's Unique Compensation Scheme ........................................... 134

1.    Berger's Compensation ......................................................... 134

2.    Berger's Compensation Was Unique in Extreme's History and Highly Unusual Across Comparable Companies at the Time ................ 135

(a)    Berger's Bonus Plan Was Unique in Extreme's History .......... 135

(b)    Lead Plaintiff's Executive Compensation Expert Confirms that Berger's Bonus Plan Was Not Only Unique in Extreme's History, but Also Highly Unusual Compared to Its Peer Companies and Other Companies of Similar Size ............................................... 137

3.    Berger Was Motivated to Make Misrepresentations to Trigger His "Performance Option" Tied to Extreme's Short-Term Stock Price, and Had the Opportunity to Do So ........................................................ 142

B.    Core Operations Allegations: The Enterasys Acquisition Was a Critical Transaction for Extreme and Its Integration Was Followed Closely by Senior Management ........................................................... 144

VIII.    CLASS ACTION ALLEGATIONS ......................................... 146

IX.    LOSS CAUSATION ........................................................... 148

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ......................................................... 151

XI.    NO SAFE HARBOR ........................................................... 152

A.    The Majority of Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking ........................................... 152

B.    Any Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........................................................... 153

C.    Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ........................................................... 153

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................... 154

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Berger, Arola and Kurtzweil ........................................................... 155

XII.    PRAYER FOR RELIEF ...................................................... 157

XIII.    JURY DEMAND ............................................................. 157

1    Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher" or "Lead

2 Plaintiff"), individually and on behalf of a class of similarly situated persons and entities,

3 alleges the following against Defendants Extreme Networks, Inc. ("Extreme" or the

4 "Company") and Charles W. Berger, Kenneth B. Arola, and John T. Kurtzweil (collectively, the

5 "Individual Defendants," described more fully below) (together with Extreme, the

6 "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and

7 belief as to all other matters.

8    Lead Plaintiff's information and belief as to allegations concerning matters other than

9 itself and its own acts is based upon, among other things, a review and analysis of (i) press

10 releases, news articles, transcripts, and other public statements issued by or concerning Extreme

11 and the Individual Defendants; (ii) research reports issued by financial analysts concerning

12 Extreme's business; (iii) reports filed publicly by Extreme with the Securities and Exchange

13 Commission (the "SEC"); (iv) an investigation conducted by and through Lead Plaintiff's

14 attorneys, which included interviews of numerous former employees of Extreme on a

15 confidential basis; (v) news articles, media reports, and other publications concerning the

16 networking technology industry and markets; (vi) other publicly available information and data

17 concerning Extreme, its securities, and the markets therefor; and (vii) information provided by a

18 consulting expert in the planning and implementation of senior executive compensation

19 programs and incentives.  Lead Plaintiff believes that substantial additional evidentiary support

20 exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a

21 reasonable opportunity for discovery.

22 **I.      NATURE OF THE ACTION**

23    1.    Lead Plaintiff brings this federal securities class action on behalf of itself and all

24 persons and entities that, during the period from September 12, 2013 through April 9, 2015

25 inclusive (the "Class Period"), purchased the publicly traded common stock of Extreme and/or

26 exchange-traded options on such common stock, and were damaged thereby (the "Class").

27 Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any

28 Defendant who is an individual; (iii) any person who was an officer or director of Extreme

1    during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant

2    has or had a controlling interest; (v) Extreme's employee retirement and benefit plan(s); and (vi)

3    the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded

4    person.  Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C.

5    §§ 78a et seq.  (the "Exchange Act").

6         2.     Extreme develops and sells network infrastructure equipment.  Its main products

7    include wired and wireless devices for accessing the Internet, as well as relevant software.

8         3.     Enterasys Networks, Inc. ("Enterasys") was a privately held company

9    headquartered in Salem, New Hampshire, that also sold network infrastructure equipment and

10   software, including analytics and security products.  Enterasys was a direct competitor of

11   Extreme.

12        4.     Extreme announced its acquisition of Enterasys on September 12, 2013 and

13   completed it on October 31, 2013 for $180 million, net of cash acquired.  The acquisition

14   roughly doubled the size of the Company, and the Company described it as a "merger of equals."

15   On the September 12, 2013 conference call where Extreme announced the acquisition, Defendant

16   CEO Charles Berger ("Berger") assured investors that: "***There will be no disruption in***

17   ***customers' ability to grow and operate their networks. Period. None***."[1]

18        5.     Defendant CFO John T. Kurtzweil ("Kurtzweil") similarly stressed that

19   management had a "***plan***" to "***fully integrate[] the two Teams***" and "***reduce product costs and***

20   ***operating expenses between $30 million to $40 million***," telling investors they could "expect to

21   realize these synergies ***over a 12 to 24-month period***."

22        6.     During the Class Period, Extreme's business model depended primarily on selling

23   its products and services through other companies called "channel partners."  Indeed, because

24   Extreme sold its products primarily through partners in these arrangements, the Company

25   described its business during the Class Period as "partner-driven."  One such partnership was

26

27   ───────────────

[1] All emphasis is added unless otherwise noted.  **Bold** emphasis is used for general emphasis;
28   ***bold and italics*** are used specifically to denote statements alleged to be false and misleading, as
     specified in Section VI, *infra*.

1    with the global technology company Lenovo Group Ltd. ("Lenovo"), which Extreme announced

2    for the first time on July 17, 2013.

3           7.    Throughout the Class Period, Defendants repeatedly highlighted the Lenovo

4    relationship to investors as one of the Company's "key partnerships" as well as a key growth

5    driver of Extreme's revenues.  For example, Berger assured on October 28, 2014 that "**_Lenovo []_**

6    **_certainly by then [June 2015] will have double-digit revenue impact_**…."  Lenovo was touted as

7    being particularly important due to its expanding server business—for example, Extreme claimed

8    to be Lenovo's "only networking partner."

9           8.    From the moment the Enterasys acquisition was announced, Extreme

10   management created a growth narrative out of the above factors to encourage investment in the

11   Company.  Specifically, Defendants assured investors during the Class Period that the Company

12   would achieve 10% revenue growth and 10% operating (profit) margin as a result of integrating

13   Enterasys successfully, the Lenovo relationship, and only a few other factors.  In fact,

14   Defendants repeatedly assured investors that these results would be achieved by June 2015 at the

15   latest.  CEO Berger, for example, speaking at Extreme's earnings call on May 6, 2014

16   (announcing results for the third quarter of fiscal year 2014[2]), stated:

17             *I want to again reemphasize our plan and our commitment to attain double*
18             *digit [10% or higher] revenue growth by the second half of [fiscal year] 2015 as*
               *we complete the integration, realize the benefits of our key partnerships like*
19             *Lenovo* and Ericsson, and align our efforts between the growth opportunities in
               the wireless and datacenter segments. *Over the same period we are committed to*
20             *achieve a 10% operating margin* on a non-GAAP basis.

21          9.    Defendant Berger was unusually incentivized to promote this growth narrative: if

22   he could get Extreme's stock price to rise to $4, $5, and $6 per share and stay there for only 30

23   days, pursuant to the terms of his employment agreement, Berger would earn options to purchase

24   300,000 shares of Extreme Stock at each level, for only $3.17 per share.  By making false and

25   misleading statements and omissions regarding the Enterasys integration, Berger inflated

26   Extreme's stock to first $4, then $5, and then $6 per share for 30 consecutive days (on October

27

28        [2] The Company's fiscal year 2015 ended June 30, 2015.

18, 2013, November 6, 2013, and December 16, 2013).  At each point, Berger became entitled to purchase 300,000 additional shares of Extreme stock, totaling 900,000 shares.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000.  Based on the current market price for Extreme stock (as of June 2, 2017 market close), Berger's profit would be more than $6.3 million, or over **twelve times** his 2013 base annual salary.

10.      As described in further detail below, Defendants repeated throughout the Class Period that the integration of Enterasys was "***on track***."  *See also* Appendix A (chart of alleged false and misleading statements and omissions).  Defendants also repeated that cost savings (or "synergies") from the integration, in combination with benefits from the Lenovo partnership, would drive double-digit revenue growth and a 10% operating margin.

11.      Their baseless assurances continued during the Class Period even as the Company lowered its revenue guidance and reported quarterly revenue results below both guidance and analyst expectations.  Defendants touted that the Company's integration efforts were "***on track***," "***ahead of plan***," "***exactly where [they] planned to be***," and similar assurances.  For example, on May 6, 2014, Extreme reported disappointing financial results, for the quarter in which management had told investors to expect to see the first positive impact of the integration on the Company's financials.  Nevertheless, Berger reassured investors that "***[t]he integration efforts following the acquisition of Enterasys continue ahead of plan***."

12.      Defendants also continually represented that the Company was "***on track***" to realize $30 to $40 million in synergies from the integration.  For example, on October 15, 2014, the Company preannounced that it would be falling below its revenue guidance while CEO Berger reassured investors in a Company press release that "***[w]e are on track to realize the full $30-$40 million in cost synergies expected from the acquisition***."

13.      Defendants' statements regarding the "on track" and "ahead of plan" status of the Enterasys integration and achievement of cost-saving synergies as "on track" all entailed and created the false impression that a plan existed.  These statements were all false and misleading because the integration was not going according to any plan.  Based on information from

1   multiple Confidential Witnesses ("CWs") who worked at the Company during the Class Period,

2   the integration was a failure because the Company did not have an integration plan, including (1)

3   a plan setting forth how the two salesforces would be integrated,  (2) a plan outlining other steps

4   to cut costs and obtain synergies from the integration, (3) a "product roadmap"[3] stating how the

5   companies' separate products would be integrated, and (4) a "go-to-market strategy"[4] as to how

6   the combined entity would reach customers and provide competitive products.

7        14.     Indeed, after the Class Period (on September 14, 2016), Ed Meyercord

8   ("Meyercord"), who was Chairman of Extreme's Board of Directors during the entire Class

9   Period[5] and replaced Berger as CEO less than two weeks after the Class Period,  admitted that

10  "[t]here were **a lot of integration issues**" in the Enterasys acquisition,  promising that a

11  subsequent integration of another recently acquired business would be "**[v]ery different**"

12  because unlike with Enterasys, "a lot of work has gone into **planning**" it, and this time, the

13  Company developed "**very extensive and detailed bottoms-up plans**," including specifically

14  "**integration planning**," such as a "**very clean and clear product and technology roadmap.**"

15       15.     As a result of this lack of an integration plan during the Class Period, Extreme

16  experienced substantial integration problems including: lost clients, client dissatisfaction with a

17

18  [3] A "product roadmap" is "a record of **planned** releases and may extend two to four release
    cycles into the future," and it includes "specific products, product capabilities, or themes phased

19  over a period of time."  "The roadmap projects into the future and suggests the likelihood that
    additional products and/or services will be developed to continue to address identified market

20  needs."  Further, where products like Extreme's are "sold business-to-business, an external
    version of the roadmap may be **required** for customers," because customers "expect to see **long-**

21  **term product plans . . .  to be sure that the organization will continue to invest in the
    products**."  Indeed, "product roadmaps are often used as a means to measure the pace of

22  investment" and "as a planning tool for the customer's budgeting and operational processes so
    that major expenditures can be planned for the future."  GREG GERACIE, *THE PRODUCT*

23  *MANAGEMENT AND MARKETING BODY OF KNOWLEDGE*  §§ 11.2.2 & 17.1.3 (Steven Eppinger ed.,
    1st ed. 2013); *see also id.* ("**A product roadmap is common** for products that can be delivered

24  incrementally or in an evolutionary fashion," as Extreme's network switching products are
    delivered).

25  [4] A "go-to-market strategy" (or GTM strategy) is an action plan that specifies how a company
    will reach customers and achieve competitive advantage. The purpose of a GTM strategy is to

26  provide a blueprint for delivering a product or service to the end customer, taking into account
    such factors as pricing and distribution. *See* http://searchitchannel.techtarget.com/definition/go-

27  to-market-strategy-GTM-strategy.
    [5] Meyercord had been on Extreme's Board of Directors since October 2009, serving as

28  Chairman since March 2011.

1   poorly integrated salesforce and the lack of a product roadmap, a failure to correct employee

2   redundancies and thus achieve related cost-saving synergies, and high executive turnover.  In

3   reality, Defendants lacked a reasonable basis to expect to achieve the $30 to $40 million of

4   integration synergies in the time frame promised given these undisclosed, adverse facts, and

5   indeed, never did.  From the beginning of the Class Period, Defendants knew or recklessly

6   disregarded these omitted, material facts.

7        16.     Further, Defendants made false and misleading statements regarding Extreme's

8   relationship with Lenovo.  For example, Defendants touted that the Company's "key

9   partnership" with Lenovo "*certainly … **will have double-digit revenue impact***" by June 2015.

10  However, Extreme would later reveal that it did not actually know whether there was any

11  "collaboration in the field" and in fact had "**zero visibility**" into Lenovo's operations, much less

12  any basis to forecast Lenovo's ability to contribute to Extreme's overall revenue.  CWs who

13  worked at the Company during the Class Period confirm that there was no support for the

14  partnership at Lenovo's "field" level, or even a way for the Lenovo salesforce to benefit from

15  selling Extreme's products  (and thus no incentive to sell Extreme's products, rendering this

16  partnership futile for Extreme).  As a result, because of these material, adverse facts that

17  Defendants knew but failed to disclose during the Class Period, they had no reasonable basis for

18  believing during the Class Period that its partnership with Lenovo would positively impact

19  Extreme's revenue, and in particular had no reasonable basis for making a commitment that it

20  would drive double-digit revenue growth by June of 2015.

21       17.     Nevertheless, Defendants emphasized the Company's "*commitment*" to achieve

22  10% revenue growth and 10% operating margin by the end of its fiscal year 2015 (*i.e.*, by June

23  2015) during the Class Period, even in the face of revenue shortfalls and other revelations

24  described herein.  Defendants also stated during the Class Period that Extreme's commitment

25  "has only strengthened."  However, Defendants lacked a reasonable basis for this "commitment"

26  to achieve 10% revenue growth and 10% profit margin by June 2015 because they knew but

27  omitted material, adverse facts regarding the failing Enterasys integration and the unproductive

28

Lenovo partnership that undermined such statements. In fact, they ultimately failed to fulfil this "commitment" to investors.

18.   Accordingly, during the Class Period, Defendants knowingly or recklessly made materially false and misleading statements and omissions regarding the Company's quarterly and year-end revenue and earnings guidance.

19.   As a result of these misrepresentations and omissions, Extreme's stock traded at artificially inflated prices during the Class Period, reaching a high of $8.14 per share in intraday trading on January 23, 2014.

20.   The inflation caused by the fraud came out of the Company's stock price through four partial corrective disclosures and/or materializations of the risk before a final one on April 9, 2015, as shown in the chart below.



21.   On February 5, 2014, before the market opened, Extreme reported low revenues and disappointing guidance for the next quarter, citing issues relating to the integration.  On May 6, 2014, Extreme reported disappointing revenues, admitted that it "experienced **some** integration issues," and revealed that its CFO and COO would be leaving (and Berger would be taking over the COO's role and directly overseeing the salesforce integration efforts).  On

1    October 15, 2014, Extreme preannounced revenues significantly below its previous guidance.

2    And on January 14, 2015, the Company backed away from its commitment to achieve 10%

3    revenue growth and 10% operating margin by June 2015 (based on the Lenovo partnership).

4         22.    Finally, on April 9, 2015, after the markets closed, Extreme preannounced that it

5    would miss guidance for its third fiscal quarter of 2015, reporting non-GAAP revenue of $118-

6    $120 million and earnings per share ("EPS") of ($0.09)-($0.07), significantly below its guidance

7    of $130-$140 million and ($0.03)-$0.02, respectively.  The Company also announced more

8    executive turnover – Chief Revenue Officer Jeff White, who had been hired only six months

9    earlier to manage the integration of the Extreme and Enterasys salesforces (taking over from

10   CEO Berger, who had filled that role from May to October 2014), was "no longer with the

11   Company" – and trading in its shares was halted.  On these disclosures, the Company's stock

12   price fell nearly 23%, from $3.24 per share to $2.50 per share, on highly unusual trading volume

13   of 10.1 million shares traded (versus 356,300 shares traded the day before).

14        23.    Less than two weeks after the end of the Class Period, on April 21, 2015, the

15   Company announced that Berger had resigned, effective April 19, and would be replaced by

16   Meyercord.

17        24.    On May 6, 2015, the Company announced its financial results for the third fiscal

18   quarter of 2015, and Meyercord hosted his first earnings call as CEO.  During the call,

19   Meyercord was asked to explain how an acquisition that created a Company with combined

20   annual revenues of $624 million was reporting only $535 million annual revenue a year and a

21   half later.  Meyercord admitted, among other things, that the integration of Enterasys and its

22   salesforce had not been successful, and indeed, the acquisition "wasn't a very good deal" to

23   begin with.  He further admitted that **Extreme had "zero visibility into Lenovo"** and was

24   "uncomfortable" providing any forecast for when, if ever, that relationship would contribute to

25   Extreme's revenue.  These revelations show that the previous revenue shortfalls, guidance

26   misses, and executive turnovers were materializations of undisclosed risks relating to the failed

27   Enterasys integration and the weakness of the so-called Lenovo partnership.

28

25. Extreme never achieved the promised 10% operating margin or double-digit revenue growth, either by the scheduled second half of fiscal year 2015 or thereafter. Extreme's stock price returned to pre-fraud levels at the end of the Class Period.

## II. JURISDICTION AND VENUE

26. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

27. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

28. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Extreme has operations in this district and division, including its principal place of business at 145 Rio Robles, San Jose, California 95134.

29. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ Stock Market ("NASDAQ"), the world's second-largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

30. On June 28, 2016, this Court appointed Arkansas Teacher to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 75).

31. Arkansas Teacher is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas. Arkansas Teacher was established by Act 266 of 1937, as

1  an Office of Arkansas State government, for the purpose of providing retirement benefits for

2  employees of any school or other educational agency participating in the system.  Arkansas

3  Teacher has more than $15 billion in net assets held in trust for pension benefits.  As of June 30,

4  2015, Arkansas Teacher has 335 participating employers and more than 126,000 individual

5  members.  As set forth in its PSLRA certification previously filed with the Court (ECF No. 88-

6  1), Arkansas Teacher purchased Extreme common stock during the Class Period and suffered

7  damages as a result of the securities law violations alleged herein.

8  **B.    Defendants**

9  32.    Defendant Extreme is a Delaware corporation with principal executive offices at

10  145 Rio Robles, San Jose, CA 95134.  Founded in 1996, Extreme first incorporated in California

11  in May 1996 and shipped its first products in 1997.  The Company reincorporated in Delaware in

12  March 1999 and had its initial public offering ("IPO") in April 1999.  As of June 30, 2016,

13  Extreme had approximately 1,378 employees worldwide.  Throughout the Class Period, Extreme

14  common stock traded actively on the NASDAQ under the ticker symbol "EXTR."  During the

15  Class Period, there were approximately 94 million to 100 million shares of Extreme common

16  stock outstanding.

17  33.    Extreme's fiscal year ends on June 30 of each year.  Thus, for example, its 2015

18  Fiscal Year ended on June 30, 2015, and its 2015 fiscal quarters Q1, Q2, Q3, and Q4 ended on

19  September 30, 2014, December 31, 2014, March 31, 2015, and June 30, 2015 respectively.

20  34.    Defendant Charles W. Berger was at all relevant times Extreme's President and

21  Chief Executive Officer ("CEO").  Berger was Extreme's CEO and a member of Extreme's

22  Board of Directors from April 2013 until April 19, 2015, when his employment with Extreme

23  was terminated.  Prior to joining Extreme, Berger was the Chairman and CEO of ParAccel, Inc.,

24  a software company that provided a database management system designed for advanced

25  analytics for business intelligence.  From April 2006 through December 2009, Berger served as

26  CEO of DVDPlay, Inc., a developer and manufacturer of automated and remotely managed DVD

27  rental kiosks, for which he also served as Chairman from December 2001 through December

28  2009.  From March 2003 through September 2005, he served as President, CEO, and as a

1    director of Nuance Communications, Inc., a computer software technology company that

2    provides speech and imaging applications.  Berger was a direct and substantial participant in the

3    fraud.  During the Class Period, as more fully alleged below, he made materially false and

4    misleading statements/omissions in Extreme's press releases, quarterly conference calls, industry

5    events, and events for analysts, investors, and the media.

6          35.    Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and

7    Senior Vice President from June 29, 2012 to June 1, 2014.  Kurtzweil then served as "Special

8    Assistant to the CEO," from June 2, 2014 until September 30, 2014, when his employment with

9    Extreme ended.  Prior to Extreme, from 2006 to 2012, Kurtzweil was the Executive Vice

10   President of Finance, CFO, and Treasurer of Cree, Inc., a manufacturer of lighting-class LEDs,

11   lighting products and products for power and radio frequency applications.  Kurtzweil was a

12   direct and substantial participant in the fraud.  During the Class Period, as more fully alleged

13   below, he made materially false and misleading statements/omissions in press releases, quarterly

14   conference calls, industry events, and events for analysts, investors, and the media.

15         36.    Defendant Kenneth B. Arola ("Arola") was Extreme's CFO and Senior Vice

16   President from June 2, 2014 to May 2016.  Prior to joining Extreme, from 2005 to 2013, Arola

17   was the Vice President of Finance and CFO of Align Technology, Inc., a medical device

18   company.  From 1990 to 2004, he was the Vice President of Finance and Corporate Controller at

19   Adaptec, Inc., a manufacturer of computer storage products.  Arola was a direct and substantial

20   participant in the fraud.  During the Class Period, as more fully alleged below, he made

21   materially false and misleading statements/omissions in Extreme's press releases, quarterly

22   conference calls, industry events, and events for analysts, investors, and the media.

23         37.    For purposes of this Complaint, "Individual Defendants" refers to Defendants

24   Berger, Kurtzweil, and Arola.  The Individual Defendants, together with Extreme, are the

25   "Defendants."

26   **IV.    CONTROL PERSON ALLEGATIONS**

27         38.    The Individual Defendants, by virtue of their high-level positions at Extreme,

28   directly participated in the management of the Company, were directly involved in the day-to-

1   day operations of the Company at the highest levels, and were privy to confidential proprietary

2   information concerning the Company and its business, operations, growth, financial statements,

3   and financial condition, as alleged herein.  As set forth below, the materially misstated

4   information conveyed to the public was the result of the collective actions of these individuals.

5         39.    Berger was very closely involved in all aspects of the Company's operations.  For

6   example, he took over direct responsibility for the Sales group, including overseeing the

7   integration of the Enterasys and Extreme salesforces, when COO Chris Crowell left the

8   Company on May 6, 2014.  Berger continued in that capacity until he was replaced by Jeff White

9   on October 1, 2014. *See, e.g.*, *infra* ¶¶ 135-138, 141, 405-409.  As further described below, both

10   before and after this period, Berger spoke personally with employees regarding failures of the

11   integration process, particularly the lack of an integration plan and related salesforce integration

12   problems *(see, e.g.*, *infra* ¶¶ 122, 126, 410), including at quarterly sales calls (which he led while

13   acting as **head of Sales** from May to October 2014) and the annual global salesforce conference

14   in Las Vegas in the summer of 2014.

15         40.    The Individual Defendants, as senior executive officers, and Berger additionally

16   as a director, of a publicly held company whose common stock was, and is, registered with the

17   SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the

18   NASDAQ, and governed by the federal securities laws, each had a duty to disseminate prompt,

19   accurate, and truthful information with respect to the Company's business, operations, financial

20   statements, and internal controls, and to correct any previously issued statements that had

21   become materially misleading or untrue, so that the market prices of Extreme's publicly-traded

22   common stock would be based on accurate information.  Berger, Kurtzweil, and Arola each

23   violated these requirements and obligations during the Class Period.

24         41.    The Individual Defendants, because of their positions of control and authority as

25   senior executive officers of Extreme, and Berger as an Extreme director, were able to and did

26   control the content of the SEC filings, press releases, and other public statements issued by

27   Extreme during the Class Period.  Each was provided with copies of the statements made in

28   statements at issue in this action before they were issued to the public and had the ability to

1   prevent their issuance or cause them to be corrected.  Accordingly, Defendants Berger,

2   Kurtzweil, and Arola are responsible for the accuracy of the public statements detailed herein.

3      42. The Individual Defendants, because of their positions of control and authority as

4   senior executive officers of Extreme, and Berger as an Extreme director, had access to the

5   adverse undisclosed information about Extreme's business, operations, financial statements, and

6   internal controls through access to internal corporate documents, conversations with other

7   corporate officers and employees, attendance at Extreme management and Board of Directors

8   meetings and committees thereof, and via reports and other information provided to them in

9   connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts

10   rendered the positive representations made by or about Extreme materially false and misleading.

11      43. The Individual Defendants are liable as participants in a fraudulent scheme and

12   course of conduct that operated as a fraud or deceit on purchasers of Extreme common stock by

13   disseminating materially false and misleading statements and/or concealing material adverse

14   facts.  The scheme: (i) deceived the investing public regarding Extreme's integration of

15   Enterasys, partnership with Lenovo, related "commitment" to achieve 10% revenue growth and

16   operating margin, operations, and management, and the intrinsic value of Extreme's common

17   stock and options; and (ii) caused Lead Plaintiff and members of the Class to purchase Extreme

18   common stock and options at artificially inflated prices.

19   **V. SUBSTANTIVE ALLEGATIONS**

20     **A. Extreme's Business Overview[6]**

21      44. Extreme is a network infrastructure company.  It develops and sells equipment for

22   accessing the Internet, as well as software for running the equipment, monitoring its usage, and

23   analyzing the data that passes through.  The Company also offers related services contracts for

24   extended warranty and maintenance of its equipment.   Together, equipment sales and service

25   contract payments constitute, in the Company's words, "substantially all" of the Company's

26   revenue.

27

28    [6] This discussion of Extreme's business, products, and customers is limited to the Class Period, unless otherwise noted.

45.     Extreme occupies part of the modern information technology ecosystem known as "switching" and/or "routing," *i.e.*, the part of network infrastructure that is upstream of the Internet user's device but downstream of the data carrier (such as Ethernet, 3G, and 4G services). The Company's products consist of wired and wireless means of accessing the Internet such as wired switching, wireless switching, and access point devices.  The Company also offers software services, including programs that monitor and address Internet performance, as well as programs that capture and analyze or "mine" Internet usage data.  In addition, the Company sells what it refers to as "renewable support arrangements," which include extended warranty contracts that generally range from one to five years.

46.      These products and services together accounted for over $500 million in global revenues per fiscal year during the Class Period.  Extreme's main competitors during the Class Period included Cisco Systems, Inc., Brocade Communications Systems, Inc., Juniper Networks Inc., and Hewlett-Packard.

47.     Extreme's domestic and international customers include businesses such as hospitals, hotels, universities, sports venues, and telecommunications companies, as well as government agencies.   For example, its customers during the class period included Ericsson AB, U.S. school districts, the University of Southern California, and the National Football League.

48.     Throughout the Class Period, Extreme's primary business model was to sell its products and services through other companies called "channel partners."  A channel partner is another company in the same technology ecosystem that supplements its own goods and services with Extreme products.  Typically, companies partnered with Extreme so they could offer their own customers more complete information technology solutions.   Because Extreme sold its products primarily through partners in these arrangements, Extreme described its business during the Class Period as "partner-driven."

49.     The Company also generated revenue through the efforts of its internal salesforce, also referred to as its "field sales organization."   This salesforce both provided support to channel partners and made direct sales to Extreme's own customers.  According to the Company, "about 65% to 70%" of its revenue during the Class Period was earned through

its partners, and "about 25% to 30%" of its revenue was from direct sales by the Company itself.

      **B.**    **Start of Class Period: Extreme Acquired Enterasys, Emphasizing the Integration and the Synergies to Be Obtained**

     50.    On September 12, 2013, Extreme issued a press release, before the market opened, announcing that it had acquired rival network infrastructure technology company Enterasys.  The release disclosed that Extreme would acquire all Enterasys outstanding stock in an all cash transaction valued at $180 million.

     51.    The acquisition roughly doubled the size of the Company.  At the time the acquisition was announced on September 12, 2013, Extreme had approximately 750 employees and reported "just shy of $300 million in annual revenues." Enterasys had approximately 900 employees and announced it would "achieve between $325 million and $330 million" in annual revenues for its fiscal year about to end on September 30.  As such, Extreme stated it "will have trailing 12-months revenues in excess of $600 million."  Further, Extreme had more than 6,000 customers before the acquisition, and management announced at the September 12, 2013 conference call that "[t]he combined Company will have over 12,000 customers."  Accordingly, the Company described the acquisition as a "merger of equals."

     52.    On the September 12, 2013 conference call, where Extreme announced the acquisition, Defendant Kurtzweil stated that "when we have fully integrated the two Teams, we *plan to reduce product costs and operating expenses between $30 million to $40 million*," further specifying that "[w]e expect to realize these synergies *over a 12 to 24-month period*." Later on the same call, Defendant Berger assured investors that: "*There will be no disruption in customers' ability to grow and operate their networks. Period. None*."

     53.    The Company completed the acquisition on October 31, 2013 and announced that it made "Extreme the fifth largest Ethernet switching company in the market."  Shortly thereafter, on November 4, 2013, Berger assured the market: "*Overall, our integration efforts are on track*."  Kurtzweil reiterated both that the Company had a "*plan* to reduce product costs and operating expenses *between $30 million to $40 million . . . over a 12- to 24-month period*,"

and that these "*synergies will be seen in the financials* in a small way in the third fiscal quarter and *will hit full stride in 12 to 15 months from now*."

### C. Throughout the Class Period, Defendants Repeatedly Assured the Market that Extreme's Integration of Enterasys Was "On Track" and "Ahead of Plan"

#### 1. January 13, 2014 – Company Releases Combined Pro Forma Financials

54.     On January 13, 2014, after the acquisition was completed and the Company had spent over two months on integration, it released a set of consolidated financial statements. These statements showed, among other metrics, a look at the combined Company's pro forma financial statements as if it were operating as one company for the entirety of fiscal year 2013. The pro forma GAAP revenue for the combined year would have been $632 million.

55.     After a January 14, 2014 conference call to discuss these financial statements, the market reacted positively.  An analyst report released the same day from Wedbush Securities maintained its "Outperform" rating and increased its price target, stating "the company is looking to extract $30-40mn in synergies from the combined company over the next 24 months.  We expect early returns to be generated . . . .  The **key takeaway** is that there are **no major changes to original assumptions**."

#### 2. February 5, 2014 – Q2 2014 Results

56.     Less than a month later, on February 5, 2014, the Company reported its financial results for its second fiscal quarter of 2014, as well as guidance for the next fiscal quarter (Q3 2014).  On the earnings conference call that day, the Company acknowledged it was "at the low end of the revenue guidance" for the quarter, and that its Q3 2014 guidance was also "at the low end," albeit "similar" to its Q3 2013.  The Company further acknowledged that it had as yet "not seen significant evidence of revenue to synergies" and that it experienced "**some** self imposed" integration issues "most pronounced in our North American organization." Due to this initial partial corrective disclosure and/or materialization of risk, at the close of trading on February 5, 2014, Extreme's stock price dropped approximately 16%, as detailed *infra* at ¶¶ 202-203, 424.

On the same day, however, Defendants falsely reassured investors that "*[o]ur integration plans are on track.*"

### 3.     May 6, 2014 – Q3 2014 Results

57.     On May 6, 2014, after the markets closed, the Company reported financial results for its next quarter: the third fiscal quarter of 2014.  This was the first full quarter after the acquisition, and the quarter in which management had told investors to expect to see the first positive impact of the integration on the Company's financials.  *See* ¶¶ 52-53, *supra*.  However, the Company reported results at the low end of its previous guidance, and management revealed that they "have experienced **some** integration issues" "particularly in North America."  As a result of this partial corrective disclosure and/or materialization of the risk, Extreme's stock price fell more than 25% by the close of trading the next day, May 7, 2014, as detailed *infra* at ¶¶ 224-226, 425.  Despite these integration issues and the disappointing financial news, management assured investors that the integration was "*ahead of plan*;" that "our target for synergy savings as a result of the acquisition of Enterasys continues" unchanged; and that overall the Company would deliver the positive revenue impacts that Defendants had been promising. Specifically, in the press release Berger stated, "*[t]he integration efforts following the acquisition of Enterasys continue ahead of plan*."  Similarly, during the earnings call on the same date, Berger repeated that "*the integration of the two companies … is on track*."

### 4.     July 21, 2014 – Q4 2014 Revised Guidance

58.     On July 21, 2014, Extreme issued a press release and announced higher guidance for Q4 2014. In the press release, Berger reiterated that "*[o]ur integration remains ahead of plan* as we continue to execute against key Company operational and financial milestones. . . .*"

### 5.     August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results

59.     On August 14, 2014, the Company reported financial results for its fourth fiscal quarter and fiscal year 2014, as well as guidance for the next fiscal quarter (Q1 2015).  In a press release, Berger was quoted as saying: "*Our sales force integration is complete*, with all territories rationalized, and the team is aligned and executing, which is evident in this quarter's results."

60.     In the earnings call later that day, Arola reiterated that "***the two companies are now fully integrated***."  Berger further discussed "signs that the integration issues ***are behind us***" and told investors "***we are exactly where we planned to be in [the] integration process***."  Berger also represented that "[w]e completed major elements of the integration of Enterasys and ***are on track to realize the synergies we have committed to***."

### 6.     October 15, 2014 – Prerelease of Q1 2015 Results

61.     Two months later, on October 15, 2014, after the markets closed, the Company preannounced in a press release that its earnings for the first quarter of fiscal year 2015 would fall short of previous guidance.  In contrast to Defendants' August 14, 2014 representations that "the two companies are now fully integrated" and that the sales force integration was "complete," Berger now admitted that even after the intervening two months, the integration was only "**nearly** completed."  Due to this partial corrective disclosure and/or materialization of the risk, by the end of the day on October 16, 2014, Extreme's stock price fell by approximately 18%, as detailed *infra* at ¶¶ 272-273, 426.  Nevertheless, in the press release, Berger reassured investors that the Company remained "***on track to realize the full $30-$40 million in cost synergies expected from the acquisition***."

### 7.     October 28, 2014 – Q1 2015 Results

62.     Two weeks later, on October 28, 2014, the Company released full financial results for the same fiscal quarter, as well as guidance for the next fiscal quarter (Q2 2015).  On a conference call, Defendants attributed the Company's below-expected results to "significant" "disruptions" caused by the acquisition and integration of Enterasys, which Defendants previously assured investors would not happen.  In a press release, Berger specified that some integration efforts "had an impact on our revenues during the quarter as our partners and sales people had to learn a new way to do business with us" – in direct contradiction with Berger's statement on August 14, 2014 that "***integration issues are behind us***" and Arola's assurance that the companies were "***fully integrated***."  However, Berger again reassured investors in the press release that "[w]e are ***on track*** to realize the full $30 to $40 million in cost synergies expected

from the acquisition."  Arola added: "*We continue to [be on] track* to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition."

**8.     December 17, 2014 – Bernstein Technology Innovation Summit**

63.     On December 17, 2014 at the Bernstein Technology Innovation Summit, Arola continued describing the Company's achievement of cost-saving synergies as "*on track*," further assuring investors that, *inter alia*, the "*sales organizations have been integrated*" and the "*integration of sales is completed*."

**9.     January 28, 2015 – Q2 2015 Results**

64.     On January 28, 2015, the Company reported financial results for its second fiscal quarter of 2015 and announced guidance for the next fiscal quarter (Q3 2015).  In an earnings call, Berger disclosed that "while **we are making daily substantial progress on the complete integration and upgrading of our salesforce**, it is clear that we still have considerable work to do going forward."  He thus admitted that, contrary to Berger's and Arola's prior statements on August 14, 2014 and December 17, 2014 that the salesforce integration had been "complete" then, it **still** was not complete at this time.  But he continued to reassure investors: "I absolutely do not believe the acquisition and subsequent integration of Enterasys has, to use your words, failed miserably. . . *we're right on track with where we expected to be from a synergy basis*."  The market was reassured by this and Berger's other false and misleading statements on this date, with Extreme's stock price increasing by 9% after this call (*see infra* at ¶¶301-302).

65.     Thus, throughout the Class Period, Defendants repeatedly assured the market that Extreme's integration of Enterasys and promised cost-saving "synergies" were "on track," thereby continually misleading investors.  As explained below, these representations were part of Defendants' "commitment" to investors to achieve double-digit revenue growth and 10% profit margin by a specific time—June 2015.  *See* Section V.E., *infra*.

**D.     Defendants Repeatedly Touted Extreme's Partnership with Lenovo**

**1.     Inception of the Lenovo Partnership**

66.     As noted above, Extreme earned the majority of its revenue from products and services sold through "channel partners," *i.e.*, other companies in the same technology ecosystem

1   that supplement their own goods and services with Extreme offerings.  One such partnership was

2   with the global technology company Lenovo, which Extreme announced on July 17, 2013.

3   Defendants repeatedly highlighted the Lenovo relationship to investors as one of the Company's

4   "key partnerships" as well as an important growth driver.  In reality, it was neither.

5          67.     On a November 4, 2013 earnings call to discuss financial results for Q1 2014 and

6   guidance for Q2 2014, Berger informed the market that "Lenovo plans a fairly significant launch

7   of their [server] business in North America coming into the middle of this month, November,

8   with a major launch in the Asia Pacific region coming in the first calendar quarter. So I suspect

9   we won't see a lot of business from them in the December quarter, but we should see a pick up

10  coming into the March quarter."  A Wedbush Securities analyst report the following day echoed

11  the financial impact of Berger's announcement: "Lenovo is expected to formally launch its

12  server products in November in the US and late March in APAC [Asia Pacific]. While it will

13  take time to build, expect initial revenues in 1H14" for Extreme.  The report maintained its

14  positive "outperform" rating in part based on the "newly announced partnerships [including

15  Lenovo] which should drive revenue upside late in FY14."

16         68.     On January 23, 2014, Lenovo announced that it would be greatly expanding its

17  server business by acquiring IBM's "x86" server business for approximately $2.3 billion.

18  Extreme soon began to publicize its relationship with Lenovo as being even more important for

19  Extreme's growth strategy.

20         **2.      February 5, 2014 – Q2 2014 Results**

21         69.     On a February 5, 2014 earnings call to discuss financial results for Q2 2014 and

22  guidance for Q3 2014, Berger described Lenovo's IBM deal as "tak[ing] them [Lenovo] from a

23  2% global market share player to a 14% global market share player." On the same call, Berger

24  claimed that Extreme was Lenovo's "only networking partner" and touted that Extreme "will be

25  now included in a price list shared by 1200 more sales people they are getting as part of the

26  acquisition."  When an analyst asked Berger to describe the Company's partnerships responsible

27  for over 10% of its total revenue, he responded:  "The two large ones are really Ericsson and

28  Lenovo going forward."

1

### 3.      August 14, 2014 – Fiscal Year 2014 and Q4 2014 Results

2    70.    On the Company's August 14, 2014 earnings call to discuss financial results for

3    its fourth fiscal quarter and fiscal year 2014, and to announce guidance for Q1 2015, Berger

4    again touted the "key partnership" with Lenovo, stating that it would "generate significant

5    revenues" for the company "starting in our fourth quarter of 2015 and beyond."  Berger stated

6    that he "met with the Lenovo executive team in China and it is clear they are strongly committed

7    to the alliance," falsely assuring that Extreme "also ***trained all Lenovo North American reps on***

8    ***Extreme products***."

9

### 4.      October 15, 2014 – Prerelease of Q1 2015 Results

10    71.    On October 15, 2014, Extreme issued a press release preannouncing results for its

11    first fiscal quarter of 2015 below its previous guidance.   On the call, Berger reported that

12    Lenovo "closed the acquisition of the IBM X86 server business" during the quarter, which would

13    "position us well for the remainder of our fiscal year."

14

### 5.      October 28, 2014 – Q1 2015 Results

15    72.    On the October 28, 2014 earnings call to discuss the Company's disappointing

16    financial results for its first fiscal quarter of 2015, as well as guidance for Q2 2015, Berger

17    assured investors of management's "confidence in our ability to improve our top line

18    performance" due in part to "advancing Lenovo relationships."  When an analyst asked Berger

19    about his previous commitments to achieve double-digit revenue growth by the end of June

20    2015, detailed below in Section VI.C.2. *infra*, Berger responded that "***Lenovo [] certainly by***

21    ***then we believe will have double-digit revenue impact***."

22

### 6.      January 28, 2015 – Q2 2015 Results

23    73.    On the Company's January 28, 2015 earnings call to discuss financial results for

24    its second fiscal quarter of 2015, and to announce guidance for Q3 2015, Berger disclosed that

25    the Company would not be able to keep its promise regarding the Lenovo relationship.

26    Specifically, he revealed that the promised revenue impact in "double-digit[s]" would not be

27    achieved by the promised time of June 2015, and perhaps not for another year, even while

28    continuing to tout the strength of Extreme's partnership with Lenovo.  He stated: "we're still

expecting the kind of results that we have talked about before; we just think they are another 2 to 4 quarters [6-12 months] out." Berger, however, reassured investors that the "partnership with Lenovo strengthened during the quarter on many fronts," with "continued productive discussions at all levels with Lenovo." He further assured investors that "we continue to make progress almost on a daily basis with Lenovo, across the board." Moreover, Berger falsely stated that "on the positive side, *we are exactly where we thought we would be* on things like being on the price list, being in their literature, *having airtime with the legacy Lenovo salesforce*."

74.     Thus, throughout the Class Period, Defendants repeatedly assured the market that Extreme's partnership with Lenovo would result in increased revenues and profits. As explained below, these representations were part of a "commitment" from the Company, reinforced by Defendants' representations that Lenovo's impact on revenue was "certain[]" and in "double-digit[s]" to investors to achieve double-digit revenue growth and 10% profit margin by a specific time—June 2015. *See* Section V.E., *infra*.

**E.     Defendants Promoted the Company's Integration of Enterasys and Lenovo Relationship as Key Aspects of a "Commitment" Announced to Investors: to Achieve Double-Digit Revenue Growth and 10% Profit Margin by June 2015.**

**1.     Extreme Announced Its "Goal" of 10% Profit Margin by June 2015**

75.     On November 4, 2013, Extreme issued a press release outlining its first fiscal quarter 2014 financial results. In this release, the Company unveiled the target of and strategy behind its financial plan: "The company is targeting a quarterly financial model of operating at a non-GAAP operating income of 10% +/-, by the end of fiscal [year] 2015. To achieve this goal, the company intends to focus on completing the integration of the two companies and growing its revenue with high performing and lower cost products and services."

76.     On February 5, 2014, Extreme issued a press release outlining its second fiscal quarter 2014 financial results. Using identical language, the Company reiterated the same strategy, "completing the integration of the two companies and growing its revenue," for achieving the same target, "operating income of 10% +/-, by the end of fiscal [year] 2015."

### 2. Extreme's "Goal" Changed to a "Commitment" to Achieve *Both* Double-Digit Revenue Growth *and* 10% Profit Margin by June 2015

#### (a) May 6, 2014 Earnings Call

77. On May 6, 2014, Extreme hosted a conference call with investors to discuss the Company's third fiscal quarter 2014 financial results. Defendant Berger referenced and repeated the same plan to achieve 10% revenue growth and 10% operating margin with increased certainty to investors: "[m]y belief in our ability to achieve these goals has only strengthened since our last earnings call." In particular, he now represented them as a "*commitment*" to investors, including additional detail about where the "key" Lenovo relationship factored in:

> I want to again *reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015 as we complete the integration*, realize the benefits of our *key partnerships like Lenovo* and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments. *Over the same period we are committed to achieve a 10% operating margin on a non-GAAP basis.*

#### (b) October 28, 2014 Earnings Call

78. On the October 28, 2014 conference call to discuss the Company's first fiscal quarter 2015 financial results, Berger stated: "*We stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better.*" Arola reiterated Extreme's commitment: "*I want to remind you that I remain committed to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015.*"

### 3. Extreme Began to Distance Itself From Its "Commitment"

79. Shortly thereafter, management tempered its confidence and certainty, distancing itself from its commitment to achieve double digit revenue growth (including specifically based on the Lenovo partnership) or a 10% operating margin by its fourth fiscal quarter of 2015, *i.e.*, the end of June 2015.

80. Specifically, on January 14, 2015, Extreme made a presentation at the Needham Growth Conference, touting the success of the integration, its customers, and the quality of its products and services. In response to a question from an audience member about when to expect meaningful revenue from Lenovo, Arola stated:

I'll start by saying because we are in a quiet period I don't want to comment on a future forecast. But with that said, we are currently looking at what our second half looks at right now, **evaluating where we are with things like our Lenovo relationship**. . . .  But we are currently evaluating that top line and operating expenses in bottom line. We are looking at alternatives. If something didn't materialize and we stayed at levels we are, that we would go out and look at how we are going to restructure the business in essence to make sure we can drive bottom line. And we'll provide updates when we come to earnings.  **But, again, I don't want to today make a comment about the 10% and the 10%**, but our long-term view of the business, if you ask me we should be running this business at a 10% operating margin pretty consistently over time. The question is as **we are evaluating it now,** we will make some comments on our earnings call more specifically about timing of that.

81.     Due to this partial corrective disclosure and/or materialization of the risk, Extreme's stock price declined over a two-week period, as detailed *infra* at ¶¶364-366.  In particular, on January 15, 2015, the first day of trading after the Needham Growth Conference, Extreme's stock fell over 4.7%, and on January 16, 2015, it fell another 4.7%.  This decline in stock price continued until January 28, 2015.  *See id.*

82.     By January 28, 2015, when the Company released its financial results for the second fiscal quarter of 2015, Berger retreated from his prior "commitment" entirely, confirming the prior disclosure on January 14, 2015 that Extreme was backing away from its commitment:

In the past, we committed to 10% year-over-year revenue growth, and 10% operating margin in the fourth fiscal quarter of this year. Our commitment was based on the expected lift from improved sales execution [from the Enterasys integration], the return of E-Rate, and improved sales and channel execution, and from our relationship with Lenovo. . . . **However, it is now clear that it will take longer for them to have enough impact to deliver 10% year-over-year growth**.

83.     Defendants failed to fulfil their commitment to investors to achieve double-digit revenue growth and 10% profit margin by June of 2015 (or ever).  They never achieved the combined revenues "in excess of $600 million," (*see* ¶51 *supra*) much less 10% revenue growth on top of that by June of 2015.  In fact, by the end of its first fiscal year as a combined company (2014), Extreme reported reduced net revenues of only $520 million.  After the next fiscal year (2015), it was still only $553 million.

**F.    End of Class Period: The Truth Was Fully Revealed as Extreme Disclosed Missed Revenue Estimates and Termination of Jeff White**

84.    On April 9, 2015, after the close of trading, Extreme issued a press release preannouncing results for its third fiscal quarter of 2015 below its previous estimates.  The Company did not hold a conference call that day to discuss the negative preannouncement.

85.    In the same press release, the Company disclosed that: "Effective April 6, 2015, Jeff White, who served as our Chief Revenue Officer, is no longer with the Company. We are currently in the process of identifying a successor."  White did not immediately join another company.

86.    Due to these final corrective disclosures and/or materialization of the risk, Extreme's stock collapsed, falling approximately 23% from April 9, 2015 to April 10, 2015, as detailed *infra* at ¶¶428.

87.    Analysts drew a direct connection between the missed earnings estimates, the unexplained departure of the Company's executive in charge of the salesforce integration (White), integration problems, and the Company's overall financial health. For example, on April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to $2.80/share.  The report clarified that Extreme's announcements the previous day were the main cause of its downgrade.  Regarding the Company's announced failure to achieve its revenue estimates, the report noted that the failure to meet its own estimates "continued the pattern of missing expectations in alternating quarters with a F3Q15 warning of magnitude comparable to that of F1Q15, except that estimates have come down since then."  Regarding the announced departure of Jeff White, the report noted that he only "had a 6-month stint" and "the CEO will run the department again until a replacement executive is found."  Together, these disclosures caused the analyst report to dramatically revise its valuation of the company downward, which would last "until there are signs that the company can find the recipe for execution."

88.    Similarly, a Buckingham Research Group analyst report on the same day announced that it was lowering its share price target from $3.50 to $3.00 "on [the] negative

preannouncement."  Specifically, the report described Extreme's disclosures regarding its revenue estimates miss and White's departure as a "**surprise** announcement" that was **"an indicator of greater challenges at the company**" with respect to the integration.  In particular, the report understood these disclosures as "[s]**ignal[ing] [o]ngoing [c]hallenges**" within the Company related to the salesforce integration, contrary to Defendants' prior representations that the salesforce integration had been completed, given that "the appointment of Mr. White . . . was supposed to be an answer to [these] challenges" and that "Mr. White had only been on board since October 1, 2014."

89.     The Buckingham analyst report also noted that, because of the news, the "timing and magnitude" of any "**contribution from Lenovo as [a] primary top-line catalyst[]" became "uncertain,"** concluding: "We advise investors to stay on the sidelines."

90.     Accordingly, this news disclosed to investors that the integration of the two companies was a failure, that the Lenovo relationship could not produce the revenue growth that management had told investors was "certain[]," and that their "commitment" to achieve the 10% revenue growth and 10% operating margin by June 2015 (based substantially on the Lenovo partnership and the Enterasys integration) was impossible and lacking a reasonable basis.

**G.     Confidential Witnesses Demonstrate that the Enterasys Integration Was Not "On Track" or "Ahead of Plan" Because Extreme Lacked an Integration Plan, Leading to Substantial Integration Problems and Adverse Impact on Sales and Revenues**

91.     Extreme's integration of Enterasys was a failure from its inception and through the end of the Class Period.  First, Defendants represented that the integration and related achievement of synergies was being conducted according to a plan, and was proceeding "on track" with that plan or "ahead" of it, when in reality there was no integration plan (including, for example, a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies as well as an underlying product roadmap by which the Company would integrate the two companies' separate product lines going forward).  Second, Defendants experienced, but did not disclose, substantial integration problems, particularly in integrating the two companies' salesforces, during the Class Period, which rendered false and misleading their

statements that the integration was "on track" and that the salesforce integration was "complete." Third, the Company experienced significant executive turnover related to its substantial integration problems, which further demonstrates that the integration was not "on track" or "complete" during the Class Period.  Finally, Defendants' assurances about the financial benefits of the acquisition were false and misleading when made because the statements omitted these known, material facts regarding major problems with the integration that undermined any reasonable basis for such statements.

> ### 1. Defendants Misled Investors into Believing that the Integration Was Following a Plan

92.     Defendants continually represented that their integration of Enterasys was structured around a plan.  For example, as noted above, at the time the acquisition was announced on September 12, 2013, Kurtzweil stated that the integration would follow a "***plan*** to reduce product costs and operating expenses [synergies] between $30 million to $40 million" over an 12 to 24-month period.

93.     As the Class Period continued, Defendants reiterated not only that such a plan was in place, but that it was being followed, such that the integration was proceeding "on track" to deliver the promised synergies and revenue benefits.  For example, they repeatedly assured investors that "***[o]ur integration plans are on track,***" that the integration was "***ahead of plan,***" that "***we are exactly where we planned to be in [the] integration process***," that the Company continued "***on track*** to realize the full $30-$40 million in cost synergies expected from the acquisition," and similar assurances.  Each of these statements explicitly represented or created the strong impression that the Company was following an integration plan to combine two disparate yet equal-sized companies and, by virtue of following that plan, into a single, integrated company defined by specific financial measurements, including $30-40 million in reduced costs or synergies, a 10% operating margin, and 10% revenue growth compared to the individual companies' combined, pre-acquisition revenues of roughly $632 million.

94.     In reality, however, there was no such integration plan, as revealed by multiple CWs and later admitted by Meyercord, Extreme's Chairman of the Board throughout the Class

1  Period, and who replaced Berger as CEO less than two weeks after the Class Period.

2  Accordingly, Defendants misled investors by assuring them that the Company was "on track"

3  with or "ahead" of a non-existent integration plan.

4          (a)     **Confidential Witnesses Reveal That Extreme Lacked an Integration Plan**

5

6                  (i)     **Extreme Lacked a Product Roadmap for the Combined Company**

7       95.     Confidential Witness 1 ("CW1") was employed by Extreme from March 2004

8  until April 2014.  CW1 last held the position of Senior Systems Engineer, the technical

9  counterpart to a regional sales manager.  During CW1's employment at Extreme, s/he reported to

10  John Barger, Extreme's Senior Director of Worldwide Systems Engineering.  CW1, who was

11  responsible for Extreme's sales and technical support for one of its North American sales regions

12  (the Southeast), personally observed the Company's integration efforts in North America from

13  the beginning of the Class Period.  Because CW1 was the technical counterpart to a regional

14  sales manager, s/he worked closely with the salesforce, including attending regular team

15  meetings with sales personnel held by the sales director in CW1's region with all the sales

16  representatives in that region (attended by a total of 15-20 people).  CW1 also participated in the

17  quarterly sales calls held by Extreme's VP of Sales along with the national salesforce, as well as

18  annual global sales conferences in Las Vegas, which CW1 confirmed Berger also attended.

19       96.     CW1 stated that there was no centralized plan to integrate Extreme and Enterasys.

20  Initially after the acquisition, each company had its own distinct products, and each had a

21  separate product roadmap for developing features, hardware, and management systems.  From

22  the time the acquisition was announced to CW1's departure in April of 2014, s/he was never told

23  – by Company management or otherwise – whether the combined Company would be able to

24  provide customers with product features, hardware, or management systems from the legacy

25  Extreme or Enterasys sides.

26       97.     Immediately after the acquisition, CW1 observed that there was no plan to

27  combine these separate product roadmaps.  According to CW1, the lack of an integration plan

28  that, *inter alia*, addressed how Extreme would combine the separate product lines and a single

1   product roadmap for the combined Company made the integration confusing to customers.

2   Further, CW1 personally knew that existing customers were not happy because they could not be

3   told which product features, hardware, or management systems would be available after the

4   acquisition.  According to CW1, the product roadmap was very important to customers, who

5   liked the particular company's products that they had purchased before the acquisition (which

6   they generally expected to run for 4-7 years) and were concerned about whether those products

7   would be supported long-term after the acquisition.  Stated differently, CW1 elaborated that all

8   of Extreme's customers were concerned because Extreme's lack of a combined product roadmap

9   provided them no clarity as to how and when the two companies' different technologies would

10  be combined and what those resultant products would look like.  CW1 explained that this was

11  particularly a concern for those products where there was overlap between Extreme and

12  Enterasys (for example, WiFi solutions), where it was especially unclear as to which company's

13  technology would prevail after the products were combined.   As a Senior Systems Engineer,

14  CW1 was directly involved in discussions with Southeast region customers regarding their

15  concerns about the lack of a product roadmap for the combined Company.  CW1's customers

16  who expressed dissatisfaction to CW1 during this time period due to the lack of a product

17  roadmap included the University of Central Florida (the second-largest university in the nation

18  by student enrollment), the University of West Georgia, and Georgia State University.

19          98.     CW1 recalled that such customer concerns about the lack of a combined product

20  roadmap were both company-wide and widely known within the Company, including

21  specifically by Berger, because this was a frequent topic of conversation within Extreme after the

22  acquisition, including at the quarterly sales calls that CW1 attended.  CW1 added that

23  "everyone" in the Company knew that the lack of a combined product roadmap was the "biggest

24  challenge" for Extreme after the acquisition.  As an example of a specific meeting where this

25  was a focus of the conversation, CW1 recalled attending a meeting in San Francisco after the

26  acquisition, in January or February of 2014, which was held by the VP of Engineering, Dan

27  Dulac, who was a former Enterasys executive, and attended by other senior executives such as

28  the Chief Marketing Officer.  CW1 stated that at this meeting there was a lot of discussion about

1    how Extreme would integrate the two companies' separate technologies and products and

2    develop the combined product roadmap, which they were still trying to figure out at that time.

3    According to CW1, it was clear at that meeting that there was "still a lot to be worked out" with

4    respect to the combined product roadmap.

5        99.    Confidential Witness 2 ("CW2") was a senior executive of Extreme before,

6    during, and after the Class Period.[7]  CW2 indicated that s/he sat on conference calls with upper

7    management and the Board of Directors and had personal knowledge of how the acquisition of

8    Enterasys was originally conceived.  CW2 stated that s/he first became aware of the acquisition

9    idea being seriously discussed when Oscar Rodriguez was CEO, and that Rodriguez opposed the

10   measure.  CW2 specified that, in CW2's opinion, the idea was the "brainchild" of Directors Ed

11   Meyercord and Edward Kennedy, who orchestrated bringing in Chuck Berger as the CEO

12   (replacing Rodriguez) to accomplish the acquisition.

13       100.    CW2's opinion is that the integration was "problematic right from the get-go."

14   CW2 believed that there was difficulty retaining clients due to uncertainty with the future of the

15   combined Company's product roadmap as follows: "When we came out to refresh the network,

16   they [legacy clients] didn't go with us because we didn't have a story or a product roadmap."

17   One "major client" CW2 recalled losing due to such problems was Abbott Laboratories, and

18   CW2 believed there were "probably more" legacy Enterasys customers that were lost this way as

19   well.  CW2 attributed approximately $90 million in lost revenue to client losses stemming from

20   integration failures.

21       101.    Confidential Witness 3 ("CW3") was employed by Extreme from January 2012

22   until June 2015.  CW3 last held the position of Territory Sales Manager for New York.  During

23   CW3's employment at Extreme, s/he reported to Peter Katavolos, Extreme's Regional Sales

24   Director.  CW3 confirmed that the acquisition was favored by Chairman/Director Meyercord.

25

26

27      [7] Lead Plaintiff believes that the details of CW2's identity contained herein are sufficient to
satisfy the requirements of the PSLRA.  Lead Plaintiff can provide additional specificity,
including CW2's exact position title and dates of employment, to the Court through an *in camera*

28   submission.

1   102.   CW3 stated from personal experience at Extreme that there was "**no plan**" for

2   integration.  CW3 would have known if there was such an integration plan, including a roadmap

3   as to how to combine the two companies' products, based on his/her attendance at quarterly sales

4   calls and the annual global sales conference where s/he personally observed sales personnel

5   question Berger and other management regarding such plans, as detailed below.  Specifically,

6   CW3 described Extreme and Enterasys as two separate companies with very different product

7   lines, systems, and platforms, which were essentially "**apples to oranges**" and thus

8   incompatible, and that there was "no plan" as to how to combine them.  In particular, CW3 stated

9   that Extreme had no product roadmap and no direction from management as to how to integrate

10  the two companies' products.  As a Territory Sales Manager, CW3 was responsible for

11  communicating the product roadmap to customers.  CW3 emphasized that s/he was both the

12  "field manager" and the "sales engine," meaning that there would have been no one to

13  implement any integration plan "without me and my counterparts around the country."  Thus,

14  CW3 would have known whether Extreme had an integration plan, including a product roadmap

15  for the combined Company.

16  103.   CW3 also participated in quarterly, company-wide salesforce conference calls

17  (with approximately 150 other attendees), held by the Vice President of Sales and attended by

18  Berger and sometimes the CFO; indeed, Berger led these quarterly calls after Crowell's

19  departure and before White's arrival, when Berger was acting head of Sales, from May 2014

20  through October 2014.  (CW3 recalled that these sales meetings were convened through

21  company-wide emails, which were sent out by Berger himself during the time period that he was

22  acting head of Sales.) According to CW3, sales personnel raised questions during these quarterly

23  calls directly with Berger about the lack of a product roadmap and the lack of a plan to complete

24  the integration.  CW3 recalled that Berger's responses to these questions were "evasive," *e.g.*,

25  "**we're working on it**" or "**we'll get back to you**."

26  104.   CW3 elaborated that there were discussions about possible ways to integrate the

27  companies' separate product lines and systems, but "nothing determined" in terms of how to

28  actually do it during the Class Period.  According to CW3, the most prominent example of such

1    discussion was at the Company's annual global sales meeting in Las Vegas in July or August of

2    2014,[8] which Berger ran (as Crowell had already departed), and which both CW3 and **then-CFO**

3    **Arola also attended**.  CW3 personally witnessed peer sales personnel question Berger about the

4    lack of a plan to integrate the two companies and their products during this event, when Berger

5    was acting head of Sales.  CW3 recalled that Berger responded with "non-answers," *e.g.*, that

6    management was working on the integration and that the plan was – in Berger's words – "**TBD**"

7    or "**to be determined**."  CW3 understood Berger's "TBD" message to the assembled salesforce

8    as conveying that Extreme was evaluating its options but still had "no clear strategy how to do

9    it."  Thus, CW3 confirmed that, in July or August of 2014, Berger – with upper management

10    present and in front of the global salesforce – described Extreme's integration strategy, including

11    creation of a combined product roadmap and a plan for achieving synergies, as "**TBD**."

12        105.    According to CW3, the fact that the acquisition was a merger-of-equals meant

13    that customers were uncertain whose product lines would prevail, because there was no clear

14    "Goliath."  CW3 stated that "all" of the legacy Extreme and Enterasys customers were worried

15    that the products they purchased would not be supported post-acquisition because of the lack of a

16    product roadmap.  In CW3's personal experience, approximately 100 of CW3's own New York-

17    area customers expressed such concerns; s/he specifically recalled hearing these concerns from

18    the ASPCA, Logicworks, and community college customers.  In particular, CW3 recalled that

19    due to the lack of a product roadmap and this resulting uncertainty about future product lines,

20    numerous customers delayed purchasing products (for example, CW3's customers SUNY

21    Farmingdale and Kingsborough Community College), creating revenue losses.  CW3 confirmed

22    the company-wide scope of this problem, explaining that sales personnel from other regions

23    raised the same customer concerns about the uncertain future of the combined product lines at

24    sales meetings.  CW3 added that sales personnel "constantly" had such conversations and

25

26        [8] According to Berger's statements on the August 14, 2014 earnings call, this global sales
     conference, which he publicly confirmed he attended, occurred approximately on July 31, 2014.
27    *See* ¶ 258, *infra* ("**[T]wo weeks ago, we held our global sales conference**, bringing the entire
     sales team together for the first time ever. The incredible spirit and unity I saw over the entire
28    event are added signs that ***the integration issues are behind us***.").

1    described it as an "ongoing conversation," adding that it was "all we talked about," including "all

2    the way up" to Berger.  By way of example, CW3 recalled attending one quarterly sales meeting

3    that Berger held right after the acquisition, where such issues were discussed.  CW3 recalled that

4    at these meetings, sales personnel asked Berger about what they were supposed to tell customers

5    who were nervous about how the company would combine its products (hardware and software)

6    – but Berger had no real answers, as described above.  CW3 added that the feedback from Berger

7    at this meeting was that "**we're formulating the integration plan**," thus showing that the

8    Company did not have a plan at that time (right after the acquisition).

9                                     **(ii)    Extreme Lacked a Plan to Merge the Two Salesforces
                                              and Other Steps to Cut Costs and Obtain Integration
10                                            Synergies**

11          106.    According to CWs 1, 3, and 5, another key part of an integration plan that was

12   lacking was a plan to merge the two companies' salesforces, including, for example, how

13   customer accounts would be reassigned or divided up among the sales personnel. For instance,

14   CW1, stated that there was also no plan with respect to how to combine the salesforces of the

15   two companies, which s/he knew based on his/her close working relationship with the sales

16   personnel, including CW1's attendance at the team sales meetings described above.  For

17   example, CW1 recalled that after the acquisition there was no plan as to "account management"

18   – *i.e.,* which salesperson would run which customer accounts and who would be in leadership

19   positions – particularly given the substantial overlap in sales employees created by the

20   acquisition, as detailed below.  *See* ¶120, *infra*.  According to CW1, this lack of a plan for

21   account management compounded the integration problems.

22          107.    There was also no integration plan by which the salesforces would be combined

23   based on centralized, objective criteria, such as the sales representatives' performance history,

24   years of experience covering particular territories and customers, and similar metrics. For

25   example, CW1 stated that after Chris Crowell, the former Enterasys CEO, took over as COO of

26   the combined Company he put former Enterasys managers in positions of authority, who

27   replaced the Extreme sales leadership with Enterasys personnel, who then similarly retained their

28   own legacy Enterasys personnel.  This resulted in substantial employee redundancies, as further

1    detailed below.  Thus, according to CW1, the sales personnel and territories were combined

2    based on subjective, *ad hoc* factors that were not tied to any past performance-based metrics,

3    rather than according to an integration plan.

4         108.    CW1 confirmed that the integration, including with respect to the salesforce and

5    the product roadmap, was not complete by the time s/he left in April 2014.

6         109.    Similarly, CW3 stated that there was also no plan for achieving synergies from

7    the integration.  CW3 explained that management provided no direction for how to attain

8    synergies after the acquisition, and that no synergies were achieved in any aspect of the

9    Company with which CW3 was familiar**.** CW3 elaborated that by this, s/he meant that there was

10   "no incremental value" added from the acquisition to either Extreme's customers or the

11   Company from an earnings or cost-savings perspectives, and no plan as to how generate such

12   synergies – *e.g.*, there was no plan about eliminating product costs or achieving any supply chain

13   efficiencies that would offer tangible financial benefits to the Company.  CW3 added that at the

14   time the acquisition was announced, the Company did not know where the synergies would

15   come from, and by the time the acquisition closed, it was clear that there was no compatibility

16   between the two companies' products.  Ultimately, CW3 stated, "zero" synergies resulted from

17   the integration.

18        110.    CW3 also confirmed that during the quarterly sales meetings the participants

19   explicitly discussed how there was "**no plan**" as to how to achieve synergies from the

20   acquisition.   (As noted above, Berger attended quarterly sales meetings throughout the Class

21   Period and led them from May 2014 through October 2014.)  CW3 further stated that sales

22   personnel raised similar questions about the lack of a plan to achieve synergies at the annual

23   global sales meeting in Las Vegas in July or August of 2014 where Berger similarly described

24   their plan for achieving synergies, as "TBD."  Based on such conversations, CW3 understood

25   that Extreme was not really sure how to put these two companies together and that it was clear

26   that "there wasn't a lot of thought" put into how to get synergies out of this acquisition.

27        111.    Another CW who joined Extreme in August 2014 likewise confirmed that there

28   was no integration plan as of that time. Confidential Witness 5 ("CW5") was employed by

Extreme from August 2014 until February 2015.  CW5 last held the position of "Solutions Marketing Manager."  CW5 recalled coming to work for Extreme in August of 2014 and being told that, instead of the Company having an integration plan in place, the "dust had not yet settled from the integration," the Company was still going through a "period of adjustment," and people were still trying to figure out the best ways of working together.

**(iii)     Extreme Lacked a "Go-to-Market" Strategy for the Combined Company**

112.     Another aspect of the lack of an integration plan was the lack of a "go-to-market strategy."  For example, CW3 stated that Extreme had no "go-to-market strategy" for the combined Company after the acquisition.  CW3 explained that this meant there was no business model setting forth the products Extreme would build, how it would price them for profitability, or to whom and how it would sell them.  In fact, CW3 stated that Extreme hired Jeff White as CRO (in October 2014) to develop such a go-to-market strategy, which Extreme **still** did not have at that time, over a year after the acquisition.  CW3 knew this because soon after White joined the Company (on October 1, 2014), White held a meeting with the global salesforce (including CW3), via a WebEx conference call that lasted approximately one and a half hours, where White acknowledged the absence of a go-to-market strategy post-acquisition at that time and made it clear that part of his job was to develop such a plan.  According to CW3, Berger also participated in this call.

113.     CW3 further indicated that there was "no way" for sales to increase without a go-to-market strategy.  As a Territory Sales Manager, CW3 would have been responsible for implementing any go-to-market strategy.  CW3 further indicated that s/he was present when the lack of a go-to-market strategy was raised directly with Berger during the quarterly sales meetings detailed above, to which Berger similarly replied that Extreme was "**working on it**."  Berger's statement that Extreme was still "working on" developing a go-to-market strategy for the combined Company was an admission that Extreme lacked such a plan during the Class Period.

114.    CW3 concluded that given this lack of a plan to integrate the two companies, including the lack of a combined product roadmap, the lack of a go-to-market strategy and plan to achieve synergies, "there was no possible way revenues would increase."

115.    CW1 similarly stated that after the acquisition, and until s/he left in April 2014, there was no determined "go-to-market" strategy for the combined Company.  CW1 explained that it was "piecemeal" and incomplete and that they were still trying to figure it out by the time CW1 left.  CW1 elaborated that there were two different sets of products and two different approaches to marketing and that, due to the lack of an integration plan, the Company was struggling how to combine them.  CW1 confirmed that s/he knew this based on CW1's close working relationship with the sales team, including participation in sales team meetings and quarterly sales calls, where this issue was "constantly" discussed.   Further, although Marketing and Sales had primary responsibility for creating a go-to-market strategy, engineers such as CW1 provided important input because of their technical expertise and their feedback from customers.

116.    CW1, CW2, and CW3 confirmed an understanding that Extreme's integration of Enterasys was a failure from the start because of a lack of integration plan, including the lack of a combined product roadmap, the lack of a plan to merge the salesforces, the lack of a plan to take other steps to cut costs and achieve integration synergies, and/or the lack of a go-to-market strategy.

117.    The CWs' allegations above were confirmed by Meyercord's statements on a September 14, 2016 analyst conference call where he admitted that Extreme lacked the necessary "integration planning" and "product and technology roadmap" for the Enterasys integration, resulting in "a lot of integration issues" during the Class Period, as discussed in greater detail below. *See* Section V.I.4. *infra*.

### 2.    Extreme Experienced Substantial Salesforce Integration Problems During the Class Period, Which Defendants Failed to Disclose

118.    As a result of Extreme's lack of an integration plan for the Enterasys acquisition, during the Class Period the Company experienced undisclosed, substantial integration problems, particularly among the salesforce, including: (a) substantial employee redundancies, which

1   showed that Extreme failed to achieve the cost-saving synergies from the integration during the

2   Class Period, and (b) the replacement of Extreme personnel by Enterasys personnel who were

3   not knowledgeable about Extreme's products, causing customer disruption and lost sales, as

4   detailed below.

5        119.    Because of the Company's lack of an integration plan with respect to how to

6   combine the two salesforces and achieve cost-saving synergies, the merger of the two companies

7   produced substantial employee redundancies, particularly among the salesforce, which

8   undermined Defendants' repeated representations, *inter alia*, that they were "on track" to achieve

9   the $30 to $40 million of cost-saving synergies from the integration.   CW1 stated that s/he

10   personally observed the Company's integration efforts in North America.  CW1 was one of

11   approximately 6 or 7 Senior Systems Engineers (and one of approximately 30-45 total engineers

12   across the U.S.) before the Enterasys acquisition.  CW1 stated that after the acquisition, those

13   numbers increased substantially because Enterasys was an equal-sized company and both

14   Extreme and Enterasys personnel stayed on post-acquisition, continuing to cover the same

15   territories and thus creating major overlap and redundancies in the employee structure.  For

16   example, CW1 explained that Enterasys had many more engineers in the Southeast region; thus,

17   the number of engineers post-acquisition more than doubled.  CW1 also stated that the same

18   overlap and redundancies were created in the salesforce after the acquisition.  CW1 knew of such

19   salesforce redundancies based on his/her close working relationship with the salesforce,

20   including attendance at regular team meetings held by the sales director in CW1's region with all

21   the sales representatives in that region, where such issues were regularly discussed.  CW1

22   recalled that at such meetings they were told by the sales leadership that Extreme was not cutting

23   the salesforce after the acquisition.  Based on such conversations as well his/her attendance at the

24   quarterly sales calls with the entire salesforce, CW1 knew that this was true across the Company,

25   rather than just his/her region.

26        120.    Similarly, Extreme experienced other salesforce integration problems due to the

27   lack of an integration plan for how to combine the salesforces and their territories, including, for

28   example, a plan for "account management" as described by CW1 above.  *See* ¶106, *supra*.  CW1

1   stated that s/he and a colleague, John Greiner (Extreme's Sales Director for the Southeast region

2   from July 2001-April 2014), were consistently cited as top performers at the regional level.

3   CW1 recalled that after the acquisition of Enterasys, their (CW1's and Greiner's) territory of

4   almost 10 years was taken from them and "divvied up to 8-10 Enterasys people" who had no

5   experience or understanding of Extreme's legacy products. (The Company continued to employ

6   CW1, as well.) CW1 described that CW1's client base used Extreme legacy products and

7   because the Enterasys replacements did not understand the Extreme legacy products, clients

8   became dissatisfied.  CW1 listed examples of legacy Extreme customers who were dissatisfied

9   due to the lack of understanding from Enterasys sales personnel, including the University of

10  Central Florida, the University of West Georgia, and Georgia State University, with whom s/he

11  personally interacted during this time period.  CW1 was certain that at least one large client –

12  DeKalb Schools (then the third-largest school district in Georgia) – was lost as a direct result of

13  the integration failures s/he personally observed, described above.  CW1 also stated that the

14  University of Central Florida decided not to expand its current contract for the same reasons,

15  losing progress sales people had made before the integration. CW1 further recalled that Extreme

16  also lost Abbott Laboratories for the same reasons, which had been its "largest customer" worth

17  several million dollars in the years CW1 was with the Company.

18       121.    CW1 called the results of being replaced with Enterasys people who did not

19  understand Extreme legacy products "**disastrous**," and indicated that s/he voiced her/his

20  opposition with CW1's superior, Barger (Senior Director of Worldwide Systems Engineering, as

21  noted above), before CW1's voluntary departure in April of 2014.  CW1 identified these

22  integration problems as the reason for CW1's resignation.

23       122.    CW1 further stated that after s/he submitted CW1's resignation on April 1, 2014,

24  s/he was contacted by CEO Berger and asked to reconsider.  CW1 recalled this conversation with

25  Berger in detail.  CW1 recalled that s/he described the reasons for CW1's departure to Berger at

26  length, including the manner in which s/he and Greiner were replaced by Enterasys personnel,

27  who were not as familiar with legacy Extreme products, despite CW1's and Greiner's superior

28  performance.  CW1 also related the ensuing negative impact on customers and revenue in their

1   region to Berger.  CW1 stated that during this conversation Berger expressed his concern that a

2   top-performing team (CW1 and Greiner) were leaving, acknowledging that it was a sign of

3   broader problems with the integration.  CW1 understood from this conversation that Berger was

4   concerned about this because while some challenges were to be expected in any integration, this

5   one was "unique" in that personnel were being integrated based on individual executives'

6   preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—

7   rather than according to a systematic plan.  CW1 stated that Berger had a similar conversation

8   with Greiner (who also resigned for similar reasons) at this time. (CW1 learned this through a

9   conversation with Greiner after they both spoke to Berger.) CW1's personal interaction with

10  Berger, discussing CW1's personal experience with the integration failures, as well as Berger's

11  response, directly evidences Berger's personal knowledge of the integration failures recited

12  herein, including the lack of an integration plan.

13      123.    Moreover, the fact that CEO Berger personally contacted CW1 after CW1

14  announced his/her resignation further demonstrates that Berger was a hands-on CEO who closely

15  managed Extreme's operations, including with respect to Extreme's integration efforts.

16      124.    Likewise, as noted above, CW2 was of the opinion that the integration was

17  "problematic right from the get-go"  CW2 specified particular problems that s/he personally

18  observed as a result of the acquisition.  For example, CW2 believed that "people synergies" or

19  the elimination of employee redundancies did not actually start until Meyercord replaced Berger

20  as CEO (after the Class Period), as Meyercord brought a new "tough love" approach.

21      125.    So, too, CW3 described the Company's failure to integrate overlapping sales

22  force personnel after the acquisition of Enterasys.  In fact, CW3 stated that the integration was a

23  "reverse acquisition" in that Extreme overlaid Enterasys sales personnel on top of existing

24  Extreme ones, resulting in legacy Extreme salespeople (including CW3) having Enterasys

25  "counterparts" covering the same areas, creating redundancies.  S/he indicated that Enterasys

26  sales people had absolutely no knowledge of Extreme's products or clients, yet were given sales

27  territories "ripped" from Extreme salespeople who had built relationships in those territories over

28  years.  CW3 also described the example of John Greiner, Extreme's Sales Director for the

1  Southeast region from July 2001-April 2014, whom CW3 describes as having received an award

2  for bringing in $100 million in revenue during his tenure.  CW3 described how, after the

3  acquisition, a legacy Enterasys executive named Mike Fabiaschi got rid of Greiner to replace

4  him with Enterasys personnel.  Accordingly, that personnel were replaced based on individual

5  executives' preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past

6  performance metrics, rather than in a systematic manner designed to maximize Extreme's

7  financial results—further demonstrates that the Company lacked an integration plan to combine

8  the two salesforces.

9      126.   CW3 indicated that upper management knew about the integration problems

10  because s/he personally related them to Berger.  CW3 recalled that s/he spoke with Berger twice

11  in October or November of 2014, first over the telephone and later in person while Berger was in

12  New York City to meet with investors and analysts.  CW3 related that s/he specifically told

13  Berger of the problems integrating the sales teams, including Fabiaschi's decision to replace

14  Greiner.  CW3 stated that Berger indicated that he already knew about what happened with

15  Greiner, was angry about it, and would look into the situation further.  CW3 confirmed that s/he

16  and Berger discussed this Greiner replacement as an example of broader problems with the

17  salesforce integration efforts.  According to CW3, Berger acknowledged during this conversation

18  that he knew of the "adversarial" relationship between the two groups.  CW3 also stated that,

19  based on this conversation and the quarterly and annual sales conferences that Berger attended, it

20  was clear to CW3 that Berger knew about these company-wide salesforce integration problems.

21      127.   Additionally, the fact that Berger had such direct, one-on-one conversations with

22  a Territory Sales Manager further shows that he was a hands-on CEO who closely managed

23  Extreme's operations, including specifically the salesforce and its integration after the Enterasys

24  acquisition.

25      128.   Thus, CW1, CW2, and CW3 all confirmed their understanding that Extreme's

26  integration of Enterasys was consistently a failure through the time they were at Extreme.

27      129.   Other former employees echoed the integration problems described above,

28  particularly Extreme's failure to eliminate employee redundancies, which undermined

1   Defendants' representations that they, as part of an integration plan, had a plan to achieve cost-

2   saving synergies.  Confidential Witness 4 ("CW4") was employed by Extreme from February

3   2008 until February 2014.  CW4 held the position of Regional Sales Director during the Class

4   Period.  CW4 indicated that s/he was re-assigned to be Regional Sales Director of a new region

5   in 2013 to accommodate an Enterasys legacy appointment to CW4's region.[9]  CW4 stated that

6   s/he was rated as a sales leader prior to CW4's voluntary departure from Extreme, and was

7   assured that the Company wished to retain CW4.

8          130.    CW4 observed one reason why the integration failed, which was a lack of action

9   to manage duplication between the two businesses, as illustrated by CW4's own re-assignment.

10  CW4 stated that Extreme and Enterasys were about equal in size and each came with

11  overlapping product lines and a duplicate sales structure.  CW4 observed that COO Chris

12  Crowell, who had been the CEO of Enterasys, looked out for his people and slotted an Enterasys

13  individual to run North American Sales.  CW4 provided a specific example of the duplicate

14  personnel structure post-acquisition (in addition to CW4's own situation): a New York sales

15  representative who was executing quite favorably while his Enterasys counterpart was not selling

16  anything, but both continued at overlapping positions for a year.  CW4 personally observed that

17  sales people were stepping on each other by calling the same accounts.

18         131.    Thus, Defendants experienced but did not disclose substantial salesforce

19  integration problems, which resulted from Extreme's lack of an integration plan, during the Class

20  Period.

21                 **3.    The Company Experienced Significant Executive Turnover During
                         the Class Period Related to Its Substantial Integration Problems**

22

23         132.    Effective November 1, 2013, Chris Crowell joined Extreme as its Chief Operating

24  Officer.  Crowell had been the former CEO of Enterasys.

25

26  _____

27      [9] Lead Plaintiff believes that the details of CW4's identity contained herein are sufficient to
    satisfy the requirements of the PSLRA.  Lead Plaintiff can provide additional specificity,
    including the regions for which CW4 and CW4's replacement were responsible, to the Court

28  through an in camera submission.

133.   On a November 4, 2013 conference call, Berger characterized Crowell's hire as "significant progress" on the integration, specifying that Crowell's role would include "direct responsibility for sales and marketing" to "maintain the entire revenue streams of both companies."  Berger continued, "I have no doubt he will succeed."

134.   On May 6, 2014, the Company announced in a press release that Chris Crowell "will be leaving the Company effective immediately."  In another press release the same day, the Company announced that Kurtzweil would transition on June 2, 2014 from CFO to "special assistant to the CEO," before his departure at the end of September 2014, and that Arola would become the Company's new CFO.  None of the disclosures explained the reasons for these changes.  As noted above, Extreme's stock price fell more than 25% on this news.

135.   The Company was not immediately prepared with a replacement for Crowell. Instead, Berger disclosed in a conference call later the same day that, notwithstanding prior assurances, there had been problems with the integration and that, as a result, he would be taking a more direct role in the integration efforts:

> As we move on to the next phase of the integration I feel that **it is critical that I stay close to our field organizations** [i.e., the salesforce] particularly in North America **where we have experienced some integration issues**. The field organizations and corporate marketing will **report directly to me effective today**.

136.   A May 7, 2014 Wunderlich Securities analyst report observed that "**[c]hallenges of combining** like-size companies impacted Extreme 3Q14 results and outlook with the Americas team **lagging behind integration** in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being**."  The report also noted that "a new CFO has been recruited," interpreting this as partially negative news because "we believe departing **CFO John Kurtzweil has been a major factor in driving most of the Enterasys integration**."  On this news, the analyst report revised its estimates lower.

137.   On October 1, 2014, the Company issued a press release announcing that it had hired Jeff White to be its new Chief Revenue Officer.  White, as CRO, would be "responsible for

overseeing Extreme's global sales and marketing organizations." The role did not exist before White's hire. Ever since the Company lost Crowell as COO, "field organizations and corporate marketing" had been reporting **directly** to CEO Berger. *See* ¶ 135, *supra*.

138. Accordingly, from May to October 2014, when Berger was acting as head of Sales, he directly oversaw the salesforce and its ongoing integration efforts, including by leading the quarterly sales calls and the annual global sales conference in the summer of 2014, as CW3 described above (*see* ¶¶103-104, 110 *supra*). Based on this role, Berger had direct knowledge of the salesforce integration problems that existed at the time, as described by the CWs above. Thus, he knew or recklessly disregarded that his subsequent statements regarding the integration (*e.g.*, his August 14, 2014 statements that the "*sales force integration is complete*" and that "*integration issues are behind us*") were false and misleading.

139. Analysts recognized that the appointment of White in the Chief Revenue Officer role was to remedy continuing problems integrating Extreme and Enterasys, particularly their respective sales forces. For instance, the Buckingham Research Group issued a report on October 1, 2014 and noted that White was to fill a "key void" that was created when Chris Crowell was terminated as COO:

> Given the sales transition issues the company has faced in recent quarters, we think the appointment [of Jeff White as Chief Revenue Officer] is a positive, particularly given Mr. White's international experience [from competitor Cisco]… Bottom line, a key void is filled and given Mr. White's substantial international and leadership experience, we expect near term strategic changes and realignment of the sales organization, leading to top line improvement in 2015.

This executive-level turnover was directly related to the Company's substantial integration problems.

140. Then, on April 9, 2015, Extreme preannounced that it would miss guidance for Q3 2015. The Company also announced that White, who had been hired only six months earlier to manage the integration of the Extreme Networks and Enterasys salesforces, was "no longer with the Company." Trading in Extreme shares was halted. As described more fully above, *see*

1   Section V.G., *supra*, this executive-level turnover was directly related to the Company's

2   substantial integration problems.

3       141.    CW3 recalled that Jeff White's brief tenure was another aspect of the failed

4   integration. In late 2014, CW3 recalled receiving company-wide emails from Berger announcing

5   the hiring of White (which occurred on or about October 1, 2014).  Based on such emails, CW3

6   stated that Berger and the Board "touted" White's hiring as intended to fix Extreme's continuing

7   sales and integration problems post-acquisition. CW3 further explained that after Berger fired

8   Chris Crowell (in May 2014), Berger took on Crowell's role of the head of Sales (in addition to

9   CEO); however, Berger's time serving as both CEO and direct head of Sales (from May 2014 to

10  October 2014) turned out to be "too big a job," so Berger and the Board were bringing in White

11  to revitalize Extreme's sales channel and fix the persisting integration problems.  Thus, as late as

12  October 2014, substantial salesforce integration problems still existed and thus prevented the

13  salesforce integration (and, by extension, the integration as a whole) from being complete, an

14  issue that Berger knew and acknowledged in a company-wide email at the time that significant

15  action still needed to be taken.

16      142.    Moreover, on October 15, 2014, Berger admitted that the integration was only

17  "**nearly** completed," contrary to his and Arola's prior statements on August 14, 2014 that the

18  two companies, and specifically their salesforces, were "*now fully integrated*" and that the

19  salesforce integration was "*complete*" at that time.

20      143.    Likewise, on January 28, 2015, Berger again admitted that, contrary to his and

21  Arola's prior statements on August 14, 2014 and Arola's statement on December 17, 2014 that

22  the salesforce integration had been "complete" and/or the two teams "fully integrated," it still

23  was not complete at this time:  "**while we are making daily substantial progress on the**

24  **complete integration and upgrading of our salesforce**, it is clear that we still have

25  considerable work to do going forward."

26      144.    Further, CW3 confirmed that the salesforce integration still was not "complete" in

27  2015, contrary to Defendants' assurances on August 14, 2014 and December 17, 2014.

28  According to CW3, after joining the Company (in October 2014), White embarked on a

1  "listening tour" around the world, which was intended to fix the continuing salesforce problems,

2  culminating in a two-hour global salesforce call in early 2015 in which White listed "many

3  things wrong" with the Company.  CW3 attended this call along with the global salesforce and

4  sales leadership.  CW3 recalled that White also described his agenda on the call as his "burning

5  platform."  On this call, White further described the Company as a "**disaster**" and "**a hot mess**,"

6  -- making it clear to CW3 that the salesforce integration was still not complete.  However, CW3

7  stated that shortly thereafter (approximately six months after White joined the Company), White

8  was abruptly no longer with the Company.  CW3 recalled that White's initiatives ultimately went

9  nowhere; in CW3's words, "nothing happened," which CW3 suggested explained why he

10  "lasted" only for a few months at the Company.  Approximately three months after White's call

11  with the global salesforce, CW3 recalled receiving a company-wide email announcing White's

12  departure.  Accordingly, given that White was specifically brought in by Berger and the Board to

13  fix the continuing salesforce integration issues, which he confirmed in the global salesforce call

14  persisted after his arrival, and which he then failed to resolve during his brief tenure, the

15  salesforce integration (and, by extension, the integration as a whole) was still not complete as of

16  his departure on April 9, 2015.

17      145.    Finally, in an April 21, 2015 press release, Extreme announced that Berger would

18  be resigning as CEO effective immediately.  The same release stated he would be replaced by

19  Board Chairman Ed Meyercord.  As described more fully above, *see* Section V.G, *supra*, this

20  turnover at the Company's highest levels was further evidence of the Company's substantial

21  integration problems.

22           **4.    Summary of CW Allegations Concerning the Enterasys Integration**

23      146.    According to these detailed CW accounts, Extreme lacked an integration plan,

24  including  any plan setting forth how the two salesforces would be integrated, any product

25  roadmap to integrate the two companies' separate product lines, any go-to-market strategy for

26  the combined Company, and any plan to achieve $30-$40 million in integration synergies.

27  Proceeding without any such plan led to serious integration problems during the Class Period:  it

28  resulted in numerous employee redundancies; placed legacy employees from one company *ad*

*hoc* on the products and clients of the other, which they did not understand; caused substantial customer dissatisfaction, particularly due to the lack of a product roadmap; and resulted in lost business.  Further, the Company's significant executive turnover, the CWs confirmed, was driven by these substantial integration problems and Defendants' lack of an integration plan.  Thus, the CWs demonstrate that, contrary to Defendants' representations, the Enterasys integration and synergies were not "on track" or "ahead of plan," that customers experienced "disruption" during the integration, and that the salesforce integration was not "complete," nor the integration problems "behind" the Company when Defendants assured that they were.

### 5.    Summary of Berger's Admissions Regarding the Integration

147.    In sum, Berger publicly and privately admitted information about the true state of Extreme's integration, while concealing the same information from investors during the Class Period.  As reported by CW3, at an internal quarterly sales meeting that he held immediately after the acquisition, when sales personnel raised customer concerns about the lack of a product roadmap or plan to combine products, Berger responded: "**we're formulating the integration plan**," thus admitting it did not yet exist.  As CW3 further reported, at the Company's annual global sales meeting in Las Vegas in July or August of 2014, when Berger was **acting head of Sales**, he admitted to the Company's global salesforce that the integration plan was still "**to be determined**" or "**TBD**."  In fact, throughout Berger's time as head of Sales (May to October 2014), CW3 observed Berger responding to internal questions about the lack of an integration plan, including a product roadmap and a go-to-market strategy for the combined Company, by responding "**we're working on it**" and "**we'll get back to you**."

148.    Further, in an October 15, 2014 press release, after months of telling investors that the salesforce integration was "complete," Berger publicly admitted that the integration was only "**nearly completed**."  Defendants again declared on December 17, 2014 that the salesforce integration was "complete" and the two teams were "fully integrated," only for Berger to later admit on January 28, 2015 that the Company still had to make "**substantial progress on the complete integration**," with "**still . . . considerable work to do**."

**H.    Defendants Lacked Any Reasonable Basis to Believe That the Lenovo Partnership Would Positively Impact Extreme's Revenue and Omitted Adverse Facts Undermining Their Statements Regarding Lenovo**

149.    CW4 personally observed that the Company's alliance with Lenovo was pushed very hard internally by Executive Vice President Eileen Brooker, but noted that all activity was at the strategic level and nothing came down to the field level.  CW4 stated:  "There were no joint meetings, no Go-to-Market sessions, no follow-up – there was no field level activity towards that alliance."  CW4 stated that s/he "certainly wanted to get together with Lenovo teams" but was not able to.

150.    Confidential Witness 7 ("CW7") was employed by Extreme from May 2013 until January 2015.  CW7 last held the position of "Account Executive-Lenovo."  CW7 related that s/he had no direct report during CW7's tenure, but would have occasional contact with Executive Vice President Eileen Brooker.  CW7 stated that there was "no mechanism in place" for the Lenovo sales people to benefit from Extreme's product line the entire time s/he was with the Company.  Accordingly, Lenovo sales personnel had no incentive to sell Extreme's products (explaining the lack of field activity described by CW4), thereby rendering this partnership useless for Extreme.

151.    As described in more detail below, *see* Section V.I., revelations after the Class Period confirmed the CWs' observations.  At the Company's May 6, 2015 earnings call, new CEO Meyercord confirmed that the Lenovo partnership had not yet translated into sales at the field level, and that Extreme had "**zero visibility**" into when it would.  It further confirmed that the Company had no basis to "forecast" any revenue growth from the Lenovo partnership.

152.    With no Lenovo activity at the "field" level and no visibility into when the so-called partnership would translate into any sales – material, adverse facts that Defendants knew but failed to disclose during the Class Period – Defendants had no reasonable basis to conclude that the Lenovo partnership would drive any revenue growth at all, much less "certainly" at least 10% revenue growth by June of 2015.  *See* Section V.H., *supra*.

**I.      Post Class-Period Revelations**

**1.      Meyercord's May 6, 2015 Admissions Regarding the Enterasys Integration and Lenovo Partnership**

153.     On the May 6, 2015 conference call to discuss the Company's third fiscal quarter 2015 financial results, the Company's CEO, Meyercord confirmed that the acquisition of Enterasys and subsequent integration efforts were a failure.  When an analyst asked Meyercord how to evaluate the Company's loss of almost $100 million in revenue since Extreme acquired Enterasys, Meyercord stated that the acquisition "wasn't a very good deal" and that there were problems with its "execution":

> … [I]f I go back to the Enterasys acquisition with Extreme, if you look at it on paper, you'd say **that wasn't a very good deal. There's no doubt there were some execution issues, and it was harder for the teams to put the companies together than anticipated.**

154.     The Company's May 6, 2015 earnings press release and prepared statements during the earnings call also no longer touted – or even mentioned – the Lenovo partnership.  At the earnings call, an analyst asked:  "And how about an update on Lenovo? You didn't mention that. Is that still a few quarters out?"  Meyercord's response confirmed the truth, that the Company had no basis for committing to future revenue growth from the Lenovo relationship:

> One of the things that I looked at when I came in was taking a deeper dive into Lenovo. And there's a lot of changes happening in that organization. We've got a very good relationship at the corporate level with the Lenovo folks. But, the deals right now are happening out in the field, and **it's just a question of whether or not we're collaborating in the field to get deals done with them,** which it's hard to step on a throttle when that's the situation. So, I don't have much visibility into that. At this stage, **I have zero visibility into Lenovo.** So, as far as where that is or how you're building that as a model, **I'd be uncomfortable giving you a forecast for Lenovo**.

This statement indicated not only that the Company did not know "whether or not we're collaborating in the field to get deals done with" Lenovo, but also that it had no "visibility" or other basis to forecast revenue growth from the Lenovo partnership.   Given that two CWs reported a lack of field-level activity between Lenovo and Extreme sales personnel early in the Class Period (*see* ¶¶149-150, *supra*) and this admission of "zero visibility" into Lenovo shortly

1  after the Class Period, it is a strong inference that there was a similar lack of field activity with

2  and visibility into Lenovo in between, and thus throughout the Class Period.

3           2.     **Meyercord's May 20-21, 2015 Announcement of a "*New* Operating Plan," Including an 18% Workforce Reduction and a "*New* Go-to-Market Strategy"**

4

5           155.    Two weeks later, Extreme announced that it was reducing its workforce by 18%,

6  confirming that its integration efforts during the Class Period failed to remove redundancies.

7  Specifically, on May 20, 2015, the Company issued a press release, which announced a "**new**

8  operating plan."  The "**first step**" of this plan was to "restructure its global workforce and

9  implement other operating cost reductions," which was "expected to yield approximately $40

10 million in reduction to operating costs in fiscal 2016."  This announcement of a "**new** operating

11 plan," including these cost-saving measures, confirms the CWs' allegations that there was no

12 such prior plan to achieve integration synergies during the Class Period.  The use of the word

13 "new" to describe Extreme's operating plan is an admission that such a plan for achieving cost-

14 saving synergies from the integration did not exist previously, further showing the falsity of

15 Defendants' prior statements that referenced or created the strong impression that such a plan

16 existed.

17          156.    On May 21, 2015, Extreme hosted a conference call to discuss this "New Go-to-

18 Market Strategy and Realignment," which was already being put into effect.  During the Call,

19 Meyercord explained that "the actions we took yesterday" to create these $40 million in cost

20 savings were "**primarily associated** with the reduction of 18% of the global workforce" equal to

21 "approximately 300 employees worldwide."   Those numbers confirmed that Extreme had been

22 employing approximately 1,666 people, which was substantially identical to the 1,650 employees

23 it had employed **at the beginning of the integration almost two years earlier**.  *See supra* ¶51.

24 This strongly corroborates the statements of the four CWs who said that redundancies in the

25 workforce were not being eliminated throughout the Class Period, reinforcing the allegations that

26 there was no integration plan with respect to achieving cost-saving synergies from reducing the

27 salesforce and other employees.  *See* ¶¶106-107, 119-120 (CW1), ¶124 (CW2), ¶¶110, 125,

28 (CW3), and ¶130 (CW4).  In particular, it supports the statement of CW2, a senior executive

1   before, during, and after the Class Period, who said that the elimination of employee

2   redundancies did not actually start until Meyercord replaced Berger as CEO.  *See* ¶124.  Overall,

3   the Company's post-Class Period workforce reduction revealed that Defendants' statements

4   committing to and reassuring investors of $30-$40 million in cost-saving "synergies" were false

5   and misleading because Defendants knew or should have known that Extreme would not be able

6   to accomplish $30-$40 million in cost-saving "synergies" without substantial elimination of

7   workforce redundancies created by the Enterasys acquisition, which did not occur as part of the

8   integration efforts during the Class Period.

9        157.   Extreme's May 20, 2015 press release, titled "Extreme Networks Unveils **New**

10  Solutions-Based Strategy: **Go-to-Market Plan** and Company Realignment to Deliver Bundled

11  Software and Services-Driven Networking Solutions Combined with the Highest Level of

12  Customer Support,"  further announced that, as part of Extreme's "new operating plan," it was

13  "implementing its **new** solutions-based **go-to-market strategy**," confirming CW3's statements

14  that there was also no such prior go-to-market strategy during the Class Period.   Again, the use

15  of the word "new" to describe Extreme's go-to-market strategy is an admission that such a plan

16  did not exist previously, further supporting the falsity of Defendants' prior statements

17  referencing or creating the strong impression that an integration plan, including such a a go-to-

18  market strategy for the combined Company, existed.  Additionally, the May 20, 2015 press

19  release revealed that "[t]o **develop the new strategy**, the company **initiated** a comprehensive

20  review process **in January** that included input from analysts, customers and partners."

21  Accordingly, not only did Extreme lack such a "go-to-market strategy" until May 2015, it did not

22  even begin to develop one until January 2015, just three months before the end of the Class

23  Period.  In the press release, Meyercord touted this new go-to-market strategy as "**a tangible,**

24  **executable plan**" that reflected "a clear cut strategy centered on software and service led

25  solutions and **a definitive transformation in how the company goes to market**," underscoring

26  the importance of such a plan to the success of the Company.

27

28

### 3. Meyercord's May 21, 2015 Admissions Regarding the Lenovo Partnership

158.    On the same May 21, 2015 conference call, an analyst asked the Company for an update on "the potential Lenovo opportunity."  Meyercord reiterated that "**we don't have a specific target for Lenovo,**" and there was "**nothing tangible** for us to guide you towards" regarding any revenue contribution from the Lenovo partnership.  Meyercord put the issue to rest by concluding that "until something comes up with Lenovo, my preference is to **just take it off the table**."  These statements further confirmed that Defendants had no reasonable basis to commit to revenue growth from its relationship with Lenovo during the Class Period.

159.    Subsequent to the May 21, 2015 conference call, Defendants ceased to describe the Lenovo partnership as a revenue driver.  In fact, the Company has not mentioned any aspect of the Lenovo partnership or even Lenovo's name in any of Extreme's subsequent earnings calls or press releases.  Extreme never included Lenovo in any subsequent 10Q or 10K where it purports to list all companies responsible for 10% or more of Extreme's revenue.  The Lenovo partnership thus never contributed double-digit revenue growth.

### 4. Meyercord's September 14, 2016 Admissions that the Enterasys Acquisition Lacked the Necessary "Integration Planning," Including a "Clean and Clear Product and Technology Roadmap"

160.    On September 14, 2016, Extreme held a conference call with analysts to discuss its recently announced agreement to acquire the wireless Local Area Network ("LAN") business from Zebra Technologies for $55 million. During the call, a Buckingham Research Group analyst (the same analyst responsible for Extreme during the Class Period) asked Meyercord "if there is a plan in place" for the integration of this business, in contrast to "the Enterasys integration," which was "a little bit challenging."  In his response, Meyercord admitted that "there were **a lot of integration issues**" in the Enterasys acquisition and that, in contrast, this new Zebra acquisition would be "very different," including because it would have "extensive" and "detailed bottoms-up" **"planning"** – in particular, "**integration planning**" and a "**very clean and clear product and technology roadmap**," thus strongly confirming the CWs' allegations that the Enterasys integration lacked such an integration plan and product roadmap:

| | | |
|---|---|---|
| 1 | [Analyst:] | … **But on the Enterasys acquisition, it was a little bit challenging**, I think, and you were not, obviously, involved in that |
| 2 | | whole thing. But there was **a little bit of a challenge** trying to |
| 3 | | maintain those customers and offer service to those customers. |
| 4 | | **And I just wanted to know if there is a plan in place to keep these customers**, make sure you guys go after them from a service |
| 5 | | perspective, and not just that upgrade opportunity that is out there. **And I think you know what I'm talking about with Enterasys,** |
| 6 | | **right?** There was some early challenges, I think. |
| 7 | | |
| 8 | [Meyercord:] | **Absolutely**. And what I think everyone has to keep in mind is that the Extreme/ Enterasys, it was really a merger. And Extreme |
| 9 | | acquired a business that was actually larger than Extreme. … |
| 10 | | And there were a lot of issues. **There were a lot of integration issues**. **There were a lot of technology debates about how the** |
| 11 | | **roadmap should be built** and where the Company should drive its |
| 12 | | investment in R&D. |
| 13 | | This [new Zebra acquisition] is a very clean asset purchase. I will tell you, **we have a very clean and clear product and technology** |
| 14 | | **roadmap**. … |
| 15 | | I will also tell you that, from a planning perspective, **a lot of work has gone into planning on this deal**. There was a due diligence |
| 16 | | |
| 17 | | phase. It was extensive. **Integration planning, which has been extensive** and very collaborative. |
| 18 | | ...<br>**We have very extensive and detailed bottoms-up plans**. Now we |
| 19 | | go into the implementation phase, and we are feeling very confident about the integration. |
| 20 | | |
| 21 | | The other comment that I made in my script is that we expect to -- they are on Oracle and salesforce. We are on Oracle and |
| 22 | | salesforce. So it is really a porting exercise here that we expect to get done in less than 45 days after closing. **Very different**. |

161.    Securities analysts reporting on this conference call understood Meyercord's statements above as admissions that the Enterasys integration had substantial problems.  For example, a Buckingham Research Group report on September 16, 2016 discussed Extreme's "focus[] on execution and integration post the ZBRA deal close" and noted under "Key Points:"

1    "**Acknowledging that the Enterasys execution was not smooth**, **management is determined**

2    **to not to make the same mistakes**."

3        162.    Similarly, a September 14, 2016 Craig-Hallum analyst report discussed Extreme's

4    acquisition of the Zebra wireless LAN business as a positive development and stated that "the

5    acquired business has the same ERP and CRM systems as Extreme and remind investors that

6    while the integration of these systems were a **major challenge in the Enterasys acquisition** we

7    don't see that being an issue here."

8    **VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**
         **AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND**
9        **MARKET REACTIONS THERETO**

10        163.    During the Class Period, Defendants made the following false and misleading

11   statements and material omissions.

12       **A.    Misstatements and Omissions Regarding the Enterasys Integration**

13           **1.    September 12, 2013 – Business Update Conference Call**

14               **(a)    Kurtzweil's Misstatement and Omissions**

15        164.    On September 12, 2013, Extreme issued a press release, before the market

16   opened, announcing that it had entered into an agreement to acquire Enterasys for $180 million.

17        165.    The Company hosted a conference call with analysts to discuss the acquisition

18   later that day.  Defendants Berger and Kurtzweil participated in this call.  During the call,

19   Kurtzweil explained the terms of the acquisition and stated that the two companies would be

20   fully integrated within 12 to 24 months, resulting in significant cost savings and related

21   "synergies" for shareholders:

22        Extreme Networks is purchasing all the outstanding shares of Enterasys Networks
          for $180 million in cash and is expected to close early in the fourth quarter of
23        2013. … **When we have fully integrated the two Teams, we plan to reduce**
          **product costs and operating expenses between $30 million to $40 million. We**
24        **expect to realize these synergies over a 12 to 24-month period**.

25               **(i)    Falsity**

26        166.    Kurtzweil's statement in the preceding paragraph was false and misleading

27   because:  (1) Extreme had no "plan" to achieve $30-40 million in synergies, over a 12 to 24-

28

1    month period or otherwise, or to "fully integrate[] the two Teams" given the accounts of CWs 1,

2    2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two

3    salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration

4    synergies, a product roadmap for the combined Company, and a go-to-market strategy (*see*

5    Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an

6    integration plan led to substantial integration problems from the beginning, including lost clients

7    and client dissatisfaction with a salesforce that only understood half of the Company's legacy

8    products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to

9    correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord

10   admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration

11   planning," including a "very clean and clear product and technology roadmap," resulting in "a lot

12   of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new**

13   operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an

14   18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5

15   that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4

16   that the employee redundancies created by the acquisition were not eliminated during the Class

17   Period, and thereby showing that such cost-saving synergies were not achieved during the Class

18   Period.

19          167.    Kurtzweil's statement was false and misleading in omitting the preceding

20   material, adverse facts, because it created a strong impression of a state of affairs (a carefully

21   planned integration that was reasonably likely to generate the $30-40 million in synergies by the

22   timeframe specified) that differed in a material way from the one that actually existed.

23          168.    To the extent the statement conveyed Kurtzweil's opinion, it was misleading

24   because it lacked a reasonable basis and omitted Extreme's lack of an integration plan, including

25   the related components discussed above—facts which would conflict with what a reasonable

26   investor would understand from the statement itself.

27

28

1

### (ii)      Scienter

2        169.     As CFO, Kurtzweil knew, or was deliberately reckless in not knowing, that his

3   preceding statement was false and misleading because he knew about the lack of an integration

4   plan, including the related components discussed above, due to his role as CFO overseeing a

5   merger of equals, which was a core transaction for the Company, particularly given that,

6   according to analysts, he had "been a major factor in driving most of the Enterasys integration,"

7   as noted above (¶136).  *See* Section VII.B., *infra*.

8

### (b)      Berger's Misstatement and Omissions

9        170.     During the September 12, 2013 call, Berger also assured investors that in the

10   integration between the two companies that ***"[t]here will be no disruption in customers' ability***

11   ***to grow and operate their networks. Period. None***."

12

### (i)      Falsity

13        171.     Berger's statement in the preceding paragraph was false and misleading because

14   (1) he could not assure such a lack of customer "disruption" during the integration given the

15   accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting

16   forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and

17   obtain integration synergies, a product roadmap for the combined Company, and a go-to-market

18   strategy (s*ee* Section V.G., *supra*); (2) according to CWs 1, 2, and 3, the lack of a product

19   roadmap for the combined Company, in particular, created substantial uncertainty and concern

20   among its customers because Extreme could not tell them how long their products would be

21   supported or when the combined products or updates would become available, leading customers

22   to delay making purchases or upgrades throughout the Class Period, thereby causing "disruption

23   to customers' ability to grow and operate their networks" (*see* Section G.1.(a).(i)., *supra*); (3)

24   based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial

25   integration problems from the beginning, including lost clients and client dissatisfaction with a

26   salesforce that only understood half of the Company's legacy products, and client dissatisfaction

27   with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during

28   the Class Period (s*ee* Section V.G., *supra*); (4) Meyercord admitted on September 14, 2016 that

1   the Enterasys acquisition lacked such "integration planning," including a "very clean and clear

2   product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.);

3   (5) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-

4   market strategy, supporting the statements of CWs 1, 2, 3, and 5 that there were no such prior

5   plan during the Class Period.

6       172.    Berger's statement was false and misleading in omitting the preceding material,

7   adverse facts because it created a strong impression of a state of affairs (a carefully planned

8   integration that would not disrupt Extreme's customers' business) that differed in a material way

9   from the one that actually existed.

10      173.    Further, to the extent the statement conveyed Berger's opinion, it was misleading

11  because it lacked a reasonable basis and omitted these facts about Extreme's lack of an

12  integration plan, particularly the product roadmap, which was necessary to avoid causing

13  disruption to the customers' ability to grow and operate their networks,---facts which would

14  conflict with what a reasonable investor would understand from the statement itself.

15                          **(ii)    Scienter**

16      174.    Berger knew, or was deliberately reckless in not knowing, that his statement was

17  false and misleading because he knew of the preceding omitted, materially adverse facts

18  undermining it (*e.g.*, that Extreme had no integration plan, particularly an underlying product

19  roadmap, which was necessary to avoid causing disruption to customers' business) and that it

20  thus lacked a reasonable basis when made,  due to his role as CEO overseeing a merger of

21  equals, which was a core transaction for the Company.  *See* Section VII.B., *infra*.

22      175.    In addition, Berger's compensation agreement contained a highly unusual feature

23  wherein he would earn 300,000 Extreme stock options if the price of the Company stock

24  increased to $4.00 per share, another 300,000 options if the price increased to $5.00 per share

25  and another 300,000 options if the price increased to $6.00 per share (and stayed above those

26  price targets for 30 days).  *See* Section VII.A., *infra*.  This compensation package had the effect

27  of providing Berger with strong incentives to make false and misleading statements about the

28  success of the acquisition to inflate the price of Extreme stock and reach the target prices.  *Id.*

1

**(c)     Market Reactions to the Misstatements and Omissions**

2        176.    The market reacted favorably to Defendants' statements above regarding their

3    "plan" for the Enterasys integration and achievement of related synergies and Berger's assurance

4    that the integration would not "disrupt" customers.  As a result, Extreme's stock price increased

5    7%, by $0.30 per share on 7.7 million shares traded, from $4.03 per share at the close of trading

6    on September 11, 2013 to $4.33 per share at the close of trading on September 12, 2013.

7        177.    On September 13, 2013, Craig-Hallum issued an analyst report that included a

8    "Buy" rating and an increased price target, positively noting Kurtzweil's statements regarding

9    Extreme's plan to achieve " "**cost reductions of $30-40 million in the 12-24 months following**

10   **the [Enterasys] acquisition**."  The report also repeated Berger's assurance that the integration

11   would have "**no disruption to customers' businesses**," highlighting it as a "key takeaway.".

12       178.    On September 17, 2013, Wedbush Securities upgraded its rating on Extreme from

13   "neutral" to "outperform" "based on [its] view that the acquisition of Enterasys is immediately

14   accretive and **offers potential upside from synergies**, leading to valuation which suggests

15   upside from current levels."  This analyst report further explained that its "upgrade is predicated

16   on [its] belief that . . . (2) **we think the company will benefit from deal synergies**, including

17   optimization of the supply chain and **the removal of duplicate cost structures**."

18           **2.     November 4, 2013 – Q1 2014 Earnings Call**

19       179.    On November 4, 2013, five days after the acquisition of Enterasys had been

20   completed, Extreme issued a press release announcing its Q1 2014 financial results and its Q2

21   2014 guidance.  Extreme announced that it generated revenues of $75.9 million during Q1 2014,

22   and expected revenue for Q2 2014 to be in the range of $140 to $155 million.  The press release

23   further stated that Chris Crowell, the former CEO of Enterasys, had been retained as the COO of

24   Extreme, with direct responsibility for "sales and marketing."

25           **(a)     Berger's Misstatement and Omissions**

26       180.    Later that day, Extreme hosted a conference call with analysts to discuss the

27   Company's financial results for Q1 2014 and Q2 2014 guidance.  Berger and Kurtzweil

28

participated in this call, and Berger reiterated that the integration of Extreme and Enterasys was "**on track**" – *i.e.,* proceeding according to plan:

> [T]he acquisition will double the size of the Company, in terms of revenues, and will be immediately accretive from an earnings standpoint….We began to focus on the integration of Extreme and Enterasys right after the announcement. We have made significant progress, including finalizing the top levels of executive management…. ***Overall, our integration efforts are on track***.

### (i)    Falsity

181.    Berger's statement in the preceding paragraph that "***[o]verall, our integration efforts are on track***" was false and misleading because it created the strong impression that an integration plan against which progress could be objectively measured existed, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (*see* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (*see* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created by the acquisition were not eliminated during the Class Period, and thereby showing that such cost-saving synergies were not achieved during the Class Period.

182.     Berger's statement was false and misleading in omitting this lack of an integration plan and the other material, adverse facts regarding integration problems as discussed in the preceding paragraph, because it created a strong impression of a state of affairs (a carefully planned integration that was positively proceeding "on track" with such a plan) that differed in a material way from the one that actually existed.

**(ii)     Scienter**

183.     Berger knew, or was deliberately reckless in not knowing, that this statement was false and misleading because, according to CW3, he knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales personnel questioned him about such a plan, including one such call held right after the acquisition where Berger replied that "we're formulating the integration plan," thus showing that the Company did not have a plan at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration plan, including the product roadmap for the combined Company, was still "TBD" as late as July/August of 2014, at the annual global sales conference in Las Vegas. *See* ¶104, *supra*. Berger also knew about the lack of an integration plan due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*.

184.     In addition, Berger's compensation agreement contained a highly unusual feature wherein he would earn 300,000 Extreme stock options if the price of the Company stock increased to $4.00 per share, another 300,000 options if the price increased to $5.00 per share and another 300,000 options if the price increased to $6.00 per share (and stayed above those price targets for 30 days). *See* Section VII.A., *infra*. This compensation package had the effect of providing Berger strong incentives to make false and misleading statements about the success of the acquisition to inflate the price of Extreme stock and reach the target prices. *Id.*

**(b)     Kurtzweil's Misstatement and Omissions**

185.     During the November 4, 2013 call, Kurtzweil also discussed Extreme's "plan" for the Enterasys integration synergies coming to fruition over a 12 to 24 month period, resulting in a substantial positive impact on Extreme's revenues: "***When we have fully integrated the two***

1   ***teams, we plan to reduce product costs and operating expenses between $30 million to $40***

2   ***million. We expect to realize these synergies over a 12- to 24-month period. The timing of the***

3   ***synergies will be seen in the financials*** in a small way in the third fiscal quarter and ***will hit full***

4   ***stride in 12 to 15 months from now***."

5   **(i)   Falsity**

6   186.   Kurtzweil's statement in the preceding paragraph was false and misleading

7   because: (1) Extreme had no "plan" to achieve $30-40 million in synergies, over a 12 to 24-

8   month period or otherwise, or to "fully integrate[] the two Teams" given the accounts of CWs 1,

9   2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two

10  salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration

11  synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee*

12  Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an

13  integration plan led to substantial integration problems from the beginning, including lost clients

14  and client dissatisfaction with a salesforce that only understood half of the Company's legacy

15  products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to

16  correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord

17  admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration

18  planning," including a "very clean and clear product and technology roadmap," resulting in "a lot

19  of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new**

20  operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an

21  18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5

22  that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4

23  that the employee redundancies created by the acquisition were not eliminated during the Class

24  Period, and thereby showing that such cost-saving synergies were not achieved during the Class

25  Period.

26  187.   Kurtzweil's statement was false and misleading in omitting the preceding

27  material, adverse facts, because it created a strong  impression of a state of affairs (a carefully

28

1   planned integration that was reasonably likely to generate the $30-40 million in synergies by the

2   timeframe specified) that differed in a material way from the one that actually existed.

3         188.   To the extent the statement conveyed Kurtzweil's opinion, it was misleading

4   because it lacked a reasonable basis and omitted Extreme's lack of an integration plan, including

5   the related components discussed above—facts which would conflict with what a reasonable

6   investor would understand from the statement itself.

7                              **(ii)   Scienter**

8         189.   As CFO, Kurtzweil knew, or was deliberately reckless in not knowing, that his

9   statement was false and misleading because he knew, based on his participation in quarterly sales

10  calls where such matters were discussed (*see* ¶¶103-105, *supra*), that Extreme had no integration

11  plan, including for how the Company would achieve $30 million to $40 million in synergies in a

12  12 to 24-month period or fully integrate the salesforces, which undermined his statement.  *See*

13  Sections V.G. & V.I., *supra*.  For example, according to CW3, there was one such call held right

14  after the acquisition where sales personnel questioned Berger about such a plan, and replied that

15  "we're formulating the integration plan," thus showing that the Company did not have a plan at

16  that time.  *See* ¶105, *supra*.  Kurtzweil also knew about the lack of plans due to his role as CFO

17  overseeing a merger of equals, which was a core transaction for the Company, particularly given

18  that, according to analysts, he had "been a major factor in driving most of the Enterasys

19  integration," as noted above (¶136).  *See* Section VII.B., *infra*.

20                  **(c)   Market Reactions to the Misstatements and Omissions**

21        190.   The market reacted favorably to Defendants' misstatements regarding the "on

22  track" progress of the Enterasys integration and expected synergies with a positive impact on

23  Extreme's revenues.  On November 4, 2013, after the release of the Company's financial results

24  and its earnings call, Extreme's stock closed at $6.30 per share on 8.9 million shares traded,

25  rising almost 17% or $0.92 per share from the prior trading day's closing price of $5.38 per share

26  on 1.9 million shares traded.

27        191.   Analysts also reacted positively to Defendants' misstatements. For example, a

28  Craig-Hallum report issued on November 5, 2013 reiterated its "buy" rating on Extreme, stating:

"Over the next 24 months management **plans to realize synergies of $30-$40 million** which we believe will be driven by 200-300bp [basis points] of gross margin improvement from improved purchasing scale and the remainder through headcount reductions as the combined workforce is right-sized."

192.    Similarly, a November 5, 2013 Wedbush Securities report maintained its "outperform" rating on Extreme "based on [its] view that the recently closed acquisition of Enterasys is immediately accretive, offers upside from synergies and the potential contribution from partnerships."

193.    Further, a follow-up Wedbush Securities report published on November 6, 2013 spoke positively regarding Extreme's ability to improve margins and revenues based on the Enterasys acquisition:  "Initial **synergies** to begin in December, with potential for better-than-expected [gross margin] long term. . . . [F]urther management due diligence of Enterasys has uncovered additional areas for improvement which have the potential to add another 200-400 [basis points] to initial expectations."

194.    Moreover, after Extreme held a conference call to discuss the *pro forma* financials following the acquisition of Enterasys on January 14, 2014, the market became even more encouraged by Defendant's assertions that it will achieve $30 to $40 million in cost-saving synergies from the integration within 12-24 months from the acquisition. In an analyst report published on January 14, 2014, Wedbush Securities maintained its "Outperform" rating "based on [its] view that the acquisition of Enterasys is immediately accretive, potentially more than anticipated and offers **upside from synergies and partnerships**." Wedbush further stated, "**with the acquisition complete, the stock will now trade on integration, capturing synergies** and guide [sic] rather than the first quarterly combined results. . . .  Recall the company is looking to extract $30-40 [million] in synergies from the combined company over the next 24 months. . . . **The key takeaway is that there are not major changes to original assumptions**."

### 3. February 5, 2014 – Q2 2014 Press Release and Earnings Call – The Truth Partially Emerges but Defendants Continue to Mislead the Market

#### (a) Partial Corrective Disclosure and/or Materialization of the Risk

195.    On February 5, 2014, before the market opened, Extreme issued a press release that announced its Q2 2014 financial results and its Q3 2014 guidance.  Extreme reported revenues of $146.6 million for 2Q 2014, toward the low end of the guidance announced on November 4, 2013, and expected revenues of $140 to $155 million for Q3 2014, below the consensus estimates of $154 million.  Later that day, Extreme held a conference call with analysts to discuss its Q2 2014 financial results and guidance.  During this call, Berger acknowledged that the Company had as yet "not seen significant evidence of revenue [due] to synergies." Kurtzweil acknowledged that the Company's guidance for the third quarter of 2014 was "at the low end of the revenue guidance" compared to its third quarter of 2013.  Kurtzweil further attributed the reason why the Company saw "North America as [the] weakest region" to the fact that it "is a tough market right now."  When the call was opened to questions, an analyst noted to the contrary that competitors in North America were doing "pretty decent," were "flush," and "one . . . actually had a good quarter," and asked for the Company to explain "what you saw in North America that made it tough."  Berger answered: "I think for this, to keep this in perspective is, we have been in the middle of a turnaround of both our sales and marketing efforts at Legacy Extreme, and that was probably most pronounced -- the need for that was probably most pronounced in our North American organization."  Berger summarized by disclosing that the Company experienced not only "tough market conditions but also **some** self imposed issues" relating to the integration.

196.    These disclosures and softer guidance for Q3 2014 were the first indication that Defendants' statements regarding (a) the Company's successful progress with the integration and (b) realization of cost-saving synergies by the third quarter of 2014, the first full quarter of the combined Company, were false and misleading. Due to this initial partial corrective disclosure and/or materialization of risk, at the close of trading on February 5, 2014, the price of Extreme's

1   stock dropped 16%, from $7.04 per share to $5.92 per share on unusually high trading volume of

2   8.6 million shares.

3   **(b)   Berger's Misstatement and Omissions**

4   197.   However, in the midst of the lower guidance, Defendants continued to minimize

5   the emerging problems and falsely reassure investors that the integration was "*on track*" and had

6   "few surprises," with any integration issues "getting dramatically better."  Specifically, in the

7   February 5, 2014 press release, Berger stated, "*[o]ur integration plans are on track*." On the

8   conference call, Berger similarly reassured investors that, with respect to "self imposed"

9   integration issues: "We see that getting dramatically better with a couple of things, the

10   combination of sales forces under the leadership of our now head of North American sales John

11   Fabiaschi, who came from Enterasys with strong performance there."  Moreover, during the

12   February 5, 2014 earnings call, Berger also stated:

13   As significant, we delivered these numbers in the first quarter after closing the
     acquisition. That we were able to forecast our financial performance accurately is
14   one of the many examples of how the integration of the two companies has gone
     to date. Overall we have found few surprises since closing the acquisition
15   reflecting how well Chris Crowell now our Chief Operating Officer and his team
     managed Enterasys for the past six years.
16

17   **(i)   Falsity**

18   198.   Berger's statement in the preceding paragraph that Extreme's "*integration plans*

19   *are on track*" was false and misleading because it specifically represented the existence of an

20   integration plan against which progress could be objectively measured, when in fact there was no

21   such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme

22   lacked an integration plan, including a plan setting forth how the two salesforces would be

23   integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product

24   roadmap for the combined Company, and a go-to-market strategy (*see* Section V.G., *supra*); (2)

25   based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial

26   integration problems from the beginning, including lost clients and client dissatisfaction with a

27   salesforce that only understood half of the Company's legacy products, and client dissatisfaction

28   with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during

1   the Class Period (*see* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that

2   the Enterasys acquisition lacked such "integration planning," including a "very clean and clear

3   product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.);

4   (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-

5   market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40

6   million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during

7   the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

8   by the acquisition were not eliminated during the Class Period, and thereby showing that such

9   cost-saving synergies were not achieved during the Class Period.

10      199.    Berger's statement was false and misleading in omitting this lack of an integration

11  plan and the other material, adverse facts regarding integration problems as discussed in the

12  preceding paragraph, because it created a strong impression of a state of affairs (a carefully

13  planned integration that was positively proceeding "on track" with such a plan) that differed in a

14  material way from the one that actually existed.

15                          **(ii)    Scienter**

16      200.    Berger knew, or was deliberately reckless in not knowing, that this statement was

17  false and misleading because, according to CW3, he knew of the lack of an integration plan at

18  this time based on his participation in quarterly sales calls after the acquisition where sales

19  personnel questioned him about such a plan, including one such call held right after the

20  acquisition where Berger replied that "we're formulating the integration plan," thus showing that

21  the Company did not have a plan at that time. *See* ¶¶103-105, *supra*.  Indeed, Berger was telling

22  the salesforce that the integration plan, including the product roadmap for the combined

23  Company, was still "TBD" as late as July/August of 2014, at the annual global sales conference

24  in Las Vegas. *See* ¶104, *supra*.  Berger also knew about the lack of an integration plan and

25  related integration problems due to his role as CEO overseeing a merger of equals, which was a

26  core transaction for the Company. *See* Section VII.B., *infra*.

27      201.    Moreover, as noted above, Berger's compensation agreement contained a highly

28  unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

Company stock increased to $6.00 per share and stayed above that price target for 30 days. *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options. Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (c)   Market Reactions to the Misstatements and Omissions

202.   The market reacted unfavorably to the softer than expected guidance and the partial disclosures revealing that the integration was experiencing "some" initial setbacks. Nevertheless, the market was reassured by Defendants' continued false and misleading statements minimizing the extent of the apparent issues and assuring that the integration was still "on track." For example, on February 6, 2014, Wedbush Securities issued a report expressing disappointment, confirming its understanding that that "lower-than-expected revenue guidance reflects ongoing integration activities including training the sales force on both product lines" and "ongoing realignment of the legacy Extreme sales force"; accordingly, the report lowered its share price target for Extreme. However, the same analyst also maintained its positive "outperform" rating, echoing Defendants' reassurances that synergies would be seen on a specific timeline, and that the integration efforts were "on track":

> With the acquisition now complete, we believe the focus now turns to delivering on synergies, driving partner revenues and consistent execution. **Bottom line, there is no change to the story and the company remains on track to deliver on its stated goals over the next 12-24 months.**
> …
> **Company outlines timeline and reiterates targeted synergies of $30-40mn. . . .** Management noted that cross selling opportunities have begun, specifically in WLAN, and reaffirmed its targeted synergies of $30-40mn.

203.   A February 6, 2014 Craig-Hallum analyst report similarly stated: "Going forward management continues to expect to generate $30-$40M of synergies which should begin to show up in a small way in the coming quarter and hit full stride 12-15 months from now." Accordingly, it concluded that "[m]ost importantly, the meaningful potential earnings power of the combined company remains intact even on only modest revenue growth."

**4.     May 6, 2014 – Q3 2014 Press Release and Earnings Call – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market**

  **(a)     Partial Corrective Disclosure and/or Materialization of the Risk**

204.     On May 6, 2014, Extreme released two press releases after trading hours.  The first announced Company revenues of $143.7 million for Q3 2014, the low end of the guidance given in February 2014, and expected revenues in the range of $143 million to $148 million for Q3 2014.  These Q3 2014 announcements reported financial results for the first full quarter after the acquisition was completed, and the quarter in which management had told investors to expect to see the first positive impact of the integration on the Company's financials.  *See* ¶¶ 52-53, *supra.*

205.     The press release also announced the transition of Kurtzweil from CFO to "special assistant to the CEO," before his departure at the end of September 2014; and the hiring of Defendant Arola as CFO.  Another press release, later the same day, announced the sudden and unexplained departure of Chris Crowell, Chief Operating Officer of Extreme and former Chief Executive Officer of Enterasys. This significant turnover in the executive leadership partially disclosed the falsity of Extreme's prior statements touting the strength of integration efforts.  *See* Section V.G.3, *supra*.

206.     Later that day on May 6, 2014, Extreme hosted an earnings call on which Berger partially disclosed the truth that Extreme had experienced "**some**" problems with its salesforce integration efforts and that, as a result, he would be taking a more direct role in these efforts. Specifically, he stated, "[a]s we move on to the next phase of the integration I feel that it is critical that I stay close to our field organizations particularly in North America **where we have experienced some integration issues.** The field organizations and corporate marketing will report directly to me effectively today."

207.     As a result of this partial corrective disclosure that Extreme was experiencing integration issues and its resultant negative impact on the Company's financial results, over the same quarter in which Defendants told investors to expect the benefits of the acquisition,

Extreme's stock fell more than 25%, dropping $1.38 per share on unusually heavy trading volume of 9.3 million shares to $3.95 per share by the close of trading the next day, May 7, 2014.

### (b)   Berger's Misstatement and Omissions in the May 6, 2014 Press Release

208.    However, Defendants continued to mislead the market by representing in the May 6, 2014 press release and earnings call that, despite these integration issues and disappointing financial news, the Enterasys integration was still "ahead of plan" and would soon deliver the positive revenue impacts that Defendants had been assuring. Specifically, in the press release Berger stated, *"[t]he integration efforts following the acquisition of Enterasys continue ahead of plan*."

### (i)   Falsity

209.    Berger's statement in the preceding paragraph that Extreme's "*integration efforts following the acquisition of Enterasys continue ahead of plan*" was false and misleading because it specifically represented the existence of an integration plan against which progress could be objectively measured, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (*see* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (*see* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-

1    market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40

2    million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during

3    the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

4    by the acquisition were not eliminated during the Class Period, and thereby showing that such

5    cost-saving synergies were not achieved during the Class Period.

6        210.    Berger's statement was false and misleading in omitting this lack of an integration

7    plan and the other material, adverse facts regarding integration problems as discussed in the

8    preceding paragraph, because it created a strong impression of a state of affairs (a carefully

9    planned integration that was positively proceeding "ahead of" such a "plan") that differed in a

10   material way from the one that actually existed.

11                              **(ii)    Scienter**

12       211.    Berger knew, or was deliberately reckless in not knowing, that this statement was

13   false and misleading because, according to CW3, he knew of the lack of an integration plan at

14   this time based on his participation in quarterly sales calls after the acquisition where sales

15   personnel questioned him about such a plan, thus showing that the Company did not have a plan

16   at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration

17   plan, including the product roadmap for the combined Company, was still "TBD" as late as

18   July/August of 2014, at the annual global sales conference in Las Vegas. *See* ¶104, *supra*.

19   Further, Berger knew about the lack of an integration plan to merge the salesforces and the

20   resulting, ongoing salesforce integration problems at this time because of his then-recent

21   conversation with CW1 in April 2014, wherein they discussed such issues, including the

22   replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives'

23   individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance

24   metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Berger also

25   knew about the lack of an integration plan and related integration problems due to his role as

26   CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section

27   VII.B., *infra*.

28

212.     Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (c)     Berger's "Integration … Is On Track" Misstatement and Omissions on the May 6, 2014 Earnings Call

213.     Similarly, during the earnings call that day, Berger repeated that the "integration was still "***on track***:"  "***Overall, the integration of the two companies*** is going well and ***is on track*** or ahead of our expectations."

### (i)     Falsity

214.     Berger's statement in the preceding paragraph that "***[o]verall, the integration of the two companies … is on track***" was false and misleading because it created the strong impression that an integration plan against which progress could be objectively measured existed, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap,"

resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created by the acquisition were not eliminated during the Class Period, and thereby showing that such cost-saving synergies were not achieved during the Class Period.

215.    Berger's statement was false and misleading in omitting this lack of an integration plan and the other material, adverse facts regarding integration problems as discussed in the preceding paragraph, because it created a strong impression of a state of affairs (a carefully planned integration that was positively proceeding "on track" with such a plan) that differed in a material way from the one that actually existed.

### (ii)    Scienter

216.    Berger knew, or was deliberately reckless in not knowing, that this statement was false and misleading because, according to CW3, he knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales personnel questioned him about such a plan, thus showing that the Company did not have a plan at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration plan, including the product roadmap for the combined Company, was still "TBD" as late as July/August of 2014, at the annual global sales conference in Las Vegas. *See* ¶104, *supra*. Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time because  of his then-recent conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.*, subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Berger also knew about the lack of an integration plan and related integration problems due to his role as

1    CEO overseeing a merger of equals, which was a core transaction for the Company.  *See* Section

2    VII.B., *infra*.

3    217.    Moreover, as noted above, Berger's compensation agreement contained a highly

4    unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

5    Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See*

6    Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of

7    Extreme's stock, including by making false and misleading statements about the success of the

8    acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential

9    profit during the Class Period on those shares (based on the Class Period high of $8.14 per share)

10   was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (d)    Berger's Integration "Synergies" Misstatement and Omissions on the May 6, 2014 Earnings Call

218.    During the call, Berger further reassured that he was "***more confident than ever***"

of achieving the $30 to $40 million in integration synergies:

> *[O]ur target for synergy savings as a result of the acquisition of Enterasys continues to be in the range of $30 million to $40 million per year. We are more confident than ever that we will achieve at least that amount.*

### (i)    Falsity

219.    Berger's statement in the preceding paragraph, which asserted his "***confiden[ce]***"

in achieving the $30-40 million in integration synergies, was false and misleading because it

created the strong impression of the existence of an integration plan, including specifically a plan

to achieve such synergies, against which progress could be objectively measured, when in fact

there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5

that Extreme lacked an integration plan, including a plan setting forth how the two salesforces

would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a

product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G.,

*supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to

substantial integration problems from the beginning, including lost clients and client

dissatisfaction with a salesforce that only understood half of the Company's legacy products, and

1   client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel

2   redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on

3   September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including

4   a "very clean and clear product and technology roadmap," resulting in "a lot of integration

5   issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating

6   plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18%

7   workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that

8   there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that

9   the employee redundancies created by the acquisition were not eliminated during the Class

10   Period, and thereby showing that such cost-saving synergies were not achieved during the Class

11   Period.

12        220.    Berger's statement was false and misleading in omitting the preceding material,

13   adverse facts because it created a strong impression of a state of affairs (a carefully planned

14   integration that was reasonably likely to generate the $30-40 million in synergies by the

15   timeframe specified) that differed in a material way from the one that actually existed.

16        221.    To the extent the statement conveyed Berger's opinion, it was misleading because

17   it lacked a reasonable basis and omitted Extreme's lack of an integration plan, including the

18   related components discussed above, and the ongoing integration problems that Extreme was still

19   experiencing (particularly, the continuing employee redundancies that undermined the

20   achievement of cost-saving synergies)—facts which would conflict with what a reasonable

21   investor would understand from the statement itself.

22                              **(ii)    Scienter**

23        222.    Berger knew, or was deliberately reckless in not knowing, that this statement was

24   false and misleading because, according to CW3, he knew of the lack of an integration plan at

25   this time based on his participation in quarterly sales calls after the acquisition where sales

26   personnel questioned him about such a plan, thus showing that the Company did not have a plan

27   at that time.  *See* ¶¶103-105, *supra*.  Indeed, Berger was telling the salesforce that the integration

28   plan, including notably the plan to achieve integration synergies, was still "TBD" as late as

July/August of 2014, at the annual global sales conference in Las Vegas.  *See* ¶104, *supra.*  Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time based on his then-recent conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan.  *See* ¶¶ 109, 122, & 125, *supra.*  Berger also knew about the lack of an integration plan and related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company.  *See* Section VII.B., *infra.*

223.    Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See* Section VII.A., *infra.* Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

(e)    **Market Reactions to the Misstatements and Omissions**

224.    The market recognized and reacted unfavorably to Defendants' partial disclosure of the truth regarding the Enterasys integration efforts.   For example, a May 7, 2014 Wunderlich Securities analyst report commented as follows:

> **Challenges of combining like-size companies impacted Extreme (EXTR) F3Q14 results** and outlook with the Americas team lagging behind integration in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being; a new CFO has been recruited to operate from headquarters**….Management was most disappointed in Americas, for which the integration of the Extreme and Enterasys sales forces is taking longer.

However, Wunderlich Securities was reassured by Defendants' continued  misstatements regarding the progress of the integration, maintaining its "Buy" rating and price target and stating, for example, that "[w]e believe the company is **ahead of plan or on plan** with regard to integration of everything but Americas sales."

225.    Similarly, Craig-Hallum issued a report on May 7, 2014 report maintaining its "Buy" rating and stating, "[**a**]**lthough Extreme Networks has experienced some hiccups integrating two equal sized companies, management remains confident in its ability to find $30-$40 million in synergies**. We expect synergies to begin to be seen once the company can consolidate its ERP systems which is expected to occur during the September quarter."

226.    Subsequently, the market continued to be misled by Defendants' false reassurances that early problems with integration had been resolved and the integration was progressing well.  For example, on July 2, 2014, Wunderlich Securities issued an analyst report entitled "Extreme Networks, Inc. (EXTR: $4.45): It's Getting Fixed – Buy SDN Strategy Beginning to Emerge with R&D Synergies." Wunderlich reported:

> After 6+ months of discovering integration challenges and disappointment, we believe Extreme (EXTR) is beginning to execute….We believe the sales force disruption that was the primary factor in disappointing results **[is] on the mend**….
>
> **Discovery phase complete, now things are getting fixed.** We expect improving outlook for sales force productivity. Our understanding is that since the CEO took over sales force management in early May, conflicts that handicapped the Extreme side of the U.S. sales force and distribution network have been identified, have progressed toward resolution, and that cross-selling product lines of the constituent operations has begun to occur.
>
> …
>
> **Transitioning from discovery to resolution**. The first six months of the November 1 acquisition, Enterasys included a significant amount of discovery, as with any purchase, but when it involves an operation of comparable size to the acquirer, the magnitude of the discoveries can be disruptive, as has been the case for Extreme. **We believe the discovery phase for resolving operational integration and synergies is now largely behind the company with the key milestone of resolving conflict between Enterasys and Extreme sales and channel practices having been solved in recent weeks.** In addition to improved execution, we expect the basis for future guidance to be much firmer.
>
> …

Up to now, synergies have been theoretical based on 70%+ functional overlap between product likes of the two constituent companies. **Now we are beginning to see signs of implementation goals. Management continues to assert the goal of achieving $30 million to $40 million in cost reductions from synergies with the November Enterasys acquisition, but these are across the company.**

…

We expect tangible signs of execution to yield multiple expansion, especially once the market gains conviction that the likelihood of negative surprises is diminished.

### 5.     July 21, 2014 – Press Release

#### (a)     Berger's Misstatement and Omissions

227.     On July 21, 2014, Extreme issued a press release and announced higher guidance for 4Q 2014, just two weeks before its official 4Q 2014 financial results would be released. In the press release, Extreme reported that it expected non-GAAP revenues in the range of $154 to $156 million, as compared to its prior guidance of $145 to $150 million. Berger reiterated that "*[o]ur integration remains ahead of plan* as we continue to execute against key Company operational and financial milestones, including successfully completing our ERP integration in early July, two months ahead of schedule."

#### (i)     Falsity

228.     Berger's statement in the preceding paragraph that "*[o]ur integration remains ahead of plan*" was false and misleading because it specifically represented the existence of an integration plan against which progress could be objectively measured, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that

1   the Enterasys acquisition lacked such "integration planning," including a "very clean and clear

2   product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.);

3   (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-

4   market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40

5   million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during

6   the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

7   by the acquisition were not eliminated during the Class Period, and thereby showing that such

8   cost-saving synergies were not achieved during the Class Period.

9       229.    Berger's statement was false and misleading in omitting this lack of an integration

10   plan and the other material, adverse facts regarding integration problems as discussed in the

11   preceding paragraph, because it created a strong impression of a state of affairs (a carefully

12   planned integration that was positively proceeding "ahead of" such a "plan") that differed in a

13   material way from the one that actually existed.

14                **(ii)**    **Scienter**

15       230.    Berger knew, or was deliberately reckless in not knowing, that this statement was

16   false and misleading because, according to CW3, he knew of the lack of an integration plan at

17   this time based on his participation in quarterly sales calls after the acquisition where sales

18   personnel questioned him about such a plan, thus showing that the Company did not have a plan

19   at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration

20   plan, including the product roadmap for the combined Company, was still "TBD" as late as

21   July/August of 2014, at the annual global sales conference in Las Vegas, which took place

22   around this time. *See* ¶104, *supra*. Further, Berger knew about the lack of an integration plan to

23   merge the salesforces and the resulting, ongoing salesforce integration problems at this time

24   based on his then-recent conversation with CW1 in April 2014, wherein they discussed such

25   issues, including the replacement or reassignment of legacy Extreme personnel based on legacy

26   Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied

27   to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, &

28   125, *supra*. Berger also knew about the lack of an integration plan and related integration

problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger was then serving as the **acting head of Sales** following Crowell's departure in May 2014, directly overseeing the salesforce and related integration efforts, and thus had direct access to the lack of an integration plan and the related, persisting salesforce integration problems. *See* ¶¶ 135-138, 141, 405-409.

231.    Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days. *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options. Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (b)    Market Reactions to the Misstatements and Omissions

232.    The market reacted favorably to Berger's false reassurance that the integration was "ahead of plan." On July 21, 2014, after the press release was issued, Extreme's stock increased by 15% and closed at $5.06 per share on 9.9 million shares, up from a close of $4.37 per share on over 980,000 shares traded on the previous trading day.

233.    This July 21, 2014 press release also reassured analysts that although Extreme hit integration setbacks in Q3 2014, repairing these problems now proceeded "ahead of plan." For example, on July 22, 2014, Craig-Hallum issued an analyst report, which maintained its positive "Buy" rating and raised its price target, echoing Berger's reassuring statements: "We are also **encouraged that the company's integration efforts are ahead of plan**. . . ."

234.    Likewise, Wunderlich Securities published an analyst report the same day stating that the Company's earnings exceeded guidance and its statements concerning Enterasys integration helped to reassure investors. The report also implied that the departures of Crowell and Kurtzweil were involuntary and related to problems with the Enterasys integration efforts:

> The worry about the June quarter was **dysfunction** within the North American sales force, which **cost some management jobs**; **repair is now confirmed to be**

**well underway with better than previously expected volume**. With expectations for the company to field full strength for more than a few weeks in the current quarter, we expect guidance to support our unchanged F1Q15 forecast.

### 6.   August 14, 2014 – Q4 2014 Press Release and Earnings Call

#### (a)   Berger's Salesforce Integration "Complete" Misstatement and Omissions in the August 14, 2014 Press Release

235.   On August 14, 2014, Extreme issued a press release and announced revenues of $156.87 million for Q4 2014 and expected revenue in the range of $150 to $155 million for Q1 2015.  In the press release, Berger touted that the integration of the two companies' salesforces was now "complete":  "***Our sales force integration is complete***, with all territories rationalized, and the team is aligned and executing, which is evident in this quarter's results.…"

#### (i)   Falsity

236.   Berger's statement that the salesforce integration was "complete" as of August 14, 2014 was false and misleading because: (1) Berger admitted just two months later, on October 15, 2014, the salesforce integration was only "**nearly** completed," and thus still not complete at that time, and therefore could not have been complete on August 14, 2014; (2) Berger later admitted that the salesforce integration was **still** not complete as of January 28, 2015, and thus could not have been complete on August 14, 2014; (3) CWs described persisting salesforce integration issues (including employee redundancies and overlap on client accounts as well as the *ad hoc* assignment of legacy employees from one company to the products and clients of the other, which they did not understand) throughout the Class Period, including **after** August 14, 2014, thus showing that the salesforce integration was still not complete at this time; (4) Extreme hired Jeff White as CRO to head the salesforce, including to manage the continuing salesforce integration efforts, on October 1, 2014, further showing that the integration could not have been completed in August; (5) CW3 confirmed that Berger and the Board internally touted White's hiring in October 2014 as intended to fix the salesforce integration problems that still existed as of that time, further evidencing that the salesforce integration was not complete earlier in August (*see* ¶¶ 112, 141, 144, *supra*); and (6) CW3 further stated the salesforce integration still was not complete even as late as 2015, including based on White's global salesforce call in early 2015

1    wherein he described severe salesforce integration problems that still existed as of that time and

2    which, according to CW3, continued until the end of the Class Period on April 9, 2015, when

3    White abruptly departed after failing to address the integration problems (*see* ¶ 144, *supra*).

4         237.    Berger's statement was false and misleading in omitting the preceding material,

5    adverse facts regarding the persisting salesforce integration problems and the lack of integration

6    plan, including specifically a plan to merge the two salesforces, because it created a strong

7    impression of a state of affairs (a carefully planned integration that was now successfully

8    completed) that differed in a material way from the one that actually existed.

9                              **(ii)    Scienter**

10        238.    Berger knew, or was deliberately reckless in not knowing, that this statement was

11   false and misleading because Berger knew about the lack of an integration plan to merge the

12   salesforces and the resulting, ongoing salesforce integration problems at this time, which

13   prevented the salesforce integration from being complete, based on his conversation with CW1

14   in April 2014, wherein they discussed such issues, including the replacement or reassignment of

15   legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.*,

16   subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than

17   according to a systematic plan.  *See* ¶¶ 109, 122, & 125, *supra*.  Further, according to CW3,

18   Berger knew that the salesforce was still not completely integrated only two weeks before this

19   statement, at Extreme's 2014 global sales conference in Las Vegas that Berger led, because sales

20   personnel there questioned Berger about the lack of a plan to integrate the two companies.  *See*

21   ¶¶ 104 & 110, *supra*.  Moreover, Berger acknowledged at this Las Vegas meeting that the

22   salesforce integration was still not complete, that it still needed a plan, and that the plan was still

23   "TBD."  *See* ¶ 104, *supra*.  Berger also knew about the lack of an integration plan and related

24   integration problems due to his role as CEO overseeing a merger of equals, which was a core

25   transaction for the Company.  *See* Section VII.B., *infra*. Further, Berger was then serving as the

26   **acting head of Sales** following Crowell's departure in May 2014, directly overseeing the

27   salesforce and related integration efforts, and thus had direct access to the lack of an integration

28   plan and the related, persisting salesforce integration problems that prevented it from being

complete.  *See* ¶¶ 135-138, 141, 405-409.  Indeed, Berger admitted at the time of his statements on this August 14, 2014 call that he had been closely involved in the salesforce integration since May 2014.  *See* ¶ 407, *infra*.

239.    Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (b)    Berger's Integration "Plan" Misstatement and Omissions on the August 14, 2014 Earnings Call

240.    On the same day, Extreme hosted an earnings call with analysts to discuss its results for Q4 2014.  Berger and Arola participated in this call with the analysts.  During the earnings call, Berger again highlighted the successful integration progress to date:  "***Overall, we are exactly where we planned to be in integration process and the realization of the related financial synergies***.…"

### (i)    Falsity

241.    Berger's statement in the preceding paragraph that Extreme was "***exactly where we planned to be in integration process and the realization of the related financial synergies***" was false and misleading because it specifically represented the existence of an integration plan against which progress could be objectively measured, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration

1   problems from the beginning, including lost clients and client dissatisfaction with a salesforce

2   that only understood half of the Company's legacy products, and client dissatisfaction with the

3   lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class

4   Period (*see* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the

5   Enterasys acquisition lacked such "integration planning," including a "very clean and clear

6   product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.);

7   (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-

8   market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40

9   million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during

10  the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

11  by the acquisition were not eliminated during the Class Period, and thereby showing that such

12  cost-saving synergies were not achieved during the Class Period.

13          242.    Berger's statement was false and misleading in omitting this lack of an integration

14  plan and the other material, adverse facts regarding integration problems as discussed in the

15  preceding paragraph, because it created a strong impression of a state of affairs (a carefully

16  planned integration that was positively proceeding according to such a "plan") that differed in a

17  material way from the one that actually existed.

18                          **(ii)    Scienter**

19          243.    Berger knew, or was deliberately reckless in not knowing, that this statement was

20  false and misleading because, according to CW3, he knew of the lack of an integration plan at

21  this time based on his participation in quarterly sales calls after the acquisition where sales

22  personnel questioned him about such a plan, thus showing that the Company did not have a plan

23  at that time. *See* ¶¶103-105, *supra*.  Indeed, Berger was telling the salesforce that the integration

24  plan, including the product roadmap for the combined Company and the plan to achieve

25  integration synergies, was still "TBD" just two weeks earlier, at the annual global sales

26  conference in Las Vegas. *See* ¶104, *supra*.  Further, Berger knew about the lack of an

27  integration plan to merge the salesforces and the resulting, ongoing salesforce integration

28  problems at this time based on his conversation with CW1 in April 2014, wherein they discussed

such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.*, subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Berger also knew about the lack of an integration plan and related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger was then serving as the **acting head of Sales** following Crowell's departure in May 2014, directly overseeing the salesforce and related integration efforts, and thus had direct access to the lack of an integration plan and the related, persisting salesforce integration problems. *See* ¶¶ 135-138, 141, 405-409. Indeed, Berger admitted at the time of his statements on this August 14, 2014 call that he had been closely involved in the salesforce integration since May 2014. *See* ¶ 407, *infra*.

244.    Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days. *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options. Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (c)    Berger's Synergies "On Track" Misstatement and Omissions on the August 14, 2014 Earnings Call

245.    During the call, Berger also assured: "We completed major elements of the integration of Enterasys and *are on track to realize the synergies we have committed to*."

### (i)    Falsity

246.    Berger's statement in the preceding paragraph that Extreme was "*on track*" to deliver the "*committed*" integration synergies was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated

and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (*see* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (*see* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created by the acquisition were not eliminated during the Class Period, and thereby showing that such cost-saving synergies were not achieved during the Class Period.

247.    Berger's statement was false and misleading in omitting this lack of an integration plan and the other material, adverse facts regarding integration problems as discussed in the preceding paragraph, because it created a strong impression of a state of affairs (a carefully planned integration that was positively proceeding "on track" with such a plan and was reasonably likely to generate the $30-40 million in synergies) that differed in a material way from the one that actually existed.

### (ii)    Scienter

248.    Berger knew, or was deliberately reckless in not knowing, that this statement was false and misleading because, according to CW3, he knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales

1  personnel questioned him about such a plan, thus showing that the Company did not have a plan

2  at that time.  *See* ¶¶103-105, *supra*.  Indeed, Berger was telling the salesforce that the integration

3  plan, including the product roadmap for the combined Company and the plan to achieve

4  integration synergies, was still "TBD" just two weeks earlier, at the annual global sales

5  conference in Las Vegas.  *See* ¶104, *supra*.  Further, Berger knew about the lack of an

6  integration plan to merge the salesforces and the resulting, ongoing salesforce integration

7  problems at this time based on his conversation with CW1 in April 2014, wherein they discussed

8  such issues, including the replacement or reassignment of legacy Extreme personnel based on

9  legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were

10  not tied to any past performance metrics—rather than according to a systematic plan.  *See* ¶¶

11  109, 122, & 125, *supra*.  Berger also knew about the lack of an integration plan and related

12  integration problems due to his role as CEO overseeing a merger of equals, which was a core

13  transaction for the Company.  *See* Section VII.B., *infra*.  Further, Berger was then serving as the

14  **acting head of Sales** following Crowell's departure in May 2014, directly overseeing the

15  salesforce and related integration efforts, and thus had direct access to the lack of an integration

16  plan and the related, persisting salesforce integration problems.  *See* ¶¶ 135-138, 141, 405-409.

17  Indeed, Berger admitted at the time of his statements on this August 14, 2014 call that he had

18  been closely involved in the salesforce integration since May 2014.  *See* ¶ 407, *infra*.

19       249.    Moreover, as noted above, Berger's compensation agreement contained a highly

20  unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

21  Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See*

22  Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of

23  Extreme's stock, including by making false and misleading statements about the success of the

24  acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential

25  profit during the Class Period on those shares (based on the Class Period high of $8.14 per share)

26  was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

27

28

1

2

                **(d)**     **Arola's Synergies "On Track" Misstatement and Omissions on the August 14, 2014 Earnings Call**

3

      250.    During the earnings call, Arola also made statements that Extreme was still "***on track***" to deliver the integration synergies of $30 to $40 million:

4

5

> In Q4, we realized our target $5 million to $6 million in savings relating to cost reduction efforts in both cost of goods sold and operating expenses…. ***[W]e remain on track to deliver the synergies of $30 million to $40 million annually***…

6

7

                           **(i)**     **Falsity**

8

      251.    Arola's statement in the preceding paragraph that Extreme "***remain[ed] on track to deliver the synergies of $40 to 40 million***" was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    by the acquisition were not eliminated during the Class Period, and thereby showing that such

2    cost-saving synergies were not achieved during the Class Period.

3        252.   Arola's statement was false and misleading in omitting this lack of an integration

4    plan and the other material, adverse facts regarding integration problems as discussed in the

5    preceding paragraph, because it created a strong impression of a state of affairs (a carefully

6    planned integration that was positively proceeding "on track" with such a plan and was

7    reasonably likely to generate the $30-40 million in synergies) that differed in a material way

8    from the one that actually existed.

9                   **(ii)    Scienter**

10       253.   As CFO, Arola knew, or was deliberately reckless in not knowing, that his

11   statement was false and misleading because he knew, based on his position as well as attendance

12   at quarterly sales meetings and the 2014 annual global sales conference in Las Vegas just two

13   weeks earlier, where such matters were openly discussed, that Extreme had no integration plan,

14   including a plan for how the Company would achieve $30 million to $40 million in synergies,

15   which undermined his statements.  *See* Sections V.G. & V.I., *supra*.  Moreover, Arola observed

16   Berger acknowledge at this Las Vegas meeting that the salesforce integration was still not

17   complete, that it still needed a plan, including a plan to achieve integration synergies, and that

18   the plan was still "TBD."  *Id.*  Arola also knew about the lack of an integration plan and related

19   integration problems due to his role as CFO overseeing a merger of equals, which was a core

20   transaction for the Company.  *See* Section VII.B., *infra*.

21           **(e)    Arola's "Fully Integrated" Misstatement and Omissions on the**
                  **August 14, 2014 Earnings Call**

22

23       254.   On the same call, Arola also stated that that the companies were "***now fully***

24   ***integrated***," including specifically with regard to the salesforces and the product portfolio:

25       While we remain on track to deliver the synergies of $30 million to $40 million
    annually we will not be breaking these out going forward, due principally to ***the***

26   ***fact that the two companies are now fully integrated,*** and going forward, the
    efforts to separate normal ongoing cost-cutting activities from execution of

27       synergies will be difficult.
    …

28

Also, ***with integrated product portfolio,*** consolidated supply chain operations, ***and fully integrated sales and marketing teams***, we expect to being seeing operational efficiencies as we move through the fiscal year.

### (i)   Falsity

255.   Arola's statement that "***the two companies were now fully integrated,***" including specifically the salesforces and the product portfolios, as of August 14, 2014 was false and misleading because: (1) Berger admitted just two months later, on October 15, 2014, the salesforce integration was only "**nearly** completed," and thus still not complete at that time, and therefore could not have been complete on August 14, 2014; (2) Berger later admitted that the salesforce integration was **still** not complete as of January 28, 2015, and thus could not have been complete on August 14, 2014; (3) CWs described persisting salesforce integration issues (including employee redundancies and overlap on client accounts as well as  the *ad hoc* assignment of legacy employees from one company to the products and clients of the other, which they did not understand) throughout the Class Period, including **after** August 14, 2014, thus showing that the salesforce integration was still not complete at this time; (4) Extreme hired Jeff White as CRO to head the salesforce, including to manage the continuing salesforce integration efforts, on October 1, 2014, further showing that the integration could not have been completed in August; (5) CW3 confirmed that Berger and the Board internally touted White's hiring in October 2014 as intended to fix the salesforce integration problems that still existed as of that time, further evidencing that the salesforce integration was not complete earlier in August (*see* ¶¶ 112, 141, 144, *supra*); (6) CW3 further stated the salesforce integration still was not complete even as late as 2015, including based on White's global salesforce call in early 2015 wherein he described severe salesforce integration problems that still existed as of that time and which, according to CW3, continued until the end of the Class Period on April 9, 2015, when White abruptly departed after failing to address the problems (*see* ¶ 144, *supra*); (7) the two companies' "product portfolio[s]" were not "fully integrated" at this time because, based on the accounts of CWs 1, 2, 3, and 5, Extreme lacked an integration plan, including specifically a product roadmap for how the Company would combine the two companies' products, throughout

1   the Class Period, including, according to CW3 as recently as the global sales conference in Las

2   Vegas, which was just two weeks before this statement (*see* Section V.G., *supra*); and (8)

3   Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such

4   "integration planning," including a "very clean and clear product and technology roadmap,"

5   resulting in "a lot of integration issues" (*see* Section V.I.4.);

6        256.   Arola's statement was false and misleading in omitting the preceding material,

7   adverse facts regarding the persisting salesforce integration problems and the lack of integration

8   plan, including specifically a plan to merge the two salesforces and the product roadmap for

9   combining the two companies' products, because it created a strong impression of a state of

10  affairs (a carefully planned integration that was now successfully completed) that differed in a

11  material way from the one that actually existed.

12                 **(ii)   Scienter**

13       257.   As CFO, Arola knew, or was deliberately reckless in not knowing, that his

14  statement was false and misleading because he knew, based on his position as well as attendance

15  at quarterly sales meetings and the 2014 annual global sales conference in Las Vegas just two

16  weeks earlier, where such matters were openly discussed, that Extreme had no integration plan,

17  including a plan to merge the two salesforces and the product roadmap for combining the two

18  companies' products, which undermined his statements.  *See* Sections V.G. & V.I., *supra*.

19  Moreover, Arola observed Berger acknowledge at this Las Vegas meeting that the salesforce

20  integration was still not complete, that it still needed a plan, including a plan to merge the

21  salesforces and a product roadmap for the combined Company, and that the plan was still

22  "TBD."  *Id.*  Arola also knew about the lack of an integration plan and related integration

23  problems due to his role as CFO overseeing a merger of equals, which was a core transaction for

24  the Company.  *See* Section VII.B., *infra*.

25

26

27

28

(f)     **Berger's "Behind Us" Misstatement and Omissions on the August 14, 2014 Earnings Call**

258.    Additionally, on this earnings call, Berger admitted that the integration of the salesforces within North America experienced some "challenges," but he reassured investors that they were fully resolved:

> [W]e are experiencing integration challenges in our North American sales and partner organization. *I am confident,* having spent a great deal of time with the North America Management team over the quarter, *that virtually all of these issues are behind us.* Additionally, two weeks ago, we held our global sales conference, bringing the entire sales team together for the first time ever. The incredible spirit and unity I saw over the entire event *are added signs that the integration issues are behind us*.

(i)     **Falsity**

259.    Berger's statements that the was "*confident*" that the salesforce "*integration issues are behind us*" as of August 14, 2014 was false and misleading because: (1) Berger admitted just two months later, on October 15, 2014, the salesforce integration was only "**nearly completed**," and thus still not complete at that time, and therefore could not have been complete on August 14, 2014; (2) Berger later admitted that the salesforce integration was **still** not complete as of January 28, 2015, and thus could not have been complete on August 14, 2014; (3) CWs described persisting salesforce integration issues (including employee redundancies and overlap on client accounts as well as  the *ad hoc* assignment of legacy employees from one company to the products and clients of the other, which they did not understand) throughout the Class Period, including **after** August 14, 2014, thus showing that the salesforce integration was still not complete at this time; (4) Extreme hired Jeff White as CRO to head the salesforce, including to manage the continuing salesforce integration efforts, on October 1, 2014, supporting that the integration could not have been completed in August; (5) CW3 confirmed that Berger and the Board internally touted White's hiring in October 2014 as intended to fix the salesforce integration problems that still existed as of that time, further evidencing that the salesforce integration was not complete earlier in August (*see* ¶¶ 112, 141, 144, *supra*); and (6) CW3 further stated the salesforce integration still was not complete even as late as 2015, including based on White's global salesforce call in early 2015 wherein he described severe salesforce

1    integration problems that still existed as of that time and which, according to CW3, continued

2    until the end of the Class Period on April 9, 2015, when White abruptly departed after failing to

3    address the problems (*see* ¶ 144, *supra*).

4         260.    Berger's statement was false and misleading in omitting the preceding material,

5    adverse facts regarding the persisting salesforce integration problems and the lack of an

6    integration plan, including specifically a plan to merge the two salesforces, because it created a

7    strong impression of a state of affairs (a carefully planned integration that was now successfully

8    completed, with any salesforce integration issues fully resolved) that differed in a material way

9    from the one that actually existed.

10                        **(ii)    Scienter**

11        261.    Berger knew, or was deliberately reckless in not knowing, that this statement was

12   false and misleading because Berger knew about the lack of an integration plan to merge the

13   salesforces and the resulting, ongoing salesforce integration problems at this time, which

14   prevented the salesforce integration from being complete, based on his conversation with CW1

15   in April 2014, wherein they discussed such issues, including the replacement or reassignment of

16   legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,*

17   subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than

18   according to a systematic plan.  *See* ¶¶ 109, 122, & 125, *supra*.  Further, according to CW3,

19   Berger knew that the salesforce was still not completely integrated only two weeks before this

20   statement, at Extreme's 2014 global sales conference in Las Vegas that Berger led, because sales

21   personnel there questioned Berger about the lack of a plan to integrate the two companies.  *See*

22   ¶¶ 104 & 110, *supra*.  Moreover, Berger acknowledged at this Las Vegas meeting that the

23   salesforce integration was still not complete, that it still needed a plan, and that the plan was still

24   "TBD." *See* ¶ 104, *supra*.  Berger also knew about the lack of an integration plan and related

25   integration problems due to his role as CEO overseeing a merger of equals, which was a core

26   transaction for the Company.  *See* Section VII.B., *infra*. Further, Berger was then serving as the

27   **acting head of Sales** following Crowell's departure in May 2014, directly overseeing the

28   salesforce and related integration efforts, and thus had direct access to the lack of an integration

1  plan and the related, persisting salesforce integration problems that prevented it from being

2  complete.  *See* ¶¶ 135-138, 141, 405-409.  Indeed, Berger admitted at the time of his statements

3  on this August 14, 2014 call that he had been closely involved in the salesforce integration since

4  May 2014.  *See* ¶ 407, *infra*.

5      262.    Moreover, as noted above, Berger's compensation agreement contained a highly

6  unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

7  Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See*

8  Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of

9  Extreme's stock, including by making false and misleading statements about the success of the

10  acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential

11  profit during the Class Period on those shares (based on the Class Period high of $8.14 per share)

12  was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

13          **(g)     Market Reactions to the Misstatements and Omissions**

14      263.    Analysts reacted positively to Defendants' continued reassuring statements that

15  the concerns with integrating the salesforce in North America were over and that the integration

16  was proceeding on track to deliver the promised financial benefits.  For instance, Wunderlich

17  Securities published an analyst report on August 15, 2014 entitled "Extreme Networks, Inc.

18  (EXTR: $5.35): Good Progress in F4Q14 **On Track** to Make Goals."  The report maintained its

19  positive "Buy" rating and updated its model, discussing the Enterasys integration efforts and

20  noting, *inter alia*, that "[m]anagement appears **on track** to achieve targets."

21      264.    Furthermore, on August 15, 2014, in a *SeekingAlpha.com* stock analysis article,

22  the author Martin Vlcek was reassured by Defendants that "**[t]he North American integration**

23  **issues seem to be over now**," due to Berger's direct involvement in overseeing the salesforce

24  integration efforts.  He wrote:

25      The Enterasys integration has "significantly exceeded expectations." It is ahead of
        track in some areas, such as the ERP IT systems integration. **The integration**
26      **challenges experienced earlier in the North American sales and partner**
        **organization seem to be successfully resolved now thanks to special attention**
27      **and focus of the company's CEO on this area.**

28      …

Overall, EXTR had a very strong quarter and finished a fiscal year of transformation. **Synergies from Enterasys acquisition should start flowing in.**

**7.     October 15, 2014 – Press Release – The Truth Continues to Partially Emerge but Defendants Continue to Mislead the Market**

**(a)     Partial Corrective Disclosure and/or Materialization of the Risk**

265.     On October 15, 2014, Extreme issued a press release preannouncing disappointing Q1 2015 financial results. Extreme reported revenues of $135 to $136.5 million for Q1 2015, significantly below the Company's prior guidance of $150 to $155 million. Whereas the Company had previously guided Non-GAAP Net Income per Diluted Share between $0.06 and $0.08, it was now reporting that its quarter would be at best break-even, at ($0.02) to $0.00. In the press release, Berger attributed the results to "significant delays in closing deals" in North America, where Extreme was having sales integration problems.  Importantly, however, this announcement came over 13 months after the acquisition was announced, making it the first earnings results announced during the original "12 to 24-month period" in which Defendants had specified they would deliver $30-$40 million in cost-saving synergies. *See* ¶¶ 52, 165.  This drastic earnings shortfall was a sign that Extreme's integration issues were not firmly behind it as Defendants had previously assured.  Moreover, on the earnings call that day, Berger admitted that the integration was **not fully completed** as Defendants had previously assured on August 14, 2014:  "The combination of strong sales leadership, **nearly completed integration** and the finalization of the Lenovo acquisition position us well for the remainder of our fiscal year."

266.     As a result of these partial corrective disclosures and materialization of concealed risk that integration failures would continue to negatively impact the Company's ability to meet its revenue guidance, by the end of the day on October 16, 2014, following the press release, Extreme's stock fell by approximately 18% on unusually heavy trading volume of 8.5 million shares traded, closing at $3.06 per share from $3.76 per share on the prior day.

**(b)     Berger's Misstatements and Omissions**

267.     In the press release, however, Berger minimized these purported issues and again falsely reassured the market that in this quarter Extreme was still "*on track*" with the Enterasys

integration synergies.  Berger also highlighted the hiring of Jeff White as CRO, responsible for the salesforce integration, as an important positive in resolving any lingering sales integration issues:

> At the same time we made dramatic progress towards finalizing the integration of the acquisition of Enterasys during the quarter, successfully converging on a single ERP system, closing the Illinois distribution center, converting our direct distribution model in Brazil, and executing a unified partner program and service offering. ***We are on track to realize the full $30-$40 million in cost synergies expected from the acquisition*** and were able to maintain strong gross margins in the first quarter, despite the top line miss. On October 1, we announced that Jeff White joined Extreme as chief revenue officer. Jeff brings with him 20 years of experience in the networking market, most recently at Cisco. . . .

### (i)   Falsity

268.    Berger's statement that Extreme was "***on track to realize the full $40-40 million in cost synergies expected from the acquisition***" was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40

1  million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during

2  the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created

3  by the acquisition were not eliminated during the Class Period, and thereby showing that such

4  cost-saving synergies were not achieved during the Class Period.

5         269.    Berger's statement was false and misleading in omitting this lack of an integration

6  plan and the other material, adverse facts regarding integration problems as discussed in the

7  preceding paragraph, because it created a strong impression of a state of affairs (a carefully

8  planned integration that was positively proceeding "on track" with such a plan and was

9  reasonably likely to generate the $30-40 million in synergies) that differed in a material way

10  from the one that actually existed.

11                   **(ii)**    **Scienter**

12         270.    Berger knew, or was deliberately reckless in not knowing, that this statement was

13  false and misleading because, according to CW3, he knew of the lack of an integration plan at

14  this time based on his participation in quarterly sales calls after the acquisition where sales

15  personnel questioned him about such a plan, thus showing that the Company did not have a plan

16  at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration

17  plan, including the product roadmap for the combined Company and the plan to achieve

18  integration synergies, was still "TBD" just two and a half months earlier, at the annual global

19  sales conference in Las Vegas. *See* ¶104, *supra*. Further, Berger knew about the lack of an

20  integration plan to merge the salesforces and the resulting, ongoing salesforce integration

21  problems at this time based on his conversation with CW1 in April 2014, wherein they discussed

22  such issues, including the replacement or reassignment of legacy Extreme personnel based on

23  legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were

24  not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶

25  109, 122, & 125, *supra*. Additionally, Berger knew such information specifically at this time

26  because CW3 spoke directly with Berger about the continuing salesforce integration problems

27  that resulted from the lack of an integration plan at approximately this time, in October and/or

28  November 2014. *See* ¶ 126, *supra*. Berger also knew about the lack of an integration plan and

related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger had been serving as the **acting head of Sales** from May 2014 and up until two weeks before this statement (October 1, 2014, when White was hired as CRO); therefore, Berger had been directly overseeing the salesforce and related integration efforts, and thus had direct access to the lack of an integration plan and the related, persisting salesforce integration problems. *See* ¶¶ 135-138, 141, 405-409. Indeed, Berger admitted on the August 14, 2014 call that he had been closely involved in the salesforce integration since May 2014. *See* ¶ 407, *infra*.

271.   Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days. *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options. Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (c)   Market Reactions to the Misstatements and Omissions

272.   Although analysts recognized the disappointing financial results as a potential sign of some integration issues, they nevertheless continued to be misled by Defendants' false reassurances that these issues were temporary or now resolved. For example, in an October 16, 2014 report, Wunderlich Securities stated, "[**m**]**anagement commentary** and channel checks during the quarter **mentioned integration issues as having an impact on revenue, including delayed start to the quarter with early July ERP integration**." Nevertheless, Wunderlich was comforted by Defendants' reassurances that any lingering issues were "temporary," maintaining its "Buy" rating:

> Yesterday after regular trading, Extreme Networks (EXTR) warned of F1Q15 shortfall. **With most of the challenges self-imposed for acquisition and distribution integration, we expected them to have been baked in to guidance**. However, it appears a tougher-than-expected economic environment and **perhaps trouble with sales waiting for a new manager to board were**

**more than management anticipated**. **We believe most of these issues are temporary**. . . .

As the report further explained:

> With a more challenging macroeconomic environment combining with integration and management transition, F1Q15 was the worst pro-forma comparison since the Enterasys acquisition. **However, the integration sales channel and management issues that handicapped the quarter are mostly behind the company and we expect to see better execution almost immediately** (assuming no further negative revelations from the earnings call week after next).

273.     Likewise, in a report issued on October 16, 2014, Craig-Hallum echoed Defendants' misleading assurances attributing the miss to one-time events such as deal slippage: "[w]e believe roughly half of the company's revenue miss was the result of deal delays in North America and that these deals are not lost but instead pushed out as companies have been digesting macroeconomic uncertainty."  This report further maintained its positive "buy" rating on Extreme based on Defendants misstatements regarding the successful progress of the integration:  "**management believes the company remains on track to realize $30-$40 million of synergies from the Enterasys acquisition** which we believe could begin to show up in reduced operating expenses in the next few quarters as the integration of the Enterasys acquisition is nearly finalized."

### 8.     October 28, 2014 – Press Release and Earnings Call

#### (a)     Berger's Misstatement and Omissions in the October 28, 2014 Press Release

274.     On October 28, 2014, Extreme issued a press release announcing its financial results of Q1 2015 and Q2 2015 guidance.  Extreme reported revenue of $137.1 million for Q1 2015, slightly above the Company's preannounced results, and guided revenue in the range of $140 to $150 million for 2Q 2015.  In the press release, Berger reassured investors that Extreme was still "**on track**" to attain its $30 to $40 million in cost-saving synergies from the Enterasys integration:

> During the quarter, we made significant progress towards finalizing the integration of the acquisition of Enterasys: successfully converging on a single ERP system, closing the Illinois distribution center, selectively reducing the number of distributors globally, converting our direct distribution model in Brazil to a leveraged two tier model, and executing a unified partner program and

service offering. Although these changes were well executed, they also had an impact on our revenues during the quarter as our partners and sales people had to learn a new way to do business with us. *We are on track to realize the full $30 to $40 million in cost synergies expected from the acquisition* and were able to maintain strong gross margins in the first quarter, despite the top line miss.

### (i)   Falsity

275.    Berger's statement that Extreme was "*on track to realize the full $30 to 40 million in cost synergies expected from the acquisition*" was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, and client dissatisfaction with the lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created by the acquisition were not eliminated during the Class Period, and thereby showing that such cost-saving synergies were not achieved during the Class Period.

276.    Berger's statement was false and misleading in omitting this lack of an integration plan and the other material, adverse facts regarding integration problems as discussed in the preceding paragraph, because it created a strong impression of a state of affairs (a carefully planned integration that was positively proceeding "on track" with such a plan and was reasonably likely to generate the $30-40 million in synergies) that differed in a material way from the one that actually existed.

**(ii)     Scienter**

277.    Berger knew, or was deliberately reckless in not knowing, that this statement was false and misleading because, according to CW3, he knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales personnel questioned him about such a plan, thus showing that the Company did not have a plan at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration plan, including the product roadmap for the combined Company and the plan to achieve integration synergies, was still "TBD" just three months earlier, at the annual global sales conference in Las Vegas. *See* ¶104, *supra*. Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time based on his conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Additionally, Berger knew such information specifically at this time because CW3 spoke directly with Berger about the continuing salesforce integration problems that resulted from the lack of an integration plan at approximately this time, in October and/or November 2014. *See* ¶ 126, *supra*. Berger also knew about the lack of an integration plan and related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger had been serving as the **acting head of Sales** from May 2014 and up until about a month before this statement (October 1, 2014, when White was hired as CRO); therefore, Berger had been directly

1   overseeing the salesforce and related integration efforts, and thus had direct access to the lack of

2   an integration plan and the related, persisting salesforce integration problems.  *See* ¶¶ 135-138,

3   141, 405-409.  Indeed, Berger admitted on the August 14, 2014 call that he had been closely

4   involved in the salesforce integration since May 2014.  *See* ¶ 407, *infra*.

5          278.    Moreover, as noted above, Berger's compensation agreement contained a highly

6   unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

7   Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See*

8   Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of

9   Extreme's stock, including by making false and misleading statements about the success of the

10  acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential

11  profit during the Class Period on those shares (based on the Class Period high of $8.14 per share)

12  was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

                        **(b)    Berger's "Disruptions Now Fully Behind Us" Misstatement on
                                the October 28, 2014 Earnings Call**

13

14

15         279.    Later that day, Extreme hosted an earnings call with analysts to discuss the

16  financial results of 1Q 2015.  Berger and Arola participated in the call, and Berger acknowledged

17  that the low revenue and top-line growth were caused by "significant" "disruptions" resulting

18  from the ongoing Enterasys integration efforts – disruptions which Defendants previously

19  assured investors would not happen (*see, e.g.*, ¶¶ 52, 170).   Specifically, Berger described how

20  "virtually every part of our business, and the interface between our partners, customers and

21  Extreme were disrupted in a significant way during the quarter, and contributed to the

22  disappointment on the top line."  However, Berger reassured investors on the conference call that

23  "[f]or the most part, ***these disruptions are now fully behind us***."

                                **(i)     Falsity**

24         280.    Berger's statement in the preceding paragraph that the integration-related

25  "***disruptions are now fully behind us***" was false and misleading because: (1) Berger later

26  admitted that the salesforce integration was **still** not complete and Extreme was **still** experiencing

27  salesforce integration problems as of January 28, 2015, and thus such integration-related

28

1    disruptions could not have been "fully" resolved at this time in October 2014; (2) CWs described

2    persisting salesforce integration issues (including employee redundancies and overlap on client

3    accounts as well as the *ad hoc* assignment of legacy employees from one company to the

4    products and clients of the other, which they did not understand) throughout the Class Period,

5    including **after** this date, thus showing that integration-related disruptions could not have been

6    "fully" resolved at this time; (3) Extreme hired Jeff White as CRO to head the salesforce,

7    including to manage the continuing salesforce integration efforts, just a few weeks earlier, on

8    October 1, 2014, supporting that the integration-related disruptions could not have been "fully"

9    resolved at this time; (4) CW3 confirmed that Berger and the Board internally touted White's

10   hiring in October 2014 as intended to fix the salesforce integration problems that still existed as

11   of that time, further evidencing that the integration-related disruptions could not have been

12   "fully" resolved at this time (*see* ¶¶ 112, 141, 144, *supra*); and (5) CW3 further stated the

13   salesforce integration still was not complete even as late as 2015, including based on White's

14   global salesforce call in early 2015 wherein he described severe salesforce integration problems

15   that still existed as of that time and which, according to CW3, continued until the end of the

16   Class Period on April 9, 2015, when White abruptly departed after failing to address the

17   problems (*see* ¶ 144, *supra*)—thus, further demonstrating that integration-related disruptions

18   could not have been "fully" resolved on October 28, 2014.

19       281.    Berger's statement was false and misleading in omitting the preceding material,

20   adverse facts regarding the persisting salesforce integration problems and the lack of an

21   integration plan, including specifically a plan to merge the two salesforces, because it created a

22   strong impression of a state of affairs (a carefully planned integration that was now successfully

23   completed, with any salesforce integration "disruptions" "fully" resolved) that differed in a

24   material way from the one that actually existed.

25                              **(ii)    Scienter**

26       282.    Berger knew, or was deliberately reckless in not knowing, that this statement was

27   false and misleading because Berger knew about the lack of an integration plan to merge the

28   salesforces and the resulting, ongoing salesforce integration problems, which showed that the

1  integration-related disruptions were not "fully" resolved, based on his conversation with CW1 in

2  April 2014, wherein they discussed such issues, including the replacement or reassignment of

3  legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,*

4  subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than

5  according to a systematic plan.  *See* ¶¶ 109, 122, & 125, *supra*.  Further, according to CW3,

6  Berger knew that the salesforce was still not completely integrated only three months before this

7  statement, at Extreme's 2014 global sales conference in Las Vegas that Berger led, because sales

8  personnel there questioned Berger about the lack of a plan to integrate the two companies.  *See*

9  ¶¶ 104 & 110, *supra*.  Moreover, Berger acknowledged at this Las Vegas meeting that the

10 salesforce integration was still not complete, that it still needed a plan, and that the plan was still

11 "TBD."  *See* ¶ 104, *supra*.  Additionally, Berger knew such information specifically at this time

12 because CW3 spoke directly with Berger about the continuing salesforce integration problems

13 that resulted from the lack of an integration plan at approximately this time, in October and/or

14 November 2014.  *See* ¶ 126, *supra*. Berger also knew about the lack of an integration plan and

15 related integration problems due to his role as CEO overseeing a merger of equals, which was a

16 core transaction for the Company.  *See* Section VII.B., *infra*. Further, Berger had been serving as

17 the **acting head of Sales** from May 2014 until about a month before this statement (October 1,

18 2014, when White was hired as CRO); therefore, Berger had been directly overseeing the

19 salesforce and related integration efforts, and thus had direct access to the lack of an integration

20 plan and the related, persisting salesforce integration problems.  *See* ¶¶ 135-138, 141, 405-409.

21 Indeed, Berger admitted on the August 14, 2014 call that he had been closely involved in the

22 salesforce integration since May 2014.  *See* ¶ 407, *infra*.

23        283.    Moreover, as noted above, Berger's compensation agreement contained a highly

24 unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

25 Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See*

26 Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of

27 Extreme's stock, including by making false and misleading statements about the success of the

28 acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential

profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

        **(c)**    **Arola's Synergies "On Track" Misstatement and Omissions on the October 28, 2014 Earnings Call**

284.    During the call, Berger touted the appointment of Jeff White, "a true sales leader," as CRO to lead the ongoing salesforce integration and achieve "better sales execution." Arola similarly discussed the hiring of "Jeff White, our new Chief Revenue Officer" as intended to improve the salesforce integration efforts and thus "reduc[e] our sales expenses as we go forward," and thus assured: "***We continue to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition.***"

        **(i)**    **Falsity**

285.    Arola's statement that Extreme "continue[d] to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition" was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (*see* Section V.G., supra); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (*see* Section V.G., supra); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "new operating

1    plan," including a "new go-to-market strategy" and a new cost-cutting measure of an 18%

2    workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that

3    there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that

4    the employee redundancies created by the acquisition were not eliminated during the Class

5    Period, and thereby showing that such cost-saving synergies were not achieved during the Class

6    Period.

7        286.    Arola's statement was false and misleading in omitting this lack of an integration

8    plan and the other material, adverse facts regarding integration problems as discussed in the

9    preceding paragraph, because it created a strong impression of a state of affairs (a carefully

10   planned integration that was positively proceeding "on track" with such a plan and was

11   reasonably likely to generate the $30-40 million in synergies) that differed in a material way

12   from the one that actually existed.

13                        **(ii)    Scienter**

14       287.    As CFO, Arola knew, or was deliberately reckless in not knowing, that his

15   statement was false and misleading because he knew, based on his position as well as attendance

16   at quarterly sales meetings and the 2014 annual global sales conference in Las Vegas three

17   months earlier, where such matters were openly discussed, that Extreme had no integration plan,

18   including a plan for how the Company would achieve $30 million to $40 million in synergies,

19   which undermined his statements.  *See* Sections V.G. & V.I., *supra*.  Moreover, Arola observed

20   Berger acknowledge at this Las Vegas meeting that the salesforce integration was still not

21   complete, that it still needed a plan, including a plan to achieve integration synergies, and that

22   the plan was still "TBD."  *Id.*  Arola also knew about the lack of an integration plan and related

23   integration problems due to his role as CFO overseeing a merger of equals, which was a core

24   transaction for the Company.  *See* Section VII.B., *infra*.

25                **(d)    Market Reactions to the Misstatements and Omissions**

26       288.    Investors reacted positively to these reassurances.  After the October 28, 2014

27   earnings call, Extreme's stock price increased approximately **10%** to a closing price of $3.63 per

28

1   share on October 29, 2014 from a closing price of $3.30 per share on October 28, 2014 on

2   unusually heavy trading volume of 3.9 million shares.

3          289.   Analysts also reacted favorably to Defendants' misstatements, evidencing that the

4   market continued to be misled, including by adopting Extreme's slippage explanation for its

5   continued failures.   For example, in a report issued on October 29, 2014, Wunderlich Securities

6   maintained its "Buy" rating and concluded that "we believe the company is now on much better

7   footing for growth," explaining: "Extreme Networks…integration ambitions were arguably a bit

8   more than could be managed while executing in the current industry environment, **but they**

9   **appear to have been accomplished and now the company is positioned** with channels,

10  executive staff and information systems **to grow**."

11         290.   Other analysts also highlighted Defendants' statements regarding the hiring of

12  Jeff White as CRO as an important positive step in rectifying any remaining sales integration

13  issues.  For example, an October 29, 2014 Buckingham Research Group report stated: "New

14  sales leadership brings long term positives . . . As we indicated in our note October 1st **when**

15  **Jeff White was announced, we think the new Chief Revenue Officer (aka head of sales) is**

16  **likely to bring about positive change to an organization in desperate need of sales**

17  **leadership**."

18                     **9.     December 17, 2014 – Bernstein Technology Innovation Summit**

19                          **(a)     Arola's Misstatements and Omissions**

20         291.   On December 17, 2014, Arola and Eric Broockman, Extreme's Chief

21  Technology Officer, attended the Bernstein Technology Innovation Summit, where Arola

22  discussed the successful completion of the Enterasys integration, particularly with respect to the

23  salesforce:

24

25         *From a sales perspective, more specifically, sales organizations have been*
           *integrated*. We've actually brought in new talent also to the organization. We

26         have a new VP of North America. We have a new worldwide VP or CRO [Jeff
           White] who came on board. Both of these individuals, longer-term Cisco

27         employees, very well respected in the industry, and really hit the ground running
           for us here.

28         …

*As far as sales organization, again, two teams have been integrated.* That was probably more of the difficult things to integrate for us, but *it's been done now*. And for the last several months, we are without a leader of sales for about four or five months there. But now with, again, Jeff White coming on board at the beginning of October, that's moving ahead nicely. *So integration of sales is completed*.

#### (i)   Falsity

292.   Arola's statements in the preceding paragraph that the "*sales organizations have been integrated*" and that the salesforce integration was "*completed*" as of December 17, 2014 were false and misleading because: (1) Berger later admitted that the salesforce integration was **still** not complete as of January 28, 2015, and thus could not have been complete on December 17, 2014; (2) CWs described persisting salesforce integration issues (including employee redundancies and overlap on client accounts as well as the *ad hoc* assignment of legacy employees from one company to the products and clients of the other, which they did not understand) throughout the Class Period, including **after** December 17, 2014, thus showing that the salesforce integration was still not complete at this time (*see* Sections V.G.2. & V.G.3., *supra*); and (3) CW3 stated the salesforce integration still was not complete even as late as 2015, including based on White's global salesforce call in early 2015 wherein he described severe salesforce integration problems that still existed as of that time and which, according to CW3, continued until the end of the Class Period on April 9, 2015, when White abruptly departed after failing to address the problems (*see* ¶¶ 141, 144, *supra*).

293.   Arola's statement was false and misleading in omitting the preceding material, adverse facts regarding the persisting salesforce integration problems and the lack of an integration plan, including specifically a plan to merge the two salesforces, because it created a strong impression of a state of affairs (a carefully planned integration that was now successfully completed) that differed in a material way from the one that actually existed.

#### (ii)   Scienter

294.   As CFO, Arola knew, or was deliberately reckless in not knowing, that his statement was false and misleading because he knew, based on his position as well as attendance at quarterly sales meetings and the 2014 annual global sales conference in Las Vegas in the

1   summer, where such matters were openly discussed, that Extreme had no integration plan,

2   including a plan to merge the two salesforces, which undermined his statements.  *See* Sections

3   V.G. & V.I., *supra*.  Moreover, Arola observed Berger acknowledge at this Las Vegas meeting

4   that the salesforce integration was still not complete, that it still needed a plan, including a plan

5   to merge the salesforces and a product roadmap for the combined Company, and that the plan

6   was still "TBD."  *Id.*  Arola also knew about the lack of an integration plan and related

7   integration problems due to his role as CFO overseeing a merger of equals, which was a core

8   transaction for the Company.  *See* Section VII.B., *infra*.

9            **10.     January 28, 2015 – Q2 2015 Earnings Call**

10                    **(a)     Berger's Misstatement and Omissions**

11          295.    On January 28, 2015, Extreme hosted an earnings call with analysts to discuss its

12   results for the Q2 2015 and its guidance for Q3 2015.  Berger and Arola participated in this call

13   with analysts.  Extreme announced that it generated revenue of $147.2 million for Q2 2015,

14   which was in line with original guidance, and expected revenue in the range of $129 to $139

15   million for Q3 2015, which was slightly lower than analysts' expectations.

16          296.    During the call, Berger discussed the purported strengthening of the salesforce,

17   under the new leadership of White, among other things, and, in response to an analyst's

18   question, he assured that the Company was still "***on track***" to deliver the promised integration

19   synergies:

20          [Analyst]: "All right. I think I did the math myself anyway. So this is a little bit
            tougher question, okay? What is our ultimate OpEx goal? The reason why I say
21          that is, before you bought Enterasys you were doing $299 million, and making
            $0.18 of your own. And now we've put the two companies together, and revenues
22          have gone down, and we're going to make less than that, this year. So obviously
            this has not gone well at all.
23

24          And so you guys were running at about a $73 million OpEx, give or take.
            Enterasys was running a little heavier. At one point -- and I know, Chuck, you
25          were put in a position to fail, or a position of extreme difficulty in this acquisition,
            since you were told shortly after you joined the Company that you had bought it
26          without having your own team together to take a look at what you had, let alone
            figure out what you had at Extreme. But now that you've been there a while, and
27          we've upgraded the salesforce, at what point in the future should we anticipate
            OpEx in line with realistic quarterly revenue expectations?
28

[Berger:] That's a broad question, so let me cover it, and get to the answer regarding OpEx. First of all, I absolutely do not believe the acquisition and subsequent integration of Enterasys has, to use your words, failed miserably. We've put two very different companies together, although they look a lot alike from the outside. Last year, we managed to finish the year with just over 2% revenue erosion, ***and we're right on track with where we expected to be from a synergy basis.***

### (i)    Falsity

297.    Berger's statement that Extreme was "***right on track***" to achieve the $30 million to $40 million of synergies from the Enterasys integration was false and misleading because it created the strong impression of the existence of an integration plan against which progress could be objectively measured, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, when in fact there was no such plan, as demonstrated by the following:  (1) the accounts of CWs 1, 2, 3, and 5 that Extreme lacked an integration plan, including a plan setting forth how the two salesforces would be integrated, a plan outlining other steps to cut costs and obtain integration synergies, a product roadmap for the combined Company, and a go-to-market strategy (s*ee* Section V.G., *supra*); (2) based on the accounts of CWs 1, 2, 3, 4, and 5, the lack of an integration plan led to substantial integration problems from the beginning, including lost clients and client dissatisfaction with a salesforce that only understood half of the Company's legacy products, client dissatisfaction with the  lack of a clear product roadmap, and a failure to correct personnel redundancies during the Class Period (s*ee* Section V.G., *supra*); (3) Meyercord admitted on September 14, 2016 that the Enterasys acquisition lacked such "integration planning," including a "very clean and clear product and technology roadmap," resulting in "a lot of integration issues" (*see* Section V.I.4.); (4) Meyercord announced on May 20-21, 2015 a "**new** operating plan," including a "**new** go-to-market strategy" and a **new** cost-cutting measure of an 18% workforce reduction to save $40 million, supporting the statements of CWs 1, 2, 3, and 5 that there was no such prior plan during the Class Period and the statements of CWs 1, 2, 3 and 4 that the employee redundancies created by the acquisition were not eliminated during the Class Period, and thereby showing that such cost-saving synergies were not achieved during the Class Period.

298.     Berger's statement was false and misleading in omitting this lack of an integration plan and the other material, adverse facts regarding integration problems as discussed in the preceding paragraph, because it created a strong impression of a state of affairs (a carefully planned integration that was positively proceeding "on track" with such a plan and was reasonably likely to generate the $30-40 million in synergies) that differed in a material way from the one that actually existed.

**(ii)     Scienter**

299.     Berger knew, or was deliberately reckless in not knowing, that this statement was false and misleading because, according to CW3, he knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales personnel questioned him about such a plan, thus showing that the Company did not have a plan at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration plan, including the product roadmap for the combined Company and the plan to achieve integration synergies, was still "TBD" just six months earlier, at the annual global sales conference in Las Vegas. *See* ¶ 104, *supra*. Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time based on his conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Additionally, Berger knew such information specifically at this time because CW3 spoke directly with Berger about the continuing salesforce integration problems that resulted from the lack of an integration plan just two-three months earlier, in October and/or November 2014. *See* ¶ 126, *supra*. Berger also knew about the lack of an integration plan and related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger had served as the **acting head of Sales** from May to October 2014 (before White was hired as CRO); therefore, Berger had been directly overseeing the salesforce and related integration efforts, and thus had

direct access to the lack of an integration plan and the related, persisting salesforce integration problems.  *See* ¶¶ 135-138, 141, 405-409.  Indeed, Berger admitted on the August 14, 2014 call that he had been closely involved in the salesforce integration since May 2014.  *See* ¶ 407, *infra*.

300.    Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  *See* Section VII.A., *infra*. Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the acquisition, in order to maintain or increase the value of his 900,000 options.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000. *Id.*

### (b)    Market Reactions to the Misstatements and Omissions

301.    The market reacted favorably to Defendants' assurances that the Company was on track to deliver the promised $30-40 million of integration synergies and year-end guidance. Accordingly, after the January 28, 2015 earnings call, the Company's stock price increased by 9%, closing at $3.04 per share on January 29, 2015 from a close of $2.78 per share the day before.

302.    Analysts were also encouraged by Defendants' reassuring statements. For example, on January 29, 2015, Wunderlich Securities published an analyst report stating,

> It appears the company may have been too hasty to integrate the two sales forces, but there were so many disparate operating policies between the two companies that there was not a lot of choice, especially since integrating ERP systems was a major operating expense initiative. Efforts are underway to achieve long-term customer service, inside sales and territory solutions, among other issues. At a minimum, **we believe that with a quarter of tenure now completed, the new head of sales can at least forecast better**.

### 11.    April 9, 2015 – The Truth Was Fully Revealed

303.    On April 9, 2015, after the close of trading, the Company preannounced that it would miss its previously issued earnings estimates for the third quarter of fiscal 2015.  The press release stated that Extreme expected non-GAAP revenue in the range of $118 to $120

1    million, compared to the previous estimates of $130 to $140 million, falling far below guidance

2    and investor expectations.  It also announced that Jeff White was "no longer with the Company."

3          304.    Extreme's stock collapsed as a result of these disclosures. Shares lost

4    approximately 25% of their value, falling from a close of $3.24 per share on April 9, 2015 to

5    $2.50 per share on April 10, 2015, on 10.1 million shares traded.

6          305.    The market was surprised, as shown by the analyst reports issued on April 10,

7    2015.  Analysts drew a direct connection between the missed earnings estimates, White's

8    departure, integration problems, and the Company's overall financial health.  For example, on

9    April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from

10   "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to

11   $2.80/share.  The analyst report clarified that Extreme's announcements the previous day were

12   the cause of its downgrade, highlighting White's departure as a sign of persisting salesforce

13   integration problems:

14         Yesterday after regular trading, Extreme (EXTR) continued the pattern of missing
           expectations in alternating quarters with a F3Q15 warnings of magnitude
15         comparable to that of F1Q15, except that estimates have come down since
           then….Chief revenue officer [White] had a 6-month stint. Along with the
16         warning, management announced the departure last Monday of the sales leader
           who started in early October. Our understanding is that other recent sales
17         department hires will stay on and that the CEO will run the department again until
           a replacement executive is found.
18

19   Together, these disclosures caused the analyst report to dramatically revise its valuation of the

20   company downward, which it stated would last "until there are signs that the company can find

21   the recipe for execution."

22         306.    Similarly, a Buckingham Research Group analyst report on the same day

23   announced that it was lowering its share price target from $3.50 to $3.00 "on [the] negative

24   preannouncement."  Specifically, the report noted that "Mr. White had only been on board since

25   October 1, 2014, and **we see the surprise announcement as an indicator of greater challenges**

26   **at the company**."  The report further explained the negative implications of this news:

27         [T]he appointment of Mr. White, given his years of experience at companies such
           as [Cisco] . . . was supposed to be an answer to the challenges. In fact
28         management had even indicated that sales changes would drive some of the

potential revenue improvement over the next several quarters. There are few details explaining why there is a vacancy once again in the sales leadership position, but **the bottom line is that a significant sales rebound is unlikely to occur until there is stability in the role**, in our view.

The report analyzed "[r]easons for the miss" and concluded "we believe . . . internal challenges likely had a role."  The analyst lowered its estimates because, per the report's title: "Another Miss and Sales Leadership Departure **Signal Ongoing Challenges**."

### B.      Misstatements and Omissions Regarding the Lenovo Partnership

#### 1.      August 14, 2014 – Q4 2014 Earnings Call

##### (a)      Berger's Misstatement and Omissions

307.    On August 14, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q4 2014 and the Company's guidance for Q1 2015.  *See supra* ¶ 235. During the call, Berger touted Extreme's partnership with Lenovo and its substantial contribution to Extreme's revenues:

> We continue to make progress in expanding our relationships with key partners, particularly Lenovo. In the last quarter, I met with the Lenovo executive team in China and it is clear they are strongly committed to the alliance*. We've also trained all Lenovo North American reps on Extreme products.* We continue to believe that Lenovo will begin to generate significant revenues for us starting in our fourth quarter of 2015 and beyond.

##### (i)      Falsity

308.    Berger's statement in the preceding paragraph regarding Extreme's training of Lenovo sales representatives was false and misleading because Extreme did not train "*all Lenovo North American reps on Extreme products*," as demonstrated by the following:  (1) the account of CW4 that there was no activity at the "field" level towards the alliance (including any meetings between the Extreme and Lenovo salesforces), and thus no training of field-level sales representatives; (2) the account of CW7 that, from May 2013 until at least January 2015, Extreme had not put in place any means for the Lenovo sales people to benefit from Extreme's product line, and thus there was no incentive for Lenovo representatives to train on Extreme's products, nor any reason for them to sell Extreme's products even if they had; and (3) Meyercord admitted on May 6, 2015, that the Company did not actually know "whether or not we're

1  collaborating in the field" and had "zero visibility into Lenovo," creating the strong inference

2  (especially in combination with CW4's observations) that there was a similar lack of field

3  activity with and visibility into Lenovo throughout the Class Period, including when this

4  statement was made.

5      309.    Berger's statement was false and misleading because in omitting the lack of field-

6  level activity and visibility with Lenovo as well as the other material, adverse facts as discussed

7  in the preceding paragraph, it created a strong impression of a state of affairs (a productive

8  partnership that was reasonably likely to generate the promised revenue benefits) that differed in

9  a material way from the one that actually existed. *See* Sections V.H, V.I.1., & V.I.3.

10                              **(ii)    Scienter**

11      310.    Berger knew, or was deliberately reckless in not knowing, that his preceding

12  statement was false and misleading because of Meyercord's May 6, 2015 statement that Extreme

13  still had "zero visibility" into the Lenovo partnership's ability to drive Extreme's revenues.

14  Given that CWs reported a lack of field-level activity between Lenovo and Extreme sales

15  personnel during the Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero

16  visibility" into Lenovo shortly after the Class Period, there is a strong inference that there was a

17  similar lack of field activity with and visibility into Lenovo in August 2014.  Further, Berger had

18  direct access to such information because he was **acting head of Sales** at this time (as discussed

19  in ¶¶ 135-138, 141, 405-409, *supra*), and was leading quarterly sales calls and the global sales

20  conference in Las Vegas, which occurred just two weeks before this statement, where such lack

21  of Lenovo "field" level activity and resulting lack of revenues reasonably would have been

22  discussed.

23      311.    As noted above, Berger's compensation agreement contained a highly unusual

24  feature wherein he earned a total of 900,000 Extreme stock options when the price of the

25  Company stock increased to $6.00 per share and stayed above that price target for 30

26  days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock,

27  including by making false and misleading statements about the Lenovo partnership, in order to

28  maintain or increase the value of his 900,000 options. Berger's potential profit during the Class

1    Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4

2    million, or almost **nine times** his baseline annual salary of $500,000.

3                   **(b)      Market Reactions to the Misstatement and Omissions**

4        312.    The market reacted positively to these assurances regarding the Lenovo

5    partnership.  For instance, an August  15, 2014 Craig-Hallum analyst report continued to

6    maintain its positive "Buy" rating in part because "[m]anagement believes that **given the . . .**

7    **positive impact of its partnership with Lenovo,** the company can achieve double digit

8    year/year revenue growth and 10% operating margins in the June 2015 quarter."

9        313.    Similarly, Buckingham Research Group increased its price target for Extreme,

10   writing on August 15, 2014 that "**Lenovo remains primary partnership opportunity**."  The

11   report further stated that "we continue to think Lenovo remains the biggest potential catalyst for

12   the top line" in part because "[m]anagement indicated that . . . Lenovo remains committed to the

13   partnership."

14       314.    Likewise, on August 15, 2014, in a *SeekingAlpha.com* stock analysis article

15   authored by analyst Martin Vlcek observed: "The company confirmed its previous guidance,

16   with growth expected to be **driven by increased Lenovo Business**" and "expects a 10% non-

17   GAAP operating margin going forward."

18       315.    Further, on August 18, 2014, Wunderlich Securities issued an analyst report

19   stating, "[w]e believe **Extreme management is working closely with Lenovo** in order to

20   provide products that will complement what Lenovo is acquiring from IBM….**Implications**

21   **could be transformational**."

22               **2.      October 28, 2014 – Q1 2015 Earnings Call**

23               **(a)      Berger's Misstatement and Omissions About Field-Level**
                          **Activity with Lenovo**

24

25       316.    On October 15, 2014, Extreme issued a press release preannouncing its

26   disappointing Q1 2015 financial results.  *See supra* ¶ 265.  Berger again discussed the potential

27   added value of the Lenovo partnership: "Lenovo also closed the acquisition of the IBM X86

28

server business. The combination of strong sales leadership, nearly completed integration and the finalization of the Lenovo acquisition position us well for the remainder of our fiscal year."

317.    On October 28, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q1 2015 and the Company's guidance for Q2 2015.  *See supra* ¶ 279. During the call, Berger expounded on Extreme's partnership with Lenovo as a growth opportunity given Lenovo's acquisition of IBM's server business:

> [W]e have been working at this for well over a year now, we think that we are well-positioned as this integration evolves, you wouldn't think that some of these things would be hard, but Lenovo is a very big company, and getting all of our products, or at least our data center products on their price list, and getting part numbers and getting the ability for Lenovo sales reps to order them through the Lenovo order entry and delivery process has largely been completed globally. ***Getting internal sales reps that are Extreme employees sitting side-by-side with people in North America and China has been accomplished.*** Attendance and training at global sales conferences for Lenovo has happened. So there are a number of things that we've done, in addition as I mentioned there's been technology exchange discussions, and we've certainly worked to the extent we're able to a parallel path with some of the IBM assets as well. So everything, we didn't wait for the October 1 start gun to go and begin the race. This is really a race that we put a couple laps on the track over the last 14 or 15 months, but again I think I think there's a lap or two to go before we see meaningful volume.

### (i)    Falsity

318.    Berger's statement in the preceding paragraph was false and misleading as demonstrated by the following:  (1) the account of CW4 that there was no activity at the "field" level towards the alliance (including any "side-by-side" meetings between the Extreme and Lenovo salesforces); (2) the account of CW7 that, from May 2013 until at least January 2015, Extreme had not put in place any means for the Lenovo sales people to benefit from Extreme's product line, and thus there was no incentive for Lenovo representatives to meet with Extreme sales personnel and sell Extreme's products;  and (3) Meyercord admitted on May 6, 2015, that the Company did not actually know "whether or not we're collaborating in the field" and had "zero visibility into Lenovo," creating the strong inference (especially in combination with CW4's observations) that there was a similar lack of field activity with and visibility into Lenovo throughout the Class Period, including when this statement was made.

319.   Berger's statement was false and misleading because in omitting the lack of field-level activity and visibility with Lenovo as well as the other material, adverse facts as discussed in the preceding paragraph, it created a strong impression of a state of affairs (a productive partnership that was reasonably likely to generate the promised revenue benefits) that differed in a material way from the one that actually existed. *See* Sections V.H, V.I.1., & V.I.3.

**(ii)     Scienter**

320.   Berger knew, or was deliberately reckless in not knowing, that his preceding statement was false and misleading because of Meyercord's May 6, 2015 statement that Extreme still had "zero visibility" into the Lenovo partnership's ability to drive Extreme's revenues. Given that CWs reported a lack of field-level activity between Lenovo and Extreme sales personnel during the Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero visibility" into Lenovo shortly after the Class Period, there is a strong inference that there was a similar lack of field activity with and visibility into Lenovo in October 2014.  Further, Berger had direct access to such information because he was **acting head of Sales** until earlier the same month (as discussed in ¶¶ 135-138, 141, 405-409, *supra*), including by leading quarterly sales calls and the global sales conference in Las Vegas, which occurred just three months before this statement, where such lack of Lenovo "field" level activity and resulting lack of revenues reasonably would have been discussed.

321.   As noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the Lenovo partnership, in order to maintain or increase the value of his 900,000 options. Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000.

1

2

           **(b)**      **Berger's Misstatement and Omissions About Lenovo's "Certain[] . . . Revenue Impact"**

3

     322.     Berger also continued to assure investors that Extreme would see the benefits of

4

the Lenovo partnership in the near future and the substantial revenue obtained from the

5

partnership would set Extreme up to meet the Company's revenue growth commitments:

6

> [O]ur partnership with Lenovo took another step forward when they completed
> the acquisition of the IBM X86 server business on October 1. There is no longer
> any doubt that this will happen. We continue to make progress each day towards
> realizing the potential of this agreement, and reiterate that we expect significant
> results by the fourth quarter.

7

8

9

> . ….***And then Lenovo has certainly by then [June 2015] we believe will have
> double-digit revenue impact***….

10

11

             **(i)**      **Falsity**

12

     323.     Berger's statement above that "***certainly***" the Lenovo partnership would drive

13

"***double-digit revenue impact***" by June 2015 was false and misleading because of the following

14

adverse, material facts, which demonstrate that it lacked a reasonable basis when made:  (1) that

15

there was no activity at the "field" level towards the alliance (per the account of CW4), nor did

16

Lenovo sales people have any reason to sell Extreme's products (per the account of CW7), and

17

thus there was no way to generate increased sales revenues, much less 10% or more by

18

specifically June 2015;  (2) as Meyercord later admitted, *inter alia,* that Extreme had "**zero**

19

**visibility**" into Lenovo as a potential revenue source, and could provide "nothing tangible" about

20

when the partnership would contribute any revenue *(see* Sections V.I.1 & V.I.3.); and (3) not

21

only did Extreme not experience a double-digit revenue impact from Lenovo by June 2015, but

22

indeed Lenovo never became a 10% revenue contributor (*see* Section V.I.3.), such that one of

23

Meyercord's first acts as new CEO was to "take it off the table" as a potential revenue source

24

entirely due to the fact that it was contributing "nothing tangible" (*see* Section V.I.3.).

25

     324.     To the extent the statement conveyed Berger's opinion, it was misleading because

26

it lacked a reasonable basis and omitted Extreme's lack of field-level activity with Lenovo and

27

Extreme's "zero visibility" into the partnership's ability to drive Extreme's revenues (such that

28

Meyercord eventually had to "just take it off the table" as a revenue contributor only seven

1   months later, on May 21, 2015)—facts which would conflict with what a reasonable investor

2   would understand from the statement itself.

3                    **(ii)    Scienter**

4        325.    As CEO, Berger knew, or was deliberately reckless in not knowing, that his

5   preceding statement was false and misleading because of Meyercord's May 6, 2015 statement

6   that Extreme still had "zero visibility" into the Lenovo partnership's ability to drive Extreme's

7   revenues.  Given that CWs reported a lack of field-level activity between Lenovo and Extreme

8   sales personnel during the Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of

9   "zero visibility" into Lenovo shortly after the Class Period, there is a strong inference that there

10  was a similar lack of field activity with and visibility into Lenovo in October 2014.  Further,

11  Berger had direct access to such information because he was **acting head of Sales** until earlier

12  the same month (as discussed in ¶¶ 135-138, 141, 405-409, supra), including by leading

13  quarterly sales calls and the global sales conference in Las Vegas, which occurred just three

14  months before this statement, where such lack of Lenovo "field" level activity and resulting lack

15  of revenues reasonably would have been discussed.

16        326.    As noted above, Berger's compensation agreement contained a highly unusual

17  feature wherein he earned a total of 900,000 Extreme stock options when the price of the

18  Company stock increased to $6.00 per share and stayed above that price target for 30

19  days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock,

20  including by making false and misleading statements about the Lenovo partnership, in order to

21  maintain or increase the value of his 900,000 options. Berger's potential profit during the Class

22  Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4

23  million, or almost **nine times** his baseline annual salary of $500,000.

24                    **(c)    Market Reactions to the Misstatements and Omissions**

25        327.    Investors reacted positively to these statements.  After the October 28, 2014

26  earnings call, Extreme's stock price increased approximately **15%** to an opening price of $3.79

27  per share on October 29, 2014 from a closing price of $3.30 per share on October 28, 2014 on

28  unusually heavy trading volume of 3.9 million shares.

328.     Analysts also reacted positively to Defendant's false and misleading statements and omissions. An analyst from Craig-Hallum commented on October 29, 2014 that "management is confident the company can see return to strong year/year growth beginning in the June quarter as **Lenovo could drive double digit millions of quarterly revenue**." Buckingham Research Group also published an analyst report on October 29, 2014, similarly stating: "**We continue to think Lenovo remains the biggest potential catalyst for the top line**, and management has taken a decidedly optimistic tone regarding the partnership with the closing of the IBM…server business now complete. Against this backdrop, management expects a material revenue impact from Lenovo contribution in F2H15."

### 3.     January 28, 2015 – Q2 2015 Earnings Call

329.     On January 28, 2015, Extreme hosted an earnings call with analysts to discuss the financial results for Q2 2015 and guidance for Q3 2015.  *See supra* ¶ 295.  During the call, Berger again touted the strength of Extreme's partnership with Lenovo and explained that the delay in the realization of revenues from the Lenovo partnership was due to Lenovo's delay in the acquisition of IBM's server business:

> Our partnership with Lenovo strengthened during the quarter on many fronts. Most notably, we were selected as their networking partner for their high-performance computing solution that we jointly announced at the Supercomputing Conference in November. We have continued productive discussions at all levels with Lenovo, as our partnership with them continues to evolve.
> ...
> [W]e continue to make progress almost on a daily basis with Lenovo, across the board. The high-performance computing, we actually -- that was mostly won before even the acquisition closed, competing against the captive networking business inside of -- which is now inside of Lenovo. So we're seeing solid progress there. Now, all of our products are on their price list, including wireless.

#### (a)     Berger's Misstatement and Omissions

330.     In this context, an analyst then questioned Berger about whether there was any new information causing Extreme to state that the revenue from the Lenovo partnership will be delayed.  Berger responded my making the following false and misleading reassurances:

> [Analyst]: going back to this Lenovo issue that I think is the big instrumental here. So, all along, we've known that it's a big, complicated deal and a lot of moving parts and geographic challenges. So **I think what I'm struggling with today is, what's different, or what's changed**?

Part of what I'm wondering is, Extreme is a pretty small company, a small part of this. And is it simply that you're not tight enough in the discussions; it is sort of after the fact? Or did something actually change in terms of the [Lenovo-IBM] integration? Or are there challenges that weren't anticipated? That's what I'm really trying to focus on, is – what's different from what you knew a few months ago on this integration?

[Berger:] Well, on the positive side, *we are exactly where we thought we would be on things like* being on the price list, being in their literature, *having airtime with the legacy Lenovo salesforce.*

### (b)   Falsity

331.   Berger's statement in the preceding paragraph was false and misleading because Extreme was not "*exactly where we thought we would be on things like . . . having airtime with the legacy Lenovo* salesforce," as demonstrated by the following: (1) the account of CW4 that there was no activity at the "field" level towards the alliance (including any "airtime," *i.e.*, meetings, with Lenovo's salesforce); (2) the account of CW7 that, from May 2013 until at least January 2015, Extreme had not put in place any means for the Lenovo sales people to benefit from Extreme's product line, and thus there was no incentive for the Lenovo salesforce to meet with, or dedicate "airtime" to, Extreme's salesforce, nor any reason for them to sell Extreme's products; and (3) Meyercord admitted on May 6, 2015, that the Company did not actually know "whether or not we're collaborating in the field" and had "zero visibility into Lenovo," creating the strong inference (especially in combination with CW4's observations) that there was a similar lack of field activity with and visibility into Lenovo throughout the Class Period, including when this statement was made. In light of the foregoing omitted facts, it was materially false and misleading for Berger to represent that the Company was "exactly" where Defendants thought it would be, *i.e.*, on track with, the Lenovo partnership at this time.

332.   Berger's statement was false and misleading because in omitting the lack of field-level activity and visibility with Lenovo as well as the other material, adverse facts as discussed in the preceding paragraph, it created a strong impression of a state of affairs (a productive partnership that was reasonably likely to generate the promised revenue benefits)

1   that differed in a material way from the one that actually existed. *See* Sections V.H, V.I.1., &

2   V.I.3.

3             **(c)**     **Scienter**

4         333.     Berger knew, or was deliberately reckless in not knowing, that this statement was

5   false and misleading because of Meyercord's May 6, 2015 statement that Extreme still had "zero

6   visibility" into the Lenovo partnership's ability to drive Extreme's revenues.  Given that CWs

7   reported a lack of field-level activity between Lenovo and Extreme sales personnel during the

8   Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero visibility" into Lenovo

9   shortly after the Class Period, there is a strong inference that there was a similar lack of field

10   activity with and visibility into Lenovo in January 2015.  Further, Berger had direct access to

11   such information because he was **acting head of Sales** until only four months prior (as discussed

12   in ¶¶ 135-138, 141, 405-409, *supra*), including by leading quarterly sales calls and the global

13   sales conference in Las Vegas, which occurred just six months before this statement, where such

14   lack of Lenovo "field" level activity and resulting revenues reasonably would have been

15   discussed.

16         334.     As noted above, Berger's compensation agreement contained a highly unusual

17   feature wherein he earned a total of 900,000 Extreme stock options when the price of the

18   Company stock increased to $6.00 per share and stayed above that price target for 30

19   days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock,

20   including by making false and misleading statements about the Lenovo partnership, in order to

21   maintain or increase the value of his 900,000 options. Berger's potential profit during the Class

22   Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4

23   million, or almost **nine times** his baseline annual salary of $500,000.

24             **(d)**     **Market Reactions to the Misstatements and Omissions**

25         335.     The market reacted favorably to Defendants' assurances that although the

26   revenues from the Lenovo agreement would be delayed, Lenovo would still have a big impact

27   on Extreme's revenues when it comes to fruition. Accordingly, after the January 28, 2015

28

earnings call, the Company's stock price increased by 9%, closing at $3.04 per share on January 29, 2015 from a close of $2.78 per share the day before.

336.    Analysts also reacted favorably to Defendants' reassuring statements. For example, Buckingham Research Group published a report on January 29, 2015 that stated:

> Citing the complicated nature of the **Lenovo integration**, later than expected timing on E-rate contribution and the ongoing sales force realignment, management pushed out its target of 10% operating margin and 10% YOY growth exiting FY15 by 2-4 quarters. **We continue to believe that revenue catalysts have the potential to eventually contribute materially to the top line**, and we think street estimates and investors were already pricing in a reset of expectations with regards to timing.

### 4.    April 9, 2015 – The Truth Was Fully Revealed[10]

337.    As noted above, on April 9, 2015, after the close of trading, the Company preannounced that it would miss its previously issued guidance.

338.    Extreme's stock collapsed as a result of these disclosures. Shares lost approximately 25% of their value, falling from a close of $3.24 per share on April 9, 2015 to $2.50 per share on April 10, 2015, on 10.1 million shares traded before trading was halted.

339.    The market was surprised, as evidenced by the analyst reports issued on April 10, 2015.  Analysts drew a direct connection between the missed earnings guidance, White's departure, integration problems, **the unlikelihood of a meaningful revenue contribution from the Lenovo partnership**, and the Company's overall financial health.  For example, on April 10, 2015, Wunderlich Securities issued an analyst report downgrading its rating from "Buy" to "Hold" and reducing its target price **by more than half**, from $6.00/share to $2.80/share.  The analyst report clarified that Extreme's announcements the previous day were the cause of its downgrade, stating:

> Yesterday after regular trading, Extreme (EXTR) continued the pattern of missing expectations in alternating quarters with a F3Q15 warnings of magnitude comparable to that of F1Q15, except that estimates have come down since then….**The risk is that Lenovo**, like the IBM (IBM-NR) business it acquired, **simply goes with the path of lead customer resistance when it comes to data**

---

[10] As noted below, Defendants' statements on January 14, 2015 were also a partial corrective disclosure of the falsity of their statements regarding the Lenovo partnership.

**center networks and that prospects for data center networking success degrade to a quixotic fantasy for Extreme**.

340.    This revelation was confirmed by the revelations that took place on April 21, May 6, and May 21, 2015, after the end of the class period. *See* Sections V.G.3 & V.I., *supra*.

### C.    Misstatements and Omissions Regarding Defendants' "Commitment" to Achieve 10% Revenue Growth and 10% Operating Margin by June 2015

#### 1.    May 6, 2014 – Q1 2014 Earnings Call

##### (a)    Berger's Misstatements and Omissions

341.    On May 6, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q3 2014 and the Company's guidance for Q4 2014.  *See supra* ¶¶ 204-206. On the call, Berger reiterated that the completion of the Enterasys integration and the Lenovo partnership will be significant factors in the Company's "*commitment*" of achieving "double digit [*i.e.,* at least 10%] revenue growth" and 10% operating margin by the second half of 2015:

> ***I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015 as we complete the [Enterasys] integration, realize the benefits of our key partnerships like Lenovo*** and Ericsson, and align our efforts between the growth opportunities in the wireless and datacenter segments.
>
> ***Over the same period we are committed to achieve a 10% operating margin*** on a non-GAAP basis. My belief in our ability to achieve these goals has only strengthened since our last earnings call.
> …
>
> Our conviction over our goals for the second half and the impact that some of the growth engines like Lenovo, wireless, datacenter, and completion of the integration will bring to the Company has not weakened at all. In fact, if anything, it has strengthened and the fact that we are two months ahead on our ERP integration I take as a very positive sign for that and that even in the midst of this integration we were able to show revenue growth in this quarter so we will keep pushing ahead….

##### (i)    Falsity

342.    Berger's statements regarding Extreme's "***plan and commitment***" to achieve 10% revenue growth or 10% operating margin by June of 2015, based in substantial part on the successful integration of Enterasys (including attaining related synergies), and the Lenovo

partnership, were false and misleading because: (1) the integration was a failure, lacking an integration plan, including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, a product roadmap and a go-to-market strategy, which resulted in substantial integration problems and loss of revenue (*see* Sections V.G. & V.I., *supra*);  (2) Extreme had "zero visibility" into the Lenovo partnership's ability to drive Extreme's revenue and there was no "field" level activity towards that alliance, and thus no ability to generate sales and drive revenues based on Lenovo (*see* Sections V.H. & V.I., *supra*.); and (3) Extreme never achieved these commitments (*see* ¶¶ 83, 159.).  Thus, Berger's statements were false and misleading because they lacked a reasonable basis and omitted the material, adverse facts referenced above, which undermined this "commitment" and which would conflict with what a reasonable investor would understand from the statement itself.

### (ii)    Scienter

343.    Berger knew, or was deliberately reckless in not knowing, that these statements were false and misleading because at this time he knew of material, adverse facts regarding the Enterasys integration that undermined his "commitment" to achieving 10% revenues and 10% operating margin by June 2015.  Specifically, according to CW3, Berger knew of the lack of an integration plan at this time based on his participation in quarterly sales calls after the acquisition where sales personnel questioned him about such a plan, thus showing that the Company did not have a plan at that time.  *See* ¶¶103-105, *supra*.  Indeed, Berger was telling the salesforce that the integration plan, including notably the plan to achieve integration synergies, was still "TBD" as late as July/August of 2014, at the annual global sales conference in Las Vegas.  *See* ¶104, *supra*. Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time based on his then-recent conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan.  *See* ¶¶ 109, 122, & 125, *supra*.  Berger also knew about the lack of an integration plan and related integration problems due to his role as

1   CEO overseeing a merger of equals, which was a core transaction for the Company.  *See* Section

2   VII.B., *infra*.

3       344.   Berger also knew, or was deliberately reckless in not knowing, that these

4   statements were false and misleading because at this time he knew of material, adverse facts

5   regarding Extreme's Lenovo partnership that undermined his "commitment" to achieving 10%

6   revenues and 10% operating margin by June 2015.  Specifically, as CEO, Berger knew, or was

7   deliberately reckless in not knowing, that the Lenovo partnership could not contribute to

8   Extreme's revenues because of Meyercord's May 6, 2015 statement that Extreme still had "zero

9   visibility" into the Lenovo partnership's ability to drive Extreme's revenues.  Given that CWs

10  reported a lack of field-level activity between Lenovo and Extreme sales personnel during the

11  Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero visibility" into Lenovo

12  shortly after the Class Period, there is a strong inference that there was a similar lack of field

13  activity with and visibility into Lenovo in May 2014.

14      345.   Moreover, as noted above, Berger's compensation agreement contained a highly

15  unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the

16  Company stock increased to $6.00 per share and stayed above that price target for 30

17  days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock,

18  including by making false and misleading statements about the success of the Enterasys

19  acquisition and the Lenovo partnership, in order to maintain or increase the value of his 900,000

20  options.  Berger's potential profit during the Class Period on those shares (based on the Class

21  Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline

22  annual salary of $500,000.

23      **(b)   Market Reactions to the Misstatements and Omissions**

24      346.   The market reacted favorably to Berger's statements about his commitment to

25  achieve the 10% revenue growth and 10% operating margin, based in part on the Enterasys

26  integration and the positive impact the Lenovo partnership that were expected to have on the

27  Company's revenues in the near future.

28

347.   Analysts also took this "commitment" seriously.  For example, on May 7, 2014, Craig-Hallum issued an analyst report maintaining its positive "Buy" rating despite negative news from the Company the previous day, including high-level executive turnover and reported earnings at the low end of prior guidance.  The report justified its rating because "management believes it can achieve 10% operating margins exiting the year, up from 2.3% in the current quarter," noting "[w]e expect growth to be driven by key partnerships with Lenovo."  The report further noted that "[a]lthough Extreme Networks has experienced some hiccups integrating two equal sized companies, management remains confident in its ability to find $30-$40 million in synergies" on schedule, and therefore "we expect synergies to begin . . . during the September quarter."

348.   Likewise, a Wunderlich Securities analyst report from August 15, 2014 maintained its positive "Buy" rating and updated its model because "[m]anagement re-iterated the goal of 10%+ revenue growth and 10% + operating margins exiting F2015," further noting that "[m]anagement appears on track to achieve targets."

349.   Wunderlich Securities published an analyst report on August 15, 2014 entitled "Extreme Networks, Inc. (EXTR: $5.35): Good Progress in F4Q14 On Track to Make Goals." The report maintained its positive "Buy" rating and updated its model because "[m]anagement re-iterated the goal of 10%+ revenue growth and 10% + operating margins exiting F2015,"

350.   Similarly, a report from Craig-Hallum the same day continued to maintain its positive "Buy" rating in part because "[m]anagement believes that given the . . . positive impact of its partnership with Lenovo, the company can achieve double digit year/year revenue growth and 10% operating margins in the June 2015 quarter."

### 2.   October 28, 2014 – Q1 2015 Earnings Call

### (a)   Berger's Misstatement and Omissions

351.   On October 28, 2014, Extreme hosted an earnings call with analysts to discuss the financial results of Q1 2015 and the Company's guidance for Q2 2015.  *See supra* ¶ 279.  Berger again assured investors that Extreme was on track to realize its commitment of 10% year-over-

year growth and 10% operating margin based in part on the successful integration of Enterasys

and resultant "synergies," and also based in part on the Lenovo partnership:

> Strong sales leadership, new partner and service programs, advancing Lenovo
> relationships, return of E-Rate, and continued new product introductions, give us
> confidence in our ability to improve our top line performance going forward.
> Coupled with strong focus on realizing the promised synergies from the
> acquisition, and ongoing focus on cost reductions across the board, we expect to
> see substantially improved bottom line performance as well. ***We stand by our
> commitment for 10% year-over-year revenue growth by the fourth fiscal
> quarter, at a 10% operating margin or better***.

### (i)    Falsity

352.    Berger's statement above  that Defendants "***stand by [their] commitment***" to

achieve 10% revenue growth and 10% operating margin by June of 2015, based in substantial

part on the successful integration of Enterasys (including attaining related synergies), and the

Lenovo partnership, was false and misleading because: (1) the integration was a failure, lacking

an integration plan, including a plan setting forth how the two salesforces would be integrated

and other steps to cut costs and obtain synergies, a product roadmap and a go-to-market strategy,

which resulted in substantial integration problems and loss of revenue (*see* Sections V.G. & V.I.,

*supra*);  (2) Extreme had "zero visibility" into the Lenovo partnership's ability to drive

Extreme's revenue and there was no "field" level activity towards that alliance, and thus no

ability to generate sales and drive revenues based on Lenovo (*see* Sections V.H. & V.I., *supra*.);

and (3) Extreme never achieved these commitments (*see* ¶¶ 83, 159.).  Thus, Berger's statement

was false and misleading because it lacked a reasonable basis and omitted the material, adverse

facts referenced above which undermined this "commitment" and which would conflict with

what a reasonable investor would understand from the statement itself.

### (ii)    Scienter

353.    Berger knew, or was deliberately reckless in not knowing, that these statements

were false and misleading because at this time he knew of material, adverse facts regarding the

Enterasys integration that undermined his "commitment" to achieving 10% revenues and 10%

operating margin by June 2015.  Specifically, according to CW3, Berger knew of the lack of an

integration plan at this time based on his participation in quarterly sales calls after the acquisition

where sales personnel questioned him about such a plan, thus showing that the Company did not have a plan at that time. *See* ¶¶103-105, *supra*. Indeed, Berger was telling the salesforce that the integration plan, including notably the plan to achieve integration synergies, was still "TBD" just three months earlier—in July/August of 2014, at the annual global sales conference in Las Vegas. *See* ¶104, *supra*. Further, Berger knew about the lack of an integration plan to merge the salesforces and the resulting, ongoing salesforce integration problems at this time based on his conversation with CW1 in April 2014, wherein they discussed such issues, including the replacement or reassignment of legacy Extreme personnel based on legacy Enterasys executives' individual preferences—*i.e.,* subjective, *ad hoc* factors that were not tied to any past performance metrics—rather than according to a systematic plan. *See* ¶¶ 109, 122, & 125, *supra*. Additionally, Berger knew such information specifically at this time because CW3 spoke directly with Berger about the continuing salesforce integration problems that resulted from the lack of an integration plan at approximately this time, in October and/or November 2014. *See* ¶ 126, *supra*. Berger also knew about the lack of an integration plan and related integration problems due to his role as CEO overseeing a merger of equals, which was a core transaction for the Company. *See* Section VII.B., *infra*. Further, Berger had been serving as the **acting head of Sales** from May 2014 and up until about a month before this statement (October 1, 2014, when White was hired as CRO); therefore, Berger had been directly overseeing the salesforce and related integration efforts, and thus had direct access to the lack of an integration plan and the related, persisting salesforce integration problems. *See* ¶¶ 135-138, 141, 405-409, *supra*. Indeed, Berger admitted on the August 14, 2014 call that he had been closely involved in the salesforce integration since May 2014. *See* ¶ 407, *infra*.

354. Berger also knew, or was deliberately reckless in not knowing, that these statements were false and misleading because at this time he knew of material, adverse facts regarding Extreme's Lenovo partnership that undermined his "commitment" to achieving 10% revenues and 10% operating margin by June 2015. Specifically, as CEO, Berger knew, or was deliberately reckless in not knowing, that the Lenovo partnership could not contribute to Extreme's revenues because of Meyercord's May 6, 2015 statement that Extreme still had "zero

visibility" into the Lenovo partnership's ability to drive Extreme's revenues.  Given that CWs reported a lack of field-level activity between Lenovo and Extreme sales personnel during the Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero visibility" into Lenovo shortly after the Class Period, there is a strong inference that there was a similar lack of field activity with and visibility into Lenovo in May 2014.  Further, Berger had direct access to such information because he was **acting head of Sales** until earlier the same month (as discussed in ¶¶ 135-138, 141, 405-409, *supra*), including by leading quarterly sales calls and the global sales conference in Las Vegas, which occurred just three months before this statement, where such lack of Lenovo "field" level activity and resulting lack of revenues reasonably would have been discussed.

355.     Moreover, as noted above, Berger's compensation agreement contained a highly unusual feature wherein he earned a total of 900,000 Extreme stock options when the price of the Company stock increased to $6.00 per share and stayed above that price target for 30 days.  Berger was then incentivized to maintain or further inflate the price of Extreme's stock, including by making false and misleading statements about the success of the Enterasys acquisition and the Lenovo partnership, in order to maintain or increase the value of his 900,000 options.  Berger's potential profit during the Class Period on those shares (based on the Class Period high of $8.14 per share) was in excess of $4.4 million, or almost **nine times** his baseline annual salary of $500,000.

### (b)      Arola's Misstatement and Omissions

356.     Additionally, during this call, Arola reiterated Extreme's unchanged commitment: "I want to remind you that ***I remain committed to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015***."

### (i)      Falsity

357.     Arola's statement above that he "***remain[ed] committed***" to 10% revenue growth and 10% operating margin by June of 2015, based in substantial part on the successful integration of Enterasys (including attaining related synergies), and the Lenovo partnership, was false and misleading because: (1) the integration was a failure, lacking an integration plan,

including a plan setting forth how the two salesforces would be integrated and other steps to cut costs and obtain synergies, a product roadmap and a go-to-market strategy, which resulted in substantial integration problems and loss of revenue (*see* Sections V.G. & V.I., *supra*);  (2) Extreme had "zero visibility" into the Lenovo partnership's ability to drive Extreme's revenue and there was no "field" level activity towards that alliance, and thus no ability to generate sales and drive revenues based on Lenovo (*see* Sections V.H. & V.I., *supra*.); and (3) Extreme never achieved these commitments (*see* ¶¶ 83, 159).  Thus, Arola's statement was false and misleading because it lacked a reasonable basis and omitted the material, adverse facts referenced above which undermined this "commitment" and which would conflict with what a reasonable investor would understand from the statement itself.

### (ii)   Scienter

358.   Arola knew, or was deliberately reckless in not knowing, that his statement were false and misleading because at this time he knew of material, adverse facts regarding the Enterasys integration that undermined his "commitment" to achieving 10% revenues and 10% operating margin by June 2015.  Specifically, as CFO, Arola knew, or was deliberately reckless in not knowing, that his statement was false and misleading because he knew, based on his position as well as attendance at quarterly sales meetings and the 2014 annual global sales conference in Las Vegas three months earlier, where such matters were openly discussed, that Extreme had no integration plan, including a plan for how the Company would achieve $30 million to $40 million in synergies, which undermined his statements.  *See* Sections V.G. & V.I., *supra*.  Moreover, Arola observed Berger acknowledge at this Las Vegas meeting that the salesforce integration was still not complete, that it still needed a plan, including a plan to achieve integration synergies, and that the plan was still "TBD."  *Id.*  Arola also knew about the lack of an integration plan and related integration problems due to his role as CFO overseeing a merger of equals, which was a core transaction for the Company.  *See* Section VII.B., *infra*.

359.   Arola also knew, or was deliberately reckless in not knowing, that these statements were false and misleading because at this time he knew of material, adverse facts regarding Extreme's Lenovo partnership that undermined his "commitment" to achieving 10%

1   revenues and 10% operating margin by June 2015.  Specifically, as CFO, Arola knew, or was

2   deliberately reckless in not knowing, that the Lenovo partnership could not contribute to

3   Extreme's revenues because of Meyercord's May 6, 2015 statement that Extreme still had "zero

4   visibility" into the Lenovo partnership's ability to drive Extreme's revenues.  Given that CWs

5   reported a lack of field-level activity between Lenovo and Extreme sales personnel during the

6   Class Period (*see* ¶¶ 149-150 *supra*) and Meyercord's admission of "zero visibility" into Lenovo

7   shortly after the Class Period, there is a strong inference that there was a similar lack of field

8   activity with and visibility into Lenovo in May 2014.

9               **(c)      Market Reactions to the Misstatements and Omissions**

10          360.    Investors reacted positively to these false and misleading statements and

11   omissions. After the October 28, 2014 earnings call, Extreme's stock price increased

12   approximately **15%** to an opening price of $3.79 per share on October 29, 2014 from a closing

13   price of $3.30 per share on October 28, 2014 on unusually heavy trading volume of 3.9 million

14   shares.

15          361.    Analysts also reacted positively to Defendants' false and misleading statements

16   and omissions. For example, Buckingham Research Group published an analyst report on

17   October 29, 2014, which increased its price target, including because management "**reiterated**"

18   Extreme's commitment of "double digit revenue growth by F4Q15 with a 10% OM [operating

19   margin]," which would be "driven by double-digit Lenovo contribution" and other factors.

20   Likewise, an October 28, 2014 analyst report from Raymond James maintained its "outperform"

21   rating, noting as "the call's **highlight**" management's reiteration of the 10% revenue and

22   operating margin figures by June 2015, which were "achievable based on . . .  initial

23   contributions from the Lenovo partnership."

24          362.    Similarly, an analyst from Craig-Hallum commented on October 29, 2014 that

25   "management is confident the company can see return to strong year/year growth beginning in

26   the June quarter as **Lenovo could drive double digit millions of quarterly revenue**."

27

28

3.      **January 14, 2015 – Needham Growth Conference – The Truth Was Partially Revealed**

363.    On January 14, 2015, Arola and Norman Rice, SVP of Corporate Development, made a public presentation on behalf of Extreme at the Needham Growth Conference.  Arola touted the success of the integration, its customers, and quality of its products and services. However, toward the end of the day, Arola also partially disclosed the truth about the uncertainty of the synergies and revenue growth the Company said would materialize by the upcoming end of its fiscal year of 2015, when he implied that Extreme would not be able to deliver on its commitment of 10% revenue growth and 10% operating margin by the end of fiscal year 2015, including specifically based on the Lenovo partnership.  In response to a question from an audience member about when to expect meaningful revenue from Lenovo, Arola stated:

> I'll start by saying because we are in a quiet period I don't want to comment on a future forecast. But with that said, we are currently looking at what our second half looks at right now, **evaluating where we are with things like our Lenovo relationship, how much business we'll get in our quarter-four timeframe in relation to that business**…. But we are currently evaluating that top line and operating expenses in bottom line. We are looking at alternatives. If something didn't materialize and we stayed at levels we are, that we would go out and look at how we are going to restructure the business in essence to make sure we can drive bottom line. And we'll provide updates when we come to earnings.  But, again, **I don't want to make a comment about the 10% and the 10%**, but our long-term view of the business if you ask me should be running this business at a 10% operating margin pretty consistently over time. **The question is as we are evaluating it now**, we will make some comments on our earnings call more specifically about timing of that.

364.    As a result of this partial corrective disclosure that Extreme was reevaluating its commitment to achieving 10% growth and 10% operating margin, including specifically based on the Lenovo partnership, and was backing away from its commitment to achieve the same by the end of fiscal year 2015, Extreme's stock price consistently declined for a two week period.[11] On January 15, 2015, the first day of trading after the Needham Growth Conference, Extreme's stock fell over 4% from $3.36 per share on January 14, 2015 to $3.20 per share. Additionally,

---

[11] As noted above, such statements were also a partial corrective disclosure with respect to Defendants' misstatements and omissions regarding the Lenovo partnership.

1  on January 16, 2015, Extreme's stock fell another 4.6% from $3.0 per share to $3.05 per share.

2  This decline in stock price continued until January 28, 2015.

3  365.   Securities analysts also reacted negatively to Arola's partial disclosure.  For

4  example, a Craig-Hallum analyst report dated January 22, 2015 attributed the share price's

5  subsequent decline to Arola's lack of enthusiasm and evasiveness regarding management's

6  commitment to achieve 10% revenue growth and 10% operating margin by June 2015.  He

7  observed that "shares have fallen over 10% since presenting" at the January 14 conference

8  because, the analyst believed, "**management sounded less enthusiastic** about its previous

9  outlook for 10% y/y [year-over-year] growth and 10% operating margins for the upcoming June

10  quarter." The analyst further noted that "**[w]hen asked about meaningful revenue from**

11  **Lenovo kicking in, management side stepped the question** and said it was still evaluating and

12  mentioned if something did not materialize, the company would address operating expenses."

13  366.   The following day, an analyst report from the Buckingham Research Group

14  interpreted management's statements as signifying bad news regarding the timing of any

15  benefits, including specifically based on the Lenovo partnership: "We think material **revenue**

16  **from the Lenovo partnership will likely not occur before 2H15**, ramping in 2016."  The

17  analyst further noted that, after the disclosure, "we think the targeted 10% revenue growth and

18  10% OM [operating margin] may be somewhat challenging."

19  **4.   January 28, 2015 – The Truth Was Confirmed**

20  367.   On January 28, 2015, Extreme hosted an earnings call with analysts to discuss its

21  results for the Q2 2015 and its guidance for Q3 2015.  Berger and Arola participated in this call

22  with analysts.  During the call Berger admitted that the Company would not be able to deliver the

23  10% year-over-year growth that Defendants had confidently committed to from the beginning of

24  the Enterasys acquisition.  Berger stated:

25  > In the past, **we committed to 10% year-over-year revenue growth, and 10%
  > operating margin in the fourth fiscal quarter of this year. Our commitment
  > was based on the expected lift from improved sales execution**, the return of E-
26  > Rate, and improved sales and channel execution, **and from our relationship with
  > Lenovo.**

27

28

We strongly believe these forces will begin to come to have an impact throughout the rest of the year and beyond. However, it is now clear that it will take longer for them to have enough impact to deliver 10% year-over-year growth.

368.    As stated above, the Company never achieved the 10% operating margin or double-digit revenue growth, either by the scheduled second half of fiscal year 2015 or thereafter.  *See* ¶ 83.

## VII.    ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

369.    At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above.  Each of the Individual Defendants had actual knowledge that the statements and omissions made by him were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements and omissions.  Each of the Individual Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above. The following additional allegations further support a strong inference of scienter.

### A.    Defendant Berger's Highly Unusual Compensation Scheme

370.    Extreme's Board of Directors, and in particular its Chairman Ed Meyercord, brought in Berger as a replacement for the Company's previous CEO, Oscar Rodriguez. Whereas Rodriguez opposed the acquisition of Enterasys, Berger supported it.  *See* ¶ 99.

#### 1.    Berger's Compensation

371.    Berger received a base annual salary of $500,000, eligibility to participate in the Company's "Incentive Plan" with an annual target of 100% of his annual base salary, and a one-time "Option Grant" to acquire 900,000 shares of the Company's common stock that would vest according to a standard formula.[12]

---

[12] The formula provided that 25% of the "Option Grant" would vest on the first anniversary of Berger's first date of employment, with the remainder vesting monthly over the following three years, at a rate of 1/48th of the entire "Option Grant" each month, so long as Berger remained employed by Extreme.

372.   In addition to the above, Berger was given added incentive to increase the value of Extreme stock itself, through an unusual bonus where he would receive 300,000 Extreme stock options every time Extreme's stock price stayed above a certain price for 30 days. Berger's offer letter referred to this bonus as a "Performance Option."  Specifically, he would be given non-qualified stock options for 300,000 **additional** shares of Extreme stock, exercisable on **each** of the following events:

       a.    Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of **$4.00 per share**;

       b.    Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of $**5.00 per share**; and

       c.    Once the Company's stock has traded for at least 30 consecutive trading days at or above a closing price of **$6.00 per share**.

373.   Notably, pursuant to the terms of his employment contract, Berger would keep all 900,000 options even if the stock price subsequently fell below the target stock prices before vesting.

**2.     Berger's Compensation Was Unique in Extreme's History and Highly Unusual Across Comparable Companies at the Time**

**(a)     Berger's Bonus Plan Was Unique in Extreme's History**

374.   The addition of Berger's "Performance Option" bonus was not just unusual, but unique in Extreme's history as a public company at the time.

375.   The previous CEO, Oscar Rodriguez, who served as CEO from his appointment effective August 23, 2010 through his departure from the Company on April 25, 2013, received a higher annual base salary of $550,000.  Like Berger, Rodriguez was also granted eligibility to participate in the Company's "Incentive Plan" with an annual target of 100% of his annual base salary.  Also like Berger, Rodriguez received a one-time "Option Grant" to acquire 900,000 shares of the Company's common stock that would vest according to the same standard formula. However, in contrast, Rodriguez had no comparable incentive scheme "Performance Option" tied to Extreme's short-term stock price performance.

376.    Similarly, Extreme's prior CEOs before Rodriguez also had no such Performance Option tied to Extreme's short-term stock price performance.  The individual who preceded Rodriguez, Bob Corey, served as the acting CEO from October 20, 2009 until Rodriguez's appointment on August 23, 2010.  Corey was the Company's CFO[13] before he became acting CEO, and continued to receive the same annual base salary of $375,000.  Corey also continued to have the same eligibility to participate in the Company's Incentive Plan with an annual target of 60% of his annual base salary.  When Corey joined as CFO, he also received and a one-time "Option Grant" to acquire 450,000 shares of the Company's common stock that would vest according to the same standard formula.  When Corey became the acting CEO, he received a supplemental one-time "Additional Option" to acquire 100,000 more shares of the Company's common stock.  However, Corey had no "Performance Option" tied to Extreme's short-term stock price performance, as Berger did.

377.    The individual who preceded Corey as CEO, Mark Canepa, served as CEO from August 30, 2006 until his resignation on October 20, 2009.  Similar to Berger, Canepa received a baseline salary of $480,000.  He was also granted eligibility to participate in the Company's "Incentive Plan" with an annual target of 70% of his annual base salary.  Finally, Canepa similarly received a one-time option to acquire 850,000 shares of the Company's common stock that would vest according to the same standard formula. However, Canepa had no "Performance Option" tied to Extreme's short-term stock price performance, as Berger did.

378.    The individual who preceded Canepa as CEO, Gordon Stitt, served as Extreme's CEO since he co-founded the Company in May 1996, until his retirement on August 30, 2006.  As a co-founder, Stitt's salary varied year to year (*e.g.*, $220,000 in 2003, $165,000 in 2004, and $370,000 in 2005) and he received options throughout his tenure pursuant to a 1996 Stock Option Plan and subsequent Amended 1996 Stock Option Plans.  For instance, pursuant to that plan in fiscal year 1999, the year Extreme went public, Stitt received options to acquire 200,000 shares of company stock that vested according to the same standard formula.  In 2006, the year

---

[13] Corey had only become Extreme's CFO effective July 21, 2009, or only three months prior to his appointment as acting CEO.

Stitt retired, he received a baseline salary of $400,000, was eligible to participate in the Company's "Incentive Bonus Plan" with an annual target of 100% of his annual base salary, and received options to acquire 250,000 shares of company stock (pursuant to the Amended 1996 Stock Option Plan in 2006) that vested according to the same standard formula.  However, Stitt never received any "Performance Option" tied to Extreme's short-term stock price performance comparable to Berger's.

> **(b)** **Lead Plaintiff's Executive Compensation Expert Confirms that Berger's Bonus Plan Was Not Only Unique in Extreme's History, but Also Highly Unusual Compared to Its Peer Companies and Other Companies of Similar Size**

379.     Further, Berger's absolute stock price-based bonus plan was not only unique in Extreme's history, but also highly unusual beyond Extreme, including among companies that Extreme identified as its peers, as well as across companies of its size and beyond.

380.     Steven Hall, an expert in executive compensation, has been retained by counsel for Lead Plaintiff in this case.  Mr. Hall's conclusions, as set forth below, are based on his 38 years of experience in the field of executive compensation, his review of public documents Extreme has filed with the SEC, his review of the 16 companies that Extreme has identified as compensation comparators for the period beginning in April 2013, and his research into the executive compensation records for 1,329 other companies that are generally comparable to Extreme in terms of revenues.

381.     Mr. Hall's relevant professional experience includes over 38 years advising company senior management and board compensation committees in the planning and implementation of senior executive compensation programs and incentives.  He is a founding partner and managing director of Steven Hall & Partners, an independent compensation consulting firm specializing exclusively in the areas of executive compensation, board remuneration, and related corporate governance issues.  Prior to forming Steven Hall & Partners, he served as President and co-founder at Pearl Meyer & Partners for over 15 years.  He has also served as a member of the faculty of the National Association of Corporate Directors where he taught courses related to executive and director compensation, and best practices in

compensation committee governance.  He is also the co-author of the book *Executive Compensation Best Practices* and a chapter entitled *The Effective Compensation Committee* included in *The Handbook of Board Governance*.  He has been identified multiple times by The Directorship Institute as one of the Top 100 most influential boardroom leaders.  He holds an M.B.A. in Accounting and a B.A. in Economics.

382.    Lead Plaintiff engaged Mr. Hall to (i) examine the 2013 executive compensation agreement between CEO Charles Berger and Extreme, and in particular the stock "Performance Option" grant that was part of that agreement, which would be earned based solely on the stock price of Extreme Networks hitting certain specified targets and staying above those targets for 30 consecutive trading days; (ii) provide an expert opinion regarding how customary such a provision was in Extreme's history and among companies similar to Extreme; and (iii) provide an expert opinion as to whether this type of stock option bonus could motivate an executive to make false or misleading, positive public statements about the Company or fail to disclose material negative information in order to inflate Extreme's stock price.

383.    Mr. Hall determined that the pertinent terms of the Performance Option grant at issue are as follows:

        a.    Grant of a Performance Option on 900,000 shares of the Common Stock of Extreme with an exercise price of $3.17;

        b.    Seven-year term during which the options can be exercised;

        c.    Performance Options will be earned upon the attainment of established stock price targets as follows:

                (i)    300,000 options will be earned once the Company's stock price has traded above $4.00 per share for 30 consecutive trading days;

                (ii)    300,000 options will be earned once the Company's stock price has traded above $5.00 per share for 30 consecutive trading days; and

                (iii)    300,000 options will be earned once the Company's stock price has traded above $6.00 per share for 30 consecutive trading days;

1    d.    Once earned, the options would vest and become exercisable over 2 years,

2    at a rate of 1/24th of the amount earned each month subject to continued employment at Extreme.

3    384.    In order to develop his opinion, in addition to drawing on his years of experience

4    in the executive compensation industry, Mr. Hall performed the following tasks, with the

5    assistance of his professional staff:

6    a.    He reviewed the compensation agreements of Extreme's CEOs before

7    Berger (Oscar Rodriguez, Bob Corey, Mark Canepa, and Gordon Stitt);

8    b.    He reviewed the then-current long-term incentive compensation grants[14]

9    for the CEOs of the 16 peer companies reported by Extreme as their peer group in Extreme's

10   proxy filing for the fiscal year ending June 30, 2013;[15]

11   c.    He reviewed data provided to him by Main Data Group related to

12   executive compensation for the CEOs at 412 U.S. companies with revenues between $500

13   million and $1 billion (comparable to Extreme's anticipated revenues of  approximately $600

14   million after its acquisition of Enterasys, which was contemplated at the time Berger entered into

15   his compensation agreement with Extreme), which identified performance metrics used by each

16   company in their long-term performance grants;

17   d.    He reviewed the reported performance metrics for the long-term incentive

18   compensation grants made to each CEO of these 412 companies in 2013, the year Berger's

19   compensation package was created;

20   e.    He also reviewed data provided to him by Main Data Group related to

21   executive compensation for the CEOs at 917 U.S. companies with revenues between $1 billion

22

23   —————————————

24   [14] "Long-term incentive compensation grants" is an industry term that refers to cash or equity-based incentive plans that provide for rewards based on a period greater than one year, similar to the "Performance Options" granted to Berger by Extreme.  To be clear, these long-term grants may have short-term performance aspects.  For example, although the options had a seven year term,  Mr. Berger earned 900,000 options within 8 months of when he became Extreme's CEO due to the Company's stock price reaching established goals.

25

26

27   [15] The listed peer companies are: ADTRAN, Calix, Digi International, Emulex, Harmonic, Infinera, Ixia, MRV Communications, Novatel Wireless, Oplink Communications, QLogic Corporation, RadiSys Corporation, ShorTel, Sonus Networks, Symmetricon and Ubiquiti Networks.

28

and $5 billion,[16] which identified performance metrics used by each company in their long-term incentive compensation grants; and

> f.    He reviewed the reported performance metrics for the long-term incentive compensation grants made to each CEO of these 917 companies in 2013, the year Berger's compensation package was created.

385.    Based on Mr. Hall's review of Extreme's prior CEOs' compensation agreements, he determined that **none** of their plans used absolute share price as a performance metric for any incentive compensation grants, like Berger's agreement.

386.    In his review of the 16 peer companies reported by Extreme, he noted that **none** of the long-term incentive compensation grants for the CEOs of those companies used absolute share price as a performance metric for grants.

387.    In his review of the 412 companies with revenues between $500 million and $1 billion, he determined that only 12 of these 412 CEO compensation packages – *i.e.,* only **2.91%** – included a "performance metric" offering incentive equity grants that would be earned or vest based on absolute stock price performance, like Berger's.

388.    He further reviewed the 12 long-term incentive grants that used absolute stock price as a performance measure referenced above to determine how many were made at a time when the company was involved in acquiring another company.  He determined that this was an appropriate factor to consider because during the period after an acquisition, company executives have the opportunity to inflate their company's stock price by making positive public statements about how well the integration of the two companies is progressing.  Adding this parameter to his search, he found that only 4 of the 12 long-term incentive grants referenced were granted within one year prior to an acquisition.

389.    Thus, when controlling for whether these long-term incentive compensation awards were granted within a year prior to a company making an acquisition, Mr. Hall's analysis

---

[16] Although these companies are somewhat larger than Extreme by revenue, Mr. Hall included them in his review because he believed they provide another relevant comparison in assessing how common Berger's compensation plan was overall.

1    showed that the percentage of comparable CEO long-term incentive grants among these 412

2    companies fell from 2.91% to **.97%**.

3         390.    Further, in his review of the 917 companies with revenues between $1 billion and

4    million and $5 billion, he determined that only 32 of these 917 CEO compensation packages –

5    *i.e.,* only **3.49%** – included a "performance metric" offering performance-based incentive grants

6    that would be earned or vest based on absolute stock price performance, like Berger's.

7         391.    He further reviewed the 32 long-term incentive grants that used absolute stock

8    price as a performance measure referenced above to determine how many were made at a time

9    when the company was involved in acquiring another company.  Adding this parameter to his

10   search, he found that only 10 of the 32 long-term incentive grants referenced were granted within

11   one year prior to an acquisition.

12        392.    Thus, when controlling for whether these long-term incentive compensation

13   awards were granted within a year prior to a company making an acquisition, Mr. Hall's analysis

14   showed that the percentage of comparable CEO long-term incentive grants among these 917

15   companies fell from 3.49% to **1.09%.**

16        393.    Mr. Hall concluded that these results were not surprising because in his expert

17   opinion, when a portion of an executive's compensation is based on absolute stock price

18   performance, (i) the executive is highly incentivized to make misstatements or omissions about

19   the current or future performance of the Company to earn that bonus, and (ii) factors entirely

20   unrelated to the executive's performance can cause him to earn that bonus.[17]  For these reasons,

21

22

---

23   [17] *See, e.g.*, Dan Cable and Freek Vermeulen, *Stop Paying Executives for Performance*,
     HARVARD BUSINESS REVIEW, February 23, 2016, *available at* https://hbr.org/2016/02/stop-
24   paying-executives-for-performance. ("Contingent pay leads to cooking the books. When a large
     proportion of a person's pay is based on variable financial incentives, those people are more
25   likely to cheat. In academic terms, we would put it this way: extrinsic motivation causes people
     to distort the truth regarding goal attainment. When people are largely motivated by the financial
26   rewards for hitting results, it becomes attractive to game the metrics and make it seem as though
     a payout is due. For example, different studies have shown that paying CEOs based on stock
27   options significantly increases the likelihood of earnings manipulations, shareholder lawsuits,
     and product safety problems. When people's remuneration depends strongly on a financial
28   measure, they are going to maximize their performance on that measure; no matter how.").

---

1   he opined, the use of absolute stock price as a performance metric in executive compensation

2   plans is negatively viewed by most corporate governance professionals.

3   394.   Mr. Hall stated that, for example, the use of absolute share price as a performance

4   metric provides a CEO with strong incentives to make positive statements regarding the

5   anticipated success of the company to cause the share price to rise, or alternatively, not disclose

6   negative information about the company that could cause the share price to decline.

7   395.   Under the above analyses, Mr. Hall concluded that Berger's compensation as

8   CEO of Extreme, entered on April 25, 2013, was unique in Extreme's history and highly unusual

9   among comparably-sized companies across the U.S.  He further concluded that it was even more

10  unusual across comparably-sized companies granting such an award to CEOs within one year of

11  making an acquisition.

12  396.   Mr. Hall further concluded that Berger's highly unusual performance options

13  provided in his compensation package had the effect of providing Berger strong incentives to

14  make false and misleading statements about the success of the acquisition to inflate the price of

15  Extreme stock.

16   **3.    Berger Was Motivated to Make Misrepresentations to Trigger His**
17   **"Performance Option" Tied to Extreme's Short-Term Stock Price,**
      **and Had the Opportunity to Do So**

18  397.   Through Berger's repeated false and misleading statements regarding the

19  Company's integration of Enterasys and anticipated earnings, cost savings, and profits – as well

20  as the false and misleading statements of Berger's direct reports Kurtzweil and Arola – Berger

21  succeeded in meeting all three "Performance Option" incentive targets and thereby obtained

22  900,000 valuable Extreme stock options that he would not have otherwise had.

23  398.   The stock price reached a high of $8.14 per share during the Class Period after

24  Berger succeeded in meeting all three incentive targets.  Berger's options to purchase 900,000

25  shares of Extreme stock had an exercise price of $3.17 per share.  Accordingly, his potential

26  profit from his unique incentive scheme was in excess of $4.4 million, or almost **nine times** his

27  annual base salary.

28

399.    With this highly unusual incentive package as motivation, Berger made numerous false and misleading statements and omissions regarding the Enterasys integration.

400.    Before Berger announced the Enterasys acquisition, Extreme's stock price was not able to stay above $4.00/share to trigger even the first level of his "Performance Option" bonuses.  By September 12, 2013, five months of Berger's tenure had passed without earning the bonus, and Berger announced the Enterasys acquisition.  On that day, he represented to investors that the Company had a "***plan***" in place to achieve "***$30 million to $40 million***" in cost-saving synergies and guaranteed them that "***[t]here will be no disruption in customers' ability to grow and operate their networks. Period. None.***"  Not only did Extreme's stock price immediately rise, *see* ¶ 176, but Berger's "Performance Option" bonuses also began to trigger: first on October 18, and again on November 6, 2013.  *See* ¶ 9.  Although the rally on Extreme's share price slowed in early November, Berger represented on November 4 to investors that "***our integration efforts are on track***." Extreme's share price resumed its rise, *see* ¶ 190, and finally on December 16, 2013, after only two months, Berger earned the final level of his "Performance Option" bonuses. *See* ¶ 9.

401.    As noted above, the terms of Berger's bonus indicated that he would keep all 900,000 options even if the stock price immediately fell below the target stock prices.  After the truth emerged, in a sequence of four partial events before a final event on April 9, 2015 (*see* ¶ 424-428), Extreme's stock price returned to pre-fraud levels, yet Berger's contract allowed him to keep all 900,000 options acquired through this unusual "Performance Option."  This remained the case even after Berger left the Company (as the options would not expire for seven years after the grant date), and today, the options earned over the course of merely two months (September 12 to December 16, 2013) are worth over $6.3 million,[18] or **over twelve times** Berger's annual salary at Extreme.  Berger would not have received this substantial windfall if he refrained from inflating the stock price during the Class Period, because his Performance Option **would not have otherwise triggered**: at no point before his first misstatement or after the final

---

[18] This measurement uses the closing price of $10.23/share on June 2, 2017.

1   corrective disclosure was Extreme's price ever above $4.00/share for 30 consecutive days,

2   through Berger's entire two-year tenure.

3       402.    Thus, Berger's highly unusual incentives provided him the motive and

4   opportunity to receive unwarranted compensation while diluting investor holdings.

5   **B.**   **Core Operations Allegations: The Enterasys Acquisition Was a Critical Transaction for Extreme and Its Integration Was Followed Closely by Senior Management**

7       403.    Berger was at all times fully informed about the problems with the acquisition and

8   integration of Enterasys, which was a critical transaction for Extreme.  Extreme acquired

9   Enterasys's outstanding stock in an all cash transaction valued at $180 million, which was nearly

10  **half** of Extreme's market capitalization at the time.  When the acquisition was first announced,

11  Berger stated it "**will certainly be transformational** for our Companies."

12      404.    Because Extreme had "just shy of $300 million in annual revenues" at the time

13  the transaction was announced, and Enterasys had "between $325 million and $330 million," the

14  acquisition would be responsible for adding **over half** of the Company's revenue going forward.

15  As such, Extreme's ability to successfully integrate Enterasys was tantamount to its ability to

16  maintain Enterasys's revenue stream.  In fact, because of the competition and overlap that

17  resulted from the integration, described *supra*, Extreme's ability to successfully integrate

18  Enterasys also imperiled Extreme's own half of the revenue stream.

19      405.    Further, Berger took on direct responsibility for the integration for a large portion

20  of the Class Period.  At the beginning of the Class Period, the "responsibility for sales and

21  marketing" to "maintain the entire revenue streams of both companies" had been Chris

22  Crowell's, who had been the CEO of Enterasys.  When Extreme suddenly announced Crowell's

23  departure as Chief Operations Officer on May 6, 2014, it was not immediately prepared with a

24  replacement.  Instead, Berger disclosed in a conference call later the same day that,

25  notwithstanding prior assurances, there had been problems with the integration and that, as a

26  result, he would be taking direct responsibility for the integration efforts:

27          As we move on to the next phase of the integration I feel that **it is critical that I stay close to our field organizations** [i.e., the salesforce] particularly in North America **where we have experienced some integration issues**. The field

28

organizations and corporate marketing will **report directly to me effective today**.

Thus, Berger came to be directly in charge of the salesforce operations, including the continuing integration efforts.  In fact, as CW3 described (*see* ¶¶ 103-105, 110, 112, 113 *supra*), Berger scheduled the quarterly salesforce meetings by email, led these quarterly salesforce calls and the annual global salesforce conference in Las Vegas in the summer of 2014, and at these quarterly calls and annual meeting responded to the sales personnel's questions regarding the continuing integration problems, including specifically the lack of an integration plan, a product roadmap, and plan to achieve synergies.

406.    Indeed, a May 7, 2014 Wunderlich Securities analyst report observed that "**[c]hallenges of combining like-size companies impacted Extreme (EXTR) 3Q14 results and outlook** with the Americas team lagging behind integration in other regions. **Because of this, the COO has recently left the company and CEO Chuck Berger will run sales for the time being**."  The report further noted that "CEO Chuck Berger has eliminated the COO role **and put himself in charge of sales management** for the time being."

407.    Furthermore, on an August 14, 2014 conference call to discuss results for the fourth fiscal quarter of 2014, Berger stated that his knowledge of integration issues in North America came directly from "having spent a great deal of time with the North America Management team over the quarter."  On the same call, he disclosed that he attended the Company's **"global sales conference" along with "the entire sales team**," which he also purported to give him insight into "integration issues" (though he went on to say, falsely, that they were "***behind us***"), thus confirming CW3s allegations about the same (*see* ¶¶ 104, 110 *supra*).

408.    Berger continued being directly responsible for the integration until Extreme hired Jeff White as CRO to head the sales group on October 1, 2014.

409.    Finally, after the departure of CRO White after only six months in the position, an April 10, 2015 Wunderlich Securities analyst report stated that Berger "will run the department **again** until a replacement" for White could be found, referring to the period when Berger

1   previously ran the Company's sales division.  This confirmed the market's understanding that

2   Berger was intimately aware of, was closely involved in, and **even managed** the day-to-day

3   operations of the Company's main operations and revenue stream throughout the Class Period.

4         410.   Moreover, Berger's close management of Extreme's operations, including

5   specifically the salesforce and the Enterasys integration efforts, is further demonstrated by his

6   direct contacts with Extreme's sales and engineering personnel (CW1s and CW3) about the

7   salesforce integration problems during the Class Period, as discussed at ¶¶ 122-123, 126-127,

8   *supra*.  In particular, the fact that Berger personally contacted CW1 upon learning of CW1's

9   resignation in April 2014 shows Berger's hands-on management style.

10         411.   Kurtzweil's close management of the Enterasys integration is further evidenced

11   by the fact that securities analysts who followed Extreme during the Class Period noted upon his

12   departure in May 2014 that **"**CFO John Kurtzweil has been a major factor in driving most of the

13   Enterasys integration."  *See* ¶136, *supra*.

14   **VIII.   CLASS ACTION ALLEGATIONS**

15         412.   Lead Plaintiff brings this federal securities class action on behalf of itself and all

16   persons and entities that, during the period from September 12, 2013 through April 9, 2015,

17   inclusive (the "Class Period"), purchased the publicly traded common stock of Extreme and/or

18   exchange-traded options on such common stock, and were damaged thereby (the "Class").

19   Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any

20   Defendant who is an individual; (iii) any person who was an officer or director of Extreme

21   during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant

22   has or had a controlling interest; (v) Extreme's employee retirement and benefit plan(s); and (vi)

23   the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded

24   person.

25         413.   The members of the Class are so numerous that joinder of all members is

26   impracticable.  During the Class Period, Extreme had approximately 94 to 100 million shares of

27   common stock outstanding and actively trading on the NASDAQ with the ticker symbol

28   "EXTR." While the exact number of Class members is unknown to Lead Plaintiff at this time,

1    and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the

2    proposed Class numbers in the thousands and is geographically widely dispersed.  Record

3    owners and other members of the Class may be identified from records maintained by Extreme

4    or its transfer agent and may be notified of the pendency of this action by mail, using a form of

5    notice similar to that customarily used in securities class actions.

6         414.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All

7    members of the Class were similarly affected by Defendants' allegedly wrongful conduct in

8    violation of the Exchange Act as complained of herein.

9         415.    Lead Plaintiff will fairly and adequately protect the interests of the members of

10   the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities

11   litigation.

12        416.    Common questions of law and fact exist as to all members of the Class, and

13   predominate over any questions solely affecting individual members of the Class.  The

14   questions of law and fact common to the Class include:

15        a.    whether the federal securities laws were violated by Defendants' acts and

16   omissions as alleged herein;

17        b.    whether the statements made to the investing public during the Class

18   Period contained material misrepresentations or omitted to state material information;

19        c.    whether and to what extent the market price of Extreme's common stock

20   and exchange-traded options on such common stock was artificially inflated during the Class

21   Period because of the material misstatements alleged herein;

22        d.    whether Defendants acted with the requisite level of scienter;

23        e.    whether the Individual Defendants were controlling persons of Extreme;

24        f.    whether reliance may be presumed pursuant to the fraud-on-the-market

25   doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United*

26   *States*, 406 U.S. 128 (1972); and

27        g.    whether the members of the Class have sustained damages as a result of

28   the conduct complained of herein and, if so, the proper measure of damages.

417.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    LOSS CAUSATION

418.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Extreme common stock and operated as a fraud or deceit on Class Period purchasers of Extreme common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Extreme common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

419.    As a result of their purchases of Extreme's common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Extreme common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $8.14 per share at the close of the market on January 23, 2014.

420.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Extreme's business and prospects.  As the truth about the Company was revealed to the market and concealed risks materialized, the price of Extreme's common stock fell dramatically.  These declines removed the artificial inflation from the price of Extreme's common stock, causing economic loss to investors who had purchased Extreme common stock and exchange-traded options on such common stock during the Class Period.

421.    The declines in the price of Extreme common stock after the partial corrective disclosures and/or materializations of the risk on February 5, 2014, May 6, 2014, October 15, 2014, and January 14, 2015, and the final corrective disclosure and/or materializations of the risk on April 9, 2015 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market.  The timing and magnitude of the price declines in Extreme's common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

422.    During the Class Period, the price of Extreme stock declined as the true state of Extreme's operations was revealed to the investing public.

423.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Extreme common stock and the subsequent material declines in the value of Extreme common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

424.    On February 5, 2014, Defendants partially revealed the truth that there were "some self imposed issues" relating to the integration, and reported disappointing revenues and guidance for the next quarter.  *See supra* ¶ 188.  As a result, on February 5, 2014 Extreme's stock fell almost **16%** on unusually heavy trading with more than 8.6 million shares trading hands (versus 1.4 million shares traded the day before), dropping $1.12 per share to close at $5.92.  However, Defendants failed to disclose the full extent of the integration failures or the truth about its partnership with Lenovo up to that point.  In fact, Defendants continued to falsely reassure the market that their "***integration plans are on track***."

425.    On May 6, 2014, Defendants further partially revealed that it "experienced **some** integration issues."  The Company also announced the abrupt and unexplained departure of its CFO and COO and reported disappointing revenues.  *See supra* ¶¶ 204-207.  As a result, on May 7, 2014 Extreme's stock fell almost **26%** on unusually heavy trading with more than 9.3 million shares trading hands (versus 3.7 million shares traded the day before), dropping $1.38 per share

1    to close at $3.95.  However, Defendants failed to disclose the full extent of the integration

2    failures, the truth about its partnership with Lenovo, or its lack of a basis for its 10% revenue

3    growth and operating margin "commitment" up to that point.  In fact, Defendants continued to

4    falsely reassure the market that "***[t]he integration efforts following the acquisition of Enterasys***

5    ***continue ahead of plan***."

6          426.   On October 15, 2014, Defendants preannounced revenues significantly below its

7    previous guidance.  *See supra* ¶ 265.  As a result, on October 16, 2014 Extreme's stock fell **more**

8    **than 18%** on unusually heavy trading with more than 8.4 million shares trading hands, dropping

9    $0.70 per share to close at $3.06.  However, Defendants failed to disclose the full extent of the

10   integration failures, the truth about its partnership with Lenovo, or its lack of a basis for its 10%

11   revenue growth and operating margin "commitment" up to that point.  In fact, Defendants

12   continued to falsely reassure the market that the Company "made dramatic progress towards

13   finalizing the integration of the acquisition of Enterasys" and remained "***on track to realize the***

14   ***full $30-$40 million in cost synergies expected from the acquisition***."

15         427.   On January 14, 2015, Defendants backed away from its commitment to achieve

16   10% revenue growth and 10% operating margin by June 2015.  As a result, by January 16, 2015

17   Extreme's stock had fallen **more than 9%** on unusually heavy trading with more than 2.2

18   million shares trading hands that day (versus 351,000 shares traded on January 14, 2015),

19   dropping a total of $0.31 per share to close at $3.05.  However, Defendants failed to disclose the

20   full extent of the integration failures, the truth about Extreme's partnership with Lenovo, or their

21   lack of any basis for their 10% revenue growth and operating margin "commitment" up to that

22   point.

23         428.   On April 9, 2015, the Company preannounced that it would miss guidance for

24   3Q15, reporting revenue of $118-$120 million and earnings per share ("EPS") of ($0.09)-

25   ($0.07), significantly below its guidance of $130-$140 million and ($0.03)-$0.02, respectively.

26   The Company also announced more executive turnover – Chief Revenue Officer Jeff White, who

27   had been hired only six months earlier to manage the integration of the Extreme and Enterasys

28   salesforces, was "no longer with the Company" – and trading in its shares was halted.  On these

disclosures, the Company's stock price fell **nearly 23%**, from $3.24 per share to $2.50 per share, on highly unusual trading volume of 10.1 million shares traded (versus 356,300 shares traded the day before).

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

429.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

430.   In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

a.   Extreme's common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period.

b.   Extreme's common stock traded at high weekly volumes during the Class Period.

c.   As a regulated issuer, Extreme filed periodic public reports with the SEC.

d.   Extreme regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

e.   The market reacted promptly to public information disseminated by Extreme.

f.   Extreme's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.  The firms who wrote analyst reports on Extreme during the

Class Period included, but are not necessarily limited to, the following: Craig-Hallum Capital, D.A. Davidson & Co., Wedbush Securities, Wunderlich Securities, Inc., Buckingham Research Group, Raymond James, and Needham & Company.

g.       The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Extreme's common stock.

h.       Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Extreme's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI.    NO SAFE HARBOR

431.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  *First*, many of the statements and omissions alleged to be false and misleading relate to historical facts or existing conditions.  *Second*, any purported forward-looking statements and omissions were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  *Third*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A.    The Majority of Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking

432.    The majority of the false and misleading statements and omissions alleged herein, *e.g.*, ¶¶180, 197, 209, 213, 227, 235, 240, 245, 250, 254, 258, 267, 274, 279, 284, 291, 296, 307, 317, and 330, (1) relate to historical or current facts, (2) implicate existing conditions, and (3) do not contain projections of future performance or future objectives.  For example, they relate to

the current status of Extreme's integration of Enterasys or current status of Extreme's partnership with Lenovo.

433.   To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

**B.   Any Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language**

434.   None of Defendants' statements were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

435.   Additionally, to the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested.  For example, as detailed herein, at the time Defendants made their false and misleading statements and omissions, Defendants knew that the Enterasys integration was not "on track," "ahead of plan," or "complete" because it lacked an integration plan and was experiencing substantial integration problems, and that Extreme did not have visibility into how and when the Lenovo partnership.  Thus, vague warnings regarding, for example, how: (1) failure to integrate successfully and (2) failure to cultivate relationships with channel partners "*may*" adversely affect Extreme's business, were insufficient because they failed to warn that the risks had already occurred when Defendants made their false and misleading statements.

436.   To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to the forward-looking statements at issue. The purported cautionary language did not mention important factors that could cause actual results to differ materially from those in the forward-looking statements.

**C.   Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made**

437.   Even if the alleged statements were sufficiently identified as "forward-looking" at the time they were made, each speaker knew that the statement was false or misleading, as discussed above.  In addition, all such statements were authorized or approved by Extreme

1   executive officers who actually knew that the statements were false or misleading when made.

2   Accordingly, Defendants remain liable even for forward-looking statements.

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

438.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

439.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

440.   As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Extreme common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Extreme common stock and options on such common stock at artificially inflated prices.

441.   The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

442.   As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead

1  Plaintiff and the other members of the Class who purchased Extreme common stock and options

2  during the Class Period.

3        443.     In ignorance of the false and misleading nature of Defendants' statements and

4  omissions, and relying directly or indirectly on those statements or upon the integrity of the

5  market price for Extreme common stock and options, Lead Plaintiff and other members of the

6  Class purchased Extreme common stock and options at artificially inflated prices during the

7  Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have

8  purchased Extreme common stock and options at such artificially inflated prices.  As set forth

9  herein, when the true facts were subsequently disclosed, the price of Extreme common stock

10  and options declined precipitously and Lead Plaintiff and members of the Class were harmed

11  and damaged as a direct and proximate result of their purchases of Extreme common stock and

12  options at artificially inflated prices and the subsequent decline in the price of that stock and

13  options when the truth was disclosed.

14        444.     By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members

15  of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

16  thereunder.

17  **COUNT II**

18  **Violation of § 20(a) of the Exchange Act**
19  **Against Defendants Berger, Arola and Kurtzweil**

20        445.     Lead Plaintiff repeats and realleges each of the allegations set forth above as if

21  fully set forth herein.

22        446.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against

23  Defendants Berger, Arola and Kurtzweil.

24        447.     As alleged above, Defendants violated Section 10(b) of the Exchange Act and

25  Rule 10b-5 promulgated thereunder by making false and misleading statements in connection

26  with the purchase and sale of Extreme's common stock and options on such common stock and

27  by participating in a fraudulent scheme and course of business or conduct throughout the Class

28  Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with

the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Extreme is primarily liable under Section 10(b) of the Exchange Act.

448.    As set forth above, Defendants Berger, Kurtzweil, and Arola were controlling persons of Extreme during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including Extreme's Enterasys integration efforts, partnership with Lenovo, and sales force.

449.    By virtue of the foregoing, Defendants Berger, Arola and Kurtzweil each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Extreme, including the content of its public statements with respect to the Company's integration efforts, the success (or lack thereof) of its partnerships, and financial commitments to investors including growth.

450.    Defendants Berger, Arola and Kurtzweil knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Extreme common stock and options during the Class Period.

451.    In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Extreme common stock and options, Lead Plaintiff and other members of the Class purchased Extreme common stock and options at an artificially inflated price during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased Extreme common stock and options at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Extreme common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Extreme common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth began to be disclosed.

452.    By reason of the foregoing, Defendants Berger, Arola and Kurtzweil are liable to Lead Plaintiff and the members of the Class as controlling persons of Extreme in violation of Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court deems just and proper.

## XIII.    JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated:  June 2, 2017

**LABATON SUCHAROW LLP**

By:    _/s/ Thomas A. Dubbs_
Thomas A. Dubbs

Louis Gottlieb
Irina Vasilchenko
Jeffrey A. Dubbin (SBN 287199)
Wendy Tsang
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
       lgottlieb@labaton.com
       ivasilchenko@labaton.com
       jdubbin@labaton.com
       wtsang@labaton.com

[Master File No. 15-cv-04883-BLF] AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lead Counsel for the Class*

Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermandevalerio.com
        cpoppler@bermandevalerio.com

*Liaison Counsel*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, the undersigned, state that I am employed in the City and County of New York, State of New York, that I am over the age of eighteen (18) years and not a party to the within action, that I am employed at Labaton Sucharow LLP, 140 Broadway, New York, New York 10005, and that on June 2, 2017, I served a copy of the attached:

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

to the parties listed on the attached Service List by the following means of service:

[X]    BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record registered with the Court's electronic filing system.

I declare under penalty of perjury under the laws of the New York that the foregoing is true and correct.  Executed on the 2nd day of June, 2017.

*/s/ Thomas A. Dubbs*
THOMAS A. DUBBS

[Master File No. 15-cv-04883-BLF]
CERTIFICATE OF SERVICE