1

**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)

2

Louis Gottlieb (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)

3

Jeffrey A. Dubbin (SBN 287199)
Wendy Tsang (*pro hac vice*)

4

140 Broadway
New York, NY 10005

5

Telephone: (212) 907-0700
Facsimile: (212) 818-0477

6

Email: tdubbs@labaton.com

7

       lgottlieb@labaton.com
       ivasilchenko@labaton.com

8

       jdubbin@labaton.com
       wtsang@labaton.com

9

*Attorneys for Lead Plaintiff and Lead Counsel
for the Class*

10

11

**BERMAN TABACCO**
Nicole Lavallee (SBN 165755)

12

A. Chowning Poppler (SBN 272870)
44 Montgomery Street, Ste. 650

13

San Francisco, CA 94111
Telephone: (415) 433-3200

14

Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
       cpoppler@bermantabacco.com

15

*Liaison Counsel for the Class*

16

17

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

18

19

| | Master File No. 15-cv-04883-BLF |
|---|---|
| In re EXTREME NETWORKS, INC. SECURITIES LITIGATION, | **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates to: | <u>CLASS ACTION</u> |
| All Actions. | Date: December 14, 2017 Time: 9:00 a.m. Judge: Hon. Beth Labson Freeman Courtroom: 3, 5th Floor |

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

I.   INTRODUCTION ...................................................................................... 1

    A.   The AC Pleads New Allegations that Preclude Dismissal.................... 1

    B.   Defendants' Arguments Against Falsity and Scienter Fail................... 3

II.  STATEMENT OF ISSUES (Civil L. R. 7-4(a)(3)) AND LEGAL STANDARDS .......... 4

III. ARGUMENT ............................................................................................. 5

    A.   Defendants' Request for Judicial Notice Should Be Denied to the Extent It Seeks to Notice the Truth of the Exhibits' Contents and Disputed Facts.............. 5

    B.   The Complaint Sufficiently Pleads Falsity ......................................... 5

        1.   Misstatements and Omissions Regarding the Enterasys Integration .......... 6

            (a)   "On Track," "Ahead of Plan" and Similar "Plan" Statements ...................................................................... 6

                (i)   CWs Show that Extreme Lacked an Integration Plan............. 6

                (ii)   The AC Adequately Pleads the Basis of the CWs' Knowledge and Reliability ....................................... 8

                (iii)   Defendants Improperly Challenge these Well-Pled Facts ....................................................................... 9

                (iv)   CWs Show that the Lack of an Integration Plan  Led to Severe, Concealed Integration Problems ................. 11

                (v)   Later Admissions Confirm that Extreme Lacked an Integration Plan and Had Severe Integration Problems .......... 12

            (b)   Statements that the Integration Was "Complete" and the Problems Were "Behind" Extreme Were False and Misleading.................... 13

            (c)   Defendants' Integration "Risk" Disclosures Do Not Shield Them Under the Safe Harbor or Bespeaks Caution Doctrine....... 15

            (d)   Defendants' Truth-on-the-Market Defense Fails......................... 15

        2.   Defendants Misrepresented Extreme's Partnership with Lenovo............ 17

            (a)   Berger's 10/28/14 Opinion Statement About Lenovo ................. 17

            (b)   Remaining Lenovo Statements ................................................... 18

        3.   Defendants Falsely Assured 10% Margin and Revenue Growth............. 19

C.     The Complaint Pleads a Strong and Compelling Inference of Scienter ...............20

    1.     Plaintiff's CW Allegations Support a Strong Inference of Scienter .........20

    2.     "Core Operations" Allegations Add to a Strong Inference of Scienter ........................................................................................21

       (a)     The Integration Was a Core Operation ........................................22

       (b)     Defendants Were Closely Involved with the Integration..............22

    3.     Berger's Motive Allegations Further Support Scienter ...........................23

       (a)     Berger's Highly Unusual Bonus Plan Incentivized Fraud...........23

       (b)     Defendants' Counterarguments Are Meritless..............................24

    4.     Departures of Defendants and Key Executives Also Support Scienter ........................................................................................25

IV.     CONCLUSION................................................................................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aetna Inc. Sec. Litig.*,
  34 F. Supp. 2d 935 (E.D. Pa. 1999) ...................................................................................22

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)...........................................................................................23

*Anderson v. Peregrine Pharm. Inc.*,
  2013 WL 4780059 (C.D. Cal. Aug. 23, 2013)................................................................22

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) .......................................................................................9

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................................8, 15, 22

*Better v. YRC Worldwide Inc.*,
  2012 WL 4433500 (D. Kan. Sept. 25, 2012) ....................................................................4

*Bielousov v. GoPro, Inc.*,
  2017 WL 3168522 (N.D. Cal. July 26, 2017)..................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .........................................................................................20

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
  660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ............................................15

*In re Cooper Sec. Litig.*,
  691 F. Supp. 2d 1105 (C.D. Cal. 2010) .........................................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................................16

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ..................................................................8

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ...........................................................................................7

*Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .........................................................................................25

*Gammel v. Hewlett-Packard Co.,*
   905 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................................19

*Hatamian* v. *Adv. Micro Devices, Inc.,*
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) ................................................9, 12, 18

*Hensley v. Imprivata, Inc.,*
   2017 WL 2178644 (D. Mass. May 16, 2017) ...............................................8

*Howard v. Everex Sys. Inc.,*
   228 F.3d 1057 (9th Cir. 2000) ....................................................................23

*In re Huffy Corp. Sec. Litig.,*
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ........................................................22

*In re Immucor, Inc. Sec. Litig.,*
   2011 WL 2619092 (N.D. Ga. June 30, 2011) ...............................................19

*In re Intuitive Surgical Sec. Litig.,*
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ..........................................................25

*Jasin v. Vivus, Inc.,*
   2016 WL 1570164 (N.D. Cal. Apr. 19, 2016) .............................................17

*Kovtun v. VIVUS, Inc.,*
   2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ...........................................21

*In re LDK Solar Sec. Litig.,*
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......................................................8

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) ..................................................................5, 10

*In re Level 3 Commc'ns, Inc. Sec. Litig.,*
   667 F.3d 1331 (10th Cir. 2012) ..................................................................24

*Livid Holdings Ltd. v. Salomon Smith Barney Inc.,*
   416 F.3d 940 (9th Cir. 2005) ......................................................................15

*Lloyd v. CVB Fin.Corp.,*
   811 F.3d 1200 (9th Cir. 2016) ....................................................................17

*In re McKesson HBOC, Inc. Sec. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................18

*In re MobileMedia Sec. Litig.,*
   28 F. Supp. 2d 901 (D.N.J. 1998) .................................................................4

*In re Moody's Corp. Sec. Litig.,*
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) .........................................................19

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................19

*In re Nash Finch Co. Sec. Litig.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) ................................................................12

*Nguyen v. Radient Pharm. Corp.*,
   946 F. Supp. 2d 1025 (C.D. Cal. 2013) ..............................................................15

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..............................................................................24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...........................................................................3, 18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .......................................................................22, 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ...............................................................17, 18, 19, 20

*In re Premiere Techs. Inc.*,
   2000 WL 33231639 (N.D. Ga. Dec. 8, 2000) ......................................................4

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................................16

*Public Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ..............................................................................12

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ................................................................. *passim*

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003) ..............................................................................12

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ............................................................................4, 6

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by*
   *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) .........................................................................3, 22

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ...................................................22, 23

*Rosenbaum Capital, LLC v. McNulty*,
   549 F. Supp. 2d 1185 (N.D. Cal. 2008) ..............................................................12

*S. Ferry LP # 2 v. Killinger,*
    399 F. Supp. 2d 1121 (W.D. Wash. 2005), *vacated in part on other grounds,*
    542 F.3d 776 (9th Cir. 2008) .........................................................................16

*S. Ferry LP #2 v. Killinger,*
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) .................................................23

*SEC v. Mozilo,*
    2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ...........................................17

*Tellabs, Inc. v. Makor Issues & Rights Ltd.,*
    551 U.S. 308 (2007)..........................................................................4, 11, 23

*In re Tibco Software, Inc. Sec. Litig.,*
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ...............................................8

*Tracinda Corp. v. DaimlerChrysler AG,*
    197 F. Supp. 2d 42 (D. Del. 2002) ..............................................................15

*U.S. v. Corinthian Colleges,*
    655 F.3d 984 (9th Cir. 2011) .........................................................................5

*U.S. v. Goyal,*
    629 F.3d 912 (9th Cir. 2010) .......................................................................23

*Vesta Corp. v. Amdocs Mgmt. Ltd.,*
    129 F. Supp. 3d 1012 (D. Or. 2015) ..............................................................5

*Warshaw v. Xoma Corp.,*
    74 F.3d 955 (9th Cir. 1996) .....................................................................6, 19

*Weiner v. Quaker Oats Co.,*
    129 F.3d 310 (3d Cir. 1997).........................................................................19

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) .......................................................................25

1    Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiff") respectfully submits this

2 memorandum in opposition to the motion to dismiss the Amended Complaint[1] (ECF No. 107,

3 "MTD") filed by Defendants Extreme Networks, Inc. ("Extreme" or the "Company"), Charles

4 Berger, John Kurtzweil and Kenneth Arola (collectively, "Defendants").

5 **I.    INTRODUCTION**

6    **A.    The AC Pleads New Allegations that Preclude Dismissal**

7    In response to the Court's Order Granting Defendants' Motion to Dismiss (ECF No. 102,

8 the "Order"), the AC focuses on statements the Order indicated were actionable, adding factual

9 detail to explain how they were deliberately false or misleading. For example, it details how, at

10 Extreme's internal global sales conference in Las Vegas, CW3 was present when members of the

11 salesforce questioned Berger about the lack of an integration plan, and Berger responded – a year

12 into the Class Period – that the plan was still "to be determined" or "TBD." ¶104. So Defendants

13 pivot, moving to dismiss on the grounds that Extreme supposedly disclosed everything.

14    But Defendants' so-called disclosures did more than project a permissible amount of

15 corporate optimism (MTD at 22). They knew they had no plan to integrate, but told investors

16 there was a plan. AC App'x A at 1. They knew they had "zero visibility" into Lenovo's ability to

17 contribute revenue (¶154), but told investors it would increase revenue over 10%, by June 2015.

18 ¶322. The strongest inference is that Defendants recklessly or intentionally misled investors.

19    **Integration**: **First**, in response to the Court's questions at oral argument (Pls. Ex. 1 at

20 22:19-25, 39:1-19), the AC defines an integration plan as one that *ex ante*: (1) combines

21 salesforces based on objective criteria; (2) identifies how to cut costs and achieve synergies; (3)

22 has a "product roadmap" as to how (and when) the two companies' separate products would

23 combine; and (4) includes a "go-to-market" ("GTM") strategy as to how the Company would

24 reach customers and provide competitive products. ¶13. **Second**, the AC adds new details from

25 CWs 1 and 3, including their direct interactions with Berger about the lack of an integration plan.

26 ¶¶102-105, 110, 112-113, 122, 126. **Third**, it explains how the CWs knew that Extreme lacked

27

28 [1]References to the Amended Complaint (ECF No. 105, "AC,") are denoted as "¶___."

such a plan, in addition to what they heard from Berger. *E.g.*, ¶102; *cf.* Order at 27. **Fourth**, it provides additional facts regarding the salesforce integration problems through 2015. *E.g.*, ¶144 (CW3 heard new CRO Jeff White's report of "many things wrong" on early 2015 sales call).

**Berger's Key Admissions.** The AC adds allegations that Berger admitted:

o  There was still no integration plan as of 7/31/14, telling CW3 and the rest of the salesforce the plans were still "***TBD***" (¶¶104, 110);[2]

o  The integration was only "nearly completed" as of 10/15/14 (¶142), after telling investors it was "complete" on 8/14/14 (*see* ¶235);

o  "[W]e still have considerable work to do" integrating as of 1/28/15 (¶143), after investors ***again*** were told it was "complete" on 12/17/14 (*see* ¶291).

**Post-Class-Period Admissions.** Further, the AC adds allegations that:

o  Extreme announced on 5/20–5/21/15, just 6 weeks after the Class Period, a "***new*** operating plan" to achieve synergies and a "***new*** solutions-based ***go-to-market strategy***," which Extreme only started to develop in January 2015 (¶¶155-157);

o  Berger's replacement, Ed Meyercord – who was Chairman of Extreme's Board during the entire Class Period – admitted on 9/14/16 that the Enterasys deal lacked "***integration planning***" and thus suffered from "***a lot of integration issues***" (¶¶14, 160).

**Berger's Bonus Plan**: In response to the Order at 40, the AC contains new allegations detailing how unusual Berger's stock price-based bonus was. First, it provides "comparisons to prior incentive schemes" to show that no preceding CEO had such a bonus. ¶¶374-78. Second, it adds expert testimony that his bonus was highly unusual: for example, ***none*** of Extreme's 2013 peer companies had such a plan. ¶¶384(b), 386; *see also* ¶¶387-92. Defendants' argument that such motive allegations are insufficient because Berger did not exercise his 900,000 options (MTD at 24) is contrary to controlling Ninth Circuit law. Their assertion that his options expired is contradicted by the AC (¶401) and public filings (Pls. Ex. 2 (listing "Expiration Date" for Berger's options from this bonus as "5/2/2020")), and is improper on a motion to dismiss.

**Lenovo**: The AC alleges only four misstatements about the Lenovo alliance. App'x A at 4-5. The first misstatement, by Berger on 10/28/14, that "Lenovo ***certainly*** by then [June 2015]

---

[2]Unless otherwise noted, all emphasis is added and internal brackets, citations, or quotes omitted.

1    we believe will have double-digit revenue impact" (¶322), is an actionable statement of "surety"

2    (Order at 24); it is contradicted by Meyercord's admission, just two weeks after the Class Period,

3    that Extreme had "zero visibility" into Lenovo's ability to drive revenues. The other three

4    statements are specific representations of current or historical fact regarding Extreme's sales

5    personnel "having airtime," "sitting side-by-side" with and "train[ing]" Lenovo representatives

6    on Extreme's products. ¶¶307, 317, 330. They are contradicted by Meyercord's admission that

7    Extreme did not know "whether or not we're collaborating in the field." ¶154. This is also

8    corroborated by CW4's account that there was no such "field level" activity early in the Class

9    Period. ¶149.

10          **10% Revenue and Margin "Commitment**:" The AC kept only three "commitment"

11   statements (App'x A at 5-6), which Plaintiff believes are sufficiently definitive and specific to be

12   actionable because they set a specific number (10%) by a specific time (June 2015). They are

13   also material when viewed in context, as required under Ninth Circuit law.

14          **B.     Defendants' Arguments Against Falsity and Scienter Fail**

15          Defendants rely on an improper, summary judgment-style evidentiary attack, seeking

16   judicial notice of disputed factual matters in 26 exhibits. They deploy these disputed facts to

17   challenge falsity and scienter with three main arguments: (1) the AC pleads mere

18   "mismanagement" (MTD at 1); (2) Defendants were entitled to be "optimistic" (*id.* at 20-21);

19   and (3) they disclosed enough not to deceive investors (*id.* at 1, 3). They are wrong on all counts.

20          **Mismanagement**: The parties agree that Defendants mismanaged the integration, but that

21   is not the basis of Plaintiff's case. Instead, the AC alleges that rather than truthfully disclosing

22   that their lack of an integration plan caused worse-than-expected problems, Defendants

23   knowingly, or at least recklessly, misrepresented and concealed it. *See Reese v. Malone*, 747 F.3d

24   557, 581 (9th Cir. 2014) (reversing dismissal because, though defendants' "actions exemplify

25   corporate mismanagement," the complaint pled a Section 10(b) claim where they were "at the

26   very least, deliberately reckless as to the false or misleading nature of their public statements"),

27   *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align*

28   *Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *see also Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d

1    Cir. 2000) (defendants' "false reassurances … or [] false explanations" for problems pled

2    "conduct actionable under the securities laws," rather than "matters of business judgment").

3    Courts have repeatedly rejected mismanagement arguments in similar integration cases. *E.g.*,

4    *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *7-8 (D. Kan. Sept. 25, 2012) ("defendants

5    falsely portrayed the integration … as successful, but [CWs] described it as otherwise" and thus

6    "***plaintiffs have done more than simply set forth disagreements with management decisions***");

7    *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 927 (D.N.J. 1998) (same); *In re Premiere*

8    *Techs., Inc. Sec. Litig.*, 2000 WL 33231639, at *14 (N.D. Ga. Dec. 8, 2000) (same).

9         **Corporate Optimism**: Defendants are allowed a degree of optimism, but cannot mislead

10   investors. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017). Here,

11   their statements concerned "objectively verifiable matters of ***fact***" (Order at 20-21)—that they

12   were "on track" with or "ahead of" a plan that did not exist. This distinguishes *Align*, which

13   involved only ***opinion*** statements about goodwill. MTD at 4, 19, 21.

14        **Disclosures**: This is not a case of full disclosure as Defendants claim. Though they

15   disclosed "***some***" issues (¶¶196, 206) they repeatedly omitted and misrepresented material facts,

16   minimized integration problems, and falsely reassured that the issues were "behind us."  ¶¶258,

17   279. Further, this argument that public disclosures preclude liability is the affirmative truth-on-

18   the-market defense, which is highly fact-intensive and rarely granted at this stage. Part III.B.1.d.

19   **II.    STATEMENT OF ISSUES (Civil L. R. 7-4(a)(3)) AND LEGAL STANDARDS**

20        **Issues:**  Whether the AC adequately pleads that Defendants violated Sections 10(b) and

21   20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

22        On a motion to dismiss a §10(b) case, "courts must … accept all factual allegations in the

23   complaint as true," *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007), and

24   "construe them in the light most favorable to [plaintiffs]." *Reese v. BP Expl. (Alaska) Inc.*, 643

25   F.3d 681, 690 (9th Cir. 2011). In analyzing scienter, "the court's job is not to scrutinize each

26   allegation in isolation but to assess all the allegations ***holistically***." *Tellabs*, 551 U.S. at 326.

27        Defendants' attempt to incorporate the Court's prior Order and cases cited therein (MTD

28   at 5) violates this Court's Standing Order Re Civil Cases (at 4:5-9): "All factual ***and legal bases***

1   for a party's position must be [] in the briefs submitted in connection with the [] motion…."

2   **III.   ARGUMENT**

3         **A.   Defendants' Request for Judicial Notice Should Be Denied to the Extent It**
              **Seeks to Notice the Truth of the Exhibits' Contents and Disputed Facts**

4
5         Defendants seek judicial notice of 26 exhibits supposedly only "for the purposes of

6   showing what was disclosed to investors." MTD at 5. (Austin Exs. 6, 9, 12, 16, 20, 22, & 24-27

7   are not referenced in the AC.) Plaintiff objects to the extent Defendants seek to notice the

8   *truth* of the exhibits' contents. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011)

9   (taking judicial notice of reports referred to in complaint for their "existence," but holding "***we***

10  ***may not, on the basis of these reports, draw inferences or take notice of facts that might***

11  ***reasonably be disputed***"); *Lee v. City of Los Angeles*, 250 F.3d 668, 688, 690 (9th Cir. 2001).

12        Defendants even ask the Court to notice as true their public statements about so-called

13  facts that the AC disputes. For example, they cite hearsay to suggest Extreme had an integration

14  plan. MTD at 2, 9, 10 (statement that Extreme "retained" Deloitte). Such "factual challenges to a

15  [] complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)."

16  *Lee*, 250 F.3d at 688 (reversing dismissal where "court assumed the existence of facts that favor

17  defendants based on evidence outside plaintiffs' pleadings [and] took judicial notice of the truth

18  of disputed factual matters"). That Plaintiff does not "challenge" these statements does not mean

19  it agrees they are true or accepts factual inferences that may be drawn from them.[3] *Vesta Corp. v.*

20  *Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1021–22 (D. Or. 2015) ("it is clear that Plaintiff

21  ***disputes the inferences*** that Defendants ask this Court to draw based on those documents").

22        **B.   The Complaint Sufficiently Pleads Falsity**

23        A public statement is "materially false or misleading" if it is "inconsistent with" internal

24  information. *Quality Sys.*, 865 F.3d at 1144. Further, "[a] statement or omission is misleading …

---

[3]These also include statements that Defendants (a) put "a great deal of … effort" into and
achieved "savings" from the integration (MTD at 9, citing Austin 5:7)); (b) put "a great deal of
… money" into the integration (MTD at 9, citing Austin Exs. 6, 9, 12, 16, 20, & 24)); (c) attained
synergies (MTD 11, citing Austin 11:5); (d) achieved "new customer wins" (MTD at 22, citing
Austin 8:4, 10:4, 15: 3); (e) achieved "positive steps in Lenovo" alliance (MTD at 16, citing
Austin 11:4, 15:4, 19:3); and (f) that Berger's options from his unusual bonus plan expired
unexercised three months after he left Extreme (MTD at 24, citing Austin 1:9, 25:7, 27:48-49).

if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese*, 643 F.3d at 691. "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (cited with approval by *Quality Sys.*, 865 F.3d at 1143).

### 1. Misstatements and Omissions Regarding the Enterasys Integration

#### (a) "On Track," "Ahead of Plan" and Similar "Plan" Statements

Berger, Kurtzweil and Arola repeatedly represented that the integration and related synergies were "on track," "ahead of plan," that they had a "plan" to achieve $30-40 million of synergies, and similar assurances. ¶¶165, 180, 185, 187, 209, 213, 218, 227, 240, 245, 250, 267, 274, 284, 296; *see* App'x A at 1-2. The Court previously upheld these statements as not puffery (Order at 20-21) but held they were not false because Plaintiff had not sufficiently alleged that the CWs "would have been privy to any [integration] plan" or "demonstrate[d] [the] absence of a plan." *Id.* at 26-28. The Court also found that Defendants "disclosed the challenges faced" with the integration and had no duty to disclose the problems alleged by the CWs. *Id.* at 30. But such statements created the strong impression that an integration plan existed, and thus were false and misleading because there was no such plan, as shown by new, particularized statements from CW1 and CW3 and new allegations detailing the basis of their knowledge.

##### (i) CWs Show that Extreme Lacked an Integration Plan

Defendants convinced the market they had a "***plan***" to integrate and achieve synergies, and reassured investors they were "***on track***" or even "***ahead of plan***." As described below, CWs 1, 2, 3 and 5 all stated that Extreme had no such plan. The AC adds particularity about four crucial plan components Extreme lacked throughout the Class Period, as noted above. *See* ¶13.

**CW1.** CW1 stated that there was no centralized integration plan. ¶96. New allegations from CW1 elaborate that there was no combined product roadmap, though it was critical to Extreme's clients, who wanted to know how and when the Company would combine the different technologies and whether the resulting products would be compatible with existing products. ¶¶97-98. Nor was there a plan to combine salesforces, *e.g.*, no "account management"

1    or direction for which salesperson would run which customer accounts and who would be in

2    leadership positions (¶106), so such decisions were made *ad hoc* rather than according to a plan

3    with objective criteria (¶107). Further, Extreme's GTM strategy was "piecemeal" and

4    incomplete, from the Enterasys acquisition until CW1 left in April 2014. ¶115.

5        **CW3**. CW3 similarly said that there was "no plan" for integration. ¶102. The lack of a

6    product roadmap created company-wide concern among Extreme's clients (including roughly

7    100 of CW3's customers) about future product lines, resulting in delayed purchases and

8    substantial revenue losses. ¶105 (salespeople from other regions voiced the same concerns at

9    internal sales meetings). These new allegations render false Berger's 9/12/13 statement that

10    "[t]here will be no disruption in customers' ability to grow and operate their networks. Period.

11    None." ¶170. (This Court previously dismissed this statement, finding "no allegations in the

12    [prior] Complaint that the integration did in fact disrupt Extreme's customers' businesses." Order

13    at 29.) Extreme could not tell customers that its products would be supported for their expected

14    lifetime of 4–7 years (¶97), or when the combined products or updates would become available,

15    leading customers to forego making purchases throughout the Class Period (¶105), thus

16    "disrupt[ing]  Extreme's customers' businesses" (Order at 29). *See Fecht v. Price Co.*, 70 F.3d

17    1078, 1083 (9th Cir. 1995) ("[A]llegations of specific problems undermining a defendant's

18    optimistic claims suffice to explain ***how*** the claims are false." (emphasis in original)).

19        CW3 also stated that the lack of a product roadmap was "constantly" discussed internally,

20    including "all the way up" to Berger at quarterly sales calls (¶¶103-05) and that Extreme lacked a

21    GTM strategy throughout the Class Period, as Berger stated they were "working on it" at

22    quarterly sales meetings CW3 attended. ¶¶112-14. Indeed, soon after White joined Extreme on

23    10/1/14, he acknowledged the lack of a GTM strategy on a global sales call (with Berger and

24    CW3 present), stating that he was hired to develop it. ¶112. New CW3 statements also confirm

25    there was no plan for how customer accounts would be reassigned or divided among the two

26    salesforces, and that such decisions were not made according to a plan. ¶125.

27        CW3 particularly undermined Defendants' statements that there was a "***plan***" to achieve

28    synergies (¶¶165, 185, 218), or that such synergies were "***on track***" (¶¶245, 250, 267, 274, 284,

296). According to CW3, management provided no direction for how to attain integration synergies within CW3's purview, including through reduced product costs or supply chain efficiencies. ¶109. There was no product "compatibility" from which synergies could arise, and thus "no incremental value" added by the acquisition from either an earnings or cost-savings perspective—resulting in "zero" discernable synergies. *Id.*

**CW2**. CW2 said Extreme lacked a combined product roadmap, which caused substantial client concern and resulting losses totaling at least $90 million. ¶100. Nor did Extreme achieve any synergies from the elimination of employee redundancies during the Class Period. ¶124.[4]

### (ii)   The AC Adequately Pleads the Basis of the CWs' Knowledge and Reliability

Contrary to Defendants' arguments (MTD at 10), these CWs were in a position to know the above facts. The AC alleges their job titles, duties and dates of employment, which show that they were in a position to know the alleged information. *Quality Sys.*, 865 F.3d at 1144-45. ¶¶95, 99, 101, 111, 129, & 150. Direct involvement in integration planning (MTD at 10) is not required. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (employees may well be in position to know facts that impact their jobs); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) ("For pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense.").

Per the Order (at 27), the AC also alleges new facts supporting the basis of their knowledge. CW1 was one of only 6 or 7 Senior Systems Engineers at Extreme before the acquisition, as well as a "top performer" with access to CEO Berger. ¶¶119-122. In fact, CW1 spoke with Berger specifically about the *ad hoc*, damaging way the salesforces were combined without a plan, which Berger did not deny. ¶¶107, 122. Further, CW1 was on company-wide

---

[4]Defendants' integration cases (MTD at 21) are distinguishable because they did not allege the lack of an integration plan. *Hensley v. Imprivata, Inc.*, 2017 WL 2178644, at *14-15 (D. Mass. May 16, 2017) (conclusory allegations that integration was "a complete nightmare" insufficient to plead falsity of statement that integration "was 'going on plan, on target'"); *Fadia v. FireEye, Inc.*, 2016 WL 6679806, *6-7 (N.D. Cal. Nov. 14, 2016) ("none of Plaintiffs' allegations or arguments directly address [] statement" about product integration); *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, *19, *23-24 (N.D. Cal. May 25, 2006) (CWs "not inconsistent" with statements and were not at company at relevant time or not "personally knowledgeable").

1   sales calls where integration issues were discussed with senior management, including Berger,

2   but no integration plan was ever mentioned. ¶¶95, 98. CW1 also recalled a January/February

3   2014 meeting in San Francisco that focused on developing a combined product roadmap, which

4   "still [had] a lot to be worked out" at that time. ¶98.

5       Likewise, CW3 spoke from personal knowledge as a Territory Sales Manager, who

6   would have been tasked to implement any integration in his or her territory, where s/he was both

7   the "field manager" and the "sales engine." ¶102. At a quarterly sales call shortly after the

8   acquisition, CW3 heard Berger answer questions about the lack of a plan by saying Extreme was

9   "*formulating the integration plan*," confirming it did not have one initially. ¶105. As late as

10  7/31/14, nine months after the acquisition, CW3 heard Berger state at the annual global sales

11  conference in Las Vegas that the integration plan was *still "TBD"* (¶104 & n.8), as was any plan

12  to achieve synergies (¶110). CW3 also attended quarterly sales calls with Berger, where the lack

13  of a synergies plan was discussed. ¶¶109-110; *see also* ¶39 (Berger was hands-on).

14      CW2 was a senior executive for the entire Class Period,[5] with access to both Extreme's

15  upper management and Board of Directors. ¶99. Moreover, these CWs corroborate each other,

16  independently confirming the lack of the four components of an integration plan and thus

17  supporting their reliability. *Hatamian* v. *Adv. Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163

18  (N.D. Cal. 2015). *See also* ¶111 (CW5 on lack of a plan to integrate personnel after s/he joined in

19  August 2014). Defendants' repeated attempts to dispute the CWs' statements, including by

20  offering extrinsic facts (MTD at 14, 17) to cast doubt on the truth of their statements, are

21  improper attacks on their credibility. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d

22  1229, 1239 (10th Cir. 2016). ("We accept the truth of the witnesses' accounts as pleaded in the

23  complaint and do not assess the witnesses' credibility.").

24              **(iii)    Defendants Improperly Challenge these Well-Pled Facts**

25      Defendants do not dispute that an integration plan must include the four components

26

27  _____
    [5]CW2 is described as a "senior executive of Extreme before, during and after the Class Period."
    ¶99. Plaintiff believes this description is sufficient, but can provide CW2's exact positions and
28  employment dates *in camera*. *Id.* & n.7.

1    outlined above. Instead, they challenge whether these elements were really absent, and how

2    much was disclosed. But such factual disputes are improper at this stage. *Lee*, 250 F.3d at 688.

3        **Salesforce Integration**. The Court found that the prior complaint implied "there was a

4    plan that involved making significant cuts in personnel." Order at 27. The allegations have been

5    clarified to show that Extreme's attempt to combine the salesforces *ad hoc* resulted in "overlap"

6    and "redundancies" rather than cuts. *See infra*. Defendants challenge the new allegations by

7    agreeing there were problems integrating the salesforces, but asserting these problems were

8    disclosed in 2014. MTD at 14-15. But these disclosures were alleged as partially **corrective** of

9    earlier misstatements, too late to avoid misleading investors. ¶¶195, 206-207, 424-425. Nor were

10   such problems typical of any integration (MTD at 14). ¶122 (Berger acknowledging to CW1 that

11   this integration was "unique" in that personnel were integrated *ad hoc* rather than per a plan).

12       **Synergies**. Defendants argue that reducing headcount was not a significant driver of

13   synergies. MTD at 12-13. But they ignore their own statements describing the elimination of

14   redundancies as a key part of achieving the $30-40 million synergies. ¶165 (Kurtzweil, 9/12/13:

15   "***When we have fully integrated the two teams***, we plan to reduce product costs and ***operating***

16   ***expenses*** between $30 million to $40 million … [of] synergies."); ¶185 (same on 11/5/13);

17   Austin 19:7 (Arola promising "***some additional cost reductions*** …. with Jeff [White] onboard

18   now, we're really focusing on the ***sales organization***, to see what we can do to streamline in that

19   area as well as drive more efficiencies"); Austin 8:6 ("***we have started to make significant***

20   ***[personnel] cuts***… you will see ***more of those synergies*** in this quarter and certainly next.").

21       Indeed, analysts understood Defendants' statements to mean that a substantial part of the

22   $30-40 million of synergies would come from headcount reductions. *E.g.*, ¶191 ("management

23   plans to realize synergies of $30-$40 million which we believe will be driven by 200-300bp of

24   gross margin improvement from improved purchasing scale [*i.e.* about $1.3 million] ***and the***

25   ***remainder through headcount reductions as the combined workforce is right-sized***."); Pls. Ex.

26   3 ("Beginning the September quarter (F1Q15), we expect progressive improvement in earnings

27   from integration ***and synergies, starting with sales and marketing consolidation***"). In any event,

28   Defendants' extrinsic evidence of achieving synergies (MTD at 11, 22) is improper. Part III.A.

**Product Roadmap.** Defendants improperly dispute the lack of a combined product roadmap by asserting it was disclosed (MTD at 17-19), pointing to statements, *e.g.*, promising to "support the product roadmaps of both companies" for 18-30 months, which spun it as a positive action "'to protect the investments of current customers and avoid any disruption.'" *Id.* at 18. In reality, customers were widely concerned by the lack of a combined product roadmap, as they needed and expected support for the 4-7 year life of the product—material facts that Defendants failed to disclose. ¶¶97, 100, 105, 120, 122. Thus, whether Defendants adequately disclosed the lack of a roadmap is a disputed fact issue that cannot be resolved at this time. *See* Part III.B.1.d.

**GTM Strategy**. Defendants assert that Extreme had a GTM strategy, improperly relying on statements not in the AC for their truth. MTD at 18; *see* Austin 3:5 ("we have plans for" a combined marketing strategy); Austin 14:4 ("our go to market approach has never been stronger."). At this stage, however, the Court must take as true the CWs' accounts about the lack of a GTM strategy, not Defendants' contrary statements. *Tellabs*, 551 U.S. at 322.

          **(iv)**     **CWs Show that the Lack of an Integration Plan Led to Severe, Concealed Integration Problems**

Defendants' "on track," "ahead of plan" and similar "plan" statements were also false and misleading because the lack of a plan resulted in severe, undisclosed integration problems. ¶¶118-131. The Court held these statements not misleading because "Defendants disclosed the challenges faced with respect to the integration." Order at 30. But the AC alleges ***other*** problems that were never disclosed during the Class Period. *See also* Part III.B.1.d.

Without a plan, personnel from one company were put in charge of territories, customers, and products of the other, but did not understand them, causing substantial customer dissatisfaction and lost business. ¶¶120, 125. According to CWs 1-4, substantial redundancies went uncorrected throughout the Class Period. ¶¶119, 124, 125, 130. New allegations by CW1 and CW3 clarify that the replacement of Extreme with Enterasys personnel did not mean that the Extreme employees were cut. ¶¶119; 125; *cf.* Order at 27. Indeed, in sales meetings that CW1 attended, management told sales personnel that no one was being cut post-acquisition. ¶119.

These integration problems were "inconsistent" with the public impression Defendants

1    created of a successful integration. *Quality Sys.*, 865 F.3d at 1144. *See also Rosenbaum Capital,*

2    *LLC v. McNulty*, 549 F. Supp. 2d 1185, 1187, 1193 (N.D. Cal. 2008) (statements that "all phases

3    of the integration process are either ***on target or ahead of plan***" were false where "Defendants

4    knew of the problems with the integration"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d

5    861, 877, 880-81 (D. Minn. 2007) (statements, *e.g.*, that the "'[i]ntegration … is ***proceeding***

6    ***according to plan***,'" were false given CWs "recount[ing] numerous problems … that caused …

7    the integration process to not proceed smoothly").

8                        **(v)    Later Admissions Confirm that Extreme Lacked an**
                                  **Integration Plan and Had Severe Integration Problems**
9
10        The AC alleges new, post-Class Period admissions and events that support the falsity of

11   Class Period statements. *Hatamian*, 87 F. Supp. 3d at 1160 ("later admissions" supported falsity

12   of statements that "issues were ***not 'behind' the Company***" when made). *See also Public*

13   *Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981 (8th Cir. 2012) ("***post-class-period*** data

     … can be used to confirm what a defendant should have known during the class period").

14        On 9/14/16, when Extreme announced its acquisition of Zebra Technologies, Meyercord

15   confirmed the CWs' statements that the Enterasys deal lacked an integration plan. He admitted

16   that "***[t]here were a lot of integration issues***" with Enterasys, and assured that the Zebra

17   integration would be "[v]ery different" because, unlike with Enterasys, "a lot of work has gone

18   into planning" it. ¶160. This new deal had "very extensive and detailed bottoms-up plans,"

19   including "***integration planning***," such as a "***very clean and clear product and technology***

20   ***roadmap***." *Id.* Such "later statement[s]" support falsity and scienter as they "directly contradict[]

21   or [are] inconsistent with" Defendants' earlier statements implying the existence of an

22   integration plan. *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). Defendants

23   respond only that Enterasys was "a merger in which Extreme had acquired a business larger than

24   itself" while Zebra was a "clean asset purchase." MTD at 19; ¶160. But this does not dispute

25   Meyercord's statements admitting that the Enterasys deal lacked integration planning.

26        Further, on 5/20-5/21/15, just 5 weeks after the Class Period, Extreme announced a "***new***

27   operating plan," including an 18% workforce reduction and "other operating cost reductions" to

28

achieve $40 million in cost savings. ¶¶155-156. As part of this new plan, it also announced a

"*new* solutions-based go-to-market strategy," which it only started to develop in January 2015.

¶157. These announcements confirm the CWs' accounts that such plans did not exist before.

Indeed, the 18% workforce reduction was equal to "approximately 300 employees

worldwide," confirming that Extreme had been employing about 1,666 people, which was

substantially identical to the 1,650 employees it had at the beginning of the integration in late

2013. ¶156. Defendants assert that "Plaintiffs do not allege a factual basis for" 1,650 employees.

MTD at 12. To the contrary, Plaintiff alleged "Extreme had approximately 750 employees" and

"Enterasys had approximately 900 employees." ¶51. Defendants proffer a number higher by 100,

but the fault for any discrepancy lies with them: on 9/12/13, they disclosed both that Enterasys

had "approximately 900 employees" (Austin 2:5), and that it had "nearly 1,000." Austin 3:3.

### (b) Statements that the Integration Was "Complete" and the Problems Were "Behind" Extreme Were False and Misleading

On 8/14/14, Berger assured that "our sales force integration is complete" and Arola stated

that they had "fully integrated [the] sales and marketing teams." ¶¶235, 254. These statements

were false and misleading because Berger admitted two months later, on 10/15/14, that the

salesforce integration was only "*nearly* completed," and thus could not have been complete on

August 14. ¶142. This revelation caused the Company's stock to drop 18%. ¶61. *Defendants*

*ignore this admission*. *See* MTD at 15. Likewise, Arola's 12/17/14 statement that the "two

[sales] teams have been integrated" and "integration of sales is completed" (¶291) is *directly*

*contradicted* by Berger's 1/28/15 admission that the salesforce integration was *still* not complete

at that time. ¶143 ("[W]e still have considerable work to do" on the integration). Arola's

purported disclosure of integration efforts (*e.g.,* that "there was '*probably some* areas to continue

to *fine-tune* in the sales group,'" MTD at 16) is another example of Defendants minimizing

rather than fully disclosing Extreme's integration problems.

Defendants argue that ongoing salesforce integration problems do not mean the

integration was incomplete. MTD at 14-15. But Berger himself admitted that the integration was

not complete as of 1/28/15 because of the "considerable work" that remained on the "integration

1   and upgrading of our salesforce." ¶¶142-143. Moreover, Arola's assurance of "full" integration

2   created the misleading impression that no material problems remained with the salesforce

3   integration and that it was "aligned and executing" well, as Berger stated. ¶235. *See In re Cooper*

4   *Sec. Litig.*, 691 F. Supp. 2d 1105, 1117-18 (C.D. Cal. 2010) (statements that "the ***integration was***

5   ***complete***," and that the two salesforces were "***fully integrated***," "appear[] to conflict with the

6   reports [] by the employees who were on-the-ground," which showed integration problems

7   indicating they were not functioning as a united team).

8          Such statements are also false and misleading because the CWs described continuing

9   salesforce integration problems after this date. ¶¶118-131. Indeed, per CW3, Extreme hired

10  White in October 2014 to fix these problems, yet they were not fixed as of White's departure on

11  April 9, 2015. ¶¶112, 141, 144. *Contra* Order at 28 ("[T]here is no claim that the two companies

12  were not fully integrated."). Defendants' attempt to minimize White's statements as his

13  "opinion" (MTD at 15) fails. He was hired to head the salesforce and fix its integration problems

14  (¶¶141, 144), and his "negative assessment" of it (MTD at 15) thus is highly relevant.

15         Arola's other alleged misstatement on 8/14/14, that Extreme had "***integrated [the]***

16  ***product portfolio[s]***" of the two companies (¶254), was false and misleading because Extreme

17  had not yet done so, as revealed by the CWs' statements that Extreme lacked a combined product

18  roadmap throughout the Class Period, including at the time of its global sales conference in Las

19  Vegas, held ***just two weeks before*** this statement (¶255).

20         Further, Berger's statements on 8/14/14 that "virtually all of these issues ***are behind us***"

21  and on 10/28/14 that "for the most part, these disruptions ***are now fully behind us***" are false and

22  misleading for the same reasons. Defendants' emphasis on the word "virtually" as "impl[ying]

23  that some issues remained" (MTD at 15) is an unreasonable interpretation of Berger's full

24  statement, which creates the false impression that all material issues already had been resolved.

25  ¶279. In fact, Defendants ignore that at the end of that same passage, Berger referenced "added

26  signs that the integration issues ***are behind us***," without any such caveat. ¶258. Significantly,

27  when Defendants tout Berger's "disclosure chronology" on 10/28/14, they quote his statement

28  that "virtually every part of our business" was "disrupted in a significant way during the quarter"

1   (MTD at 22), but conspicuously omit his false reassurance in the very next sentence that "***these***

2   ***disruptions are now fully behind us***." ¶279.

3            **(c)      Defendants' Integration "Risk" Disclosures Do Not Shield
                        Them Under the Safe Harbor or Bespeaks Caution Doctrine**
4

5            Defendants concede that none of the integration statements were forward-looking. MTD

6   at 7 (challenging only one Lenovo statement as forward-looking); *see* ¶¶180, 197, 209, 213, 227,

7   235, 240, 245, 250, 254, 258, 267, 274, 279, 284, 291, 296. Even their statements regarding their

8   "plans" to achieve $30-40 million in synergies (¶¶165, 185) represented that they had an existing

9   "plan." *See Quality Sys.*, 865 F.3d at 1141-42 ("mixed" statements are not shielded by safe

10  harbor). The PSLRA safe harbor and bespeaks caution doctrine thus offer no defense. *See* Order

11  at 20, n.3 (finding "on track" and similar statements are not forward-looking and declining to

12  address safe harbor); *Livid Holdings Ltd. v. Salomon Smith Barney Inc.*, 416 F.3d 940, 947-48

13  (9th Cir. 2005) (bespeaks caution defense applies only to forward-looking statements). Thus,

14  Defendants' argument about Extreme's integration "risk" warnings is a red herring. MTD at 10.

15           Nor do any of Defendants' risk warnings satisfy the "stringent" standard for what

16  qualifies as meaningful cautionary language. *Livid*, 416 F.3d at 947. Their risk disclosures were

17  boilerplate and warned of potential future risks, rather than disclosing known problems that

18  already existed. *Berson,* 527 F.3d at 987; *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp.

19  2d 42, 75-77 (D. Del. 2002) (similar cautionary language about "integration" and "synergies"

20  risks insufficient). Likewise, Defendants' argument that they added "new risk factors regarding

21  the merger" on 5/6/14 (MTD at 20) is irrelevant because the language used also was too general,

22  and no forward-looking statements about the integration were made after this date.

23           **(d)      Defendants' Truth-on-the-Market Defense Fails**

24           Defendants' recurrent argument that their public disclosures preclude liability is the truth-

25  on-the-market defense. *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1174

26  (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ("[a] showing that the market was already aware of

27  the truth behind the defendant's supposed falsehoods … [is] the so-called 'truth-on-the-market'

28  defense"); *Nguyen v. Radient Pharm. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013)

1    (arguing statements "were not misleading *in light of other statements Defendants made* is an

2    attempt to argue the affirmative defense of truth-on-the-market"). Defendants must prove that the

3    truth "was transmitted to the public *with a degree of intensity and credibility sufficient to*

4    *effectively counterbalance any misleading impression* created by ... [the] representations."

5    *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). They do not meet their "heavy

6    burden" here. *Id.* For every integration issue disclosed (¶¶424-427), they continued to conceal

7    the material, adverse facts reported by the CWs and to falsely reassure investors, *e.g.*, that the

8    integration was still "on track," (¶¶197, 213) and "ahead of plan" (¶¶209, 227) and that any

9    integration issues were now "behind us" (¶¶258, 279). *See S. Ferry LP # 2 v. Killinger*, 399 F.

10   Supp. 2d 1121, 1138 (W.D. Wash. 2005), *vacated in part on other grounds*, 542 F.3d 776 (9th

11   Cir. 2008) (statements about "progress … *integrating*" materially misleading as "Defendant []

12   disclosed … challenges" but "reassured investors that 'we … *are back on track*'").

        Plaintiff's allegations that the truth was revealed in four partial disclosures do not

13

14   "admit" that Defendants made sufficient disclosures. Order at 30; MTD at 23. "[C]orrective

15   information sometimes comes to the market slowly" through "partial disclosures [which] may

16   not contain enough information to significantly undermine a misrepresentation," particularly

17   where, as here, defendants' "corrective disclosures were made over an extended period of time

18   *and often in combination with alleged further misrepresentations*." *In re Countrywide Fin.*

19   *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1200, 1160 (C.D. Cal. 2008). Moreover, analysts'

20   reactions confirm that the market was reassured by Defendants' misstatements. *E.g.*, ¶202

21   (2/6/14 report: "*no change to the story and the company remains on track*"); ¶272 (10/16/14

22   report: "the integration sales channel and management issues … are mostly *behind the*

23   *company*"); ¶¶203, 225-26, 233-34, 263-64, 273, 289. Thus, the full truth did not reach the

24   market with sufficient "intensity and credibility." *Provenz*, 102 F.3d at 1492-93.

        While the MTD does not appear to challenge loss causation, it argues that "Plaintiffs'

25

26   characterization of February 5 as a 'corrective disclosure' is baseless." MTD at 20. Defendants,

27   however, take issue with the wrong part of the February 5 disclosure. *See* ¶¶195-96 ("self-

28   imposed" integration "issues" and absence of "revenue due to synergies" were corrective, to

1   explain why Extreme's Q3-14 guidance was "at the low end" and missed analysts' consensus

2   estimates); ¶¶202-203 (analysts reacting to the same); *see also* ¶424. These disclosures bear a

3   sufficient "causal connection" to prior integration and synergies misstatements. *Lloyd v. CVB*

4   *Fin.Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016). Further, these disclosures were themselves

5   misstatements and material omissions and thus insufficient to negate scienter, thus distinguishing

6   Defendants' authorities (MTD at 23), including this Court's decision in *Jasin v. Vivus, Inc.*, 2016

7   WL 1570164, at *22 (N.D. Cal. Apr. 19, 2016) (noting "the ***thoroughness*** of [defendants'] risk

8   disclosures"). *See also SEC v. Mozilo*, 2010 WL 3656068, at *19 (C.D. Cal. Sept. 16, 2010)

9   (defendants' disclosures "are certainly not sufficient to entirely negate" scienter, especially

10  where "the disclosures were incomplete [and] interspersed with misleading statements").

11          **2.      Defendants Misrepresented Extreme's Partnership with Lenovo**

12               **(a)      Berger's 10/28/14 Opinion Statement About Lenovo**

13          Berger promised on 10/28/14 that "Lenovo ***certainly*** by then [June 2015] we believe will

14  have double-digit revenue impact." ¶322. Defendants assert "parts of the AC" omit "we believe"

15  to characterize Berger's statement as a "guarantee" rather than an opinion. MTD at 6. But the AC

16  quotes the full statement multiple times, including "we believe." ¶¶72, 322, App'x A at 5.

17          Indeed, the AC pled the statement as an "opinion," misleading in that "it lacked a

18  reasonable basis" and omitted "facts which would conflict with what a reasonable investor would

19  understand from the statement itself." ¶324. Under *Omnicare*, an opinion is misleading if it

20  "omits material facts about the issuer's inquiry into or knowledge concerning a statement of

21  opinion, and if those facts conflict with what a reasonable investor would take from the statement

22  itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318,

23  1329 (2015). Meyercord admitted on 5/6/15 that Extreme had "***zero visibility into Lenovo***," that

24  he did not know "whether or not we're collaborating in the field to get deals done with" Lenovo,

25  and that he was "uncomfortable" making a "forecast" of revenue from Lenovo. ¶154. When

26  Berger stated he believed Lenovo would "have double-digit revenue impact" "certainly by" June

27  2015, only seven months prior, he omitted that Extreme had "zero visibility" into Lenovo's

28  ability to add revenue, notwithstanding any inquiry he may have conducted.

1    Defendants also argue that the AC must plead "actual knowledge" because this statement

2    is forward-looking. MTD at 7. Meyercord's admissions, however, are sufficient because they

3    "conflict with what a reasonable investor would take from the statement itself." *Omnicare,* 135

4    S. Ct. at 1329. The Court previously held that "Meyercord is not a defendant, and therefore, his

5    statements cannot be deemed an admission of what Defendants knew at any time." Order at 36.

6    That the admission was made by Meyercord as CEO on behalf of the Company, rather than an

7    Individual Defendant, does not undermine its relevance. *See In re McKesson HBOC, Inc. Sec.*

8    *Litig.*, 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (**new CEO's** admissions of misconduct

9    by terminated executives supported scienter). Meyercord was also Chairman of the Board during

10   the entire Class Period and would have known of Lenovo's ability to impact revenue all along.

11              **(b)       Remaining Lenovo Statements**

12   The AC alleges three statements about Lenovo that make specific factual representations

13   about positive interactions between Lenovo and Extreme sales personnel: (a) "We've [] trained

14   all Lenovo North American reps" (¶307), (b) Extreme sat "side-by-side with [Lenovo] people in

15   North America and China" (¶317), and (c) Extreme had "airtime with the legacy Lenovo

16   salesforce" (¶330). These statements are undermined by Meyercord's admissions on 5/6/15 that

17   Extreme did not know "whether or not we're collaborating in the field" with Lenovo and had

18   "zero visibility into Lenovo." ¶154. On 5/21/15, Meyercord further admitted that there was

19   "nothing tangible" about the relationship. ¶158. These admissions, just weeks after the Class

20   Period, support the inference that Defendants were not having productive meetings with Lenovo

21   at the field level during the Class Period. *See Hatamian*, 87 F. Supp. 3d at 1160; *Novak*, 216 F.3d

22   at 313 (that inventory was misdated "***six months after the Class Period*** … supports the inference

23   that inventory during the Class Period was similarly [mis]dated"). This is corroborated by CW4's

24   statement (as director of two regions) that there was no "field level activity" between Extreme

25   and Lenovo through February 2014, ¶149, and the account of CW7 (Account Executive for

26   Lenovo, May 2013-January 2015) that there was "no mechanism in place" for Lenovo sales

27   personnel to benefit from Extreme's products—hence no reason to sell them (¶150).

28

### 3. Defendants Falsely Assured 10% Margin and Revenue Growth

Defendants falsely "reemphasize[d]" and "st[oo]d by" Extreme's "commitment" to 10% revenue growth and profit margin by June 2015, highlighting their "conviction" and their "belief in our ability to achieve these goals [which] has only strengthened." ¶341 (Berger on 5/10/14); ¶¶351, 356 (Berger and Arola on 10/28/14). The Court ruled that the word "commitment" does not "invoke[] surety." Order at 24 (citing Webster's Third New Int'l Dictionary, one definition of "commit" as "to pledge"); *but see* Webster's Third New Int'l Dictionary (another definition of "commit" is "to obligate or bind"); *see also* Black's Law Dictionary (10th ed. 2014) (defining "commitment" as "[a]n agreement," "a promise," or "[a]n obligation"). In context, these statements expressed "a certainty," and are therefore actionable. *Omnicare*, 135 S. Ct. at 1326.

Defendants renew their argument that these statements are puffery, characterizing them as "management's *personal* aspiration." MTD at 16. Their position is not credible, as it cannot be doubted that Berger and Arola spoke on the Company's behalf. And their commitments were "*capable of objective verification*" in setting a "standard against which a reasonable investor could expect them to be pegged"—a specific number (10%) by a specific deadline (June 2015). *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *see also Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 (3d Cir. 1997) (finding statement actionable because it provided "a specific figure regarding a particular, defined time period," not because it used the term "confident," as the Court believed (*see* Order at 24)).

Numerous courts hold strong commitments actionable. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 501, 509 (S.D.N.Y. 2009) (statement that company "remains *committed*" actionable where it "*also impl[ies] certainty*"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1070 (C.D. Cal. 2012) ("commitment" not puffery "when read in the context" of specific new products and plans). Here, Defendants reiterated their commitment amid emerging investor concerns, despite knowing that the integration and Lenovo alliance were "performing poorly." *Quality Sys.*, 865 F.3d at 1143-44; *see also Warshaw*, 74 F.3d at 959-60 ("optimistic statements" actionable where designed to "reassure" investors); *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *3 (N.D. Ga. June 30, 2011) (same). Further, investors and analysts reacted

positively to the commitments, evidencing their materiality. *E.g.*, ¶¶347-50, 360-62.

Berger told investors that the basis for Extreme's 10% commitments included the success of the integration, its synergies, and the Lenovo partnership. ¶¶341, 351, 356. But he had "no reasonable basis" to make this commitment while omitting the integration problems and lack of field-level activity with Lenovo or visibility into the so-called Lenovo partnership. *Align*, 856 F.3d at 616. The statements were also misleading because they created the false impression that the integration and Lenovo alliance were both going well enough to contribute to revenue growth and profit by at least 10% by mid-2015. Thus, they "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1329; *Align*, 856 F.3d at 615.

That Extreme one time "announced Q4 [20]14 revenues that exceeded the high end of its May 6 guidance ($156.9 million vs. $145-$150 million)" is no defense. MTD at 22. In fact, the touted "$145-$150 million" guidance ***was not the operative guidance***. Defendants revised it on 7/21/14 to "$154 to $156 million" (¶227); thus, they barely exceeded guidance. They also failed to meet guidance not once (*see* MTD at 11) but twice: in Q1 2015 (¶¶265, 274) and in Q3 2015 (¶303). And when Extreme did meet guidance, their performance was nevertheless disappointing to the market (*e.g.*, ¶¶195-96, 202, 204-07, 224, 226, 265-66, 272, 303-06), because the guidance was "below the consensus estimates" (¶195) or achieved at the "low end" (¶¶195, 204). Far from an "achievement" (MTD at 22), Extreme's performance offered no basis for its commitment.

### C.   The Complaint Pleads a Strong and Compelling Inference of Scienter

#### 1.   Plaintiff's CW Allegations Support a Strong Inference of Scienter

A complaint can establish a strong inference of scienter through CW accounts by satisfying a two-part test: (1) the CW "must be described with sufficient particularity to establish their reliability and personal knowledge;" (2) the CWs' "statements … must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. Here, the AC easily satisfies the first prong (Part III.B.1.a.ii), and the amended CW accounts are strongly probative of scienter. Both CW1 and CW3 "spoke directly to the CEO about the specific matters at issue," which this Court "agrees … can carry extra weight." Order at 36. Though the Court found "simply not enough" details before, the AC provides more. CW1 spoke to Berger in April of 2014 about sales

1    personnel being integrated based on subjective, *ad hoc* factors rather than according to a plan,

2    and its negative impact on customers and revenue. ¶122. Per CW1, Berger acknowledged that

3    this integration was "unique" in this respect, creating problems atypical of other acquisitions. *Id.*

4        CW3 discussed the same salesforce integration problems, indicative of the lack of a

5    salesforce integration plan, with Berger in two conversations in October and/or November of

6    2014. ¶¶125-26. Further, ***CW3 repeatedly observed Berger admit***, at internal sales meetings and

7    calls throughout the Class Period, that there was still no integration plan, including no combined

8    product roadmap, no GTM strategy, and no synergies plan. ¶147. *See Quality Sys.*, 2017 WL

9    3203558, at *10 (account of a CW who "was on a conference call during which [the defendant]

10   stated" the relevant adverse fact was "indicative of scienter"). For example, right after the

11   acquisition, which closed on 10/31/13 (¶4), Berger admitted in an internal quarterly sales call

12   that "***we're formulating the integration plan***." ¶105. Thus, Berger knew or was deliberately

13   reckless of the falsity of his 11/4/13 "on track" statement. ¶180.

14       CW3 also detailed how Berger (with Arola present) told the salesforce that the

15   integration plan, including product roadmap and plan to achieve synergies, was still "***TBD***" on or

16   about 7/31/14, at the global sales conference in Las Vegas. ¶¶104, 110. This newly pled fact

17   shows that the "on track," "ahead of plan" and similar misstatements on February 5, May 6, July

18   21, and August 14, 2014 were knowingly false. ¶¶197, 208, 213, 227, 240, 245, 250.

19       Berger also knew of other integration problems, including how sales personnel were put

20   in charge of unfamiliar products (¶¶120-122, per CW1) and clients (¶¶125-126, per CW3), which

21   drove away customers. Such allegations show Berger's knowledge of widespread salesforce

22   integration problems through November of 2014, contrary to his statements on 8/14/14 that the

23   "sales force integration is complete" (¶235), the "integration issues are behind us" (8/14/14,

24   ¶258), and "disruptions are now fully behind us" (10/28/14, ¶279).

25       **2.    "Core Operations" Allegations Add to a Strong Inference of Scienter**

26       "[K]nowledge of facts critical to a business's 'core operations' ***or an important***

27   ***transaction***" may be "impute[d] to a company's key officers." *Kovtun v. VIVUS, Inc.*, 2012 WL

28   4477647, at *19 (N.D. Cal. Sept. 27, 2012). Core operations allegations establish scienter where

1    they: (1) "along with other allegations…raise a strong inference of scienter under the *Tellabs*

2    standard;" (2) "independently satisfy the PSLRA" by suggesting "that defendants had actual

3    access to the disputed information," or (3) on their own show "that it would be absurd to suggest

4    that management was without knowledge of the matter." *Reese*, 747 F.3d at 575-76. Thus,

5    knowledge that there was no plan, and of the resulting problems, can be imputed to Defendants.

6                    **(a)      The Integration Was a Core Operation**

7            The Enterasys deal was a "transformational" merger of equals, costing nearly half of

8    Extreme's market capitalization and ***doubling the size and revenues*** of the Company. ¶¶403-04.

9    It was precisely the kind of critical transaction where the Individual Defendants, who "were

10   directly responsible for [Extreme's] day-to-day operations," closely followed its integration and

11   knew about the lack of an integration plan and resulting problems. *Berson*, 527 F.3d at 987-88 &

12   n.5 (scienter pled solely via core operations given "the size of the contract and the prominence of

13   the client"); *see also Anderson v. Peregrine Pharm. Inc.*, 2013 WL 4780059, at *12 (C.D. Cal.

14   Aug. 23, 2013) ("The core operations doctrine applies … to ***transactions worth millions of***

15   ***dollars or that represent a significant portion of the company's revenue***."). Indeed, Defendants

16   do not, and cannot, dispute that Enterasys was a core transaction for Extreme. MTD at 25. Courts

17   often apply this doctrine in such cases. *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968,

18   1000 (S.D. Ohio 2008); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999).

19                   **(b)      Defendants Were Closely Involved with the Integration**

20           Berger also had "actual access" (*Reese*, 747 F.3d at 575-76) to adverse information.

21   ¶¶405-11. He was acting Head of Sales May-October 2014 and thus had "direct responsibility"

22   over the salesforce and its integration efforts; he admitted that "it is critical that I ***stay close to***

23   ***our field organizations*** particularly in North America." ¶¶405-08. *Nursing Home Pension Fund,*

24   *Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("specific admissions" about

25   defendants' "detail-oriented management style" bolstered scienter). *See also* ¶¶103-105, 110,

26   112-13, 405. Kurtzweil was "a major factor in driving most of the Enterasys integration." ¶136.

27           Defendants' disagreement (MTD at 25) ignores that "actual access" is an independent

28   and non-exclusive way to infer scienter under core operations. *Robb v. Fitbit Inc.*, 2017 WL

219673, at *6 (N.D. Cal. Jan. 19, 2017). Even if not sufficient on their own, core operations allegations strengthen scienter when read with other allegations. *Id.*; *see also S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009) (same; CEO's scienter pled under core operations where he assured that they "had successfully integrated [] recent acquisitions").

### 3. Berger's Motive Allegations Further Support Scienter

#### (a) Berger's Highly Unusual Bonus Plan Incentivized Fraud

"[M]otive can be a relevant consideration, and personal financial gain may weigh ***heavily*** in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *see also Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (motive "may [] be considered as circumstantial evidence of" scienter) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977-79 (9th Cir. 1999)). Because the AC alleges Berger's bonus plan together with other "red flags," Defendants' reliance on *Silicon Graphics* (MTD at 23) is misplaced. *Howard*, 228 F.3d at 1064.

Berger had a substantial and highly unusual incentive to inflate Extreme's stock price: if he could get the stock price to rise from $3.17 per share to $4, $5, and $6, and stay there for only 30 days, he would earn a total bonus of 900,000 options. ¶¶372-73. By making misstatements in the fall of 2013, he inflated Extreme's stock price to over $8 per share, triggering this bonus, worth more than $4.4 million – almost ***nine times*** his base salary. ¶¶397-400. Per the Order (at 40), the AC alleges with particularity that his plan was unique in Extreme's history at the time— none of the four prior CEOs had one. ¶¶375-78; 385.

Further, the AC incorporates an expert opinion by Steven Hall, who has over 38 years of experience in executive compensation and conducted an empirical review of public data, which establishes that Berger's incentive plan was also ***highly unusual*** across comparable companies. ¶¶379-96. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("When financial incentives … go ***far beyond the usual arrangements of compensation*** … they may be considered among other facts to show scienter.") (cited with approval by *U.S. v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010)); *Oracle*, 380 F.3d at 1233 (relying in part on expert testimony alleged in complaint to find scienter pled). Specifically, Mr. Hall found that ***none*** of the 16 companies identified by Extreme as its peers in 2013 had such a stock price-tied bonus plan. ¶¶384(b); 386.

1    Further, fewer than **3%** of CEOs at 412 companies with revenues between $500 million and $1

2    billion had a similar bonus plan. ¶¶384(c); 387.

3                      **(b)    Defendants' Counterarguments Are Meritless**

4             Defendants' sole attempt to dispute the unusualness of Berger's plan is to note that

5    Meyercord got the same deal. MTD at 24. But this one *post hoc* example does not undermine the

6    argument. Defendants' reliance on *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346

7    (10th Cir. 2012), MTD at 24, is also unavailing, as it involved only general allegations that

8    defendants' equity grants were tied to the stock price, without specifying whether or how the

9    plans were unusual. Pls. Ex. 4 (*Level 3* Complaint) at ¶¶195-96. In contrast, the AC shows that

10   Berger's plan was **not at all** "common among executives." *Level 3*, 667 F.3d at 1346.

11            Defendants' assertion that "Extreme's stock price had stagnated" before Berger's arrival

12   and Extreme "wished to incentivize Berger well" in the merger (MTD at 24) misses the point.

13   That Extreme may have had its reasons for giving Berger this package does not change that it

14   created a major incentive for him to inflate its stock price "'to maximize [his] performance on

15   that measure; ***no matter how***.'" ¶¶393-94 & n.17 (quoting Dan Cable and Freek Vermeulen, *Stop*

16   *Paying Executives for Performance*, Harvard Business Review, February 23, 2016).

17            Further, the Ninth Circuit has rejected Defendants' arguments regarding the AC's lack of

18   allegations that "Berger exercised any options or sold any shares." MTD at 24. "***[T]he lack of***

19   ***stock sales by a defendant is not dispositive as to scienter***" and does not render "illogical"

20   motive allegations. *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding*

21   *Corp.*, 320 F.3d 920, 944-45 (9th Cir. 2003). Allegations that options were exercised are also not

22   required. *Id.* (finding "***eligibility***" for stock options" sufficient to plead motive and scienter).

23            Defendants go outside the pleadings to assert that Berger's options expired. MTD at 24.

24   This factual challenge is both improper on a motion to dismiss and appears incorrect (*see* Pls. Ex.

25   2 (later-filed SEC Form 4 listing "Expiration Date" for Berger's options from this bonus as

26   "5/2/2020")). And it is irrelevant to his motive ***during*** the Class Period because it concerns what

27   happened to his options ***afterward***. Berger earned these options on 12/16/13 (¶400), and they

28   "would not expire for seven years after the grant date" (¶401). It incentivized him to inflate the

1    stock price (¶393) and try to maintain it while the options "vested incrementally over time"

2    (MTD at 24). By the time many of his options had vested, Extreme's stock price had already

3    started dropping as the truth regarding the integration problems slowly emerged (starting on

4    2/6/14). ¶¶20; 401. Thus, it is likely that Berger chose not to exercise them at those lower market

5    prices, determined to try to get the price back up by falsely reassuring investors that the

6    integration was going well. That his "gambl[e]" ultimately "did not pay off" does not invalidate

7    his motive to lie in the first place. *Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270

8    F.3d 645, 661–62 (8th Cir. 2001) ("Just as we cannot countenance pleading fraud by hindsight,

9    neither can we infer innocence by hindsight because the alleged misdeeds did not pay off.").

10                **4.    Departures of Defendants and Key Executives Also Support Scienter**

11            Departures of Berger, Kurtzweil, and two other executives directly responsible for the

12   salesforce integration (COO Crowell and CRO White) also bolster scienter. *See Zucco Partners,*

13   *LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). Berger was hired to accomplish the

14   Enterasys acquisition (¶99); it was the major initiative of his tenure, and he resigned just two

15   weeks after the Class Period. ¶145. *See Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D.

16   Cal. July 26, 2017) (scienter "bolstered" by "the resignation of [defendant] as GoPro's

17   president"). White was hired in the fall of 2014 to fix the continuing sales integration problems,

18   and departed just six months later, unable to fix them. ¶¶141, 144; *see also* ¶¶305-06. Analysts

19   knew Kurtzweil was "a major factor in driving most of the Enterasys integration" and linked his

20   departure to integration problems. ¶136.[6]

21   **IV.   CONCLUSION**

22           For these reasons, Defendants' motion to dismiss should be denied in its entirety.

23   Dated:  August 31, 2017                    Respectfully submitted,

24                                              **LABATON SUCHAROW LLP**

25                                              By:   */s/ Thomas A. Dubbs*
26                                                    Thomas A. Dubbs

27   ―――――――――――――
[6]Because Plaintiff states a Section 10(b) claim, the Court should also sustain the Section 20(a)
28   claims. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014).

1

**CERTIFICATE OF SERVICE**

2        I, the undersigned, state that I am employed in the City and County of New York, State of

3   New York, that I am over the age of eighteen (18) years and not a party to the within action, that

4   I am employed at Labaton Sucharow LLP, 140 Broadway, New York, New York 10005, and that

5   on August 31, 2017, I caused to be served a copy of the attached:

6        **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
         **IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
7        **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

8   to the parties through counsel who have appeared in this matter by the following means of

9   service:

10

11  [X]    BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the
            CM/ECF system which will send notification of such filing to all parties of record
12          registered with the Court's electronic filing system.

13        I declare under penalty of perjury under the laws of the State of California that the

    foregoing is true and correct.  Executed on the 31st day of August, 2017.

14

15                        By:   _/s/ Thomas A. Dubbs_____
                                      Thomas A. Dubbs
16

17

18

19

20

21

22

23

24

25

26

27

28