**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

Case No.  15-cv-04883-BLF

In re EXTREME NETWORKS, INC.
SECURITIES LITIGATION

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

[Re:  ECF 107]

This is a putative class action for securities fraud brought against Extreme Networks, Inc. ("Extreme") and its officers Charles W. Berger, Kenneth B. Arola, and John T. Kurtzweil ("Individual Defendants"), (collectively with Extreme, "Defendants").  Plaintiffs have filed an Amended Consolidated Class Action Complaint alleging that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See* ECF 105 ("Amended Compl.").  Plaintiffs also assert that the Individual Defendants are liable for violations of federal securities laws as "control persons" of Extreme, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants have moved to dismiss the Amended Complaint, arguing that Plaintiffs have not cured the deficiencies identified by the Court in its previous order granting Defendants' motion to dismiss with leave to amend.  *See* ECF 107 ("Mot."); ECF 102 ("Prior Order").  The Court heard oral argument on Defendants' motion to dismiss the Amended Complaint on December 14, 2017.  For the reasons set forth herein, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

Founded in 1966, Extreme is a Delaware corporation with its principal offices in San Jose, California, that develops and sells network infrastructure equipment such as wired and wireless devices for accessing the Internet, as well as relevant software.  *See* Amended Compl. ¶¶ 2, 32.[1] The Individual Defendants were officers and directors of Extreme during the time relevant to this litigation.  Defendant Charles W. Berger was the Company's President and Chief Executive Officer ("CEO") and a member of Extreme's Board of Directors from April 2013 until April 19, 2015.  *Id.* ¶ 34.  Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and Senior Vice President from June 29, 2012 through June 1, 2014.  *Id.* ¶ 35.  From June 2, 2014 until September 30, 2014, Kurtzweil served as "Special Assistant to the CEO."  *Id.*  Defendant Kenneth B. Arola was the Company's CFO and Senior Vice President from June 2, 2014 through May 2016.  *Id.* ¶ 36.

To summarize in relevant part, Plaintiffs bring this action against Defendants for alleged misrepresentations regarding the success of Extreme's post-acquisition integration with its former competitor, Enterasys Networks, Inc. ("Enterasys"), as well as developments in Extreme's "key partnership" with Lenovo Group Ltd. ("Lenovo").  Amended Compl. ¶¶ 1-7.  Defendants' positive representations to investors about the resulting "synergies" from the Enterasys integration and benefits of the Lenovo partnership—including a commitment that cost savings from these arrangements would lead to double-digit revenue growth and a 10% operating margin by June 2015—caused Extreme's stock price to rise.  Meanwhile, Extreme's stock price dropped when Extreme reported disappointing financial results at various points between February 2014 and the end of the Class Period on April 9, 2015.  *Id*. ¶¶ 17-22.

Relying on six (6) confidential witnesses ("CWs"), Plaintiffs allege that Defendants knew or recklessly disregarded material, adverse facts regarding the lack of any integration plan for the Enterasys merger, which was not "on track" or "complete" as represented.  *Id.* ¶ 13.[2] Plaintiffs

---

[1] The facts of this case are familiar to the parties and the Court and are set forth at length in this Court's Prior Order.  For purposes of this motion to dismiss, the Court provides the relevant factual and procedural history and focuses on Plaintiffs' amendments to their allegations.
[2] The Consolidated Complaint included statements from seven CWs, but the Amended Complaint

also point to accounts from CWs that the Lenovo partnership was largely unproductive, in direct contrast to Defendants' representations to the market. *Id.* ¶ 17. According to Plaintiffs, Defendants' false statements caused Extreme's stock to trade at artificially inflated prices during the Class Period, reaching a high of $8.14 per share on January 23, 2014. *Id.* ¶ 19. Plaintiffs allege that four partial corrective disclosures by Defendants announcing revenue shortfalls, guidance misses, and turnovers of Extreme executives, caused the stock price to plummet as the undisclosed risks relating to the Enterasys integration and Lenovo partnership materialized. *Id.* ¶ 20-22.

## A. Procedural History

On September 26, 2016, Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiffs") filed a Consolidated Class Action Complaint on behalf of all investors who purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock between September 12, 2013, and April 9, 2015, (the "Class Period"). *See* Consolidated Complaint ¶ 1, ECF 87. The Consolidated Complaint alleged two counts: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (2) violation of § 20(a) of the Exchange Act against the Individual Defendants for liability as control persons of Extreme.

Plaintiffs allege that Defendants made false statements that generally fall into three separate categories: (1) false statements assuring investors regarding the status of Extreme's acquisition of and integration with Enterasys; (2) misrepresentations of the potential impact of Extreme's partnership with Lenovo; and (3) false promises to investors that these business arrangements would lead Extreme to achieve double-digit revenue growth and a 10 percent profit margin by June 2015. Plaintiffs originally offered statements by seven CWs to suggest that the Individual Defendants knew of or deliberately disregarded the falsity of their statements at the time they were made.[3]

Defendants moved to dismiss the Consolidated Complaint, arguing that many of the

---

removed all statements attributable to CW6. *See* Consolidated Compl. ¶ 150. The Court therefore considers only the statements from CWs 1-5 and 7, who are included in the Amended Complaint.
[3] The Court's Prior Order described each CW and their statements in detail. *See* Prior Order at 11-14. The Court considers the CWs as described below in its analysis of scienter and falsity, with the exception of CW6 whose statements were removed from the Amended Complaint. For purposes of this background section, the focus remains on Plaintiffs' amended allegations.

allegedly false statements are immaterial and non-actionable. *See* Prior Order at 18-25. The Court agreed in part, finding that certain challenged statements were non-actionable statements of corporate optimism and puffery. *Id*. Although some of Plaintiffs' allegations regarding Defendants' statements about the Enterasys integration and the Lenovo partnership amounted to objectively verifiable matters of fact, *id*. at 25, the Court dismissed Plaintiffs § 10(b) and Rule 10b-5 cause of action with leave to amend because the allegations of falsity were insufficient with respect to such statements. The Court also found that Plaintiffs had not adequately alleged scienter in the Consolidated Complaint. *Id*. at 33. Without a primary violation of the Exchange Act, the Court dismissed with leave to amend Plaintiffs' second count against the Individual Defendants for violations of Section 20(a) of the Exchange Act. *Id*. at 42.

**B.     Factual Allegations in the Amended Complaint**

Plaintiffs filed an Amended Consolidated Class Action Complaint on June 2, 2017 that contains the same two causes of action for securities violations against the same Defendants. *See generally* Amended Compl. Plaintiffs focus their amended factual allegations on statements that the Court indicated were actionable, and attempt to cure the previously identified deficiencies with respect to falsity and scienter.

**i.     The Enterasys Integration**

Enterasys was a privately held company that was one of Extreme's direct competitors. Amended Compl. ¶ 3. Like Extreme, Enterasys also sold network infrastructure equipment and software, including analytics and security products. *Id*. Extreme announced its acquisition of Enterasys on September 12, 2013 and the transaction was completed on October 31, 2013 for $180 million in cash. *Id*. ¶ 4. As explained in the Court's Prior Order, Plaintiffs allege that Defendants made a number of false and misleading statements related to the Enterasys acquisition during the Class Period. *See* Prior Order at 5-8.

*1.     Timeline of Statements and Disclosures*

Specifically, Plaintiffs allege that when the Enterasys acquisition was announced on September 12, 2013, CEO Charles Berger assured investors that "[t]here will be no disruption in customers' ability to grow and operate their networks. Period. None." Amended Compl. ¶¶ 4, 52,

4

170, 400.  Meanwhile, CFO John Kurtzweil stated on behalf of Extreme's management that "[w]hen we have fully integrated the two Teams, we plan to reduce product costs and operating expenses between $30 million to $40 million.  We expect to realize these synergies over a 12 to 24-month period." *Id.* ¶¶ 5, 52, 165, 185.  The market reacted favorably to these statements, made on September 12, 2013, announcing the "plan" for the Enterasys integration and Berger's assurance that there would be no disruption to customers.  *Id.* ¶ 176.  Extreme's stock price increased seven (7) percent, by $0.30 per share, from $4.03 per share at the close of trading on September 11, 2013, to $4.33 per share at the close of trading on September 12, 2013.  *Id.*

As time went on, Defendants partially disclosed issues with the Enterasys integration. Before the market opened on February 5, 2014, Extreme issued a press release announcing its Second Quarter ("Q2") 2014 financial results and its Q3 2014 guidance.  *Id.* ¶¶ 21, 195.  Extreme reported revenues toward the low end of the guidance announced in its November 4, 2013, press release for Q2 2014, and expected reserves for Q3 2014 below the consensus estimates of $154 million.  *Id.* ¶ 195.  During a conference call with investors to discuss this announcement, Berger acknowledged that the Company had "not seen significant evidence of revenue [due] to synergies."[4]  *Id.*  After this disclosure, Extreme's stock declined sixteen (16) percent, from $7.04 per share to $5.92 per share at the close of trading on February 5, 2014.  *Id.* ¶ 196

Over the course of the Class Period, and in the midst of the lower guidance, Plaintiffs allege that Defendants continued to assure investors that Extreme was "on track" to realize the $30-40 million in synergies as a result of the integration with Enterasys.  *Id.* ¶¶ 12, 53, 56, 197. For example, in the February 5, 2014 press release when the disappointing Q2 2014 financials were announced, Berger also represented: "[o]ur integration plans are on track." *Id.* ¶ 197.

Plaintiffs allege that Defendants continued to mislead the market while the truth partially emerged through additional partial corrective disclosures.  On May 6, 2014, Extreme released two press releases after trading hours.  *Id.* ¶ 204.  These announcements reported financial results for

---

[4] Plaintiffs claim that the disclosures made on this call "were the first indication" that Defendants' statements regarding the integration and realization of cost-saving synergies by Q3 2014 were false and misleading.  Amended Compl. ¶ 196.

the first full quarter after the Enterasys acquisition was completed, and the quarter in which management had told investors to expect to see the first positive impact of the integration on Extreme's financials.  *Id*.  Revenues for Q3 2014 were again on the low end of the guidance given at the end of the prior quarter in February 2014.  *Id.* ¶ 204.  The press release also announced Kurtzweil's transition from CFO to "Special Assistant to the CEO" and the hiring of Defendant Arola as Extreme's CFO.  *Id.* ¶ 205.

In the second press release on May 6, 2014, Extreme announced the departure of Chris Crowell, the current COO of Extreme and former CEO of Enterasys.  *Id.*  On an earnings call that same day, Berger disclosed "some" problems with sales force integration efforts and stated that Berger himself would take on a more direct role in those efforts.  *Id.* ¶ 206.  Because Extreme "ha[d] experienced some integration issues," Berger announced that the field organizations and corporate marketing would report to him effective immediately.  *Id.*  Following these announcements, Extreme's stock declined $1.38 per share, over twenty-five (25) percent, to a share price of $3.95 at the close of trading on May 7, 2014.  *Id.* ¶ 207.  At the same time that Extreme reported these disappointing financial results and turnover of executives, Berger told investors that "[t]he integration efforts following the acquisition of Enterasys continue ahead of plan." *Id*. ¶¶ 11, 57, 208-9, 425.

On July 21, 2014, Extreme issued a press release announcing higher guidance for Q4 2014, two weeks before Extreme's official Q4 2014 financial results would be released.  *Id*. ¶ 227.  In the press release, Berger stated that "[o]ur integration remains ahead of plan as we continue to execute against key Company and operational and financial milestones, including successfully completing our ERP integration in early July[.]"  *Id.*  Plaintiffs allege that the market reacted favorably to Berger's assurances in July 2014 that integration was "ahead of plan." *Id*. ¶ 232.  After the press release was issued, Extreme's stock increased by fifteen (15) percent, rising from $4.37 per share at the close of trading on July 20, 2014 to a close of $5.06 per share on July 21, 2014. *Id*.

On August 14, 2014, Extreme reported financial results for its fourth fiscal quarter (Q4 2014) and FY 2014, as well as guidance for the next fiscal quarter. *Id*. ¶ 59.  In a press release that

day, Berger stated: "[o]ur sales force integration is complete." *Id*. Also on August 14, 2014, Defendant Arola announced on an earnings call that Extreme and Enterasys were "now fully integrated," including specifically with regard to the sales force and product portfolio. *Id*. ¶¶ 60, 254. Berger further stated on the earnings call that "we are exactly where we planned to be in [the] integration process," and discussed "signs that the integration issues are behind us." *Id*. ¶¶ 60, 93, 240. During the call, Berger also assured investors that Extreme had "completed major elements of the integration of Enterasys and are on track to realize the synergies we have committed to." *Id*. ¶ 245. Berger explained on the August 14, 2014 conference call that his knowledge of the Enterasys integration came from his direct involvement with North America sales personnel, including his personal attendance at Extreme's global sales conference with the entire sales team, giving him insight into "integration issues." *Id*. ¶ 407.

Berger and Arola continued to tout Enterasys integration as a success until October 15, 2014, when Extreme preannounced its disappointing Q1 2015 financial results. *Id*. ¶ 265. Berger attributed the results to "significant delays in closing deals" in North America, but reassured investors that Extreme had "made dramatic progress" with the Enterasys integration, including hiring Jeff White as Chief Revenue Officer ("CRO"). *Id*. ¶¶ 227–28. The day after these disclosures, Extreme's stock fell by approximately eighteen (18) percent, declining from $3.76 per share to $3.06 per share on October 16, 2014. *Id*. ¶ 266. The Amended Complaint adds allegations that Plaintiffs describe as "key admissions" by Berger regarding the status of the Enterasys integration. *Id*. ¶¶ 104, 110, 142, 143. Plaintiffs allege that on October 15, 2014, the same day Extreme announced disappointing Q1 2015 results, Berger backtracked from his previous representations and stated that sales force integration with Enterasys was only "nearly completed." *Id*. ¶¶ 61, 142.

On October 28, 2014, Extreme released its full Q1 2015 financial results and guidance for Q2 2015. *Id*. ¶ 62. On a conference call, Defendants attributed the results to "significant" "disruptions" caused by the Enterasys acquisition and integration, which Berger explained, "had an impact on our revenues during the quarter as our partners and sales people had to learn a new way to do business with us." *Id*. Despite these financial results, Berger assured investors that

7

"these disruptions are now fully behind us," and "[w]e are on track to realize the full $30 to $40 million in cost synergies expected from the acquisition." *Id*. ¶¶ 62, 274, 279. Arola added on the same call, "[w]e continue to [be on] track to realize the full $30 million to $40 million of synergies expected from the Enterasys acquisition." *Id*. ¶¶ 62, 284. As a result, Extreme's stock price increased approximately ten (10) percent to a closing price of $3.63 per share on October 29, 2014 from a closing price of $3.30 per share on October 28, 2014. *Id*. ¶ 288.

On January 28, 2015, Berger disclosed on an earnings call that "while we are making daily substantial progress on the complete integration and upgrading of our salesforce, it is clear that we still have considerable work to do going forward." *Id*. ¶¶ 64, 143, 148. During the call, Berger also stated that Extreme would not be able to deliver the 10 percent year-over-year growth that he and the other Defendants had projected from the beginning of the Enterasys acquisition. *Id*. ¶ 367.

### 2. *Amended Allegations*

With this timeline in mind, the Court turns to Plaintiffs' amended allegations regarding the Enterasys integration. Plaintiffs allege, through accounts from multiple CWs, that Extreme never had a "plan" to achieve $30-40 million synergies over a 12 to 24-month period, or to "fully integrate" Enterasys with Extreme because, in reality, Extreme lacked an integration plan altogether. *Id*. ¶¶ 166, 186. In response to the Court's previous comments, the Amended Complaint now defines an integration plan as including "(1) a plan setting forth how the two salesforces would be integrated, (2) a plan outlining other steps to cut costs and obtain synergies from the integration, (3) a 'product roadmap' stating how the companies' separate products would be integrated, and (4) a 'go-to-market strategy' as to how the combined entity would reach customers and provide competitive products." *Id*. ¶ 13.

The Amended Complaint also supplements the factual allegations from the CWs, including the direct interactions that CWs 1 and 3 had with Berger about the status of Extreme's integration efforts with Enterasys. *Id*. ¶¶ 102-105, 110, 112-113, 122, 126. In particular, CW3 was a Territory Sales Manager at Extreme who stated from personal experience that there was "no plan" for integration with Enterasys. *Id*. ¶ 102. CW3 stated that at a quarterly sales meeting held by Berger right after the acquisition, Extreme sales personnel pressed Berger on what they should tell

8

customers who were nervous about how the two companies would combine their products. *Id*. ¶ 105. Berger responded that "we're formulating the integration plan," indicating to CW3 that the "plan" announced at the time of the acquisition was false or misleading. *Id*. Moreover, at Extreme's annual global sales meeting in Las Vegas in July or August of 2014, CW3 personally witnessed peer sales personnel question Berger about the lack of a plan to integrate the two companies and their products. *Id*. ¶ 105. In response to these questions, Berger stated that management was working on the integration and the plan was "TBD" or "to be determined." *Id*.

CWs 1 and 3 also state that they had personal conversations with Berger where he acknowledged problems with the Enterasys integration, which led to the resignation of top performing personnel. *Id*. ¶¶ 122, 126. These allegations are provided to show that Berger knew about company-wide sales force integration problems at the time he made allegedly false or misleading statements to investors. *Id*. ¶ 126. The Amended Complaint also adds allegations regarding how CW3 would have known whether Extreme actually had an integration plan, including a product road map for the combination with Enterasys. *Id*. ¶ 102. Plaintiffs further allege that in early 2015, CW3 participated in a sales call with Chief Revenue Officer Jeff White who confirmed that the sales force integration between the two companies was not "complete." *Id*. ¶ 144. White listed "many things wrong," describing Extreme as a "disaster" and a "hot mess," which made it clear to CW3 that the salesforce integration was still not complete despite Defendants representations throughout 2014 to the contrary. *Id*.

Plaintiffs further supplement their allegations regarding the Enterasys integration by adding post-Class Period "admissions" to demonstrate that Extreme lacked an integration plan. *Id*. ¶¶ 14, 155-57, 160. In May 2015, Extreme announced a "new operating plan" and a "new go-to-market strategy and realignment" which was the result of a review process that took place in January 2015. *Id*. ¶¶ 155-57. Plaintiffs allege that these "new" strategies corroborate the accounts of the CWs that there was no prior plan in place to achieve synergies from the Enterasys integration during the Class Period. *Id*. Ed Meyercord, who replaced Berger as CEO, further "admitted" on September 14, 2016 that "[t]here were a lot of integration issues" with the Enterasys acquisition, and a subsequent integration of a recently acquired business, Zebra Technologies,

would be "very different" and involve "integration planning" such as a "very clean and clear product and technology roadmap." *Id.* ¶¶ 14, 160.[5]

### ii. The Lenovo Partnership

The second category of allegedly false and misleading statements in the Amended Complaint relates to Extreme's "key partnership" with Lenovo. *See, e.g. id.* ¶¶ 6-8, 16-17, 24, 66-68. Extreme's business model depended primarily on selling its products and services through its "channel partners," one of which was global technology company, Lenovo. *Id.* ¶ 6. Extreme announced the Lenovo partnership on July 17, 2013, and highlighted the relationship to investors. *Id.* ¶¶ 6-7. Plaintiffs allege that throughout the Class Period, Defendants represented that the partnership was a growth driver for Extreme due to Lenovo's expanding server business, when in reality Extreme derived little value from the Lenovo arrangement due to a lack of "visibility" into Lenovo and an absence of activity at the field level. *Id.* ¶¶ 7, 66.

#### 1. *Timeline of Statements and Disclosures*

On January 23, 2014, Lenovo announced that it would be greatly expanding its own server business by acquiring IBM's "x86" server business for approximately $2.3 billion. *Id.* ¶ 68. Soon after the announcement of the IBM acquisition, Extreme began to publicize its relationship with Lenovo as being even more important for Extreme's growth strategy. *Id.* On an August 14, 2014 earnings call to discuss Q4 2014 financial results and to announce guidance for Q1 2015, Berger touted the Lenovo partnership and specifically stated that he had "met with the Lenovo executive team in China and it is clear they are strongly committed to the alliance. We've also trained all Lenovo North American reps on Extreme products." *Id.* ¶¶ 70, 307. Berger further indicated that Lenovo would "generate significant revenues" for Extreme "starting in our fourth quarter of 2015 and beyond." *Id.* ¶ 70.

On October 28, 2014, Berger stated that the two companies "continue to make progress each day towards realizing the potential of this agreement," and anticipated "significant results by

---

[5] The Court considers the entire context of Meyercord's statements, including his distinction between the type of transaction involved, explaining that Extreme/Enterasys "was really a merger" and Extreme/Zebra was "a very clean asset purchase." *Id.* ¶ 160.

the fourth quarter." *Id.* ¶ 322. Berger emphasized that "there [was] no longer any doubt that this will happen," and that he expected to achieve double-digit revenue growth as a result of the partnership by the end of 2015. *Id.* Also on October 28, 2014, Berger stated on an earnings call that Lenovo continued to be a growth opportunity for Extreme because of Lenovo's expanding server business. *Id.* ¶ 317. Specifically, Berger stated that "[g]etting internal sales reps that are Extreme employees sitting side-by-side with people in North America and China has been accomplished." *Id.* Berger also continued to assure investors that Extreme would see benefits of the Lenovo partnership in the near future, stating that "Lenovo has certainly by then [June 2015] we believe will have double-digit revenue impact." *Id.* ¶ 322. After the October 28, 2014 announcements, Extreme's stock increased from $3.30 per share to $3.79 overnight. *Id.* ¶ 327.

On January 14, 2015, Arola made a public presentation on behalf of Extreme at the Needham Growth Conference. *Id.* ¶ 363. Although he touted the success of the Enterasys integration and Extreme's customers, products and services, Arola also partially disclosed the uncertainties of the expected synergies and revenue growth that Defendants said would materialize by the end of FY 2015. *Id.* Plaintiffs allege that after his presentation, Arola implied that Extreme would not be able to deliver on its commitment of 10% revenue growth and 10% operating margin by the end of FY 2015, including specifically based on the Lenovo partnership. *Id.* After this disclosure, Extreme's stock declined from $3.36 per share to $3.20 per share overnight. *Id.* ¶ 295. Two days after the disclosure, Extreme's stock declined further, and the decline continued until January 28, 2015. *Id.* ¶ 364.

During Extreme's January 28, 2015, earnings call to discuss financial results for its Q2 2015, Berger revealed that the previously anticipated revenue impact from the Lenovo partnership would not be achieved by June 2015, and perhaps not for another year. *Id.* ¶ 73. Nevertheless, Berger expressed confidence, claiming that the "partnership with Lenovo strengthened during the quarter on many fronts," with "continued productive discussions at all levels with Lenovo." *Id.* Berger further stated that "we continue to make progress almost on a daily basis with Lenovo, across the board," and "we are exactly where we thought we would be on things like being on the price list, being in their literature, having airtime with the legacy Lenovo salesforce." *Id.* ¶¶ 73,

330.  After these public statements, Extreme's stock price increased by nine (9) percent from $2.78 per share to a close of $3.04 per share on January 29, 2015.  *Id.* ¶ 301.

On April 9, 2015, the last day of the Class Period, Extreme preannounced that it would miss its previously issued earnings estimates for Q3 2015.  *Id.* ¶ 303.  The press release stated that Extreme expected non-GAAP revenue between $118 to $120 million, compared to previous estimates of $130 to $140 million, falling far below investor expectations.  *Id.*  Plaintiffs allege that Extreme's stock price collapsed as a result of the April 9, 2015 disclosures.  *Id.* ¶ 304.  Shares lost approximately twenty-five (25) percent of their value, falling from a close of $3.24 per share on April 9, 2015 to $2.50 per share on April 10, 2015.  *Id.*

### 2.  *Amended Allegations*

In their Amended Complaint, Plaintiffs challenge four alleged misstatements by Defendants concerning Extreme's partnership with Lenovo:

- "We've also trained all Lenovo North American reps on Extreme products." *Id.* ¶¶ 70, 307-8 (Aug. 14, 2014).

- "Lenovo [] certainly by then [June 2015] we believe will have double-digit revenue impact." *Id.* ¶¶ 7, 72, 322 (Oct. 28, 2014).

- "Getting internal sales reps that are Extreme employees sitting side-by-side with people in North America and China has been accomplished." *Id.* ¶ 317 (Oct. 28, 2014)

- In response to analyst question regarding the "Lenovo issue" which was "a complicated deal and a lot of moving parts and geographic challenges," Berger responded: "Well, on the positive side, we are exactly where we thought we would be on things like being on the price list, being in their literature, having airtime with the legacy Lenovo salesforce." *Id.* ¶¶ 73, 330, 331.

*See also* Amended Compl. Appendix A at 4-5, ECF 105-1 ("App'x A").  The Court notes that although the Amended Complaint has honed in on these four statements, none of them are new allegations.  *See* Consolidated Complaint ¶¶ 89, 103, 279, 288-89, 299.  Nevertheless, because the parties did not focus on these statements in the prior motion to dismiss, the Court addresses these four statements specifically in its analysis below.

The "admissions" that Plaintiffs rely on to show the falsity of Defendants' Lenovo statements are also repled in the Amended Complaint.  Plaintiffs repeat their allegations that the

12

above statements were false because, in reality, Extreme had "zero visibility into Lenovo" and whether or not the two companies were "collaborating in the field." Amended Compl. ¶¶ 16, 24, 151, 301, 331, 333. CW4, a Regional Sales Director at Extreme during the Class Period, also personally observed that although the Lenovo alliance was pushed very hard internally, all activity was at the strategic level and nothing came down to the "field level." *Id.* ¶ 149. For example, CW4 stated "[t]here were no joint meetings, no Go-to-Market sessions, no follow-up –there was no field level activity towards that [Lenovo] alliance." *Id.*

### iii. "Commitment" to Achieve 10% Revenue Growth and 10% Operating Margin

Plaintiffs refuse to abandon the third category of statements, which the Court previously found to be inactionable statements of corporate optimism and puffery. *See* Prior Order at 24. The Amended Complaint reorganizes and repleads Defendants' statements related to their "commitment" to achieving a 10% operating margin and double-digit revenue growth by June 2015, driven at least in part by the Enterasys integration and Lenovo partnership. *See* Amended Compl. ¶¶ 8, 77, 78, 341, 351, 356. As discussed below, Plaintiffs essentially ask the Court to reconsider its prior determination and find that the following three "commitment" statements are sufficiently definitive and specific to be actionable under the securities laws:

- "I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015 as we complete the [Enterasys] integration, realize the benefits of our key partnerships like Lenovo…Over the same period we are committed to achieve a 10% operating margin." *Id.* ¶¶ 8, 77, 341 (May 6, 2014).

- "We stand by our commitment for 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better." *Id.* ¶¶ 78, 351, 356 (Oct. 28, 2014).

- "I want to remind you that I remain committed to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015." *Id.* ¶¶ 78, 356 (Oct. 28, 2014)

*See* App'x A at 5-6.

### iv. Berger's Bonus Plan

In its Prior Order, the Court found with respect to Plaintiffs' scienter allegations that Berger's "unusual" bonus scheme did not contribute to a strong inference of scienter when viewed

holistically. *See* Prior Order at 39-40. As previously alleged, through Berger's contract with Extreme, Berger was given 300,000 Extreme stock options every time Extreme's stock price stayed above a certain price for 30 consecutive trading days, and that based on Extreme's stock price during the class period, Berger received options to purchase 900,000 shares of Extreme stock. *See, e.g.*, Amended Compl. ¶¶ 9, 201, 212, 217, 223, 231, 398. Thus, Plaintiffs allege that Berger was incentivized to promote Extreme's "growth narrative" in order to inflate the share price of Extreme stock in the short term so he could maintain or increase the value of his stock options. *Id.* ¶¶ 9, 201, 212, 217, 223, 249.

Plaintiffs have added allegations to detail how unusual Berger's stock price-based bonus was. *See* Pltfs' Opposition ("Opp'n") at 2, ECF 112. The Amended Complaint now alleges that no preceding CEO of Extreme had a similar "Performance Option" bonus. Amended Compl. ¶¶ 372, 374-78. Plaintiffs also engaged an executive compensation expert, Steven Hall, to provide expert testimony that Berger's bonus was highly unusual compared to Extreme's peer companies and other companies of a similar size. *Id.* ¶¶ 379-92. Notably, Plaintiffs do not add any allegation that Berger actually exercised his options. Instead, Plaintiffs argue that the Ninth Circuit does not require such allegations, which the Court addresses below.

## II.     LEGAL STANDARD

### A.     Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed

factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*

## B.  Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## C.  Confidential Witnesses

To satisfy the PSLRA pleading requirements, "a complaint relying on statements from confidential witnesses must pass two hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005)). First, the confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge [of the events they report]." *Id.* "Second, those statements . . . must themselves be indicative of scienter [or falsity]." *Id.*

### III. JUDICIAL NOTICE

As a preliminary matter, Defendants request that the Court take judicial notice of Extreme's quarterly press releases filed with the SEC, as well as transcripts from conference calls, to show what was disclosed to investors along with the challenged statements. *See* Mot. at 5; Declaration of Margaret Austin ("Austin Decl."), Exh. 1-27, ECF 107-1. Defendants also request the Court to take judicial notice of historical price data for Extreme's stock during the time period of August 30, 2006 to July 20, 2015. *See* Austin Decl. Exh. 27, ECF 107-28.

Plaintiffs oppose Defendants' request for judicial notice to the extent Defendants request the Court to take notice of the truth of the contents of the exhibits, which Plaintiffs argue contain disputed facts. *See* Opp'n at 5. Specifically, Plaintiffs argue that Defendants employ an "improper, summary judgment-style evidentiary attack" through 26 exhibits. Opp'n at 3.[6]

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have previously taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Under the incorporation by reference doctrine, a court may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached [to] the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). The Court may consider the entire document, even if only portions were quoted or referenced in the Complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569, n. 13 (2007) (citing Fed. R.

---

[6] Thus, it appears that Plaintiffs do not oppose Defendants' request for judicial notice of the historical price data for Extreme's stock. *See* Austin Decl. Exh. 27. The Court GRANTS Defendants' request for judicial notice of Exhibit 27.

United States District Court
Northern District of California

Evid. 201) (holding that courts are "entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn.").

Defendants' request for judicial notice of the press releases, SEC filings, and transcripts of the conference calls at Exhibits 1-26 is GRANTED with respect to their existence. *See* Exs. 1–26 to Austin Decl., ECF 107-2–107-27. Plaintiffs have objected to the Court taking judicial notice of these documents for the truth of the contents of the exhibits. *See* Opp'n at 5. The Court agrees that it would be improper to take notice of facts that might reasonably be disputed, or to draw inferences from such documents. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (taking judicial notice of reports referred to in complaint for their "existence," but holding "we may not, on the basis of these reports, draw inferences or take notice of facts that might reasonably be disputed"); *Lee v. City of Los Angeles*, 250 F.3d 668, 688, 690 (9th Cir. 2001). Plaintiff clearly disputes the truth and the inferences drawn from certain facts in the judicially noticed exhibits. *See* Opp'n at 5.

## IV. DISCUSSION

### A. Section 10(b) and Rule 10b-5

Plaintiffs bring a claim for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants. *See* Amended Compl. ¶¶ 438-444 (Count I). Section 10(b) prohibits any act or omission that results in fraud or deceit in connection with the purchase or sale of any security. Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities fraud claim, Plaintiffs must plead the following with particularity: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017); *see also Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014).

The Court previously dismissed Plaintiffs' § 10(b) and Rule 10b-5 claim for failure to adequately plead falsity and scienter with respect to any of the challenged statements. *See* Prior Order at 18-42.[7] Defendants now move to dismiss this claim in the Amended Complaint, arguing that the pleading "treads the same path as its predecessor, and deserves a similar fate." Mot. at 1. As before, Plaintiffs' allegations in the Amended Complaint fall into three categories of statements by Defendants regarding: (1) the Enterasys integration; (2) the partnership with Lenovo; and (3) Extreme's "commitment" to 10% operating margins and revenue targets. The Court addresses each category in turn, first considering whether Plaintiffs have alleged an actionable misrepresentation or omission along with "specific facts indicating why" the statements at issue were false when made.

For the reasons that follow, Defendants' motion to dismiss Count I of the Amended Complaint for failure to state a claim is GRANTED IN PART and DENIED IN PART.

### i. Falsity

In order to plead falsity, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014). The Court examines the Amended Complaint for "specific facts indicating why" the challenged statements were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"); *In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible

---

[7] Before reaching falsity, the Court addressed a number of Plaintiffs' allegations that amounted to immaterial and non-actionable statements and omissions. Prior Order at 18-25.

United States District Court
Northern District of California

under Rule 9(b)"). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH*, 540 F.3d at 1070.

As explained in the Court's Prior Order, a material misrepresentation differs significantly from corporate puffery. Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification"). Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Finally, "mildly optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d at 1111.

An omission, by contrast, "refers to the failure to disclose material information about a company." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). "[A]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1061 (citations and internal quotation marks omitted); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011).

### a. Claims Based on Statements about the Enterasys Integration

The bulk of Defendants' motion to dismiss focuses on Plaintiffs' allegations regarding false statements concerning the Enterasys acquisition and integration. That is not surprising, as the vast majority of Plaintiffs' amended allegations relate to this first category of statements. As set forth in Appendix A to the Amended Complaint, Plaintiffs challenge portions of twenty-one (21) statements regarding the Enterasys integration as false as misleading under the securities laws. *See* App'x A at 1-4. Defendants argue that Plaintiffs have not remedied the deficiencies previously identified by the Court, and rely on a number of public disclosures during the Class Period in an attempt to undermine Plaintiffs' theories of falsity.

Specifically, Plaintiffs organize the challenged Enterasys integration statements into six categories, including statements that (1) the integration is "on track"; (2) the integration is "ahead of plan," and similar "plan" statements; (3) Extreme had a "plan" to achieve synergies from integration; (4) synergies from integration are "on track"; (5) sales force integration is "complete" and integration problems are "behind" Extreme; and (6) the integration will cause "no disruption" to customers. *See, e.g.*, Amended Compl. ¶¶ 165, 170, 180, 185, 197, 209, 213, 218, 227, 235, 240, 245, 250, 254, 258, 267, 274, 279, 284, 291, 296.

Defendants organize the Enterasys integration statements chronologically, moving to dismiss the section 10(b) claim based on statements made in 2013, the statements made in 2014-2015 regarding cost savings, and statements made in 2014 regarding the sales force. *See* Mot. at 8-16. The Court follows Defendants' organization on their motion to dismiss, but refers back to Plaintiffs' categories to ensure that each type of allegedly false statements is addressed.

### 1. 2013 Statements

Plaintiffs argue that they have plausibly stated a section 10(b) claim against Defendants based on affirmative statements made in 2013 around the time that Extreme announced its merger with Enterasys. *See* Opp'n at 6-13 (referring to certain 2013 statements as "plan" statements). Plaintiffs allege that on September 12, 2013, Defendants announced Extreme's acquisition of Enterasys and told investors that "when we have fully integrated the two Teams, we plan to reduce product costs and operating expenses between $30 million to $40 million." Amended Compl. ¶¶ 5, 52, 165. Kurtzweil, who made this representation, added that investors could "expect to realize these synergies over a 12 to 24-month period." *Id*. Berger further stated on the September 12, 2013 conference call that "[t]here will be no disruption in customers' ability to grow and operate their networks. Period. None." *Id*. ¶¶ 4, 52, 170.

On November 4, 2013, Defendants updated the market via Berger's statement that "[o]verall, our integration efforts are on track." *Id*. ¶¶ 53, 180. Kurtzweil repeated Extreme's "plan to reduce product costs and operating expenses between $30 million and $40 million…over a 12- to 24-month period," and that "the timing of these synergies will be seen in the financials in a small way in the third fiscal quarter and will hit full stride in 12 to 15 months from now." *Id*.

¶ 185.  Defendants argue that through this statement, Kurtzweil was telling investors not to expect any cost synergies in the quarter in which the Enterasys merger closed and only a small amount of savings even in the subsequent quarter.  Mot. at 9.  The 2013 statements are included in Plaintiffs' first, third, and sixth categories of statements.  *See* App'x A at 1-4.

The Court previously held that although the 2013 statements are actionable—i.e. not puffery—Plaintiffs had not adequately alleged that any of the statements was materially false or misleading when made.  *See* Prior Order at 21, 26.  Defendants move to dismiss the section 10(b) claim based on the 2013 statements in the Amended Complaint, arguing that Plaintiffs have still not alleged falsity or scienter under the PSLRA.  *See* Mot. at 8-11.  With respect to falsity, the Court agrees with Defendants that the 2013 statements do not get out of the gate.

The Court first addresses Kurtzweil's statements on September 12, 2013 and November 4, 2013 regarding expected cost savings of $30 to $40 million over a 12- to 24-month period.  *See* Amended Compl. ¶¶ 165, 185.[8]  Defendants argue that the Amended Complaint does not allege any contemporaneous facts suggesting that Kurtzweil lacked the intention to cut costs or knew that these savings could not be achieved.  *See* Mot. at 8 (citing *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 882, 886 (9th Cir. 2012)).  Plaintiffs argue that the factual allegations from the CWs are sufficient to demonstrate that Kurtzweil's 2013 statements were false because they "created the strong impression" that an integration plan existed when, in fact, there was no such plan.  Opp'n at 6.

The Court previously held that Plaintiffs did not adequately allege facts to explain how or why the CWs "would have been privy to any such [integration] plan."  Prior Order at 27.  Moreover, the Court credited Defendants' contemporaneous disclosures, discussed below, that Extreme faced many challenges with integration.  *Id*. at 30.  Although the Court credits Plaintiffs' additional allegations regarding the basis of the CWs' knowledge, the Amended Complaint fails to allege that Defendants "lacked an integration plan," rendering the 2013 statements false.

Plaintiffs argue that the allegations from multiple CWs make clear that Defendants never

---

[8] These are the only two statements made by Kurtzweil about the Enterasys integration that Plaintiffs challenge.  *See* App'x A at 1.

had an integration plan, and thus Kurtzweil's statements in 2013 regarding a "plan" for cost savings and expected synergies were false at the time they were made. *See* Opp'n at 6. For example, CW1, a Senior Systems Engineer at Extreme, stated that there was no centralized integration plan. *Id*. ¶¶ 95-96.[9] The Amended Complaint adds statements from CW1 that Extreme's customers were concerned by Extreme's lack of a product roadmap regarding how the two companies' products would be combined and what the resulting product would look like. *Id*. ¶ 97. CW1 alleges that in post-acquisition meetings attended by senior executives of Extreme, the combined product roadmap was still being worked out and presented the "biggest challenge" for Extreme after the acquisition. *Id*. ¶ 98.

Plaintiffs also point to statements from CW2, a senior executive of Extreme before, during, and after the Class Period. Amended Compl. ¶ 99. CW2 stated that s/he sat on conference calls with upper management and the Board of Directors and knew, based on personal knowledge, that the acquisition of Enterasys was the "brainchild" of Directors Ed Meyercord and Edward Kennedy, who "orchestrated" bringing in Berger as the CEO to accomplish the acquisition. *Id*. However, CW2 stated that the integration with Enterasys was "problematic right from the get-go" and caused Extreme to have difficulty retaining clients due to uncertainty with the future of the combined Company's product roadmap. *Id*. ¶ 100. CW2 attributed approximately $90 million in lost revenue to client losses stemming from integration failures such as uncertainty about the future of the product roadmap. *Id*. CW2 explained that "When we came out to refresh the network, they [legacy Extreme clients] didn't go with us because we didn't have a story or a product roadmap." *Id*.

CW3, who worked for Extreme from January 2012 until June 2015, also stated that there was "no plan" for Extreme's integration with Enterasys. *Id*. ¶ 102. As a Territory Sales Manager, CW3 was responsible for communicating the product roadmap to customers, and thus would have known whether there was an integration plan, including a plan as to how to combine the two

---

[9] Many of the allegations that Plaintiffs point to in their opposition, including this statement from CW1, are simply repeated from the Consolidated Complaint and do not constitute amended allegations. However, the Court has considered the totality of the allegations in the Amended Complaint, whether repeated or new.

22

companies' products. *Id.* CW3 stated that "all" legacy Extreme and Enterasys customers were worried that the products they purchased would not be supported post-acquisition due to the lack of a product roadmap. *Id.* ¶ 105. This resulted in delayed purchases and substantial revenue losses. *Id.* CW3 further stated that management provided no direction for how to obtain synergies after the Enterasys acquisition, and thus there was no "compatibility" between the products and no "incremental value" added by the acquisition. *Id.* ¶ 109. Plaintiffs argue that these new allegations from CW3 not only render false the 2013 "plan" statements, but also demonstrate the falsity of Berger's statement on September 12, 2013 that "[t]here will be no disruption in customers' ability to grow and operate their networks. Period. None." Opp'n at 7.

Defendants argue that none of the 2013 statements amount to telling investors that Extreme had a fully worked-out cost savings plan at the time of the Enterasys acquisition. *See* Mot. at 8-9; Reply at 3, ECF 113. The Court takes judicial notice of the existence of Defendants' disclosures to investors in order to assess the information that the market received in context. *See* Austin Decl. Exh. 1-26.[10] For example, on the September 12, 2013 conference call where Berger made one of the challenged statements, Berger also disclosed: "We are making it clear to the customers of both Companies that we will support the full product road map of each Company going forward. There will be no disruption in customers' ability to grow and operate their networks. Period. None. In approximately two years, XOS will be extended to support both hardware platforms and include a number of important features available in the Enterasys' network operating systems that are not available in XOS today." Austin Decl. Exh. 3 at 3.[11] Berger later added, "I can't emphasize enough that for the foreseeable future, we are messaging to our customers that they will be able to buy the full product line of both Companies and be able to conduct their network operations as if this merger hadn't happened, with only future benefits by combining the best technologies of both Companies. Once we -- the way we'll rationalize this is combining the operating systems into one operating system that will be branded XOS... And at

---

[10] However, the Court finds that certain disclosures, such as Defendants' hiring of Deloitte and Touche as consultants to assist with integration, go beyond adding context to the challenged statements and are not properly considered on a Rule 12(b)(6) motion.
[11] XOS is the operating system used by Extreme's legacy products. *See* Mot. at 17.

that point, the customers will be in different -- and we can start to think about how we rationalize the product line at that point. And that is somewhere between 18 and 30 months out." Austin Decl. Exh. 3 at 5.

In other words, the "product roadmap" or "plan" for the integration with Enterasys that Defendants disclosed to the market on September 12, 2013 was that there *would be no integration* of the products for a specified period of time: the products from both companies would continue to be supported going forward, and any combination of those technologies was 18 to 30 months out. While this may have caused uncertainty among the customer base for each company, it does not support an inference that Defendants lacked an integration "plan" for the Enterasys acquisition. The reasonable inference is that this may have been a clumsy or ineffective plan, but it is a plan. Moreover, the CWs speak to customer concern about product availability but the CWs do not say that the statement of availability was false—it seems that both product lines remained available. At best, this was a marketing failure regarding the timeline for narrowing and changing product offerings.

Although Plaintiffs have attempted to define the "plan" that Defendants allegedly represented was in place in 2013, Plaintiffs' definition is inconsistent with Defendants' statements to the market. Amended Compl. ¶ 13. Plaintiffs define an integration plan as one that (1) combines salesforces based on objective criteria; (2) identifies how to cut costs and achieve synergies; (3) has a product roadmap for how to combine the products from each company; and (4) includes a "Go-to-Market" strategy as to how to reach consumers and provide competitive products. *Id.* The allegations in paragraph 13 may be Plaintiffs' idea of an integration plan, but it does not raise a plausible inference that it was Defendants' definition of one. As explained above with respect to a product roadmap, Extreme clearly disclosed that its "plan" was to continue to support both product lines "as if this merger hadn't happened," until the product lines were combined in 18 to 30 months. Austin Decl. Exh. 3 at 5. Extreme's disclosed decision immediately after the merger with Enterasys to not immediately disrupt the customer base and workforce at both companies is still a "plan." Accordingly, the Amended Complaint does not allege contemporaneous facts demonstrating that Defendants never had a "plan" to reduce costs by

$30 to $40 million once the teams were fully integrated (Category 3).

With respect to Berger's "no disruption" to customers statement (Category 6), the Court previously determined that "[t]here are no allegations in the [Consolidated] Complaint that the integration did in fact disrupt Extreme's customers' businesses or that the statement that it would not disrupt customers' business was false at the time it was made." Prior Order at 29. Plaintiffs have not added any material allegations to the Amended Complaint. The Court has considered CW1's statement that a product roadmap was important to customers who expected the particular company's products they purchased to be supported for the life of the product (4-7 years), and were concerned about what a combined product would look like. Amended Compl. ¶ 97. As explained above, Plaintiffs have not alleged that Defendants represented that products from either company would continue to be supported for the life of the product. Rather, Defendants stated that no product integration would happen immediately and a combined product line was "somewhere between 18 and 30 months out." Austin Decl. Exh. 3 at 5.

Customer dissatisfaction with Extreme's business decision, as communicated through CWs 1, 2, and 3, does not render Berger's "no disruption" statement false at the time it was made on September 12, 2013. Plaintiffs pivot and attempt to argue that Defendants "failed to disclose" the lack of a combined product roadmap. *See* Opp'n at 11. However, the Court cannot ignore Berger's clear disclosure in the very same press release as the challenged statement, that Extreme would "support the full product road map of each Company going forward," and that both product lines would be supported "for the foreseeable future" until the product lines combined "somewhere between 18 and 30 months out." Austin Decl. Exh. 3 at 5. In the September 12, 2013 press release announcing the acquisition, Extreme was clear that: "[t]he combined company will be committed to continue to support the product roadmaps of both companies going forward to protect the investments of current customers and avoid any disruption to businesses." Austin Decl. Exh. 2 at 5. That customers wanted assurances that Extreme did not provide, and stopped purchasing Extreme products as a result, does not raise a "disputed fact issue" on whether Defendants adequately disclosed the lack of product roadmap. Opp'n at 11. The Court maintains its previous determination that falsity has not been adequately alleged with respect to Berger's "no

25

disruption" statement.

Finally, Berger informed investors on November 4, 2013 that "[o]verall, our integration efforts are on track." Amended Compl. ¶ 180. Although this statement is actionable in context, Plaintiffs have not adequately amended their pleading with respect to the falsity of this statement. Again, because the Court finds that Defendants never promised a seamless integration plan, they similarly were not misrepresenting the actual situation when they assured the market that the plan was "on track" less than two months after the acquisition. Again, with respect to product integration, the plan was to continue to support both product lines for the foreseeable future. Thus, a statement in November 2013 that integration efforts were "on track" could simply mean that the status quo of the product line remained intact for both companies. As explained at the hearing, "on track" does not mean that an equal amount of progress is achieved toward the ultimate goal in each quarter. *See* December 14, 2017 Hearing Transcript at 34:16-22, ECF 128 ("Transcript"). Depending on the "plan," the "track" could mean zero progress, or negative progress, following a giant leap forward at a later point. *Id*. 34:23-35:5. Thus, the pleadings do not adequately allege what "on track" meant in 2013, just weeks after the acquisition was announced, other than being false by virtue of the absence of any plan.[12]

Because Plaintiffs have not adequately alleged that there was no "plan" with respect to the Enterasys integration, the 2013 statements are not adequately alleged to be false or misleading under the PSLRA. *See* Amended Compl. ¶¶ 180, 165, 185, 170. Rather, the CWs criticize what was perhaps an ill-conceived plan that upset Extreme's customers. But a poorly received "plan," does not amount to securities fraud. Because the only two statements made by Kurtzweil regarding the Enterasys integration fall into this category, and Plaintiffs fail to plead an actionable misrepresentation or omission, Plaintiffs have not alleged that Kurtzweil is liable for the section 10(b) and Rule 10b-5 claim.[13]

---

[12] The Court draws a distinction between the "on track" statements made in 2013 and the "on track" statements in 2014, because Plaintiffs have made stronger allegations that integration efforts were no longer "on track" at that point.

[13] As explained below, Plaintiffs have also not adequately alleged falsity or scienter with respect to the Lenovo partnership and "10% commitment" statements, and thus Kurtzweil is not alleged to have made any of the surviving statements.

The Court next considers whether Plaintiffs have adequately alleged the falsity of statements made in 2014 and 2015 regarding the progress of the Enterasys integration and the resulting cost savings or "synergies". These 2014-15 statements correspond with Plaintiffs' categories 1, 2, 3, and 4. *See* App'x A at 1-2. The Court finds that the 2014 statements regarding Defendants' "plan" to achieve synergies from the acquisition, and statements that those synergies were "on track" in 2014 and 2015, are not adequately alleged to be false. Plaintiffs' conclusory assertions of falsity with respect to these statements are not adequately supported by factual allegations. However, Plaintiffs have adequately alleged the falsity of Defendants' statements in 2014 that the integration with Enterasys was "on track" and "ahead of plan."

*a. "Cost Savings" Statements*

Plaintiffs challenge Berger's statement on May 6, 2014 in which he affirmed Extreme's "target" for "$30 million to $40 million per year" in "synergy savings as a result of the acquisition," that was originally announced by Kurtzweil at the time of the Enterasys acquisition in September 2013. Amended Compl. ¶ 218. Plaintiffs argue that Berger and Arola continued to make false statements to investors throughout 2014 and in January 2015 that Extreme was "on track" to realize these synergies and cost savings. *Id.* ¶¶ 245, 250, 267, 274, 284, 296.

As the Court explained in detail above, Plaintiffs have not adequately alleged falsity with respect to Kurtzweil's 2013 statements projecting $30 to $40 million in synergies over a 12- to 24-month period. *Id.* ¶¶ 165, 185. The Court finds that Berger's May 6, 2014 statement that Extreme's "target for synergy savings as a result of the acquisition of Enterasys continues to be in the range of $30 million to $40 million per year," and "we are more confident than ever that we will achieve at least that amount," is also not adequately alleged to be false. *Id.* ¶ 218. Plaintiffs also do not adequately allege falsity with respect to the statements in Category 4 that the "synergies" are "on track." *See* App'x A at 2 (citing Amended Compl. ¶¶ 245, 250, 267, 274, 284, 296). In fact, when viewed in light of Defendants' disclosed timeline, such synergies appeared to

be "on track" at the time Defendants made such representations.[14]

Kurtzweil made clear on November 4, 2013 that "[t]he timing of the synergies will be seen in the financials in a small way in the third fiscal quarter and will hit full stride in 12 to 15 months from now." *Id.* ¶ 185. Kurtzweil further disclosed on November 4, 2013 that "I wouldn't expect to see much, if any, in terms of cost reductions out of R&D over the next 12 months or so, 18 months, as they're working to consolidate the product lines." Austin Decl. Exh. 5 at 7. Based on this timeline, Defendants represented that the resulting synergies from the integration were projected by fall of 2015 (24 months after fall of 2013), with cost savings becoming visible and hitting "full stride" beginning around February 2015 (fifteen months from November 2013). All of the statements that Plaintiffs challenge regarding the expected synergies were made much earlier—in May, August, and October of 2014 as well as one statement on January 28, 2015. *Id.* ¶¶ 218, 245, 250, 267, 274, 284, 296.

Defendants point to additional disclosures throughout 2014 and 2015 to argue that the cost-savings statements in 2014 and 2015 are not alleged to be false and do not amount to a section 10(b) fraud claim. *See* Mot. at 11-14. Plaintiffs do not challenge that Extreme reported revenues after each quarter and periodically disclosed the status of achieving merger benefits. For example, on May 6, 2014, Kurtzweil announced that Extreme had saved $2 million through Q314 and was targeting $5 million in savings by the end of Q414, with $6 million quarterly savings rate thereafter. Austin Decl. Exh. 11 at 5. Defendants' financial announcements are entirely consistent with the challenged representation in November 2013 that the synergies from the integration with Enterasys would first be seen "in a small way" and "hit full stride" in 12 to 15 months from November 2013. Amended Compl. ¶ 185. Similarly, Arola announced on August 14, 2014, that Extreme had saved $6 million through Q414 and was "on track" to achieve the total $30-$40 million in synergies at that point. Amended Compl. ¶¶ 250, 254. On December 17, 2014, Arola again reported an approximate $25 million annual savings rate as of the end of Q414. Austin Decl.

---

[14] In the following section, the Court discusses statements that integration was "on track" (as opposed to synergies being "on track") and reviews the case law to come to its determination that "on track" statements can be actionable under securities law.

Exh. 21 at 7.

The Court has considered the challenged statements from 2014 and 2015 regarding cost savings in the context of Defendants' disclosed timeline for achieving synergies from the integration, as well as Extreme's announcements of its financial results during this time period. Plaintiffs have failed to allege that Berger and Arola's statements in August and October 2014, and even January 2015, that Extreme was "on track to realize the full $30-50 million in cost synergies expected from the acquisition" were false or misleading. Moreover, the Amended Complaint does not plausibly allege that Extreme failed to make efforts to reduce costs as promised throughout the Class Period in order to support the conclusion that 2014-2015 cost savings statements were false at the time they were made.

Instead, Plaintiffs again rely on their theory that Extreme never had a plan to achieve the touted synergies and cost savings, and that the $30-40 million prediction was always false. *See, e.g.*, Opp'n at 6. In addition, CW2 stated that Extreme did not eliminate employee redundancies resulting from the integration until after the Class Period. Amended Compl. ¶ 124. According to Plaintiffs, analysts understood Defendants' statements regarding $30-40 million in cost savings to mean that a substantial part of the synergies would come from reducing headcount. *See* Opp'n at 10 (citing Amended Compl. ¶ 191). But Defendants point out that they disclosed a plan to increase headcount in some areas, and cost savings were expected from factors other than headcount reductions. Mot. at 12-13 (citing Austin Decl. Exh. 10 at 4; Exh. 11 at 3, 11). The Court agrees with Defendants that Plaintiffs' reliance on Defendants' lack of headcount reductions to achieve synergies runs counter to Defendants' contemporaneous statements themselves as well as their public disclosures during the Class Period.

For the foregoing reasons, the Court finds that the 2014-2015 statements identified in Plaintiffs' Appendix A, Categories 3 and 4 are not alleged to be false or misleading. *See* App'x A at 1-2 (citing Amended Compl. ¶¶ 218, 245, 250, 267, 274, 284, 296).

### b. *"Plan" Statements*

In contrast to Defendants' statements specifically relating to cost-saving synergies from the integration, Defendants also made statements that the overall integration with Enterasys was "on

track" and "ahead of plan" throughout 2014.  *See* Amended Compl. ¶¶ 197, 209, 213, 227, 240.

For example, Berger made two statements on February 5, 2014 and May 6, 2014 that the

integration of the two companies was "on track." Amended Compl. ¶¶ 197, 213.  Berger added in

the May 6, 2014 press release that "integration efforts following the acquisition of Enterasys

continue ahead of plan." *Id.* ¶¶ 208-09.  Berger made two additional "plan" statements in 2014,

stating that integration was "ahead of plan" on July 21, 2014, and stating in an August 14, 2014

earnings call that "[o]verall, we are exactly where we planned to be in integration process and the

realization of the related financial synergies." *Id.* ¶¶ 227, 240.

While the Court finds that the Amended Complaint does not allege the falsity of Berger's

November 2013 statement that "integration efforts" were "on track" (*Id.* ¶ 180), Plaintiffs have

adequately alleged that the situation on the ground quickly deteriorated while Berger continued to

promote the integration as "on track" in February and May 2014.  Similarly, Berger's public

statements that integration remained "ahead of plan" in May and July 2014 and "exactly where we

planned to be" in the integration process in August 2014, are directly at odds with the accounts of

the CWs.

For example, the Amended Complaint now contains allegations from CW1 recalling a

meeting with senior executives in San Francisco in January or February 2014, where it became

clear that the combined product roadmap still had "a lot to be worked out." *Id.* ¶ 98.  The fact that

executives were still trying to figure out the combined product roadmap while Berger

simultaneously represented that integration was "on track," supports an inference that the

statement was false.  Similarly, Berger stated at the annual global sales conference in Las Vegas in

July or August 2014 that the integration plan, including the product roadmap for the combined

company, was still "TBD" or "to be determined." *Id.* ¶ 104.  That the integration plan was still

"TBD" as of late July 2014, supports a plausible inference that Defendants' "on track" and "ahead

of plan" statements in 2014 were false or misleading.

CW5's account also supports the falsity of these statements.[15]  CW5 joined Extreme in

_____

[15] CW5 worked for Extreme from August 2014 to February 2015, with the last held position of
"Solutions Marketing Manager." Amended Compl. ¶ 111.

August 2014, and recounted that at the time s/he joined, s/he was told that the "dust had not yet settled from the integration," and the Company was still going through a "period of adjustment" while people figured out how to work together. *Id.* ¶ 111. Plaintiffs argue that CW5's statements indicate that there was no integration plan *at all* in place as of August 2014. Opp'n at 9.

The Court finds that although Plaintiffs have not adequately alleged the lack of *any* integration plan, they have successfully alleged that any integration plan that was put in place in 2013 was not "on track," "ahead of plan" or "exactly where we planned to be," when Defendants' made the challenged statements in 2014. Amended Compl. ¶¶ 197, 209, 213, 227, 240. Rather, Plaintiffs allege that the plan remained "TBD" or in its very early stages with little if any progress occurring since the September 2013 announcement of the Enterasys acquisition. As the Court previously explained, the statement that the merger is "on track" has been alternatively interpreted as a non-actionable prediction or a factual statement about a company's present status, which would be actionable. *See* Prior Order at 20 n.3. "The authority on whether statements that company is 'on track' are forward-looking statements is split[.]" *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198–99 (D. Nev. 2011).

Certain courts have held that "on track" statements are not forward-looking because they convey the current state of affairs. *See, e.g., In re Secure Computing Corp. Securities Litig.*, 120 F.Supp.2d 810, 818 (N.D. Cal. 2000) (finding that the statement that a company was "on track" to meet expectations is "considered as [a] statement[ ] of current business conditions" and is not forward-looking). Others, such as the Third Circuit Court of Appeals, have held that statements that the company is "on track" and that its first quarter results "position [it]" to meet its goals "cannot meaningfully be distinguished from the future projection of which they are a part." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). In this case, Defendants previously conceded that the "on track" statements at issue are not protected by the safe harbor rule. Prior Order at 20 n.3 (citing ECF 97 at 53:16–18). Because Defendants do not challenge the "on track" statements as forward-looking, and courts in this Circuit have found "on track" to be a statement of the Company's present status, the Court finds that statements that the Enterasys integration was "on track" are actionable. *See In re Secure Computing Corp. Securities*

*Litig*, 120 F.Supp.2d at 818.

In summary, the Court finds that falsity is adequately pled with respect to the 2014 statements in Categories 1 and 2 as identified in Plaintiffs' Appendix A to the Amended Complaint. *See* App'x A at 1 (citing Amended Compl. ¶¶ 197, 209, 213, 227, 240). Relying on multiple CWs who corroborate each other regarding the internal meetings and conversations that took place during the time period in question, Plaintiffs allege that integration was not "on track" or "ahead of plan" but was actually "TBD." *See, e.g.*, ¶¶ 98, 104, 111. Whether these statements were in fact false is not appropriate for the Court to resolve at this stage—it matters only that a material misrepresentation or omission has been alleged. As discussed below, scienter is also adequately pled with respect to these false statements, and on that basis the motion is DENIED.

### 3. 2014 Statements Regarding the Sales Force

There is another category of statements regarding the Enterasys integration that Plaintiffs have adequately alleged to be false under the PSLRA: Berger and Arola's statements that sales force integration is "complete" and integration problems are "behind" Extreme (Category 5). On August 14, 2014, Berger touted in a press release: "Our sales force integration is complete, with all territories rationalized, and the team is aligned and executing, which is evident in this quarter's results." Amended Compl. ¶ 235. On an earnings call the same day, Arola stated that the companies are "now fully integrated" with "integrated product portfolio" and "fully integrated sales and marketing teams." *Id*. ¶ 254. Berger also stated on the August 14, 2014 earnings call to investors: "I am confident…that virtually all of these [integration] issues are behind us," adding that at Extreme's global sales conference the entire sales team came together and "[t]he incredible spirit and unity I saw over the entire event are added signs that the integration issues are behind us." *Id*. ¶ 258.

Then, on October 15, 2014, Plaintiffs allege that Berger backtracked and stated that integration with Enterasys was only "nearly completed." *Id*. ¶¶ 61, 142. Extreme's stock price dropped by approximately 18% following the October 2014 press release. *Id*. ¶¶ 61, 266. Soon after, Berger repeated statements that integration issued were resolved on an October 28, 2014 earnings call with analysts, acknowledging disruptions resulting from the Enterasys integration but

stating: "For the most part, these disruptions are now fully behind us." *Id.* ¶ 279. On December 17, 2014, Arola attended the Bernstein Technology Innovation Summit and discussed the Extreme/Enterasys sales force integration: "From a sales perspective, more specifically, sales organizations have been integrated…as far as sales organization, again, two teams have been integrated…it's been done now…[s]o integration of sales is completed." *Id.* ¶ 291.

Contrary to the 2014 representations regarding sales force integration, on January 28, 2015, Berger stated that "while we are making daily substantial progress on the complete integration and upgrading of our salesforce, it is clear that we still have considerable work to do going forward." *Id.* ¶ 143.

The CWs also paint a vastly different picture from Defendants' representations in this category. *See, e.g.* ¶¶ 118-131. Days before the August 2014 statements were made, CW3 attended Extreme's annual global sales meeting in Las Vegas—the same meeting that Berger referred to in his statement. *Id.* ¶ 104. CW3 stated that Berger ran the conference and Arola also attended. *Id.* At the event, rather than showing signs of "spirit and unity," CW3 states that sales personnel questioned Berger about the lack of a plan to integrate the two companies and their products. *Id.* Berger responded with "non-answers" and told his work force that management was working on integration and the plan was "TBD" or "to be determined." *Id.* The plausible inference from these nearly contemporaneous factual allegations is that the road to full integration did not go from "TBD" to "complete" within a few weeks.

Moreover, Extreme hired Jeff White as its Chief Revenue Officer on or about October 1, 2014, after the challenged August 2014 representations. *Id.* ¶ 141. In company-wide emails, Berger internally touted White's hiring as intended to oversee and fix the continuing sales and integration problems that persisted after the Enterasys acquisition. *Id.* The Court finds that Berger's 2014 statements are particularly inconsistent with the arrival of White in October 2014 who was allegedly hired to fix the sales force integration problems that still existed at the very same time Berger stated externally that the integration was "complete" and the problems were "behind" the Company. Amended Compl. ¶ 236.

CW3's account makes clear that sales force integration was not complete in 2015, after all

33

of the statements in this category were made. *Id.* ¶ 144. In early 2015, White made comments about the persistent problems at Extreme in a global salesforce call, and White ultimately left the company on April 9, 2015 although his sales initiatives "ultimately went nowhere" during his brief tenure. *Id.* Defendants argue that ongoing sales force integration problems—and White's personal opinions—do not render false or misleading statements in 2014 that sales force integration was "complete" with disruptions "behind [Extreme]." Mot. at 14-15. The Court disagrees.

Although the Court previously held that Plaintiffs failed to allege that Extreme had not completed the conversion to one ERP system or the integration of the sales team, the Amended Complaint alleges particularized facts raising the plausible inference that the two companies' sales forces were not fully integrated at the time Defendants made the challenged statements. Moreover, statements from the CWs adequately allege that Extreme had not yet integrated the two companies' product portfolios at the time Arola made the representation on August 14, 2014 that the combined company had an "integrated product portfolio." Amended Compl. ¶¶ 104, 254.

Defendants' reliance on their disclosures throughout the Class Period is actually detrimental with respect to these statements, because their disclosed "plan" to continue to support products from both companies for the foreseeable future made the August 14, 2014 statement that the companies are "fully integrated" with an "integrated product portfolio" false or misleading. Similarly, allegations that sales force redundancies were not eliminated until after the Class Period lend credence to Plaintiffs' argument that the sales forces were not fully integrated in late 2014. *Id.* ¶¶ 119, 124, 125, 130. For example, CW1 stated that management informed the sales team that there would be no cuts post-acquisition, and Extreme and Enterasys personnel overlapped and covered the same territories, which created redundancies in the employee structure. *Id.* ¶ 119. Although Plaintiffs have been unable to allege that Extreme lacked any sort of integration plan, Plaintiffs have shown through Defendants' admissions and the accounts of their CWs that any such plan was not "complete" and the company was not "fully integrated" with Enterasys in 2014.

For the foregoing reasons, Defendants' motion to dismiss the section 10(b) and Rule 10b-5 claim based on the statements involving the Enterasys integration is DENIED as to the 2014

34

statements in Categories 1, 2 and 5, and GRANTED as to the remaining integration statements. *See* App'x A. Before turning to Plaintiffs' scienter allegations, the Court addresses whether any statements concerning Lenovo or Defendants' "Commitments" sufficiently allege falsity.

**b. Claims Based on Statements about the Lenovo Partnership**

The Amended Complaint does not add any new allegations involving the Lenovo partnership. Nevertheless, Plaintiffs reargue that Defendants misrepresented Extreme's partnership with Lenovo, specifically challenging four statements as a basis for their section 10(b) claim. Opp'n at 17-18; Amended Compl. ¶¶ 307, 317, 322, 330. As explained in the Court's Prior Order, Plaintiffs allege that Defendants touted Extreme's partnership with Lenovo, but the accounts from CW4 and CW7 undermine the optimism that Defendants conveyed to investors. *See* Prior Order at 30. Defendants challenged certain Lenovo statements as inactionable corporate optimism, and argued that Plaintiffs had failed to allege that the only actionable statements about positive steps in the Lenovo alliance were false. *Id*. at 22-23, 30-32. The Court previously agreed with Defendants based on Plaintiffs' identical allegations in the Consolidated Complaint. Without any new allegations to consider in the Amended Complaint, the Court does not disrupt its prior conclusion that Plaintiffs have not adequately alleged either an actionable misrepresentation or falsity with respect to the Lenovo statements. *See* Prior Order at 22-23, 30-32.

As before, Plaintiffs rely on statements from CW4 and CW7 that are relevant to the Lenovo partnership. The Amended Complaint provides that CW4 was a Regional Sales Director for Extreme, covering multiple regions from February 2008 through February 2014. Amended Compl. ¶ 129. Plaintiffs allege that CW4 personally observed that Extreme's alliance with Lenovo was "pushed very hard internally" but all activity was at the strategic level and nothing came down to the field level. *Id*. ¶ 149. CW4 stated that there were "no joint meetings, no Go-to-Market sessions, no follow-up – there was no field level activity towards that alliance." *Id*. CW4 also stated that although s/he wanted to get together with Lenovo teams, s/he was not able to. *Id*.

CW7 was employed by Extreme from May 2013 to January 2015, with the last held position of "Account Executive – Lenovo." *Id*. ¶ 150. CW7 recounted that there was "no mechanism in place" for Lenovo salespeople to benefit from Extreme's products during the entire

35

time s/he was with Extreme. *Id.* According to Plaintiffs, this statement from CW7 means that Lenovo sales personnel had no incentive to sell Extreme's products, "thereby rendering this partnership useless for Extreme." *Id.*[16]

With the Court's Prior Order and the statements of CW4 and CW7 in mind, the Court turns to Plaintiffs' arguments in support of finding that the Lenovo statements were false when made. First, Plaintiffs argue that Berger's opinion statement on October 28, 2014 that "Lenovo certainly by then [June 2015] we believe will have double-digit revenue impact," is an actionable misrepresentation. Opp'n at 17; Amended Compl. ¶ 322. Defendants argue that this is an aspirational statement about a personal belief, not a guarantee. Mot. at 6. The Court already held that statements that the Lenovo partnership would have "meaningful revenue impact" by June 2015 are inactionable statements. *See* Prior Order at 23 n.5 (citing *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41–42 (D. Mass. 2016) (finding statements such as "we believe that [a certain product] will continue to be a major business driver," "we think [it] is a terrific product that is going to perform very well in the market," and "we'd be surprised if we don't see forward momentum from here" immaterial expressions of corporate optimism or puffery, and therefore not actionable)).

Plaintiffs argue that Berger's opinion statement is misleading under the standard set forth in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318, 1329 (2015). The Supreme Court explained in *Omnicare* that liability for opinion statements attaches when "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" and "those facts conflict with what a reasonable investor would take from the statement itself." *Id.* However, the Supreme Court also cautioned that pleading falsity under an omissions theory would be "no small task for an investor." *Id.* at 1332; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017).

---

[16] The Court notes that although this final sentence in paragraph 150 is "new" to the Amended Complaint, it is not a factual allegation but is instead Plaintiffs' argument and interpretation of CW4 and CW7s statements. The actual CW statements remain unchanged with respect to the Lenovo partnership. Amended Compl. ¶¶ 149-150

Once again, Plaintiffs try to impute Meyercord's "admission" in May 2015 that Extreme had "zero visibility into Lenovo," and other representations about the difficult partnership onto Berger. Plaintiffs' theory is thus that Berger's October 28, 2014 statement is an actionable opinion because Berger omitted the facts expressed in Meyercord's post-Class Period statements. Opp'n at 17. Meyercord's later statements after he assumed the job of CEO and was looking back in hindsight, cannot be deemed an admission of what Berger or the other Defendants knew at the time the statements were made. Thus, Meyercord's statements do not come close to rendering Berger's opinion statement actionable under *Omnicare*.

Plaintiffs challenge three additional statements by Berger on August 14, 2014, October 28, 2014 and January 28, 2015 respectively. Amended Compl. ¶¶ 307, 317, 330. These statements include representations that Extreme personnel had (1) "trained all Lenovo North American reps on Extreme products," (¶ 307); (2) accomplished "sitting side-by-side with [Lenovo] people in North America and China," (¶ 317); and (3) gotten "airtime with the legacy Lenovo salesforce," (¶ 330). These statements each conveyed positive interactions between Lenovo and Extreme sales personnel that Plaintiffs argue were false at the time they were made because—according to CW4 and CW7—there was "no field level activity" toward the Lenovo alliance and "no mechanism in place" for Lenovo personnel to benefit from Extreme's products. Opp'n at 18; Amended Compl. ¶¶ 149-150. With no additional factual allegations in the Amended Complaint to consider, the Court again finds that Plaintiffs have not alleged that the statements about positive steps in the Lenovo alliance were false or misleading.

Again, Plaintiffs rely on Meyercord's statements in May 2015 after he took over as Extreme's CEO from Berger that he did not know "whether or not we're collaborating in the field" with Lenovo, Extreme had "zero visibility into Lenovo," and there was "nothing tangible" about the Lenovo relationship. Amended Compl. ¶¶ 154, 158. Plaintiffs urge the Court to draw the inference that these admissions mean Extreme never had productive meetings with Lenovo at the field level. Opp'n at 18. Even if the Court draws the inference that such meetings were not productive, it does not render the challenged statements false. One can have unproductive "airtime," "training" or "side-by-side" meetings—that does not mean they did not take place in

37

some form, nor is it reasonable to conclude that the failure of these efforts was immediately apparent. Such an inference would not be reasonable. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (holding that the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") As such, Plaintiffs' allegations do not raise a plausible inference that interactions between the Extreme and Lenovo sales forces never took place as represented. At most, Meyercord's comments can be viewed as the statement of a new CEO attempting to distance himself from a failed partnership that was touted by Berger, the former CEO, and does not speak to whether Berger's statements were false at the time he made them.

Plaintiffs repeat statements from CW4, a Regional Sales Director of multiple regions from 2008 through February 2014, and CW7, most recently an Account Executive for Lenovo. Amended Compl. ¶¶ 149, 150. The Court briefly reviews them here, but does not change its prior conclusion that they do not move the needle on falsity. CW4 stated that there was "no field level activity towards that alliance," such as joint meetings or Go-to-Market (marketing planning) sessions. *Id.* ¶ 149. CW7 recounted that there was "no mechanism in place" for Lenovo salespeople to benefit from Extreme's products during his/her tenure, hence no reason to sell them. *Id.* ¶ 150.

None of the allegations in the Amended Complaint disputes that Extreme trained Lenovo North American reps on Extreme products, that Extreme employees sat "side-by-side" with Lenovo people in North America and China, or that Extreme had "airtime" with the legacy Lenovo salesforce. *Id.* ¶¶ 307, 317, 330. These challenged statements could still be true even if there were problems with the Lenovo partnership, the arrangement added little if any benefit to Extreme, and there was no "field level activity."

Defendants' motion to dismiss the section 10(b) claim based on the Lenovo statements is GRANTED for failure to allege that any of the Lenovo statements were false or misleading when made.

### c. Claims Based on Defendants' "Commitment" Statements

The third and final category of statements that Plaintiffs challenge are statements made by

Arola and Berger in 2014 regarding management's "commitment" to achieve 10% revenue growth and 10% operating margins by the end of June 2015. Amended Compl. ¶¶ 314, 351, 356. Plaintiffs point to only three statements in this category, including Berger's statement on May 6, 2014 that: "I want to again reemphasize our plan and our commitment to attain double digit revenue growth by the second half of 2015[.]" *Id.* ¶ 314. Second, on October 28, 2014, Berger reiterated: "We stand by our commitment for a 10% year-over-year revenue growth by the fourth fiscal quarter, at a 10% operating margin or better." *Id.* ¶ 351. Also on October 28, 2014, Arola told investors "I remain committed to year-over-year revenue growth of 10%, and 10% operating margin in the fourth quarter of 2015." *Id.* ¶ 356.

The Court previously ruled that these statements are non-actionable statements of corporate optimism. Prior Order at 23-25 (citing *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993)). The Court explained that a "commitment" does not invoke surety, but rather means that one is trying to achieve a certain result. *Id.* (citing Webster's Third New Int'l Dictionary 457 (2002) (defining "commit" as "to pledge to some particular course or use"). Plaintiffs renew their argument that Defendants' "commitment" statements are actionable and expressed management's "certainty" of a particular result—in this case, achieving 10% revenue growth and 10% operating margins by June 2015. *See* Opp'n at 19. Plaintiffs point out that another definition of "commit" is "to obligate or bind," and a "commitment" is defined in Black's Law Dictionary as "an agreement," "a promise" or "an obligation." *Id.* Again, Plaintiffs argue these statements are capable of objective verification because they set a specific number (10%) by a specific deadline (June 2015).

Plaintiffs cite to *Gammel v. Hewlett-Packard Co.* for the proposition that Defendants' "commitment" statements can be held actionable when viewed in context. 905 F. Supp. 1052, 1060 (C.D. Cal. 2012). In *Gammel*, the court considered allegations that the defendants were publicly touting HP's "commitment to developing and integrating its webOS products." *Id.* Meanwhile, the plaintiffs alleged that "things were very different behind the scenes." *Id.* The court held that certain statements concerning defendants' "commitment" to the webOS ecosystem were actionable when considered in conjunction with other factual allegations that were "too

39

specific to be dismissed as puffery." *Id.* at 1070. For example, the court held that specific statements highlighting HP's plans to expand webOS to millions of PCs and printers were not inactionable as a matter of law. *Id.*

Here, Defendants argue that Berger and Arola used the word "commitment," which is not a word of certainty, even when viewed in context. *See* Mot. at 16. The surrounding factual allegations do not raise an inference that Defendants had an "obligation" to achieve these results or assured the market that these results were "certain." Rather, the Defendants expressed that they were devoted to an effort to achieve these results within the specified time frame. The Court does not disrupt its prior determination that the "commitment" statements are inactionable puffery. *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (finding statement touting defendant's "commitment to create earning opportunities" inactionable puffery); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 684 (S.D. Tex. 2015) (statement that defendants "aim to go above and beyond local requirements to ensure your comfort and security" contains aspirational language, which prevents a reasonable consumer from relying upon it as a statement of fact); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 890 (E.D. Mo. 2012) (holding that defendant's statement that it was "'committed to' reaching the predicted goals" was inactionable puffery).

For the foregoing reasons, and those detailed in the Prior Order, Defendants' motion to dismiss the section 10(b) claim based on the "commitment" statements is GRANTED.

### ii. Scienter

Under the PSLRA's heightened standard to allege scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights*, 856 F.3d at 619 (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "[D]eliberate recklessness is 'an *extreme* departure from the standards of ordinary care…which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at 705. (quoting *Zucco*

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), as amended (Feb. 10, 2009)). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig*., 704 F.3d 694, 701 (9th Cir. 2012).

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). However, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id*. In light of this standard, a securities fraud complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

The Court's inquiry is twofold: first, the Court determines whether "any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011); *accord Curry v. Yelp Inc.*, No. 16-15104, 2017 WL 5583889, at *4 (9th Cir. Nov. 21, 2017). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M. State Inv. Council*, 641 F.3d at 1095. Viewing the totality of the circumstances pled, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006.

The Court previously found Plaintiffs' allegations of scienter to be insufficient under the PSLRA. *See* Prior Order at 41. The Court held that taken together, the facts in the Consolidated Complaint suggested at most "corporate mismanagement and negligence, but they do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent." *Id*. Because the Court finds above that the Amended Complaint has now adequately pled falsity with respect to statements in 2014 that integration was "on track," and "ahead of plan," and that sales

41

force integration was "complete" and integration problems were "behind" Extreme, the Court focuses on whether scienter is alleged with respect to those statements. However, even if Plaintiffs had adequately alleged the falsity of Defendants' 2013 statements, 2014-2015 statements regarding cost savings from the integration, the Lenovo statements, or the "commitment" statements, the Court finds that scienter is not alleged with respect to those statements.[17]

Plaintiffs rely on the following to support an inference of scienter: (1) the allegations of their CWs; (2) the core operations inference; (3) Berger's "highly unusual" bonus scheme; and (4) departures of Defendants and other key executives from Extreme. Opp'n 20-25. The Court summarizes these allegations in the Amended Complaint, although its ultimate scienter analysis is holistic. *VeriFone*, 704 F.3d at 704 (finding it "would be folly to simply skirt the major allegations," although scienter is ultimately to be considered holistically).

To satisfy the "strong inference" requirement, the Court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 701 (citing *Tellabs*, 551 U.S. at 323). "[A] dual analysis"—that is, first considering whether any individual allegation gives rise to scienter and then assessing the allegations in combination— "remains permissible so long as it does not unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *VeriFone*, 704 F.3d at 703.

For the reasons that follow, the Court finds that with respect to the misrepresentations in 2014 that integration was "on track," and "ahead of plan," and that sales force integration was "complete," the companies were "fully integrated," and integration problems were "fully behind" Extreme in 2014, Plaintiffs have adequately alleged scienter under a holistic analysis.

### a. Confidential Witnesses

Plaintiffs argue that the statements from their CWs are strongly probative of a cogent and compelling inference that Defendants recklessly or intentionally made false statements to investors. Opp'n at 20-21. "[A] complaint relying on statements from confidential witnesses

---

[17] Accordingly, the motion to dismiss the section 10(b) and Rule 10b-5 claim is GRANTED as to Defendant Kurtzweil, who is not alleged to have made any of the surviving misrepresentations.

must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted).

As summarized in the Court's Prior Order, Plaintiffs rely on statements from several CWs. *See* Prior Order at 33-35. In their opposition, Plaintiffs specifically argue that the allegations of CW1, CW2, and CW3 are strongly indicative of scienter, in particular because CW1 and CW 3 spoke directly with Berger, the CEO, about the specific matters at issue. Opp'n at 33. The Court previously agreed with Plaintiffs that statements from CWs who spoke directly with the "CEO can carry extra weight." Prior Order at 36. However, the Court found that the statements attributed to the CWs in the Consolidated Complaint did not support Plaintiffs' argument that Berger "knew" of the problems with integration, and Plaintiffs' opposition promised more than the pleadings could deliver. *Id*. at 33-34.

The Court has considered the allegations in the Amended Complaint and finds that certain statements from the CWs, reliably and based on personal knowledge, suggest that Berger and Arola either knew that the 2014 statements regarding the progress and completion of the Enterasys integration were false when made or that they were acting in a deliberately reckless manner to the truth of their statements.

For example, CW1 worked for Extreme from March 2004 to April 2014. Amended Compl. ¶ 95. CW1's last held position at Extreme was as a Senior Systems Engineer who reported to John Barger, Extreme's Senior Director of Worldwide Systems Engineering. *Id.* The Amended Complaint adds allegations with respect to the first hurdle for a confidential witness, that CW1 worked closely with the salesforce at Extreme by attending regular team meetings with sales personnel and participating in quarterly sales calls as well as the annual global sales conference in Las Vegas. *Id.* The Amended Complaint repleads allegations that CW1 stated that there was no centralized plan to integrate Extreme and Enterasys and their distinct products. *Id.* CW1's allegations discuss the lack of a combined product roadmap, and the confusion and discontent

among customers as a result of the uncertainty created by the Enterasys acquisition. *Id.*

Plaintiffs also add statements from CW1 that customer concerns regarding the lack of a combined product roadmap were widely known within the Company, including by Berger himself, because Extreme continuously discussed the "challenge" presented by the lack of a combined product roadmap after the acquisition. *Id.* ¶ 98. Specifically, CW1 describes a meeting in January or February 2014 held and attended by senior executives at the Company, where a discussion took place about how to develop a combined product roadmap, which was still being "worked out" at the time of the meeting. *Id.* CW1's account of this meeting is virtually simultaneous—and at odds with—Berger's statement on February 5, 2014 that integration plans were "on track." *Id.* ¶ 197. The Court notes, however, that Plaintiffs do not allege that Berger personally attended this January/February 2014 meeting, and Berger did not take over as head of sales until May 2014. Accordingly, the scienter allegations are weaker with respect to Berger's February 5, 2014 statement, and Defendants may wish to revisit this issue after discovery. Amended Compl. ¶ 197.

CW1's statements also support a strong inference of scienter with respect to Berger and Arola's statements made later in 2014, especially once Berger assumed his position as head of sales, directly overseeing the Enterasys integration. After CW1 resigned on April 1, 2014, s/he was contacted by Berger and asked to reconsider. *Id.* ¶ 122. As previously alleged, CW1 spoke to Berger about the manner in which s/he and others were replaced by Enterasys personnel who were not as familiar with legacy Extreme products, and the ensuing negative impact on customers and revenue in the North America region. *Id.* The Amended Complaint now adds that Berger expressed his concern that a top-performing team was leaving, and acknowledged that it was a sign of broader problems with integration. *Id.* According to CW1, Berger acknowledged the "unique" problem that sales personnel were being integrated based on individual executives' preferences that were "subjective" and "*ad hoc*," rather than tied to past performance metrics. *Id.* CW1 stated that the integration with respect to the salesforce and product roadmap was not complete by the time s/he left in April 2014. *Id.* ¶ 108. Importantly, CW1's conversation with Berger occurred shortly before Berger made his May 6, 2014 statements that integration "is going well and is on track or ahead of our expectations," and the integration with Enterasys continues

"ahead of plan." *Id*. ¶¶ 209, 213.

CW2 was a senior executive of Extreme before, during, and after the Class Period. *Id.* ¶ 99. CW2 stated that s/he sat on conference calls with upper management and the Board of Directors and knew, based on personal knowledge, that the acquisition of Enterasys was the "brainchild" of Directors Ed Meyercord and Edward Kennedy, who "orchestrated" bringing in Berger as the CEO to accomplish the acquisition. *Id.* CW2 opined that the integration was "problematic right from the get-go" and caused Extreme to have difficulty retaining clients due to uncertainty with the future of the combined Company's product roadmap. *Id.* ¶ 100. CW2 alleges that $90 million in lost revenue from clients stemmed directly from integration failures. *Id.*

CW3 was a former Territory Sales Manager for New York at Extreme from January 2012 through June 2015, who reported to Peter Katavolos, Extreme's Regional Sales Director. *Id.* ¶ 101. CW3 states that Extreme had "no plan" for integration with Enterasys. *Id.* ¶ 102. The Amended Complaint adds allegations that CW3 would have known if there was any such integration plan, including a product roadmap, based on his/her attendance at quarterly sales calls and the annual global sales conference in Las Vegas where he personally observed sales personnel question Berger about the integration plan. *Id.* CW3 describes the distinct product lines, systems and platforms at Extreme and Enterasys as trying to compare "apples to oranges," stating that they are incompatible and management had "no plan" as to how to combine them. *Id.*

CW3 specifically described the Company's difficulties with respect to integration of sales force personnel after the acquisition. *Id.* ¶ 125. According to CW3, the integration was a "reverse acquisition" in that Extreme overlaid Enterasys sales personnel on top of existing Extreme personnel which resulted in legacy Extreme salespeople (including CW3) having Enterasys "counterparts" covering the same areas. *Id.* CW3 explained that this led to sales territories being "ripped" from Extreme personnel and given to Enterasys personnel who had no knowledge of Extreme's products or clients. *Id.* In particular, CW3 cited the example of John Greiner who was terminated by legacy Enterasys executive Mike Fabiaschi after the acquisition despite having received an award for bringing in $100 million in revenue during his tenure, and was replaced with Enterasys personnel. *Id.* CW3 personally relayed these problems with the sales force

integration and redundancies to Berger, speaking to Berger twice in October or November 2014 by phone and in person about specific issues (such as Greiner's departure) as well as the "broader problems with the sales force integration efforts." *Id.* ¶ 126. Berger was already aware of these issues and acknowledged to CW3 that there was an "adversarial" relationship between the two groups of sales teams. *Id.* CW3 was clear after leaving the conversations that Berger was aware of the company-wide sales force integration issues. Importantly, CW3's personal conversations with Berger occurred two months *after* Berger made public statements that such integration was "complete" and the disruptions were "fully behind" the Company. *See id.* ¶¶ 235, 258

In July or August of 2014, CW3 also attended the first Global Sales meeting in Las Vegas after the Enterasys acquisition, when Berger was still acting head of sales. *Id.* ¶ 147.[18] In response to questions from sales personnel, CW3 personally observed Berger admit to the Company's global sales force that the integration plan was still "to be determined" or "TBD." *Id.* CW3 added that throughout Berger's tenure as head of sales from May to October 2014, Berger responded to internal questions regarding the integration with evasive answers such as "we're working on it" and "we'll get back to you." *Id.* In addition, CW3 recalled that Jeff White's comments during his brief tenure *after the allegedly false statements were made* is indicative of the "failed" sales force integration. *Id.* ¶ 144 (noting that in 2015 White described the Company as a "disaster" and "a hot mess," which indicated to CW3 that sales force integration was not "complete" and major problems persisted).

The Court finds that these amended allegations satisfy the first requirement that statements from the CWs be described with sufficient particularity to establish their reliability and personal knowledge. The Court credits that the CWs corroborate each other with respect to what was going on internally at Extreme, which further supports the reliability of their statements. *Hatamian* v. *Adv. Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015). Accordingly, the Court accepts the statements of CWs 1, 2, and 3 as true and finds them to be reliable and based on personal knowledge. *See Zucco Partners*, 552 F.3d at 995.

---

[18] The Amended Complaint also alleges that Arola attended this conference. *Id.* ¶ 104.

The accounts of these CWs are also indicative of scienter.  In particular, CW1's personal conversations with Berger in 2014 where they discussed the "unique" problem with sales force integration raises an inference that Berger had knowledge of the tensions between the two Companies internally when he was making outward statements that integration was "on track," "ahead of plan," and even "complete."  CW1's conversation with Berger occurred only a few months before Berger publicly acknowledged to investors in August 2014 that "virtually all of these issues are behind us" and, in October 2014, that "[f]or the most part, these disruptions are now fully behind us."  Amended Compl. ¶¶ 258, 279.

CW3 also had personal conversations with Berger in October or November 2014, *after* certain allegedly false statements were made, that indicated Berger was aware of major issues persisting with sales force integration.  *Id.* ¶¶ 125-26.  As with CW1's statements, these conversations with Berger indicate that he knew about integration problems that persisted throughout 2014 including how sales personnel were in charge of products and clients they were not familiar with, and the "adversarial" relationship between Extreme and Enterasys sales teams. *Id.* ¶¶ 120-22, 125-26.  The Court finds that CW1 and CW3's personal conversations with Berger, as well as CW3's observations of Berger's comments at the global sales conference, strongly support an inference that Berger knew or was deliberately reckless to the truth or falsity of his statements that sales force integration was "complete" and virtually all integration challenges were "behind" the Company.

Berger's role as acting head of sales from May 2014 to October 2014 also bolsters Plaintiffs' allegations of scienter.  Berger was not only the CEO of Extreme, but he assumed the job as head of sales in May 2014 upon the departure of Chris Crowell, the former CEO of Enterasys.  Amended Compl. ¶¶ 405-408.  On May 6, 2014, Berger announced Crowell's departure and explained that Berger himself would be taking responsibility for the integration efforts.  *Id.* ¶ 405.  Berger stated in no uncertain terms that: "[a]s we move on to the next phase of the integration I feel that it is critical that I stay close to our field organizations particularly in North America where we have experienced some integration issues. The field organizations and corporate marketing will report directly to me effective today." *Id.*  On August 14, 2014, Berger

47

told investors that he had personal knowledge of sales force integration issues because he had "spent a great deal of time with the North America Management team over the quarter," and had just attended the "global sales conference" with the "entire sales team." *Id.* ¶ 407.

Accordingly, Plaintiffs allege that Berger was directly in charge of the sales force integration during the time period in which he made misleading statements that integration was "on track," "ahead of plan," and that sales force integration was "complete" with integration issues "behind" Extreme. Berger's admissions confirm CW3's particularized statements regarding Berger's direct involvement in the day-to-day operations of the sales organization. CW3 explained that Berger scheduled quarterly sales force meetings, led sales force calls, led the global sales force conference in Las Vegas, and responded to questions from employees regarding continued integration issues throughout 2014. *Id.* ¶¶ 103-105, 110, 112, 113, 405. Moreover, the personal conversations that Berger had with CW1 and CW3 further support the allegations that Berger had a "hands-on" management style during his tenure and was directly told about integration challenges that persisted throughout 2014. Berger indicated that he was personally aware of these ongoing integration issues including *specific* employees (such as Greiner and CW1 who were fired or leaving as a result of the sales force integration problems. *Id.* ¶ 410. In addition, Plaintiffs have alleged that Berger was aware of the integration issues at the global sales conference in Las Vegas in summer 2014. Here, the direct link between the CWs and Berger, and the particularized allegations regarding Berger's involvement in the integration efforts support a strong inference of scienter.

Plaintiffs also point to particularized allegations that Arola personally attended meetings and was present for many of Berger's internal announcements to the sales force. For example, Plaintiffs allege that Arola attended the global sales meeting in Las Vegas run by Berger in July or August of 2014, where Arola observed Berger tell employees that management's integration plan was "TBD," and thus not complete. *Id.* ¶ 104. Arola also attended quarterly sales meetings and had direct interactions with Berger, the CEO, by virtue of Arola's position as CFO overseeing the integration with Enterasys. *Id.* ¶ 253. When considered holistically, the Court finds these allegations sufficient to support a strong inference of scienter with respect to Arola.

The Court need not consider Plaintiffs' scienter allegations relating to Kurtzweil, as none of his statements survives the Court's falsity analysis. However, the Court notes that the scienter allegations as to Kurtzweil's statements are deficient. Plaintiffs allege only that an analyst report issued on May 7, 2014 stated upon Kurtzweil's departure as CFO that he was "a major factor in driving most of the Enterasys integration." *Id*. ¶ 136. This sole allegation from an analyst, even when considered holistically, is insufficient to support scienter.

For the foregoing reasons, the Court finds that the CW allegations in the Amended Complaint raise a strong inference that Berger and Arola had contemporaneous knowledge of the actual status of the Enterasys integration. Viewed holistically as *Tellabs* requires, the Court finds that Plaintiffs' allegations with respect to Extreme, Berger, and Arola, raise a strong inference of scienter that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

### b. Core Operations Inference

Plaintiffs also raise the "core operations" doctrine to support a strong inference of scienter. Opp'n at 21. The core operations doctrine permits knowledge of certain facts or an important transaction that are so critical to a business's "core operations" to be imputed to a company and its key officers. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008). The core operations theory of scienter is based on the principle that "corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). "[A]llegations regarding management's role in a company may . . . help to satisfy the PSLRA scienter requirement in three circumstances": (1) "in any form," as part of a holistic analysis; (2) on their own, "where they are particular and suggest that defendants had actual access to the disputed information"; and (3) on their own "in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785-86.

Here, Plaintiffs argue that because integration with Enterasys was a core operation of Extreme, knowledge of the various integration issues can be imputed to Defendants. Opp'n at 21.

The Amended Complaint alleges that Extreme's acquisition of Enterasys was a "merger of equals" which was a core transaction that Berger, Kurtzweil, and Arola oversaw as key executives of Extreme. *See* Amended Compl. ¶¶ 169, 211, 253. Berger called the acquisition "transformational" when it was publicly announced that Extreme would acquire all outstanding Enterasys stock for $180 million in cash—nearly half of Extreme's market capitalization at the time. *Id.* ¶¶ 403-04.

The Court does not find Plaintiffs' core operations argument in its "bare form" persuasive in this case. *S. Ferry*, 542 F.3d at 786. Even if Defendants had knowledge of the Enterasys *acquisition* and the importance of integrating the companies, that does not amount to knowledge of the minutia of all integration efforts thereafter. It is not fraud or misrepresentation related to the acquisition that Plaintiffs seek to charge Defendants with knowledge of, but rather the progress of the integration that occurred over the following years. Here, Defendants do not dispute that they had knowledge of the Enterasys acquisition itself. Rather, they argue that Plaintiffs do not allege a "cataclysmic event" or adverse information that obviously would have been known to an executive. *See* Reply at 15.

The Court agrees with Defendants that the core operations allegations are insufficient. The lack of a core operations inference further supports this Court's determination that even if the other statements regarding integration in 2013, progress on $30-40 million in savings, the Lenovo partnership, and Defendants' "10% commitment" were alleged to be false, there would not be sufficient allegations of scienter with respect to those statements.

Plaintiffs' stronger argument is under the second circumstance contemplated in *S. Ferry LP, No. 2 v. Killinger*, that allegations regarding Berger and Arola's role in Extreme are "particular and suggest that defendants had actual access to the disputed information." 542 F.3d at 786; *see* Opp'n at 22. As explained above, the Court has already taken into account the CWs' allegations regarding Berger and Arola's direct involvement in the integration efforts. Such particularized allegations of actual access constitute strong evidence of scienter as to the 2014 statements that integration is "on track," "ahead of plan," and sales force integration is "complete" with integration issues "fully behind" Extreme.

### c. Berger's "Unusual" Bonus Scheme

Plaintiffs also renew their argument that Berger's bonus scheme supports an inference of scienter. Opp'n at 23-25. At the hearing on Defendants' motion to dismiss the Amended Complaint, Plaintiffs conceded that these allegations should be considered as part of the holistic analysis rather than standing alone. Transcript at 38:8-19. The Court briefly addresses these allegations here, and also reviews them in the context of the holistic analysis below. "A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco Partners*, 552 F.3d at 1004. However, for executive compensation to support the inference of scienter, "the allegations in the complaint must demonstrate a strong correlation—including comparisons to previous years' [compensation]—between the [compensation] and the company's 'bottom line.'" *In re Downey Sec. Litig.* (*Downey II*), No. CV-08-3261, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) (citing *Zucco Partners*, 552 F.3d at 1005).

Specifically, Plaintiffs allege that in his contract as CEO of Extreme, Berger was awarded 300,000 Extreme stock options every time Extreme's stock price stayed above a certain price for 30 days, and that based on Extreme's stock price during the class period, Berger received 900,000 Extreme shares—*potentially* worth $4.4 million in profit. Amended Compl. ¶¶ 9, 175. The bonus plan, Plaintiffs contend, gave Berger a motive to commit securities fraud and should be considered as circumstantial evidence of scienter. Opp'n at 23. The Court previously rejected these allegations as insufficient to support a strong inference of scienter. Prior Order at 39-40 (finding that "[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'") (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)).

The Court also pointed out that Plaintiffs did not allege that Berger exercised any options or sold any stock, and the Court could therefore not infer a strong inference of scienter from the incentive structure. Prior Order at 40. The Amended Complaint does not add any allegations that Berger actually exercised his stock options pursuant to his "unusual" bonus plan. As the Ninth

Circuit recently repeated, "a lack of stock sales can detract from a scienter finding." *Webb v. Solarcity Corp.*, No. 16-16440, 2018 WL 1189422, at *9 (9th Cir. Mar. 8, 2018) (citing *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012)). Accordingly, the Court does not find that Plaintiffs' allegations regarding Berger's unusual stock option grant, are consistent with scienter.[19]

Defendants rely on extrinsic evidence to argue that Berger's stock options expired unexercised. Mot. at 24. According to Defendants and the judicially noticed documents, SEC filings disclosing the grant of the options to Berger reported that he had to exercise vested options "no later than three months following the cessation of [his] service" at Extreme. *See* Austin Decl. Exh. 1 at 9; Austin Decl. Exh. 25 at 7. Because Berger left Extreme on April 19, 2015, and the options were not "in the money," during the three-month exercise window, Defendants request the Court to draw the inference that Berger never exercised his options. Mot. at 24 (citing Austin Decl. Exh. 27 at 48-49). Plaintiffs dispute this point, pointing to allegations in the Amended Complaint that Berger's contract allowed him to keep all 900,000 options acquired through his unusual "Performance Option" even after Berger left Extreme (as the options would not expire for seven years after the grant date). Amended Compl. ¶ 401. Plaintiffs also point to public filings listing Berger's bonus options as expiring on "5/2/2020." Opp'n at 2. Given this factual dispute, the Court finds that whether Berger's options expired unexercised is a factual dispute that is not suitable for a motion to dismiss.

Plaintiffs argue that the Ninth Circuit's decision in *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.* supports their argument that Berger's "eligibility" for stock options is sufficient to plead motive and scienter under the PSLRA. 320 F.3d 920, 944 (9th Cir. 2003); *see* Opp'n at 24. The Court finds that Plaintiffs misread that

---

[19] The Court makes this finding even in light of Plaintiffs' added allegations that Berger's options were *worth* a large profit (that he never realized during the Class Period or thereafter), and that the four prior CEOs of Extreme never had the unique plan granted to Berger. Amended Compl. ¶¶ 375-78, 385. Plaintiffs also allege through their expert, Steven Hall, that Berger's bonus scheme was unusual compared to executives at Extreme's peer companies. *Id.* ¶¶ 379-92. These facts do not weigh heavily in the Court's holistic review of scienter.

52

decision. The Ninth Circuit held in *No. 84 Employer-Teamster* that "[s]center *can* be established even if the officers who made the misleading statements did not sell stock during the class period." 320 F.3d at 944 (emphasis added). "In other words, the lack of stock sales by a defendant is not dispositive as to scienter." *Id.* This holding is entirely consistent with the Ninth Circuit's recent statement in *Solarcity* that "a lack of stock sales can detract from a scienter finding." 2018 WL 1189422, at *9. Plaintiffs' failure to allege that Berger exercised his unusual options grant is not dispositive—meaning the Court can still find scienter is adequately pled—but it can detract from a scienter finding.

Ultimately, in its holistic review, the Court gives little weight to Berger's alleged financial motive to make false statements in order to potentially benefit from the short-term increase in Extreme's stock.

### d. Departure of Defendants and Key Executives

Plaintiffs assert that the suspicious nature and timing of the departures of Berger, Kurtzweil, Crowell, and White bolster their scienter allegations. Opp'n at 25. The Court previously found this argument to be unpersuasive. *See* Prior Order at 41. Plaintiffs have an uphill battle on this point, but the Court considers whether the departures of any of these executives supports a strong inference of scienter.

Standing alone, resignations or terminations do not support a strong inference of scienter. *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009). "Instead, a resignation or termination provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing." *Id.* "[A]bsent allegations that the resignation at issue was uncharacteristic . . . or was accompanied by suspicious circumstances," the inference of a suspicious change in personnel will never be as cogent or as compelling as the inference of a benign one. *Zucco*, 552 F.3d at 1002.

Plaintiffs point to allegations that (1) Berger resigned two weeks after the Class Period (Amended Compl. ¶ 145); (2) White was hired on October 1, 2014 to fix sales integration issues, but departed soon after in April 2015) (Amended Compl. ¶ 141, 144); and (3) analysts stated upon Kurtzweil's departure that he was "a major factor in driving most of the Enterasys integration" and

linked his departure to integration problems (Amended Compl. ¶ 136).  With the exception of a

few allegations regarding White's brief tenure, including CW3's personal opinions, these

allegations remain unchanged from the Consolidated Complaint.   The Amended Complaint does

not remedy the previously identified deficiency that Plaintiffs must allege uncharacteristic or

suspicious circumstances in order for these departures to support scienter.  The Court agrees with

Defendants that the securities laws cannot be used to punish and deter companies from making

leadership changes. Mot. at 25 (citing *In re Cornerstone Propane Sec. Litig.*, 355 F. Supp. 2d

1069, 1093 (N.D. Cal. 2005) ("Most major stock losses are often accompanied by management

departures, and it would be unwise for courts to penalize directors for these decisions.").

For the foregoing reasons, the Court finds that the departure of these executives fails to

support a strong inference of scienter.  Prior Order at 41 ("The more plausible inference is that

these executives performed poorly, however poor business performance is not securities fraud.")

(citing *Jasin v. Vivus, Inc.*, No. 14-cv-3263, 2016 WL 1570164, at *22 (N.D. Cal. April 19,

2016)).

### e.  Holistic Analysis

The Court has "consider[ed] the complaint in its entirety" to determine "whether *all* of the

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong

inference' of scienter, a court must consider plausible, nonculpable explanations for the

defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-34.  "[T]he inference

of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and

compelling." *Id.* at 324.

As explained above, the Court finds that, in particular, the CWs' allegations are sufficient

to infer scienter with respect to Berger and Arola's knowledge or deliberate recklessness as to the

falsity of the 2014 statements regarding the progress and completion of the Enterasys integration.

The Court has reviewed all of the scienter allegations in the Amended Complaint holistically, as

required by *Tellabs*.  In contrast to the Court's Prior Order, the Court now finds that Plaintiffs'

allegations, taken together, make the inference of scienter cogent as to Defendants Extreme, Berger, and Arola.[20]

Regarding the statements from the CWs, the Court has explained that Plaintiffs' amendments plausibly allege that CW1, 2, and 3 are reliable and their accounts are based on personal knowledge. With respect to CW 1 and 3, their particularized allegations of personal conversations with Berger during the relevant time period leading up to the 2014 misrepresentations are strong evidence of scienter. CW2 and CW5's allegations about the persistent issues with sales force integration and product offerings during the relevant time period, coupled with allegations of Berger's direct oversight of the sales team from May to October 2014, contribute to an inference that Berger knew or was deliberately reckless to the truth of his statements. In particular, scienter is evident from Berger's public announcements that integration was "on track," "complete" and integration problems were "behind" the company shortly after he told his global sales force in Las Vegas that the integration plan was "TBD". Even without a core operations inference and a motive derived from Berger's "unusual" bonus scheme or departures of key executives, Plaintiffs have plausibly alleged that Berger was acutely aware of persistent sales force integration issues at the ground level.

Berger's own admissions also support scienter—including his public statement that the integration was "nearly completed" on October 15, 2014, and another declaration on January 28, 2015 that the Company had to make "substantial progress on the complete integration" with "considerable work to do" remaining. Amended Compl. ¶ 148. *See Berson*, 527 F.3d at 988 (finding that the "temporal proximity" of the misleading statement and the subsequent disclosure "bolster[s]" the inference that defendants knew about the order when they made the statement.") (citing *Ronconi v. Larkin,* 253 F.3d 423, 437 (9th Cir.2001)). Plaintiffs' other allegations are also suggestive of scienter, such as the timing of Berger and Arola's statements shortly after the

---

[20] As explained above, Kurtzweil is not alleged to have made any of the allegedly fraudulent statements that survive this Court's analysis, and Plaintiffs do not have a coherent theory as to how Berger and Arola's 2014 statements can be imputed onto Kurtzweil, who transitioned from CFO to "special assistant to the CEO" in June 2014 before his departure in September 2014. *See* Amended Compl. ¶ 134.

internal sales calls and global sales conference when a myriad of integration issues were brought to their attention. Indeed, Arola and Berger both attended the Las Vegas conference where Extreme sales personnel directly asked Berger about the integration plan. Berger responded with "non-answers" and said the integration plan was still "TBD" mere days before Berger and Arola made the August 2014 misrepresentations that sales force integration was "complete," the company was "fully integrated," and integration issues and disruptions were "behind" the company which was "exactly where [it] planned to be" in the integration process." Amended Compl. ¶¶ 105, 240.

The scienter requirement is also met as to Extreme itself because Defendants do not argue that Berger or Arola were acting outside the scope of their apparent authority when they made allegedly false statements to investors. *See Shenwick v. Twitter, Inc.*, No. 16-CV-05314-JST, 2017 WL 4642001, at *23 (N.D. Cal. Oct. 16, 2017); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

Viewing the allegations in the Amended Complaint as a whole, the Court finds that Plaintiffs have established a strong inference of scienter with respect to certain 2014 statements including that integration is "on track," and "ahead of plan," and that sales force integration was "complete" and the teams "fully integrated," that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.[21] Plaintiffs have plausibly alleged that Berger, Arola, and Extreme itself were at least deliberately reckless with respect to the truth or falsity of these public statements. *See Verifone*, 704 F. 3d at 708. The non-fraudulent alternative of mismanagement is less cogent in regard to this narrow group of alleged false statements in light of Plaintiffs' Amended Complaint and the Court's second look at the allegations and relevant law.

For the foregoing reasons, the Court finds that holistically, considering the timing and

---

[21] These 2014 statements are contained in Categories 1, 2 and 5 in Plaintiffs' Appendix A to the Amended Complaint. *See* App'x A at 1-4.

content of the statements from the CWs, as well as Berger's own admissions, Plaintiffs have alleged a strong inference of scienter under the PSLRA with respect to the misleading statements identified above.

### B. Section 20(a)

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 (9th Cir. 1990)). To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

The Court previously found that Plaintiffs failed to state a claim for a primary violation of the Exchange Act in their original complaint, and therefore they had also failed to state a claim against the Individual Defendants for control person liability pursuant to Section 20. *See* Prior Order at 42. The Court now finds that Plaintiffs have adequately pled a section 10(b) and Rule 10b-5 claim, and Defendants do not move to dismiss the section 20(a) claims on any other grounds. *See generally* Mot.[22] As such, the motion to dismiss is DENIED with respect to Plaintiffs' claim for control person liability pursuant to section 20(a) of the Exchange Act against the Individual Defendants.

### VI. ORDER

The Court finds that falsity and scienter are adequately pled with respect to the allegations set forth in paragraphs 197, 213, 209, 227, 240, 235, 254, 258, 279, and 291 as identified in Appendix A to the Amended Complaint, and on that basis the motion to dismiss the section 10(b) and Rule 10b-5 claim is DENIED. *See* App'x A Categories 1, 2, & 5.

Because Kurtzweil is not alleged to have made any of the surviving statements, the motion

_____

[22] The Court notes that in their motion to dismiss briefing, Defendants do not even mention Plaintiffs' second cause of action against the Individual Defendants for violations of section 20(a).

to dismiss the section 10(b) and Rule 10b-5 claim is GRANTED as to Kurtzweil only. The motion to dismiss the section 20(a) claim against the Individual Defendants is DENIED.

Defendants shall answer the Amended Complaint. The Court REAFFIRMS the initial Case Management Conference scheduled for **April 27, 2018 at 11:00 A.M.** The Parties shall file a Joint Case Management Conference Statement **on or before April 20, 2018.**

**IT IS SO ORDERED.**

Dated: March 21, 2018

BETH LABSON FREEMAN
United States District Judge