**LABATON SUCHAROW LLP**
Carol C. Villegas (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
        acoquin@labaton.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Class*

**BERMAN TABACCO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
44 Montgomery Street, Ste. 650
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        cpoppler@bermantabacco.com

*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>All Actions. | Master File No. 5:15-cv-04883-BLF-SVK<br><br>**DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**<br><br>Date:  June 20, 2019  1:30 p.m.<br>Dept.:  Courtroom 4, 5th Floor<br>Judge:  Hon. Beth Labson Freeman |

1    I, CAROL C. VILLEGAS, declare as follows pursuant to 28 U.S.C. §1746:

2        1.    I am a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow" or

3    "Lead Counsel").  Labaton Sucharow serves as court-appointed Lead Counsel for Lead Plaintiff

4    Arkansas Teacher Retirement System ("ATRS or "Lead Plaintiff").[1]  I have been actively

5    involved in prosecuting and resolving the Action, am familiar with its proceedings, and have

6    personal knowledge of the matters set forth herein based upon my supervision and participation

7    in all material aspects of the Action.

8        2.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this

9    declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement

10   and Plan of Allocation as well as Lead Counsel's Motion for an Award of Attorneys' Fees and

11   Payment of Litigation Expenses.  Both motions have the full support of Lead Plaintiff.  *See*

12   Declaration of Rod Graves, Deputy Director of Arkansas Teacher Retirement System, attached

13   hereto as Exhibit 1.[2]

14   **I.    PRELIMINARY STATEMENT**

15       3.    Lead Plaintiff has succeeded in obtaining a recovery for the Settlement Class in

16   the amount of $7,000,000, in cash, which has been deposited in an interest-bearing escrow

17   account for the benefit of the Settlement Class.  As set forth in the Stipulation, in exchange for

18   this payment, the proposed Settlement resolves all claims asserted by Lead Plaintiff and the

19   Settlement Class in the Action and all related claims that could have been brought against the

20   Released Defendant Parties ("Released Claims").

21       4.    The case has been vigorously litigated from its commencement in October 2015

22   through the execution of the Stipulation.  The Settlement was achieved only after Lead Counsel,

23   *inter alia*, as detailed below: (i) conducted a thorough and wide-ranging investigation concerning

24

25       [1] All capitalized terms not otherwise defined herein have the same meaning as that set
26   forth in the Stipulation and Agreement of Settlement, dated as of November 30, 2018 (the
     "Stipulation", ECF No. 156-1).
         [2] Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration.  For
27   clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The
     first numerical reference is to the designation of the entire exhibit attached hereto and the second
28   numerical reference is to the exhibit designation within the exhibit itself.

1   the allegedly fraudulent misrepresentations/omissions made by Defendants; (ii) prepared and

2   filed a detailed Consolidated Class Action Complaint for Violations of the Federal Securities

3   Laws (the "Consolidated Complaint"); (iii) researched and drafted an opposition to Defendants'

4   motion to dismiss the Consolidated Complaint; (iv) prepared and filed a detailed Amended

5   Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Amended

6   Complaint") after the Court's order granting Defendants' motion to dismiss the Consolidated

7   Complaint; (v) researched and drafted an opposition to Defendants' motion to dismiss the

8   Amended Complaint; (vi) worked closely with experts to analyze loss causation and damages

9   issues, as well as executive compensation; and (vii) engaged in thorough mediation efforts,

10  which included the review of approximately 1,270 pages of core documents produced prior to

11  mediation, the exchange of comprehensive mediation statements, and a full-day mediation

12  session.  At the time the Settlement was reached, Lead Counsel had a thorough understanding of

13  the strengths and weaknesses of the Parties' positions.

14          5.      Further, as discussed in more detail below, Lead Plaintiff's consulting damages

15  expert has estimated that maximum aggregate damages with respect to the claims that survived

16  the Court's order granting in part and denying in part Defendants' motion to dismiss the

17  Amended Complaint ("MTD Order") would range from approximately $74 million to $140

18  million, and could be as low as approximately $13 million to $36 million if Defendants'

19  disaggregation arguments were credited and certain disclosures were excluded as a consequence.

20  Against these benchmarks, for the claims surviving the motion to dismiss, the $7 million

21  Settlement, therefore, represents a recovery of approximately 5% to 9.5% of non-disaggregated

22  damages and 19% to 54% if foreseeable disaggregation arguments are credited—a favorable and

23  reasonable recovery in light of the countervailing legal and factual arguments and litigation risks.

24  *See also* Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of

25  Allocation and Memorandum of Points and Authorities in Support Thereof ("Settlement Brief"),

26  §I.B.4.

27          6.      In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the

28  significant risks associated with establishing liability, as well as the duration and complexity of

MASTER FILE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT
AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

2

1  the legal proceedings that remained ahead.  As discussed in Section VII, *infra*, the Settlement

2  was achieved in the face of vigorous opposition by Defendants who would have, had the

3  Settlement not been reached, continued to raise serious arguments concerning, among other

4  things, the alleged material falsity of statements and omissions made during the Class Period as

5  well as scienter.  Principally, Lead Plaintiff had not yet moved for class certification and there

6  was a significant risk that the Court would credit Defendants' unique arguments about price

7  impact and either refuse to certify the class or decertify the class in connection with summary

8  judgment or after trial.  Further, Lead Plaintiff faced significant challenges relating to loss

9  causation and damages, which would have come down to an inherently unpredictable and hotly

10  disputed "battle of the experts," with Defendants' experts undoubtedly rejecting Lead Plaintiff's

11  expert's model and opinions.  Accordingly, in the absence of a settlement, there was a very real

12  risk that the Settlement Class could have recovered nothing or an amount significantly less than

13  the negotiated Settlement.

14      7.      With respect to the proposed Plan of Allocation, as discussed below and in

15  Section II of the Settlement Brief, the proposed Plan was developed with the assistance of Lead

16  Plaintiff's consulting damages expert, and provides for the fair and equitable distribution of the

17  Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved

18  for payment.

19      8.      With respect to the Fee and Expense Application, as discussed below and in Lead

20  Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses and Memorandum

21  of Points and Authorities in Support Thereof ("Fee Brief"), the requested fee of 25% of the

22  Settlement Fund would be reasonable and warrants the Court's approval.  This fee request is

23  consistent with the Ninth Circuit's "benchmark" for common fund cases, within the range of fee

24  percentages frequently awarded in this type of action, and, under the particular facts of this case,

25  justified in light of the benefits that Lead Counsel conferred on the Settlement Class, the risks it

26  undertook, the quality of its representation, the nature and extent of the legal services, and the

27  fact that Lead Counsel pursued the case at their financial risk.

28

## II.      SUMMARY OF LEAD PLAINTIFF'S CLAIMS

9.      Extreme is a network infrastructure company. It develops and sells equipment for accessing the Internet, as well as software for running the equipment, monitoring its usage, and analyzing the data that passes through.  ¶44.[3]  The Company also offers related services contracts for extended warranty and maintenance of its equipment.  *Id.*  Together, equipment sales and service contract payments constitute, in the Company's words, "substantially all" of the Company's revenue.  *Id.*

10.      Enterasys Networks, Inc. ("Enterasys") was a privately held company headquartered in Salem, New Hampshire, that also sold network infrastructure equipment and software, including analytics and security products. Enterasys was a direct competitor of Extreme.  ¶3.

11.      Extreme announced its acquisition of Enterasys on September 12, 2013 and completed it on October 31, 2013 for $180 million, net of cash acquired.  The acquisition roughly doubled the size of the Company, and the Company described it as a "merger of equals."  ¶4.

12.      As set forth in more detail below, the Amended Complaint alleges that during the Class Period Defendants made materially false and misleading statements and omissions regarding (i) the status of Extreme's acquisition of and integration with Enterasys; (ii) the potential impact of Extreme's partnership with Lenovo; and (iii) that these business arrangements would lead Extreme to achieve double-digit revenue growth and a 10 percent profit margin by June 2015.  *See, e.g.*, ¶¶15-17, 66-83.  In particular, with respect to the status of the integration, the Amended Complaint alleges that Defendants made false and misleading statements and omissions that: (i) the integration is "on track"; (ii) the integration is "ahead of plan," and similar "plan" statements; (iii) Extreme had a "plan" to achieve synergies from integration; (iv) synergies from integration are "on track"; (v) sales force integration is

---

[3] All citations to "¶ ____" are to the Amended Complaint, unless otherwise noted.

MASTER FILE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT
AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

4

1    "complete" and integration problems are "behind" Extreme; and (vi) the integration will cause

2    "no disruption" to customers.  *See, e.g.*, ¶¶13, 50-65, 170.

3          13.    The Amended Complaint further alleges that the artificial inflation caused by the

4    alleged fraud came out of the Company's stock price through four partial corrective disclosures

5    and/or materializations of the risk before a final one on April 9, 2015.  On February 5, 2014,

6    before the market opened, Extreme reported low revenues and disappointing guidance for the

7    next quarter, citing issues relating to the integration.  On May 6, 2014, Extreme reported

8    disappointing revenues, saying that it "experienced some integration issues," and revealed that its

9    CFO and COO would be leaving (and Berger would be taking over the COO's role and directly

10   overseeing the salesforce integration efforts).  On October 15, 2014, Extreme preannounced

11   revenues significantly below its previous guidance.  On January 14, 2015, the Company backed

12   away from its commitment to achieve 10% revenue growth and 10% operating margin by June

13   2015 (based on the Lenovo partnership).  ¶¶20-21.

14         14.    Finally, on April 9, 2015, after the markets closed, Extreme preannounced that it

15   would miss guidance for its third fiscal quarter of 2015, reporting non-GAAP revenue of $118-

16   $120 million and earnings per share ("EPS") of ($0.09)-($0.07), significantly below its guidance

17   of $130-$140 million and ($0.03)-$0.02, respectively.  The Company also announced more

18   executive turnover – Chief Revenue Officer Jeff White, who had been hired only six months

19   earlier to manage the integration of the Extreme and Enterasys salesforces (taking over from

20   CEO Berger, who had filled that role from May to October 2014), was "no longer with the

21   Company."  Trading in Extreme's common shares was halted.  On these alleged disclosures, the

22   Company's stock price decreased nearly 23%, from $3.24 per share to $2.50 per share, on heavy

23   trading volume.  ¶22.

24         15.    The operative complaint in the Action, the Amended Complaint, asserts violations

25   of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

26   U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

27   §240.10b-5, by Extreme and former Chief Executive Officer Charles W. Berger, former Chief

28

Financial Officer John T. Kurtzweil, and former Chief Executive Officer Kenneth B. Arola (collectively, "Individual Defendants").

## III.   RELEVANT PROCEDURAL HISTORY

### A.   Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

16.     Beginning in October of 2015, two securities class action complaints were filed in the Court on behalf of investors in Extreme.[4]  On December 1, 2015, the Court issued an Order consolidating the Extreme-related securities actions.  ECF No. 18.  On June 28, 2016, the Court issued an Order appointing ATRS as Lead Plaintiff and appointing Labaton Sucharow LLP as Lead Counsel and Berman DeValerio[5] as Liaison Counsel to represent the putative class.  ECF No. 75.

### B.   The Consolidated Complaint

17.     On September 26, 2016, Lead Plaintiff filed the Consolidated Complaint alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  ECF No. 87.  The Consolidated Complaint was based upon Lead Counsel's extensive factual investigation, which included, among other things, the review and analysis of: (i) documents filed publicly by the Company with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the Individual Defendants; (iii) research reports issued by financial analysts concerning the Company; and (iv) other publicly available information and data concerning the Company.  Lead Counsel's investigation also included contacting and interviewing a significant number of former employees of Extreme and other persons with relevant knowledge (seven of whom were relied on in the Consolidated Complaint).  Lead Counsel also consulted with an economics expert regarding loss causation and damages.

18.     The Consolidated Complaint alleged that Defendants falsely stated that the integration of Extreme and Enterasys was "on track," "ahead of plan" and made other similar

---

[4] *Hong v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04883-BLF and *Kasprzak v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04975-BLF.

[5] Berman DeValerio has since been renamed Berman Tabacco.

1   assurances. The Consolidated Complaint alleged that such statements were false and misleading

2   because Defendants knew that the Enterasys integration lacked an integration plan, including a

3   product roadmap for the combined company, and was substantially behind in its integration

4   efforts and, as a result, the integration efforts were riddled with material problems (*e.g.*,

5   redundancies in the combined salesforce) that would prevent the Company from achieving the

6   profit margins touted by Defendants during the Class Period. The Consolidated Complaint

7   attempted to establish the falsity of Defendants' statements by relying in part on former

8   employees of the Company, or Confidential Witnesses ("CWs") who recounted, among other

9   things, that "there was no centralized plan to integrate Extreme and Enterasys." ¶133.

10          **C.      Defendants' Motion to Dismiss the Consolidated Complaint**

11          19.    Defendants filed a motion to dismiss the Consolidated Complaint on November

12  10, 2017. ECF No. 89. Extreme and the Individual Defendants moved to dismiss all allegations

13  of the Consolidated Complaint.

14          20.    Defendants argued, *inter alia*, that Lead Plaintiff failed to allege falsity or scienter

15  regarding Defendants' statements about the success of the integration efforts and that, in any

16  event, ongoing disclosures of the challenges experienced in the integration undermined falsity

17  and scienter. Defendants also argued that the Consolidated Complaint failed to state a claim

18  based on Defendants' Lenovo statements and that the Consolidated Complaint did not allege

19  falsity or scienter with respect to Defendants' margin and revenue targets, which were protected

20  by the PSLRA safe harbor.

21          21.    Lead Plaintiff filed its opposition to Defendants' motion to dismiss the

22  Consolidated Complaint on December 23, 2016. ECF No. 90. Lead Plaintiff argued, among

23  other things, that Defendants' positive statements about the integration, when viewed in context,

24  were false and misleading when made, and that Defendants' statements that the integration was

25  "on track" misrepresented present facts that were not protected by the PSLRA safe harbor. Lead

26  Plaintiff further argued that the Consolidated Complaint alleged a strong inference of scienter

27  based on certain admissions by the Company's new CEO following the Class Period, Defendant

28

Berger's unique bonus scheme, and the sudden departure of Defendants and certain key executives.

**D.     The Court's Order Granting the Motion to Dismiss
the Consolidated Complaint**

22.     On April 27, 2017, after a hearing and thorough argument, the Court issued its Order Granting Defendants' Motion to Dismiss with Leave to Amend.  ECF No. 102.  Therein, the Court held that many of Defendants' class period statements concerning the progress of the integration were puffery, but that some statements were potentially actionable because they were "objectively verifiable matters of fact."  *See id.* at 17-20.  The Court also held that the statements identified by Defendants with respect to Lenovo were not actionable as "mildly optimistic, subjective assessment[s]," *id*. at 22, and that Defendants' margin and revenue target statements were inactionable as "vague, generalized assertion of corporate optimism."  *Id*. at 24.

23.     In turn, the Court found that the potentially actionable statements concerning the integration were not false and misleading, as "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves and the Complaint does not contain any particularized allegations demonstrating that any of the statements was materially false or misleading when made."  *Id*. at 26.  Similarly, the Court held that the potentially actionable Lenovo statements were not false and misleading where "Plaintiffs specify what information they contend Extreme omitted, but do not indicate why the statements that were made were misleading, and is it not self-evident that the statements were misleading."  *Id*. at 31.  With respect to scienter, the Court, held that "taken together, the facts suggest, at most, corporate mismanagement and negligence, but they do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent."  *Id*. at 41-42.

24.     The Order allowed Lead Plaintiff until May 29, 2017 to amend the complaint and to attempt to correct the identified deficiencies.  *Id*. at 43.

**E.     The Amended Complaint and the Court's Order Denying
in Part the Motion to Dismiss**

25.     The Amended Complaint was filed on May 29, 2017.  ECF No. 105.  Like the Consolidated Complaint, the Amended Complaint was based on the investigation conducted by

MASTER FILE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT
AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

8

Lead Counsel, which was expanded and ultimately included contacting a total of 148 former employees of Extreme and other persons with relevant knowledge and interviewing 24 of them (six of whom were relied on in the Amended Complaint).  The Amended Complaint was also based on consultation with an expert in the field of executive compensation.  Like the Consolidated Complaint, the Amended Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of a class of all purchasers of Extreme's common stock and/or exchange-traded options from September 12, 2013 through April 9, 2015, inclusive.

26.     The Amended Complaint attempted to cure the deficiencies identified in the Court's order granting Defendants' motion to dismiss the Consolidated Complaint by adding additional allegations from confidential witnesses supporting the contemporaneous falsity of Defendants' class period statements and specifying, for each statement alleged to be false and misleading, the specific basis for falsity and scienter.  *See, e.g.*, ECF No. 121-1 (redline showing additional and specific falsity and scienter allegations as to Defendant Kurtzweil's September 12, 2013 statements).  In particular, the Amended Complaint supplemented the factual allegations from the CWs with direct interactions that CWs 1 and 3 had with Defendant Berger about the status of Extreme's integration efforts with Enterasys.  Amended Complaint at ¶¶102-105, 110, 112-113, 122, 126; ECF No. 130 at 8.

27.     Lead Plaintiff further supplemented its allegations regarding the Enterasys integration in the Amended Complaint by adding post-class period admissions to demonstrate that Extreme lacked an integration plan.  Amended Complaint at ¶¶14, 155-57, 160; ECF No. 130 at 9.  Lead Plaintiff also added allegations to detail how unusual Berger's stock price-based bonus was.  Amended Complaint at ¶¶371-73; ECF No. 130 at 14.  The Amended Complaint alleged that no preceding CEO of Extreme had a similar "Performance Option" bonus (Amended Complaint at ¶¶372, 374-78), and included allegations supported by an executive compensation expert, Steven Hall, stating that Berger's bonus was highly unusual compared to Extreme's peer companies and other companies of a similar size.  Amended Complaint at ¶¶379-92.

MASTER FILE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT
AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

9

28.     On July 10, 2017, Defendants filed a motion to dismiss the Amended Complaint, which Lead Plaintiff opposed on August 31, 2017.  ECF Nos. 107, 112.  On September 21, 2017, Defendants filed a reply brief in further support of their motion to dismiss.  ECF No. 113.  Oral argument on the motion was held on December 14, 2017.  ECF No. 123.

29.     On March 21, 2018, the Court issued an Order granting in part and denying in part Defendants' motion to dismiss.  ECF No. 130.  In particular, the Court found that falsity and scienter, based on the Amended Complaint's supplemental allegations, were adequately pled with respect to certain integration statements.  The Court granted the motion to dismiss with respect to the Lenovo and revenue and margin statements, and generally as to Defendant Kurtzweil on the Section 10(b) claim, finding that he was not alleged to have made any surviving statements.

30.     On May 21, 2018, Defendants filed a Statement of Affirmative Defenses raising seven affirmative defenses.  The defenses focused on issues surrounding reliance, loss causation, and price impact.  *See* ECF No. 144.  On May 21, 2018, Defendants filed their Answer to the Amended Complaint, generally denying the Amended Complaint's substantive allegations.  ECF No. 145.

## IV.     DISCOVERY

31.     Following the denial, in part, of Defendants' motion to dismiss the Amended Complaint, the Parties negotiated a case schedule that would see the case through summary judgment and commenced discovery.  As part of this process, the Parties summarized the outstanding legal issues in dispute, which included, at a minimum:

(a)     Whether Defendants' acts violated the federal securities laws, specifically Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. §240.10b-5, as alleged in the Amended Complaint;

(b)     Whether Defendants misrepresented material facts or omitted to state any material facts that were necessary to make their statements not misleading in light of the circumstances under which they were made;

1          (c)      Whether Defendants had a duty to disclose any alleged material omission;

2          (d)      Whether any Defendant acted with scienter in making any alleged

3    misrepresentations or omissions;

4          (e)      Whether the market price of the Company's common stock during the

5    class period was artificially inflated due to the alleged material omissions and/or

6    misrepresentations complained of in the Amended Complaint;

7          (f)      Whether Lead Plaintiff and putative class members relied on Defendants'

8    alleged misrepresentations and/or omissions;

9          (g)      Whether the Safe Harbor precluded liability for Defendants' alleged

10   misstatements to the extent they are forward-looking statements;

11         (h)      Whether Defendants acted in good faith with respect to all matters alleged

12   in the Amended Complaint as narrowed by the March 2018 Order, and did not directly or

13   indirectly induce any act or acts constituting a violation of, or cause of action based on, Section

14   10(b) of the Exchange Act and Rule 10b-5;

15         (i)      Whether the members of the class have sustained damages, and if so, the

16   proper measure of any such damages;

17         (j)      Whether any of the acts or omissions alleged against Defendants caused

18   damages to plaintiffs;

19         32.      As part of the meet and confer process surrounding the submission of the Case

20   Management Conference Statement, the Parties also discussed and notified the Court that they

21   anticipated that Lead Plaintiff's class certification motion would be a contested motion and that

22   each side would file expert witness reports on one or more topics.  ECF No. 143.  As such,

23   briefing on Lead Plaintiff's anticipated motion for class certification was not scheduled to

24   conclude until September 5, 2019 (over a year and four months later).

25         33.      As part of its initial discovery requests, Lead Plaintiff served eighty-seven

26   requests for the production of documents on Defendants on April 30, 2018.  Defendants served

27   responses and objections to Lead Plaintiff's document requests on June 14, 2018.  The Parties

28   also exchanged initial disclosures on May 21, 2018.  The Parties met and conferred extensively

1    on the search terms that would be used to search for documents responsive to Lead Plaintiff's

2    requests for production.  The meet and confer process highlighted the Parties' opposing views on

3    the scope of the allegations that survived the MTD Order, and consequently on the scope of

4    discovery.

5         34.    In connection with these negotiations, the Parties entered into an agreement for

6    the production of electronically stored information, and agreed to a protective order that would

7    govern the disclosures in the Action.

8    **V.    NEGOTIATION OF THE SETTLEMENT**

9         35.    Beginning shortly after the Court's order denying, in part, Defendants' motion to

10   dismiss the Amended Complaint, the Parties began initial discussions concerning the possibility

11   of a negotiated resolution of the case.  Defendants and Lead Plaintiff engaged Robert A. Meyer,

12   Esq. ("Mr. Meyer"), a well-respected and highly experienced mediator, to assist them in

13   exploring a potential negotiated resolution of the claims in the Action.

14        36.    On July 18, 2018, Lead Plaintiff and Defendants met with Mr. Meyer in an

15   attempt to reach a settlement.  The mediation involved an extended effort to settle the claims and

16   was preceded by the exchange of mediation statements and Defendants' production of

17   approximately 1,270 pages of documents, including Board of Director minutes and presentations.

18        37.    Lead Counsel worked diligently to review the documents and to prepare Lead

19   Plaintiff's mediation statement.  The Parties' respective mediation statements thoroughly set

20   forth Lead Plaintiff's and Defendants' positions and included substantial supporting

21   documentation.

22        38.    Following rigorous, arm's-length, and mediated negotiations under the auspices

23   of Mr. Meyer, Defendants and Lead Plaintiff accepted a mediator's proposal concerning a

24   settlement nearly a month later on August 17, 2018, and on September 26, 2018, the Parties

25   entered into a settlement term sheet.

26        39.    Lead Plaintiff and Defendants thereafter memorialized the final terms of

27   settlement in the Stipulation, which was executed by the Parties on November 30, 2018 and filed

28

with the Court, ECF No. 156-1, along with Lead Plaintiffs' motion and supporting memorandum of points and authorities seeking preliminary approval of the Settlement, ECF No. 155.

## VI.   LEAD PLAINTIFF'S COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER

40.      By Order entered March 13, 2019, the Court preliminarily approved the Settlement and approved the forms of notice to the Settlement Class.  Pursuant to the Preliminary Approval Order, the Court appointed Kurtzman Carson Consultants LLC ("KCC") as Claims Administrator and instructed KCC to disseminate copies of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Notice Packet") by mail and to disseminate the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses.

41.      The Notice, attached as Exhibit A to the Declaration of Lance Cavallo Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of Summary Notice; (C) Report on Requests for Exclusion to Date ("Mailing Affidavit" or "Mailing Aff.") (attached as Exhibit 2 hereto), provides potential Settlement Class Members with information about the terms of the Settlement and, among other things: their right to exclude themselves from the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement.  The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees of no more than 25% of the Settlement Fund and for payment of expenses in an amount not to exceed $230,000.

42.      As detailed in the Mailing Affidavit, on March 27, 2019, KCC began mailing Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be Settlement Class Members.  Mailing Aff. at ¶¶3-7.  In total, to date, KCC has mailed 27,710 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid.  *Id.* at ¶7.  To disseminate the Notice, KCC obtained the names and addresses of potential Settlement Class Members from

1   listings provided by Extreme's transfer agent and from banks, brokers, and other nominees. *Id.*

2   at ¶¶3-6.

3       43.    On April 8, 2019, KCC caused the Summary Notice to be published in *Investor's*

4   *Business Daily* and to be transmitted over *PR Newswire*. *Id.* at ¶8 and Exhibit B attached thereto.

5       44.    KCC also maintains and posts information regarding the Settlement on a

6   dedicated website established for the Action, www.ExtremeNetworksSecuritiesLitigation.com,

7   to provide Settlement Class Members with information, as well as downloadable copies of the

8   Notice Packet and the Stipulation. *Id.* at ¶10.  In addition, Lead Counsel has made relevant

9   documents concerning the Settlement available on its firm website.

10       45.    Pursuant to the terms of the Preliminary Approval Order, the deadline for

11   Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the

12   Fee and Expense Application, or to request exclusion from the Settlement Class is May 23, 2019.

13   To date, no objections have been received and the Claims Administrator has not received any

14   requests for exclusion from the Settlement Class. *Id.* at ¶11.  Should any objections or requests

15   for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due June

16   6, 2019.

17   **VII.**    **RISKS FACED BY LEAD PLAINTIFF IN THE ACTION**

18       46.    Based on publicly available information and documents obtained through

19   mediation-related discovery, Lead Plaintiff believes that the claims in the Action were strong.

20   However, Lead Plaintiff also recognizes that there were considerable risks in continuing the

21   Action against Defendants.  Lead Plaintiff and its counsel carefully considered these risks during

22   the months leading up to the Settlement and throughout the settlement discussions with

23   Defendants and the Mediator.

24       47.    In agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other

25   things, the substantial cash benefit to Settlement Class Members against: (i) the uncertainties

26   associated with trying complex securities cases; (ii) the difficulties and challenges involved in

27   proving materiality, falsity, scienter, causation, and damages in this particular case; (iii) the

28   difficulties and challenges involved in certifying a class; (iv) the fact that, even if Lead Plaintiff

prevailed at summary judgment and trial, any monetary recovery could have been less than the Settlement Amount; and (v) the delays that would follow even a favorable final judgment, including appeals.

48.     The principal risks are discussed below. However Defendants would have continued to challenge the material falsity of each alleged misstatement and omission that survived the Court's MTD Order and Lead Plaintiff's proof of scienter, as discussed above.

### A.     Narrowed Scope of the Action and Risks Concerning Class Certification

49.     The most immediate risk faced by Lead Plaintiff was its upcoming motion for class certification, and then retaining certification through summary judgment and trial.  While at the time of settlement Lead Plaintiff had not yet moved for class certification, the discussions between the Parties indicated that the motion would lead to a difficult contested "battle of the experts."  This was, in part, because of the scope of the claims surviving Defendants' motion to dismiss.  The MTD Order excluded: (i) all claims based on challenged statements made in 2013, the year the Enterasys acquisition was announced (September 12) and closed (as announced November 4); (ii) all claims based on statements about anticipated costs and operating expense savings from the acquisition, including projections; (iii) all claims based on business Extreme hoped to achieve from its relationship with Lenovo; and (iv) all claims based on aspirational targets for "double digit growth" and 10% operating margin.

50.     The MTD Order thus significantly trimmed the scope of the Action, finding actionable only: (i) certain general statements attributed to Berger in press releases and investor conferences that Enterprise Resource Planning integration and other operational milestones in the integration of Enterasys were "on track" or "ahead of plan"; (ii) certain statements made by Berger about integration of the Sales organization; and (iii) certain statements made by former CFO Ken Arola regarding the integration of the two companies and the projected integration of the product portfolio and Sales and marketing teams.  Based on the surviving claims, Defendants and their expert(s) would likely have argued a lack of "price impact," a complex attack on the presumption of reliance that counsel for Defendants have successfully pioneered in this district. *See In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 6026244, at *1 (N.D.

1   Cal. Dec. 5, 2017), *reconsideration denied*, No. 5:11-CV-01252-EJD, 2018 WL 3472334 (N.D.

2   Cal. Jan. 18, 2018), and *leave to appeal denied sub nom.*, *Oklahoma Firefighters Pension & Ret.*

3   *Sys. v. Finisar Corp.*, No. 18-80013, 2018 WL 3472714 (9th Cir. July 13, 2018).  As part of this

4   attack at class certification, Defendants would have argued that when allegedly misrepresenting

5   these actionable topics, Extreme's stock price declined, and thus that there was no "price

6   impact."

7       51.    For example, Extreme's stock price declined following the press release and

8   conference call of February 5, 2014.  As a result, Defendants would have argued that the

9   allegedly false and misleading statements on that day had no positive price impact, which, they

10  would argue, is required to invoke the presumption of reliance.  As such, Lead Plaintiff's bid to

11  certify a class of investors between February 5, 2014 and May 5, 2014, the date of the next

12  challenged statement, may have failed, removing thousands of trades from the Class Period and

13  millions of dollars in damages.  Defendants would have attempted this "price impact" attack on

14  each of the days on which the allegedly false and misleading statements were made.

15      52.    In order to rebut Defendants' anticipated price impact attack, Lead Plaintiff would

16  have had to argue either that Defendants' alleged misstatements artificially maintained the prices

17  of Extreme common stock or that certain of Defendants' statements had a positive price impact

18  on Extreme's securities on July 21, 2014 and October 29, 2014, two days on which there were

19  statistically significant price increases in Extreme's stock price and on which Defendants are

20  alleged to have made false and misleading statements the Court considered actionable.  While

21  this argument would have aided Lead Plaintiff in its class certification arguments, it would also

22  have reduced damages by moving inflation from the start of the Class Period to later in the Class

23  Period, arguably reducing the amount of inflation per damaged share at different points

24  throughout the Class Period.

25      53.    In sum, there was no guarantee that the proposed class would be certified and that

26  certification could have been retained through summary judgment and trial.  It was also far from

27  clear how the Court's rulings in this regard would affect loss causation and damages or how the

28  case would be presented to the jury.  Moreover, the prospect of appeal from any ruling was

1   extremely high.  Ultimately, while Lead Plaintiff and Lead Counsel believe they would have

2   advanced strong arguments in support of class certification and reliance, without negative price

3   impact ramifications, they nonetheless acknowledge that Defendants' arguments posed very

4   credible threats to Lead Plaintiff's ability to recover more than that offered by the Settlement.

5          **B.**       **Risks in Proving Loss Causation and Damages**

6         54.     As discussed above, before the MTD Order, the Amended Complaint alleged a

7   theory of causation and damages premised on three distinct categories of allegedly false and

8   misleading statements starting on September 12, 2013.  Using a rigorous event study and a well-

9   recognized trading model, Lead Plaintiff's causation and damages expert estimated maximum

10   aggregate damages under the original theories of liability, and the longer Class Period, to be

11   approximately $242 million (and approximately $145 million, crediting Defendants' likely

12   argument that pre-class period gains must be netted from a recovery).

13         55.     However, taking into account arguments necessary to counter Defendants' likely

14   price impact arguments at class certification and crediting a netting argument, maximum

15   aggregate damages under the original theories, and Class Period, would be approximately $121

16   million.  This aggregate estimate also includes the impact of purportedly non-fraud related

17   disclosures on the corrective disclosure dates which, Defendants would likely argue, would need

18   to be isolated and removed at summary judgment and trial, further reducing potential damages.[6]

19         56.     In ruling on Defendants' motion to dismiss the Amended Complaint, however, the

20   Court found only one category of false and misleading statements actionable and further

21   dismissed certain sub-categories of statements relating to that category.  The first false and

22   misleading statement the Court found actionable thus occurred on February 5, 2014.  Assuming

23   the viability of all remaining categories of false and misleading statements, Lead Plaintiff's

24   causation and damages expert has estimated maximum aggregate damages following the MTD

25   Order to be approximately $140 million.  However, if arguments necessary to counter

26   Defendants' likely price impact arguments at class certification and trial are taken into account,

27   

28   _____

[6] Against these benchmarks, and without disaggregation, the Settlement recovers between approximately 3% and 6% of aggregate damages.

and pre-Class Period gains are netted from the recovery, maximum aggregate damages following the MTD Order decrease to approximately $74 million.[7] These "aggregate" estimates still include the impact of arguably non-fraud related disclosures on the corrective disclosure dates, which Defendants would argue need to be isolated and removed.

57.     For example, on May 6, 2014, Defendants announced management changes, earnings, and forward guidance.  While Lead Plaintiff believes that evidence would link the management changes and the consensus revenue miss to sales force integration issues, the poor forward guidance was publicly linked to non-integration related issues that were "largely the result of a falloff in K-12 spending."  Based on these public statements, Defendants would have strenuously argued that the entire price decline was driven by the Company's poor forward guidance (and not merger issues) and, thus, that Lead Plaintiff and the class suffered no recoverable damages on this day.  Taking into account arguments necessary to counter Defendants' likely price impact arguments at class certification and netting pre-Class Period gains, maximum aggregate damages under this possible scenario are approximately $36 million.

58.     Further, on April 9, 2015, Extreme pre-announced lowered guidance for the March quarter and announced the departure of Jeff White, the Company's Chief Revenue Officer.  As with the May 6, 2014, disclosure, Defendants would have strenuously argued that the entire price decline was driven by the Company's poor forward guidance and, thus, that Lead Plaintiff and the class suffered no recoverable damages on this day.  Taking into account this scenario and the scenario in ¶57, arguments necessary to counter Defendants' likely price impact arguments at class certification, and netting pre-Class Period gains, maximum aggregate damages under this possible scenario are just $13 million.[8]

59.     As illustrated above, there was a very real risk that Lead Plaintiff would be unable to counter at summary judgment, or trial, that a substantial portion of the declines on the

---

[7]   Maximum aggregate damages for claims surviving the MTD Order would be approximately $94.5 million, if arguments necessary to counter Defendants' likely price impact arguments are taken into account and gains on pre-Class Period purchases are not netted.
[8]   Against these post-MTD Order benchmarks, the Settlement recovers between approximately 5% and 54% of aggregate damages.

1    disclosure dates were attributable to the alleged fraud.  There was also substantial uncertainty

2    surrounding Lead Plaintiff's expert's ability to isolate the proportion of the stock price declines

3    on the corrective disclosure dates attributable specifically to the alleged fraud.  These challenges

4    were further complicated by the Court's MTD Order, which found actionable only certain

5    categories of integration statements but not others.  For example, the Court found inactionable

6    statements that the integration would cause "no disruption" to customers but found actionable

7    statements that the sales force integration was "complete."  ECF No. 130 at 20.  Lead Plaintiff

8    was thus faced with the difficult task of separating out the impact of interrelated statements about

9    the integration on the corrective disclosure dates.  Because of this challenge, Lead Plaintiff's

10   proposed damages methodology would have come under sustained attack by Defendants, and

11   issues relating to damages would likely have come down, at best, to an inherently unpredictable

12   and hotly disputed "battle of the experts."

13       60.      Furthermore, in order to recover any damages, Lead Plaintiff would have to

14   prevail at summary judgment and trial and, even if Lead Plaintiff prevailed at those stages,

15   appeals would likely follow.  At each of these stages, there would be significant risks attendant

16   to the continued prosecution of the Action, and no guarantee that further litigation would have

17   resulted in a higher recovery, or any recovery at all.

18   **VIII.   THE PROPOSED PLAN OF ALLOCATION**

19       61.      Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all

20   Settlement Class Members who wish to participate in the distribution of the Settlement proceeds

21   must submit a valid Claim Form, including all required information, postmarked or submitted

22   electronically no later than June 6, 2019.  As provided in the Notice, after deduction of Court-

23   awarded attorneys' fees and expenses, notice and administration costs, and applicable taxes, the

24   balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the

25   plan of allocation approved by the Court (the "Plan of Allocation").

26       62.      The proposed Plan of Allocation, which was set forth in full in the Notice (Ex. 2-

27   A at 8-12), is designed to achieve an equitable and rational distribution of the Net Settlement

28   Fund.  Lead Counsel developed the Plan of Allocation in close consultation with one of Lead

Plaintiff's consulting damages experts and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

63. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages. In developing the Plan of Allocation, Lead Plaintiff's damages expert considered the amount of artificial inflation present in Extreme's common stock and call options (or deflation in the prices of Extreme put options) throughout the Class Period that was purportedly caused by the alleged fraud. This analysis entailed studying the price declines associated with Extreme's allegedly corrective disclosures, adjusted to eliminate the effects attributable to general market or industry conditions. In this respect, an inflation table was created as part of the Plan of Allocation and reported in the Notice. Shares purchased before February 5, 2014 and held through the February 5, 2014 disclosure will be valued using 20% of the alleged artificial inflation, given the Court's dismissal of these claims.

64. Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated by the Claims Administrator for each purchase of Extreme common stock and call options and each sale of Extreme put options during the Class Period, as listed in the Claim Form, and for which adequate documentation is provided. The value of a claimant's Recognized Claim will depend upon several factors, including when the claimant purchased shares during the Class Period and whether these shares were sold during the Class Period, and if so, when. Under Lead Counsel's direction, the Claims Administrator, KCC, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants.

65. Once the Claims Administrator has processed all submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payment distributions will be made to eligible Authorized Claimants using PayPal (for all payments below $10.00 and for payments between $10.00 and $100.00 for those who elect this option), and checks. After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least

1    six (6) months from the date of initial distribution, Lead Counsel will, if feasible and economical,

2    re-distribute the balance among Authorized Claimants who have cashed their checks.  Re-

3    distributions will be repeated until the balance in the Net Settlement Fund is no longer

4    economically feasible to distribute.  *See* Ex. 2-A at ¶66.  At this point, Lead Counsel will file a

5    report with the Court supporting the determination that an additional distribution would not be

6    economically feasible and requesting that the unclaimed balance remaining in the Net Settlement

7    Fund, after payment of any outstanding Notice and Administration Expenses or Taxes, be

8    donated to Consumer Federation of America.  *Id.*

9          66.      Consumer Federation of America (CFA) is a non-profit, consumer advocacy

10    organization established in 1968 to advance consumer interests through policy research,

11    advocacy, and education before the judiciary, Congress, the White House, federal and state

12    regulatory agencies, and state legislatures.  *See generally* www.consumerfed.org.  With respect

13    to victims of financial fraud, CFA has an Investor Protection program that works nationwide to

14    promote consumer-oriented policies that safeguard investors against fraud through: (i) the

15    development of educational material for investors; (ii) drafting policies and legislation; (iii) and

16    providing testimony and comments on legislation and regulations.  *See*

17    www.consumerfed.org/issues/investor-protection.  CFA has been approved as a *cy pres*

18    beneficiary in several securities cases in California, including *In re Intuitive Surgical Sec. Litig.*,

19    Case No. 5:13-cv-01920-EJD (N.D. Cal.), *In re Vocera Commc'ns, Inc. Sec. Litig.*, No. 13-CV-

20    03567-EMC (N.D. Cal.) and *In re Broadcom Corp. Sec. Litig.*, No. 01-CV-00275-MLR (C.D.

21    Cal.).

22          67.      In sum, the proposed Plan of Allocation, developed in consultation with Lead

23    Plaintiff's consulting damages expert, was designed to fairly and rationally allocate the Net

24    Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits

25    that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

26

27

28

## IX.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES

### A.   Consideration of Relevant Factors Justifies an Award of a 25% Fee in this Case

68.   For its diligent efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  Consistent with the Notice to the Settlement Class, Lead Counsel seeks a fee award of 25% of the Settlement Fund.  Lead Counsel also requests payment of expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $167,200.00, plus accrued interest at the same rate as is earned by the Settlement Fund, and reimbursement to Lead Plaintiff pursuant to the PSLRA in the amount of $2,180.8.  Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### 1.   Lead Plaintiff Supports the Fee and Expense Application

69.   ATRS is a public pension fund organized in 1937 to provide retirement, disability, and survivor benefit programs to active and retired public teachers of the State of Arkansas. ATRS is responsible for the retirement income of these employees and their beneficiaries.  As of June 30, 2018, ATRS's defined benefit plans served more than 125,000 active and retired members and their beneficiaries, and ATRS had over $17 billion in assets under management. Ex. 1 at ¶1.

70.   Lead Plaintiff has evaluated and fully supports the Fee and Expense Application. *See* Ex. 1 at ¶7.  In coming to this conclusion, Lead Plaintiff—which was substantially involved in the prosecution of the Action and negotiation of the Settlement—considered the recovery obtained as well as Lead Counsel's substantial effort in obtaining the recovery.  Particularly in light of the considerable risks of litigation, Lead Plaintiff agreed to allow Lead Counsel to apply for 25% of the Settlement Fund.  *See id.*  The fee request is also consistent with Lead Counsel's pre-settlement fee agreement with the Lead Plaintiff.

### 2.     The Favorable Settlement Achieved

71.     Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award. *See* Fee Brief, §I.C.1. Here, the $7,000,000 Settlement is a favorable and reasonable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through summary judgment, to trial, and through likely post-trial motions and appeals.

72.     As discussed above, Lead Plaintiff's consulting damages expert has estimated that maximum aggregate damages following the MTD Order are approximately $74 million to $140 million, without disaggregation. Against these yardsticks, the Settlement will return approximately 5% to 9.5% of estimated losses. When disaggregation arguments are factored in, damages decrease substantially to between approximately $13 million and $36 million. Against this measure, the Settlement will return approximately 19% to 54% of estimated losses.

73.     This recovery was the result of very thorough and diligent prosecutorial and investigative efforts, complicated motion practice, and vigorous settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### 3.     The Risks and Unique Complexities of Contingent Class Action Litigation

74.     This Action presented substantial challenges from the outset of the case, some of which could not be overcome. The specific risks Lead Plaintiff faced in proving Defendants' liability and damages are detailed in Section VII, above. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis.

75.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead

1   Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the

2   Action, and that funds were available to compensate staff and to cover the considerable costs that

3   a case such as this requires.  With an average lag time of several years for these cases to

4   conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid

5   on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the two

6   and a half year course of the Action but have incurred 5,901.8 hours of time for a total lodestar

7   of $3,330,856.50 and have incurred $167,200.00 in expenses in prosecuting the Action for the

8   benefit of the Settlement Class.

9        76.     Counsel also bore the risk that no recovery would be achieved (or that a judgment

10   could not be collected, in whole or in part).  Even with the most vigorous and competent of

11   efforts, success in contingent-fee litigation, such as this, is never assured.  Lead Counsel know

12   from experience that the commencement of a class action does not guarantee a settlement.  To

13   the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories

14   that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to

15   engage in serious settlement negotiations at meaningful levels.

16        77.     Lead Counsel is aware of many hard-fought lawsuits where, because of the

17   discovery of facts unknown when the case was commenced, or changes in the law during the

18   pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent

19   professional efforts of members of the plaintiffs' bar produced no fee for counsel.

20        78.     Federal appellate reports are filled with opinions affirming dismissals with

21   prejudice in securities cases.  The many appellate decisions affirming summary judgments and

22   directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of

23   recovery.  *See, e.g.*, *Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon

24   Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F.

25   App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st

26   Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l Inc.

27   Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir.

28   2001).

79.     Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Labaton Sucharow, or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

80.     Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court tossed unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals (2010 WL 5927988 (9th Cir. June 23, 2010)) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 131 S. Ct. 1602 (2011)).

81.     Losses such as those described above are exceedingly difficult for plaintiff's counsel to bear.  The fees that are awarded in successful cases are used to cover enormous overhead expenses incurred during the course of litigations and are taxed by federal, state, and local authorities.

82.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers

1  and directors of public companies.  Vigorous private enforcement of the federal securities laws

2  and state corporation laws can only occur if private plaintiffs can obtain some parity in

3  representation with that available to large corporate defendants.  If this important public policy is

4  to be carried out, courts should award fees that will adequately compensate private plaintiffs'

5  counsel, taking into account the enormous risks undertaken with a clear view of the economics of

6  a securities class action.

7        83.     As discussed in greater detail above, this case was fraught with significant risk

8  factors concerning liability and damages.  Lead Plaintiff's success was by no means assured.

9  Defendants disputed, and would continue to dispute, whether Lead Plaintiff could establish

10  liability and would no doubt contend, as the case proceeded to trial, that even if liability existed,

11  the amount of damages was substantially lower than Lead Plaintiff alleged.  Were this Settlement

12  not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff and Lead Counsel faced

13  potentially years of costly and risky appellate litigation against Defendants, with ultimate success

14  far from certain and the prospect of no recovery significant.  It is also possible that a jury could

15  have found no liability or no damages.  Lead Counsel therefore respectfully submits that based

16  upon the considerable risk factors present, this case involved a very substantial contingency risk

17  to counsel.

18           **4.**      **The Work of Plaintiffs' Counsel and the Lodestar Cross-Check**

19        84.     The work undertaken by Plaintiffs' Counsel in investigating and prosecuting this

20  case and arriving at the present Settlement in the face of serious hurdles has been time-

21  consuming and challenging.  As more fully set forth above, the Action settled only after Lead

22  Counsel overcame multiple legal and factual challenges.  Among other efforts, Lead Counsel

23  conducted a comprehensive investigation into the class's claims; researched and prepared two

24  detailed amended complaints; briefed thorough oppositions to Defendants' motions to dismiss

25  the Consolidated and Amended Complaints; obtained and reviewed more than approximately

26  1,270 pages of core documents from Defendants in connection with the mediation process; and

27  engaged in a hard-fought settlement process with experienced defense counsel and an

28  experienced Mediator.

85.     At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means necessary.

86.     Attached hereto are declarations from Plaintiffs' Counsel, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses.  *See* Declaration of Carol Villegas on Behalf of Labaton Sucharow LLP in Support of Application for Award of Attorneys' Fees and Expenses (attached as Exhibit 3 hereto) and Declaration of Nicole Lavallee on Behalf of Berman Tabacco in Support of Application for Award of Attorneys' Fees and Expenses (attached as Exhibit 4 hereto).

87.     Included with these declarations are schedules that summarize the time of each firm (including by category of work conducted), as well as the expenses incurred by category (the "Fee and Expense Schedules").[9]  The attached declarations and the Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employed by Plaintiffs' Counsel and the "lodestar" calculations, *i.e.*, their hours multiplied by their current rates.  *See* Exs. 3 & 4.  As explained in each declaration, they were prepared from daily time records regularly prepared and maintained by the respective firms.

88.     The hourly rates of Plaintiffs' Counsel here range from $875 to $995 for partners, $615 to $675 for of counsels, and $425 to $625 for associates.  *See* Exs. 3-A, 4-A.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary.  Exhibit 6, attached hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2018.  The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates here are consistent with, or lower than, the firms surveyed.

89.     Plaintiffs' Counsel have expended more than 5,900 hours in the prosecution and investigation of the Action.  *See* Exs. 3-A and 4-A.  The resulting lodestar is $3,330,856.50.  *Id.*  Pursuant to a lodestar "cross-check," applied within the Ninth Circuit, the requested fee of 25%

---

[9] Attached hereto as Exhibit 5 is a summary table of the lodestars and expenses of Plaintiffs' Counsel.

of the Settlement Amount ($1,750,000) results in a significantly *negative* "multiplier" of 0.53 on the lodestar, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting class members.  Accordingly, Lead Counsel seeks only approximately 53% of Plaintiffs' Counsel's legal fees.

### 5.      The Skill Required and Quality of the Work

90.      Lead Counsel Labaton Sucharow is among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of the Firm's attorneys is described in Exhibit 3-D, annexed hereto.

91.      Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous securities class actions throughout the United States.  Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby greatly benefiting the outcome by bringing to bear many years of collective experience.  For example, Labaton has served as lead counsel in a number of high profile matters: *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Securities Litigation*, Civil Action No. 08-397 (DMC) (JAD) (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 3-D.

### B.      Plaintiffs' Counsel's Request for Litigation Expenses

92.      Lead Counsel seeks payment from the Settlement Fund of $167,200.00 in litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.  The Notice informs the Settlement Class that Lead

1    Counsel will apply for payment of litigation expenses of no more than $230,000, plus interest at

2    the same rate earned by the Settlement Fund.  *See* Ex. 2-A at ¶¶5, 33.  The amounts requested

3    herein are well below this cap.  To date, no objection to Lead Counsel's request for expenses has

4    been raised.

5           93.    As set forth in the Fee and Expense Schedules, Plaintiffs' Counsel have incurred a

6    total of $167,200.00 in litigation expenses in connection with the prosecution of the Action.  *See*

7    Ex. 3-C and Ex. 4-C.  As attested to, these expenses are reflected on the books and records

8    maintained by each firm.  These books and records are prepared from expense vouchers, check

9    records, and other source materials and are an accurate record of the expenses incurred.  These

10   expenses are set forth in detail in Plaintiffs' Counsel's declarations, which identify the specific

11   category of expense—*e.g.*, online/computer research, experts' fees, travel costs, costs related to

12   mediation, duplicating, telephone, fax and postage expenses.

13          94.    A significant component of Plaintiffs' Counsel's expenses is the cost of a

14   consulting financial expert and an executive compensation expert, which totals $62,062.62 or

15   approximately 37% of total expenses.  The services of Lead Plaintiff's consulting damages

16   expert were necessary for preparing estimates of damages, analyzing loss causation issues, and

17   assisting with the preparation of the Plan of Allocation. Lead Plaintiff's executive compensation

18   expert was used to buttress Lead Plaintiff's scienter allegations in the Amended Complaint.

19          95.    Plaintiffs' Counsel were also required to travel in connection with this Action and

20   incurred costs related to working meals, lodging, and transportation, which total $52,501.36 or

21   approximately 31% of aggregate expenses.  This primarily included travel to court hearings and

22   for the mediation of the case, as well as working late hours.

23          96.    Computerized research totals $21,974.96 or approximately 13% of total expenses.

24   These are the charges for computerized factual and legal research services, including LexisNexis,

25   Westlaw, Thomson and PACER.  These services allowed counsel to perform media searches on

26   Extreme, obtain analysts' reports and financial data for Extreme, and conduct legal research.

27          97.    Lead Counsel also paid $6,021.10 (or approximately 4% of total costs) in

28   mediation fees assessed by the mediator in this matter.

1       98.     The other expenses for which Lead Counsel seeks payment are the types of

2  expenses that are necessarily incurred in litigation and routinely charged to clients billed by the

3  hour.  These expenses include, among others, duplicating costs, long distance telephone and

4  facsimile charges, filing fees, and postage and delivery expenses.

5       99.     All of the litigation expenses incurred, which total $167,200.00, were necessary to

6  the successful prosecution and resolution of the claims against Defendants.

7  **X.      LEAD PLAINTIFF'S REIMBURSEMENT PURSUANT TO THE PSLRA**

8       100.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Lead Plaintiff ATRS

9  seeks reimbursement of its reasonable costs and expenses (including lost wages) incurred in

10  connection with its work representing the class in the amount of $2,180.8.  The amount of time

11  and effort devoted to this Action by ATRS is detailed in the accompanying Declaration of Rod

12  Graves, attached hereto as Exhibit 1.  Lead Counsel respectfully submits that the amount

13  requested is consistent with Congress's intent, as expressed in the PSLRA, of encouraging

14  institutional investors to take an active role in commencing and supervising private securities

15  litigation.

16       101.    As discussed in the Fee Brief and in the Lead Plaintiff's declaration, ATRS has

17  been committed to pursuing the class's claims since it became involved in the litigation back in

18  2015.  As a large institutional investor, ATRS has actively and effectively fulfilled its obligation

19  as a representative of the class, complying with all of the many demands placed upon it during

20  the litigation and settlement of the Action, and providing valuable assistance to Lead Counsel.

21  Among other things, ATRS met with Lead Counsel and spoke with them on a regular basis to

22  discuss the status of the case and counsel's strategy for the prosecution, and eventual settlement,

23  of the case.  ATRS also reviewed pleadings and other material documents during the litigation.

24  Mr. Graves also attended the May 2016 hearing on ATRS's motion for appointment as lead

25  plaintiff.  Ex. 1 at ¶5.  These efforts required employees of ATRS to dedicate time and resources

26  to the Action that they would have otherwise devoted to their regular duties.

27

28

102.    The efforts expended by ATRS during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support the Lead Plaintiff's request for reimbursement.

## XI.    THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

103.    As mentioned above, consistent with the Preliminary Approval Order, a total of 27,710 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 25% of the Settlement Fund, and payment of expenses in an amount not greater than $230,000.  *See* Ex. 2 at ¶7.  Additionally, the Summary Notice was published in *Investor's Business Daily* and disseminated over *PR Newswire*.  *Id.* at ¶8.  The Notice and the Stipulation have also been available on the settlement website maintained by the Claims Administrator.  *Id.* at ¶10.[10]  While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date Lead Plaintiff has received no objections.  Lead Counsel will respond to any objections received in its reply papers, which are due June 6, 2019.

## XII.    MISCELLANEOUS EXHIBITS

104.    Attached hereto as Exhibit 7 is a true and correct copy of Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA Jan. 29, 2019).

105.    Attached hereto as Exhibit 8 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

## XIII.   CONCLUSION

106.    In view of the significant recovery to the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved

---

[10] Lead Plaintiff's motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

1   as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial

2   risks, the quality of work performed, the contingent nature of the fee, and the standing and

3   experience of Lead Counsel, as described above and in the accompanying memorandum of law,

4   Lead Counsel respectfully submits that a fee in the amount of 25% of the Settlement Fund be

5   awarded, that litigation expenses in the amount of $167,200.00 be paid, and that Lead Plaintiff

6   be awarded $2,180.80, pursuant to the PSLRA.

7

8        I declare under penalty of perjury that the foregoing is true and correct.  Executed on

9   May 9, 2019.

10

11                                     CAROL C. VILLEGAS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 9, 2019

*/s/ Carol C. Villegas*
Carol C. Villegas

1   **Electronic Mail Notice List**

2   **Mailing Information for a Case 5:15-cv-04883-BLF**

3   *Hong v. Extreme Networks, Inc.* **et al.**

4   **Electronic Mail Notice List**

5   The following are those who are currently on the list to receive e-mail notices for this case.

6   • **Eric J. Belfi**
7     ebelfi@labaton.com,kgutierrez@labaton.com,ElectronicCaseFiling@labaton.com,
      4076904420@filings.docketbird.com
8   • **Kenneth Joseph Black**
      KennyB@rgrdlaw.com
9   • **Alec T Coquin**
      acoquin@labaton.com,kgutierrez@labaton.com,7391740420@filings.docketbird.com,
10    electroniccasefiling@labaton.com
11  • **Jeffrey Dubbin**
      jdubbin@labaton.com,6415738420@filings.docketbird.com,kgutierrez@labaton.com,
12    mpenrhyn@labaton.com,echan-lee@labaton.com,electroniccasefiling@labaton.com
    • **Thomas A. Dubbs**
13    tdubbs@labaton.com,kgutierrez@labaton.com,1751297420@filings.docketbird.com,
      mpenrhyn@labaton.com,echan-lee@labaton.com,electroniccasefiling@labaton.com
14  • **Jonathan Gardner**
      jgardner@labaton.com,kgutierrez@labaton.com,cvillegas@labaton.com,
15    4027988420@filings.docketbird.com,ryamada@labaton.com,acoquin@labaton.com,
      fmalonzo@labaton.com,acarpio@labaton.com,agreenbaum@labaton.com
16  • **Louis J Gottlieb**
      lgottlieb@labaton.com,kgutierrez@labaton.com,5401845420@filings.docketbird.com,
17    electroniccasefiling@labaton.com
18  • **Elliot Schlesinger Katz**
      elliot.katz@dlapiper.com
19  • **Christopher J. Keller**
      ckeller@labaton.com,5497918420@filings.docketbird.com,kgutierrez@labaton.com,
20    drogers@labaton.com,electroniccasefiling@labaton.com
    • **Nicole Catherine Lavallee**
21    nlavallee@bermantabacco.com,ysoboleva@bermantabacco.com
22  • **Jeremy Alan Lieberman**
      jalieberman@pomlaw.com
23  • **Francis P McConville**
      fmcconville@labaton.com,kgutierrez@labaton.com,drogers@labaton.com,
24    9849246420@filings.docketbird.com,sjessee@labaton.com,
25    electroniccasefiling@labaton.com
26  • **Brian O. O'Mara**
      bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com
27  • **Jennifer Pafiti**
      jpafiti@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,
28    abarbosa@pomlaw.com,jpalazzolo@pomlaw.com

- **Aidan Chowning Poppler**
  cpoppler@bermantabacco.com,ysoboleva@bermantabacco.com
- **David Allen Priebe**
  david.priebe@dlapiper.com,margaret.austin@dlapiper.com,carmen.
  manzano@dlapiper.com,david-priebe-3844@ecf.pacerpro.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Wendy Tsang**
  wtsang@labaton.com,kgutierrez@labaton.com,1795730420@filings.docketbird.com,
  electroniccasefiling@labaton.com
- **Irina Vasilchenko**
  ivasilchenko@labaton.com,ElectronicCaseFiling@labaton.com,
  8032137420@filings.docketbird.com,KGutierrez@labaton.com
- **Carol C. Villegas**
  cvillegas@labaton.com,kgutierrez@labaton.com,5739893420@filings.docketbird.com,
  jchristie@labaton.com,acoquin@labaton.com,fmalonzo@labaton.com,
  acarpio@labaton.com,electroniccasefiling@labaton.com
- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com,
  kirstenb@rgrdlaw.com
- **Nicole Zeiss**
  zeiss@labaton.com,cboria@labaton.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).

- (No manual recipients)