UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SECURITIES LITIGATION | Case No. 15-cv-04883-BLF<br><br>**ORDER GRANTING LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; GRANTING LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**<br><br>[Re: ECF 172, 173] |

On June 27, 2019, the Court heard (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (Appr. Mot., ECF 172), and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses (Fees Mot., ECF 173). For the reasons discussed below and those stated on the record at the hearing on the motions, the motions are GRANTED.

**I.  BACKGROUND**

**A.  Facts**

This is a putative class action for securities fraud brought against Extreme Networks, Inc. ("Extreme") and its officers Charles W. Berger, John T. Kurtzweil, and Kenneth B. Arola ("Individual Defendants") (collectively with Extreme, "Defendants"). Founded in 1966, Extreme is a Delaware corporation with its principal offices in San Jose, California. *See* First Am. Compl. ("FAC") ¶ 2, 32, ECF 105. Extreme develops and sells network infrastructure equipment such as wired and wireless devices for accessing the Internet, as well as related software. *Id.* ¶ 2. The Individual Defendants were officers and directors of Extreme during the time relevant to this

litigation. Defendant Charles W. Berger was Extreme's President and Chief Executive Officer ("CEO") and a member of Extreme's Board of Directors from April 2013 until April 19, 2015. *Id.* ¶ 34. Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and Senior Vice President from June 29, 2012 until June 1, 2014. *Id.* ¶ 35. From June 2, 2014 until September 30, 2014, Kurtzweil served as Special Assistant to the CEO. *Id.* Defendant Kenneth B. Arola was the Company's CFO and Senior Vice President from June 2, 2014 through May 2016. *Id.* ¶ 36.

The First Amended Complaint ("FAC") alleges that Defendants misrepresented to investors the success of Extreme's post-acquisition integration with its former competitor, Enterasys Networks, Inc. ("Enterasys"), as well as developments in Extreme's "key partnership" with Lenovo Group Ltd. ("Lenovo"). *See, e.g.*, *id.* ¶¶ 1–18. Defendants' positive representations to investors about the resulting "synergies" from the Enterasys integration and benefits of the Lenovo partnership—including a commitment that cost savings from these arrangements would lead to double-digit revenue growth and a 10% operating margin by June 2015—caused Extreme's stock price to rise. *Id.* ¶¶ 17–19. Extreme's stock price then dropped when Extreme reported disappointing financial results at various points between February 2014 and the end of the Class Period on April 9, 2015. *Id.* ¶¶ 20–22.

Relying on six confidential witnesses ("CWs"), Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") alleged that Defendants knew or recklessly disregarded material adverse facts regarding the lack of any integration plan for the Enterasys merger, which was not "on track" or "complete" as represented. *Id.* ¶ 13. ATRS also pointed to accounts from CWs that the Lenovo partnership was largely unproductive, in direct contrast to Defendants' representations to the market. *Id.* ¶ 17. According to ATRS, Defendants' false statements caused Extreme's stock to trade at artificially inflated prices between September 12, 2013, and April 9, 2015 (the "Class Period"), reaching a high of $8.14 per share on January 23, 2014. *Id.* ¶ 19. ATRS alleges that four partial corrective disclosures by Defendants announcing revenue shortfalls, guidance misses, and turnovers of Extreme executives, caused the stock price to plummet as the undisclosed risks relating to Enterasys integration and Lenovo partnership

2

materialized. *Id.* ¶ 20–22.

Defendants have agreed to pay $7,000,000 in cash, to secure a settlement of the claims in the Action and related claims that could have been brought ("Released Claims").

### B. Procedural History

This litigation has a long history of nearly four years. In October of 2015, two securities class action complaints were filed on behalf of individuals who invested in Extreme during the relevant time period.[1] On December 1, 2015, the Court granted the parties' stipulation to consolidate the two actions. ECF 18. On June 28, 2016, the Court appointed ATRS as Lead Plaintiff, Labaton Sucharow LLP as Lead Counsel, and Berman DeValerio[2] as Liaison Counsel to represent the putative class. ECF 75.

On September 26, 2016, ATRS filed a Consolidated Class Action Complaint on behalf of all investors who purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock during the Class Period. *See* Consol. Compl. ¶ 1, ECF 87. Prior to filing the Consolidated Complaint, Lead Counsel conducted extensive factual investigation, including reviewing SEC documents, press releases, and other publicly available information, as well as reviewing research reports issued by financial analysts and other public data. Villegas Decl. ISO Final Appr. ("Villegas Decl.") ¶ 17, ECF 174. Lead Counsel also interviewed former employees of Extreme and other persons with relevant knowledge and consulted with an economics expert for loss causation and damages. *Id.* The Consolidated Complaint asserted two causes of action, based on the facts described above: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against all Defendants; and (2) violation of § 20(a) of the Securities Exchange Act of 1934 against the Individual Defendants for liability as control persons of Extreme. *See generally* Consol. Compl.

On November 10, 2016, Defendants moved to dismiss the Consolidated Complaint. *See* ECF 89. On April 17, 2017, the Court granted Defendants' motion with leave to amend because

---

[1] *See Hong v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04883-BLF, Compl., ECF 1 (Oct. 23, 2015); and *Kasprzak v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04975-BLF, Compl., ECF 1 (Oct. 29, 2015).
[2] Berman DeValerio has since been renamed Berman Tabacco.

3

1 ATRS had failed to adequately plead that Defendants made any false or misleading statements and
2 that they did so with scienter. *See* ECF 102 at 42. On May 29, 2017, ATRS filed its First
3 Amended Complaint, asserting the same two causes of action for securities violations against the
4 same Defendants, focusing their amended factual allegations on statements that the Court had
5 indicated were actionable. *See generally* FAC. Prior to filing the FAC, ATRS contacted 148
6 former employees of Extreme and interviewed 24 of those employees. Villegas Decl. ¶ 25. ATRS
7 also consulted with an expert in the field of executive compensation. *Id.* On July 10, 2017,
8 Defendants filed a motion to dismiss the FAC. *See* ECF 107. On March 21, 2018, the Court
9 granted in part and denied in part Defendants' motion to dismiss, finding that ATRS stated a claim
10 under Section 10(b) and Rule 10b-5 against all Defendants except Kurtzweil and that ATRS stated
11 a claim under Section 20(a) against the Individual Defendants. On June 21, 2018, more than one
12 and a half years after the Consolidated Complaint was filed and over two and a half years after the
13 lawsuit's inception, Defendants answered the FAC. *See* ECF 145.

The parties then engaged in some discovery, including numerous requests for production and interrogatories and their responses, as well as depositions. Lead Plaintiff served eighty-seven requests for the production of documents on Defendants on April 30, 2018. Villegas Decl. ¶ 33. Defendants served responses and objections to Lead Plaintiff's document requests on June 14, 2018. *Id.* The parties exchanged initial disclosures on May 21, 2018. *Id.* And the parties met and conferred extensively regarding the production of electronically stored information and a protective order governing the disclosures in the action. *Id.* ¶ 34.

Concurrently with discovery, the parties engaged in mediation and settlement discussions. On July 18, 2018, the parties attended an in-person mediation with Robert A. Meyer, Esq. ("Mr. Meyer"), an experienced mediator. *Id.* ¶¶ 35–36. The initial mediation was preceded by the exchange of mediation statements and Defendants' production of approximately 1,270 pages of documents, including Board of Director minutes and presentations, which Lead Counsel reviewed. *Id.* ¶¶ 36–37. Following rigorous arm's length negotiations led by Mr. Meyer, the parties accepted a mediator's proposal on August 17, 2018. *Id.* ¶ 38. On September 26, 2018, the parties entered into a settlement term sheet, and on November 30, 2018, ATRS filed the finalized settlement

4

agreement in support of its motion seeking preliminary approval of the settlement. *See* ECF 155, 156-1.

### C. Settlement Agreement, Allocation Plan, and Notice Plan

On March 13, 2019, the Court granted ATRS's motion for preliminary approval of class action settlement and approved the forms of notice to the Settlement Class. *See* ECF 167. The class includes "all persons and entities that purchased or otherwise acquired the publicly traded common stock and exchange-traded call options, and/or sold put options, of Extreme Networks, Inc. during the period from September 12, 2013 through April 9, 2015, inclusive, and who were damaged thereby." *See* ECF 156-1 ("Agreement") at 10 ¶ hh. Under the Settlement Agreement, Extreme has agreed to provide a settlement fund in the amount of $7 million. *See* Agreement at 10 ¶ gg, 13 ¶ 6. Of the $7 million, the Settlement Class will receive what remains after subtracting the cost of any attorney's fees and expenses, notice and administration costs, Lead Plaintiff's service awards, and applicable taxes (the "Net Settlement Fund"). Villegas Decl. ¶ 62; Agreement ¶ 26. The Net Settlement Fund will be distributed among claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to claimants' potential damages and developed by ATRS's expert. Settlement Agreement ¶¶ 22–26; Villegas Decl. ¶ 63; ECF 167 ¶¶ 48–57. Each claimant's calculated recognized loss will be compared to the aggregate recognized loss of all claimants to determine that claimant's *pro rata* share of the settlement fund. Villegas Decl. ¶ 64. Because the Court dismissed claims prior to February 5, 2014, but the class covers individuals who purchased shares prior to that date, those individuals' claims will be calculated using 20% of the alleged artificial inflation of the share prices. *Id.* ¶ 63.

The Court preliminarily approved, and the Settlement Administrator ("KCC") and the parties complied with, the following notice process: KCC obtained the names and addresses of potential settlement class members from listings provided by Extreme's transfer agent and from banks, brokers, and other nominees. Villegas Decl. ¶ 42; Villegas Decl., Ex. 2 ¶¶ 1–7, ECF 174-2. KCC sent by first-class mail notice packets (containing the notice and claim form) to settlement class members and potential nominees (third-party purchasers who may have purchased shares on behalf of potential claimants). Villegas Decl. ¶ 42; Villegas Decl., Ex. 2 ¶¶ 4–7. As of June 4,

2019, KCC had mailed 27,972 notice packets. Suppl. Decl. of Lance Cavallo ¶ 2, ECF 177. The summary notice was also published in *Investor's Business Daily* and disseminated over *PR Newswire*. Villegas Decl. ¶ 43. KCC also created and maintained a settlement website. Villegas Decl., Ex. 2 ¶ 10.

The Agreement (and approved notice plan) contemplates a process for direct payments to the class members. First, class members needed to submit by June 6, 2019 a simple claim form for their shares purchased during the class period. Villegas Decl. ¶ 61; ECF 167. The direct mail and website notices informed members of the opportunity to opt out through a simple form. Requests for exclusions or objections needed to be filed by May 23, 2019. Villegas Decl. ¶ 45; ECF 167. Once KCC has processed submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payment distributions will be made to eligible claimants through PayPal (for all payments below $10.00 and for payments between $10.00 and $100.00 for those who elect this option), or by check. Villegas Decl. ¶ 65. At least six months after the initial distribution of the funds, any funds remaining will be redistributed to those who have previously cashed their checks. *Id.* This process will be repeated until the remaining sum is no longer economically feasible to distribute. At that time, Lead Counsel will request with the Court that the unclaimed balance be distributed to a *Cy Pres* Recipient: Consumer Federation of America ("CFA"). *Id.* CFA is a national non-profit consumer advocacy organization for investor protection; it has been approved as a *Cy pres* beneficiary in several securities cases in California. *Id.* ¶ 66.

As of June 4, 2019, 1,244 valid claims had been submitted, representing over 66,777,000 shares of common stock purchased during the class period. Villegas Decl., Ex. 2 ¶¶ 5–6. Of those claims, 888 were filed by or on behalf of institutions and 356 claims were submitted by or on behalf of individuals. *Id.* ¶ 5.

On June 20, 2019, the Court held a hearing on the motions. Counsel represented on the record at the hearing that a total of 3,845 claims had been received, constituting a response rate of approximately 14 percent. Counsel also represented that of these claims, over 3,000 had been filed by or on behalf of institutions and approximately 400 by or on behalf of individuals. The

6

deadline to submit claims had passed, but Counsel was continuing to accept claims through an informal grace period. At the hearing, this Court ordered Lead Counsel to post by June 21, 2019 a firm grace period termination date of June 28, 2019 on the website maintained by KCC, and to accept only claims filed before that date as determined by postmark and email timestamp. Only two requests for exclusion were received by June 20, 2019, one of which was deemed invalid for failing to provide the requisite information and neglecting to cure the deficiency when notified by KCC that the exclusion request was invalid. Villegas Decl., Ex. 2 ¶ 3. There were no objectors before the deadline and no objectors appeared at the hearing. *Id.* Counsel represented on the record at the hearing that initial distribution was expected to commence in December 2019. The Court indicated on the record that both motions would be granted. On the day of the hearing, the Court issued an order approving the Plan of Allocation. ECF 180.

## II. MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

In order to grant final approval of the class action settlement, the Court must determine that (1) the class meets the requirements for certification under Federal Rule of Civil Procedure 23, and (2) the settlement reached on behalf of the class is fair, reasonable, and adequate. *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("Especially in the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement.").

### A. The Class Meets the Requirements for Certification under Rule 23

A class action is maintainable only if it meets the four requirements of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule—

those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

In addition to satisfying the Rule 23(a) requirements, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* at 614. Plaintiffs seek certification under Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Court concluded that these requirements were satisfied when it granted preliminary approval of the class action settlement. *See* ECF 167. The Court is not aware of any new facts which would alter that conclusion. However, the Court reviews the Rule 23 requirements again briefly, as follows.

Turning first to the Rule 23(a) prerequisites, the Court has no difficulty concluding that because the class contains thousands of members (3,845 claims filed as of the June 20, 2019 hearing), joinder of all class members would be impracticable. The commonality requirement is met because the key issues in the case are the same for all class members, including, for example, whether Defendants misrepresented material facts or omitted material facts for publicly traded stocks in violation of the law and whether these alleged actions artificially inflated the stock price. *See* Villegas Decl. ¶ 31. ATRS's claims are typical of those of the class, as it advances the same claims, shares identical legal theories, and allegedly experienced losses from Extreme's misrepresentations. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (typicality requires only that the claims of the class representatives be "reasonably co-extensive with those of absent class members"). Finally, to determine ATRS's adequacy, the Court "must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (internal quotation marks and citation omitted). The Court has no reservations regarding the

8

abilities of Class Counsel or their zeal in representing the class, and the record discloses no conflict of interest which would preclude ATRS from acting as class representative. *See* Villegas Decl. ¶¶ 4, 16, 101.

With respect to Rule 23(b)(3), the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The common questions in this case which would be subject to common proof include whether Defendants misrepresented material facts or omitted material facts for publicly traded stocks in violation of the law, whether Defendants had a duty to disclose alleged material omissions or acted with scienter, and whether the market price of Extreme's common stock during the class period was artificially inflated due to the alleged material omissions and/or misrepresentations. Villegas Decl. ¶ 31; *see generally* ECF 130. These questions predominate. Moreover, given this commonality, and the number of potential class members, the Court concludes that a class action is a superior mechanism for adjudicating the claims at issue.

Accordingly, the Court concludes that the requirements of Rule 23 are met and that certification of the class for settlement purposes is appropriate. Plaintiff Arkansas Teacher Retirement System is hereby appointed as class representative and Labaton Sucharow LLP is appointed class counsel.

### B. The Settlement is Fundamentally Fair, Adequate, and Reasonable

Federal Rule of Civil Procedure 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon,* 150 F.3d at 1026. In the Ninth Circuit, courts use a multi-factor balancing test to analyze whether a given settlement is fair, adequate and reasonable. That test includes the following factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026–27; *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (discussing *Hanlon* factors).

9

Recent amendments to Rule 23 require the district court to consider a similar list of factors before approving a settlement, including whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In the Advisory Committee notes to the amendment, the Advisory Committee states that "[c]ourts have generated lists of factors to shed light" on whether a proposed class-action settlement is "fair, reasonable, and adequate." Advisory Committee Notes to 2018 Amendments, Fed. R. Civ. P. 23(e)(2) ("2018 R23 Advisory Notes"). The notes of the Advisory Committee explain that the enumerated, specific factors added to Rule 23(e)(2) are not intended to "displace" any factors currently used by the courts, but instead aim to focus the court and attorneys on "the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*; *cf. United States v. Vonn,* 535 U.S. 55, 64 n.6 (2002) ("[T]he Advisory Committee Notes provide a reliable source of insight into the meaning of a rule . . . ."). Accordingly, the Court applies the framework set forth in Rule 23 with guidance from the Ninth Circuit's precedent, bearing in mind the Advisory Committee's instruction not to let "[t]he sheer number of factors" distract the Court and parties from the "central concerns" underlying Rule 23(e)(2).

Because this settlement occurs before formal class certification, the Court must also ensure that the class settlement is not the "product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F. 3d 935, 946–47 (9th Cir. 2011).

#### 1. Adequacy of Notice

"Adequate notice is critical to court approval of a class settlement under Rule 23(e). *Hanlon,* 150 F.3d at 1025. For the Court to approve a settlement, "[t]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco,* 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

The Court previously approved the parties' proposed notice procedures. *See* ECF 167. In the motion for final approval, ATRS states that it followed this approved notice plan. Appr. Mot. at 3. After determining the best way to contact potential members of the class, KCC mailed almost 28,000 notice packets to potential class members and nominees. Cavallo Suppl. Decl. ¶ 3. The notice informed the class members of all key aspects of the Settlement, hearings, and the process for objections. *Id.* In addition, the Court-approved summary notice was published in *Investor's Business Daily*, transmitted over *PR Newswire*, and posted on the dedicated website. Villegas Decl. ¶ 103; Villegas Decl., Ex. 2 ¶ 10. Class counsel represented at the hearing that this notice process resulted in approximately 14% of the potential class submitting claims. This response rate is substantial.

In light of these actions and the Court's prior order granting preliminary approval, the Court finds that the parties have provided sufficient notice to the class members. *See Lundell v. Dell, Inc.*, Case No. 05-3970 JWRS, 2006 WL 3507938, at *1 (N.D. Cal. Dec. 5, 2006) (holding that notice via email and first class mail constituted the "best practicable notice" and satisfied due process requirements).

#### 2. Rule 23(e)/*Hanlon* Factors

Turning to the Rule 23(e) factors, the Court first considers whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)–(B). These considerations overlap with certain *Hanlon* factors, such as the non-collusive nature of negotiations, the extent of discovery completed, and the stage of proceedings. *See Hanlon,* 150 F.3d at 1026.

As discussed above when certifying the class, the Court finds that both Lead Plaintiff and

Class Counsel have adequately represented the class. In its Preliminary Approval Order, the Court found no evidence of a conflict between class representatives or counsel and the rest of the class. ECF 167 ¶ 3. No contrary evidence has emerged. Similarly, the Court found that counsel has vigorously prosecuted this action through dispositive motion practice, extensive initial discovery, and formal mediation. *See* Villegas Decl. ¶¶ 3–39, 90–91. Counsel possessed sufficient information to make an informed decision about the settlement, and its preliminary approval motion included information regarding settlement outcomes of similar cases, further indicating that counsel had adequate information from which to negotiate the settlement. *See* 2018 R23 Advisory Notes. The Court finds that counsel has continued to represent the class diligently by complying with the notice plan and settlement procedures. *See* Villegas Decl. ¶¶ 40–45. ATRS likewise actively participated in the prosecution of this case, including reviewing filings and discovery, and attending and participating in settlement negotiations. *See* ECF 174-1. Thus, the Court finds the adequacy of representation weighs in favor of approval.

The Settlement was also the product of arm's length negotiations through mediation sessions and follow-up communications supervised by an experienced mediator. Villegas Decl. ¶¶ 35–36. Pursuant to Ninth Circuit precedent, the Court must examine the Settlement for additional indicia of collusion that would undermine a *prima facie* arm's length negotiation. Because the Settlement was reached prior to class certification, there is "greater potential for a breach of fiduciary duty owed the class during settlement," and the Court must examine the risk of collusion with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest." *In re Bluetooth,* 654 F.3d at 946. Signs of collusion may include (a) disproportionate distributions of settlement funds to counsel; (b) negotiation of attorney's fees separate from the class fund (a "clear sailing" provision); or (c) an arrangement for funds not awarded to revert to the defendants. *Id.* If multiple indicia of implicit collusion are present, the district court has a heightened obligation to assure that fees are not unreasonably high. *Id.* (quoting *Staton*, 327 F.3d at 965).

There is no evidence that the parties colluded here. Counsel's fee request is proportionate to the settlement fund, there is no clear sailing provision, and no funds revert to Defendants. *See generally* Agreement. Further, the Court finds that the requested fees are in fact reasonable, to be

12

discussed in greater detail below. This factor weighs in favor of approval.

Rules 23(e)(2)(C)–(D) specify factors for conducting a "substantive" review of the proposed settlement. The Court discusses each of the enumerated factors in turn.

### a. Strength of Plaintiffs' Case and Risk of Continuing Litigation

In assessing "the costs, risks, and delay of trial and appeal," Fed R. Civ. P. 23(e)(2)(C)(i), courts in the Ninth Circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial." *Hanlon*, 150 F.3d at 1026. The Court finds that ATRS faced significant obstacles in this case, including needing to survive multiple motions to dismiss that raised important and complicated issues. The class would have faced similar risks at trial. As set forth in ATRS's motion, these obstacles included challenges to the material falsity of each alleged misstatement, class certification challenges, loss causation and damages challenges, and the risks inherent in a "battle of the experts" of complex economic theories in a jury trial. Appr. Mot. at 6–14. Throughout the litigation and mediation, Defendants raised many substantive, potentially meritorious defenses to the claims; indeed, the Court narrowed the claims significantly through the motions to dismiss phase. *See* Villegas Decl. ¶¶ 46–60. Securities actions in particular are often long, hard-fought, complicated, and extremely difficult to win.

The Court finds this factor weighs in favor of approval.

### b. Effectiveness of Distribution Method, Terms of Attorney's Fees, and Supplemental Agreements

The Court must likewise consider "the effectiveness of [the] proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). The Court has already approved the Plan of Allocation and has determined that it is reasonable and effective. ECF 180. The "terms of [the] proposed award of attorney's fees," Fed. R. Civ. P. 23(e)(2)(C)(iii), are reasonable as discussed below. There are no supplemental agreements. This factor weighs in favor of approval.

### c. Equitable Treatment of Class Members

Rule 23 also requires consideration of whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)(i). Consistent with this instruction,

13

1    the Court considers whether the proposal "improperly grant[s] preferential treatment to class

2    representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078,

3    1079 (N.D. Cal. 2007) (citation omitted). Under the Agreement, class members who have

4    submitted timely claims will receive payments on a *pro rata* basis based on the value of their

5    original claim and the number of claims filed. Villegas Decl. ¶¶ 63–66. In granting preliminary

6    approval, the Court found that this proposed allocation did not constitute improper preferential

7    treatment. ECF 180. The Court adheres to its view that the allocation plan is equitable.

8    Moreover, the service award ATRS seeks is reasonable and does not constitute inequitable

9    treatment of class members. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir.

10   2009). This factor weighs in favor of approval.

### d. Settlement Amount

"The relief that the settlement is expected to provide to class members is a central concern," though it is not enumerated among the factors of Rule 23(e). 2018 R23 Advisory Notes. Thus, the Court considers "the amount offered in the settlement." *Hanlon,* 150 F.3d at 1026. Crucial to the determination of adequacy is the ratio of "plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware,* 484 F. Supp. 2d at 1080. However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628.

Here, the $7 million fund represents a substantial recovery for the class. Experts have calculated that the maximum potential damages in this action is $74 million to $140 million, with a recovery as low as $13 million to $36 million if Defendants' disaggregation arguments had succeeded. *See* Villegas Decl. ¶ 5. The gross settlement amount thus represents a recovery of between 5% and 9.5% of non-disaggregated damages and between 19% to 54% if disaggregated arguments are credited. *Id.* Other courts have found similar recoveries to be fair and reasonable. *See, e.g.*, *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419-MMD, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (finding 3.5% recovery to be within "the median

14

recovery in securities class actions settled in the last few years").

Accordingly, the amount of the settlement also weighs in favor of approval.

### e. Counsel's Experience

The Court also considers "the experience and views of counsel." *Hanlon,* 150 F. 3d at 1026. Labaton Sucharow has extensive experience representing plaintiffs in securities and financial class action lawsuits. *See generally* Villegas Decl., Ex. 3, ECF 174-3. That such experienced counsel advocate in favor of the settlement weighs in favor of approval.

### C. Objections

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted). Here, Class Counsel and the Court received zero objections. Cavallo Suppl. Decl. ¶ 3. Many potential class members are sophisticated institutional investors; the lack of objections from such institutions indicates that the settlement is fair and reasonable. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013); *In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004). Likewise, there were only two requests for exclusion, one of which KCC deemed invalid. *See id.* ¶ 3. This positive response from the class confirms that the settlement is fair and reasonable.

\* \* \*

Balancing the relevant factors, the Court finds the settlement fair and reasonable under Rule 23(e) and *Hanlon*.

### D. CONCLUSION

For the foregoing reasons, and after considering the record as a whole, the Court finds that notice of the proposed settlement was adequate, the settlement was not the result of collusion, and the settlement is fair, adequate, and reasonable.

Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation is GRANTED.

## III. MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES

ATRS seeks an award of attorneys' fees totaling $1.75 million, reimbursement of litigation costs and expenses in the amount of $167,200, and a service award of $2,180.80 for ATRS. The Court also considers the reasonableness of the Settlement Administrator's requested costs.

### A. Attorneys' Fees and Expenses

#### 1. Legal Standard

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. "Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to determine the reasonableness of attorneys' fees. *Id.* at 942.

Under the percentage-of-recovery method, the attorneys are awarded fees in the amount of a percentage of the common fund recovered for the class. *Id.* Courts applying this method "typically calculate 25% of the fund as the benchmark for a reasonable fee award, providing adequate explanation in the record of any special circumstances justifying a departure." *Id.* (internal quotation marks omitted). However, "[t]he benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.3d 1301, 1311 (9th Cir. 2011). Relevant factors to a determination of the percentage ultimately awarded include "(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." *Tarlecki v. bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009).

Under the lodestar method, attorneys' fees are "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate

16

documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. This amount may be increased or decreased by a multiplier that reflects factors such as "the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 942.

In common fund cases, a lodestar calculation may provide a cross-check on the reasonableness of a percentage award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002). Where the attorneys' investment in the case "is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable." *Id.* "Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted." *Id.* Thus even when the primary basis of the fee award is the percentage method, "the lodestar may provide a useful perspective on the reasonableness of a given percentage award." *Id.* "The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. . . . [Courts] may rely on summaries submitted by the attorneys and need not review actual billing records." *Covillo v. Specialtys Cafe*, No. C-11-00594-DMR, 2014 WL 954516, at *6 (N.D. Cal. Mar. 6, 2014) (internal quotation marks and citation omitted).

An attorney is also entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks and citation omitted).

**2. Discussion**

ATRS seeks an award of attorneys' fees totaling $1.75 million, which represents 25% of the $7 million gross Settlement Fund, as well as litigation expenses and costs in the amount of $167,200. *See* Fees Mot at 1.

Addressing expenses first, the Court does not hesitate to approve an award in the requested amount of $167,200. Class Counsel have submitted an itemized list of expenses by category of expense incurred through April 15, 2019, totaling $164,647.87, excluding Settlement Administration fees. *See* ECF 174-3, Ex. C. The Court has reviewed the list and finds the expenses to be reasonable.

The Court likewise is satisfied that the request for attorneys' fees is reasonable. Using the percentage-of-recovery method, the Court starts at the 25% benchmark. *See In re Bluetooth*, 654 F.3d at 942. ATRS requests 25%, given the exceptional results achieved, the risks of the litigation, the fine quality of Class Counsel's work, and the contingent nature of the fee. Courts have awarded comparable percentages in similar cases. *See* Villegas Decl.; *Destefano v. Zynga, Inc.*, No. 12-cv-04007-JSC, 2016 WL 537946, at *23 (N.D. Cal. Feb. 11, 2016) (25%); *Omnivision*, 559 F. Supp. 2d at 1049 (28%). As of April 15, 2019, Labaton Sucharow expended 5,778.7 hours litigating this action. Villegas Decl., Ex. 3 ¶ 6 & Ex. A. A lodestar cross-check confirms the reasonableness of the requested fees, which amounts to a 0.53 multiplier of the lodestar in the amount of $3,260,714.50. *Id.* Courts have found that "[m]ultipliers of 1 to 4 are commonly found to be appropriate in common fund cases." *Aboudi v. T-Mobile USA, Inc.*, No. 12-CV-2169-BTM, 2015 WL 4923602, at *7 (S.D. Cal. Aug. 18, 2015); *see also Petersen v. CJ Am., Inc.*, No. 14-CV-2570-DMS, 2016 WL 5719823, at *1 (S.D. Cal. Sept. 30, 2016) (awarding 1.12 multiplier and recognizing that "the majority of fee awards in the district courts in the Ninth Circuit are 1.5 to 3 times higher than lodestar"). Thus, a multiplier below 1.0 is below the range typically awarded by courts and is presumptively reasonable.

Lead Plaintiff's motion for attorneys' fees and expenses is GRANTED. ATRS is awarded expenses in the amount of $167,200 and attorneys' fees in the amount of $1.75 million.

### B. Incentive Award

Lead Plaintiff ATRS requests an incentive award in the amount of $2,180.80. The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(4), limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." Incentive awards "are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private

attorney general." *Rodriguez*, 563 F.3d at 958–59 (internal citation omitted).

"Incentive awards typically range from $2,000 to $10,000." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015). Service awards as high as $5,000 are presumptively reasonable in this judicial district. *See, e.g.*, *Camberis v. Ocwen Loan Serv. LLC*, Case No. 14-cv-02970-EMC2015 WL 7995534, at *3 (N.D. Cal. Dec. 7, 2015). ATRS's participation in this case was substantial and was essential to obtaining the considerable monetary recovery which will be enjoyed by each class member. *See* Villegas Decl., Ex. 1 ¶¶ 8–11. Two representatives of ATRS expended 25 hours supervising and participating in the litigation and their requested award is directly tied to their normal hourly rates. *Id.* ¶¶ 10–11. Given the amount of time and assistance ATRS put into the case and the success of the recovery, an incentive award in the amount of $2,180.80 is proportional to the class members' recoveries. *See Hayes v. MagnaChip Semiconductor Corp.*, No.14-cv-01160-JST, 2016 WL 6902856 at *10 (N.D. Cal. Nov. 21, 2016) (noting that $5,000 incentive awards are presumptively reasonable in the 9th Circuit); *In re Am. Apparel S'holder Litig.*, No. CV 10-06352 MMM, 2014 WL 10212865, at *34 (C.D. Cal. July 28, 2014) (awarding an incentive award of $6,600 in a securities class action).

The Court concludes that the requested $2,180.80 incentive award is appropriate in this case.

### C. Settlement Administrator Costs

The Court also holds that it is appropriate to award KCC its costs. In its preliminary approval order, the Court held that Lead Counsel may pay KCC its costs in an amount not to exceed $500,000. *See* ECF 167 ¶ 20. To date, ATRS has not submitted evidence regarding the total final costs requested by KCC. Given the somewhat complex nature of the allocation plan, the Court approves the awarding of costs to KCC in an amount not to exceed $500,000 subject to ATRS submitting an accounting of such costs with a request that the Court approve the final amount. ATRS shall submit such a request by administrative motion **within 14 days of KCC's final accounting**. If KCC does not reach this cap, the excess funds shall be distributed to the class claimants according to the provisions of the Agreement if practicable or distributed through *Cy Pres*.

## IV. ORDER

For the reasons discussed above,

(1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation is GRANTED; and

(2) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses is GRANTED. ATRS is awarded attorneys' fees in the amount of $1.75 million, costs and expenses in the amount of $167,200, and a service award in the amount of $2,180.80.

(3) The Settlement Administrator costs are APPROVED in an amount not to exceed $500,000.

Without affecting the finality of this Order and accompanying Judgment in any way, the Court retains jurisdiction over (1) implementation and enforcement of the Settlement Agreement until each and every act agreed to be performed by the parties pursuant to the Settlement Agreement has been performed; (2) any other actions necessary to conclude the Settlement and to administer, effectuate, interpret, and monitor compliance with the provisions of the Settlement Agreement; and (3) all parties to this action and Settlement class members for the purpose of implementing and enforcing the Settlement Agreement. Within 21 days after the distribution of the settlement funds and payment of attorneys' fees, the parties shall file a Post-Distribution Accounting in accordance with this District's Procedural Guidance for Class Action Settlements. The parties must seek approval from the Court for any *Cy Pres* distributions.

**IT IS SO ORDERED.**

Dated: July 22, 2019

_____
BETH LABSON FREEMAN
United States District Judge